## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x

STARR INVESTMENTS CAYMAN II, INC.,   :

                     Plaintiff,   :

         – *versus* –   :        **Case No.**

                         :

CHINA MEDIAEXPRESS HOLDINGS, INC.,   :   **Jury Trial Demanded**
DELOITTE TOUCHE TOHMATSU,   :
ZHENG CHENG, and   :
JACKY LAM,   :

               Defendants.   :

-------------------------------------------------------x

## COMPLAINT

Plaintiff Starr Investments Cayman II, Inc. ("Starr"), by its undersigned counsel, alleges as and for its complaint against Defendants China MediaExpress Holdings, Inc. ("CCME"), Deloitte Touche Tohmatsu ("DTT"), Zheng Cheng, and Jacky Lam (collectively "Defendants"), with knowledge of Starr's own acts and acts taking place in its presence, and upon information and belief as to all other matters:

## SUMMARY OF THE ACTION

1.   This action for declaratory relief and damages arises out of CCME's repeated and systemic violations of the securities laws and regulations and its fraudulent inducement of hundreds of millions of dollars of investments by and through Defendants Zheng Cheng, Jacky Law, and DTT to accomplish an international fraud on the market in both the United States and China.

2.   Starr was fraudulently induced into purchasing approximately 1.5 million common shares of CCME then worth roughly $13.5 million on October 18, 2010 as a direct result of: (1) Defendants affirmative misrepresentations of the nature and extent of their business

{BMF-W0242581.}

relationships; (2) Defendants intentional misrepresentations regarding the size of the bus advertising market in China; (3) Defendants Jacky Lam and DTT's willful, negligent, and reckless disregard for Generally Accepted Accounting Standards ("GAAS") and Generally Accepted Accounting Principles ("GAAP") in the publication of the Company's financial results to the Securities and Exchange Commission and the public at large that; (4) as a result, significantly overstated the Company's financial results in the period leading up to the purchase of shares; and (5) Defendants knowingly and intentionally deceived investors, including Starr, as a result of these actions, to invest in CCME, a Company whose business model, operations, and management were intrinsically overvalued as a result of these actions.

3. Since the beginning of the year, media reports of Defendants misrepresentations have been widespread, with some referring to the entire corporate enterprise as a "fraud." Most recently, CCME has had the following significant business disruptions: (1) On March 11, 2011, CCME stock trading was halted on NASDAQ; (2) on that same day, CCME's auditor DTT resigned, stating according to public reports that it "was no longer able to rely on the representations of management," and concluding that the issues it raised "may have adverse implications for the prior periods' financial reports"; (3) on March 13, 2011, Jacky Lam, Chief Financial Officer of CCME resigned; and (4) on March 16, 2011, CCME Board member and Starr representative Dorothy Dong resigned due to management's failure to take steps to protect the corporate entity and noting "irregularities concerning the bank account balances for CCME's PRC subsidiaries". Without a single affirmative public statement to quell or disavow the maelstrom of media reports that the entire Company is a fraud of epic proportions and with no evidence of management action to contradict these reports, the overwhelming conclusion is that Defendants have and continue to perpetuate a fraud on the market.

{BMF-W0242581.}

2

## II. **THE PARTIES**

4.   Plaintiff Starr Investments Cayman II, Inc. is a Cayman corporation.  It purchased 1.5 million common shares of CCME on October 18, 2010.  Prior to that investment and during the period thereafter, Starr evaluated market information necessary to purchase said securities, are referred to in this complaint.

5.   Defendant China MediaExpress Holdings, Inc. is a Delaware corporation with its principal executive offices situated at Room 2805, Central Plaza, Wan Chai, Hong Kong.  The Company, through its subsidiaries and its variable interest entity, purports to operate the largest television advertising network on inter-city and airport express buses in China.  The Company generates revenue by selling advertisements on a network of television displays installed on express buses originating in eighteen of China's regions, including the four municipalities of Beijing, Shanghai, Tianjin and Chongqing, and fourteen regions including Guangdong, Jiangsu, Jiangxi, Fujian, Sichuan, Hebei, Anhui, Hubei, Shandong, Shanxi, Inner Mongolia, Zhejiang, Hunan and Henan.  CCME shares trade on the NASDAQ under the symbol "CCME."

6.   Defendant Deloitte Touche Tohmatsu in Hong Kong SAR is a Hong Kong independent legal entity that is a member of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee.  DTT provides audit, accounting, financial advisory, tax, and risk management services.  On December 4, 2009, CCME engaged DTT to serve as its independent auditor.  DTT served in that capacity accessing and reviewing corporate materials for fiscal years 2009 and 2010, until March 11, 2011.  DTT also signed the audit statements incorporated into CCME's 2009 10-K with the U.S. Securities and Exchange Commission.

7.   Defendant Zheng Cheng is Chairman, Chief Executive Officer (CEO), and President of CCME.  He is the founder of CCME and the largest shareholder in the Company.  Because of

{BMF-W0242581.}

3

Cheng's positions with the Company, he possessed the power and authority to control the contents of CCME's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Mr. Cheng was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his positions and access to material non-public information available to him, Cheng knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. Mr. Cheng signed all relevant SEC filings.

8. Defendant Jacky Lam was during the entire relevant period and until March 13, 2011 Chief Financial Officer (CFO) of CCME. Because of Mr. Lam's position with the Company, he possessed the power and authority to control the contents of CCME's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Mr. Lam was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his positions and access to material non-public information available to him, Lam knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. Mr. Lam signed all relevant SEC filings.

{BMF-W0242581.}

4

9.   Both Defendants Cheng and Lam own a significant number of shares of CCME and have benefitted from the sale of shares and inflated market price of the shares as a result of the misrepresentations and omissions at issue.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.1 Ob-5) and the common law of Delaware.

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 139l(b).  Defendant CCME is a Delaware corporation, and Defendants Zheng Cheng and Jacky Lam are officers and directors of CCME.  Defendant DTT is CCME's independent auditor and provided the financial audit incorporated into CCME's 2009 10-K.

13. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## FACTUAL BACKGROUND

### *Starr's Initial Investment*

14.   In 2009, Starr and CCME began discussing a potential investment by Starr in CCME.  During those discussions and in subsequent due diligence, CCME management represented CCME to be a highly successful, reputable and profitable media and advertising company, with extensive operations throughout the PRC.

