**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------x
STARR INVESTMENTS CAYMAN II, INC.,  :
                                    :
                  Plaintiff,        :
                                    :
         – versus –                 :    **Case No.  11 CV 00233SLR**
                                    :
CHINA MEDIAEXPRESS HOLDINGS, INC.,  :    **Jury Trial Demanded**
DELOITTE TOUCHE TOHMATSU,           :
ZHENG CHENG, JACKY LAM,             :
OU WEN LIN, QINGPING LIN,           :
THOUSAND SPACE HOLDINGS LIMITED,    :
BRIGHT ELITE MANAGEMENT LIMITED,    :
THEODORE GREEN, MALCOLM BIRD,       :
A.J. ROBBINS, P.C.,                 :
                  Defendants.       :
---------------------------------------------------------x

## AMENDED COMPLAINT

Plaintiff Starr Investments Cayman II, Inc. ("Starr"), by its undersigned counsel, alleges as and for its complaint against Defendants China MediaExpress Holdings, Inc. ("CCME"), Deloitte Touche Tohmatsu ("DTT"), Zheng Cheng, Jacky Lam, Ou Wen Lin, Qingping Lin, Thousand Space Holdings Limited ("Thousand Space"), Bright Elite Management Limited ("Bright Elite"), Theodore Green, Malcolm Bird, and A.J. Robbins, P.C ("Robbins") (collectively "Defendants"), with knowledge of Starr's own acts and acts taking place in its presence, and on information and belief as to all other matters:

## SUMMARY OF THE ACTION

1.   This action for damages arises out of CCME's repeated and systematic violations of the securities laws, federal regulations and Delaware law, and its fraudulent inducement of millions of dollars of investments by and through Defendants Zheng Cheng, Jacky Lam, Ou Wen Lin, Qingping Lin, Thousand Space, Bright Elite, Theodore Green, Malcolm Bird, Robbins and

DTT, to accomplish an international conspiracy to defraud Starr and other investors in the U.S. public markets and in China.

2.   Starr was fraudulently induced into:  acquiring 150,000 common shares of CCME stock from Green and Bird for good and valuable consideration in January 2010; purchasing approximately 1.5 million common shares of CCME stock from Company founders Ou Wen Lin and Qingping Lin, through Thousand Space and Bright Elite respectively, for which Starr paid approximately $13.5 million on October 18, 2010; later converting warrants into 1,545,455 common shares of CCME stock, at a price of approximately $10 million in December 2010; and, in addition, as to certain defendants as specified below, acquiring one million preferred shares and 1,545,455 warrants from CCME at a price of $30 million in January 2010 (together, the "Shares").  All of the Shares are now effectively worthless, as a direct result of: (1) Defendants' affirmative misrepresentations and omissions regarding the nature and extent of CCME's business relationships and operations, and failure to correct previous misrepresentations; (2) Defendants' intentional misrepresentations regarding the size of the bus advertising market in China and failure to correct previous misrepresentations; (3) Defendants Jacky Lam, Robbins, and DTT's willful, negligent, and reckless disregard for Generally Accepted Auditing Standards ("GAAS") and Generally Accepted Accounting Principles ("GAAP") in the certification and publication of the Company's financial results in filings with the Securities and Exchange Commission ("SEC"), to Starr and to the public at large; (4) Defendants Theodore Green and Malcolm Bird's willful, reckless and negligent misrepresentation that they conducted extensive due diligence on CCME.  The foregoing acts and omissions resulted in Defendants significantly overstating the Company's financial results in the period leading up to Starr's acquisitions of the Shares.

3. Through their actions, Defendants knowingly and intentionally deceived Starr into investing in CCME, a company whose business model, operations, and management were radically overvalued as a result of Defendants' actions and omissions.

4. Within weeks after Starr completed the acquisition of the Shares, it became evident that Starr had been the victim of a massive international fraud. Starting in January 2011, news reports and securities analysts asserted that CCME's claimed financial condition was the result of significant fabrication. Reports of Defendants' misrepresentations were widespread, with some referring to the entire corporate enterprise as a "fraud." Similar allegations were reported to CCME's independent auditors, DTT, in anonymous e-mails. When DTT subsequently tried to confirm the Company's reported financial and operational information, it could not do so and resigned.

5. As a result of the public disclosure of Defendants' fraud, since March 2011, CCME has had the following significant business disruptions: (1) on March 11, 2011, CCME's auditor, DTT, resigned, stating according to public reports that it "[had] lost confidence in the representations of management," and concluding that the issues it raised "may have adverse implications for the prior periods' financial reports"; (2) on that same day, trading in CCME stock was temporarily halted on NASDAQ; (3) on March 13, 2011, Jacky Lam, Chief Financial Officer and director of CCME, resigned; (4) on March 16, 2011, CCME Board member and Starr representative Dorothy Dong resigned, noting "irregularities concerning the bank account balances for CCME's PRC subsidiaries"; (5) on March 31, 2011, CCME filed a Form 8-K/A disclosing that DTT had, among other things, "informed [CCME] in its resignation letter that it was no longer able to rely on the representations of management and that it had lost confidence in the commitment of the Board and the Audit Committee to good governance and reliable

financial reporting"; (6) on April 1, 2011, CCME received a letter from NASDAQ stating that CCME would be suspended from trading on April 12, 2011 for failure to timely file an Annual Report on Form 10-K; (7) on April 6, 2011, CCME disclosed a March 25 letter in which DTT stated (referring to its March 11 resignation letter) "We have since reached the conclusion that we are no longer able to place reliance on management representations in relation to prior period financial reports.  Accordingly, we request that the Company take immediate steps to make the necessary 8-K/A filing to state that continuing reliance should no longer be placed on the audit report on the 2009 financial statements and moreover that we decline to be associated with any of [CCME]'s financial communications during 2010 and 2011"; (8) on April 7, 2011, another director of CCME, Marco Kung, who was Chairman of the Audit Committee, resigned due to an inability to engage "capable and appropriate independent professionals" to conduct an independent investigation of the company; and (9) on May 19, 2011, CCME announced that its efforts to resume being listed on NASDAQ had been rejected.

6.    As stated in the former directors' resignation letters, no genuine attempts had been made by CCME management to address the publicly disclosed allegations of fraud at CCME. Although CCME announced on May 2, 2011, that the remaining members of CCME's Audit Committee had engaged a law firm to assist in an investigation of concerns raised by DTT, there is nothing to indicate the timing, scope, or independence of that undertaking, and the "noisy" resignation letters described above called into question CCME's ability to conduct an independent investigation.  To date, Defendants have declined to substantively refute the numerous public reports suggesting that the Company is in whole or in part a fraud.

## THE PARTIES

7.    Plaintiff Starr Investments Cayman II, Inc., is a Cayman corporation.  It purchased 1,000,000 shares of preferred stock, and 1,545,455 warrants in January 2010, for a combined price of $30,000,000.  It acquired 150,000 common shares of CCME stock on January 28, 2010 for good and valuable consideration.  It purchased a further 1.5 million common shares of CCME on October 18, 2010.  On December 8, 2010, Starr exercised the warrants and thereby acquired 1,545,455 additional common shares of CCME.  Prior to those investments and during the period thereafter, Starr evaluated market and company information necessary to purchase said securities, as referred to in this Amended Complaint.  Starr relied to its detriment on Defendants' continuing misrepresentations and omissions, including Defendants' failure to correct previous misrepresentations.

8.    Defendant China MediaExpress Holdings, Inc., is a Delaware corporation.  CCME's principal executive offices are or were, at least up to April 6, 2011, situated at Room 2805, Central Plaza, Wan Chai, Hong Kong.  The Company, through its subsidiaries and its variable interest entity, purports to operate the largest television advertising network on inter-city and airport express buses in China.  The Company generates revenue by selling advertisements on a network of television displays installed on express buses originating in eighteen of China's regions, including the four municipalities of Beijing, Shanghai, Tianjin and Chongqing, and fourteen regions including Guangdong, Jiangsu, Jiangxi, Fujian, Sichuan, Hebei, Anhui, Hubei, Shandong, Shanxi, Inner Mongolia, Zhejiang, Hunan and Henan.  Prior to its delisting, CCME shares were traded on NASDAQ under the symbol "CCME."

9.    Defendant Zheng Cheng is Chairman and Chief Executive Officer (CEO) of CCME. He is a founder of CCME's predecessor, Hong Kong Mandefu Holding Limited ("Hong Kong

Mandefu"), and the largest shareholder in CCME.  Because of Cheng's positions with the

Company, he possessed the power and authority to control the contents of CCME's reports to the

SEC, and to Starr, as well as press releases and presentations to securities analysts, money and

portfolio managers and institutional investors, *i.e.*, the market.  Cheng was provided with copies

of the Company's reports and press releases alleged herein to be misleading prior to, or shortly

after, their issuance and had the ability and opportunity to prevent their issuance or cause them to

be corrected.  Because of his positions and access to material non-public information available to

him, Cheng knew that the adverse facts specified herein had not been disclosed to, and were

being concealed from, the public and, in particular, Starr, and that the affirmative representations

which were being made were then materially false and/or misleading.  Cheng signed all relevant

SEC filings after October 2009.

     10. Cheng's access to information went beyond his control of CCME.  Cheng is, and was

at all relevant times, the majority owner of Fujian Fenzhong Media Co., Ltd ("Fujian

Fenzhong"), and together with his mother, Chunlan Bian, was in control of that entity.  Fujian

Fenzhong, through contractual relationships with Hong Kong Mandefu's wholly-owned

subsidiary Fujian Across Express Technology Co. Ltd. ("Fujian Across Express"), produced all

or most of CCME's revenue.  Through Cheng's unique position of ownership and control in both

the operating business and the listed corporation, he knew, or should reasonably have been

aware, of any gross irregularities in the finances, business relationships and other relevant

aspects of CCME's business.

     11. Defendant Jacky Lam was during the entire relevant period and until March 13, 2011

Chief Financial Officer (CFO) of CCME.  Because of Lam's position with the Company, he

possessed the power and authority to control the contents of CCME's reports to the SEC and to

Starr, as well as press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Lam was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his positions and access to material non-public information available to him, Lam knew or should have known that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and, in particular, Starr, and that the affirmative representations which were being made were then materially false and/or misleading.  Lam signed all relevant SEC filings after October 2009.

12. Defendant Thousand Space is a holding company organized under the laws of the British Virgin Islands and is wholly owned and controlled by Ou Wen Lin, a founder of Hong Kong Mandefu, now known as CCME.  With Ou Wen Lin as its sole shareholder, sole director and sole beneficiary, Thousand Space operates as a single economic entity and shares complete unity of interest with Ou Wen Lin.  On information and belief, knowing that he was part of, and stood to benefit financially from, the fraudulent conspiracy as alleged herein, Ou Wen Lin used Thousand Space as the vehicle to sell shares to Starr in an attempt to shield himself from personal liability should the fraud be uncovered.  On October 12, 2010, Starr entered into a Share Sale Agreement with Thousand Space to purchase 1,000,000 shares of CCME stock at $9 per share, which closed on October 18, 2010.  At the time of the sale, Thousand Space owned approximately 6 million shares of CCME's common stock.

13. Defendant Ou Wen Lin is the sole owner, sole director, sole beneficiary and alter ego of holding company Thousand Space.  Through the vehicle of Thousand Space, Ou Wen Lin is a founder and original shareholder of Hong Kong Mandefu, now known as CCME.  Because of his

positions, ownership and contractual rights, and significant personal contact and familiarity with the other defendants, and access to material non-public information available to him, Ou Wen Lin knew or should have known that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and, in particular, Starr, and that the affirmative representations which were being made about CCME were then materially false and/or misleading.

14. Defendant Bright Elite is a holding company organized under the laws of the British Virgin Islands and is wholly owned and controlled by Qingping Lin, a founder of Hong Kong Mandefu, now known as CCME. With Qingping Lin as its sole shareholder, sole director and sole beneficiary, Bright Elite operates as a single economic entity and shares complete unity of interest with Qingping Lin. On information and belief, knowing that he was part of, and stood to benefit financially from, the fraudulent conspiracy as alleged herein, Qingping Lin used Bright Elite as the vehicle to sell shares to Starr in an attempt to shield himself from personal liability should the fraud be uncovered. On October 12, 2010, Starr entered into a Share Sale Agreement with Bright Elite to purchase 500,000 shares of CCME stock at $9 per share, which closed on October 18, 2010. At the time of the sale, Bright Elite owned approximately 2.3 million shares of CCME's common stock.

15. Defendant Qingping Lin is the sole owner, sole director, sole beneficiary and alter ego of holding company Bright Elite. Through the vehicle of Bright Elite, Qingping Lin is a founder and original shareholder of Hong Kong Mandefu, now known as CCME. Because of his positions, ownership and contractual rights, and significant personal contact and familiarity with the other defendants, and access to material non-public information available to him, Qingping Lin knew or should have known that the adverse facts specified herein had not been disclosed to,

and were being concealed from, the public and, in particular, Starr, and that the affirmative

representations which were being made were then materially false and/or misleading.

16. Defendant Ou Wen Lin is the brother of Defendant Qingping Lin and they and their

holding companies, Thousand Space and Bright Elite respectively, at all relevant times shared

the same Hong Kong address as CCME. Ou Wen Lin, Qingping Lin, Thousand Space and

Bright Elite are collectively referred to herein as "the Lin Defendants."

17. Theodore Green is the former Chairman, co-CEO and interim CFO of TM

Entertainment and Media, Inc. ("TM"), a Delaware corporation. TM was used as a special-

purpose acquisition company ("SPAC") to acquire Hong Kong Mandefu in October 2009

through a reverse merger. The Definitive Proxy Statement, Schedule 14A ("October 2009

Proxy") filed by TM and signed by Green, describes in detail the process by which TM came to

acquire Hong Kong Mandefu. The combined company became known as CCME. Because of

Green's position in TM and as a director of CCME following the merger, he possessed the power

to control the flow of information to TM's shareholders, who ultimately voted to acquire Hong

Kong Mandefu. He also took on but did not fulfill the responsibility of acquiring sufficient

information to perform adequate due diligence of Hong Kong Mandefu. Green turned a blind

eye to red flags evidencing fraud. He knew or should have known the adverse facts contained

herein existed, and of substantial discrepancies between CCME's actual performance as

compared to the earnings and successes reported to TM shareholders, but did not alert TM

shareholders or the investing public to them, in a purposeful attempt to aid and abet the fraud of

and in conspiracy with, Cheng, Lam, the Lin Defendants and Bird. Green's shares in CCME

were registered in or about October 2010 pursuant to CCME's Registration Statement on Form

S-3, dated August 16, 2010, as amended on October 5, 2010, which became effective on October

19, 2010 ("2010 Form S-3"), and therefore he was in a position to sell all of his shares in CCME before the misrepresentations were disclosed.

18. Malcolm Bird is the former co-CEO and director of TM, a SPAC that, through a reverse merger, acquired Hong Kong Mandefu in October 2009 and became known as CCME. Because of Bird's position in TM, and as a director of CCME following the merger, he possessed the power to control the flow of information to TM's shareholders, who ultimately voted to acquire Hong Kong Mandefu.  He also took on but did not fulfill the responsibility of acquiring sufficient information to perform adequate due diligence of Hong Kong Mandefu.  Bird turned a blind eye to red flags evidencing fraud.  He knew or should have known the adverse facts contained herein existed, and of substantial discrepancies between CCME's actual performance as compared to the earnings and successes reported to TM shareholders, but did not alert TM shareholders or the investing public to them in a purposeful attempt to aid and abet the fraud of and in conspiracy with Cheng, Lam, the Lin Defendants and Green.  Bird's shares in CCME were registered in or about October 2010, and therefore he was in a position to sell all his shares in CCME before the misrepresentations were disclosed.

19. Defendants Cheng, Lam, the Lin Defendants, Green, and Bird own or, during the relevant period, owned a significant number of shares of CCME and benefitted from the inflated market price of the shares as a result of the misrepresentations and omissions at issue.

20. The Lin Defendants, Green, and Bird sold or transferred shares directly to Starr pursuant to agreements in which they consented to jurisdiction in Delaware.

21. Defendant Deloitte Touche Tohmatsu in Hong Kong SAR is a Hong Kong independent legal entity that is a member of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee.  DTT provides audit, accounting, financial advisory, tax, and risk

management services.  On December 4, 2009, CCME engaged DTT to serve as its independent auditor.  DTT served in that capacity accessing and reviewing corporate materials for fiscal years 2009 and 2010, until March 11, 2011.  DTT also signed the audit reports incorporated into CCME's 2009 Form 10-K filed on March 31, 2010 ("2009 Form 10-K") and 2010 Form S-3, which were filed with the SEC.

22.  Defendant A.J. Robbins, P.C. ("Robbins" and together with DTT, the "Auditor Defendants") is a professional corporation which has its main office in Colorado.  From 2006 through September 2009 Robbins was engaged by CCME to provide independent auditing and/or consulting services, including the examination and review of CCME's consolidated financial statements for the years 2006, 2007, and 2008 and the first six months of 2009.  The results of Robbins' examination of CCME's consolidated financial statements were disseminated to investors in the United States and were relied upon by Starr when making its decision to invest in CCME.  Robbins also signed the audit reports incorporated into TM's October 2009 Proxy, CCME's 2009 Form 10-K and 2010 Form S-3, all filed with the SEC.

## JURISDICTION AND VENUE

23.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) and the common law of Delaware.

24.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities and Exchange Act of 1934 (15 U.S.C. § 78aa) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

25.  Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b).  Defendant CCME is a Delaware corporation, and at all relevant times Defendants Cheng, Lam, Green and

Bird are or were officers or directors of CCME.  Defendant DTT was at all relevant times CCME's independent auditor and together with Robbins provided financial audit information incorporated into CCME's 2009 Form 10-K and 2010 Form S-3.

26.  This court has jurisdiction over Zheng Cheng and Jacky Lam pursuant to 10 Del. C. § 3114 and over CCME because it is a Delaware Corporation.

27.  Defendants Cheng, Lam, Green, Bird, and the Lin Defendants are also subject to jurisdiction under 15 U.S.C. § 78aa for violations of the Securities and Exchange Act of 1934.

28.  This court further has jurisdiction over the Lin Defendants, Green and Bird by contract.  Pursuant to certain share sale agreements between the Lin Defendants and Starr signed on October 12, 2010, all parties consented to jurisdiction in Delaware and agreed to a forum selection clause making Delaware the exclusive forum.  Pursuant to a certain share transfer agreement between Green and Bird, among others, and Starr, dated January 28, 2010, all parties consented to jurisdiction in Delaware and agreed to a forum selection clause making Delaware the exclusive form.

29.  By virtue of their involvement in a conspiracy, this Court also has jurisdiction over Defendants Cheng, Lam, the Lin Defendants, Green and Bird, under 10 Del. C. § 3104. Substantial acts in furtherance of the conspiracy occurred in Delaware including the filing of documents with the Delaware Secretary of State to facilitate the acquisition of Hong Kong Mandefu through a reverse merger with TM, a Delaware corporation, in October 2009, and to facilitate the transaction with Starr in January 2010.  These filings included, (1) a Certificate of Amendment to the Amended and Restated Certificate of Incorporation, (2) an Amended and Restated Certificate of Incorporation, and (3) a Certificate of Designations of Series A Preferred Stock.

