## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------X

STARR INVESTMENTS CAYMAN II, INC.          :

                          Plaintiff,          :

                               Case No. 1:11-CV-00233-SLR

             v.          :

CHINA MEDIAEXPRESS HOLDINGS, INC.,          :     **ORAL ARGUMENT REQUESTED**
DELOITTE TOUCHE TOHMATSU,
ZHENG CHENG, JACKY LAM,          :
OU WEN LIN, QINGPING LIN,
THOUSAND SPACE HOLDINGS LIMITED,          :
BRIGHT ELITE MANAGEMENT LIMITED,
THEODORE GREEN, MALCOLM BIRD,          :
A.J. ROBBINS, P.C.,
                      Defendants.   :

-------------------------------------------------------------X

## DEFENDANTS THEODORE GREEN AND
## MALCOLM BIRD'S OPENING BRIEF IN SUPPORT OF THEIR
## MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

MORRIS JAMES LLP
Peter B. Ladig (Del. Bar No. 3513)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
Telephone: (302) 888-6826
Fax: (302) 571-1750
pladig@morrisjames.com

MORRISON COHEN LLP
Donald H. Chase
Edward P. Gilbert
909 Third Avenue
New York, New York  10022
Telephone: (212) 735-8600
Fax: (212) 735-8708
dchase@morrisoncohen.com
egilbert@morrisoncohen.com

*Attorneys for Defendants Theodore Green and
Malcolm Bird*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

SUMMARY OF ARGUMENT ................................................................................. 3

STATEMENT OF FACTS ........................................................................................ 4

    1.  TM Entertainment And Media, Inc. Pursues A Business Combination ................. 4

    2.  The October 2009 Proxy .................................................................. 5

    3.  CCME Commences Business And Defendants Green And Bird Resign .............. 6

    4.  Plaintiff Starr Invests In CCME.................................................................. 7

    5.  The TM Stock Transfer Agreement ........................................................ 9

    6.  Starr Is Intimately Involved In CCME's Business ................................ 10

    7.  Plaintiff's Claims Against Defendants.................................................... 11

ARGUMENT ........................................................................................................... 12

I.    PLAINTIFF'S SECTION 10(b) CLAIM AGAINST DEFENDANTS FAILS TO
       SATISFY THE REQUISITE PLEADING REQUIREMENTS ....................... 12

    A.  Plaintiff Must Plead A Section 10(b) Claim With Particularity .................. 12

    B.  Plaintiff Does Not Plead With Particularity Any
       Material Misstatement or Omission By Defendants.................................... 13

       1.  The Proxy Statements Relating To Hong Kong
           Mandefu's Business Operations And Financial Results
           Are Not Properly Attributed To Defendants Green And Bird............................ 13

       2.  Plaintiff Fails To Allege Any Specific Misstatements Made By Bird.................. 14

       3.  Plaintiff Fails To Provide Any Specific Facts To Demonstrate
           That Any Representation As To Hong Kong Mandefu's Business
           Operations And Financial Results Was False At The Time It Was Made........... 15

       4.  Plaintiff Fails To Allege Properly That Any Statements Made
           Relating To The Due Diligence Performed By TM Were False ......................... 15

i

5. Plaintiff Fails To Provide Specific Facts Demonstrating
That Hong Kong Mandefu's Financial Results, Business Value,
Advertising Network Or Client Base Were Materially Misstated ........................ 16

C. PLAINTIFF FAILS TO PLEAD FACTS RAISING A STRONG
INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER ............................17

D. PLAINTIFF FAILS TO ALLEGE  PROPERLY REASONABLE RELIANCE
ON  ANY ALLEGED MISREPRESENTATION BY DEFENDANTS ....................21

E. IN ANY EVENT, PLAINTIFF CANNOT MAINTAIN A  PRIVATE CAUSE OF
ACTION AGAINST DEFENDANTS  UNDER SECTION 10(b) BECAUSE ITS
PURCHASE OF  SECURITIES WAS NEITHER OF A SECURITY ON A
DOMESTIC EXCHANGE NOR A DOMESTIC TRANSACTION ........................23

II. PLAINTIFF HAS FAILED TO ALLEGE
ADEQUATELY A CLAIM FOR "CONTROL PERSON"
LIABILITY UNDER SECTION 20(a) OF THE EXCHANGE ACT ............................ 25

III. THE COURT SHOULD DISMISS PLAINTIFF'S STATE LAW CLAIMS .................. 26

IV. THE COURT SHOULD NOT GRANT PLAINTIFF
LEAVE TO AMEND SINCE ANY AMENDMENT WOULD BE FUTILE ................ 28

CONCLUSION ..............................................................................................................29

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*AES Corp. v. Dow Chem. Co.*, 325 F.3d 174 (3d Cir. 2003) ........................................ 21

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc.,* No. 10 CV 4537, 2011 U.S. Dist. LEXIS 80298 (S.D.N.Y. July 20, 2011) .......................................................... 25

*Brug v. Enstar Group, Inc.*, 755 F. Supp. 1247 (D. Del. 1991)................................... 28

*California Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126 (3d Cir. 2004) ................ 12

*Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343 (1988)............................................... 27

*City of Roseville Emples. Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378 (D. Del. 2010), *aff'd,* Nos. 10-2788 and 10-3815, 2011 U.S. App. LEXIS 17701 (3d Cir. Aug. 24, 2011) ..... 18

*Craig v. Atlantic Richfield Co.*, 19 F.3d 472 (9th Cir. 1994)...................................... 27

*Farley v. Henson*, 11 F.3d 827 (8th Cir. 1993).................................................... 26

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996)................................................ 22

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999) ..................................... 18

*In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272 (3d Cir. 2010) ....................................... 12

*In re Alpharma Sec. Litig.,* 372 F.3d 137 (3d Cir. 2004)........................................... 29

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ........................... 20

*In re Cybershop.com Sec. Litig.,* 189 F. Supp. 2d 214 (D.N.J. 2002) ............................... 20

*In re Digital Island Sec. Litig.*, 223 F.Supp. 2d 546 (D. Del. 2002), *aff'd,* 357 F.3d 322 (3d Cir. 2004)................................................................................... 25, 26

*In re Merck & Co. Sec. Litig.,* 432 F.3d 261 (3d Cr. 2005)......................................... 25

*In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314 (3d Cir. 2002) ....................................... 29

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) .................. 12, 20, 25, 26

*In re Tyson Foods, Inc. Sec. Litig.*, No. 01-425-SLR, 2004 U.S. Dist. LEXIS 11122 (D. Del. June 17, 2004), *aff'd,* 155 Fed. Appx. 53 (3d Cir. 2005)............................................ 25

*Institutional Invs. Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009) ........................... 13, 18

iii

*Kalmanovitz v. G. Heileman Brewing Co.*, 595 F. Supp. 1385 (D. Del. 1984), *aff'd*, 804 F.2d 1248 (3d Cir. 1986)..................................................................................................... 28

*Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417 (D.N.J. 1999)........................ 19

*Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793 (3d Cir.), *cert denied sub nom, First Pennsylvania Bank N.A. v. Monsen*, 439 U.S. 930 (1978) ......................................... 27

*Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010)....................................... 23, 24

*Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997) ................................................ 4

*P. Schoenfeld Asset Mgmt. LLC, v. Cendant Corp.*, 142 F. Supp. 2d 589 (D.N.J. 2001)............. 21

*Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192 (1993), *aff'd*, 215 F.3d 407 (3d Cir. 2000)........................................................................................................ 4

*Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ...................................................................................................... 26

*Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880 (3d Cir. 1975)........................................................ 25

*SEC v. Lucent Techs. Inc.*, 363 F. Supp. 2d 708 (D.N.J. 2005).................................................... 14

*Shahin v. Darling*, 606 F. Supp. 2d 525 (D. Del. 2009) ............................................................. 27

*Shahin v. Delaware*, No. 10-1484, 2011 U.S. App. LEXIS 8378 (3d Cir. Apr. 21, 2011) .......... 27

*Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686 (D. Del. 2010) 12, 18

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) ......................... 12

*Straub v. Vaisman & Co.*, 540 F.2d 591 (3d Cir. 1976) .............................................................. 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .............................................. 17