{BMF-W0242581.}

5

15.     On January 12, 2010, after negotiations between the parties, Starr, CCME and

others entered into a Share Purchase Agreement (the "SPA"). Under the SPA, which is governed

by Delaware law, Starr agreed to purchase, for an aggregate amount of US$30 million, the

following securities:

(a)     1,000,000 shares of Series A Convertible Preferred Stock of CCME (defined as
        "Purchased Shares"); and

(b)     warrants to purchase 1,545,455 shares of Common Stock of CCME at a price of
        $6.47 per share (defined as "Purchased Warrants").

16.     The transactions contemplated by the SPA were duly closed on January 28, 2010

(the "Closing"). Upon that date, the parties executed various documents memorializing their

relationship, including an Investors Rights Agreement (the "IRA") (guaranteeing certain

shareholder, board representation and other rights for Starr) and certain certificates

memorializing the terms of the Purchased Shares and the Purchased Warrants.

17.     Pursuant to the IRA, Starr was entitled to designated one member for election to

the Board of Directors of CCME.

18.     CCME made numerous representations and warranties to Starr in the SPA, many

of which have been breached by the events described further below. The SPA contains an

express arbitration provision obligating the parties to arbitrate any claims relating to the SPA in

Hong Kong. On March 17, 2011, Starr commenced an arbitration in Hong Kong seeking to

recover for CCME's breaches of the SPA consistent with the terms of the SPA. These claims are

therefore not the subject of this action.

### *Material Misstatements*

19. Defendant CCME purports to operate the largest television advertising network on

inter-city and airport express buses in China. The Company claims to generate revenue by

{BMF-W0242581.}

6

selling advertisements on a network of television displays installed on more than 27,200 express buses originating in eighteen of China's most prosperous regions.

20.    On March 23, 2010, CCME issued a press release announcing its fourth quarter and 2009 full-year results.  In the press release, CCME stated in part:

Financial Highlights – Fourth Quarter 2009 vs. Fourth Quarter 2008

* Revenue increased by 90.6% to $32.0 million in the fourth quarter of 2009 as compared to $16.8 million in the same quarter of 2008;
* Gross margin for fourth quarter was 68.9%;
* Income from operation increased by 104.7% to $19.5 million in the fourth quarter of 2009 as compared to $9.5 million in the same quarter of 2008; and
 * Net income increased by 99.6% to $14.3 million in the fourth quarter of 2009 compared to $7.2 million in the same quarter of 2008.

Financial Highlights – Full Year 2009 vs. Full Year 2008

* Revenue increased 52.3% to $95.9 million in 2009 as compared to $63.0 million in 2008;
* Gross margin for year ended December 31, 2009 was 65.7%;
* Income from operation increased by 61.3% to $56.6 million in 2009 as compared to $35.1 million in 2008;
* Net income increased by 58.2% to $41.7 million in 2009 as compared to $26.4 million in 2008; and
* As of December 31, 2009, the Company had $57.2 million in cash.

*          *          *

He added, "Our network has grown with the signing of several new agreements with bus operators. As of today, our network includes 49 bus operator partners, up from 46 at the end of November; these agreements run from three to eight years. The total number of buses equipped with our television systems is now over 21,000, increasing approximately by more than 1,000 buses since the end of November."

Mr. Cheng continued, "Our successful platform, the large and growing network of bus operators partners, the wide geographic coverage and our competitive advertising rates, continue to attract a large number of international and national brands to our advertising network. More than 450 advertisers have purchased time on our network either through advertising agents or directly from us. Our growing clientele includes local brand names as well as well-known international and national brands such as Coca Cola, Pepsi, Wahaha, KFC, Siemens, Hitachi, Haier,

{BMF-W0242581.}

7

China Telecom, China Mobile, Nokia, China Post, Procter & Gamble, Bank of China, China Constructing Bank and China Pacific Life Insurance.

21. CCME went on to state:

Based on the current customer base, geographic coverage, network of express buses and existing revenue streams, CME's management projects that its 2010 net income (non-GAAP which is before share based compensation or fair value adjustments for the Company's financial instruments), will be in the range of $71 million to $75 million. These projections exclude the impact of any possible acquisitions, additional of new buses and new investments in other media projects in 2010."

22. On March 31, 2010, CCME's form 10-K filed with the SEC for the fiscal year ended

December 31, 2009, describes CCME's business and operations in relevant part as follows:

**Business Summary**

*Overview*

    CME, through contractual arrangements with Fujian Fenzhong, an entity majority owned by CME's majority shareholder, operates the largest television advertising network on inter-city express buses in China. All references in this Report to "CME's advertising network", "CME's customers", CME's operations in general and similar connotations, refer to Fujian Fenzhong, an entity which is controlled by CME through contractual agreements and which operates the advertising network. While CME has no direct equity ownership in Fujian Fenzhong, through the contractual agreements CME controls the activities and receives the economic benefits of Fujian Fenzhong's operations.  CME generates revenue by selling advertising on its network of television displays installed on inter-city express buses in China. As of July 31, 2008, CME's advertising network accounted for 81% of all inter-city express buses installed with hard disk drive players, and 55% of all inter-city express buses installed with any type of television display, according to CTR Market Research. CME commenced its advertising services business in November 2003 as one of the first participants in advertising on inter-city express buses in China. CME believes its early entry into this business has enabled them to achieve an audience reach that is highly attractive to advertisers.

    CME's extensive and growing network covers inter-city express bus services originating in China's most prosperous regions. As of December 31, 2009, CME's network covered inter-city express bus services originating in fourteen regions, including the five municipalities of Beijing, Shanghai, Guangzhou, Tianjin and Chongqing and nine economically prosperous provinces, namely Guangdong, Jiangsu, Fujian, Sichuan, Hubei, Anhui, Hebei, Shandong and Shanxi. These fourteen regions in aggregate generated more than half of China's gross domestic product, or GDP, in 2007, according to the National Bureau of Statistics of China. CME's network is capable of reaching a substantial and growing audience. In the first seven months of 2008, a monthly average of 53 million

passengers traveled on inter-city express buses within CME's network, representing 57% of all passengers traveling on inter-city express buses installed with television displays in China, according to CTR Market Research. Many of the cities connected in CME's network are major transportation hubs, which serve as points of transfer for large numbers of leisure, business and other travelers in China to other modes of transportation. CME's network also includes airport buses connecting major cities to airports and tour buses traveling on routes that connect major cities with popular tourist destinations in China. As of December 31, 2009, CME's network covered all of the transportation hubs designated by the Ministry of Transport, and CME expects to further increase this percentage as it continues to expand the geographic coverage of its network. In addition to major transportation hubs, the network also covers small to medium-sized cities in China, some of which rely on highway transportation as the primary transportation option for connection outside these cities.