30. DTT and Robbins are subject to the jurisdiction of this court by virtue of having provided audit opinions on CCME's financial statements, which DTT and Robbins knew or should have known would be included in filings with the SEC, pursuant to 15 U.S.C. § 78aa.

31. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## BASIS FOR ALLEGATIONS

32. As detailed herein, Plaintiff's allegations are based on, *inter alia*, a thorough investigation of publicly filed and available information, reports and statements, as well as documents in the possession of Plaintiff, including, but not limited to:  filings with the SEC, annual reports, press releases, media reports on the company, court filings in this action, reports of securities analysts and investor advisory services, and audits and forensic investigations.

33. Any further detailing of the specifics of Defendants' fraudulent scheme is not possible at this time because the underlying information with respect thereto, including but not limited to, internal reports and other data and information about the true state of CCME's finances, operations and sales, is not available to the Plaintiff and lies exclusively within the possession and control of Defendants and other insiders of CCME.  The true facts cannot be obtained by Starr without CCME's cooperation, as demonstrated by, among other things, DTT's unsuccessful attempts to confirm information within the possession and control of CCME, as described further below.

## FACTUAL BACKGROUND

### Chinese Reverse Mergers

34. The international fraud perpetrated by Defendants against Starr and the U.S. public securities markets occurred amid conditions favorable to the conspiracy. The capacity to use the technique of reverse mergers to place securities in the United States market without proper and complete audits in conformance with GAAP and GAAS frustrates regulators' ability to exercise oversight responsibilities.

35. Defendants' use of the mechanism of a reverse merger enabled the Defendants to mislead Starr and other investors as to the value of CCME shares. CCME fraudulently induced Starr to purchase CCME shares, which are now largely worthless, at prices greatly in excess of their actual value because of the falsified and overstated financials that CCME and its co-conspirators were able to sneak past regulatory safeguards.

36. Modern SPACs enable foreign corporations to access capital markets in the United States without the rigors of an Initial Public Offering ("IPO"). In this case, an IPO and its attendant regulatory strictures, which would subject the transaction to a thorough audit, were circumvented through the mechanism of a reverse merger with a foreign company. A "reverse merger," as used in this Amended Complaint, is the acquisition of a private operating company by a public shell company (the SPAC) that results in the private operating company having effective control of the combined company. The foreign corporation is either merged into or acquired by a shell listed on a U.S. Securities Exchange, giving the foreign company immediate "back door" access to the U.S. public securities market. As explained in an article published in the Wall Street Journal on June 3, 2011:

> In reverse mergers, a foreign company is "bought" by a publicly traded U.S. shell company. But the foreign company assumes control and gets the shell's U.S. listing

without the level of scrutiny that an initial public offering entails. Though companies from other countries also engage in reverse mergers, such deals are especially common among the Chinese. The PCAOB says nearly three-quarters of the 215 Chinese companies listing in the U.S. from 2007 to early 2010 did so via reverse merger.

Michael Rapoport, <u>SEC Probes China Auditors</u>, June 3, 2011.

37.  In recent years, scrutiny of SPACs and reverse merger activity has increased due to the loophole they present in the regulatory structure enforced by the SEC.  This is due, in part, to the popularity of the device as a means of avoiding SEC scrutiny.  According to one business columnist, reverse mergers are "a course long favored by shady stock promoters."  Floyd Norris, <u>The Audacity of Chinese Frauds</u>, N.Y. Times, May 26, 2011.

38.  A 2011 Research note released by the Public Company Accounting Oversight Board ("PCAOB") reveals that between January 1, 2007 and March 31, 2010, there were 159 reverse mergers between a Chinese private company and a United States shell.  The PCAOB expressed concern about the quality of audits conducted on the financial statements of these companies.

39.  The Chairman of the PCAOB, James R. Doty, stated that there are "significant risks associated with audits of operations of U.S. [listed] companies in China.  For example, we are finding through our oversight of U.S. firms that even simple audit maxims, such as maintaining the auditor's control over bank confirmations, may not hold given the business culture in China."  Therefore, Doty concluded that "[i]n light of these risks, the PCAOB's inability to inspect the work of registered firms from China is a gaping hole in investor protection."

40.  SEC Commissioner Luis A. Aguilar has also spoken out on the subject.  In a speech on April 4, 2011, he said that using reverse mergers as a form of "backdoor registration" was a "disturbing trend" in modern capital formation.  He said, "a growing number of them are proving to have significant accounting deficiencies or being vessels of outright fraud."  The "billions in

U.S. savings and investment dollars [that] have been entrusted with these companies" are, therefore, at risk.

41.     The above referenced <u>New York Times</u> article, dated May 26, 2011, blamed auditors and inadequate audit procedures for this disturbing trend.  The <u>New York Times</u> revealed that another Chinese corporation, Longtop Financial Technologies, also recently became "worthless" because of allegations of fraud, including fraud relating to Longtop's purported cash balances in Chinese banks.  DTT, the same auditor that CCME used to perform its most recent audits, resigned as Longtop's auditor after the fraud came to light but only after it had already given "clean audit opinions to Longtop for six consecutive years," according to the report.

42.     The May 26, 2011 <u>New York Times</u> article also noted that the major auditing firms in China are not subject to the same type of inspections required of other accounting firms that audit companies whose securities are traded in the U.S.:

> The Chinese audit firms, while they are affiliated with major international audit networks, have never been inspected by the Public Company Accounting Oversight Board in the United States. The Sarbanes-Oxley Act requires those inspections for accounting firms that audit companies whose securities trade in the United States, but China has refused to allow inspections.
>
> In a speech at a Baruch College conference earlier this month, James R. Doty, chairman of the accounting oversight board, called on the major firms to improve preventative global quality controls but said that actual inspections were needed.
>
> Two weeks ago, Chinese and American officials meeting in Washington said they would try to reach agreement on the oversight of accounting firms providing audit services for public companies in the two countries, so as to enhance mutual trust.

Floyd Norris, <u>The Audacity of Chinese Frauds</u>, N.Y. Times, May 26, 2011.

43.     A report in the <u>Wall Street Journal</u> on June 3, 2011 revealed that the SEC is now examining accounting and disclosure issues regarding Chinese companies that engaged in reverse mergers.  The investigation specifically targets the work of Chinese auditors:

> People familiar with the matter say the investigation also includes auditors, which hadn't previously been known. As part of its inquiry, the SEC has suspended trading on some Chinese companies, questioning their truthfulness about their finances and operations.
>
> The Public Company Accounting Oversight Board, or PCAOB, the government's accounting regulator, said it is investigating some audit firms over whether their audits of Chinese clients are stringent enough.
>
> . . .
>
> "Right now, the auditing and regulation of U.S.-listed Chinese companies isn't working very well," said Paul Gillis, a visiting professor of accounting at Peking University's Guangha School of Management.
>
> …
>
> Since February, about 40 Chinese companies have either acknowledged accounting problems or seen the SEC or U.S. exchanges halt trading in their stocks because of accounting questions.

Michael Rapoport, <u>SEC Probes China Auditors,</u> Wall Street Journal, June 3, 2011.  According to this article, although some auditors say, in response, that they are "intensifying their efforts" and "doing everything they can to perform strong audits," that simply "may raise questions about whether their past efforts were strong enough."  *Id.*

44. Confirming the fears of Messrs. Aguilar and Doty, at least 24 Chinese-based companies have filed 8-Ks disclosing auditor resignations, accounting problems, or both, since March 2011. (Letter from SEC Chairman Mary L. Schapiro to the Honorable Patrick T. McHenry, April 27, 2011.)

45. On April 18, 2011, NASDAQ filed a proposed rule concerning companies formed through reverse mergers.  Proposed Rule 2011-056 would require, among other things, that a

company formed pursuant to a reverse merger trade at least six months after the completion of the reverse merger, and that six months' worth of audited financial statements following the reverse merger be timely filed, prior to listing the company on NASDAQ.  In June 2011, the SEC issued an investor bulletin warning investors about fraud risks in reverse mergers.  (SEC Office of Investor Education and Advocacy, June 2011 Investor Bulletin: Reverse Mergers.)

46. The extraordinary measures being taken by U.S. regulators to curb further pump-and-dump schemes on United States markets are indicative of the inadequacy of the regulatory structure previously in place.

### Formation of the SPAC — TM Entertainment

47. In 2007, Defendants Green and Bird, along with John W. Hyde and Jonathan F. Miller, formed TM, which had its IPO on October 17, 2007.  Their prospectus of October 17, 2007, states:  "TM Entertainment and Media, Inc. is a newly formed blank check company organized for the purpose of effecting a merger, capital stock exchange, asset acquisition or other similar business combination with a domestic or foreign operating business in the entertainment, media, digital or communications industries."

48. The original prospectus also revealed the time frame in which TM, a shell company with no operating business, had to find a deal.  It stated that "[o]ur amended and restated certificate of incorporation provides that we will continue in existence only until October 17, 2009.  This provision may not be amended except in connection with the consummation of a business combination.  If we have not completed a business combination by such date, *our corporate existence will cease* except for the purposes of winding up our affairs and liquidating, pursuant to Section 278 of the Delaware General Corporation Law.  This has the same affect as if

our board of directors and stockholders had formally voted to approve our dissolution pursuant to Section 275 of the Delaware General Corporation Law." (emphasis added).

49. Over the course of its existence, TM unsuccessfully approached several target companies.  Ultimately, the reverse merger with Hong Kong Mandefu that would transform the SPAC into CCME closed mere days before the expiry of the October 17, 2009 deadline.  The October 2009 Proxy filed by TM and signed by Green, describes in detail the process by which TM came to acquire Hong Kong Mandefu.

50. As described in the October 2009 Proxy, after signing a non-binding letter of intent in January 2009, TM conducted, over a period of several months, a "detailed review of information provided to TM by [Hong Kong Mandefu] on its business as well as a further due diligence review of the Chinese advertising industry in general and the competitive landscape with respect to [Hong Kong Mandefu] in particular."

51. Specifically, on February 27, 2009, the accountant used to audit Hong Kong Mandefu's financials, Robbins, delivered draft audited financial statements for Hong Kong Mandefu's 2006, 2007 and 2008 fiscal years to TM.

52. On May 1, 2009, Robbins delivered the final audit report on the financial statements of Hong Kong Mandefu for fiscal years 2006, 2007 and 2008 and TM entered into a Share Exchange Agreement with Hong Kong Mandefu on that same date.  In September 2009, Robbins delivered its opinion based on its review of the financial statements of Hong Kong Mandefu for the first six months of 2009, stating that it was not aware of any material modifications needed to conform those financial statements to GAAP.

53. On September 30, 2009, an amended Share Exchange Agreement between Hong Kong Mandefu and TM was approved by the TM board and signed by Defendants and Green and Bird.  The transaction was announced in an October 1, 2009 press release.

54. Well before this date, TM was committed to go through with the transaction.  If TM had not completed the transaction, there would have been insufficient time to acquire a different company by the October 17, 2009 deadline, and the SPAC directors would have been forced to liquidate TM and return $77 million to investors, without receiving any return on their own investments.  Their TM shares would have been worthless.

55. To gain approval of TM's shareholders, on October 5, 2009 TM filed the October 2009 Proxy which was signed by Defendant Green.

56. In the October 2009 Proxy, TM's directors admit their direct financial interest in carrying out the transaction proposed:

> • If the Transaction is not consummated and TM is required to liquidate, the shares of TM Common Stock owned and acquired by TM's directors and officers prior to our IPO will be worthless because they will not be entitled to receive any of the assets held in the Trust Account [$77 million] with respect to these shares. In addition, if the Transaction is not consummated, and TM is forced to liquidate, warrants held by TM's directors and officers will expire with no value. On April 23, 2009, the date TM's board of directors approved the Transaction and the Share Exchange Agreement, our directors and officers owned a total of 2,250,000 shares of TM Common Stock acquired prior to our IPO having a total market value of approximately $17.2 million based on the share price of $7.64 of the TM Common Stock on the last trading day prior to that date. In addition, on April 23, 2009, our directors and officers held warrants exercisable for an aggregate of 2,100,000 shares of TM Common Stock (for which they paid $2,100,000) having a total market value of approximately $0.2 million based on our warrant price of $0.11 per warrant on the last trading day prior to that date.

> • Each of Messrs. Green and Bird has agreed, that, if we liquidate prior to the consummation of a business combination, they will be personally liable to ensure that the proceeds of the Trust Account are not reduced by the claims of vendors for services rendered or products sold to us as well as claims of prospective target businesses for fees and expenses of third parties that we have agreed in writing to pay in the event we do not complete a business combination. If the Transaction is consummated, TM's officers and directors will not have to perform such obligations. If the Transaction is not

consummated, however, TM's officers and directors could potentially be liable for any claims against the Trust Account by such vendors or prospective target businesses who did not sign waivers. If the Transaction is not consummated, [Hong Kong Mandefu] and the Sellers will be responsible for their own expenses incurred in connection with the proposed Transaction. Pursuant to the Share Exchange Agreement, [Hong Kong Mandefu] and the Sellers have waived any claim they may have against the Trust Account.

• All rights specified in TM's Amended and Restated Certificate of Incorporation relating to the right of directors and officers to be indemnified by TM, and of TM's directors and officers to be exculpated from monetary liability with respect to prior acts or omissions, will continue after the Transaction. If the Transaction is not consummated and TM liquidates, it will not be able to perform its obligations under those provisions. If the Transaction is ultimately completed, the combined company's ability to perform such obligations will probably be substantially enhanced.

57. On October 15, 2009, the proposed combination of TM and Hong Kong Mandefu was approved at a special meeting of TM stock holders. The approval occurred two days prior to the October 17, 2009 deadline, after which TM would have been forced to liquidate and return $77 million to investors, and common stock acquired prior to the TM IPO by Defendants Green and Bird would have been worthless.

## Structure of CCME

58. All or most of CCME's revenue is produced by Fujian Fenzhong, the operating company that runs a purported advertising business in China. Fujian Fenzhong was formed in 2002. On November 2, 2003 and December 1, 2003, Fujian Fenzhong entered into contractual relationships with Hong Kong Mandefu's wholly-owned subsidiary Fujian Across Express, by which Fujian Fenzhong agreed to distribute all economic benefits from the operating business to the CCME subsidiary. Although the relationship between the companies is contractual, CCME's consolidated financial statements include the operating business of Fujian Fenzhong.

59. Fujian Fenzhong is majority owned by Cheng. Cheng was therefore at all relevant times in a unique position to control Fujian Fenzhong, having access to information at both the

highest level (right before it went to the United States securities markets) and the lowest level

(on the ground, in China).  Cheng had knowledge of the affairs and had a high degree of access

to the books and records of CCME, CCME's subsidiaries and Fujian Fenzhong.

60.  Lam, as Chief Financial Officer of CCME, was at all relevant times responsible for

the consolidated financial statements of CCME and Fujian Fenzhong, as filed with the SEC and

communicated to Starr and U.S. investors.

### The Structure of the Reverse Merger Transaction

61.  Pursuant to the Share Exchange Agreement described in the October 2009 Proxy, TM

issued 20,915,000 new common shares and $10,000,000 in three-year, no interest promissory

notes in exchange for 100% of the outstanding equity of Hong Kong Mandefu.

62.  Pursuant to the transaction, TM changed its name to China MediaExpress Holdings,

Inc. ("CCME"), defendant herein.

63.  Following the reverse merger, the corporate structure was as follows:



64. CCME was owned immediately after the reverse merger, on a fully diluted basis, by Cheng (13,266,684 shares, October 27, 2009 Schedule 13D), the Lin Defendants (combined total of 8,398,316 shares, October 28, 2009 Schedule 13Ds), Green (2,428,000 shares, November 2, 2009 Schedule 13G/A)[1], Bird (648,000 shares, November 2, 2009 Schedule 13G/A), and a variety of public shareholders.

65. Additionally, the shareholders of Hong Kong Mandefu, namely Cheng and the Lin Defendants, had the opportunity to earn up to 15,000,000 TM/CCME shares, subject to the achievement of certain net income targets in 2009, 2010, and 2011, as well as up to $20,900,000 of cash proceeds from the exercise of TM's publicly held warrants.  The $20,900,000 was paid in the first quarter of 2010.  The net income target for 2009 was met and the earnout shares were distributed in the third quarter of 2010 on August 12, 2010.

## Material Misrepresentations in the TM Proxy

66. A variety of representations in the October 2009 Proxy could only have been the result of willful or reckless disregard of the facts by TM's directors, including Defendants Green and Bird, to prevent discovery of the fraud.

67. In order to induce shareholders to enter into the reverse merger transaction, TM reported in the October 2009 Proxy that Hong Kong Mandefu had the "largest television advertising network on inner-city express buses in China," and that it had a network comprising of 16,000 inter-city buses, covering four municipalities and seven economically prosperous Chinese provinces.

68. It further reported:

---

[1] Including shares held in trust as to which Green had voting power pursuant to a certain Voting Agreement.

**A highly effective and efficient advertising network**

CME believes its network is a highly effective and efficient. According to a survey conducted by CTR Market Research in July 2008 on bus services originating in eight major cities, on average, 81% of all passengers said they had watched the television displays on CME's network, and almost 80% said they regularly watched the displays on the network.

69. The TM directors made the following additional representations in relation to the

acquisition:

**Recommendation of the Board of Directors and Reasons for the Transaction**

After careful consideration, TM's board of directors, by unanimous vote at a meeting on April 23, 2009 and on September 30, 2009, approved and declared advisable the Share Exchange Agreement and the Transaction.  Accordingly, our board of directors recommends that TM's stockholders vote "FOR" the Transaction Proposal.

TM's board of directors considered a wide variety of factors in connection with its evaluation of the Transaction. Pali's valuation analysis was one of the factors the board of directors considered, in addition to TM's own due diligence and review of CME's business operations and results. In light of the complexity of those factors, TM's board of directors did not consider it practicable to, nor did it attempt to, quantify or otherwise assign relative weights to the specific factors it considered in reaching its decision. In addition, individual members of TM's board of directors may have given different weight to different factors. In reaching its determination, TM's board of directors considered the following factors, among others:

   • information with respect to the financial condition, results of operation and business of CME, on both a historical and prospective basis; 2006 — 2008 net revenue and net income CAGR of 269% and 404%, respectively, with a projected 2008 — 2011 net income CAGR of 158%;

   • CME's lower price to earnings multiples relative to its public comparables, given its future prospects and those of the industry;

   • CME's management team's quality and strength, and proven track record of success; CME's existing management team has grown the business to achieve 2008 net revenue and net income of $63.0 and $26.4 million, respectively, and 35,000 installed TV displays on over 16,000 buses in a short period of time;

\*\*\*

- the results of TM's business, financial, accounting, legal and other due diligence review of CME.