*The Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007)......................................... passim

*Tracinda Corp. v. Daimler Chrysler AG*, 364 F. Supp. 2d 362 (D. Del. 2005), *aff'd*, 502 F.3d 212 (3d Cir. 2007)................................................................................................... 21

*Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir. 1976)................................................... 27

*Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579 (2d Cir. 2002) ................... 27

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ................................................... 17

*WM High Yield Fund v. O'Hanlon*, No. 04-3423, 2005 U.S. Dist. LEXIS 12064 (E.D. Pa. May 13, 2005) ......................................................................................................... 14

**STATUTES**

*Albert v. Alex. Brown Mgmt. Servs.*, Nos. 762-N, 763-N, 2005 Del. Ch. LEXIS 133 (Del. Ch. Aug. 26, 2005) ............................................................................................................ 28

*Ramunno v. Cawley*, 705 A.2d 1029 (Del. 1998) ........................................................ 27

*S & R Assocs., L.P., III v. Shell Oil Co.*, 725 A.2d 431 (Del. Super. Ct. 1998) .......................... 27

**FEDERAL STATUES & RULES**

15 U.S.C. § 78u-4 ........................................................................................... 12, 13, 17

15 U.S.C. §78t.................................................................................................... 25

28 U.S.C. § 1367(c)(3)......................................................................................... 27

Fed. R. Civ. P. 12(b)(6)........................................................................................... 1

Rule 9(b) ................................................................................................... passim

Section 10(b) of the Securities Exchange Act of 1934 ......................................... passim

## PRELIMINARY STATEMENT

Defendants Theodore Green ("Green") and Malcolm Bird ("Bird" and collectively "Defendants") respectfully submit this opening brief in support of their motion to dismiss the Amended Complaint[1] pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

Plaintiff Starr Investments Cayman II, Inc. ("Plaintiff" or "Starr") is a large, sophisticated, off-shore institutional investor that made multiple private investments in Defendant China Media Express Holdings, Inc. ("CCME"). CCME is a publicly traded company operating exclusively in China, whose principal business is the sale of advertisements on television displays installed on buses across China. CCME was formed in October 2009 through the reverse merger of the China business entity into a Delaware public investment vehicle formed by Defendants Green and Bird for the very purpose of identifying a suitable business combination.

Prior to its initial investment, Starr conducted its own due diligence of CCME, enlisting the services of a major accounting firm to assist its financial review. Thereafter, Starr entered into private negotiations with CCME and certain of its shareholders for the purchase of CCME securities which resulted in a detailed series of agreements executed in January, 2010. The principal agreement was a Securities Purchase Agreement containing a litany of representations and warranties from CCME and the other sellers to Starr, including all of the other defendants with the exception of Jacky Lam and the accounting defendants. After appointing its own employee as a director of CCME, Starr made additional investments over the ensuing twelve months. In early 2011, however, after two short-selling bloggers issued negative reports on

---

[1] The Amended Complaint dated July 5, 2011 (D.I. 25) is referred to as the "Complaint" or "Compl.", and is attached for the convenience of the Court as Exhibit A to the Declaration of Peter B. Ladig ("Ladig Declaration" or "Ladig Dec."). All references to (¶__) are to the paragraphs of the Complaint, and to (Ex. __) are to the Exhibits attached to the Ladig Declaration.

CCME in which they made various allegations of fraud, the CCME stock plummeted, certain directors and officers then resigned, and CCME's independent accounting firm, defendant Deloitte Touche Tohmatsu ("DTT"), also resigned.  Plaintiff thus commenced this suit alleging securities fraud claims against CCME, its accounting firm, DTT, and CCME's CEO and CFO, Zheng Cheng and Jacky Lam, alleging that they had made misleading statements concerning CCME's business and financial operations in China.

Green and Bird were not initially named as defendants in this action.  Starr has now cast its net wider, apparently seeking to ensnare in its latest iteration of the Complaint anyone even remotely connected to its CCME transactions.  To be sure, Starr does not allege that it ever had any direct oral or written communication with Defendants.  Nor does it allege that Defendants made any direct misrepresentations to Starr.  Defendants were not parties to the Securities Purchase Agreement or to any of Starr's other CCME transactions with one exception: Starr executed a separate Stock Transfer Agreement with Bird, Green and others on January 28, 2010, but  Starr  paid  no  cash  consideration  to  them  for  the  transferred  shares,  and  expressly acknowledged that it was not relying on any representation by Bird or Green in connection with that transaction other than what was expressly set forth in that agreement.  Green and Bird also were nominal directors of CCME until early March 2010.

Starr now asks this Court to believe that it did not rely on its own due diligence, its own accountants, and the litany of representations and warranties by CCME and others in its Securities Purchase Agreement in connection with its purchase of CCME securities, but rather on statements it seeks improperly to attribute to Defendants.  There are no facts specifically alleged that demonstrate Defendants' knowledge of any fraud or any reason for them even to suspect fraud.  Indeed, Plaintiff's Complaint essentially boils down to acceptance of rumors and speculation, and the skewed perspective that somehow Defendants should have known that CCME was engaged in a fraud.  Even though it is clearly premature to conclude that there was

any fraud at all, there is certainly no support for any claim that these Defendants had any knowledge of it. Indeed, if Starr, with its vast coterie of professionals and significant leverage with CCME could not uncover any alleged fraud, there is certainly no basis to believe that Green and Bird did or could.

## SUMMARY OF ARGUMENT

1.      Plaintiff's securities fraud claim fails under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 for all the following reasons: (a) Plaintiff has not alleged with particularity any material misstatement or omission attributable to Green or Bird; (b) Plaintiff has not alleged facts sufficient to raise a strong inference that Green or Bird acted with scienter; (c) Plaintiff has not properly alleged reasonable reliance on any alleged misrepresentation by Green or Bird, and any such reliance is foreclosed by Plaintiff's own pleadings and the indisputable documents referenced in the pleadings and a matter of public record.

2.      Starr's claim against Green and Bird pursuant to Section 10(b) and Rule 10b-5 is barred because Starr has not alleged, and cannot allege, that its acquisition of unregistered CCME securities in January 2010 was a transaction in securities listed on a domestic exchange, or a domestic transaction in other securities.

3.      Plaintiff has failed to allege a claim for control person liability under Section 20(a) of the Exchange Act because: (a) it has not alleged a primary securities violation by a third party within Green or Bird's control; (b) it has not set forth sufficient facts to establish Green and Bird's control of any primary violator; and (c) it has not alleged sufficient facts to establish Green and Bird's culpable participation in any securities fraud.

4.      Plaintiff's common law claims for aiding and abetting fraud and conspiracy to commit fraud must be dismissed because: (a) once the federal securities law claims are dismissed and there is no diversity jurisdiction or other basis for jurisdiction of the common law claims, the

Court should decline to exercise supplemental jurisdiction since it is not otherwise warranted under the facts and circumstances of this case; (b) Plaintiff has not adequately alleged aiding and abetting or conspiracy liability because it failed to set forth specific facts demonstrating that Defendants knew of any false statements, or agreed to participate, or substantially participated, in any fraud.

5.     Leave to amend should be denied because any amendment would be futile in light of the conceded facts and unequivocal documents.

## STATEMENT OF FACTS[2]

1.     TM Entertainment And Media, Inc. Pursues A Business Combination

TM Entertainment and Media, Inc. ("TM") is a Delaware entity formed as an investment vehicle by Green, Bird and others on October 17, 2007. (¶ 47). TM was a blank check company "organized for the purpose of effecting a merger, capital stock exchange, asset acquisition or other similar business combination with a domestic or foreign operating business in the entertainment, media, digital or communications industries." (*Id.*). TM was required under its certificate of incorporation to complete such a business combination by October 17, 2009, at which time the corporation's existence would otherwise cease. (¶ 48). Green was Chairman of the Board, Co-Chief Executive Officer and Interim Chief Financial Officer of TM. (¶ 17). Bird was a director and Co-Chief Executive Officer of TM. (¶ 18).