CME has entered into long-term framework agreements with 45 bus operator partners for terms ranging from five to eight years. Pursuant to these agreements, CME pays the bus operators concession fees for the right to install its displays and automated control systems inside their buses and display entertainment content and advertisements. CME's entertainment content is provided by third parties and advertisements provided by its clients. CME obtains a wide range of free entertainment content from Fujian SouthEastern Television Channel and Hunan Satellite Television each month and purchases a limited amount of copyrighted programs from the Audio and Video Publishing House of Fujian Province. As of December 31, 2009, the number of inter-city express buses within CME's network is 20,161.

In October 2007, CME entered into a five-year cooperation agreement with Transport Television and Audio-Video Center, or TTAVC, an entity affiliated with the Ministry of Transport of the People's Republic of China, to be the sole strategic alliance partner in the establishment of a nationwide in-vehicle television system that displays copyrighted programs on buses traveling on highways in China. The cooperation agreement also gave CME exclusive rights to display advertisements on the system. In November 2007, TTAVC issued a notice regarding the facilitation of implementation of the system contemplated under the cooperation agreement to municipalities, provinces and transportation enterprises in China. CME believes its status as the sole strategic alliance partner designated by TTAVC and the exclusive rights to display advertisements on the system has facilitated its historical expansion and is expected to continue to provide them with a competitive advantage in the future.

CME believes its network is a highly effective advertising medium. The network is capable of reaching audiences on inter-city express buses while they remain in a comfortable and enclosed environment with minimal distraction. The majority of the inter-city express buses within the network are equipped with leather seats and air-conditioning, providing a comfortable environment which makes the audiences more receptive to the content displayed on CME's network. Inter- city travel in China typically takes a number of hours. Audiences are therefore exposed to the content displayed on its advertising platform for a significantly longer period of time than on shorter-distance

travel. In addition, CME's patented automated control systems ensure that the programs and advertisements are displayed continuously throughout the journey.

23. The 2009 10-K states that CCME had total revenues of $63.0 million in 2008, and $95.9 million in 2009.

24. The same 10-K states that CCME had gross profits of $37.9 million in 2008, and $63.0 million in 2009.

25.    CCME's Form 10-K also includes a copy of a Report of Independent Registered Public Accounting Firm signed by DTT.  DTT's report indicates that they "have audited the accompanying balance sheet" of CCME as of December 31, 2009 and concludes:

> In our opinion, such consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Group as of December 31, 2009, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the Untied States of America.  Also, in our opinion, such financial statements schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

26.    CCME's Form 10-K contains certifications signed by CCME's Chief Executive Officer and Chief Financial Officer as required by Sarbanes-Oxley, attesting, among other things, that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

27.    On May 14, 2010, CCME announced "Strong First Quarter Financial Results," disclosing in part:

> China MediaExpress Holdings, Inc. (NYSE Amex: CCME) ("CCME" or "Company"), China's largest television advertising operator on inter-city express buses, today announced financial results for the first quarter ended March 31, 2010.

Financial Highlights − First Quarter 2010 vs. First Quarter 2009

* Revenue increased by 137% to $44.5 million as compared to $18.8 million;
* Gross margin for first quarter was 60%;
* Income from operations increased by 130% to $24.2 million as compared to $10.5 million;
* Net income increased by 143% to $18.1 million as compared to $7.5 million; and,
* As of March 31, 2010, the Company had more than $114.4 million in cash.

Zheng Cheng, CCME's Founder and CEO, commented, "We started 2010 on a very strong note with record revenue and net income. Our revenue and net income for the quarter grew by 39% and 27% respectively when compared to the 2009 fourth quarter. Basic and diluted earnings per share in the first quarter of 2010 was $0.28 and $0.27, respectively (after a one-time charge of $9,242,000 related to a deemed dividend on the issuance of our convertible preferred stock in the first quarter); excluding this deemed dividend, the income attributable to holders of common shares (non-GAAP net income) would be $18,142,000 and the basic and diluted earnings per share would have been $0.58 and $0.54, respectively."

*          *          *

Mr. Cheng continued, "Our network continues to grow through new agreements with bus operators and currently includes 49 bus operator partners, up from 46 at the end of 2009. The number of buses equipped with our television systems is now over 21,500. The growing network has attracted more than 450 advertisers either through advertising agencies or directly from us. Our clientele includes Hitachi, China Telecom, Toyota, Siemens and China Pacific Life Insurance, which have purchased advertising time from CME for more than three years; and many other well-known international and national brands including Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance."

28. The May 14, 2010 press release continued to state:

Based on the current customer base, geographic coverage, network of express buses and existing revenue streams, CME's management reaffirms its 2010 net income guidance which is expected to be in the range of $71 million to $75 million (on a non-GAAP basis, exclusive of share based compensation in connection with the share incentive plan which is expected to be adopted and with options to be granted in the 2nd or 3rd quarter of 2010 or deemed dividend on issuance of convertible preferred shares). As previously announced, these projections exclude the impact of any possible acquisitions, additional of new buses and new investments in other media projects in 2010."

29.    Also on May 14, 2010, CCME filed its Form 10-Q with the SEC reflecting its financial results for the quarter ended March 31, 2010. Again, CCME reported positive financial results and represented its business to be performing well. The Condensed Consolidated Statements of Cash Flows contained in the Form 10-Q reflected net income for the period ended March 31, 2010 of $18.1 million, compared with $7.4 million for the same period in 2009.

30.    CCME's Form 10-Q contains certifications signed by CCME's Chief Executive Officer and Chief Financial Officer as required by Sarbanes-Oxley, attesting, among other things, that "Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report."