\*\*\*

In addition, TM's board of directors relied on a number of standards generally accepted by the financial community in making its decision to enter into the Share Exchange Agreement with CME. In particular, TM's board of directors placed heavy emphasis on the price to earnings multiples of publicly-traded companies that it deemed to be comparable to CME and compared those multiples to the earnings multiple embedded in TM's transaction with CME. In addition, TM's board of directors evaluated enterprise value to revenue multiples, enterprise value to EBITDA (earnings before interest, taxes, depreciation and amortization) multiples and the capital structures of the publicly-traded companies comparable to CME and compared the multiples and capital structures to those in TM's transaction with CME.

\*\*\*

Based on the factors outlined above, our board of directors approved and declared it advisable that TM enter into the Transaction.

70.   In addition to the previous facts, the TM Board represented that the fair market value of Hong Kong Mandefu was in excess of the threshold they were required to meet before effectuating the transaction, again acknowledged their conflict of interest, and stated that they had not retained an independent valuation advisor to confirm their self-interested determination of Hong Kong Mandefu's value:

**Satisfaction of Requirement that the Transaction has a Fair Market Value Equal to at least 80.0% of TM's Net Assets**

It is a requirement that any business acquired by TM have a fair market value equal to at least 80.0% of TM's net assets at the time of acquisition. Based solely on its evaluation of the consideration to be paid in the Transaction, TM's board of directors determined that this requirement was met and exceeded. . . . TM's board of directors did not seek or obtain an opinion of an outside valuation advisor as to whether the 80.0% test has been met, however, in light of the financial background and experience of members of TM's management and board of directors, TM's board of directors believes it is qualified to determine whether the Transaction meets this requirement. Mr. Green (in his roles at Anchor Bay Entertainment, Greenlight Consulting and Sony Wonder), Mr. Bird (in his roles at AOL, Hanna-Barbera and USA Broadcasting), Mr. Hyde (in his numerous roles as a senior executive, consultant and advisor) and Mr. Miller (in his roles as a senior executive, investor and advisor), all have had significant financial experience. If the

Transaction is not consummated and TM is required to liquidate, the shares of TM Common Stock owned and acquired by TM's directors and officers prior to our IPO will be worthless because they will not be entitled to receive any of the assets held in the Trust Account with respect to these shares. In addition, if the Transaction is not consummated, and TM is forced to liquidate, warrants held by TM's directors and officers will expire with no value. These factors created a conflict of interest for TM's directors and officers in negotiating the Transaction on behalf of TM, which resulted in the value of the consideration being paid by TM exceeding 80% of TM's net assets.

In determining that the Transaction had a fair market value equal to at least 80.0% of TM's net assets, TM's board of directors first determined that as of March 31, 2009, TM had approximately $77.4 million in net assets (total assets minus total liabilities). The fair value of the Transaction was determined through arms-length negotiations between the Sellers and TM (Messrs. Green and Bird) and resulted in a minimum purchase price equal to approximately $176.0 million, assuming a value of $8.00 of the TM Common Stock being issued. This amount exceeds 80.0% of TM's net assets at the time our board of directors approved the Share Exchange Agreement and the Transaction. Therefore, the 80.0% test was satisfied.

71.  In touting their experience in valuing companies, TM's directors, including Green and Bird, sought to induce reliance of voting shareholders in their valuation of CCME even though, as was later revealed, the numbers upon which their valuations were premised were not properly audited and could not be confirmed, a fact that must have been known to them. Moreover, TM's directors, including Green and Bird, made no apparent attempt to verify that the financials provided by Hong Kong Mandefu during the due diligence process matched the financials provided to relevant Chinese authorities, including the State Administration of Industry and Commerce ("SAIC" or "AIC").

72.  The October 2009 Proxy further represented that the CCME advertising network included over 16,000 buses, and that CCME had clients such as Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China, and China Pacific Life Insurance.

73.  Further, TM presented Hong Kong Mandefu's financial position through use of financials purportedly audited by Robbins as follows:

|  | For the Years Ended December 31 | | |
|---|---|---|---|
|  | **2006** | **2007** | **2008** |
|  | (Amount in thousands of US dollars, except for number of shares and per share data) | | |
| **Sales, net of business tax and related surcharges:** | $ 4,035 | $ 25,837 | $62,999 |
| **Cost of sales:** | (1,533) | (13,164) | (25,065) |
| **Gross profit** | 2,502 | 12,673 | 37,934 |
| **Operating expenses** |  |  |  |
| Selling expenses | (448) | (923) | (1,095) |
| General and administrative expenses | (448) | (734) | (1,718) |
| Total operating expenses | (916) | (1,657) | (2,813) |
| **Operating income** | 1,586 | 11,016 | 35,121 |
| Interest income | 8 | 24 | 100 |
| **Income before income taxes** | 1,594 | 11,040 | 35,221 |
| Income tax expenses | (689) | (4,073) | (8,854) |
| **Net income** | $ 905 | $ 6,967 | $ 26,367 |
| **Foreign currency translation adjustment** | $ 20 | $ 352 | $ 1,012 |
| **Comprehensive income** | $ 925 | $ 7,319 | $ 27,379 |
| **Earnings per share** |  |  |  |
| Basic and diluted | $ 90.50 | $ 696.70 | $ 2,636.70 |
| **Weighing average number of ordinary shares outstanding** |  |  |  |
| Basic and diluted | 10,000 | 10,000 | 10,000 |

74. These representations would later prove to have been false at the time they were made. It was later revealed, for the reasons discussed, *infra*, that Hong Kong Mandefu's condition, purportedly reflected in the October 2009 Proxy, could not be confirmed, and the extensive due diligence claimed in the October 2009 Proxy would have revealed that Hong Kong Mandefu did not have the value attributed to it in the Proxy.

75. On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with

its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC; Green and Bird knowingly or recklessly made false and misleading statements in the October 2009 proxy, including but not limited to: (i) overstating Hong Kong Mandefu's Gross Profits and Operating Income, (ii) overstating the value of Hong Kong Mandefu, and claiming its value was in excess of 80% of the value of TM, (iii) overstating the size of CCME's advertising network, and (iv) claiming that CCME had clients that it did not have.

76. The fact that Green and Bird did not uncover, report, disclose, investigate, or rectify these problems in TM's public filings, despite their purported extensive due diligence, indicates that they turned a blind eye to serious deficiencies in the information provided to TM, and did not check matching Chinese filings, in a willful and reckless attempt to consummate the reverse merger transaction in order to meet the October 17 deadline.  Their desire to cash out their pre-IPO shares and their unique position of access to Hong Kong Mandefu financial information implies that they had motive and opportunity to carry out these fraudulent and conspiratorial acts.

**Starr's Initial Investment**

77. Starr first learned about CCME through DTT.  In July 2009, Tom Kwok, a DTT partner, introduced Starr employee Dorothy Dong to CCME's CFO, Jacky Lam.  Kwok suggested that Starr talk to Lam about investing in CCME.

78. Lam met with Dong soon thereafter and made an initial presentation on CCME. Dong visited CCME headquarters later that summer and met CCME's chairman, Zheng Cheng, and other CCME senior managers.

79.     During those discussions and during Starr's own subsequent due diligence, CCME management, including Cheng and Lam, orally and in writing, represented CCME to be a highly successful, reputable and profitable media and advertising company, with extensive operations throughout the PRC and provided false and fraudulent information to Starr and its representatives.

80.     Before investing, Starr also retained an affiliate of DTT, Deloitte & Touche Financial Advisory Services Limited ("DTFAS"), to conduct financial due diligence on the Company.  Starr insisted on using a major international accounting firm to conduct the due diligence and would not have made any investment in CCME unless one of the "Big Four" accounting firms became CCME's auditor.

81.     DTFAS did not raise any "red flags" during its due diligence and provided no indication that CCME's profits or financial statements contained any material errors.  The day after DTFAS completed its due diligence for Starr, DTT was engaged by CCME to be CCME's auditor.

82.     On January 12, 2010, after negotiations among the parties, Starr, CCME and affiliated entities, the Lin Defendants, and Cheng entered into a Share Purchase Agreement (the "SPA").  Defendants DTT, Robbins, Lam, Bird and Green were not parties to the SPA.

83.     Under the SPA, which is governed by Delaware law, Starr agreed to purchase, for an aggregate amount of US$30 million, the following securities:

(a)     1,000,000 shares of Series A Convertible Preferred Stock of CCME; and

(b)     warrants to purchase 1,545,455 shares of Common Stock of CCME at a price of $6.47 per share.

84.     The transactions contemplated by the SPA were closed on January 28, 2010. Upon that date, the parties executed various documents memorializing their relationship,

including an Investors Rights Agreement (the "IRA") (guaranteeing certain shareholder, board representation and other rights for Starr) and certain certificates memorializing the terms of the purchased shares and warrants.

85.     Pursuant to the IRA, Starr was entitled to designate one member for election to the Board of Directors of CCME.

86.     CCME made numerous representations and warranties to Starr in the SPA, many of which were false.  For example, section 4.8(a) of the SPA contains a representation that "[t]he financial statements of [CCME] and Hong Kong Mandefu . . . included in . . . the [October 2009 proxy] . . . fairly present in all material respects, in accordance with U.S. GAAP, and in case of the unaudited financial statements, subject only to normal year-end adjustments, as of the dates thereof . . . the financial condition and the results of operations of [CCME] and its Subsidiaries, including, without limitation, . . . [Fujian Fenzhong]."  As alleged herein, the financials were not audited in accordance with applicable standards.

87.     Starr thus relied on the financial statements contained in the October 2009 Proxy in deciding to make its initial investment in CCME pursuant to the SPA.  Starr also relied on other statements and representations made in the October 2009 Proxy, including but not limited to statements made concerning the size of the advertising network and the customers it contained.

88.     A spreadsheet attached to an email sent to a Starr employee on November 5, 2009 by a CCME employee falsely included Coca Cola, Pepsi, Siemens, and China Mobile among the list of customers kept by CCME, thus further supporting the statements in the October 2009 Proxy on which Starr relied.  On information and belief, the CCME employee was acting under the direction of Cheng and Lam.

89.     Contemporaneous with the SPA and as part of the same transaction, Green and Bird entered into a "TM Holders Share Sale Agreement" (the "TM Agreement") with Starr.  In the TM Agreement, persons and entities associated with TM, including Defendants Green and Bird, sold 150,000 shares of CCME common stock to Starr in return "for good and valuable consideration already received."

90.      Starr entered into the TM Agreement in reliance on, among other things, statements made in the October 2009 Proxy.  In addition, Green signed the October 2009 Proxy as Chairman of the Board.  Green and Bird were directors of CCME at the time they sold their shares to Starr.  They remained on the board of CCME until March 8 and March 1, 2010 respectively, shortly before the filing of CCME's 2009 Form 10-K on March 31, 2010.  Green and Bird never corrected the misrepresentations contained in the October 2009 Proxy on which Starr relied.

91.     Based on the aforementioned contacts with Hong Kong Mandefu and involvement in the due diligence process, together with access to confidential documents within the exclusive control of Defendants, Green and Bird had access to and/or control over internal reports and other data and information about Hong Kong Mandefu's finances, operations and sales at all relevant times.

92.     Knowing the true nature and the extent of Hong Kong Mandefu, and consequently, CCME's business relationships and operations, Green and Bird had a motive to make false representations and omissions that CCME was a viable business that was performing well, in order to offload their pre-IPO investment shares, including through the January 2010 TM Agreement.

93.     Knowing the true nature and the extent of Hong Kong Mandefu, and consequently CCME's business relationships and operations, and selling CCME securities to Starr for good and valuable consideration, Green and Bird had a duty to Starr to disclose the true facts of which they were aware.  Their failure to do so constituted a material omission.

94.     The SPA contains an express arbitration provision obligating the parties to that agreement to arbitrate any claims relating to the SPA in Hong Kong.  On March 17, 2011, Starr commenced an arbitration in Hong Kong seeking to recover for CCME's breaches of the SPA consistent with the terms of the SPA.  Starr's claims against the parties to the SPA based on that agreement are therefore not the subject of this action.

### Continuing Material Misstatements

95.  As noted in the October 2009 Proxy, Defendant CCME purports to operate the largest television advertising network on inter-city and airport express buses in China.  The Company claims to generate revenue by selling advertisements on a network of television displays installed on thousands of express buses originating in eighteen of China's most prosperous regions.

96.     On March 23, 2010, CCME issued a press release announcing its fourth quarter and 2009 full-year results.  In the press release, CCME stated in part:

Financial Highlights – Fourth Quarter 2009 vs. Fourth Quarter 2008

* Revenue increased by 90.6% to $32.0 million in the fourth quarter of 2009 as compared to $16.8 million in the same quarter of 2008;
* Gross margin for fourth quarter was 68.9%;
* Income from operation increased by 104.7% to $19.5 million in the fourth quarter of 2009 as compared to $9.5 million in the same quarter of 2008; and
 * Net income increased by 99.6% to $14.3 million in the fourth quarter of 2009 compared to $7.2 million in the same quarter of 2008.

Financial Highlights – Full Year 2009 vs. Full Year 2008

\* Revenue increased 52.3% to $95.9 million in 2009 as compared to $63.0
   million in 2008;
\* Gross margin for year ended December 31, 2009 was 65.7%;
\* Income from operation increased by 61.3% to $56.6 million in 2009 as
   compared to $35.1 million in 2008;
\* Net income increased by 58.2% to $41.7 million in 2009 as compared to
   $26.4 million in 2008; and
\* As of December 31, 2009, the Company had $57.2 million in cash.

\*           \*           \*

[Mr. Cheng] added, "Our network has grown with the signing of several new
agreements with bus operators. As of today, our network includes 49 bus operator
partners, up from 46 at the end of November; these agreements run from three to
eight years. The total number of buses equipped with our television systems is
now over 21,000, increasing approximately by more than 1,000 buses since the
end of November."

Mr. Cheng continued, "Our successful platform, the large and growing network of
bus operators partners, the wide geographic coverage and our competitive
advertising rates, continue to attract a large number of international and national
brands to our advertising network. More than 450 advertisers have purchased time
on our network either through advertising agents or directly from us. Our growing
clientele includes local brand names as well as well-known international and
national brands such as Coca Cola, Pepsi, Wahaha, KFC, Siemens, Hitachi, Haier,
China Telecom, China Mobile, Nokia, China Post, Procter & Gamble, Bank of
China, China Constructing Bank and China Pacific Life Insurance.

97. CCME went on to state:

Based on the current customer base, geographic coverage, network of express
buses and existing revenue streams, CME's management projects that its 2010 net
income (non-GAAP which is before share based compensation or fair value
adjustments for the Company's financial instruments), will be in the range of $71
million to $75 million. These projections exclude the impact of any possible
acquisitions, additional of new buses and new investments in other media projects
in 2010."

98.     On information and belief, premised on facts including but not limited to: (1)

subsequent media reports indicating falsified statements made by CCME, (2) the resignations of

several of CCME's independent directors and statements made in connection with their

resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4)

the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the March 23, 2010 press release, including but not limited to: (i) overstating the revenue and net income of CCME, (ii) overstating the number of buses in the CCME advertising network, and (iii) claiming that CCME had clients that it did not have.

99. On March 31, 2010, CCME's Form 10-K filed with the SEC for the fiscal year ended December 31, 2009, describes CCME's business and operations in relevant part as follows:

**Business Summary**

***Overview***

CME, through contractual arrangements with Fujian Fenzhong, an entity majority owned by CME's majority shareholder, operates the largest television advertising network on inter-city express buses in China. All references in this Report to "CME's advertising network", "CME's customers", CME's operations in general and similar connotations, refer to Fujian Fenzhong, an entity which is controlled by CME through contractual agreements and which operates the advertising network. While CME has no direct equity ownership in Fujian Fenzhong, through the contractual agreements CME controls the activities and receives the economic benefits of Fujian Fenzhong's operations. CME generates revenue by selling advertising on its network of television displays installed on inter-city express buses in China. As of July 31, 2008, CME's advertising network accounted for 81% of all inter-city express buses installed with hard disk drive players, and 55% of all inter-city express buses installed with any type of television display, according to CTR Market Research. CME commenced its advertising services business in November 2003 as one of the first participants in advertising on inter-city express buses in China. CME believes its early entry into this business has enabled them to achieve an audience reach that is highly attractive to advertisers.

CME's extensive and growing network covers inter-city express bus services originating in China's most prosperous regions. As of December 31, 2009, CME's network covered inter-city express bus services originating in fourteen regions, including the five municipalities of Beijing, Shanghai, Guangzhou, Tianjin and Chongqing and nine economically prosperous provinces, namely Guangdong, Jiangsu, Fujian, Sichuan, Hubei, Anhui, Hebei, Shandong and Shanxi. These fourteen regions in aggregate generated more than half of China's gross domestic product, or GDP, in 2007, according to the National Bureau of Statistics of China. CME's network is capable of reaching a substantial and

growing audience. In the first seven months of 2008, a monthly average of 53 million passengers traveled on inter-city express buses within CME's network, representing 57% of all passengers traveling on inter-city express buses installed with television displays in China, according to CTR Market Research.  Many of the cities connected in CME's network are major transportation hubs, which serve as points of transfer for large numbers of leisure, business and other travelers in China to other modes of transportation. CME's network also includes airport buses connecting major cities to airports and tour buses traveling on routes that connect major cities with popular tourist destinations in China. As of December 31, 2009, CME's network covered all of the transportation hubs designated by the Ministry of Transport, and CME expects to further increase this percentage as it continues to expand the geographic coverage of its network. In addition to major transportation hubs, the network also covers small to medium-sized cities in China, some of which rely on highway transportation as the primary transportation option for connection outside these cities.

CME has entered into long-term framework agreements with 45 bus operator partners for terms ranging from five to eight years. Pursuant to these agreements, CME pays the bus operators concession fees for the right to install its displays and automated control systems inside their buses and display entertainment content and advertisements. CME's entertainment content is provided by third parties and advertisements provided by its clients. CME obtains a wide range of free entertainment content from Fujian SouthEastern Television Channel and Hunan Satellite Television each month and purchases a limited amount of copyrighted programs from the Audio and Video Publishing House of Fujian Province. As of December 31, 2009, the number of inter-city express buses within CME's network is 20,161.

In October 2007, CME entered into a five-year cooperation agreement with Transport Television and Audio-Video Center, or TTAVC, an entity affiliated with the Ministry of Transport of the People's Republic of China, to be the sole strategic alliance partner in the establishment of a nationwide in-vehicle television system that displays copyrighted programs on buses traveling on highways in China. The cooperation agreement also gave CME exclusive rights to display advertisements on the system. In November 2007, TTAVC issued a notice regarding the facilitation of implementation of the system contemplated under the cooperation agreement to municipalities, provinces and transportation enterprises in China. CME believes its status as the sole strategic alliance partner designated by TTAVC and the exclusive rights to display advertisements on the system has facilitated its historical expansion and is expected to continue to provide them with a competitive advantage in the future.

CME believes its network is a highly effective advertising medium. The network is capable of reaching audiences on inter-city express buses while they remain in a comfortable and enclosed environment with minimal distraction. The majority of the inter-city express buses within the network are equipped with leather seats and air-conditioning, providing a comfortable environment which makes the audiences more receptive to the content displayed on CME's network. Inter- city travel in China typically takes a number of hours. Audiences are therefore exposed to the content displayed on its

advertising platform for a significantly longer period of time than on shorter-distance travel. In addition, CME's patented automated control systems ensure that the programs and advertisements are displayed continuously throughout the journey.