---

[2]     All citations in the Statement of Facts (¶ __) are to the Complaint, unless otherwise identified. Certain factual allegations of the Complaint are assumed to be true solely for the purposes of this motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"). The presumption of truthfulness does not apply to "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). On a motion to dismiss, this Court may also properly consider the following without converting it into a motion for summary judgment: "matters of public record" and "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (1993), *aff'd*, 215 F.3d 407 (3d Cir. 2000). Accordingly, Defendants have attached to the Declaration of Peter B. Ladig copies of documents that are both public records and referenced in, and the basis for, Plaintiff's claims against Defendants. Defendants otherwise reserve their right to deny or contest any allegations in the Complaint.

4

Hong Kong Mandefu Holding Limited ("Hong Kong Mandefu"), a Chinese media company, emerged as a potential target for a reverse merger[3] with TM in 2008. (Ex. B, October 2009 Proxy ("Proxy") at 71). Hong Kong Mandefu generated revenue by selling advertisements on the television displays installed on buses in eighteen of China's regions. (*Id.*; ¶ 8) On May 4, 2009, TM announced that it had entered into a definitive agreement to purchase the issued and outstanding capital stock of Hong Kong Mandefu. (Ex. B, Proxy at 2). Over the next several months, TM employed various third parties to conduct due diligence in the business of Hong Kong Mandefu, including A.J. Robbins ("Robbins"), an accounting firm that audited the financials for 2006, 2007 and 2008 fiscal years. (¶¶ 51, 52). In September 2009, Robbins provided TM with its audit of Hong Kong Mandefu's financial statements for the first six months of 2009. (¶ 52). On September 30, 2009, the TM board approved an amended Share Exchange Agreement between Hong Kong Mandefu and TM. (¶ 53).

   2.    The October 2009 Proxy

   On October 2, 2009, TM issued a proxy statement (the "October 2009 Proxy" or "Proxy"). (¶¶ 69-71; Ex. B). The Proxy was intended to provide TM's shareholders at the time (which did not include Plaintiff) with the necessary and available information to make an intelligent decision in voting on the proposed reverse merger with Hong Kong Mandefu. Thus, the Proxy repeated certain business and financial information provided to TM by Hong Kong Mandefu and its accountant, Robbins, during due diligence, for the benefit of TM's shareholders. (¶ 73). Critically, the Proxy expressly stated:

> "All information contained or incorporated by reference in this
> Proxy Statement relating to TM has been supplied by TM, and all

---

[3]    Although the Complaint attempts to suggest that the use of the reverse merger mechanism was designed to permit defendants to commit fraud, the Complaint fails to allege that reverse mergers were unlawful, unusual or even that they were generally considered improper in 2009 when this merger occurred. Plaintiff merely refers to news articles and studies from 2011 that suggest some problems with the practice. (*See* ¶¶ 34- 46). Needless to say, this falls well short of establishing any basis to infer an intention by Defendants to defraud anyone.

> such information relating to CME [defined as Hong Kong Mandefu] has been supplied by the Sellers [defined as Zheng Cheng, Thousand Space Holdings Limited and Bright Elite Management Limited] and CME [Hong Kong Mandefu]. **Information provided by either of us does not constitute any representation, estimate, or projection of the other."**

(Ex. B, Proxy at 193). Accordingly, the Proxy made clear that TM (and derivatively, Green and Bird) did not make any representation as to the information provided by Hong Kong Mandefu.

The Proxy also set forth a clear disclaimer cautioning the then TM shareholders about various risk factors to be taken into account in their decision, including warnings about the "risks relating to doing business in China" and "risks relating to CME [Hong Kong Mandefu]". (*Id.* at 23). TM also explained that all of the information regarding Hong Kong Mandefu had been provided to it during due diligence. (*Id.* at 164). The Proxy published the audited and unaudited financials for Hong Kong Mandefu provided to TM by Robbins, as well as various other Hong Kong Mandefu statements regarding its business (*Id.* at 107-08).

Although the various information concerning Hong Kong Mandefu was solely the representation of Hong Kong Mandefu and the related Sellers, the Proxy also included a detailed description of the due diligence that TM conducted, covering several pages of detail. (*Id.* at 73-75). The Proxy also contained the standard cautionary statement setting forth the well-established safe harbor law for forward-looking statements. (*Id.* at 1). In setting forth TM's recommendation concerning the proposed reverse merger, the Proxy expressly noted:

> CME has a limited operating history, derives a significant portion of its revenues from a limited number of advertising clients, depends on one equipment supplier and relies on contractual arrangements with a third party to conduct its advertising business in China. (*Id.* at 14).

3.   CCME Commences Business And Defendants Green And Bird Resign

The TM shareholders approved the transaction on October 15, 2009. (¶ 57). Following the reverse merger, the company was renamed China MediaExpress Holdings, Inc. Defendant Zheng Cheng, who founded Hong Kong Mandefu, became the Chairman and Chief Executive

Officer (CEO) of CCME after the merger.  (¶ 9).  CCME was then listed on the NASDAQ.[4]  (¶ 8).  Since CCME was based exclusively in China, Defendants resigned as officers following the merger and there is no allegation that they were involved thereafter in any specific business operations or substantive activities of CCME, except that they were nominally named directors of CCME.  Both ultimately resigned from the CCME board in early March, 2010.  (¶ 90).  There is no allegation that Green and Bird had any further contact or relationship to CCME other than as a shareholder.  Moreover, although certain of the TM shareholders, including Green and Bird, continued to be shareholders of CCME following the merger, their shares were not registered, and accordingly could not be sold prior to registration.  Roughly one year after the merger, and pursuant to CCME's Registration Statement on Form S-3, dated August 16, 2010, and amended on October 5, 2010, which became effective on October 19, 2010, the CCME shares owned by Defendants Green and Bird and certain other TM shareholders were finally registered.  (¶¶ 17 and 203; Ex. C).

    4.     <u>Plaintiff Starr Invests In CCME</u>

Plaintiff Starr, a Cayman Islands corporation, is "an investment holding company for various private equity funds and direct investments" with a "principal office and principal business" in Hamilton, Bermuda.  (Ex. D at 8).[5]  Starr was not a shareholder of TM when the

---

[4]      Starr purchased all of its CCME securities through private contractual arrangements, however, and not on any public exchange.  (¶¶ 2, 12, 14, 82; Exs. D-I).

[5]      Starr is in turn a wholly owned subsidiary of Starr International Cayman, Inc., an investment holding company for various private equity funds (Ex. D at 8), and itself a wholly owned subsidiary of Starr International Investments Ltd., a Bermuda corporation, invested in various direct, private equity and hedge fund investments (*id.*), and itself a wholly owned subsidiary of Starr International Company, Inc., a Panama corporation operating a number of lines, including commercial real estate, a private golf club, and an investment portfolio with a principal business office in Switzerland (*id.*).  Pursuant to agreement, C.V. Starr & Co., Inc., shares the power over the CCME securities held by Starr International Company, Inc. (*Id.*).  Maurice Greenberg, the Chairman, CEO and director of C.V. Starr & Co., Inc., and Managing Director of Starr International Company, Inc., owns 26.37% of the C.V. Starr common stock and as such may be deemed to have power over the CCME securities although he disclaimed beneficial ownership.  Mr. Greenberg is certainly no stranger to the securities laws.  In

October 2009 Proxy was issued. Starr first learned about CCME in July 2009, when Starr's employee, Dorothy Dong, met CCME's CFO, Jacky Lam. (¶ 77). Dong visited CCME's headquarters in China and met CCME's chairman, Zheng Cheng, as well as other senior managers of CCME. (¶ 78). Before investing in CCME, Starr insisted upon conducting its own independent review of CCME's financials, and retained Deloitte & Touche Financial Advisory Services Limited ("DTFAS"), an affiliate of DTT, to conduct such financial due diligence. (¶ 80). DTFAS raised no red flags during its diligence. (¶ 81). Starr then completed negotiations with CCME on January 12, 2010, approximately three months after TM's merger with Hong Kong Mandefu. (¶ 82; Ex. D at 9, Exs. G and H).