31.    On July 12, 2010, CCME issued a press release touting its improved financial forecasts:

> Fujian, China - July 12, 2010 - China MediaExpress Holdings, Inc. (NASDAQ GS: CCME) ("CCME" or "Company"), China's largest television advertising operator on inter-city and airport express buses, today announced that based on the latest developments, including the expanded geographic coverage, increased number of inter-city buses, and higher margins from the airport express buses platform, it is revising its 2010 net income guidance.

> The revised guidance calls for 2010 net income to be in the range of $82 million to $85 million (on a non-GAAP basis, exclusive of non-cash charges for (i) share based compensation in connection with grants under the Company's share incentive plan expected to be adopted later in 2010 and (ii) deemed dividends on outstanding convertible preferred shares), compared to the initial 2010 net income guidance of $71 million to $75 million.

> Jacky Lam, CME's Chief Financial Officer stated, "Our revised 2010 net income guidance reflects the continued growth of our business from existing revenue sources, and excludes the impact of any possible acquisitions, additional new buses, new revenue streams and any new investments in other media projects in 2010.

{BMF-W0242581.}

"We expect to continue to benefit from China's rapid increase in advertising spending - which is projected to remain one of the fastest growing advertising markets in the world - sustained economic growth, and increases in disposable income and domestic consumption. We plan to continue to grow our business organically and we are also actively looking for acquisition opportunities within our core business platform. Furthermore, we are working hard to finalize several new projects which we believe will further enhance CME's shareholder value. We have sufficient resources to fund our business expansion plans, including internal growth initiatives as well as potential acquisitions."

32.     On August 13, 2010, CCME announced "Record Second Quarter Financial

Results." Specifically, CCME issued a press release touting:

* Revenue increased by 180% to $53.5 million as compared to $19.1 million;
* Gross margin for the current second quarter was 79% as compared to 62%
* Income from operations increased by 245% to $38.3 million as compared to $11.1 million; and
* Net income increased by 244% to $28.5 million or $0.80 per diluted share as compared to $8.3 million or $0.40 per diluted share.

First Half 2010 vs. First Half 2009

* Revenue increased by 159% to $98.0 million as compared to $37.9 million;
* Gross margin for the current first half period was 70% as compared to 62%;
* Income from operations increased by 189% to $62.5 million as compared to $21.6 million;
* Net income increased by 196% to $46.6 million or $1.07 per diluted share as compared to $15.7 million or $0.75 per diluted share; and
* As of June 30, 2010, the Company had more than $139 million in cash.

                    *          *          *

Mr. Cheng continued, "From January 2010 to now, we have grown our network by approximately 3,000 express buses to more than 23,200 express buses and we have long-term contracts in place, ranging from three to eight years with 61 bus operators."

Mr. Cheng noted, "Our clientele continues to grow and includes prestigious clients such as Hitachi, China Telecom, Toyota, Siemens, China Pacific Life Insurance (all of which have purchased advertising time from CME for more than three years), Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance. In 2010, our clientele was expanded to include prestigious names such as Wrigley, Bank of Communication and Callreta D."

33. CCME went on to announce:

The Company reaffirms its recently revised 2010 net income guidance which is expected to be in the range of $82 million to $85 million (on a non-GAAP basis, exclusive of non-cash charges for (i) share based compensation in connection with the granting of options under the Company's share incentive plan expected to be adopted later in 2010 and (ii) deemed dividends on outstanding convertible preferred shares). Again, these projections exclude the impact of any possible acquisitions, additional of new buses and new investments in other media projects in 2010.

34.     Also on August 13, 2010, CCME filed its Form 10-Q with the SEC reflecting its financial results for the quarter ended June 30, 2010. As with the prior filings, this Form 10-Q reflected continued positive performance by CCME. Among other things, the Form 10-Q reflected net income of $46.4 million for the six months ended June 30, 2010, compared with $15.7 million for the same period in 2009.

35.     CCME's Form 10-Q contains certifications signed by CCME's Chief Executive Officer and Chief Financial Officer as required by Sarbanes-Oxley, attesting, among other things, that "Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report."

36.     CCME also held a conference call with investors on August 13, 2010. CCME's management continued to portray CCME as realizing strong financial results.

37.     On September 17, 2010, CCME announced that a share repurchase program had been approved by its board of directors. Among other things, the September 17 press release announced:

Mr. Zheng Cheng, CCME's Chairman and Chief Executive Officer, noted, "CCME has a strong balance sheet. Our Board of Directors believes that the current share price of our common stock does not reflect the Company's fair

{BMF-W0242581.}

14

value. The share repurchase program represents a good use of a portion of our cash position, is an attractive investment opportunity for CCME and its shareholders and is consistent with our commitment to enhance stockholder value."

38.     CCME's statements described above were materially false and/or misleading when made because CCME failed to disclose or indicate that its financial results were materially overstated as were its statements regarding the size and success of its business operations, including, without limitation, statements regarding the number of buses in its network.

<u>*Starr Purchases Additional Securities Based on CCME's Representations*</u>

39.     Based on the foregoing false and misleading representations made by CCME to the market that CCME was performing well, Starr acquired additional shares of CCME stock. Absent such false and misleading statements, Starr would not have acquired additional CCME stock and/or would not have paid the price it did for the CCME stock.

40.     Specifically, on October 12, 2010, Starr entered into a Share Sale Agreement with Bright Elite Management Limited, a company organized under the laws of the British Virgin Islands and wholly owned by Qingping, a founder of CCME, to purchase 500,000 shares of CCME stock at $9 per share.

41.     Also on October 12, 2010, Starr entered into a Share Sale Agreement with Thousand Space Holdings Limited, a company organized under the laws of the British Virgin Islands and wholly owned by Ou Wen, a founder of CCME, to purchase 1,000,000 shares of CCME stock at $9 per share.

42.     Thus, based on the positive financial and business information provided by CCME to the market and directly to Starr, Starr expended $13.5 million to acquire 1.5 million shares of CCME stock.