100.   The 2009 10-K represented that CCME's clients included: Coca Cola, Pepsi, Wahaha, KFC, Siemens, Hitachi, Haier, China Telecom, China Mobile, Nokia, China Post, Procter & Gamble, Bank of China, China Constructing Bank and China Pacific Life Insurance.

101.   The 2009 10-K states that CCME had total revenues of $63.0 million in 2008, and $95.9 million in 2009.

102.   The same 10-K states that CCME had gross profits of $37.9 million in 2008, and $63.0 million in 2009.

103.   CCME's Form 10-K also includes a copy of a Report of Independent Registered Public Accounting Firm signed by DTT.  DTT's report indicates that they "have audited the accompanying consolidated balance sheet" of CCME as of December 31, 2009 and concludes:

> In our opinion, such consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Group as of December 31, 2009, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.  Also, in our opinion, such financial statements schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

104.   CCME's Form 10-K contains a certification signed by CCME's Chief Executive Officer (Cheng) and Chief Financial Officer (Lam) as required by Sarbanes-Oxley, attesting, among other things, that (1) the Report fully complies, in all material respects, with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

105.   The filing also includes a separate certification from each of Cheng and Lam that states:  "Based on my knowledge, this report does not contain any untrue statement of a material

fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Those same certifications go on to state that: "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

106.    On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the 2009 10-K including but not limited to: (i) overstating the gross profits and total revenues of CCME in 2008, (ii) overstating the gross revenue and profits of CCME in 2009, (iii) overstating the number of buses equipped with CCME's television system, and providing revenue to the Company, and (iv) claiming that CCME had clients that it did not have.

107.    On May 14, 2010, CCME announced "Strong First Quarter Financial Results," disclosing in part:

> China MediaExpress Holdings, Inc. (NYSE Amex: CCME) ("CME" or "Company"), China's largest television advertising operator on inter-city express buses, today announced financial results for the first quarter ended March 31, 2010.

Financial Highlights – First Quarter 2010 vs. First Quarter 2009

* Revenue increased by 137% to $44.5 million as compared to $18.8 million;
* Gross margin for first quarter was 60%;
* Income from operations increased by 130% to $24.2 million as compared to $10.5 million;
* Net income increased by 143% to $18.1 million as compared to $7.5 million; and,
* As of March 31, 2010, the Company had more than $114.4 million in cash.

Zheng Cheng, CCME's Founder and CEO, commented, "We started 2010 on a very strong note with record revenue and net income. Our revenue and net income for the quarter grew by 39% and 27% respectively when compared to the 2009 fourth quarter. Basic and diluted earnings per share in the first quarter of 2010 was $0.28 and $0.27, respectively (after a one-time charge of $9,242,000 related to a deemed dividend on the issuance of our convertible preferred stock in the first quarter); excluding this deemed dividend, the income attributable to holders of common shares (non-GAAP net income) would be $18,142,000 and the basic and diluted earnings per share would have been $0.58 and $0.54, respectively."

*                    *                    *

Mr. Cheng continued, "Our network continues to grow through new agreements with bus operators and currently includes 49 bus operator partners, up from 46 at the end of 2009. The number of buses equipped with our television systems is now over 21,500. The growing network has attracted more than 450 advertisers either through advertising agencies or directly from us. Our clientele includes Hitachi, China Telecom, Toyota, Siemens and China Pacific Life Insurance, which have purchased advertising time from CME for more than three years; and many other well-known international and national brands including Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance."

108.    The May 14, 2010 press release continued to state:

Based on the current customer base, geographic coverage, network of express buses and existing revenue streams, CME's management reaffirms its 2010 net income guidance which is expected to be in the range of $71 million to $75 million (on a non-GAAP basis, exclusive of share based compensation in connection with the share incentive plan which is expected to be adopted and with options to be granted in the 2nd or 3rd quarter of 2010 or deemed dividend on issuance of convertible preferred shares). As previously announced, these projections exclude the impact of any possible acquisitions, additional of new buses and new investments in other media projects in 2010."

109.    On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the May 14, 2010 press release, including but not limited to: (i) overstating its financials including its net income and revenue, (ii) overstating the size of its advertising network, and (iii) claiming that CCME had clients it did not have.

110.    Also on May 14, 2010, CCME filed its Form 10-Q with the SEC reflecting its financial results for the quarter ended March 31, 2010.  Again, CCME reported positive financial results and represented its business to be performing well.  The Condensed Consolidated Statements of Cash Flows contained in the Form 10-Q reflected net income for the period ended March 31, 2010 of $18.1 million, compared with $7.5 million for the same period in 2009.

111.    The first-quarter 10-Q additionally represented that CCME had attracted Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance to its advertising network.

112.    CCME's Form 10-Q contains a certification signed by CCME's Chief Executive Officer (Cheng) and Chief Financial Officer (Lam) as required by Sarbanes-Oxley, attesting, among other things, that (1) the report fully complies, in all material respects, with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the

information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the Company.

113.    The filing also includes a separate certification from each of Cheng and Lam states that:  "Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report."  Those same certifications go on to state that: "Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report."

114.    On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the 2010 First Quarter 10-Q including but not limited to (i) overstating CCME's net income and (ii) claiming that CCME had clients that it did not have.

115.    On July 12, 2010, CCME issued a press release touting its improved financial forecasts:

Fujian, China - July 12, 2010 - China MediaExpress Holdings, Inc. (NASDAQ GS: CCME) ("CME" or "Company"), China's largest television advertising operator on inter-city and airport express buses, today announced that based on the latest developments, including the expanded geographic coverage, increased number of inter-city buses, and higher margins from the airport express buses platform, it is revising its 2010 net income guidance.

The revised guidance calls for 2010 net income to be in the range of $82 million to $85 million (on a non-GAAP basis, exclusive of non-cash charges for (i) share based compensation in connection with grants under the Company's share incentive plan expected to be adopted later in 2010 and (ii) deemed dividends on outstanding convertible preferred shares), compared to the initial 2010 net income guidance of $71 million to $75 million.

Jacky Lam, CME's Chief Financial Officer stated, "Our revised 2010 net income guidance reflects the continued growth of our business from existing revenue sources, and excludes the impact of any possible acquisitions, additional new buses, new revenue streams and any new investments in other media projects in 2010.

"We expect to continue to benefit from China's rapid increase in advertising spending - which is projected to remain one of the fastest growing advertising markets in the world - sustained economic growth, and increases in disposable income and domestic consumption. We plan to continue to grow our business organically and we are also actively looking for acquisition opportunities within our core business platform. Furthermore, we are working hard to finalize several new projects which we believe will further enhance CME's shareholder value. We have sufficient resources to fund our business expansion plans, including internal growth initiatives as well as potential acquisitions."

116.    On July 14, 2010, spreadsheets summarizing June income and balance sheets were sent to a Starr company by a CCME employee.  One such spreadsheet represented that Fujian Across Express' total profits in the year to date amounted to 352,950,398.8 Renminbi, or approximately $52 million.[2]  On information and belief, the CCME employee was acting under the direction of Cheng and Lam.

117.    On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their

---

[2] Using the July 14, 2010 exchange rate of approximately 0.1476 US Dollars to each Renminbi.

resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC; CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the July 14, 2010 spreadsheet including but not limited to overstating CCME's total profits.

118.    On August 13, 2010, CCME announced "Record Second Quarter Financial Results."  Specifically, CCME issued a press release touting:

**Financial Highlights – Second Quarter 2010 vs. Second Quarter 2009**

* Revenue increased by 180% to $53.5 million as compared to $19.1 million;
* Gross margin for the current second quarter was 79% as compared to 62%
* Income from operations increased by 245% to $38.3 million as compared to $11.1 million; and
* Net income increased by 244% to $28.5 million or $0.80 per diluted share as compared to $8.3 million or $0.40 per diluted share.

**First Half 2010 vs. First Half 2009**

* Revenue increased by 159% to $98.0 million as compared to $37.9 million;
* Gross margin for the current first half period was 70% as compared to 62%;
* Income from operations increased by 189% to $62.5 million as compared to $21.6 million;
* Net income increased by 196% to $46.6 million or $1.07 per diluted share as compared to $15.7 million or $0.75 per diluted share; and
* As of June 30, 2010, the Company had more than $139 million in cash.

                    *               *               *

Mr. Cheng continued, "From January 2010 to now, we have grown our network by approximately 3,000 express buses to more than 23,200 express buses and we have long-term contracts in place, ranging from three to eight years with 61 bus operators."

Mr. Cheng noted, "Our clientele continues to grow and includes prestigious clients such as Hitachi, China Telecom, Toyota, Siemens, China Pacific Life Insurance (all of which have purchased advertising time from CME for more than

three years), Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance. In 2010, our clientele was expanded to include prestigious names such as Wrigley, Bank of Communication and Callreta D."

119. CCME went on to announce:

The Company reaffirms its recently revised 2010 net income guidance which is expected to be in the range of $82 million to $85 million (on a non-GAAP basis, exclusive of non-cash charges for (i) share based compensation in connection with the granting of options under the Company's share incentive plan expected to be adopted later in 2010 and (ii) deemed dividends on outstanding convertible preferred shares). Again, these projections exclude the impact of any possible acquisitions, additional of new buses and new investments in other media projects in 2010.

120. On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the August 13, 2010 press release, including but not limited to: (i) overstating CCME's net income and revenue, (ii) overstating the size of CCME's advertising network, and (iii) claiming that CCME had clients that it did not have.

121. Also on August 13, 2010, CCME filed its Form 10-Q with the SEC reflecting its financial results for the quarter ended June 30, 2010. As with the prior filings, this Form 10-Q reflected continued positive performance by CCME. Among other things, the Form 10-Q reflected net income of $46.6 million for the six months ended June 30, 2010, compared with $15.7 million for the same period in 2009.

122.    The Second Quarter 10-Q also represented that CCME had attracted Coca Cola,

Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of

China and China Pacific Life Insurance as clients.

123.    CCME's Form 10-Q contains a certification signed by CCME's Chief Executive

Officer (Cheng) and Chief Financial Officer (Lam) as required by Sarbanes-Oxley, attesting,

among other things, that (1) the report fully complies, in all material respects, with the

requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the

information contained in the report fairly presents, in all material respects, the financial condition

and results of operations of the Company.

124.    The filing also includes a separate certification from each of Cheng and Lam that

states: "Based on my knowledge, this quarterly report does not contain any untrue statement of a

material fact or omit to state a material fact necessary to make the statements made, in light of

the circumstances under which such statements were made, not misleading with respect to the

period covered by this quarterly report."  Those same certifications go on to state that: "Based

on my knowledge, the financial statements, and other financial information included in this

quarterly report, fairly present in all material respects the financial condition, results of

operations and cash flows of the registrant as of, and for, the periods presented in this quarterly

report."

125.    On information and belief, premised on facts including but not limited to: (1)

subsequent media reports indicating falsified statements made by CCME, (2) the resignations of

several of CCME's independent directors and statements made in connection with their

resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4)

the resignation of CCME's independent auditor, DTT, and statements made in connection with

its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the Second Quarter 2010 10-Q including but not limited to: (i) overstating CCME's net income and (ii) claiming that CCME had clients that it did not have.

126.    CCME also held a conference call with investors on August 13, 2010.

127.    On September 16, 2010, CCME announced that a share repurchase program had been approved by its board of directors.  Among other things, the September 16 press release announced:

> Mr. Zheng Cheng, CCME's Chairman and Chief Executive Officer, noted, "CCME has a strong balance sheet. Our Board of Directors believes that the current share price of our common stock does not reflect the Company's fair value. The share repurchase program represents a good use of a portion of our cash position, is an attractive investment opportunity for CCME and its shareholders and is consistent with our commitment to enhance stockholder value."

128.    CCME's statements described above were materially false and/or misleading when made because, as stated in further detail below, CCME's financial results were materially overstated as were its statements regarding the size and success of its business operations, including, without limitation, statements regarding its profitability and the number of buses in its network.

**Starr Purchases Additional Securities from the Lin Defendants Based on Defendants'
Continuing Misrepresentations and Omissions**

129.    Based on the foregoing continuing false and misleading representations made by Defendants to Starr and the market, and Defendants' failure to correct their prior misrepresentations, Starr acquired additional shares of CCME stock from the Lin Defendants.

Absent such false and misleading statements, Starr would not have acquired additional CCME stock and/or would not have paid the price it did for the additional CCME stock.

130.    Specifically, on October 12, 2010, Starr entered into a Share Sale Agreement with Thousand Space, a company organized under the laws of the British Virgin Islands and wholly owned and controlled by Ou Wen Lin, to purchase 1,000,000 shares of CCME stock at $9 per share.

131.    Also on October 12, 2010, Starr entered into a Share Sale Agreement with Bright Elite, a company organized under the laws of the British Virgin Islands and wholly owned and controlled by Qingping Lin, to purchase 500,000 shares of CCME stock at $9 per share. The transaction closed on October 18, 2010.

132.    On information and belief, Ou Wen Lin and Qingping Lin had access to and/or control over certain members of CCME's board of directors at all relevant times. Specifically, Ou Wen Lin serves as the Chairman, CEO and founding shareholder and Qingping Lin serves as the General Manager, COO and founding shareholder of Wuyi International Pharmaceutical Company Limited ("WIPC"). At all relevant times, WIPC's Company Secretary and Financial Controller, Marco Kung, concurrently served on the Board of Directors of CCME.

133.    Further demonstrating the connectedness between WPIC and CCME, the two companies share a Hong Kong address, namely: Suite 2805, 28/F., Central Plaza, 18 Harbour Road, Wanchai, Hong Kong.

134.    On information and belief, Ou Wen Lin and Qingping Lin enjoyed significant and longstanding personal and professional contact and familiarity with the other defendants and had access to and/or control over Cheng and Lam and other members of CCME's management team at all relevant times. Ou Wen Lin and Qingping Lin, through Thousand Space and Bright Elite

respectively, along with Cheng, were the founding shareholders of Hong Kong Mandefu, the

predecessor to CCME, which was formed on April 25, 2001.  As of the time of the reverse

merger with TM on October 15, 2009 discussed above, Cheng, Ou Wen Lin, and Qingping Lin

were the sole shareholders of Hong Kong Mandefu, then doing business as China MediaExpress.

135.   Additionally, and further demonstrating the connectedness among Ou Wen Lin,

Qingping Lin, and Cheng, the Investor Rights Agreement between the defendants and Starr,

dated January 28, 2010, indicates that all notices and communications with respect to the

agreement, if to Ou Wen Lin, Qingping Lin, Thousand Space, or Bright Elite, should be

addressed to the common attention of Zheng Cheng at: Room 2805, Central Plaza, WanChai,

Hong Kong.  This is the aforementioned address shared by WPIC and CCME.

136.   On information and belief, based on the aforementioned long-standing

relationships and contacts with certain members of CCME's board of directors and management

team, Ou Wen Lin and Qingping Lin had access to and/or control over internal reports and other

data and information about CCME's finances, operations and sales at all relevant times.

137.   On information and belief, because they had access to information concerning the

true nature and the extent of CCME's business relationships and operations, Ou Wen Lin and

Qingping Lin had a motive to sell their shares to Starr at an artificially inflated price while Starr

and the market still believed the foregoing false and misleading representations made by

Defendants that CCME was a viable business that was performing well.

138.   Ou Wen Lin and Qingping Lin had further motive to remain silent as to the true

facts concerning CCME's operations and financial condition because they stood to receive

TM/CCME earnout shares in the Third Quarter of 2010, pursuant to the terms of the reverse

merger, based on CCME's purported financial performance, which they received on August 12, 2010.

139.    Because they sold CCME securities directly to Starr, Ou Wen Lin and Qingping Lin had a duty to Starr to disclose the true facts that they knew, should have known, or recklessly disregarded.  Their silence and failure to do so constituted a material omission.

140.    Based on the false financial and business information provided by CCME to Starr and to the market, Starr paid the Lin Defendants $13.5 million on or about October 13, 2010 in exchange for 1.5 million shares of CCME common stock.  Thus, the Lin Defendants were able to sell to Starr a substantial portion of their holdings just a short time before the Defendants' misrepresentations were disclosed.

### Further Misrepresentations

141.    Following Starr's acquisition of these shares, CCME acknowledged Starr's reliance on CCME's false representations concerning its business plan and growth prospects, stating in a press release issued on October 13, 2010:

> Fujian, China — October 13, 2010 — China MediaExpress Holdings, Inc. (NASDAQ GS: CCME) ("CCME" or "Company"), China's largest television advertising operator on inter-city and airport express buses, today announced that Starr International Company, Inc. ("Starr International"), through its wholly-owned subsidiary, Starr Investments Cayman II, Inc. ("Starr Cayman"), has agreed to purchase an aggregate of 1.5 million shares of the Company's common stock in two private transactions. Mr. Ou Wen Lin and Mr. Qing Ping Lin, two of CME's founding shareholders, through their holding companies, Thousand Space Holdings Limited and Bright Elite Management Limited have agreed to sell 1,000,000 and 500,000 shares of the Company's common stock, respectively, to Starr International at $9 per share. Although the agreement was signed after the Chinese Golden Week holiday, it has been under discussion between the parties since the middle of September, and the selling price was based on CME's average closing trading prices for that month. It is CME's understanding that Mr. Ou Wen Lin and Mr. Qing Ping Lin intend to use proceeds from the stock sale to finance their other personal business projects that are unrelated to CME.
>
> Starr International is one of the major investors in CCME, having invested, through Starr Cayman, $30 million in January 2010 in the form of 1,000,000

shares of CME Series A Convertible Preferred Stock at $30.00 per share, together with 1,545,455 of CCME common stock purchase warrants.

Mr. Zheng Cheng, CME's Chairman and Chief Executive Officer, noted, "We are pleased that Starr International increased its investment in CME, **which is indicative of their continued confidence in our business plan and growth prospects**. This transaction is also an indication that Starr International views its investment in CME as a very sound long-term investment for the firm and its investors. We are glad that the Ou Wen Lin and Qing Ping Lin were able to satisfy their personal liquidity requirements while meeting Starr International's investment objectives in a manner consistent with our understanding of their intention to avoid sales into the public market."

. . . Fujian Fenzhong generates revenue by selling advertisements on its network of television displays installed on over 24,400 express buses originating in eighteen of China's most prosperous regions, including the four municipalities of Beijing, Shanghai, Tianjin and Chongqing and fourteen economically prosperous regions. . . . (emphasis added)

142.   On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the October 13, 2010 press release, including but not limited to claiming that CCME sold advertising space on 24,400 buses.

143.   On November 1, 2010, an employee of CCME sent Starr an email attaching a spreadsheet noting CCME's earnings in the first three months of 2009 and 2010.  The spreadsheet lists CCME's sales for the first nine months of 2009 as 477,764,200 Renminbi, or

approximately $71 million.[3]  Similarly, it lists the company's gross profits as 341,900,186.03 Renminbi, or approximately $51 million.  On information and belief, the CCME employee was acting under the direction of Cheng and Lam.