Plaintiff thus became a major investor in the new CCME entity pursuant to a privately executed Securities Purchase Agreement ("SPA") with Defendants CCME, Zheng Cheng, Ou Wen Lin, Qingping Lin, Thousand Space Holdings Limited, and Bright Elite Management Limited, among others. (¶¶ 7, 82; Exs. G and H). Significantly, Defendants Green and Bird were not parties or signatories to the SPA, and there is no allegation that they participated in the negotiations leading to the SPA, reviewed the SPA, or were responsible for any of the representations or warranties contained therein. (¶ 82; Ex. H). Nor is there any allegation that Starr ever contacted Defendants Green or Bird at any time prior to its purchase of CCME securities, or that Defendants made any oral or written representation to Starr in connection with its purchase of CCME securities pursuant to the SPA.

Pursuant to the SPA, Starr paid $30 million to acquire 1,000,000 shares of unregistered Series A Convertible Preferred Stock of CCME as well as warrants to purchase 1,545,455 shares of Common Stock at a set price. (¶ 83; Ex. H). Starr thereby acquired an approximate 16.5%

---

connection with an SEC action, he "consented to a judgment entered on August 7, 2009, enjoining him from violating the antifraud and other provisions of the securities laws and from controlling any person who violates the reporting, books, and records and internal control provisions of the securities laws, and directing him to pay a penalty of $7,500,000 and disgorgement of $7,500,000." (*Id.* at 9).

beneficial interest in CCME. (Ex. D). The SPA also entitled Starr to designate one member to the Board of Directors of CCME. (¶ 85). Starr exercised this right by appointing Ms. Dong as a director on January 28, 2010. (Ex. I). The SPA expressly provided in pertinent part, however, that:

> "[n]o director, … shareholder … of [CCME] … shall have any liability for any of the obligations of [CCME] … under this Agreement or for any claim based on, in respect of, or by reason of, the respective obligations of [CCME] … under this Agreement. Each party hereby waives and releases all such liability." (Ex. H § 11.6).

5.   The TM Stock Transfer Agreement

On or about January 28, 2010, Green, Bird and certain other TM shareholders also executed a stock transfer agreement (the "TM Agreement") with Starr pursuant to which Starr acquired an additional 150,000 shares of unregistered CCME stock. (¶ 89; Ex. F § 3.05). Of the 150,000 shares, 110,000 shares were previously owned by Green and Bird. (*Id.*; Ex. F, Annex A). The TM Agreement did not provide for any financial compensation to Defendants in connection with their transfer of the 150,000 shares, nor does the Complaint allege that any financial compensation was provided to Defendants in connection with the transaction. In its Schedule 13D filing, Starr acknowledged that "no additional cash consideration" was paid for the shares. (Ex. D at 12). In Section 3.02 of the TM Agreement, it expressly states:

> "Transferee [Plaintiff] is sophisticated in financial matters and is able to evaluate the risks and benefits attendant to the Transfer….Transferee [Plaintiff] further represents that it has been furnished by the Company [CCME] with, and has evaluated, all information it deems necessary, desirable and appropriate to evaluate the merits and risks of the transactions contemplated herein and has received such legal and financial other advise as deemed to be necessary, desirable and appropriate to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.   In evaluating the suitability of the transactions contemplated herein, **Transferee [Plaintiff] has not relied upon any representations or information whether oral or written made by or on behalf of Transferors [Green and Bird] other than the representations**

**and warranties of the Transferors [Green and Bird] expressly set forth in this Agreement."**

Section 3.03 of the TM Agreement further states:

> "Transferee [Plaintiff] is not relying on any statements or representations of the Transferors [Green and Bird] or any of their representatives or agents for legal, tax or investment advice with respect to this Agreement or the transactions contemplated by the Agreement."

Section 3.05 of the TM Agreement also states:

> "Transferee [Plaintiff] acknowledges and understands the Founder Shares [the shares of CCME common stock being transferred] have not been registered under the Securities Act, ... [and] may be offered, resold, pledged or otherwise transferred only (A) pursuant to an effective registration statement filed under the Securities Act, (B) pursuant to an exemption from registration under Rule 44 ... or (C) pursuant to any available other exemption from the registration requirements of the Securities Act ..."

Accordingly, Plaintiff unequivocally acknowledged in the TM Agreement that it was not relying on any oral or written representations of Defendants (other than what is in the TM Agreement and that the transferred shares were unregistered. (Ex. F)

6.   Starr Is Intimately Involved In CCME's Business

At the time of its acquisition of CCME shares in January 2010, Starr expressly indicated that it intended to review its investment in CCME "on a continuing basis and may ... engage in discussions with [CCME's] management or board of directors, or other relevant parties, concerning [CCME's] business, operations, governance, management, strategy and future plans." (Ex. D at 13). Starr's representative, Ms. Dong, joined the CCME Board on January 28, 2010. CCME thereafter filed various documents and issued press releases containing information concerning the company's performance, including: the March 31, 2010 Form 10-K (¶ 99), a May 14, 2010 press release (¶ 107), the May 14, 2010 Form 10-Q, (¶ 110), the July 12, 2010 press release (¶ 115), the August 13, 2010 press release (¶ 118), and the August 13, 2010 Form 10-Q (¶ 121). There is no allegation that Defendants Green or Bird were associated with CCME in

any capacity during this time period except as passive shareholders.

On October 18, 2010, more than 10 months after making its initial purchase, Starr in fact purchased, through another private agreement, an additional 1.5 million common shares of CCME from Defendants Thousand Space and Bright Elite, two British Virgin Island companies owned and controlled by the Lin Defendants, for a purchase price of $13.5 million. (¶¶ 129-131, 140). There is no allegation that Defendants Green and Bird had anything to do with this transaction. On December 8, 2010, Starr exercised its warrants and thereby also acquired 1,545,455 additional common shares of CCME. (¶ 7). Starr's last transaction occurred approximately nine months after Green and Bird had left CCME's Board. (¶ 90, 153). Ms. Dong, who remained on the Board throughout this period, apparently did not object or otherwise raise any red flags with respect to any of the subsequent statements and transactions of CCME.

### 7. Plaintiff's Claims Against Defendants

In late January and early February 2011, two self-interested bloggers and short-sellers published critical "research reports" alleging that they discovered fraud involving Mr. Cheng, CCME's Chairman and Chief Executive Officer. (¶¶ 157, 159). CCME issued press releases responding to the allegations. (¶ 161). However, after CCME failed to make certain required timely filings, it was suspended from trading by NASDAQ and subsequently delisted. (¶ 175).

In its original Complaint, Plaintiff did not name Defendants Green and Bird, nor did Plaintiff allege any misrepresentation by them or any reliance on the October 2009 Proxy. In its latest version of the Complaint, Plaintiff set forth four claims against Defendants Green and Bird: two statutory claims for securities fraud violations of Sections 10(b) and 20(a) of the Exchange Act and two common law claims for aiding and abetting, and conspiracy to commit, common law fraud.

## ARGUMENT

I.   **PLAINTIFF'S SECTION 10(b) CLAIM AGAINST DEFENDANTS FAILS TO SATISFY THE REQUISITE PLEADING REQUIREMENTS**

A.   Plaintiff Must Plead A Section 10(b) Claim With Particularity

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reasonable reliance by Plaintiff on the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272 (3d Cir. 2010).

Section 10(b) claims are also subject to the heightened pleading requirements of Rule 9(b) and the PSLRA.  Rule 9(b) requires that "the circumstances constituting fraud... shall be stated with particularity."  As applied to Section 10(b) claims, Rule 9(b) requires a plaintiff to plead: "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006); *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 701 (D. Del. 2010). The PSLRA in turn, imposes two exacting and distinct pleading requirements for securities fraud cases.  First, the complaint must specify each statement alleged to have been misleading and the reasons why the statement is misleading.  Second, it must state with particularity facts giving rise to a strong inference of defendant's scienter, *i.e.*, the required state of mind.  15 U.S.C. § 78u-4(b)(2).  *Snowstorm Acquisition Corp.*, 739 F. Supp. 2d at 701.  This particularity requirement must be "rigorously applied in securities fraud cases."  *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 145 (3d Cir. 2004) ("*Chubb*") (citations omitted).