43.    Following Starr's acquisition of these shares, CCME acknowledged Starr's

reliance on the continuing performance of CCME, stating in a press release issued on October

13, 2010:

> Fujian, China – October 13, 2010 – China MediaExpress Holdings, Inc.
> (NASDAQ GS: CCME) ("CCME" or "Company"), China's largest television
> advertising operator on inter-city and airport express buses, today announced that
> Starr International Company, Inc. ("Starr International"), through its wholly-
> owned subsidiary, Starr Investments Cayman II, Inc. ("Starr Cayman"), has
> agreed to purchase an aggregate of 1.5 million shares of the Company's common
> stock in two private transactions. Mr. Ou Wen Lin and Mr. Qing Ping Lin, two of
> CCME's founding shareholders, through their holding companies, Thousand
> Space Holdings Limited and Bright Elite Management Limited have agreed to sell
> 1,000,000 and 500,000 shares of the Company's common stock, respectively, to
> Starr International at $9 per share. Although the agreement was signed after the
> Chinese Golden Week holiday, it has been under discussion between the parties
> since the middle of September, and the selling price was based on CME's average
> closing trading prices for that month. It is CME's understanding that Mr. Ou Wen
> Lin and Mr. Qing Ping Lin intend to use proceeds from the stock sale to finance
> their other personal business projects that are unrelated to CME.
>
> Starr International is one of the major investors in CCME, having invested,
> through Starr Cayman, $30 million in January 2010 in the form of 1,000,000
> shares of CME Series A Convertible Preferred Stock at $30.00 per share, together
> with 1,545,455 of CCME common stock purchase warrants.
>
> Mr. Zheng Cheng, CME's Chairman and Chief Executive Officer, noted, "We are
> pleased that Starr International increased its investment in CME, which is
> indicative of their continued confidence in our business plan and growth
> prospects. This transaction is also an indication that Starr International views its
> investment in CME as a very sound long-term investment for the firm and its
> investors. We are glad that the Ou Wen Lin and Qing Ping Lin were able to
> satisfy their personal liquidity requirements while meeting Starr International's
> investment objectives in a manner consistent with our understanding of their
> intention to avoid sales into the public market."
>
> CME, through contractual arrangements with Fujian Fenzhong, an entity majority
> owned by CME's former majority shareholder, operates the largest television
> advertising network on inter-city and airport express buses in China. While CME
> has no direct equity ownership in Fujian Fenzhong, through the contractual
> agreements CME receives the economic benefits of Fujian Fenzhong's operations.
> Fujian Fenzhong generates revenue by selling advertisements on its network of
> television displays installed on over 24,400 express buses originating in eighteen
> of China's most prosperous regions, including the four municipalities of Beijing,

Shanghai, Tianjin and Chongqing and fourteen economically prosperous regions, namely Guangdong, Jiangsu, Jiangxi, Fujian, Sichuan, Hebei, Anhui, Hubei, Shandong, Shanxi, Inner Mongolia, Zhejiang, Hunan and Henan.

44.    On November 8, 2010, CCME issued a press release titled, "China MediaExpress Holdings, Inc. Announces Third Quarter Financial Results." Therein, the Company, in relevant part, stated:

China MediaExpress Holdings, Inc. (NASDAQ GS: CCME) ("CCME" or "Company"), China's largest television advertising operator on inter-city and airport express buses, today announces financial results for the three and nine months ended September 30, 2010.

**Third Quarter 2010 vs. Third Quarter 2009**

Revenue increased by 118% to $57.0 million as compared to $26.1 million; Gross margin was 76.8% as compared to 67.0%; Income from operations increased by 166% to $41.2 million as compared to $15.5 million; and, Net income increased by 167% to $31.1 million or $0.81 per diluted share as compared to $11.7 million or $0.56 per diluted  hare.

**Nine Months 2010 vs. Nine Months 2009**

*Revenue increased by 142% to $155.0 million as compared to $64.0 million;
*Gross margin was 72.6% as compared to 64.1%;
*Income from operations increased by 179% to $103.8 million as compared to $37.2 million;
*Net income increased by 184% to $77.8 million or $1.86 per diluted share as compared to $27.4 million or $1.31 per diluted share; and,
*As of September 30, 2010, the Company had approximately $170 million in cash.

Zheng Cheng, CME's Founder and CEO, commented, "As expected, revenue and net income maintained very strong growth in the third quarter. The growth was primarily attributed to the power from our largest inter-city buses network in China where our advertising time sold, average advertising rates, number of our advertising customers, and a greater proportion of direct sales to agency sales increased substantially compared to last year.

"In addition, embedded advertising continued to generate a significant portion of our revenue as we have packaged and sold it separately to our clients since Q3 2009. The embedded advertising, which is displayed during the broadcasting of the content, has relatively low production cost, generates high margins and accounts for approximately 23% of our revenue for the nine months ended September 30, 2010.

"Furthermore, our year-to-date results reflect the success of our airport express bus business. Since the first launch of this new business line at the beginning of 2010, the advertising packages sold for airport express buses have been at premium prices, because of the demographics of airport express bus travelers, exclusivity for all the buses from the airports and the unique captive environment. As a result, the expansion of this business has generated significant revenue and has produced higher gross margins overall. For the nine months ended September 30, 2010, the revenue generated from airport express buses was approximately $35.1 million, of which approximately $15.0 million was generated in the third quarter. Our network today covers six large and important airports in China: Beijing, Fuzhou, Guangzhou, Qingdao, Changsha and Chongqing."

Mr. Cheng continued, "We continue to grow our bus network through new contracts with bus operators in regions we already serve and by expanding into new regions in this highly fragmented niche market. Since the start of this year, we have grown our network by more than 4,000 express buses and have expanded into five new regions: Zhejiang, Hunan, Jianxi, Henan and Inner Mongolia. We have long-term contracts in place, ranging from three to eight years with 63 bus operators."

Jacky Lam, CCME's Chief Financial Officer stated, "As of September 30, 2010, we had approximately $170 million in cash up from $139 million as of June 30, 2010. Cash generated from operating activities for the first nine months of 2010 was $69.0 million (of which $30.8 million was generated in the third quarter), compared to $29.9 million generated in the same period of 2009. Net cash used in investing activities during the current nine month period was $3.6 million. Our cash resources continue to be sufficient to meet both our short-term and long-term liquidity needs, capital expenditure requirements to achieve our expansion plans, including internal growth initiatives as well as potential acquisitions."