144.   The same spreadsheet lists CCME's sales for the first nine months of 2010 as 1,141,518,000 Renminbi, or approximately $171 million, and its gross profits for the same time period as 922,325,085.27 Renminbi, or approximately $138 million.

145.   On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC; CCME knowingly or recklessly made false and misleading statements in the November 1, 2010 spreadsheet including but not limited to: (i) overstating its sales and gross profits for the first three months of 2009, and (ii) overstating its sales and gross profits for the first three months of 2010.

146.   On November 8, 2010, CCME issued a press release titled, "China MediaExpress Holdings, Inc. Announces Third Quarter Financial Results."  Therein, the Company, in relevant part, stated:

> China MediaExpress Holdings, Inc. (NASDAQ GS: CCME) ("CCME" or "Company"), China's largest television advertising operator on inter-city and airport express buses, today announces financial results for the three and nine months ended September 30, 2010.

---

[3] Assuming the November 1, 2010 exchange rate of 0.1494 US Dollars to 1 Renminbi.

**Third Quarter 2010 vs. Third Quarter 2009**

Revenue increased by 118% to $57.0 million as compared to $26.1 million; Gross margin was 76.8% as compared to 67.0%; Income from operations increased by 166% to $41.2 million as compared to $15.5 million; and, Net income increased by 167% to $31.1 million or $0.81 per diluted share as compared to $11.7 million or $0.56 per diluted share.

**Nine Months 2010 vs. Nine Months 2009**

*Revenue increased by 142% to $155.0 million as compared to $64.0 million;
*Gross margin was 72.6% as compared to 64.1%;
*Income from operations increased by 179% to $103.8 million as compared to $37.2 million;
*Net income increased by 184% to $77.8 million or $1.86 per diluted share as compared to $27.4 million or $1.31 per diluted share; and,
*As of September 30, 2010, the Company had approximately $170 million in cash.

Zheng Cheng, CME's Founder and CEO, commented, "As expected, revenue and net income maintained very strong growth in the third quarter. The growth was primarily attributed to the power from our largest inter-city buses network in China where our advertising time sold, average advertising rates, number of our advertising customers, and a greater proportion of direct sales to agency sales increased substantially compared to last year.

"In addition, embedded advertising continued to generate a significant portion of our revenue as we have packaged and sold it separately to our clients since Q3 2009. The embedded advertising, which is displayed during the broadcasting of the content, has relatively low production cost, generates high margins and accounts for approximately 23% of our revenue for the nine months ended September 30, 2010.

"Furthermore, our year-to-date results reflect the success of our airport express bus business. Since the first launch of this new business line at the beginning of 2010, the advertising packages sold for airport express buses have been at premium prices, because of the demographics of airport express bus travelers, exclusivity for all the buses from the airports and the unique captive environment. As a result, the expansion of this business has generated significant revenue and has produced higher gross margins overall. For the nine months ended September 30, 2010, the revenue generated from airport express buses was approximately $35.1 million, of which approximately $15.0 million was generated in the third quarter. Our network today covers six large and important airports in China: Beijing, Fuzhou, Guangzhou, Qingdao, Changsha and Chongqing."

Mr. Cheng continued, "We continue to grow our bus network through new contracts with bus operators in regions we already serve and by expanding into new regions in this highly fragmented niche market. Since the start of this year, we have grown our network by more than 4,000 express buses and have expanded into five new regions: Zhejiang,

Hunan, Jianxi, Henan and Inner Mongolia. We have long-term contracts in place, ranging from three to eight years with 63 bus operators."

Jacky Lam, CME's Chief Financial Officer stated, "As of September 30, 2010, we had approximately $170 million in cash up from $139 million as of June 30, 2010. Cash generated from operating activities for the first nine months of 2010 was $69.0 million (of which $30.8 million was generated in the third quarter), compared to $29.9 million generated in the same period of 2009. Net cash used in investing activities during the current nine month period was $3.6 million. Our cash resources continue to be sufficient to meet both our short-term and long-term liquidity needs, capital expenditure requirements to achieve our expansion plans, including internal growth initiatives as well as potential acquisitions."

**Increase 2010 Net Income Guidance**

Based on year-to-to-date results and expectations for the fourth quarter, the Company is increasing its 2010 net income guidance which is expected to be in the range of $100 million to $104 million compared to the previous net income guidance of $82 million to $85 million (on a non-GAAP basis, exclusive of non-cash charges for (i) share based compensation in connection with the granting of options under the Company's share incentive plan expected to be adopted later in 2010 and (ii) deemed dividends on outstanding convertible preferred shares).

Mr. Cheng concluded, "As we have mentioned in the past, we are working on several additional opportunities to increase our market share and reinforce our position as one of the leading players in the out-of-home advertising space. Furthermore, mergers and acquisition remain a corporate priority. We are very proud of our achievements and look forward to continued growth during the years ahead."

147.    On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the November 8, 2010 press release including but not limited

to: (i) overstating CCME's gross margin, income from operations, assets and revenues, and (2) overstating the growth of CCME's advertising network by a purported 4,000 buses.

148.    Also on November 9, 2010, CCME filed its Form 10-Q with the SEC reflecting its financial results for the quarter ended September 30, 2010.  As with the prior filings, this Form 10-Q reflected continued positive performance by CCME.  Among other things, the Form 10-Q reflected net income of $77.8 million for the nine months ended September 30, 2010, compared with $27.4 million for the same period in 2009.

149.    The Third Quarter 10-Q additionally represented that CCME had attracted Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance as clients.

150.    CCME's Form 10-Q contains a certification signed by CCME's Chief Executive Officer (Cheng) and Chief Financial Officer (Lam) as required by Sarbanes-Oxley, attesting, among other things, that (1) the report fully complies, in all material respects, with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the Company.

151.    The filing also includes a separate certification from each of Cheng and Lam states that:  "Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report."  Those same certifications go on to state that:  "Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of

operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report."

152.    On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the Third Quarter 2010 10-Q including but not limited to (i) overstating CCME's net income, and financial information generally, and (ii) claiming that CCME had clients that it did not have.

### Green and Bird Cash Out Before CCME's Fraud Becomes Known

153.    Defendants Green and Bird had a motive to keep silent regarding the truth about CCME.  While the market and Starr still believed the foregoing false and misleading representations made by CCME that CCME was performing well, CCME filed its 2010 Form S-3 to allow Green and Bird to sell their shares to the public at an artificially inflated price.  The 2010 Form S-3 incorporated by reference the financial statements included in the 2009 Form 10-K and repeated Defendants' prior misrepresentations and omissions.  Thus Green and Bird were able to cash out before the misrepresentations and omissions were disclosed.

**Starr Converts Warrants into Additional Securities in Reliance on Defendants' Continuing Misrepresentations and Omissions**

154.   Based on the foregoing continuing false and misleading representations and omissions that CCME was performing well, on December 8, 2010, Starr acquired 1,545,455 additional shares of CCME stock through the exercise of warrants, for which Starr paid approximately $10 million.  Absent such false and misleading statements and omissions by Defendants, Starr would not have acquired the additional CCME stock and/or would not have exercised the warrants.

**The Truth Is Revealed**

155.   By mid-2010, DTT began receiving anonymous complaints alleging that CCME and Cheng were committing fraud through the corporate entity.

156.   Financial analysts and investigative reporters eventually began conducting their own investigation into CCME to determine whether the corporation was, in whole or in part, a fraud.

157.   On January 30, 2011, analyst firm Citron Research published a report alleging that CCME had misrepresented, among other things, the scope of the Company's operations, its financial performance, and the extent of the Company's claimed strategic partnership with a government-affiliated entity. The Citron Research report concluded that the Company "does not exist at the scale that they are reporting to the investing public."  It identified the following sources of information indicating that CCME did not exist, or was far smaller than was first thought, including but not limited to:

- A "vacuum" of local media coverage on CCME's operating company.

- CCME's absence from a variety of market and industry reports listing the key players in its field.

- CCME's unexplained ability to generate significantly more revenue per LCD screen than its competitors.

158.   At its peak, CCME shares traded at $23.97 per share and the company had a market capitalization of approximately $884 million (assuming 36.9 million shares outstanding). On Friday, January 28, 2011 CCME shares closed at $20.86 per share.  On the news of the Citron report, shares of CCME declined $3.02 per share, more than 14%, to close on January 31, 2011, at $17.84 per share, reflecting a market capitalization of approximately $658 million.

159.   Three days later, on February 3, 2011, analyst firm Muddy Waters issued a detailed report echoing many of the allegations in the Citron Research report. Among other things, the Muddy Waters report alleged that CCME "is engaging in a massive 'pump and dump' scheme. . . . significantly inflating its revenue and earnings in order to pay management earn-outs and inflate the stock price so insiders can sell."  It detailed several misrepresentations it claimed to discover, including:

- The fact that CCME, although it tells its investors that is has over 27,200 buses in its network, tells its advertisers that it only has 12,565 buses in its network.

- That a report on which CCME relied by CTR Market Research included gross exaggerations of the number of buses that certain operators held.

- That many of the buses that are purported to be in CCME's network do not display CCME content, and were instead playing videos without CCME content.

- That it had contacted advertisers that CCME had represented were clients and discovered that three of its top ten advertisers were represented by media buyers that had never heard of CCME.

- That several of CCME's purported "competitors" had not heard of them.  The same competitors also stated that the airport express bus contracts from which CCME purported to derive revenue were far less profitable than what CCME led the public to believe.

160.    Following those disclosures, CCME shares declined $5.52 per share, or 33.23%, to close on February 3, 2011, at $11.09 per share on unusually heavy volume of more than 21.6 million shares traded.

161.    On February 1, 2011, CCME issued a press release and on February 7, 2011, Cheng issued a letter to CCME shareholders, claiming to refute the allegations of Citron and Muddy Waters.  The assertions in the press release and Cheng's letter were not specific; and they did not satisfy the market.  CCME shares closed on February 7 at $13.14 per share but by February 11, 2011, were back down to $11.92 per share, and never again reached their prior high level.

162.    CCME failed to provide a credible response to allegations of fraud.  DTT sent a letter to the Board and Audit Committee of CCME dated March 3, 2011 (the "DTT Letter"), which stated:

> In the course of our audit of the consolidated financial statements of the Group for the year ended 31 December 2010, we have encountered a number of significant issues which we want to bring to your attention.  You should be aware that our audit procedures were extended in some instances in light of the aforesaid allegations. . . .

> These are serious issues that raise questions about the validity of certain transactions and balances.  We bring these issues to your attention in the context of our responsibilities under Statement on Auditing Standards No. 99 "Consideration of Fraud in Financial Statement Audit" issued by the American Institute of Certified Public Accountants.

163.    The DTT Letter included a summary of the public allegations against CCME summarized in a chart as follows:

| Issue date | Allegations | Source | Date notified to Audit Committee |
|---|---|---|---|
| 31 January 2011 | Citron Research Reports on CCME – The China Reverse Merger stock that is "Too Good to be True" | Media | N/A |
| 1 February 2011 | Anonymous email alleging overstatement of revenue in 2009 and 2010. | Deloitte | February 1, 2011 |
| 3 February 2011 | Muddy Waters Research – CCME: Taking the Short Bus to Profits | Media | N/A |
| 8 February 2011 | Email from an individual alleging non-existence of cash balances | Deloitte | February 25, 2011 |
| 11 February 2011 | Open letter from deloittewatch setting out 9 warning signs | Deloitte | February 14, 2011 |
| 21 February 2011 | Email from a private fund manager alleging CCME committing accounting fraud. | Deloitte | February 23, 2011 |
| 23 February 2011 | Letters from Muddy Waters LLC alleging CCME committing securities fraud. | Deloitte | February 23, 2011 |
| 26 February 2011 | Email from reader10-Q's Instablog alleging CCME has made an apparent misrepresentation about a customer relationship | Deloitte | February 28, 2011 |
| 28 February 2011 | Email from LMG Capital alleging CCME committing corporate fraud | Deloitte | February 28, 2011 |
| 2 March 2011 | Email from Muddy Waters presenting its recent research – CCME: Irrefutable Evidence of Fraud | Deloitte | 3 March 2011 |
| 3 March 2011 | Email from the private fund manager (see 21 February 2011 above) presenting additional findings on CCME | Deloitte | 3 March 2011 |

164.    The DTT Letter confirms that the allegations of fraud made in analyst reports were not mere conjecture.  DTT found that there were "serious issues that raise questions about the validity of certain transactions and [CCME bank] balances."

165.    Against the background of the significant allegations of fraud, the DTT Letter set forth the results of DTT's own preliminary investigation and raised twelve specific concerns:

(i)     DTT's review of bank slips attached in Fujian Fenzhong's accounting books and the bank statements of Fujian Fenzhong and its subsidiary, Fujian Suliangou "revealed abnormalities that cast doubts about the authenticity of these documents."

(ii)    There were also significant abnormalities with Fujian Fenzhong's bank confirmation and bank statements which "call into question the validity and authenticity of the bank confirmation and bank statements" provided to DTT.

(iii)   The Financial Controller of Fujian Fenzhong informed DTT that Fujian Fenzhong only holds one bank account with the Agricultural Bank of China but information extracted from the Chinese Administration of Industry and Commerce ("AIC") showed that Fujian Fenzhong had other bank accounts and held short-term loans that were not reported to DTT.

(iv)    There were "major inconsistencies" between the audited financial report of Across Express and the financial report Across Express filed with AIC. While the two reports were issued by the same accounting firm and contains the same report reference number, there are large differences in the revenue information reported on its audited financial statement (RMB 434,040,421.97) and the financial statement submitted to AIC (RMB 0).

(v)     The tax invoices provided to DTT appeared to be invalid.  Certain of the tax invoices contained a 7-digit invoice number and do not contain any

invoice code.  Tax bureau representatives advised DTT that current tax

invoices should contain an 8-digit invoice number and an invoice code.

(vi)    DTT was unable to confirm tax payments of Fujian Fenzhong and Across

Express.

(vii)   Searches of Fujian Fenzhong's purported top ten customers indicate that

one customer has filed for deregistration and the business license of

another company has been revoked.  In addition, there was no record of

another customer filed with AIC.

(viii)  DTT received conflicting information in the confirmation process with

Fujian Fenzhong customers and bus operators.  DTT was unable to locate

some customers through site visits but confirmation letters were

successfully delivered by courier to the customers at given locations and

"confirmation (reply) was returned by customers from these addresses as

well."  DTT noted irregularities in some of these confirmations including

the fact that "replies from two customers were mailed at the same post

office on the same day at the same time and processed by the same staff."

(ix)    DTT received contradictory information from one customer during an

arranged interview.  The customer could not verify the contracts she had

with Fujian Fenzhong and "indicated that she could not confirm the

contracted amount."

(x)     Salary payments at Fujian Fenzhong were made in cash which is an

"unusual practice."  Fujian Fenzhong did not retain any bank deposit slips

for salary payments and DTT's review of payment records indicated that

four cash checks were issued on different days each month for cash withdrawal.  DTT concluded that "[t]here was insufficient information to ascertain and verify the amount of salary paid each month and to confirm the exact number of employees working for Fujian Fenzhong."

(xi)    DTT was unable to verify the production process and advertising programs that were produced by Fujian Fenzhong and, as a result, "were unable to further verify whether Fujian Fenzhong had in fact displayed the media content from its intended suppliers."

(xii)   DTT concluded that the bus information provided by Fujian Fenzhong was inaccurate.  Fujian Fenzhong claimed that there were 22,205 buses playing CCME programs but DTT concluded that this number was overstated by approximately 1,330 busses.

**CCME Refuses to Allow DTT to Complete Its Investigation and DTT Resigns**

166.    In its March 3, 2011 letter, DTT requested certain company books and records and an in-person meeting with CCME's Audit Committee and CCME's legal counsel.  DTT further recommended that the Company conduct an independent investigation into the allegations of fraud and requested that it have input into the scope of such an investigation.

167.    On information and belief, CCME did not provide DTT with the information and documents it requested.  In light of management's inability or unwillingness to resolve DTT's concerns, DTT resigned as the outside auditor of CCME on March 11, 2011.  In its resignation letter, DTT cited, among other reasons, significant issues encountered in its audit and concerns regarding the bank account balances held by CCME in China.  DTT's resignation letter stated:

> We have reached the conclusion that the Company is minded not to proceed in good faith on the basis of our requested course of action.  As a result, in our

opinion, the Board and the Audit Committee do not have a proper basis for concluding that the 2010 consolidated financial statements are free from material misstatement in respect to the above allegations and issues.  In view of the foregoing, we have lost confidence in the representations of management (which underpin any audit) and also in the commitment of the Board and the Audit Committee to good governance and reliable financial reporting and hence our resignation.

168.    On information and belief, based on court filings in this matter, Cheng refused to permit Deloitte to complete its work.

169.    Simultaneously with this announcement, trading in CCME stock on NASDAQ was halted on March 11, 2011, and has never resumed, rendering Starr's CCME stock essentially worthless.

170.    DTT's findings were discussed at a March 13, 2011 Board meeting.  The results of management's inaction following the resignation of its auditor shortly before 10-K reports were to be filed prompted board member, Dong, to write in her resignation letter:

The conduct of CCME's management leading up to the resignation by Deloitte as CCME's auditor, and management's resistance to the protective measures which I and other independent directors proposed at, amongst other occasions, the board meeting on 13 March 2011, have raised serious questions in my mind as to whether my continued membership on the board of CCME will, or can, serve any purpose beneficial to the interests of CCME's shareholders.

171.    On March 31, 2011, CCME filed a Form 8-K/A disclosing that DTT had "informed [CCME] in its resignation letter that it was no longer able to rely on the representations of management and that it had lost confidence in the commitment of the Board and the Audit Committee to good governance and reliable financial reporting."  Among the issues DTT raised before resigning were "the authenticity of bank statements; a loss of confidence in bank confirmation procedures carried out under circumstances which DTT believed to be suspicious; issues concerning the validity of certain advertising agents/customers

and bus operators (including with respect to certain of the Company's top ten customers); concerns over possible undisclosed bank accounts and bank loans"; and other issues.

172.    According to the Form 8-K/A, "DTT had requested that the bank confirmation process be re-done at the banks' head office and that the issues described above be addressed by an independent forensic investigation."

173.    The Form 8-K/A also disclosed that "in the absence of the further investigatory procedures that DTT requested, DTT was unable to determine whether the prior periods' financial statements are reliable."

174.    Thus, on information and belief, during its normal audit procedures, including its review of the prior audits performed by Robbins, DTT did not previously attempt to get confirmation of CCME's alleged cash balances in Chinese bank accounts directly from the bank's headquarters, as it should have done.  It was only after public allegations of fraud at CCME surfaced in early 2011 that DTT considered performing this basic audit procedure.

175.    On April 1, 2011, CCME received a letter from NASDAQ stating that CCME would be suspended from trading on April 12, 2011 for failure to timely file a form 10-K subject to CCME's right to appeal.  CCME was delisted effective May 19, 2011, after a NASDAQ hearing panel denied CCME's request for continued listing.  As a result, CCME common stock cannot be traded on any public securities exchange and is essentially worthless.