12

### B. Plaintiff Does Not Plead With Particularity Any Material Misstatement or Omission By Defendants

Plaintiff must establish "falsity" by "specify[ing] each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Institutional Invs. Group v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009); *see* 15 U.S.C. § 78u-4(b)(1). A complaint can only satisfy the heightened pleading requirement "by providing 'sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs.'" *Chubb,* 394 F.3d at 147. Plaintiff's Complaint does not come close to meeting this stringent pleading requirement as it fails to plead with particularity a single material misstatement by either Green or Bird.

The Complaint does not specifically allege any direct communication, written or oral, between Starr and Defendants. Nor does the Complaint allege any fiduciary obligation owed by Defendants to Starr. Instead, Plaintiff identifies five allegedly false and misleading statements in the Proxy attributed to Green and Bird: (i) alleged misrepresentations as to the amount of due diligence TM conducted on CCME; (ii) alleged overstatements of CCME's financial results; (iii) alleged overstatements of the value of Hong Kong Mandefu; (iv) alleged overstatements of the size of CCME's advertising network; and (v) alleged overstatements of the number of buses in CCME's network. (¶¶ 2, 67, 69, 70, 72, 75).

### 1. The Proxy Statements Relating To Hong Kong Mandefu's Business Operations And Financial Results Are Not Properly Attributed To Defendants Green And Bird

The October 2009 Proxy makes clear that the information supplied by Hong Kong Mandefu does not constitute any representation by TM. (Ex. B at 193). Accordingly, information in the Proxy relating to Hong Kong Mandefu's financial results, advertising network, and buses are not properly attributable to TM, much less Green and Bird.

13

2.    Plaintiff Fails To Allege Any Specific Misstatements Made By Bird

Plaintiff's 10(b) claim against Bird must also be dismissed for failure to adequately allege any statement attributable to Bird. Indeed, the Complaint does not specify a single statement that Bird signed or otherwise made. Plaintiff admits that Bird did not sign the October 2009 Proxy filed by TM.[6] Nevertheless, Plaintiff suggests that the Proxy can still be attributed to Bird based on his position in TM and/or his participation in making the statement.

Since Bird did not sign the Proxy, however, and it cannot be specifically attributed to him, Plaintiff's allegations constitute the very type of non-specific group pleading that the Third Circuit has consistently rejected. *The Winer Family Trust v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007). Courts also reject Section 10(b) liability based on "substantial participation" in a statement, adopting instead a bright-line test that requires a specific allegation that a material misstatement was made by the actor or attributable to him when disseminated. *See, e.g., WM High Yield Fund v. O'Hanlon*, No. 04-3423, 2005 U.S. Dist. LEXIS 12064, at *22 (E.D. Pa. May 13, 2005) ("Defendants who have not been alleged to have made any statements, ... cannot be held liable therefore..."); *SEC v. Lucent Techs. Inc.*, 363 F. Supp. 2d 708, 722 (D.N.J. 2005) (rejecting liability based on "substantial participation").[7]

---

[6]    Plaintiff alleges that only Green signed the October 2009 Proxy filed by TM. (¶¶ 17, 90). Although paragraph 203 of the Complaint suggests that Bird was also a signatory to the filings submitted by TM, this is contradicted by paragraphs 17 and 90 as well as the Proxy itself, which bears no signature by Bird. (Ex. B).

[7]    For the same reasons, there can be no Section 10(b) claim against either Green or Bird in connection with any statements filed by CCME. Indeed, the first statement filed by CCME upon which Plaintiff claims it relied was the Form 10-K filed on March 31, 2010, which was almost a month after both Green and Bird already left the Board. (¶ 90). The Complaint contains no allegation that any of the statements subsequently made by CCME are attributable to Green or Bird, so the 10(b) claim against them with respect to any CCME statements must also be dismissed. *Winer Family Trust*, 503 F.3d at 337.

3.  Plaintiff Fails To Provide Any Specific Facts To Demonstrate
That Any Representation As To Hong Kong Mandefu's Business
Operations And Financial Results Was False At The Time It Was Made

For all of Plaintiff's prolixity, it fails to allege any specific facts to demonstrate that any

material representation in the Proxy with respect to Hong Kong Mandefu's business and finances

was not true at the time it was made in October 2009, as opposed to early 2011. It is certainly

possible that the alleged statements were true in October 2009, even if not true in early 2011.

For example, according to the Complaint, DTT concluded in 2011 that the claim that there were

22,205 buses playing CCME programs was overstated by approximately 1,330 buses (¶

165(xii)), but the Proxy claimed only that the number of buses exceeded 16,000 as of June 30,

2009. (¶ 67; Ex. B at 2). Simply stated, Plaintiff's allegations simply assume misrepresentations

going back to October 2009 without providing any factual basis.

4.  Plaintiff Fails To Allege Properly That Any Statements Made
Relating To The Due Diligence Performed By TM Were False

Plaintiff alleges that Defendants misrepresented the due diligence that TM performed.

TM set forth in detail in the Proxy the nature of the due diligence performed, yet Plaintiff fails to

identify a single example of due diligence that TM said it performed that it did not. Instead,

Plaintiff's real gripe appears to be that Defendants did not uncover the alleged fraud, and

Plaintiff assumes that it would have been uncovered if TM had adequately performed due

diligence. Plaintiff's own Complaint elsewhere belies that very assumption, however, since

Plaintiff avers that it performed its own extensive due diligence, hired a Deloitte Touche affiliate

to assist in its due diligence, had close contact with CCME management for over a year,

including a member in China on CCME's board, and yet it still failed to uncover the alleged

fraud. How then could it possibly assume that Green and Bird should have done so?

5.   Plaintiff Fails To Provide Specific Facts Demonstrating
That Hong Kong Mandefu's Financial Results, Business Value,
<u>Advertising Network Or Client Base Were Materially Misstated</u>

Plaintiff is long on speculation but very short on facts in addressing Hong Kong

Mandefu's business and financial results.  Plaintiff cites and relies upon two short seller reports –

the Citron Research report and the Muddy Waters report – released on or about January 30, 2011

and February 3, 2011, respectively, well over one year after the filing of the October 2009 Proxy.

(¶¶ 157, 159).  Not only are the reports unsubstantiated and based wholly on anonymous sources,

but there is nothing in them (or otherwise in the Complaint) that demonstrates the falsity of any

statements allegedly attributable to Defendants.

Moreover, the sources for Plaintiff's "on information and belief" allegations are at best

neutral and, more likely, entirely unreliable.  The Third Circuit has held that in assessing the

particularity of allegations made by confidential sources, courts must engage in "an examination

of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability

of the sources, the corroborative nature of other facts alleged, including from other sources, the

coherence and plausibility of the allegations, and similar indicia." *Chubb*, 394 F.3d at 147.

Plaintiff's allegations do not permit such an examination.  Even if there did exist evidence in

these short seller reports to demonstrate falsity in October 2009, Plaintiff has not specifically

identified any such evidence, and the Complaint provides the Court with no reason to believe

either report.  Indeed, it can easily be inferred that both reports were made up out of whole cloth

simply to further the self-interest of the authors.

Plaintiff's reliance on various resignations and resignation letters in 2011 also fails to

support an inference that statements made in the October 2009 Proxy were false.  At most, the

resignations raise questions concerning the Company's financial results. (¶¶ 167, 177).  The

resignation letters do not, however, state any particularized facts supporting an inference of

falsity of the statements made in October 2009.

16

To the extent Plaintiff relies on the purported "significant discrepancy between CCME's financials as reported to the SEC and those reported to [China's] SAIC," Plaintiff fails to identify the specifics relating to the discrepancies or whether the time periods and methodologies coincide. Plaintiff also fails to tie those alleged discrepancies to statements made by Green and Bird. (*See, e.g.,* ¶ 152).

Finally, the Proxy also explained the basis for TM's opinion as to the value of Hong Kong Mandefu's business. Plaintiff fails to allege specific facts demonstrating that the valuation was materially false, and that Defendants knew it was false and did not actually hold the opinion expressed. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991).