**Increase 2010 Net Income Guidance**

Based on year-to-date results and expectations for the fourth quarter, the Company is increasing its 2010 net income guidance which is expected to be in the range of $100 million to $104 million compared to the previous net income guidance of $82 million to $85 million (on a non-GAAP basis, exclusive of non-cash charges for (i) share based compensation in connection with the granting of options under the Company's share incentive plan expected to be adopted later in 2010 and (ii) deemed dividends on outstanding convertible preferred shares).

Mr. Cheng concluded, "As we have mentioned in the past, we are working on several additional opportunities to increase our market share and reinforce our position as one of the leading players in the out-of-home advertising space. Furthermore, mergers and acquisition remain a corporate priority. We are very proud of our achievements and look forward to continued growth during the years ahead."

*Allegations of Fraud*

45. Upon information and belief, by mid-2010, DTT began receiving anonymous complaints alleging that CCME and Mr. Cheng were committing fraud through the corporate entity.

46. Financial analysts and reporters eventually began conducting their own investigation into CCME with the thought that the corporation was a fraud.

47. On January 31, 2011, analyst firm Citron Research published a report alleging that CCME has misrepresented, among other things, the scope of the Company's operations, its financial performance, and the extent of the Company's claimed strategic partnership with a government-affiliated entity. The Citron Research report concluded that the Company "does not exist at the scale that they are reporting to the investing public."

48. On this news, shares of CCME declined $3.02 per share, more than 14%, to close on January 31, 2011, at $17.84 per share.

49. Three days later, on February 3, 2011, analyst firm Muddy Waters issued a detailed report echoing many of the allegations in the Citron Research report. Among other things, the Muddy Waters alleged that CCME "is engaging in a massive 'pump and dump' scheme... significantly inflating its revenue and earnings in order to pay management earn-outs and inflate the stock price so insiders can sell."

50. Following this news, CCME shares declined $5.52 per share, or 33.23%, to close on February 3, 2011, at $11.09 per share on unusually heavy volume of more than 21.6 million shares traded.

51. As has already been alleged by several investors in other complaints, DTT, along

with the other Defendants, failed to respond to these allegations until it released a letter to the

Board and Audit Committee of CCME on March 3, 2011, which stated:

> In the court of our audit of the consolidated financial statements of the Group for the year
> ended 31 December 2010, we have encountered a number of significant issues which we
> want to bring to your attention. You should be aware that our audit procedures were
> extended in some instances in light of the aforesaid allegations. . . .

> These are serious issues that raise questions about the validity of certain transactions and
> balances. We bring these issues to your attention in the context of our responsibilities
> under Statement on Auditing Standards No. 99 "Consideration of Fraud in Financial
> Statement Audit" issued by the American Institute of Certified Public Accountants.

52.    The letter included a summary of the public allegations against CCME

summarized in a chart as follows:

| Issue date | Allegations | Source | Date notified to Audit Committee |
|---|---|---|---|
| 31 January 2011 | Citron Research Reports on CCME – The China Reverse Merger stock that is "Too Good to be True" | Media | N/A |
| 1 February 2011 | Anonymous email alleging overstatement of revenue in 2009 and 2010. | Deloitte | February 1, 2011 |
| 3 February 2011 | Muddy Waters Research – CCME: Taking the Short Bus to Profits | Media | N/A |
| 8 February 2011 | Email from an individual alleging non-existence of cash balances | Deloitte | February 25, 2011 |
| 11 February 2011 | Open letter from deloittewatch setting out 9 warning signs | Deloitte | February 14, 2011 |
| 21 February 2011 | Email from a private fund manager alleging CCME committing accounting fraud. | Deloitte | February 23, 2011 |
| 23 February 2011 | Letters from Muddy Waters LLC alleging CCME committing securities fraud. | Deloitte | February 23, 2011 |
| 26 February 2011 | Email from reader10Q's Instablog alleging CCME has made an apparent | Deloitte | February 28, 2011 |

| | misrepresentation about a customer relationship | | |
|---|---|---|---|
| 28 February 2011 | Email from LMG Capital alleging CCME committing corporate fraud | Deloitte | February 28, 2011 |
| 2 March 2011 | Email from Muddy Waters presenting its recent research – CCME: Irrefutable Evidence of Fraud | Deloitte | 3 March 2011 |
| 3 March 2011 | Email from the private fund manager (see 21 February 2011 above) presenting additional findings on CCME | Deloitte | 3 March 2011 |

53.    Only following the significant public reports, including some investigative journalists research into the allegations, DTT finally began its own investigation and concluded:

> We have reached the conclusion that the Company is minded not to proceed in good faith on the basis of our requested course of action.  As a result, in our opinion, the Board and the Audit Committee do not have a proper basis for concluding that the 2010 consolidated financial statements are free from material misstatement in respect to the above allegations and issues.  In view of the foregoing, we have lost confidence in the representations of management (which underpin any audit) and also in the commitment of the Board and the Audit Committee to good governance and reliable financial reporting and hence our resignation.

54. On March 11, 2011, DTT resigned as the principal independent accountant of CCME citing, among other reasons, irregularities encountered in its audit and irregularities concerning the bank account balances held by CCME in China.

55. DTT's findings were discussed at a March 13, 2011 Board Meeting.  The results of management's inaction following the resignation of its auditor shortly before 10-K reports were to be filed prompted board member, Dorothy Dong, to write in her resignation letter:

> The conduct of CCME's management leading up to the resignation by Deloitte as CCME's auditor, and management's resistance to the protective measures which I and other independent directors proposed at, amongst other occasions, the board meeting on 13 March 2011, have raised serious questions in my mind as to

{BMF-W0242581.}

21

whether my continued membership on the board of CCME will, or can, serve any purpose beneficial to the interests of CCME's shareholders.

56. The spate of resignations and increased media speculation that CCME is a fraud has occurred without any public response from Management.

### Adverse Market Effects

57.    The market for CCME's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failure to disclose, CCME's securities traded at artificially inflated prices during the relevant time period. Plaintiff purchased or otherwise acquired CCME's securities relying upon the integrity of the market price of the Company's securities and market information relating to CCME, and has been damaged thereby.

58.    Defendants materially misled the investing public, thereby inflating the price of CCME's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about CCME's business, operations, and prospects as alleged herein.