176.    On April 6, 2011, CCME disclosed a March 25 letter in which DTT stated (referring to its March 11 resignation letter) "We have since reached the conclusion that we are no longer able to place reliance on management representations in relation to prior period financial reports.  Accordingly, we request that the Company take immediate steps to make the necessary 8-K/A filing to state that continuing reliance should no longer be placed on the audit

report on the 2009 financial statements and moreover that we decline to be associated with any of [CCME]'s financial communications during 2010 and 2011."

**Another Board Member Resigns**

177.    On April 7, 2011, Marco Kung, director and chairperson of the Audit Committee, resigned from his positions with the Company. His resignation letter questions the independence of the Board and the Board's ability to engage an outside firm to properly investigate allegations of wrongdoing.  Kung's resignation letter stated:

> I have resigned because I cannot execute my fiduciary duties and my roles of Chairman of [the Audit Committee] as well as an Independent Director for selecting and engaging capable and appropriate independent professionals and parties with sound reputation for performing the independent investigation to the Company. [sic]

> Even though a number of discussions and meetings were gone through in the past few weeks, I was not provided by the Chairman and CEO, and other senior managements of any prompt response and tangible actions for resolutions passed in our Board meetings dated 13 March 2011 and 17 March 2011.

178.    On April 29, 2011, the Company announced that as a result of Mr. Kung's resignation, the Company no longer complied with NASDAQ Rule 5605(c)(2)(A), which requires that the Company's audit committee consist of three independent directors, and that the NASDAQ Staff exercised its discretionary authority under Listing Rule 5101 to deny the Company a cure period to regain compliance with the audit committee composition requirement.

179.    On May 2, 2011 the Company issued a press release announcing that it had retained law firm DLA Piper "to assist in [the Company's] investigation of concerns raised by [DTT] when it resigned as the Company's registered independent accounting firm on March 11, 2011."  The Company has not revealed any other details about the purported investigation or which board members were involved in hiring DLA Piper.

**CCME Refuses Requests from Shareholders for Information**

180.    On May 2, 2011 Starr made a request pursuant to 8 *Del. C.* § 220 to inspect books and records of CCME for the purposes of investigating potential breaches of fiduciary duties and to determine whether a demand on the board would be futile.  The Company did not respond to Starr's demand within the statutorily-required five-day period and Starr brought an action in the Delaware Court of Chancery seeking an order requiring CCME to provide Starr with the books and records it requested.

181.    On June 16, 2011 another purported CCME shareholder filed a similar action alleging that the Company did not respond to his demand made pursuant to Section 220 for books and records relating to the recent allegations of fraud.

### Conspiracy Allegations

182.    On information and belief, using as a basis the preceding paragraphs, defendants Cheng, Lam, Green, Bird, Ou Wen Lin and Qingping Lin and their holding companies, Thousand Space and Bright Elite, respectively, entered into a conspiracy in order to bring Hong Kong Mandefu to the United States securities market, and thereby defraud investors.

183.    On information and belief, based on the aforementioned contacts with CCME's board of directors and management team, Ou Wen Lin and Qingping Lin and their holding companies, Thousand Space and Bright Elite, respectively, had access to and/or control over internal reports and other data and information about CCME's finances, operations and sales, and agreed, whether tacitly or explicitly, with Cheng and Lam to engage in the aforementioned conduct.

184.    On information and belief, based on the aforementioned contacts with Hong Kong Mandefu's board of directors and management team, Green and Bird had access to and/or control over internal reports and other data and information about CCME's finances, operations

and sales, and agreed, whether tacitly or explicitly, with Cheng and Lam to engage in the aforementioned conduct.

185.    All eight parties did agree and did consummate this agreement through the October 2009 proxy, thereby forming a confederation to defraud Starr and U.S. investors.

**Reasonable Reliance**

186.    Starr purchased or otherwise acquired CCME's securities at artificially inflated prices during the relevant time period while reasonably relying upon Defendants' misleading statements and omissions, and has been damaged thereby.

187.    Defendants materially misled Starr and the entire investing public by issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about CCME's business, operations, and prospects as alleged herein.

188.    At all relevant times, the material misrepresentations and omissions particularized in this Amended Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Starr.  As described herein, during the relevant time period, Defendants made or caused to be made a series of materially false and/or misleading statements about CCME's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating an unrealistically positive assessment of the Company and its financial well-being and prospects.  Defendants' materially false and/or misleading statements during the relevant period resulted in Starr's purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

189.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Starr.  Absent the SEC filings, public assurances, direct representations and other communications, and the participation of a reputable independent accounting firm such as DTT, Plaintiff would not have purchased and maintained the 1.5 million shares of CCME or converted its warrants to shares of common stock, which are now rendered essentially worthless.  Absent the misleading statements of Green, Bird, and Lam, and the participation of Robbins, Starr would not have made its initial investment in CCME.

190.   Even if CCME should prove not to be a fraud, Plaintiff purchased CCME's securities at artificially inflated prices and was damaged thereby.  When the misrepresentations and/or the information alleged herein to have been concealed and/or the effects thereof were revealed, the price of the Company's securities significantly declined; the Company's auditor, DTT, and several board members resigned; trading in CCME common stock was halted; and ultimately CCME's stock was permanently delisted, rendering the stock effectively worthless and causing Starr's losses.

## Loss Causation

191.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Starr.

192.   Starr purchased CCME's shares at artificially inflated prices and was damaged thereby.  The CCME shares owned by Starr became effectively worthless when the misrepresentations made to Starr and to the market and/or the information alleged herein to have been concealed from the market, and Starr specifically, and/or the effects thereof, were revealed, resulting in the delisting of CCME stock and causing Starr's loss.

### Defendants CCME, Cheng, Lam, Lin, Green and Bird's Scienter

193.    As alleged herein, Defendants acted with scienter in that Defendants knew, should have known, or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to Starr and to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their exclusive access to and control over information reflecting the true facts regarding CCME, their control over, and/or receipt and/or modification of CCME's allegedly materially misleading misstatements and/or their associations with the Company which made them uniquely privy to confidential proprietary information concerning CCME, participated in the fraudulent scheme alleged herein.

194.    Defendants made materially false and/or misleading representations, including with respect to the extent of CCME's revenue and earnings, for the purpose of, *inter alia*, enabling the payment of earn-outs and artificially inflating the value of CCME shares.  Cheng and Lam's desire to receive earn-outs, and to allow insiders, including Green, Bird, and the Lin Defendants, to sell shares at an artificially inflated price to the investing public, and to Starr in particular, just a short time before the fraud was unraveled, combined with Defendants' unique position of exclusive access to CCME's financial information, provides that Defendants' motive and opportunity to carry out the fraudulent acts as alleged herein and gives rise to a strong inference of scienter.

195.    Defendant CCME, through the actions of its controlling officers, including defendants Cheng and Lam, knew, should have known, or recklessly disregarded that the

information being submitted was false, and made material misrepresentations or omissions and failed to correct prior misrepresentations.

196.    Defendant Cheng was an officer and director of CCME and a signatory to filings submitted to the SEC.  In addition, Cheng was majority owner and at all relevant times in control of Fujian Fenzhong.  Cheng knew, should have known, or recklessly disregarded that the information being submitted was false and made material misrepresentations or omissions and failed to correct prior misrepresentations.  Cheng made materially false and/or misleading representations, including with respect to the extent of CCME's revenue and earnings, the size of its bus fleet, and the customers it serviced, for the purpose of, *inter alia*, enabling the payment of earn-outs and artificially inflating the value of CCME shares.  Cheng's desire to receive earn-outs and to allow insiders to sell shares at an artificially inflated price to the investing public, and to Starr in particular, just a short time before the fraud was unraveled, combined with his unique position of exclusive access to CCME's financial information at all levels of the company, provides motive and opportunity to carry out the fraudulent acts as alleged herein and gives rise to a strong inference of scienter.

197.    Defendant Lam was a director and officer of the CCME and a signatory to filings submitted to the SEC.  In addition, as CFO, Lam was at all relevant responsible for the consolidated financial statements of CCME, which included Fujian Fenzhong.  He knew, should have known, or recklessly disregarded, that the information being submitted was false and made material misrepresentations or omissions and failed to correct prior misrepresentations.  Lam made materially false and/or misleading representations, including with respect to the extent of CCME's revenue and earnings, the size of its fleet, and the customers it serviced, for the purpose of, *inter alia*, enabling the payment of earn-outs and artificially inflating the value of CCME

shares.  Lam's desire to increase the value of the CCME shares he owned, as well as to allow insiders to sell shares at an artificially inflated price to the investing public, and to Starr in particular, just a short time before the fraud was unraveled, combined with his unique position of exclusive access to CCME's financial information, provides motive and opportunity to carry out the fraudulent acts as alleged herein and gives rise to a strong inference of scienter.

198.    Furthermore, Defendants Cheng and Lam each certified in relevant SEC filings that they: (1) were the two individuals responsible for establishing and maintaining disclosure controls and procedures and internal controls over financial reporting; (2) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision; (3) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision; and (4) evaluated the effectiveness of the disclosure controls and procedures. Given that the Company had a relatively small number of paid staff, having only nine staff members involved in finance as of December 31, 2009, and a total of seven senior managers, it is not plausible to suggest that a different subset of management, employees of Fujian, or lower-level employees at CCME could have perpetrated and concealed the fraud from Defendants Cheng and Lam.  Based on the above certifications made by Defendants Cheng and Lam, the small number of staff with oversight over the Company's finances, and senior management's strict control over the Company's operations, Defendants Cheng and Lam knew, should have known, or recklessly disregarded that the information being submitted was false and made material misrepresentations or omissions and failed to correct prior misrepresentations.

199.    Defendants Thousand Space and Bright Elite, through the actions of their sole controlling shareholders and directors, Ou Wen Lin and Qingping Lin respectively, knew, should

have known, or recklessly disregarded that the information being submitted was false, and made material misrepresentations or omissions and failed to correct prior misrepresentations.

200.    Defendants Ou Wen Lin and Qingping Lin, through their wholly owned and controlled holding companies, Thousand Space and Bright Elite respectively, were significant shareholders of Hong Kong Mandefu prior to the reverse merger, with superior access to board members, management and information.  On information and belief, they knew, should have known, or recklessly disregarded that the information upon which Starr relied was false.  The Lin Defendants sold 1.5 million shares of CCME stock to Starr at an artificially inflated price a few weeks before the truth about the nature and the extent of CCME's business relationships and operations was disclosed to Starr and the public, ultimately rendering CCME common stock essentially worthless.

201.    The Lin Defendants did not regularly sell shares of CCME stock.  According to public filings, the transaction with Starr was the first time that the Lin Defendants sold a substantial portion of their holdings.  As further alleged above, the Lin Defendants dumped their shares on Starr after the Company was listed in the U.S. and just prior to the unraveling of the fraud.

202.    In addition, as further alleged above, the Lin Defendants stood to receive TM/CCME earnout shares in the Third Quarter of 2010, pursuant to the terms of the reverse merger, based on CCME's purported financial performance.  Their desire to receive their earnout shares as well as to sell a substantial portion of their shares only a short time before the fraud unraveled, combined with their unique position of exclusive access to CCME's financial information, provides motive and opportunity to carry out the fraudulent acts as alleged herein and gives rise to a strong inference of scienter.

203.    Defendants Green and Bird were officers of TM and directors of CCME.  They were signatories to filings submitted by TM to the SEC and relied on by Starr in making its decision to invest in CCME.  Green and Bird claimed to have conducted months of extensive due diligence before the reverse merger that created CCME, and knew, should have known, or recklessly disregarded, that the information being submitted in the October 2009 proxy was false, and made material misrepresentations or omissions and failed to correct prior misrepresentations.  Pursuant to CCME's 2010 Form S-3, the remaining shares of CCME stock held by Green and Bird were registered for sale to the public, enabling them to sell those shares a few weeks before the truth was disclosed, which would have rendered their CCME common stock essentially worthless.  Their desire to cash out their pre-IPO shares and their unique position of access to Hong Kong Mandefu's financial information provides motive and opportunity to carry out the fraudulent acts as alleged herein and gives rise to a strong inference of scienter.

### The Auditor Defendants' Scienter

204.    In April 2003, the PCAOB adopted certain preexisting standards as its interim auditing standards.  Pursuant to PCAOB Rule 3200T, Interim Auditing Standards consist of generally accepted auditing standards, as described in the AICPA's Auditing Standards Board's Statement of Auditing Standards No. 95, as in existence on April 16, 2003, to the extent not superseded or amended by the PCAOB.[4]

205.    The Auditor Defendants' scienter is evidenced by their repeated failure to adhere to these basic auditing standards in the face of multiple red flags.  The Auditor Defendants knew,

---

[4] References to these standards in this Amended Complaint have the prefix AU.

should have known, or recklessly disregarded that CCME's financial statements contained material misstatements that were the result of fraud.

206.    The following facts constitute actual evidence of and give rise to a strong inference that the Auditor Defendants acted with scienter.

*Robbins Made False and Misleading Disclosures*

207.    Robbins knew, should have known, or recklessly disregarded that its audit report of Hong Kong Mandefu's annual financial statements for 2006, 2007, and 2008 would be disseminated in TM's October 2009 Proxy and CCME's 2009 10-K filed March 31, 2010 and the 2010 Form S-3.

208.    Robbins directly participated in the CCME fraud by ignoring material facts, violating the basic standards of the accounting profession, and knowingly or recklessly certifying the Company's false financial statements.  Among other things, Robbins represented in is audit opinion letter(s) dated February 7, 2009 that "we conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."  Robbins also certified that CCME's 2006, 2007, and 2008 financial statements were "in conformity with accounting principles generally accepted in the United States of America" and Robbins' audits provided a "reasonable basis" for its opinions.  These statements were materially false and misleading because Robbins knew, or but for its reckless disregard should have known, that it failed to conduct its audits in accordance with GAAS, that CCME had fundamentally misrepresented the condition of its business, and that CCME's financial statements for fiscal years 2006 through 2008 were materially misstated and not presented in conformity with GAAP.

209.    Robbins further reviewed CCME's financial statements for the first six months of 2009 to be included in the October 2009 Proxy.  Among other things, Robbins represented in its

audit opinion letter dated September 8, 2009, that "we conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States)."  Robbins stated:  "Based on our review, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America."

210.    GAAS requires that the auditor understand the client's industry and business and be knowledgeable about matters that relate to the nature of the entity's business, its organization, and operating characteristics. AU 311.07.  Auditors are also required to consider matters affecting the client's industry, including "matters such as accounting practices common to the industry, competitive conditions, and, if available, financial trends and ratios." *Id*.  Furthermore, the audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.  AU 150.

211.    On information and belief, based on the facts set forth above, Robbins was not familiar with and did not take sufficient steps to become familiar with Chinese norms and languages, and its personnel did not have sufficient knowledge of the bus advertising business in China, and were not adequately trained and proficient to perform CCME's 2008 audit.  Had Robbins understood CCME's business and industry and performed the analytical procedures required by GAAS, it would have identified a myriad of unrealistic claims, which would or should have elevated Robbins' risk assessment and resulted in additional procedures with heightened skepticism that would have, in turn, revealed that CCME's financial statements did not conform to GAAP.

212.    Two recent PCAOB inspection reports demonstrate that Robbins has a history of failing to obtain competent evidential matter to support its audit opinions.  These reports note

that in 57% (4 out of 7) of Robbins' audits inspected, the PCAOB identified significant deficiencies.

213.   On December 22, 2008 the PCAOB issued a release detailing the PCAOB's inspection team's findings in its inspection of Robbins' audit procedures.  The inspections were designed to "identify and address weaknesses and deficiencies related to how a firm conducts audits."  The PCAOB inspection team reviewed two of Robbins' audits and "identified what it considered to be audit deficiencies . . . in both of the audits reviewed." The deficiencies were "of such significance that it appeared to the inspection team that [Robbins] did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements."

214.   On March 31, 2010 the PCAOB issued a second report in which it disclosed, without naming the audits involved, that "two of the [five] audits reviewed [by the PCAOB] included deficiencies of such significance that it appeared to the inspection team that [Robbins] did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements."

*DTT Made False and Misleading Disclosures*

215.   DTT was instrumental in getting Starr to invest in CCME.  DTT auditors first introduced Starr to CCME in July 2009 for the purpose of a potential investment.  After an affiliate of DTT conducted due diligence on CCME for Starr, DTT became CCME's auditor. Starr relied on DTT's professional reputation and the integrity of its anticipated audit work in deciding to make investments in CCME.  Starr would never have invested in CCME if CCME had not retained DTT or another Big Four accounting firm as its auditor.

216.   After Starr made its initial investment, DTT provided periodic updates about CCME's finances directly to Starr.  There were at least two in-person meetings between DTT

and Starr in which DTT made representations directly to Starr about CCME's finances and internal controls.

217.    On or about October 11, 2010 DTT met with Starr and represented, among other things, that it was conducting management interviews as part of its Sarbanes-Oxley program review.

218.    On or about December 12, 2010 DTT met with Starr and certain officers and directors of CCME to discuss DTT's review of CCME's finances and internal controls.  At that meeting, DTT made several representations, including that there were no major outstanding deficiencies in its Sarbanes-Oxley review and that DTT conducted a fraud interview with CCME management and reached a positive conclusion.

219.    DTT knew, should have known, or recklessly disregarded that its audit report of CCME's annual financial results for 2009 and other statements regarding CCME's finances would be disseminated in CCME's 2009 10-K filed March 31, 2010, and incorporated in CCME's 2010 Form S-3, and would be used in trade and commerce in the United States and relied upon by Starr.

220.    DTT directly participated in the CCME fraud by ignoring material facts, violating the basic standards of the accounting profession, and knowingly or recklessly certifying the Company's false financial statements.   Among other things, DTT represented in its audit opinion letter dated March 30, 2010 that "we conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)."  DTT also certified that CCME's 2009 financial statements were "in conformity with accounting principles generally accepted in the United States of America" and DTT's audits provided a "reasonable basis" for its opinions.  These statements were materially false and misleading when made

because DTT knew, or but for its reckless disregard should have known, that it failed to conduct its audits in accordance with PCAOB Standards (GAAS), that CCME had fundamentally misrepresented the condition of its business, and that CCME's financial statements for fiscal year 2009 were materially misstated and not presented in conformity with U.S. GAAP.

221.    CCME's financial statements for the fiscal year ending December 31, 2009 were materially false and misleading; contained untrue statements of material facts; omitted material facts necessary to make the statements made, under the circumstances in which they were made, not misleading; and failed to adequately disclose material facts.

*The Auditor Defendants Failed to Confirm CCME's Unusual Growth Pattern and Profitability*

222.    GAAS requires that analytical procedures performed when planning the audit should "identify such things as the existence of unusual transactions and events, and amounts, ratios and trends that might indicate matters that have financial statement and audit planning ramifications." AU 329.06.  Auditors are also required to understand the client's industry and business and to be knowledgeable about matters that relate to the nature of the entity's business, including "matters, such as accounting practices common to the industry, competitive conditions, and, if available, financial trends and ratios."  AU 311.07.