## C.   PLAINTIFF FAILS TO PLEAD FACTS RAISING A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER

Plaintiff fails to plead scienter in any meaningful or legally acceptable manner. In order to survive dismissal, a complaint must "with respect to each act or omission ... state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). In the Third Circuit, "[s]cienter is a mental state embracing intent to deceive, manipulate, or defraud," and the facts alleged must rise to a strong inference of either knowing or reckless behavior. *Avaya*, 564 F.3d at 252 (internal quotations and citation omitted). In determining the sufficiency of a plaintiff's pleading, a court must consider the "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling." *Id.* "[O]missions and ambiguities count against inferring scienter." *Id.* at 326. "A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324; *see also Winer Family Trust*, 503 F.3d at 327. Merely

"[c]obbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA." *Chubb*, 395 F.3d at 155. Moreover, Plaintiff "may not merely allege 'motive and opportunity' as the requisite scienter necessary to survive a motion to dismiss. Instead, motive may be a factor in analyzing the defendants state of mind, but the plaintiff's complaint must also include some element of volition on the part of the defendant." *Snowstorm Acquis. Corp.*, 739 F. Supp. 2d at 705 (*citing Avaya*, 564 F.3d at 277).

Here, Plaintiff's fraud-by-hindsight allegations of scienter consist largely of the type of generalized, boilerplate assertions that the Third Circuit has repeatedly rejected. (*See* ¶ 203). Indeed, the allegations largely rely upon legally impermissible speculation based on Defendants' short-lived positions as CCME directors, without any specific allegations establishing their respective knowledge of the alleged fraud. In the end, Plaintiff's scienter inference is not just weak, it is entirely lacking in common sense and undermined by its own pleading.

First, Plaintiff alleges that Defendants' extensive due diligence and position as CCME directors provided them with access to information reflecting the "true facts regarding CCME" and suggests that they "knew, should have known, or recklessly disregarded" the false statements in the Proxy. (¶¶ 193, 203). However, "[i]t is well established that a pleading of scienter 'may not rest on a bare inference that a defendant "must have had" knowledge of facts.'"[8] *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) (internal citation omitted).

---

[8]     In addition to failing to allege specific facts to support a strong inference that Green and Bird had knowledge of any fraudulent statement, the allegations also fall far short of suggesting that they acted "recklessly" in not detecting a problem with any statement published in the October 2009 Proxy. Plaintiff alleges that Bird and Green "must have known" or "should have known" that the information concerning Hong Kong Mandefu was false, and that they ignored "red flags," (¶¶ 17-18), yet does not allege what red flags they ignored. Such conclusory allegations are insufficient to establish recklessness. *See, e.g., City of Roseville Emples. Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 401 (D. Del. 2010), *aff'd*, Nos. 10-2788 and 10-3815, 2011 U.S. App. LEXIS 17701 (3d Cir. Aug. 24, 2011) (notwithstanding conspiracy by certain individuals involved in the business, "plaintiffs have simply not provided any facts to support a conclusion that [the other officers] were aware of the conspiracy, or should have been aware of it....")

"Likewise, allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny." *Id.* (citations omitted). *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417, 430 (D.N.J. 1999) (dismissing complaint where plaintiffs did not "sufficiently link [each of the individual] defendants, directly and specifically, with incidents or circumstances which, apart from their positions or roles within the…compan[y], connect them to wrongdoing and create a 'strong inference' of scienter").

In any event, Starr is highly sophisticated and itself conducted extensive due diligence with respect to CCME prior to its purchase of securities in January 2010, including the retention of a Chinese affiliate of Deloitte to assist in the financial review, and Starr had a director on CCME's board from January 28, 2010 until at least March 2011, and a major accounting firm, DTT, auditing CCME during that time period, and a contractual right to "reasonable access to the Company's books and records." (Ex. E at § 9.4.4). Nevertheless, Starr did not uncover any alleged fraud, and presumably was not turning a blind eye to it. It is the height of hypocrisy for Starr to suggest that even less compelling facts point to a strong inference of scienter as to Defendants Green and Bird, while maintaining its own complete innocence. Clearly, the failure to uncover a fraud in these circumstances is not tantamount to turning a blind eye or reckless indifference. (*See* ¶ 76). If there was indeed any fraudulent representations by CCME, it is far more reasonable to conclude that it was concealed from Green and Bird and others, precisely because they would never have tolerated, much less agreed to participate in, such a fraud.

Second, Plaintiff alleges that Green and Bird "were signatories to filings submitted by TM to the SEC."[9] (¶ 203). However, "allegations that a director or officer signed public

---

[9]     As discussed previously, the assertion in paragraph 203 of the Complaint that Bird was a signatory to the October 2009 Proxy is also contradicted by paragraphs 17 and 90 of the

disclosures and/or was involved in the company's daily operations, standing alone, will not satisfy the pleading requirements of the PSLRA or Rule 9(b)." *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 235 (D.N.J. 2002). In *Winer*, for example, the Third Circuit dismissed Rule 10b-5 claims against individual defendants, finding that the allegations that they "were responsible for the accuracy of the public reports and releases" and that they had "access to, control over, and ability to edit and withhold dissemination of [the corporation's] press releases and SEC filings" did not adequately plead a claim under Section 10(b). *Winer Family Trust*, 503 F.3d at 334-35.

Third, Plaintiff also alleges that Defendants' "desire to cash out their pre-IPO shares" demonstrates scienter. *See* ¶¶ 92, 203). At the outset, Plaintiff's suggested inference lacks common sense. Plaintiff's theory implies that Defendants knowingly participated in a fraud in October 2009, in the hope that investors such as Starr and its multitude of advisors, a major accounting firm (DTT), the analysts, and all the other investors, would not discover the fraud for at least a year, since Defendants could not sell their unregistered shares until just over a year later when they were registered. On its face, Plaintiff's theory is vacuous. Similarly, Defendants also had no motive to defraud Starr in connection with the transfer of their unregistered CCME shares pursuant to the TM Agreement since they received no cash consideration for those shares. Moreover, Defendants received nothing as a result of Starr's investment, further underscoring Defendants' lack of motive for any alleged fraud. In any event, the Third Circuit has made it clear that courts should "not infer fraudulent intent from the mere fact that some officers sold stock." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 277; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997)). Indeed, it is hardly shocking that Defendants, like all shareholders, might wish to sell their shares to realize a profit one day,

---

Complaint, which concede that only Defendant Green signed it. This is also confirmed by the October 2009 Proxy itself. (*See* Ex. B).

particularly at a time when they had long ceased being directors. Plaintiff does not and cannot point to anything unusual in Defendants' behavior in connection with their shares.

Finally, Plaintiff improperly relies upon conclusory "group" allegations that the Defendants, collectively, acted in a knowing manner and with scienter. Thus, Plaintiff alleges that "Defendants knew, should have known, or recklessly disregarded that the public documents and statements issued in the name of the Company were materially false and/or misleading." (¶ 193). As explained above, "group pleading" consisting of collective wrongdoing without specifically alleging who did what has been explicitly rejected by the Third Circuit. *Winer Family Trust*, 503 F.3d at 337; *see also P. Schoenfeld Asset Mgmt. LLC, v. Cendant Corp.,* 142 F. Supp. 2d 589, 617-21 (D.N.J. 2001) (inference of wrongdoing insufficient when based on vague and generalized allegations or group-published documents, such as annual reports, prospectuses, registration statements, or press releases).

### D. PLAINTIFF FAILS TO ALLEGE PROPERLY REASONABLE RELIANCE ON ANY ALLEGED MISREPRESENTATION BY DEFENDANTS

In order to sustain its securities fraud claim, Plaintiff must also show that it reasonably relied on the alleged misrepresentations or omissions that form the basis of its claims. *Tracinda Corp. v. Daimler Chrysler AG*, 364 F. Supp. 2d 362, 400 (D. Del. 2005), *aff'd*, 502 F.3d 212 (3d Cir. 2007). The determination of reasonable reliance must "be made on a case-by-case basis based on all of the surrounding circumstances." *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 179 (3d Cir. 2003). The Third Circuit has identified a list of factors for determining whether a plaintiff's alleged reliance was reasonable, including but not limited to "(1) the existence of a fiduciary relationship; (2) the plaintiff's opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of a longstanding business or personal relationship; and (5) the plaintiff's access to the relevant information." *Tracinda*, 364 F. Supp. 2d at 400, *citing Straub v. Vaisman & Co.*, 540 F.2d 591, 598 (3d Cir. 1976). The Third Circuit has also recognized that

the presence of an integration/non-reliance clause in a written agreement is a factor to be considered in determining whether plaintiff's reliance was reasonable. *Id. See also Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996) (provisions in agreements between sophisticated parties should be given effect). In this case, Plaintiff's own pleadings, as well as the documents referenced therein and the public filings, foreclose the possibility of reasonable reliance as a matter of law.