59.    At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff. As described herein, during the relevant time period, Defendants made or caused to be made a series of materially false and/or misleading statements about CCME's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be

{BMF-W0242581.}

22

overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the relevant period resulted in Plaintiff purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

60.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff. Absent the SEC filings, public assurances, and participation of reputable independent accounting firm such as DTT, Plaintiff would not have purchased and maintained the 1.5 million shares of CCME.

61.     Even if CCME should prove not to be a fraud, Plaintiff purchased CCME's securities at artificially inflated prices and was damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing losses.

*Defendants CCME, Cheng and Lam's Scienter*

62.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding CCME, his/her control over, and/or receipt and/or modification of CCME's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CCME, participated in the fraudulent scheme alleged herein.

{BMF-W0242581.}

63.    Defendants Cheng and Lam were officers of the Company and signatories to filings submitted to the U.S. Securities and Exchange Commission. They knew or should have known that the information being submitted was false and made material misrepresentations or omissions.

### Defendant DTT's Scienter

64.    DTT knew or should have known that (i) CCME's reported annual financial results for 2009, as disseminated to shareholders in CCME's 2010 annual report and in other public filings, were materially overstated, and were not prepared or presented in accordance with Generally Accepted Accounting Principles; and (ii) that DTT audits were not performed in accordance with GAAS; therefore, DTT's audit reports were materially false and misleading.

65.    DTT audited and made statements regarding CCME's financials knowing that the 10-K and other financials, as well as any statements made about them, would be used in trade and commerce in the United States and relied upon by shareholders in the United States.

66.    The financial statements for the fiscal years ending December 31, 2009 were materially false and misleading; contained untrue statements of material facts; omitted material facts necessary to make the statements made, under the circumstances in which they were made, not misleading; and failed to adequately disclose material facts. As detailed herein, the misrepresentations contained in, or the material facts omitted from, the financial statements included but were not limited to the overstatement of revenue for the fiscal years ending December 31, 2009. The misrepresentations and omissions also included the representations issued by DTT in connection with its audits of CCME's financial statements for those years, including that (i) DTT had audited CCME's financial statements "in conformity with accounting

principles generally accepted in the United States"; and (ii) DTT's audits provided a "reasonable basis" for its opinions.

67.    As detailed herein, DTT's audit reports were materially false and misleading. DTT did not make a reasonable investigation or possess reasonable grounds for the belief that the statements described above were true, were without omissions of any material facts, and were not misleading.

68.    DTT acted with scienter in certifying the materially false and misleading financial statements, in that DTT either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted in reckless disregard of the truth in failing to ascertain and to disclose the true facts, even though such facts were available to DTT.

69.    DTT's misrepresentations and omissions were intentional or reckless. DTT, as CCME's auditor, had unfettered access to CCME's books and records throughout the audit period. DTT, as a renowned public accounting firm, certainly had knowledge of the requirements of GAAS. The following facts constitute actual evidence of and give rise to a strong inference that DTT acted with scienter:

70.    DTT knew or recklessly disregarded that it had not performed its audits of CCME's 2001 financial statements in accordance with GAAS, and, therefore, that its Independent Auditors' Report was materially false and misleading. Under GAAS, "[t]he auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AICPA Professional Standards, AU §110.02 (1998); AU §316.42 (1997). As described herein, DTT did not fulfill that responsibility.

71.    DTT failed to obtain sufficient and competent evidence of the transactions related to CCME's purported bus advertising business.

72.    DTT failed to exercise professional skepticism. "Due professional care requires the auditor to exercise professional skepticism." This requires the auditor to "diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence." "In exercising professional skepticism the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest." AU §§ 230.07-09 (1998); AU § 316.43 (1997); AU § 316.16-21 (1997) (professional skepticism is required in planning and performing an audit). The auditor also "must be without bias with respect to the client since otherwise he would lack [the] impartiality necessary for the dependability of his findings." AU § 220.02. Notwithstanding these requirements, in connection with its planning and performing audit procedures concerning, *inter alia,* revenue recognition, earnings, and certain other matters described herein, DTT relied almost exclusively on representations from CCME management rather than on sufficient competent evidential matter. DTT thus failed to exercise professional skepticism, and failed to exercise professional due care in the exercise of its audit.

73.    DTT failed to properly consider fraud and irregularities. "The auditor should specifically assess the risk of material misstatement of the financial statements due to fraud and should consider that assessment in designing the audit procedures to be performed." AU § 316.12 (1998); AU § 316A.05 (1997) ("The auditor should assess the risk that errors and irregularities may cause the financial statements to contain a material misstatement."). One of the factors in assessing the risk of fraudulent financial reporting is whether there is a known history of securities law violations or claims against the entity or its senior management alleging fraud or violations of securities laws. AU § 316.17(1998).

{BMF-W0242581.}

26

74.     As stated in CCME's 8-K dated March 17, 2011, DTT now claims that it is "unable to determine whether the prior periods' financial statements are reliable, and accordingly whether continuing reliance should be placed on these financial statements or on DTT's report on the Company's 2009 financial statements." Given that the Company may now have to restate all its financials based on basic questions that one would expect a professional firm and expert auditors to ask from the start, one may conclude that DTT knowingly, negligently, and/or recklessly participated in the material misrepresentations.

### *No Safe Harbor*

75.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many or all of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements pleaded herein. CCME is liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CCME who knew that those statements were false when made.

### **CLAIMS FOR RELIEF**

**FOR A FIRST CAUSE OF ACTION**
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5)**

76. Plaintiff realleges and incorporates by reference paragraphs 1 - 75 as set forth above.

77. During the relevant period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the relevant period, did: (i) deceive the investing public, including Plaintiff, as alleged herein; and (ii) caused Plaintiff to purchase CCME's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

78. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CCME's securities in violation of Section 10b-5 of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

79. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CCME's financial well-being and prospects, as specified herein.

80. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CCME's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about CCME and its business operations and future prospects in light of the circumstances under which they were made, not

{BMF-W0242581.}

misleading, as set forth more particularly herein, and engaged in transactions, practices and a
course of business which operated as a fraud and deceit upon the purchasers of the Company's
securities during the relevant period.