223.    GAAS also requires that auditors plan and perform their audits to obtain reasonable assurance that the financial statements subject to audit are free of material misstatement, whether caused by error or fraud.  AU 230.  "Although fraud usually is concealed and management's intent is difficult to determine, the presence of certain conditions may suggest to the auditor the possibility that fraud may exist.  For example, an important contract may be missing . . . or the results of an analytical procedure performed during the audit may not be consistent with expectations."  AU 316.11.

224.   During their audits, both of the Auditor Defendants failed to perform adequate analytical procedures required by GAAS.  Had the Auditor Defendants understood CCME's business and industry and performed the analytical procedures required by GAAS, they would have identified a myriad of unrealistic relationships, which should have elevated the Auditor Defendants' risk assessments and resulted in additional procedures with heightened skepticism that would have, in turn, resulted in discovery of the true facts.

225.   The Auditor Defendants failed to adequately confirm representations of CCME management in light of glaring red flags relating to CCME's unusual growth pattern and profitability including, but not limited to, the following:

(i)     enormous profits and growth rates, with a relatively tiny number of paid staff;

(ii)    reported operating income far higher than its competitors;

(iii)   despite having spent a mere fraction of what competitors have on infrastructure, CCME reportedly grew profits from $2 million to its recently raised guidance of $85 million expected in 2011 on revenues of $200 million; and

(iv)    management claims that the Company has grown faster and produced more cash flow than any other U.S.-listed Chinese media company over the last four years.

226.   The Auditor Defendants failed to consider that CCME's revenue per digital screen was significantly greater than its competitors.  Advertising revenue per screen was roughly double the competition, despite the fact that CCME does not own all the advertisement time on its screens.

227.     Also, CCME claims that it generated $15 million in the third quarter of 2010 from express buses operating in six airports, a number which Muddy Waters indicated was about 200% the Q3 2010 revenue that CCME's competitor AMCN derived from its 2,200 digital television screens in 38 airports, including 26 of the 30 busiest airports in China.

228.     As reported in CCME's 8K filed on March 29, 2011, DTT admitted that it was unable to verify "certain advertising agents/customers and bus operators (including with respect to certain of the Company's top ten customers)."

*The Auditor Defendants Failed to Confirm CCME's Unrealistically High Cash Flow*

229.     On information and belief, CCME's year-end and quarterly financial statements also vastly overstated the amount of cash on hand.

230.     Auditors are required look at evidentiary material to confirm management representations.  Specifically, auditors should consider "original documents," evidence "obtained from knowledgeable independent sources outside the entity," and "the reliability of the information to be used as audit evidence, for example, photocopies; facsimiles; or filmed, digitized, or other electronic documents, including consideration of controls over their preparation and maintenance where relevant." AU 326.08-09.  GAAS requires that the auditor gather and objectively assess evidence to support his opinion with diligence, integrity, and good faith.  More specifically, due professional care requires the auditor to exercise professional skepticism, which "is an attitude that includes a questioning mind and a critical assessment of audit evidence."  AU 230.07.  "In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest."  AU 230.09.

231.    Following GAAS requirements, auditors should send confirmation letters to a client's banks and customers requesting that the third party provide evidence to support the client's cash and accounts receivable balances.  GAAS recognize that information obtained directly from third parties, like that obtained through properly designed and executed confirmation procedures, provides auditors with high quality audit evidence.  "When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity."  AU 330.21.  In addition, "[p]rofessional skepticism is important in designing the confirmation request, performing the confirmation procedures, and evaluating the results of the confirmation procedures."  AU 330.15.

232.    The Auditor Defendants violated GAAS by failing to obtain adequate evidential matter supporting CCME's financial statements and related disclosures, and by failing to confirm management's representations and financial statement assertions given the numerous red flags.  As a result, the Auditor Defendants failed to obtain sufficient competent evidence to support their audit opinions.

233.    During their audits, the Auditor Defendants failed to perform adequate analytical procedures required by GAAS and failed to notice the significant red flags related to CCME's purported reported cash flow and bank balances.  For example, over the last eight quarters, CCME reported generating $95 million of cash flow after all capital expenditures and for-cash acquisitions, which is unusually high.  The sheer magnitude of cash and accounts receivable, 73% and 84% of CCME's total reported assets for 2008 and 2009, respectively, was a red flag that should have prompted the Auditor Defendants to confirm CCME's cash and accounts receivable balances directly with bank headquarters and customers.

234.    CCME also reported interest income amounts significantly lower than what would be expected in light of prevailing contemporaneous rates paid by Chinese banks.  For the year ended December 31, 2008 CCME reported interest income of only $100,000 while its average cash balance during 2008 was purportedly $18,180,599, resulting in an assumed interest rate of 0.55%.  However, according to the World Bank, the average interest rate paid to Chinese depositors during 2008 was 2.3%.  For the year ended December 31, 2009 CCME reported interest income of $113,000 while the average cash balance during 2009 was $43,574,000, resulting in an assumed interest rate of 0.26%.  However, according to the World Bank, the average interest rate paid to Chinese depositors during 2009 was 2.3%.

235.    DTT also failed to confirm CCME's stated cash balances in Chinese bank accounts with each bank's headquarters prior to its investigation in early 2011.  Instead, DTT relied on a combination of management representations and representations of local bank branches.  DTT admitted *after* allegations of fraud at CCME came to light that the bank confirmations it received "call[ed] into question the validity and authenticity of the bank confirmation and bank statements provided to us."

236.    On information and belief, if the Auditor Defendants had properly performed confirmation procedures regarding CCME's cash balances during the 2008 and 2009 audits, they would have discovered similar issues with the claimed bank balances in those years.

*The Auditor Defendants Failed to Investigate CCME's Conflicting Management Representations*

237.    The Auditor Defendants did not exercise "due professional care" in the "performance of the audit and the preparation of [their] report" as required by GAAS.  AU 150. Under this PCAOB Standard, auditors are required to exercise professional skepticism, which is an attitude that includes a questioning mind and a critical assessment of audit evidence.

238.    Representations from management "are part of the evidential matter the independent auditor obtains, but they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit."  AU 333.02.

239.    The auditor should exercise an appropriate level of professional skepticism throughout the confirmation process.  AU 330.15.

240.    Auditors need to assess all representations provided by management and be alert for contradictory information as this reflects on the overall quality of management's representations.  "If a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made.  Based on the circumstances, the auditor should consider whether his or her reliance on management's representations related to other aspects of the financial statements is appropriate and justified."  AU 333.04.

241.    If the auditor is precluded from performing necessary audit procedures, the auditor should qualify his or her opinion or disclaim an opinion even if management has given representations concerning the matter.  AU 333.14.

242.    The Auditor Defendants knew, should have known, or recklessly disregarded that CCME's management was providing a number of contradictory representations.  As a result, the Auditor Defendants were required under GAAS to appropriately investigate these contradictions and/or qualify their audit reports.  They did neither.

243.    The Muddy Waters Research Report revealed significant contradictory representations including that in CCME's January 13, 2011 press release, the Company claimed to have over 27,200 buses under contract but the spreadsheet provided as part of its advertiser kit

shows that CCME has only 12,565 buses.  Muddy Waters also noted that there are inconsistencies between numbers provided in financial and tax filings in China and financial disclosures made to the SEC.

244.    In 2011, DTT admitted that it "observed conflicting information in the confirmation process with customers and bus operators.  [DTT] conducted site visits but could not locate some of the customers and bus operators at their last known address provided by Fujian Fenzhong, including the company without registration with AIC.  However, confirmation letters were successfully delivered by courier to these customers at the given locations and confirmation (reply) was returned by customers from these addresses as well."

245.    In 2011 DTT also "compared Fujian Across Express Information Technology Co. Ltd. ('Across Express')'s audited financial report of 2009 with the audited financial report filed with the AIC (subsequent to [DTT's] 2009 audit) and found that although the two reports were issued by the same accounting firm and contains the same report reference number, there are huge differences in the information Across Express reported."  The differences were set forth as follows:

| Item | Audit Report provided to DTT | Audit Report filed with AIC |
|---|---|---|
| Total Assets | RMB 521,409,081.70 | RMB 4,400,343.18 |
| Total Liabilities | RMB 44,809,524.16 | RMB 221,146.78 |
| Ending Cash Balance | RMB 747,964.78 | RMB 39,100.97 |
| Revenue | RMB 434,040,421.85 | RMB 0 |
| Tax Payable | RMB 43,688,711.97 | RMB 0 |
| Taxes Paid | RMB 80,802,451.85 | RMB -40.13 |

246.    DTT also revealed in 2011 that it was unable to confirm the existence of all 22,205 buses CCME claims to have and believes that approximately 1,330 buses were over counted.

247.    After conducting its additional procedures in 2011, DTT admitted that "Company searches of the top ten customers of Fujian Fenzhong indicate that one customer has filed for deregistration and the business license of another company has been revoked.  Both companies are advertising agents instead of ultimate advertisers.  In addition, there is no record of another customer . . . filed with the AIC.  These companies therefore do not appear to have proper legal status."

248.    The Auditor Defendants knew, should have known, or recklessly disregarded the above or similar inconsistencies in CCME's representations during the 2008 and 2009 audits.  By failing to do so, the Auditor Defendants did not follow GAAS and should not have certified that CCME's 2008 and 2009 financial statements were in conformity with GAAP.

249.    DTT has now admitted that it cannot rely on the information it had received from the Company and has been unable to confirm certain financial information provided to DTT, including tax invoices, salary payments, and financial information.  DTT has stated that CCME's prior period financial statements cannot be relied upon.  The fact that the Company may now have to restate all its financial statements based on basic questions that a professional firm and expert auditors should have asked from the start, leads to the conclusion that DTT and Robbins knowingly, negligently, and/or recklessly participated in the material misrepresentations.

*The Auditor Defendants Failed to Consider Fraud Risk Factors and Failed to Detect the Fraud at CCME*

250.    GAAS requires that the auditors plan and perform their audits to obtain reasonable assurance that financial statements subject to audit are free of material misstatement, whether caused by error or fraud.

251.    "Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks."  AU 316.13.  "Although fraud is usually concealed and management's intent is difficult to determine, the presence of certain conditions may suggest to the auditor the possibility that fraud may exist.  For example, an important contract may be missing . . . or the results of an analytical procedure performed during the audit may not be consistent with expectations."  AU 316.11.

252.    Auditors are also required to consider whether fraud risk factors are present and, if present, respond to such risks through appropriate audit procedures.  GAAS provides a number of explicit examples of fraud risk factors that were present at CCME.

253.    One risk factor is transactions that are outside the normal course of business for that entity, or that otherwise appear to be unusual.  In these situations, auditors need to understand "the business rationale for such transactions and whether that rationale (or lack thereof) suggests that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets."  AU 316.66.

254.    In its March 3, 2011 letter, DTT noted that Fujian Fenzhong has an "unusual practice for salary payments."  DTT documented that salary payments were made in cash for each month of 2010 and that the only supporting document was a salary form containing signatures of employees working in different Fujian Fenzhong offices.

255.     DTT does not describe this as a new practice, leading to the conclusion that similar payments occurred during 2008 and 2009, which the Auditor Defendants knew or should have known.

256.     Another risk factor explicitly identified by GAAS relates to managements' or Board members' personal net worth being threatened by the entity's financial performance.  AU 316.85.

257.     Defendant Cheng held approximately 13 million shares of CCME, and therefore, on information and belief, his personal net worth was directly threatened by CCME's financial performance.

258.     In addition to specific examples of fraud risk factors, GAAS makes clear that auditors should consider whether other fraud risks are present that need to be addressed. "Although the risk factors [specifically listed in GAAS] cover a broad range of situations, they are only examples and, accordingly, the auditor may wish to consider additional or different risk factors."  AU 316.85.  The fact that CCME was a Chinese company that was listed on a U.S. stock exchange through a reverse merger presented an additional fraud risk factor which should have put the auditor on notice that the financial statements may be fraudulent.

259.     Both Citron and Muddy Waters identified a plethora of information pointing to CCME being a fraud, including but not limited to:  SAIC documents, credit rating agency documents, quotes from industry professionals, and a financial analysis.

260.     DTT only acknowledged the fraud after commencing additional procedures in 2011.  For example, in 2011 DTT reviewed the bank slips attached in Fujian Fenzhong's accounting books as well as the bank statements of Fujian Fenzhong and its subsidiary.  The review revealed anomalies and cast doubts about the authenticity of such documents.

261.    Despite having the express obligation under applicable PCAOB standards to obtain reasonable assurances that CCME's financial statements were free of material misstatement due to fraud, and despite having access to CCME's books and records throughout the audit period, the Auditor Defendants failed to detect CCME's fraud.

262.    The Auditor Defendants did not adequately assess and respond to the fraud risks and failed to employ the level of professional skepticism required by GAAS.

263.    The Auditor Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted in reckless disregard of the truth in failing to ascertain and to disclose the true facts, even though such facts were exclusively available to the Auditor Defendants.

## No Safe Harbor

264.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint.  Many or all of the specific statements pleaded herein were not identified as (and were not) "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements pleaded herein.  Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CCME who knew that those statements were false when made.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants)

265.     Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

266.     During the relevant period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the relevant period, did: (i) deceive the investing public, including Plaintiff, as alleged herein; and (ii) caused Plaintiff to purchase CCME's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

267.     Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff Starr in connection with its purchases of CCME stock.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

268.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CCME's financial well-being and prospects, as specified herein.

269.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of CCME's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about CCME and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Starr and other purchasers of the Company's securities during the relevant period.

270.    Defendants Cheng and Lam's primary liability and controlling person liability arises from the following facts: (i) Cheng and Lam were high-level executives and directors at the Company during the relevant period and members of the Company's management team or had control thereof; (ii) by virtue of their responsibilities and activities as senior officers and/or directors of the Company, Cheng and Lam were uniquely privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Cheng and Lam signed certificates filed with the SEC; (iv) Cheng and Lam enjoyed significant personal contact and familiarity with the other defendants and were advised of, and had unique access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (v) Cheng and Lam were aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

271.    As an additional basis for liability, Defendant Cheng: (i) held the position of majority owner of Fujian Fenzhong and had knowledge and control over the company; (ii)

because of his unique position as both CEO of CCME and majority owner of Fujian Fenzhong, had knowledge of discrepancies between information communicated to the investing public and the materially different financials, business relationships, and other information those communications were based upon; (iii) enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had unique access to, Fujian Fenzhong's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) was aware of Fujian Fenzhong's and other CCME subsidiaries' dissemination of false information to CCME, and knew or recklessly disregarded that it was materially false or misleading.

272.    As an additional basis for liability, Defendant Lam:  (i) held the position of CFO of CCME and had access to the books and records of CCME and the financial reports of Fujian Fenzhong, (ii) had personal contact with Defendant Cheng and members of Fujian Fenzhong's management team, (iii) was part of the CCME management team and had unique access to internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; (iv) knew or recklessly disregarded that CCME's public statements about the Company's finances were materially false or misleading; and (v) communicated directly with Starr.

273.    Defendants Bird and Green's primary liability and controlling person liability arise from the following facts: (i) Green and Bird were high-level executives and directors at TM during the period in which Hong Kong Mandefu was acquired and were members of TM's management team or had control thereof; (ii) by virtue of their responsibilities and activities as senior officers and/or directors of TM, Green and Bird were uniquely privy to and participated in the investigation, due diligence, and reporting of CCME's internal budgets to their shareholders

in the October 2009 proxy; (iii) Green and Bird enjoyed significant personal contact and familiarity with the other defendants and were advised of, and had unique access to, other members of CCME's management team, internal reports and other data and information about CCME's finances, operations, and sales at all relevant times; (iv) Green and Bird were aware of CCME's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading; and (v) Green and Bird made false and or misleading statements, including statements made in the October 2009 proxy.

274.    Defendants Ou Wen Lin and Qingping Lin's primary liability and controlling person liability arise from the following facts: (i) Ou Wen Lin and Qingping Lin, acting through their holding companies, along with Cheng, were the founders of the Company and at all relevant times were substantial shareholders in the Company; (ii) the Lins enjoyed significant and longstanding personal contact and familiarity with the other defendants and were advised of, and had unique access to and/or control over, certain members of the Company's board of directors, management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; (iii) by virtue of their responsibilities and activities as substantial shareholders of the Company, and their personal and professional contacts with the Company's board of directors and management team, the Lins were uniquely privy to and/or participated in the creation, development and reporting of the Company's internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) the Lins knew, should have known, or recklessly disregarded, by virtue of the above, that the information relied upon by Starr was false and misleading.  Acting through their own holding companies, Ou Wen Lin and Qingping Lin sold shares directly to Starr, omitting material facts.

275.     Primary liability of Ou Wen Lin's holding company, Thousand Space, and Qingping Lin's holding company, Bright Elite, arises from the following facts  (i) along with Cheng, Bright Elite and Thousand Space were, at all relevant times, substantial shareholders in the Company; (ii) through their owners Bright Elite and Thousand Space enjoyed significant and longstanding personal contact and familiarity with the other defendants and were advised of, and had unique access to and/or control over, certain members of the Company's board of directors, management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; (iii) by virtue of their responsibilities and activities as shareholders of the Company, and their owners' professional contacts with the Company's board of directors and management team, Bright Elite and Thousand Space were uniquely privy to and/or participated in the creation, development and reporting of the Company's internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) the Lin Defendants knew, should have known, or recklessly disregarded, that the information including the financials relied upon by Starr was false and misleading.  Bright Elite and Thousand Space sold shares directly to Starr, omitting these material facts.

276.     Defendant Robbins was the Company auditor from 2006 through May 1, 2009 and had open access to all books and records during that period.  Robbins made material misstatements about Hong Kong Mandefu through its audit report which was part of TM's October 2009 Proxy, CCME's 2009 Form 10-K filed March 31, 2010, and CCME's 2010 Form S-3.  Robbins further misrepresented the adequacy of its own audit performance.  Robbins had both the right and obligation to independently verify the 2006, 2007, and 2008 fiscal reports, as well as to conduct whatever independent review was necessary to satisfy its own needs.

Knowing Hong Kong Mandefu was about to become a publicly-traded U.S. company, Robbins

engaged in highly unreasonable conduct that was an extreme departure from the standard of

ordinary care by failing to ask any of the relevant questions or to conduct the independent

verifications that a reputable and reasonable accounting firm in its position would do.

277.    Defendant DTT was the Company auditor from May 2009 through March 2011

and had open access to all books and records.  DTT made material misstatements about CCME

through its audit report, which was part of CCME's 2009 Form 10-K filed March 31, 2010, and

CCME's 2010 Form S-3.  DTT further misrepresented the adequacy of its own audit

performance.  DTT had both the right and obligation to independently verify all the financial

data, business models, and operations being set forth and discussed in the 10-K and throughout

the period it served as an independent auditor with the responsibility to review and verify the

2009 and 2010 fiscal reports, as well as to conduct whatever independent review was necessary

to satisfy its own needs.  DTT engaged in highly unreasonable conduct that was an extreme

departure from the standard of ordinary care by failing to ask any of the relevant questions or to

conduct the independent verifications that a reputable accounting firm in its position would do

despite being aware since mid 2010 of allegations of fraud and misconduct concerning CCME.

278.    Defendants had actual knowledge of the misrepresentations and/or omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were exclusively available to them.