Initially, one can hardly imagine a more sophisticated investor than Plaintiff with boundless resources and the wherewithal and desire to conduct its own extensive due diligence in connection with a significant private investment. Plaintiff nonetheless claims that "Starr was fraudulently induced into acquiring: 150,000 common shares of CCME stock from Green and Bird for good and valuable consideration in January 2010." (¶ 2). The TM Agreement, however, expressly forecloses any possibility of reliance on any of the alleged misrepresentations, even assuming such misrepresentations were otherwise properly alleged. (Ex. F at 3.02). Likewise, the SPA makes clear that Plaintiff was relying on the extensive representations and warranties of CCME and the sponsoring shareholders and not any putative representation by Defendants, who were not parties to the SPA. (Ex. H §§ 4, 5, 7, 8, 10; *see* ¶ 87 (Starr relies on representation in SPA regarding Proxy accuracy, not Green and Bird)). The SPA also expressly releases Green and Bird from liability. (Ex. H § 11.6). Moreover, the Proxy also precludes reasonable reliance since it makes clear that TM was not making representations as to Hong Kong Mandefu's financial and business operations but relying on Hong Kong Mandefu's representations and presenting them for the then TM shareholders to consider in connection with their vote on the reverse merger. (Ex. B at 193).

The lack of reasonable reliance is further underscored by:

- Plaintiff's own extensive due diligence in connection with the transaction including its retention of a Deloitte affiliate.

- The subsequent public and financial filings by CCME and reports provided by CCME to Starr rendering any alleged representation by Green and Bird out of date and immaterial.

- The lack of any effort to even contact Green or Bird prior to the transactions to inquire or confirm any issues as to due diligence.

- The equal, if not greater, access that Plaintiff had to the relevant sources of information, including alleged public filings in China.

- Starr's close contact with CCME management following the January 28, 2010 transaction, including its representation on the Board of Directors from January 28, 2010 until March 2011.

- The lack of any fiduciary relationship with Green and Bird in connection with any Starr transaction.

Accordingly, Plaintiff's lip service to reasonable reliance in its pleading cannot possibly be sustained in light of its own admissions and the unassailable documentation.

E.      **IN ANY EVENT, PLAINTIFF CANNOT MAINTAIN A PRIVATE CAUSE OF ACTION AGAINST DEFENDANTS UNDER SECTION 10(b) BECAUSE ITS PURCHASE OF SECURITIES WAS NEITHER OF A SECURITY ON A DOMESTIC EXCHANGE NOR A DOMESTIC TRANSACTION**

Plaintiff's Section 10(b) claim must also be dismissed pursuant to the U.S. Supreme Court decision in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010). In *Morrison*, the Supreme Court established a bright-line test that limits implied private actions under Section 10(b) as follows: "Henceforth, those provisions [Section 10(b) and Rule 10b-5] will extend only to 'transactions in securities listed on domestic exchanges … and domestic transactions in other securities.'" 130 S. Ct. at 2888 (Stevens, J, concurring). As the Court further explained, "we think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States and it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies." *Morrison*, 130 S. Ct. at 2884.

Plaintiff's federal securities claim against Defendants under Section 10(b) plainly does

23

not satisfy the bright-line *Morrison* test.[10] First, none of the securities purchased by Plaintiff at issue in this action were registered on a domestic exchange. (*See* Ex. G, at Item 3.02 and Ex. H). Second, the Complaint fails to establish a "domestic transaction in other securities." Under *Morrison,* in determining whether the well-pled allegations establish "domestic transactions in other securities," the issue is whether the transaction itself was domestic, regardless of how much domestic "conduct" or "effects" allegedly surrounded, or arose from, the transaction. Here, Plaintiff fails to allege that its underlying purchases of securities were made in the U.S. In fact, Plaintiff's Complaint, and the SPA, make plain that the transaction was *not* domestic:

- Plaintiff is a Cayman corporation. (¶ 7);

- All of CCME's business operations are in China. (¶ 8);

- Negotiations, meetings and due diligence prior to the execution of the SPA occurred in China. (¶¶ 78, 80);

- The signatories to the SPA are CCME, Plaintiff, Fujian Zongheng Express Information Technology, Ltd., a Chinese limited liability company, Defendant Cheng, a Chinese citizen, Defendant Ou Wen Lin, a citizen of the Republic of Philippines, Defendant Qingping Lin, a Chinese citizen, Fujian Fenzhing Media Co., Ltd., a Chinese limited liability company, Defendant Thousand Space Holding Limited, a British Virgin Islands company, and Defendant Bright Elite Management Limited, a British Virgin Islands company. (Ex. H at 1);

- The SPA dispute resolution provision calls for arbitration in Hong Kong. (Ex. H at § 11.2);

- The "Notices" provision of the SPA calls for all notices to be delivered to CCME in Hong Kong and to Plaintiff in Bermuda with copies to an affiliate in China and Plaintiff's counsel in China. (Ex. H at § 11.8).

As Plaintiff's purchases of CCME securities did *not* occur in the United States, the transaction is not covered by Section 10(b) and *Morrison* mandates dismissal. *See Basis Yield*

---

[10]    We specifically address only the January 2010 transactions since the allegations concerning Plaintiff's subsequent transactions clearly have nothing to do with Defendants. After the January 2010 transactions, Defendants no longer had a seat on CCME's board, nominal or otherwise, and there is no allegation of any management or control thereafter. By contrast, Plaintiff itself had a seat on CCME's board and significant access to its business and reporting. Moreover, the Proxy was clearly out of date and superseded by CCME's subsequent filings and audited financial statement.

*Alpha Fund (Master) v. Goldman Sachs Group, Inc.,* No. 10 CV 4537, 2011 U.S. Dist. LEXIS 80298 (S.D.N.Y. July 20, 2011) (dismissing Section 10(b) claim where plaintiff fails to adequately allege that any purchase or sale occurred in the United States).

## II.   PLAINTIFF HAS FAILED TO ALLEGE ADEQUATELY A CLAIM FOR "CONTROL PERSON" LIABILITY UNDER SECTION 20(a) OF THE EXCHANGE ACT

In its second cause of action, Plaintiff has asserted a claim against Defendants based on Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). In order to state a Section 20(a) claim, Plaintiff must plead with particularity each of the following three elements: (1) a primary securities violation by a third party within the gambit of defendant's control; (2) the defendant's control of the primary violator within the meaning of the statute; and (3) culpable participation by the defendant. *See In re Suprema Specialties,* 438 F.3d at 284; *In re Digital Island Sec. Litig.,* 223 F.Supp. 2d 546, 560 (D. Del. 2002), *aff'd,* 357 F.3d 322 (3d Cir. 2004); *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 888-890 (3d Cir. 1975); *In re Tyson Foods, Inc. Sec. Litig.,* No. 01-425-SLR, 2004 U.S. Dist. LEXIS 11122 at *37 (D. Del. June 17, 2004), *aff'd,* 155 Fed. Appx. 53 (3d Cir. 2005) (Robinson, J.).