81. Defendants Cheng and Lam's primary liability and controlling person liability arises
from the following facts: (i) Cheng and Lam were high-level executives and directors at the
Company during the relevant period and member of the Company's management team or had
control thereof; (ii) by virtue of their responsibilities and activities as a senior officers and/or
director of the Company, Cheng and Lam were privy to and participated in the creation,
development and reporting of the Company's internal budgets, plans, projections and/or reports;
(iii) Cheng and Lam enjoyed significant personal contact and familiarity with the other defendant
and were advised of, and had access to, other members of the Company's management team,
internal reports and other data and information about the Company's finances, operations, and
sales at all relevant times; and (iv) Cheng and Lam were aware of the Company's dissemination
of information to the investing public which they knew and/or recklessly disregarded was
materially false and misleading.

82. Defendant DTT during the relevant period was the Company auditor for CCME and
had open access to all books and records.  DTT made material statements about CCME through
its certification of CCME's 2009 10-K filing.  DTT had both the right and obligation to
independently verify all the financial data, business models, and operations being set forth and
discussed in the 10-K and throughout the period it served an independent auditor with the
responsibility to review and verify the 2009 and 2010 fiscal reports, as well as to conduct
whatever independent review to satisfy its own needs.  DTT failed to ask any of the relevant
questions or do the independent verifications that a reputable accounting firm in its position

{BMF-W0242581.}

29

would do. DTT has also been aware since early 2010 of allegations of fraud and misconduct. At no time prior to the public reports of misconduct, did DTT undertake its own review of the books and records and independently verify the allegations.

83. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CCME's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the relevant period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

84. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of CCME's securities was artificially inflated during the relevant period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the relevant period, Plaintiff acquired CCME's securities during the relevant period at artificially high prices and were damaged thereby.

{BMF-W0242581.}

30

85. At the time of said misrepresentations and/or omissions, Plaintiff was ignorant of their falsity, and believed them to be true. Had Plaintiff and the marketplace known the truth regarding the problems that CCME was experiencing, which were not disclosed by Defendants, Plaintiff would not have purchased or otherwise acquired its CCME securities, or would not have done so at the artificially inflated prices which they paid.

86. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of the Company's securities during the relevant period.

## SECOND CAUSE OF ACTION
### (Violation of Section 20(a) of the Exchange Act Against Defendants Cheng and Lam)

87. Plaintiff realleges and incorporates by reference paragraphs 1-86 as set forth above.

88. Defendant Cheng acted as a controlling person of CCME within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level positions, and his ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Cheng had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. Cheng was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

89. Defendant Lam acted as a controlling person of CCME within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level positions, and his ownership and contractual rights, participation in and/or awareness of the Company's

{BMF-W0242581.}

operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Lam had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. Lam was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90. In particular, Defendants Cheng and Lam have direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

91. As set forth above, CCME, Cheng and Lam each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Cheng and Lam are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of the Company's securities during the relevant period.

### THIRD CAUSE OF ACTION
#### (Common Law Fraud)

92. Plaintiff realleges and incorporates by reference paragraphs 1 - 91 as set forth above.

93. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a

{BMF-W0242581.}

32

fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CCME's securities in violation of Delaware State law.

94. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CCME's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the relevant period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, behaved with reckless indifference to the truth in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

95. At the time of said misrepresentations and/or omissions, Plaintiff was ignorant of their falsity, and believed them to be true. Had Plaintiff and the marketplace known the truth regarding the problems that CCME was experiencing, which were not disclosed by Defendants, Plaintiff would not have purchased or otherwise acquired its CCME securities, or would not have done so at the artificially inflated prices which it paid

96. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of the Company's securities during the relevant period.

### FOURTH CAUSE OF ACTION
**(Breach of Fiduciary Duty Against Defendants Cheng and Lam)**

97.     Plaintiff realleges and incorporates by reference paragraphs 1 - 96 as set forth above.

{BMF-W0242581.}

33

98.     Defendant CCME owed a fiduciary duty of care and loyalty to all shareholders.

99.     Defendants Cheng and Lam as directors and/or officers of CCME owe fiduciary duties of loyalty and care, including a duty of candor, to the shareholders of CCME.

100.    Defendants Cheng and Lam breached their fiduciary duties to shareholders by (i) employing devices, schemes, and artifices to defraud; (ii) making untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaging in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CCME's securities.

101.    Defendants' actions are directly and proximately responsible for Plaintiff's injuries, including inducing the October 2010 purchase of CCME securities and Plaintiff's maintenance of those securities up to and including until the date when trading was halted.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting Against DTT)

102.    Plaintiff realleges and incorporates by reference paragraphs 1 - 101 as set forth above.

103.    Defendants Cheng and Lam as directors and/or officers of CCME owe fiduciary duties of loyalty and care, including a duty of candor, to the shareholders of CCME.

104.    Defendants Cheng and Lam breached their fiduciary duties to the shareholders by (i) employing devices, schemes, and artifices to defraud; (ii) making untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaging in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CCME's securities.

{BMF-W0242581.}

105.    Defendant DTT knowingly participated in the breaches of fiduciary duties by Defendants Cheng and Lam, as set forth above.

106.    Defendants' actions are directly and proximately responsible for Plaintiff's injuries, including inducing the October 2010 purchase of CCME securities and Plaintiff's maintenance of those securities up to and including until the date when trading was halted.

## SIXTH CAUSE OF ACTION
### (Negligent Misrepresentation)

107.    Plaintiff realleges and incorporates by reference paragraphs 1 - 106 as set forth above.

108.    Defendants Cheng and Lam owe fiduciary duties to all shareholders of CCME.

109.    Defendants breached those duties through the provision of false information regarding CCME's financials, business model, and business prospects, among other things.

110.    Defendants also failed to take reasonable care in obtaining the relevant information and in communicating it to investors and the market at large.

111.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of the Company's securities during the relevant period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)    Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

{BMF-W0242581.}

35

(c)    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 18, 2011

                                  BOUCHARD MARGULES &
                                  FRIEDLANDER, P.A

                                  /s/ Andre G. Bouchard
                                  Andre G. Bouchard (Bar No. 2504)
                                  222 Delaware Avenue, Suite 1400
                                  Wilmington, Delaware 19801
                                  (302) 573-3500

                                  *Attorneys for Plaintiff Starr Investments*
                                  *Cayman II, Inc.*

OF COUNSEL:

Nicholas Gravante
Alanna C. Rutherford
Lee S. Wolosky
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300