Defendants' material misrepresentations and/or omissions were done knowingly or recklessly

and for the purpose and effect of concealing CCME's financial well-being and prospects from

the investing public and supporting the artificially inflated price of its securities.  As

demonstrated by Defendants' overstatements and/or misstatements of the Company's business,

operations, financial well-being, and prospects throughout the relevant period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

279.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, Starr purchased CCME securities at artificially inflated prices.  In ignorance of the fact that the price of the Company's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed to Starr by Defendants during the relevant period, Plaintiff acquired CCME's securities during the relevant period at artificially high prices and was damaged thereby.

280.    Plaintiff has suffered damages in that, in reliance on these false and misleading statements, Starr paid artificially inflated prices for CCME stock in the January 2010 purchase (as to defendants Lam, Green, Bird, and Robbins), and in the October 2010 share purchases and December 2010 warrant exercise (as to all Defendants), prices that were shown to be grossly inflated when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were revealed, making the stock essentially worthless and thereby damaging Plaintiff. Plaintiff would not have purchased CCME stock at the prices it paid, or at all, if it had been aware that the purchase prices had been artificially and falsely inflated by Defendants' misleading statements.

281.    At the time of said misrepresentations and/or omissions, Plaintiff was ignorant of their falsity, and believed them to be true.  Had Starr known the truth regarding the actual

financial and business position of CCME, which was not disclosed by Defendants, Plaintiff would not have purchased or otherwise acquired its CCME securities, or would not have done so at the artificially inflated prices which it paid.

282.    Plaintiff acted in direct reliance on the representations made by Defendants, including but not limited to the statements made in the 10-K filed March 31, 2010, the audited financials contained within that 10-K, the first quarter 2010 10-Q, dated May 14, 2010, the second quarter 2010 10-Q dated August 13, 2010, and the third quarter 10-Q dated November 9, 2010, as well as the October 2009 proxy and other statements made directly to Starr as alleged herein.

283.    The Defendants' misrepresentations and omissions were the proximate cause of the significant fall in CCME's stock price that caused Plaintiff harm when the truth about CCME's actual financial and business position were finally disclosed to the market, trading in CCME was permanently halted, and Starr's investment in CCME became essentially worthless.

284.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of the Company's securities during the relevant period.

## SECOND CAUSE OF ACTION
### (Violation of Section 20(a) of the Exchange Act Against Defendants Cheng, Lam, Ou Wen Lin, Quingping Lin Green and Bird)

285.    Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

286.    Defendant Cheng acted as a controlling person of CCME within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, and his ownership and contractual rights, unique participation in and/or awareness of the Company's

operations and/or uniquely intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, Cheng had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Plaintiff

contend are false and misleading. Cheng was provided with or had unlimited access to copies of

the Company's reports, press releases, public filings and other statements alleged by Plaintiff to

be misleading prior to and/or shortly after these statements were issued and had the ability to

prevent the issuance of the statements or cause the statements to be corrected.

287.    By virtue of his position as majority owner of Fujian Fenzhong, Cheng also had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of Fujian Fenzhong. Cheng was provided with or had unlimited access to copies

of Fujian Fenzhong's reports, press releases, public filings and other statements and had the

ability to prevent the issuance of the statements or cause the statements to be corrected.

288.    Defendant Lam acted as a controlling person of CCME within the meaning of

Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, and

his ownership and contractual rights, unique participation in and/or awareness of the Company's

operations and/or uniquely intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, Lam had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Plaintiff

contend are false and misleading. Lam was provided with or had unlimited access to copies of

the Company's reports, press releases, public filings and other statements alleged by Plaintiff to

be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

289.    In particular, Defendants Cheng and Lam had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

290.    Defendants Ou Wen Lin and Qingping Lin acted as controlling persons of CCME within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of the Lin Defendants founding of the Company, their ownership and contractual rights, significant and longstanding personal contact and familiarity with the other defendants and access to members of the Company's board of directors and management team, unique participation in and/or awareness of the Company's operations and/or uniquely intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Lin Defendants had the power to influence and control decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  The Lin Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

291.    Defendant Green acted as a controlling person of TM within the meaning of Section 20(a) of the Exchange Act as alleged herein.  TM later changed its name to CCME.  By virtue of his high-level positions, and his ownership and contractual rights, unique participation

in and/or awareness of TM's operations and/or uniquely intimate knowledge of the false financial statements and proxy statements filed by TM with the SEC and disseminated to the investing public, Green had the power to influence and control and did influence and control, directly or indirectly, the decision-making of TM, including the content and dissemination of the various statements in the October 2009 Proxy which Plaintiff contends are false and misleading. Green was provided with or had unlimited access to copies of Hong Kong Mandefu's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Green later became a director and controlling person of CCME.  Thus, the statements made in the October 2009 Proxy, which Green signed, for which liability is found against TM/CCME constitute a ground for 20(a) liability against Green.

292.     Defendant Bird acted as a controlling person of TM within the meaning of Section 20(a) of the Exchange Act as alleged herein.  TM later changed its name to CCME.  By virtue of his high-level positions, and his ownership and contractual rights, unique participation in and/or awareness of TM's operations and/or uniquely intimate knowledge of the false financial statements and proxy statements filed by TM with the SEC and disseminated to the investing public, Bird had the power to influence and control and did influence and control, directly or indirectly, the decision-making of TM, including the content and dissemination of the various statements in the October 2009 Proxy which Plaintiff contends are false and misleading. Bird was provided with or had unlimited access to copies of Hong Kong Mandefu's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected.  Bird later became a director and controlling person of CCME.  Thus, the statements made in the October 2009 proxy statement for which liability is found against TM/CCME constitute a ground for Section 20(a) liability against Bird.

293.    In particular, Defendants Green and Bird had direct and supervisory involvement in the day-to-day operations of TM and were intimately involved in the transaction that led to Hong Kong Mandefu's acquisition by TM.  They are, therefore, presumed to have had the power to control and influence the particular transactions giving rise to the securities violations as allegations herein, and exercised the same.

294.    As set forth above, CCME, Cheng, Lam, the Lin Defendants, Green and Bird each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, and their culpable participation in making the false statements or omissions, Cheng, Lam, Ou Wen Lin, Qingping Lin, Green and Bird are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of the Company's securities during the relevant period.

### THIRD CAUSE OF ACTION
### (Common Law Fraud against CCME, Cheng, Lam, and the Auditor Defendants)

295.    Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

296.    CCME, Cheng, Lam, and the Auditor Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Starr and other

purchasers of the Company's securities in an effort to induce Starr to purchase securities of

CCME and to maintain artificially high market prices for CCME's securities in violation of

Delaware State law.

297.    CCME, Cheng, Lam, and the Auditor Defendants had actual knowledge of the

misrepresentations and/or omissions of material facts set forth herein, or acted with reckless

disregard for the truth in that they failed to ascertain and to disclose such facts, even though such

facts were exclusively available to them. Such defendants' material misrepresentations and/or

omissions were done knowingly or recklessly and for the purpose and effect of concealing

CCME's financial well-being and prospects from Starr and the investing public and supporting

the artificially inflated price of its securities.  As demonstrated by CCME, Cheng, Lam, and the

Auditor Defendants' overstatements and/or misstatements of the Company's business,

operations, financial well-being, and prospects throughout the relevant period, these defendants,

if they did not have actual knowledge of the misrepresentations and/or omissions alleged,

behaved with reckless indifference to the truth in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements

were false or misleading.

298.    In all cases, CCME, Cheng, Lam, and the Auditor Defendants acted with the

intent that Plaintiff rely on their false representations, and with full knowledge that Plaintiff

would rely on their false representations.

299.    At the time of said misrepresentations and/or omissions, Plaintiff was ignorant of

their falsity, and believed them to be true.  Had Plaintiff known the truth regarding the actual

financial and business position of CCME, which was not disclosed by CCME, Cheng, Lam, and

the Auditor Defendants, Plaintiff would not have purchased or otherwise acquired its CCME securities, or would not have done so at the artificially inflated prices which it paid.

300.   Plaintiff acted in direct reliance on the representations made by CCME, Cheng, Lam, and the Auditor Defendants, including but not limited to the statements made in the 10-K filed March 31, 2010, the audited financials contained within that 10-K, the first quarter 2010 10-Q, dated May 14, 2010, the second quarter 2010 10-Q dated August 13, 2010, and the third quarter 10-Q dated November 9, 2010.

301.   As a direct and proximate result of CCME, Cheng, Lam, and the Auditor Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of the Company's securities during the relevant period.

302.   Plaintiff has suffered damages in that, in reliance on these false and misleading statements, Starr paid artificially inflated prices for CCME stock in the January 2010 purchase (as to defendants Lam and Robbins), and in the October 2010 share purchases and December 2010 warrant exercise (as to all Defendants), prices that were shown to be grossly inflated when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were revealed, making the stock essentially worthless and thereby damaging Plaintiff.  Plaintiff would not have purchased CCME stock at the prices it paid, or at all, if it had been aware that the purchase prices had been artificially and falsely inflated by Defendants' misleading statements.

### FOURTH CAUSE OF ACTION
#### (Aiding and Abetting Fraud Against Green and Bird)

303.   Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein, and particularly those allegations contained in paragraphs 295-302 concerning common law fraud.

304.     Defendants Green and Bird, by virtue of their intimate involvement in the due diligence process and high level positions in TM, had knowledge of the fraud and/or negligence of Cheng and Lam prior to October 2009, but turned a blind eye to Cheng and Lam's fraudulent conduct, or recklessly disregarded it.

305.     Defendants Green and Bird carried out various lawful and unlawful acts, as specified above, in aiding the fraud, including but not limited to (i) making various false representations or omissions in connection with the filing of the October 2009 Proxy, and (ii) utilizing their powers and position as directors and officers to engage TM in a transaction with Hong Kong Mandefu that ultimately led to Hong Kong Mandefu being brought to the American securities markets.

306.     By facilitating the introduction of Hong Kong Mandefu to the United States securities markets, through issuance of the October 2009 Proxy, Green and Bird aided and abetted the fraud and/or the negligent misrepresentation of Cheng and Lam by providing substantial assistance and encouragement.

307.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of the Company's securities during the relevant period.  Plaintiff would not have purchased CCME stock at the prices it paid, or at all, if it had been aware that the purchase prices had been artificially and falsely inflated by Defendants' misleading statements.

## FIFTH CAUSE OF ACTION
### (Negligent Misrepresentation against the Auditor Defendants)

308.     Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

309.    The Auditor Defendants owed Starr a pecuniary duty, in that they provided information used by Starr in its transactions, and the Auditor Defendants profited by issuing that information to the investing public.  The Auditor Defendants were engaged by CCME and its directors, for the purpose of providing information for the use of third parties in transactions, and the Auditor Defendants are engaged in the business of providing such information, in the form of audits, opinions, due diligence, and other forms of financial review.

310.    The Auditor Defendants breached those duties through the provision of false information regarding CCME's financials, business model, and business prospects, among other things.

311.    The Auditor Defendants also failed to take reasonable care in obtaining the relevant information and in communicating it to investors and to Starr in particular, and were therefore negligent.

312.    The Auditor Defendants knew or should have known that Starr would rely on information they provided for SEC filings, press releases, and other filings, releases, or communications, and intended that Starr rely on that information.  DTT introduced Starr to CCME for the express purpose of making a potential investment.  An affiliate of DTT conducted due diligence on behalf of Starr in advance of Starr's investment.  The fact of Starr's investment, and its intention to rely on DTT's audit work, was therefore well known to DTT.  Robbins also knew or should have known that Starr would rely on information it supplied for the October 2009 Proxy and intended Starr to so rely.  Furthermore, because of Starr's large purchases of CCME stock, both Auditor Defendants had particular reason to know that Starr would rely on their statements.

313.     Plaintiff acted in direct reliance on the representations made by the Auditor

Defendants, including but not limited to the statements made in CCME's 2009 10-K filed March

31, 2010, and the audited financials contained within that 10-K, the 2010 Form S-3, as well as

the October 2009 Proxy.

314.     As a direct and proximate result of the Auditor Defendants' wrongful conduct,

Plaintiff suffered damages in connection with its purchase of the Company's securities during

the relevant period.

315.     Plaintiff has suffered damages in that, in reliance on these false and misleading

statements, Starr paid artificially inflated prices for CCME stock in the January 2010 purchase

(as to defendant Robbins), and in the October 2010 share purchases and December 2010 warrant

exercise (as to Robbins and DTT), prices that were shown to be grossly inflated when

Defendants' misrepresentations and omissions were revealed, making the stock essentially

worthless and thereby damaging Plaintiff.  Plaintiff would not have purchased CCME stock at

the prices it paid, or at all, if it had been aware that the purchase prices had been artificially and

falsely inflated by Defendants' misleading statements.

### SIXTH CAUSE OF ACTION
**(Breach of Fiduciary Duty of Disclosure Against Defendants Cheng and Lam)**

316.     Plaintiff realleges and incorporates by reference each and every allegation

contained above as if fully set forth herein.

317.     Defendants Cheng and Lam, as directors and/or officers of CCME, owe fiduciary

duties of loyalty and care, including a duty of disclosure, to Starr as a shareholder of CCME .

318.     When directors of a Delaware corporation communicate publicly or directly with

stockholders about corporate matters, the *sine qua non* of directors' fiduciary duties is honesty,

and they are obligated not to deliberately misinform shareholders about the business of the corporation.

319.    Defendants Cheng and Lam breached their fiduciary duties to Starr by (i) employing devices, schemes, and artifices to defraud; (ii) deliberately making untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaging in acts, practices, and a course of business which operated as a fraud and deceit upon Starr.

320.    Plaintiff relied upon representations made in CCME's public disclosures, including CCME's 2009 10K dated March 31, 2010, the first quarter 2010 10-Q, dated May 14, 2010, the second quarter 2010 10-Q dated August 13, 2010 and the third quarter 2010 10-Q dated November 9, 2010.

321.    The actions of Defendants Cheng and Lam are directly and proximately responsible for Plaintiff's injuries, including inducing Starr's October 2010 purchase of CCME securities, its December 2010 exercise of warrants, and its continuing to hold CCME securities up to and including until the date when trading in CCME stock was halted.

**SEVENTH CAUSE OF ACTION**
**(Conspiracy to Commit Fraud Against Defendants Cheng, Lam, Green, Bird, Ou Wen Lin, Thousand Space, Qingping Lin and Bright Elite)**

322.    Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein, and particularly those allegations contained in paragraphs 295-302 concerning common law fraud.

323.    Cheng, Lam, Green, Bird, Ou Wen Lin (acting through Thousand Space) and Qingping Lin (acting through Bright Elite) engaged in various tortious and fraudulent acts with

the purpose of bringing Hong Kong Mandefu to the United States securities markets and defrauding American investors.

324.    As detailed above, and in furtherance of the conspiracy, Green and Bird, through the October 2009 proxy, made various affirmative misrepresentations and omissions that caused Hong Kong Mandefu to be acquired by TM, and thereby formed CCME, constituting unlawful acts.  The affirmative misrepresentations and omissions within the October 2009 proxy caused additional harm because they were relied upon, by Starr and other investors, in making investment decisions, and cloaked subsequent misrepresentations by CCME in legitimacy.

325.    In furtherance of the conspiracy, Cheng and Lam filed or caused to be filed false statements concerning CCME's business relationships and financials, as well as other false and misleading information, both with the SEC and with the media, constituting unlawful acts, including but not limited to the 10-K filed on March 31, 2010, the first quarter 2010 10-Q, dated May 14, 2010, the second quarter 2010 10-Q, dated August 13, 2010 and the third quarter 2010 10-Q dated November 9, 2010.

326.    In furtherance of the conspiracy, and in violation of their duties to Starr, Ou Wen Lin (acting through Thousand Space) and Qingping Lin (acting through Bright Elite) engaged in misrepresentations and omissions related to their sales of shares to Starr.

327.    Cheng, Lam, Green, Bird, Ou Wen Lin, Thousand Space, Qingping Lin and Bright Elite, through meetings in person, electronic and telephonic communications, written messages, and through their advisors, did agree on this course of conduct and formed a confederation to achieve their illicit purpose.

328.    Cheng, Lam, Green, Bird, Ou Wen Lin, Thousand Space, Qingping Lin and Bright Elite had knowledge of the affirmative misrepresentations and omissions.

329.     Defendants, in engaging in the conspiracy, obtained benefits beyond their salaries. Cheng and the Lins obtained shares based on the earn-out provisions described in the October 2009 proxy.  Moreover, the Lins, Thousand Space, Bright Elite, Green and Bird increased the value of shares they possessed and subsequently sold, and profited therefrom.

330.     Furthermore, due to restrictions in their share transfer, Green and Bird could not have sold their TM shares obtained prior to the IPO in the absence of the Share Exchange Agreement, and would have lost the money they invested, had they not succeeded in consummating a deal with Hong Kong Mandefu to form CCME.

331.     Plaintiff suffered actual damages as a result of this conspiracy, and in direct reliance on the unlawful acts carried out in furtherance of the conspiracy.  Plaintiff would not have purchased CCME stock at the prices it paid, or at all, if it had been aware that the purchase prices had been artificially and falsely inflated by Defendants' misleading statements.

**EIGHTH CAUSE OF ACTION**
**(Aiding and Abetting Fraud and Breach of Fiduciary Duty Against the Auditor Defendants)**

332.     Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

333.     Defendants Cheng and Lam as directors and/or officers of CCME owe fiduciary duties of loyalty and care, including a duty of disclosure, to Starr as a shareholder of CCME.

334.     Defendants Cheng and Lam breached their fiduciary duties to Starr, and committed fraud, by (i) employing devices, schemes, and artifices to defraud; (ii) making untrue statements, both deliberately and negligently, of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaging in acts, practices, and a

course of business which operated as a fraud and deceit upon Starr in an effort to cause Starr to pay artificially high prices for CCME's securities.

335.   The Auditor Defendants knowingly participated in the breaches of fiduciary duties and other tortious conduct of Defendants Cheng and Lam as set forth above, providing substantial assistance or encouragement in that course of conduct, including but not limited to knowingly or recklessly disregarding information, including various "red flags" during the course of the audit, and thereby proffering false financials for SEC filings.

336.   Plaintiff relied on the false statements provided by the Auditor Defendants, including but not limited to the audits contained within the October 2009 Proxy, the 2009 10-K filed March 31, 2010, and 2010 Form S-3.

337.   Defendants' actions are directly and proximately responsible for Plaintiff's injuries, including inducing the January 2010 purchase of CCME securities (as against Robbins) and the October 2010 purchase of CCME securities and December 2010 exercise of warrants (as against Robbins and DTT) and Plaintiff's maintenance of CCME securities up to and including the date when trading was halted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)   Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)   Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c)   Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: July 5, 2011

BOUCHARD MARGULES &
FRIEDLANDER, P.A

    /s/ Andre G. Bouchard
Andre G. Bouchard (Bar No. 2504)
Sean M. Brennecke (Bar No. 4686)
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500

*Attorneys for Plaintiff Starr Investments
Cayman II, Inc.*

OF COUNSEL:

Nicholas A. Gravante, Jr.
Lee S. Wolosky
Marilyn C. Kunstler
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300