First, liability for a controlling person "is 'premised on an independent violation of the federal securities laws.'" *In re Merck & Co. Sec. Litig.,* 432 F.3d 261, 275 (3d Cr. 2005) (*quoting In re Rockefeller Ctr. Props. Sec. Litig.,* 311 F.3d 198, 211 (3d Cir. 2002)). Since Plaintiff fails to state a claim under Section 10(b) or Rule 10b-5 against any defendant, much less one controlled by Defendants Green and Bird, its claim of "control person" liability under Section 20(a) must be dismissed.[11]

Second, even if Plaintiff is determined by this Court to have alleged properly a securities fraud claim against one of the named defendants, a Section 20(a) claim will still not be

---

[11]   To the extent applicable, Defendants incorporate by reference the legal arguments advanced in the Opening Briefs submitted by the other named defendants in support of their respective motions to dismiss the Complaint.

established unless Defendants had the power to control or influence the primary violators and were culpable participants in the illegal activity. *In re Suprema Specialties*, 438 F.3d at 284. In order to establish control over the primary violator, "a defendant must possess 'actual control over the transactions in question." *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d at 561. It is well settled that officer or director status alone is insufficient to demonstrate control for purposes of Section 20(a). *Id. See Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.*), 151 F. Supp. 2d 371, 436 (S.D.N.Y. 2001). Here, the Complaint is devoid of particularized facts demonstrating that Defendants exercised any control over CCME other than serving for a brief period as CCME directors. There are no allegations that Defendants actually exercised control over any of the operations of CCME, or that they had the power to control the alleged wrongful transactions, and given the nature and location of the business in China, and Defendants' lack of participation in the negotiations leading to the SPA, it is highly unlikely that such a claim could be made. *See Farley v. Henson*, 11 F.3d 827, 835 (8th Cir. 1993). Thus, the Complaint clearly fails to satisfy the second prong of "control" under Section 20(a).

Third, Plaintiff also fails to satisfy the final prong that Defendants culpably participated in the alleged securities fraud. *In re Suprema Specialties*, 438 F.3d at 284. As discussed at length in connection with Plaintiff's scienter allegations, there is no basis whatsoever to infer Defendants' knowledge and substantial participation in a fraud. Plaintiff simply relies on the same patently insufficient allegations of scienter in order to support Defendants' alleged culpable participation. *See* Point I(C) *supra*.

## III.   THE COURT SHOULD DISMISS PLAINTIFF'S STATE LAW CLAIMS

Plaintiff asserts two state law claims against Defendants for aiding and abetting fraud (fourth cause of action) and conspiracy to commit fraud (seventh cause of action). These claims should be dismissed in the first instance as a procedural matter due to Plaintiff's failure to state an actionable federal securities law claim. Plaintiff has not alleged and cannot allege diversity

jurisdiction, or any separate basis for jurisdiction of its common law claims.[12]  Accordingly, in

this circumstance, the Court may, and typically should, decline to exercise supplemental

jurisdiction over the remaining claims. 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill,*

484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated

before trial, the balance of factors to be considered under the pendent jurisdiction doctrine –

judicial economy, convenience, fairness, and comity – will point toward declining to exercise

jurisdiction over the remaining state-law claims").[13]  All the factors pointing to a declination of

supplemental jurisdiction are even more prevalent here where the action involves largely foreign

parties and potentially complex choice of law issues.

Nonetheless, if the Court were to address the adequacy of Plaintiff's common law claims,

those claims would likewise fail as a matter of Delaware law.  Pursuant to Rule 9(b) and

Delaware law, a heightened pleading standard must be applied to the fraud related claims of

aiding and abetting[14] and civil conspiracy.[15]  *Ramunno*, 705 A.2d at 1039; *Kalmanovitz v. G.*

---

[12]     Since Plaintiff is a foreign entity and the action is asserted against both foreign and domestic defendants, the diversity statute does not confer jurisdiction.  *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 581 (2d Cir. 2002) (diversity lacking where Korean plaintiff sues Italian defendants); *Craig v. Atlantic Richfield Co.*, 19 F.3d 472 (9th Cir. 1994) (no diversity lacking where Panama plaintiff and foreign defendants).

[13]     *See also Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir. 1976) (if federal claim is dismissed under Rule 12(b)(6), court should ordinarily refrain from exercising supplemental jurisdiction); *Shahin v. Darling*, 606 F. Supp. 2d 525, 545 (D. Del. 2009), *aff'd, sub nom. Shahin v. Delaware*, No. 10-1484, 2011 U.S. App. LEXIS 8378 (3d Cir. Apr. 21, 2011) (declining to exercise jurisdiction upon dismissal of federal claims).

[14]     To prove an aiding and abetting claim, a plaintiff must demonstrate that (1) a wrongful act was committed; (2) the defendant had knowledge of the act; and (3) the defendant knowingly and substantially participated in or provided substantial assistance for the wrongful act.  *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir.), *cert denied sub nom, First Pennsylvania Bank N.A. v. Monsen*, 439 U.S. 930 (1978).

[15]     To establish a claim for civil conspiracy, a plaintiff must plead: (1) an agreement to participate in an unlawful act, (2) an injury, and (3) an unlawful overt act in furtherance of the agreement. *S & R Assocs., L.P., III v. Shell Oil Co.*, 725 A.2d 431 (Del. Super. Ct. 1998).  In Delaware, civil conspiracy is not an independent cause of action, so it must be predicated upon an underlying wrong. *Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998).

*Heileman Brewing Co.*, 595 F. Supp. 1385, 1401 (D. Del. 1984), *aff'd*, 804 F.2d 1248 (3d Cir.

1986) ("Only allegations of conspiracy which are particularized, ... will be deemed sufficient.").

Plaintiff must also plead a viable underlying claim for fraud in order to sustain its conspiracy and

aiding and abetting claims.[16] *Monsen*, 579 F.2d at 799; *see also Albert v. Alex. Brown Mgmt.*

*Servs.*, Nos. 762-N, 763-N, 2005 Del. Ch. LEXIS 133 (Del. Ch. Aug. 26, 2005) (*citing Benihana*

*of Tokyo, Inc. v. Benihana, Inc.*, No. 550-N, 2005 Del. Ch. LEXIS 19, at *26 (Del. Ch. Feb. 4,

2005) (aiding and abetting claim is essentially the same as a claim for conspiracy to commit

fraud).

The same failings with respect to Plaintiff's claims under the securities laws also doom

Plaintiff's aiding and abetting and conspiracy claims, *i.e.*, Plaintiff sets forth no specific

allegations establishing that Defendants knew of the falsity of any information in the Proxy, or

that they had any reason to know or even suspect any problem with that information, or that they

agreed to participate, or substantially participated, in any fraud. *Brug v. Enstar Group, Inc.*, 755

F. Supp. 1247, 1256 (D. Del. 1991) (dismissing aiding and abetting claim for failure to allege

defendants acted with knowledge); *Monsen*, 579 F.2d at 799 ("Knowledge of the underlying

violation is a critical element in proof of aiding-abetting liability, for without this requirement

financial institutions, brokerage houses, and other such organizations would be virtual insurers of

their customers against security law violations.")

## IV.   THE COURT SHOULD NOT GRANT PLAINTIFF
## LEAVE TO AMEND SINCE ANY AMENDMENT WOULD BE FUTILE

Leave to amend securities complaints is properly denied where there is no basis to

believe that an amendment would be anything but futile. *See, e.g., Winer Family Trust*, 503 F.3d

---

[16]   In Delaware, the elements of common law fraud are: "(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." *Snowstorm*, 739 F. Supp. 2d at 708.

at 330-31; *In re Alpharma Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004).  An amendment is futile where "the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002).  In this case, for the reasons discussed at length above, the Plaintiff's own pleading, and the unassailable documents, demonstrate that any securities claim against Defendants would be meritless, and any amendment would thus be futile.

## CONCLUSION

For all the foregoing reasons, Defendants Green and Bird respectfully request that the Court dismiss Plaintiff's claims against them in their entirety, and grant such other and further relief as the Court deems appropriate.

Dated: September 30, 2011

Respectfully submitted,

MORRIS JAMES LLP

*/s/ Peter B. Ladig*
Peter B. Ladig (Del. Bar No. 3513)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
Telephone: (302) 888-6826
pladig@morrisjames.com

-and-

MORRISON COHEN LLP
Donald H. Chase
Edward P. Gilbert
909 Third Avenue
New York, New York 10022
(212) 735-8600
dchase@morrisoncohen.com
egilbert@morrisoncohen.com

*Attorneys for Defendants Theodore Green and Malcolm Bird*