## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------X

STARR INVESTMENTS CAYMAN II, INC.                       :

                 Plaintiff,       :

                                  Case No. 1:11-CV-00233-SLR

       v.                                            :

CHINA MEDIAEXPRESS HOLDINGS, INC.,       :   **DECLARATION OF**
DELOITTE TOUCHE TOHMATSU,                          **PETER B. LADIG**
ZHENG CHENG, JACKY LAM,                                :
OU WEN LIN, QINGPING LIN,
THOUSAND SPACE HOLDINGS LIMITED,       :
BRIGHT ELITE MANAGEMENT LIMITED,
THEODORE GREEN, MALCOLM BIRD,            :
A.J. ROBBINS, P.C.,
                 Defendant.       :

------------------------------------------------------------------------X

I, PETER B. LADIG, declare as follows:

     1.    I am a partner of Morris James LLP and am co-counsel of record for Defendants Theodore Green and Malcolm Bird in this matter.  I am a member in good standing of the Bar of the State of Delaware.  I respectfully submit this declaration in support of the motion of Defendants Green and Bird to dismiss the Amended Complaint.

     2.    A true and correct copy of Plaintiff's Amended Complaint dated July 5, 2011 is attached hereto as Exhibit A.

     3.    A true and correct copy of excerpts from the TM Entertainment and Media, Inc.'s Definitive Proxy Statement (Schedule 14A) dated October 2, 2009 and filed with the Securities and Exchange Commission ("SEC") is attached hereto as Exhibit B.  This document is a public record available at the S.E.C. Edgar website in its complete form.

     4.    A true and correct copy of the Registration Statement Form S-3 filed by China MediaExpress Holdings, Inc. ("CCME") dated August 16, 2010 and amended October 5,

2010 is attached hereto as Exhibit C.  This document is a public record available at the S.E.C. Edgar website in its complete form.

5.    A true and correct copy of the CCME Schedule 13D dated January 28, 2010 (without exhibits) is attached hereto as Exhibit D.  This document is a public record available at the S.E.C. Edgar website in its complete form.

6.    A true and correct copy of the Investor Rights Agreement by and among China MediaExpress Holdings, Inc., Mr. Zheng Cheng, Ou Wen Lin, Qingping Lin, Thousand Space Holdings Limited, Bright Elite Management Limited, and Starr Investments Cayman II, Inc., dated January 28, 2010, is attached hereto as Exhibit E.  This document was attached as Exhibit E to the CCME Schedule 13D dated January 28, 2010, which is a public record available at the S.E.C. Edgar website in its complete form.

7.    A true and correct copy of the TM Holders Share Sale Agreement (the "TM Agreement") by and among John W. Hyde Living Trust, Theodore S. Green, Malcolm Bird, Jonathan F. Miller, Sara Green 2007 GST Trust and Blair Green 2007 and Starr Investments Cayman II, Inc. dated January 28, 2010, is attached hereto as Exhibit F.  This document was attached as Exhibit G to the CCME Schedule 13D dated January 28, 2010, which is a public record available at the S.E.C. Edgar website in its complete form.

8.    A true and correct copy of the January 12, 2010 Form 8-K filed by CCME (without exhibits) is attached hereto as Exhibit G.  This document is a public record available at the S.E.C. Edgar website in its complete form.

9.    A true and correct copy of the Securities Purchase Agreement by and among China MediaExpress Holdings, Inc., Fujian Fenzhong Media Co., Ltd., Mr. Zheng Cheng, Mr. Ou Wen Lin, Mr. Qingping Lin, Thousand Space Holdings Limited, Bright Elite

Management Limited, and Starr Investments Cayman II, Inc. dated January 12, 2010 (the "SPA") is attached hereto as Exhibit H.  This document was attached as Exhibit 10.18 to the CCME January 12, 2010 Form 8-K, which is a public record available at the S.E.C. Edgar website in its complete form.

       10.    A true and correct copy of the January 28, 2010 Form 8-K filed by CCME is attached hereto as Exhibit I.  This document is a public record available at the S.E.C. Edgar website in its complete form.

     I declare under penalty of perjury under the laws of the State of Delaware that the foregoing is true and correct.  This declaration was executed on September 30, 2011 in Wilmington, Delaware.

Peter B. Ladig

3855488

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

```
-----------------------------------------------------x
```
STARR INVESTMENTS CAYMAN II, INC.,      :
                                     :

                  Plaintiff,      :

                                 :

      – *versus* –      :      **Case No.  11 CV 00233SLR**

                                 :

CHINA MEDIAEXPRESS HOLDINGS, INC.,    :      **Jury Trial Demanded**
DELOITTE TOUCHE TOHMATSU,      :
ZHENG CHENG, JACKY LAM,      :
OU WEN LIN, QINGPING LIN,      :
THOUSAND SPACE HOLDINGS LIMITED,  :
BRIGHT ELITE MANAGEMENT LIMITED,  :
THEODORE GREEN, MALCOLM BIRD,      :
A.J. ROBBINS, P.C.,      :
                  Defendants.      :
```
-----------------------------------------------------x
```

## AMENDED COMPLAINT

Plaintiff Starr Investments Cayman II, Inc. ("Starr"), by its undersigned counsel, alleges as and for its complaint against Defendants China MediaExpress Holdings, Inc. ("CCME"), Deloitte Touche Tohmatsu ("DTT"), Zheng Cheng, Jacky Lam, Ou Wen Lin, Qingping Lin, Thousand Space Holdings Limited ("Thousand Space"), Bright Elite Management Limited ("Bright Elite"), Theodore Green, Malcolm Bird, and A.J. Robbins, P.C ("Robbins") (collectively "Defendants"), with knowledge of Starr's own acts and acts taking place in its presence, and on information and belief as to all other matters:

## SUMMARY OF THE ACTION

1.  This action for damages arises out of CCME's repeated and systematic violations of the securities laws, federal regulations and Delaware law, and its fraudulent inducement of millions of dollars of investments by and through Defendants Zheng Cheng, Jacky Lam, Ou Wen Lin, Qingping Lin, Thousand Space, Bright Elite, Theodore Green, Malcolm Bird, Robbins and

DTT, to accomplish an international conspiracy to defraud Starr and other investors in the U.S. public markets and in China.

2.   Starr was fraudulently induced into:  acquiring 150,000 common shares of CCME stock from Green and Bird for good and valuable consideration in January 2010; purchasing approximately 1.5 million common shares of CCME stock from Company founders Ou Wen Lin and Qingping Lin, through Thousand Space and Bright Elite respectively, for which Starr paid approximately $13.5 million on October 18, 2010; later converting warrants into 1,545,455 common shares of CCME stock, at a price of approximately $10 million in December 2010; and, in addition, as to certain defendants as specified below, acquiring one million preferred shares and 1,545,455 warrants from CCME at a price of $30 million in January 2010 (together, the "Shares").  All of the Shares are now effectively worthless, as a direct result of: (1) Defendants' affirmative misrepresentations and omissions regarding the nature and extent of CCME's business relationships and operations, and failure to correct previous misrepresentations; (2) Defendants' intentional misrepresentations regarding the size of the bus advertising market in China and failure to correct previous misrepresentations; (3) Defendants Jacky Lam, Robbins, and DTT's willful, negligent, and reckless disregard for Generally Accepted Auditing Standards ("GAAS") and Generally Accepted Accounting Principles ("GAAP") in the certification and publication of the Company's financial results in filings with the Securities and Exchange Commission ("SEC"), to Starr and to the public at large; (4) Defendants Theodore Green and Malcolm Bird's willful, reckless and negligent misrepresentation that they conducted extensive due diligence on CCME.  The foregoing acts and omissions resulted in Defendants significantly overstating the Company's financial results in the period leading up to Starr's acquisitions of the Shares.

3.   Through their actions, Defendants knowingly and intentionally deceived Starr into investing in CCME, a company whose business model, operations, and management were radically overvalued as a result of Defendants' actions and omissions.

4.   Within weeks after Starr completed the acquisition of the Shares, it became evident that Starr had been the victim of a massive international fraud.  Starting in January 2011, news reports and securities analysts asserted that CCME's claimed financial condition was the result of significant fabrication.  Reports of Defendants' misrepresentations were widespread, with some referring to the entire corporate enterprise as a "fraud."  Similar allegations were reported to CCME's independent auditors, DTT, in anonymous e-mails.  When DTT subsequently tried to confirm the Company's reported financial and operational information, it could not do so and resigned.

5.   As a result of the public disclosure of Defendants' fraud, since March 2011, CCME has had the following significant business disruptions: (1) on March 11, 2011, CCME's auditor, DTT, resigned, stating according to public reports that it "[had] lost confidence in the representations of management," and concluding that the issues it raised "may have adverse implications for the prior periods' financial reports"; (2) on that same day, trading in CCME stock was temporarily halted on NASDAQ; (3) on March 13, 2011, Jacky Lam, Chief Financial Officer and director of CCME, resigned; (4) on March 16, 2011, CCME Board member and Starr representative Dorothy Dong resigned, noting "irregularities concerning the bank account balances for CCME's PRC subsidiaries"; (5) on March 31, 2011, CCME filed a Form 8-K/A disclosing that DTT had, among other things, "informed [CCME] in its resignation letter that it was no longer able to rely on the representations of management and that it had lost confidence in the commitment of the Board and the Audit Committee to good governance and reliable

financial reporting"; (6) on April 1, 2011, CCME received a letter from NASDAQ stating that

CCME would be suspended from trading on April 12, 2011 for failure to timely file an Annual

Report on Form 10-K; (7) on April 6, 2011, CCME disclosed a March 25 letter in which DTT

stated (referring to its March 11 resignation letter) "We have since reached the conclusion that

we are no longer able to place reliance on management representations in relation to prior period

financial reports.  Accordingly, we request that the Company take immediate steps to make the

necessary 8-K/A filing to state that continuing reliance should no longer be placed on the audit

report on the 2009 financial statements and moreover that we decline to be associated with any

of [CCME]'s financial communications during 2010 and 2011"; (8) on April 7, 2011, another

director of CCME, Marco Kung, who was Chairman of the Audit Committee, resigned due to an

inability to engage "capable and appropriate independent professionals" to conduct an

independent investigation of the company; and (9) on May 19, 2011, CCME announced that its

efforts to resume being listed on NASDAQ had been rejected.

     6.   As stated in the former directors' resignation letters, no genuine attempts had been

made by CCME management to address the publicly disclosed allegations of fraud at CCME.

Although CCME announced on May 2, 2011, that the remaining members of CCME's Audit

Committee had engaged a law firm to assist in an investigation of concerns raised by DTT, there

is nothing to indicate the timing, scope, or independence of that undertaking, and the "noisy"

resignation letters described above called into question CCME's ability to conduct an

independent investigation.  To date, Defendants have declined to substantively refute the

numerous public reports suggesting that the Company is in whole or in part a fraud.

## THE PARTIES

7.     Plaintiff Starr Investments Cayman II, Inc., is a Cayman corporation.  It purchased 1,000,000 shares of preferred stock, and 1,545,455 warrants in January 2010, for a combined price of $30,000,000.  It acquired 150,000 common shares of CCME stock on January 28, 2010 for good and valuable consideration.  It purchased a further 1.5 million common shares of CCME on October 18, 2010.  On December 8, 2010, Starr exercised the warrants and thereby acquired 1,545,455 additional common shares of CCME.  Prior to those investments and during the period thereafter, Starr evaluated market and company information necessary to purchase said securities, as referred to in this Amended Complaint.  Starr relied to its detriment on Defendants' continuing misrepresentations and omissions, including Defendants' failure to correct previous misrepresentations.

8.     Defendant China MediaExpress Holdings, Inc., is a Delaware corporation.  CCME's principal executive offices are or were, at least up to April 6, 2011, situated at Room 2805, Central Plaza, Wan Chai, Hong Kong.  The Company, through its subsidiaries and its variable interest entity, purports to operate the largest television advertising network on inter-city and airport express buses in China.  The Company generates revenue by selling advertisements on a network of television displays installed on express buses originating in eighteen of China's regions, including the four municipalities of Beijing, Shanghai, Tianjin and Chongqing, and fourteen regions including Guangdong, Jiangsu, Jiangxi, Fujian, Sichuan, Hebei, Anhui, Hubei, Shandong, Shanxi, Inner Mongolia, Zhejiang, Hunan and Henan.  Prior to its delisting, CCME shares were traded on NASDAQ under the symbol "CCME."

9.     Defendant Zheng Cheng is Chairman and Chief Executive Officer (CEO) of CCME. He is a founder of CCME's predecessor, Hong Kong Mandefu Holding Limited ("Hong Kong

Mandefu"), and the largest shareholder in CCME. Because of Cheng's positions with the Company, he possessed the power and authority to control the contents of CCME's reports to the SEC, and to Starr, as well as press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Cheng was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his positions and access to material non-public information available to him, Cheng knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and, in particular, Starr, and that the affirmative representations which were being made were then materially false and/or misleading. Cheng signed all relevant SEC filings after October 2009.

10. Cheng's access to information went beyond his control of CCME. Cheng is, and was at all relevant times, the majority owner of Fujian Fenzhong Media Co., Ltd ("Fujian Fenzhong"), and together with his mother, Chunlan Bian, was in control of that entity. Fujian Fenzhong, through contractual relationships with Hong Kong Mandefu's wholly-owned subsidiary Fujian Across Express Technology Co. Ltd. ("Fujian Across Express"), produced all or most of CCME's revenue. Through Cheng's unique position of ownership and control in both the operating business and the listed corporation, he knew, or should reasonably have been aware, of any gross irregularities in the finances, business relationships and other relevant aspects of CCME's business.

11. Defendant Jacky Lam was during the entire relevant period and until March 13, 2011 Chief Financial Officer (CFO) of CCME. Because of Lam's position with the Company, he possessed the power and authority to control the contents of CCME's reports to the SEC and to

Starr, as well as press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Lam was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his positions and access to material non-public information available to him, Lam knew or should have known that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and, in particular, Starr, and that the affirmative representations which were being made were then materially false and/or misleading. Lam signed all relevant SEC filings after October 2009.

12. Defendant Thousand Space is a holding company organized under the laws of the British Virgin Islands and is wholly owned and controlled by Ou Wen Lin, a founder of Hong Kong Mandefu, now known as CCME. With Ou Wen Lin as its sole shareholder, sole director and sole beneficiary, Thousand Space operates as a single economic entity and shares complete unity of interest with Ou Wen Lin. On information and belief, knowing that he was part of, and stood to benefit financially from, the fraudulent conspiracy as alleged herein, Ou Wen Lin used Thousand Space as the vehicle to sell shares to Starr in an attempt to shield himself from personal liability should the fraud be uncovered. On October 12, 2010, Starr entered into a Share Sale Agreement with Thousand Space to purchase 1,000,000 shares of CCME stock at $9 per share, which closed on October 18, 2010. At the time of the sale, Thousand Space owned approximately 6 million shares of CCME's common stock.

13. Defendant Ou Wen Lin is the sole owner, sole director, sole beneficiary and alter ego of holding company Thousand Space. Through the vehicle of Thousand Space, Ou Wen Lin is a founder and original shareholder of Hong Kong Mandefu, now known as CCME. Because of his

positions, ownership and contractual rights, and significant personal contact and familiarity with the other defendants, and access to material non-public information available to him, Ou Wen Lin knew or should have known that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and, in particular, Starr, and that the affirmative representations which were being made about CCME were then materially false and/or misleading.

14. Defendant Bright Elite is a holding company organized under the laws of the British Virgin Islands and is wholly owned and controlled by Qingping Lin, a founder of Hong Kong Mandefu, now known as CCME. With Qingping Lin as its sole shareholder, sole director and sole beneficiary, Bright Elite operates as a single economic entity and shares complete unity of interest with Qingping Lin. On information and belief, knowing that he was part of, and stood to benefit financially from, the fraudulent conspiracy as alleged herein, Qingping Lin used Bright Elite as the vehicle to sell shares to Starr in an attempt to shield himself from personal liability should the fraud be uncovered. On October 12, 2010, Starr entered into a Share Sale Agreement with Bright Elite to purchase 500,000 shares of CCME stock at $9 per share, which closed on October 18, 2010. At the time of the sale, Bright Elite owned approximately 2.3 million shares of CCME's common stock.

15. Defendant Qingping Lin is the sole owner, sole director, sole beneficiary and alter ego of holding company Bright Elite. Through the vehicle of Bright Elite, Qingping Lin is a founder and original shareholder of Hong Kong Mandefu, now known as CCME. Because of his positions, ownership and contractual rights, and significant personal contact and familiarity with the other defendants, and access to material non-public information available to him, Qingping Lin knew or should have known that the adverse facts specified herein had not been disclosed to,

and were being concealed from, the public and, in particular, Starr, and that the affirmative representations which were being made were then materially false and/or misleading.

16. Defendant Ou Wen Lin is the brother of Defendant Qingping Lin and they and their holding companies, Thousand Space and Bright Elite respectively, at all relevant times shared the same Hong Kong address as CCME. Ou Wen Lin, Qingping Lin, Thousand Space and Bright Elite are collectively referred to herein as "the Lin Defendants."

17. Theodore Green is the former Chairman, co-CEO and interim CFO of TM Entertainment and Media, Inc. ("TM"), a Delaware corporation. TM was used as a special-purpose acquisition company ("SPAC") to acquire Hong Kong Mandefu in October 2009 through a reverse merger. The Definitive Proxy Statement, Schedule 14A ("October 2009 Proxy") filed by TM and signed by Green, describes in detail the process by which TM came to acquire Hong Kong Mandefu. The combined company became known as CCME. Because of Green's position in TM and as a director of CCME following the merger, he possessed the power to control the flow of information to TM's shareholders, who ultimately voted to acquire Hong Kong Mandefu. He also took on but did not fulfill the responsibility of acquiring sufficient information to perform adequate due diligence of Hong Kong Mandefu. Green turned a blind eye to red flags evidencing fraud. He knew or should have known the adverse facts contained herein existed, and of substantial discrepancies between CCME's actual performance as compared to the earnings and successes reported to TM shareholders, but did not alert TM shareholders or the investing public to them, in a purposeful attempt to aid and abet the fraud of and in conspiracy with, Cheng, Lam, the Lin Defendants and Bird. Green's shares in CCME were registered in or about October 2010 pursuant to CCME's Registration Statement on Form S-3, dated August 16, 2010, as amended on October 5, 2010, which became effective on October

19, 2010 ("2010 Form S-3"), and therefore he was in a position to sell all of his shares in CCME
before the misrepresentations were disclosed.

18. Malcolm Bird is the former co-CEO and director of TM, a SPAC that, through a
reverse merger, acquired Hong Kong Mandefu in October 2009 and became known as CCME.
Because of Bird's position in TM, and as a director of CCME following the merger, he possessed
the power to control the flow of information to TM's shareholders, who ultimately voted to
acquire Hong Kong Mandefu. He also took on but did not fulfill the responsibility of acquiring
sufficient information to perform adequate due diligence of Hong Kong Mandefu. Bird turned a
blind eye to red flags evidencing fraud. He knew or should have known the adverse facts
contained herein existed, and of substantial discrepancies between CCME's actual performance
as compared to the earnings and successes reported to TM shareholders, but did not alert TM
shareholders or the investing public to them in a purposeful attempt to aid and abet the fraud of
and in conspiracy with Cheng, Lam, the Lin Defendants and Green. Bird's shares in CCME
were registered in or about October 2010, and therefore he was in a position to sell all his shares
in CCME before the misrepresentations were disclosed.

19. Defendants Cheng, Lam, the Lin Defendants, Green, and Bird own or, during the
relevant period, owned a significant number of shares of CCME and benefitted from the inflated
market price of the shares as a result of the misrepresentations and omissions at issue.

20. The Lin Defendants, Green, and Bird sold or transferred shares directly to Starr
pursuant to agreements in which they consented to jurisdiction in Delaware.

21. Defendant Deloitte Touche Tohmatsu in Hong Kong SAR is a Hong Kong
independent legal entity that is a member of Deloitte Touche Tohmatsu Limited, a UK private
company limited by guarantee. DTT provides audit, accounting, financial advisory, tax, and risk

management services.  On December 4, 2009, CCME engaged DTT to serve as its independent

auditor.  DTT served in that capacity accessing and reviewing corporate materials for fiscal years

2009 and 2010, until March 11, 2011.  DTT also signed the audit reports incorporated into

CCME's 2009 Form 10-K filed on March 31, 2010 ("2009 Form 10-K") and 2010 Form S-3,

which were filed with the SEC.

22.  Defendant A.J. Robbins, P.C. ("Robbins" and together with DTT, the "Auditor

Defendants") is a professional corporation which has its main office in Colorado.  From 2006

through September 2009 Robbins was engaged by CCME to provide independent auditing and/or

consulting services, including the examination and review of CCME's consolidated financial

statements for the years 2006, 2007, and 2008 and the first six months of 2009.  The results of

Robbins' examination of CCME's consolidated financial statements were disseminated to

investors in the United States and were relied upon by Starr when making its decision to invest in

CCME.  Robbins also signed the audit reports incorporated into TM's October 2009 Proxy,

CCME's 2009 Form 10-K and 2010 Form S-3, all filed with the SEC.

## JURISDICTION AND VENUE

23.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act

(15 U.S.C. §§ 78j(b) and 78t(a)), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §

240.10b-5) and the common law of Delaware.

24.  This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331 and Section 27 of the Securities and Exchange Act of 1934 (15 U.S.C. § 78aa) and

supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

25.  Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b).  Defendant

CCME is a Delaware corporation, and at all relevant times Defendants Cheng, Lam, Green and

Bird are or were officers or directors of CCME. Defendant DTT was at all relevant times CCME's independent auditor and together with Robbins provided financial audit information incorporated into CCME's 2009 Form 10-K and 2010 Form S-3.

26. This court has jurisdiction over Zheng Cheng and Jacky Lam pursuant to 10 Del. C. § 3114 and over CCME because it is a Delaware Corporation.

27. Defendants Cheng, Lam, Green, Bird, and the Lin Defendants are also subject to jurisdiction under 15 U.S.C. § 78aa for violations of the Securities and Exchange Act of 1934.

28. This court further has jurisdiction over the Lin Defendants, Green and Bird by contract. Pursuant to certain share sale agreements between the Lin Defendants and Starr signed on October 12, 2010, all parties consented to jurisdiction in Delaware and agreed to a forum selection clause making Delaware the exclusive forum. Pursuant to a certain share transfer agreement between Green and Bird, among others, and Starr, dated January 28, 2010, all parties consented to jurisdiction in Delaware and agreed to a forum selection clause making Delaware the exclusive form.

29. By virtue of their involvement in a conspiracy, this Court also has jurisdiction over Defendants Cheng, Lam, the Lin Defendants, Green and Bird, under 10 Del. C. § 3104. Substantial acts in furtherance of the conspiracy occurred in Delaware including the filing of documents with the Delaware Secretary of State to facilitate the acquisition of Hong Kong Mandefu through a reverse merger with TM, a Delaware corporation, in October 2009, and to facilitate the transaction with Starr in January 2010. These filings included, (1) a Certificate of Amendment to the Amended and Restated Certificate of Incorporation, (2) an Amended and Restated Certificate of Incorporation, and (3) a Certificate of Designations of Series A Preferred Stock.

30. DTT and Robbins are subject to the jurisdiction of this court by virtue of having provided audit opinions on CCME's financial statements, which DTT and Robbins knew or should have known would be included in filings with the SEC, pursuant to 15 U.S.C. § 78aa.

31. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## BASIS FOR ALLEGATIONS

32. As detailed herein, Plaintiff's allegations are based on, *inter alia*, a thorough investigation of publicly filed and available information, reports and statements, as well as documents in the possession of Plaintiff, including, but not limited to: filings with the SEC, annual reports, press releases, media reports on the company, court filings in this action, reports of securities analysts and investor advisory services, and audits and forensic investigations.

33. Any further detailing of the specifics of Defendants' fraudulent scheme is not possible at this time because the underlying information with respect thereto, including but not limited to, internal reports and other data and information about the true state of CCME's finances, operations and sales, is not available to the Plaintiff and lies exclusively within the possession and control of Defendants and other insiders of CCME. The true facts cannot be obtained by Starr without CCME's cooperation, as demonstrated by, among other things, DTT's unsuccessful attempts to confirm information within the possession and control of CCME, as described further below.

## FACTUAL BACKGROUND

### Chinese Reverse Mergers

34.  The international fraud perpetrated by Defendants against Starr and the U.S. public securities markets occurred amid conditions favorable to the conspiracy.  The capacity to use the technique of reverse mergers to place securities in the United States market without proper and complete audits in conformance with GAAP and GAAS frustrates regulators' ability to exercise oversight responsibilities.

35.  Defendants' use of the mechanism of a reverse merger enabled the Defendants to mislead Starr and other investors as to the value of CCME shares.  CCME fraudulently induced Starr to purchase CCME shares, which are now largely worthless, at prices greatly in excess of their actual value because of the falsified and overstated financials that CCME and its co-conspirators were able to sneak past regulatory safeguards.

36.  Modern SPACs enable foreign corporations to access capital markets in the United States without the rigors of an Initial Public Offering ("IPO").  In this case, an IPO and its attendant regulatory strictures, which would subject the transaction to a thorough audit, were circumvented through the mechanism of a reverse merger with a foreign company.  A "reverse merger," as used in this Amended Complaint, is the acquisition of a private operating company by a public shell company (the SPAC) that results in the private operating company having effective control of the combined company.  The foreign corporation is either merged into or acquired by a shell listed on a U.S. Securities Exchange, giving the foreign company immediate "back door" access to the U.S. public securities market.  As explained in an article published in the Wall Street Journal on June 3, 2011:

> In reverse mergers, a foreign company is "bought" by a publicly traded U.S. shell company. But the foreign company assumes control and gets the shell's U.S. listing

without the level of scrutiny that an initial public offering entails. Though companies from other countries also engage in reverse mergers, such deals are especially common among the Chinese. The PCAOB says nearly three-quarters of the 215 Chinese companies listing in the U.S. from 2007 to early 2010 did so via reverse merger.

Michael Rapoport, SEC Probes China Auditors, June 3, 2011.

37.  In recent years, scrutiny of SPACs and reverse merger activity has increased due to the loophole they present in the regulatory structure enforced by the SEC.  This is due, in part, to the popularity of the device as a means of avoiding SEC scrutiny.  According to one business columnist, reverse mergers are "a course long favored by shady stock promoters."  Floyd Norris, The Audacity of Chinese Frauds, N.Y. Times, May 26, 2011.

38.  A 2011 Research note released by the Public Company Accounting Oversight Board ("PCAOB") reveals that between January 1, 2007 and March 31, 2010, there were 159 reverse mergers between a Chinese private company and a United States shell.  The PCAOB expressed concern about the quality of audits conducted on the financial statements of these companies.

39.  The Chairman of the PCAOB, James R. Doty, stated that there are "significant risks associated with audits of operations of U.S. [listed] companies in China.  For example, we are finding through our oversight of U.S. firms that even simple audit maxims, such as maintaining the auditor's control over bank confirmations, may not hold given the business culture in China." Therefore, Doty concluded that "[i]n light of these risks, the PCAOB's inability to inspect the work of registered firms from China is a gaping hole in investor protection."

40.  SEC Commissioner Luis A. Aguilar has also spoken out on the subject.  In a speech on April 4, 2011, he said that using reverse mergers as a form of "backdoor registration" was a "disturbing trend" in modern capital formation.  He said, "a growing number of them are proving to have significant accounting deficiencies or being vessels of outright fraud."  The "billions in

U.S. savings and investment dollars [that] have been entrusted with these companies" are, therefore, at risk.

41.     The above referenced <u>New York Times</u> article, dated May 26, 2011, blamed auditors and inadequate audit procedures for this disturbing trend.  The <u>New York Times</u> revealed that another Chinese corporation, Longtop Financial Technologies, also recently became "worthless" because of allegations of fraud, including fraud relating to Longtop's purported cash balances in Chinese banks.  DTT, the same auditor that CCME used to perform its most recent audits, resigned as Longtop's auditor after the fraud came to light but only after it had already given "clean audit opinions to Longtop for six consecutive years," according to the report.

42.     The May 26, 2011 <u>New York Times</u> article also noted that the major auditing firms in China are not subject to the same type of inspections required of other accounting firms that audit companies whose securities are traded in the U.S.:

> The Chinese audit firms, while they are affiliated with major international audit networks, have never been inspected by the Public Company Accounting Oversight Board in the United States. The Sarbanes-Oxley Act requires those inspections for accounting firms that audit companies whose securities trade in the United States, but China has refused to allow inspections.
>
> In a speech at a Baruch College conference earlier this month, James R. Doty, chairman of the accounting oversight board, called on the major firms to improve preventative global quality controls but said that actual inspections were needed.
>
> Two weeks ago, Chinese and American officials meeting in Washington said they would try to reach agreement on the oversight of accounting firms providing audit services for public companies in the two countries, so as to enhance mutual trust.

Floyd Norris, <u>The Audacity of Chinese Frauds</u>, N.Y. Times, May 26, 2011.

43.     A report in the <u>Wall Street Journal</u> on June 3, 2011 revealed that the SEC is now examining accounting and disclosure issues regarding Chinese companies that engaged in reverse mergers.  The investigation specifically targets the work of Chinese auditors:

> People familiar with the matter say the investigation also includes auditors, which hadn't previously been known. As part of its inquiry, the SEC has suspended trading on some Chinese companies, questioning their truthfulness about their finances and operations.
>
> The Public Company Accounting Oversight Board, or PCAOB, the government's accounting regulator, said it is investigating some audit firms over whether their audits of Chinese clients are stringent enough.
>
> . . .
>
> "Right now, the auditing and regulation of U.S.-listed Chinese companies isn't working very well," said Paul Gillis, a visiting professor of accounting at Peking University's Guangha School of Management.
>
> …
>
> Since February, about 40 Chinese companies have either acknowledged accounting problems or seen the SEC or U.S. exchanges halt trading in their stocks because of accounting questions.

Michael Rapoport, <u>SEC Probes China Auditors,</u> Wall Street Journal, June 3, 2011.  According to this article, although some auditors say, in response, that they are "intensifying their efforts" and "doing everything they can to perform strong audits," that simply "may raise questions about whether their past efforts were strong enough."  *Id.*

44. Confirming the fears of Messrs. Aguilar and Doty, at least 24 Chinese-based companies have filed 8-Ks disclosing auditor resignations, accounting problems, or both, since March 2011. (Letter from SEC Chairman Mary L. Schapiro to the Honorable Patrick T. McHenry, April 27, 2011.)

45. On April 18, 2011, NASDAQ filed a proposed rule concerning companies formed through reverse mergers.  Proposed Rule 2011-056 would require, among other things, that a

company formed pursuant to a reverse merger trade at least six months after the completion of the reverse merger, and that six months' worth of audited financial statements following the reverse merger be timely filed, prior to listing the company on NASDAQ.  In June 2011, the SEC issued an investor bulletin warning investors about fraud risks in reverse mergers.  (SEC Office of Investor Education and Advocacy, June 2011 Investor Bulletin: Reverse Mergers.)

46. The extraordinary measures being taken by U.S. regulators to curb further pump-and-dump schemes on United States markets are indicative of the inadequacy of the regulatory structure previously in place.

### Formation of the SPAC — TM Entertainment

47. In 2007, Defendants Green and Bird, along with John W. Hyde and Jonathan F. Miller, formed TM, which had its IPO on October 17, 2007.  Their prospectus of October 17, 2007, states:  "TM Entertainment and Media, Inc. is a newly formed blank check company organized for the purpose of effecting a merger, capital stock exchange, asset acquisition or other similar business combination with a domestic or foreign operating business in the entertainment, media, digital or communications industries."

48. The original prospectus also revealed the time frame in which TM, a shell company with no operating business, had to find a deal.  It stated that "[o]ur amended and restated certificate of incorporation provides that we will continue in existence only until October 17, 2009.  This provision may not be amended except in connection with the consummation of a business combination.  If we have not completed a business combination by such date, *our corporate existence will cease* except for the purposes of winding up our affairs and liquidating, pursuant to Section 278 of the Delaware General Corporation Law.  This has the same affect as if

our board of directors and stockholders had formally voted to approve our dissolution pursuant to Section 275 of the Delaware General Corporation Law." (emphasis added).

49. Over the course of its existence, TM unsuccessfully approached several target companies. Ultimately, the reverse merger with Hong Kong Mandefu that would transform the SPAC into CCME closed mere days before the expiry of the October 17, 2009 deadline. The October 2009 Proxy filed by TM and signed by Green, describes in detail the process by which TM came to acquire Hong Kong Mandefu.

50. As described in the October 2009 Proxy, after signing a non-binding letter of intent in January 2009, TM conducted, over a period of several months, a "detailed review of information provided to TM by [Hong Kong Mandefu] on its business as well as a further due diligence review of the Chinese advertising industry in general and the competitive landscape with respect to [Hong Kong Mandefu] in particular."

51. Specifically, on February 27, 2009, the accountant used to audit Hong Kong Mandefu's financials, Robbins, delivered draft audited financial statements for Hong Kong Mandefu's 2006, 2007 and 2008 fiscal years to TM.

52. On May 1, 2009, Robbins delivered the final audit report on the financial statements of Hong Kong Mandefu for fiscal years 2006, 2007 and 2008 and TM entered into a Share Exchange Agreement with Hong Kong Mandefu on that same date. In September 2009, Robbins delivered its opinion based on its review of the financial statements of Hong Kong Mandefu for the first six months of 2009, stating that it was not aware of any material modifications needed to conform those financial statements to GAAP.

53. On September 30, 2009, an amended Share Exchange Agreement between Hong Kong Mandefu and TM was approved by the TM board and signed by Defendants and Green and Bird. The transaction was announced in an October 1, 2009 press release.

54. Well before this date, TM was committed to go through with the transaction. If TM had not completed the transaction, there would have been insufficient time to acquire a different company by the October 17, 2009 deadline, and the SPAC directors would have been forced to liquidate TM and return $77 million to investors, without receiving any return on their own investments. Their TM shares would have been worthless.

55. To gain approval of TM's shareholders, on October 5, 2009 TM filed the October 2009 Proxy which was signed by Defendant Green.

56. In the October 2009 Proxy, TM's directors admit their direct financial interest in carrying out the transaction proposed:

> • If the Transaction is not consummated and TM is required to liquidate, the shares of TM Common Stock owned and acquired by TM's directors and officers prior to our IPO will be worthless because they will not be entitled to receive any of the assets held in the Trust Account [$77 million] with respect to these shares. In addition, if the Transaction is not consummated, and TM is forced to liquidate, warrants held by TM's directors and officers will expire with no value. On April 23, 2009, the date TM's board of directors approved the Transaction and the Share Exchange Agreement, our directors and officers owned a total of 2,250,000 shares of TM Common Stock acquired prior to our IPO having a total market value of approximately $17.2 million based on the share price of $7.64 of the TM Common Stock on the last trading day prior to that date. In addition, on April 23, 2009, our directors and officers held warrants exercisable for an aggregate of 2,100,000 shares of TM Common Stock (for which they paid $2,100,000) having a total market value of approximately $0.2 million based on our warrant price of $0.11 per warrant on the last trading day prior to that date.

> • Each of Messrs. Green and Bird has agreed, that, if we liquidate prior to the consummation of a business combination, they will be personally liable to ensure that the proceeds of the Trust Account are not reduced by the claims of vendors for services rendered or products sold to us as well as claims of prospective target businesses for fees and expenses of third parties that we have agreed in writing to pay in the event we do not complete a business combination. If the Transaction is consummated, TM's officers and directors will not have to perform such obligations. If the Transaction is not

consummated, however, TM's officers and directors could potentially be liable for any claims against the Trust Account by such vendors or prospective target businesses who did not sign waivers. If the Transaction is not consummated, [Hong Kong Mandefu] and the Sellers will be responsible for their own expenses incurred in connection with the proposed Transaction. Pursuant to the Share Exchange Agreement, [Hong Kong Mandefu] and the Sellers have waived any claim they may have against the Trust Account.

• All rights specified in TM's Amended and Restated Certificate of Incorporation relating to the right of directors and officers to be indemnified by TM, and of TM's directors and officers to be exculpated from monetary liability with respect to prior acts or omissions, will continue after the Transaction. If the Transaction is not consummated and TM liquidates, it will not be able to perform its obligations under those provisions. If the Transaction is ultimately completed, the combined company's ability to perform such obligations will probably be substantially enhanced.

57. On October 15, 2009, the proposed combination of TM and Hong Kong Mandefu was approved at a special meeting of TM stock holders. The approval occurred two days prior to the October 17, 2009 deadline, after which TM would have been forced to liquidate and return $77 million to investors, and common stock acquired prior to the TM IPO by Defendants Green and Bird would have been worthless.

**Structure of CCME**

58. All or most of CCME's revenue is produced by Fujian Fenzhong, the operating company that runs a purported advertising business in China. Fujian Fenzhong was formed in 2002. On November 2, 2003 and December 1, 2003, Fujian Fenzhong entered into contractual relationships with Hong Kong Mandefu's wholly-owned subsidiary Fujian Across Express, by which Fujian Fenzhong agreed to distribute all economic benefits from the operating business to the CCME subsidiary. Although the relationship between the companies is contractual, CCME's consolidated financial statements include the operating business of Fujian Fenzhong.

59. Fujian Fenzhong is majority owned by Cheng. Cheng was therefore at all relevant times in a unique position to control Fujian Fenzhong, having access to information at both the

highest level (right before it went to the United States securities markets) and the lowest level (on the ground, in China). Cheng had knowledge of the affairs and had a high degree of access to the books and records of CCME, CCME's subsidiaries and Fujian Fenzhong.

60. Lam, as Chief Financial Officer of CCME, was at all relevant times responsible for the consolidated financial statements of CCME and Fujian Fenzhong, as filed with the SEC and communicated to Starr and U.S. investors.

### The Structure of the Reverse Merger Transaction

61. Pursuant to the Share Exchange Agreement described in the October 2009 Proxy, TM issued 20,915,000 new common shares and $10,000,000 in three-year, no interest promissory notes in exchange for 100% of the outstanding equity of Hong Kong Mandefu.

62. Pursuant to the transaction, TM changed its name to China MediaExpress Holdings, Inc. ("CCME"), defendant herein.

63. Following the reverse merger, the corporate structure was as follows:



64. CCME was owned immediately after the reverse merger, on a fully diluted basis, by Cheng (13,266,684 shares, October 27, 2009 Schedule 13D), the Lin Defendants (combined total of 8,398,316 shares, October 28, 2009 Schedule 13Ds), Green (2,428,000 shares, November 2, 2009 Schedule 13G/A)[1], Bird (648,000 shares, November 2, 2009 Schedule 13G/A), and a variety of public shareholders.

65. Additionally, the shareholders of Hong Kong Mandefu, namely Cheng and the Lin Defendants, had the opportunity to earn up to 15,000,000 TM/CCME shares, subject to the achievement of certain net income targets in 2009, 2010, and 2011, as well as up to $20,900,000 of cash proceeds from the exercise of TM's publicly held warrants. The $20,900,000 was paid in the first quarter of 2010. The net income target for 2009 was met and the earnout shares were distributed in the third quarter of 2010 on August 12, 2010.

## Material Misrepresentations in the TM Proxy

66. A variety of representations in the October 2009 Proxy could only have been the result of willful or reckless disregard of the facts by TM's directors, including Defendants Green and Bird, to prevent discovery of the fraud.

67. In order to induce shareholders to enter into the reverse merger transaction, TM reported in the October 2009 Proxy that Hong Kong Mandefu had the "largest television advertising network on inner-city express buses in China," and that it had a network comprising of 16,000 inter-city buses, covering four municipalities and seven economically prosperous Chinese provinces.

68. It further reported:

---

[1] Including shares held in trust as to which Green had voting power pursuant to a certain Voting Agreement.

**A highly effective and efficient advertising network**

CME believes its network is a highly effective and efficient. According to a survey conducted by CTR Market Research in July 2008 on bus services originating in eight major cities, on average, 81% of all passengers said they had watched the television displays on CME's network, and almost 80% said they regularly watched the displays on the network.

69. The TM directors made the following additional representations in relation to the

acquisition:

**Recommendation of the Board of Directors and Reasons for the Transaction**

After careful consideration, TM's board of directors, by unanimous vote at a meeting on April 23, 2009 and on September 30, 2009, approved and declared advisable the Share Exchange Agreement and the Transaction.  Accordingly, our board of directors recommends that TM's stockholders vote "FOR" the Transaction Proposal.

TM's board of directors considered a wide variety of factors in connection with its evaluation of the Transaction. Pali's valuation analysis was one of the factors the board of directors considered, in addition to TM's own due diligence and review of CME's business operations and results. In light of the complexity of those factors, TM's board of directors did not consider it practicable to, nor did it attempt to, quantify or otherwise assign relative weights to the specific factors it considered in reaching its decision. In addition, individual members of TM's board of directors may have given different weight to different factors. In reaching its determination, TM's board of directors considered the following factors, among others:

•   information with respect to the financial condition, results of operation and business of CME, on both a historical and prospective basis; 2006 — 2008 net revenue and net income CAGR of 269% and 404%, respectively, with a projected 2008 — 2011 net income CAGR of 158%;

•   CME's lower price to earnings multiples relative to its public comparables, given its future prospects and those of the industry;

•   CME's management team's quality and strength, and proven track record of success; CME's existing management team has grown the business to achieve 2008 net revenue and net income of $63.0 and $26.4 million, respectively, and 35,000 installed TV displays on over 16,000 buses in a short period of time;

\*\*\*

- the results of TM's business, financial, accounting, legal and other due diligence review of CME.

\*\*\*

In addition, TM's board of directors relied on a number of standards generally accepted by the financial community in making its decision to enter into the Share Exchange Agreement with CME. In particular, TM's board of directors placed heavy emphasis on the price to earnings multiples of publicly-traded companies that it deemed to be comparable to CME and compared those multiples to the earnings multiple embedded in TM's transaction with CME. In addition, TM's board of directors evaluated enterprise value to revenue multiples, enterprise value to EBITDA (earnings before interest, taxes, depreciation and amortization) multiples and the capital structures of the publicly-traded companies comparable to CME and compared the multiples and capital structures to those in TM's transaction with CME.

\*\*\*

Based on the factors outlined above, our board of directors approved and declared it advisable that TM enter into the Transaction.

70.  In addition to the previous facts, the TM Board represented that the fair market value

of Hong Kong Mandefu was in excess of the threshold they were required to meet before

effectuating the transaction, again acknowledged their conflict of interest, and stated that they

had not retained an independent valuation advisor to confirm their self-interested determination

of Hong Kong Mandefu's value:

**Satisfaction of Requirement that the Transaction has a Fair Market Value Equal to at least 80.0% of TM's Net Assets**

It is a requirement that any business acquired by TM have a fair market value equal to at least 80.0% of TM's net assets at the time of acquisition. Based solely on its evaluation of the consideration to be paid in the Transaction, TM's board of directors determined that this requirement was met and exceeded. . . . TM's board of directors did not seek or obtain an opinion of an outside valuation advisor as to whether the 80.0% test has been met, however, in light of the financial background and experience of members of TM's management and board of directors, TM's board of directors believes it is qualified to determine whether the Transaction meets this requirement. Mr. Green (in his roles at Anchor Bay Entertainment, Greenlight Consulting and Sony Wonder), Mr. Bird (in his roles at AOL, Hanna-Barbera and USA Broadcasting), Mr. Hyde (in his numerous roles as a senior executive, consultant and advisor) and Mr. Miller (in his roles as a senior executive, investor and advisor), all have had significant financial experience. If the

Transaction is not consummated and TM is required to liquidate, the shares of TM Common Stock owned and acquired by TM's directors and officers prior to our IPO will be worthless because they will not be entitled to receive any of the assets held in the Trust Account with respect to these shares. In addition, if the Transaction is not consummated, and TM is forced to liquidate, warrants held by TM's directors and officers will expire with no value. These factors created a conflict of interest for TM's directors and officers in negotiating the Transaction on behalf of TM, which resulted in the value of the consideration being paid by TM exceeding 80% of TM's net assets.

In determining that the Transaction had a fair market value equal to at least 80.0% of TM's net assets, TM's board of directors first determined that as of March 31, 2009, TM had approximately $77.4 million in net assets (total assets minus total liabilities). The fair value of the Transaction was determined through arms-length negotiations between the Sellers and TM (Messrs. Green and Bird) and resulted in a minimum purchase price equal to approximately $176.0 million, assuming a value of $8.00 of the TM Common Stock being issued. This amount exceeds 80.0% of TM's net assets at the time our board of directors approved the Share Exchange Agreement and the Transaction. Therefore, the 80.0% test was satisfied.

71. In touting their experience in valuing companies, TM's directors, including Green and Bird, sought to induce reliance of voting shareholders in their valuation of CCME even though, as was later revealed, the numbers upon which their valuations were premised were not properly audited and could not be confirmed, a fact that must have been known to them. Moreover, TM's directors, including Green and Bird, made no apparent attempt to verify that the financials provided by Hong Kong Mandefu during the due diligence process matched the financials provided to relevant Chinese authorities, including the State Administration of Industry and Commerce ("SAIC" or "AIC").

72. The October 2009 Proxy further represented that the CCME advertising network included over 16,000 buses, and that CCME had clients such as Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China, and China Pacific Life Insurance.

73. Further, TM presented Hong Kong Mandefu's financial position through use of financials purportedly audited by Robbins as follows:

|  | For the Years Ended December 31 | | |
|---|---|---|---|
|  | **2006** | **2007** | **2008** |
|  | (Amount in thousands of US dollars, except for number of shares and per share data) | | |
| **Sales, net of business tax and related surcharges:** | $ 4,035 | $ 25,837 | $62,999 |
| **Cost of sales:** | (1,533) | (13,164) | (25,065) |
| **Gross profit** | 2,502 | 12,673 | 37,934 |
| **Operating expenses** | | | |
| Selling expenses | (448) | (923) | (1,095) |
| General and administrative expenses | (448) | (734) | (1,718) |
| Total operating expenses | (916) | (1,657) | (2,813) |
| **Operating income** | 1,586 | 11,016 | 35,121 |
| Interest income | 8 | 24 | 100 |
| **Income before income taxes** | 1,594 | 11,040 | 35,221 |
| Income tax expenses | (689) | (4,073) | (8,854) |
| **Net income** | $ 905 | $ 6,967 | $ 26,367 |
| **Foreign currency translation adjustment** | $ 20 | $ 352 | $ 1,012 |
| **Comprehensive income** | $ 925 | $ 7,319 | $ 27,379 |
| **Earnings per share** | | | |
| Basic and diluted | $ 90.50 | $ 696.70 | $ 2,636.70 |
| **Weighing average number of ordinary shares outstanding** | | | |
| Basic and diluted | 10,000 | 10,000 | 10,000 |

74. These representations would later prove to have been false at the time they were made. It was later revealed, for the reasons discussed, *infra*, that Hong Kong Mandefu's condition, purportedly reflected in the October 2009 Proxy, could not be confirmed, and the extensive due diligence claimed in the October 2009 Proxy would have revealed that Hong Kong Mandefu did not have the value attributed to it in the Proxy.

75. On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with

its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC; Green and Bird knowingly or recklessly made false and misleading statements in the October 2009 proxy, including but not limited to: (i) overstating Hong Kong Mandefu's Gross Profits and Operating Income, (ii) overstating the value of Hong Kong Mandefu, and claiming its value was in excess of 80% of the value of TM, (iii) overstating the size of CCME's advertising network, and (iv) claiming that CCME had clients that it did not have.

76.   The fact that Green and Bird did not uncover, report, disclose, investigate, or rectify these problems in TM's public filings, despite their purported extensive due diligence, indicates that they turned a blind eye to serious deficiencies in the information provided to TM, and did not check matching Chinese filings, in a willful and reckless attempt to consummate the reverse merger transaction in order to meet the October 17 deadline.  Their desire to cash out their pre-IPO shares and their unique position of access to Hong Kong Mandefu financial information implies that they had motive and opportunity to carry out these fraudulent and conspiratorial acts.

### Starr's Initial Investment

77.   Starr first learned about CCME through DTT.  In July 2009, Tom Kwok, a DTT partner, introduced Starr employee Dorothy Dong to CCME's CFO, Jacky Lam.  Kwok suggested that Starr talk to Lam about investing in CCME.

78.   Lam met with Dong soon thereafter and made an initial presentation on CCME.  Dong visited CCME headquarters later that summer and met CCME's chairman, Zheng Cheng, and other CCME senior managers.

79.     During those discussions and during Starr's own subsequent due diligence, CCME management, including Cheng and Lam, orally and in writing, represented CCME to be a highly successful, reputable and profitable media and advertising company, with extensive operations throughout the PRC and provided false and fraudulent information to Starr and its representatives.

80.     Before investing, Starr also retained an affiliate of DTT, Deloitte & Touche Financial Advisory Services Limited ("DTFAS"), to conduct financial due diligence on the Company.  Starr insisted on using a major international accounting firm to conduct the due diligence and would not have made any investment in CCME unless one of the "Big Four" accounting firms became CCME's auditor.

81.     DTFAS did not raise any "red flags" during its due diligence and provided no indication that CCME's profits or financial statements contained any material errors.  The day after DTFAS completed its due diligence for Starr, DTT was engaged by CCME to be CCME's auditor.

82.     On January 12, 2010, after negotiations among the parties, Starr, CCME and affiliated entities, the Lin Defendants, and Cheng entered into a Share Purchase Agreement (the "SPA").  Defendants DTT, Robbins, Lam, Bird and Green were not parties to the SPA.

83.     Under the SPA, which is governed by Delaware law, Starr agreed to purchase, for an aggregate amount of US$30 million, the following securities:

(a)     1,000,000 shares of Series A Convertible Preferred Stock of CCME; and

(b)     warrants to purchase 1,545,455 shares of Common Stock of CCME at a price of $6.47 per share.

84.     The transactions contemplated by the SPA were closed on January 28, 2010. Upon that date, the parties executed various documents memorializing their relationship,

including an Investors Rights Agreement (the "IRA") (guaranteeing certain shareholder, board representation and other rights for Starr) and certain certificates memorializing the terms of the purchased shares and warrants.

85.     Pursuant to the IRA, Starr was entitled to designate one member for election to the Board of Directors of CCME.

86.     CCME made numerous representations and warranties to Starr in the SPA, many of which were false.  For example, section 4.8(a) of the SPA contains a representation that "[t]he financial statements of [CCME] and Hong Kong Mandefu . . . included in . . . the [October 2009 proxy] . . . fairly present in all material respects, in accordance with U.S. GAAP, and in case of the unaudited financial statements, subject only to normal year-end adjustments, as of the dates thereof . . . the financial condition and the results of operations of [CCME] and its Subsidiaries, including, without limitation, . . . [Fujian Fenzhong]."  As alleged herein, the financials were not audited in accordance with applicable standards.

87.     Starr thus relied on the financial statements contained in the October 2009 Proxy in deciding to make its initial investment in CCME pursuant to the SPA.  Starr also relied on other statements and representations made in the October 2009 Proxy, including but not limited to statements made concerning the size of the advertising network and the customers it contained.

88.     A spreadsheet attached to an email sent to a Starr employee on November 5, 2009 by a CCME employee falsely included Coca Cola, Pepsi, Siemens, and China Mobile among the list of customers kept by CCME, thus further supporting the statements in the October 2009 Proxy on which Starr relied.  On information and belief, the CCME employee was acting under the direction of Cheng and Lam.

89.     Contemporaneous with the SPA and as part of the same transaction, Green and Bird entered into a "TM Holders Share Sale Agreement" (the "TM Agreement") with Starr.  In the TM Agreement, persons and entities associated with TM, including Defendants Green and Bird, sold 150,000 shares of CCME common stock to Starr in return "for good and valuable consideration already received."

90.      Starr entered into the TM Agreement in reliance on, among other things, statements made in the October 2009 Proxy.  In addition, Green signed the October 2009 Proxy as Chairman of the Board.  Green and Bird were directors of CCME at the time they sold their shares to Starr.  They remained on the board of CCME until March 8 and March 1, 2010 respectively, shortly before the filing of CCME's 2009 Form 10-K on March 31, 2010.  Green and Bird never corrected the misrepresentations contained in the October 2009 Proxy on which Starr relied.

91.     Based on the aforementioned contacts with Hong Kong Mandefu and involvement in the due diligence process, together with access to confidential documents within the exclusive control of Defendants, Green and Bird had access to and/or control over internal reports and other data and information about Hong Kong Mandefu's finances, operations and sales at all relevant times.

92.     Knowing the true nature and the extent of Hong Kong Mandefu, and consequently, CCME's business relationships and operations, Green and Bird had a motive to make false representations and omissions that CCME was a viable business that was performing well, in order to offload their pre-IPO investment shares, including through the January 2010 TM Agreement.

93.     Knowing the true nature and the extent of Hong Kong Mandefu, and consequently CCME's business relationships and operations, and selling CCME securities to Starr for good and valuable consideration, Green and Bird had a duty to Starr to disclose the true facts of which they were aware.  Their failure to do so constituted a material omission.

94.     The SPA contains an express arbitration provision obligating the parties to that agreement to arbitrate any claims relating to the SPA in Hong Kong.  On March 17, 2011, Starr commenced an arbitration in Hong Kong seeking to recover for CCME's breaches of the SPA consistent with the terms of the SPA.  Starr's claims against the parties to the SPA based on that agreement are therefore not the subject of this action.

### Continuing Material Misstatements

95.  As noted in the October 2009 Proxy, Defendant CCME purports to operate the largest television advertising network on inter-city and airport express buses in China.  The Company claims to generate revenue by selling advertisements on a network of television displays installed on thousands of express buses originating in eighteen of China's most prosperous regions.

96.     On March 23, 2010, CCME issued a press release announcing its fourth quarter and 2009 full-year results.  In the press release, CCME stated in part:

Financial Highlights – Fourth Quarter 2009 vs. Fourth Quarter 2008

* Revenue increased by 90.6% to $32.0 million in the fourth quarter of 2009 as compared to $16.8 million in the same quarter of 2008;
* Gross margin for fourth quarter was 68.9%;
* Income from operation increased by 104.7% to $19.5 million in the fourth quarter of 2009 as compared to $9.5 million in the same quarter of 2008; and
 * Net income increased by 99.6% to $14.3 million in the fourth quarter of 2009 compared to $7.2 million in the same quarter of 2008.

Financial Highlights – Full Year 2009 vs. Full Year 2008

* Revenue increased 52.3% to $95.9 million in 2009 as compared to $63.0 million in 2008;
* Gross margin for year ended December 31, 2009 was 65.7%;
* Income from operation increased by 61.3% to $56.6 million in 2009 as compared to $35.1 million in 2008;
* Net income increased by 58.2% to $41.7 million in 2009 as compared to $26.4 million in 2008; and
* As of December 31, 2009, the Company had $57.2 million in cash.

\*   \*   \*

[Mr. Cheng] added, "Our network has grown with the signing of several new agreements with bus operators. As of today, our network includes 49 bus operator partners, up from 46 at the end of November; these agreements run from three to eight years. The total number of buses equipped with our television systems is now over 21,000, increasing approximately by more than 1,000 buses since the end of November."

Mr. Cheng continued, "Our successful platform, the large and growing network of bus operators partners, the wide geographic coverage and our competitive advertising rates, continue to attract a large number of international and national brands to our advertising network. More than 450 advertisers have purchased time on our network either through advertising agents or directly from us. Our growing clientele includes local brand names as well as well-known international and national brands such as Coca Cola, Pepsi, Wahaha, KFC, Siemens, Hitachi, Haier, China Telecom, China Mobile, Nokia, China Post, Procter & Gamble, Bank of China, China Constructing Bank and China Pacific Life Insurance.

97. CCME went on to state:

Based on the current customer base, geographic coverage, network of express buses and existing revenue streams, CME's management projects that its 2010 net income (non-GAAP which is before share based compensation or fair value adjustments for the Company's financial instruments), will be in the range of $71 million to $75 million. These projections exclude the impact of any possible acquisitions, additional of new buses and new investments in other media projects in 2010."

98. On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4)

the resignation of CCME's independent auditor, DTT, and statements made in connection with

its resignation, including DTT's inability to confirm Company information or rely on prior

financial statements, and (5) the significant discrepancy between CCME's financials as reported

to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made

false and misleading statements in the March 23, 2010 press release, including but not limited to:

(i) overstating the revenue and net income of CCME, (ii) overstating the number of buses in the

CCME advertising network, and (iii) claiming that CCME had clients that it did not have.

     99. On March 31, 2010, CCME's Form 10-K filed with the SEC for the fiscal year ended

December 31, 2009, describes CCME's business and operations in relevant part as follows:

### Business Summary

#### *Overview*

     CME, through contractual arrangements with Fujian Fenzhong, an entity majority
owned by CME's majority shareholder, operates the largest television advertising
network on inter-city express buses in China. All references in this Report to "CME's
advertising network", "CME's customers", CME's operations in general and similar
connotations, refer to Fujian Fenzhong, an entity which is controlled by CME through
contractual agreements and which operates the advertising network. While CME has no
direct equity ownership in Fujian Fenzhong, through the contractual agreements CME
controls the activities and receives the economic benefits of Fujian Fenzhong's
operations. CME generates revenue by selling advertising on its network of television
displays installed on inter-city express buses in China. As of July 31, 2008, CME's
advertising network accounted for 81% of all inter-city express buses installed with hard
disk drive players, and 55% of all inter-city express buses installed with any type of
television display, according to CTR Market Research. CME commenced its advertising
services business in November 2003 as one of the first participants in advertising on
inter-city express buses in China. CME believes its early entry into this business has
enabled them to achieve an audience reach that is highly attractive to advertisers.

     CME's extensive and growing network covers inter-city express bus services
originating in China's most prosperous regions. As of December 31, 2009, CME's
network covered inter-city express bus services originating in fourteen regions, including
the five municipalities of Beijing, Shanghai, Guangzhou, Tianjin and Chongqing and nine
economically prosperous provinces, namely Guangdong, Jiangsu, Fujian, Sichuan, Hubei,
Anhui, Hebei, Shandong and Shanxi. These fourteen regions in aggregate generated more
than half of China's gross domestic product, or GDP, in 2007, according to the National
Bureau of Statistics of China. CME's network is capable of reaching a substantial and

growing audience. In the first seven months of 2008, a monthly average of 53 million passengers traveled on inter-city express buses within CME's network, representing 57% of all passengers traveling on inter-city express buses installed with television displays in China, according to CTR Market Research.  Many of the cities connected in CME's network are major transportation hubs, which serve as points of transfer for large numbers of leisure, business and other travelers in China to other modes of transportation. CME's network also includes airport buses connecting major cities to airports and tour buses traveling on routes that connect major cities with popular tourist destinations in China. As of December 31, 2009, CME's network covered all of the transportation hubs designated by the Ministry of Transport, and CME expects to further increase this percentage as it continues to expand the geographic coverage of its network. In addition to major transportation hubs, the network also covers small to medium-sized cities in China, some of which rely on highway transportation as the primary transportation option for connection outside these cities.

CME has entered into long-term framework agreements with 45 bus operator partners for terms ranging from five to eight years. Pursuant to these agreements, CME pays the bus operators concession fees for the right to install its displays and automated control systems inside their buses and display entertainment content and advertisements. CME's entertainment content is provided by third parties and advertisements provided by its clients. CME obtains a wide range of free entertainment content from Fujian SouthEastern Television Channel and Hunan Satellite Television each month and purchases a limited amount of copyrighted programs from the Audio and Video Publishing House of Fujian Province. As of December 31, 2009, the number of inter-city express buses within CME's network is 20,161.

In October 2007, CME entered into a five-year cooperation agreement with Transport Television and Audio-Video Center, or TTAVC, an entity affiliated with the Ministry of Transport of the People's Republic of China, to be the sole strategic alliance partner in the establishment of a nationwide in-vehicle television system that displays copyrighted programs on buses traveling on highways in China. The cooperation agreement also gave CME exclusive rights to display advertisements on the system. In November 2007, TTAVC issued a notice regarding the facilitation of implementation of the system contemplated under the cooperation agreement to municipalities, provinces and transportation enterprises in China. CME believes its status as the sole strategic alliance partner designated by TTAVC and the exclusive rights to display advertisements on the system has facilitated its historical expansion and is expected to continue to provide them with a competitive advantage in the future.

CME believes its network is a highly effective advertising medium. The network is capable of reaching audiences on inter-city express buses while they remain in a comfortable and enclosed environment with minimal distraction. The majority of the inter-city express buses within the network are equipped with leather seats and air-conditioning, providing a comfortable environment which makes the audiences more receptive to the content displayed on CME's network. Inter- city travel in China typically takes a number of hours. Audiences are therefore exposed to the content displayed on its

advertising platform for a significantly longer period of time than on shorter-distance travel. In addition, CME's patented automated control systems ensure that the programs and advertisements are displayed continuously throughout the journey.

100.    The 2009 10-K represented that CCME's clients included: Coca Cola, Pepsi, Wahaha, KFC, Siemens, Hitachi, Haier, China Telecom, China Mobile, Nokia, China Post, Procter & Gamble, Bank of China, China Constructing Bank and China Pacific Life Insurance.

101.    The 2009 10-K states that CCME had total revenues of $63.0 million in 2008, and $95.9 million in 2009.

102.    The same 10-K states that CCME had gross profits of $37.9 million in 2008, and $63.0 million in 2009.

103.    CCME's Form 10-K also includes a copy of a Report of Independent Registered Public Accounting Firm signed by DTT.  DTT's report indicates that they "have audited the accompanying consolidated balance sheet" of CCME as of December 31, 2009 and concludes:

> In our opinion, such consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Group as of December 31, 2009, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.  Also, in our opinion, such financial statements schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

104.    CCME's Form 10-K contains a certification signed by CCME's Chief Executive Officer (Cheng) and Chief Financial Officer (Lam) as required by Sarbanes-Oxley, attesting, among other things, that (1) the Report fully complies, in all material respects, with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

105.    The filing also includes a separate certification from each of Cheng and Lam that states:  "Based on my knowledge, this report does not contain any untrue statement of a material

fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Those same certifications go on to state that: "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

106. On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the 2009 10-K including but not limited to: (i) overstating the gross profits and total revenues of CCME in 2008, (ii) overstating the gross revenue and profits of CCME in 2009, (iii) overstating the number of buses equipped with CCME's television system, and providing revenue to the Company, and (iv) claiming that CCME had clients that it did not have.

107. On May 14, 2010, CCME announced "Strong First Quarter Financial Results," disclosing in part:

> China MediaExpress Holdings, Inc. (NYSE Amex: CCME) ("CME" or "Company"), China's largest television advertising operator on inter-city express buses, today announced financial results for the first quarter ended March 31, 2010.

Financial Highlights – First Quarter 2010 vs. First Quarter 2009

* Revenue increased by 137% to $44.5 million as compared to $18.8 million;
* Gross margin for first quarter was 60%;
* Income from operations increased by 130% to $24.2 million as compared to $10.5 million;
* Net income increased by 143% to $18.1 million as compared to $7.5 million; and,
* As of March 31, 2010, the Company had more than $114.4 million in cash.

Zheng Cheng, CCME's Founder and CEO, commented, "We started 2010 on a very strong note with record revenue and net income. Our revenue and net income for the quarter grew by 39% and 27% respectively when compared to the 2009 fourth quarter. Basic and diluted earnings per share in the first quarter of 2010 was $0.28 and $0.27, respectively (after a one-time charge of $9,242,000 related to a deemed dividend on the issuance of our convertible preferred stock in the first quarter); excluding this deemed dividend, the income attributable to holders of common shares (non-GAAP net income) would be $18,142,000 and the basic and diluted earnings per share would have been $0.58 and $0.54, respectively."

*          *          *

Mr. Cheng continued, "Our network continues to grow through new agreements with bus operators and currently includes 49 bus operator partners, up from 46 at the end of 2009. The number of buses equipped with our television systems is now over 21,500. The growing network has attracted more than 450 advertisers either through advertising agencies or directly from us. Our clientele includes Hitachi, China Telecom, Toyota, Siemens and China Pacific Life Insurance, which have purchased advertising time from CME for more than three years; and many other well-known international and national brands including Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance."

108.    The May 14, 2010 press release continued to state:

Based on the current customer base, geographic coverage, network of express buses and existing revenue streams, CME's management reaffirms its 2010 net income guidance which is expected to be in the range of $71 million to $75 million (on a non-GAAP basis, exclusive of share based compensation in connection with the share incentive plan which is expected to be adopted and with options to be granted in the 2nd or 3rd quarter of 2010 or deemed dividend on issuance of convertible preferred shares). As previously announced, these projections exclude the impact of any possible acquisitions, additional of new buses and new investments in other media projects in 2010."

109.     On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the May 14, 2010 press release, including but not limited to: (i) overstating its financials including its net income and revenue, (ii) overstating the size of its advertising network, and (iii) claiming that CCME had clients it did not have.

110.     Also on May 14, 2010, CCME filed its Form 10-Q with the SEC reflecting its financial results for the quarter ended March 31, 2010.  Again, CCME reported positive financial results and represented its business to be performing well.  The Condensed Consolidated Statements of Cash Flows contained in the Form 10-Q reflected net income for the period ended March 31, 2010 of $18.1 million, compared with $7.5 million for the same period in 2009.

111.     The first-quarter 10-Q additionally represented that CCME had attracted Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance to its advertising network.

112.     CCME's Form 10-Q contains a certification signed by CCME's Chief Executive Officer (Cheng) and Chief Financial Officer (Lam) as required by Sarbanes-Oxley, attesting, among other things, that (1) the report fully complies, in all material respects, with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the

information contained in the report fairly presents, in all material respects, the financial condition

and results of operations of the Company.

113.    The filing also includes a separate certification from each of Cheng and Lam

states that:  "Based on my knowledge, this quarterly report does not contain any untrue statement

of a material fact or omit to state a material fact necessary to make the statements made, in light

of the circumstances under which such statements were made, not misleading with respect to the

period covered by this quarterly report."  Those same certifications go on to state that: "Based on

my knowledge, the financial statements, and other financial information included in this

quarterly report, fairly present in all material respects the financial condition, results of

operations and cash flows of the registrant as of, and for, the periods presented in this quarterly

report."

114.    On information and belief, premised on facts including but not limited to: (1)

subsequent media reports indicating falsified statements made by CCME, (2) the resignations of

several of CCME's independent directors and statements made in connection with their

resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4)

the resignation of CCME's independent auditor, DTT, and statements made in connection with

its resignation, including DTT's inability to confirm Company information or rely on prior

financial statements, and (5) the significant discrepancy between CCME's financials as reported

to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made

false and misleading statements in the 2010 First Quarter 10-Q including but not limited to (i)

overstating CCME's net income and (ii) claiming that CCME had clients that it did not have.

115.    On July 12, 2010, CCME issued a press release touting its improved financial

forecasts:

Fujian, China - July 12, 2010 - China MediaExpress Holdings, Inc. (NASDAQ GS: CCME) ("CME" or "Company"), China's largest television advertising operator on inter-city and airport express buses, today announced that based on the latest developments, including the expanded geographic coverage, increased number of inter-city buses, and higher margins from the airport express buses platform, it is revising its 2010 net income guidance.

The revised guidance calls for 2010 net income to be in the range of $82 million to $85 million (on a non-GAAP basis, exclusive of non-cash charges for (i) share based compensation in connection with grants under the Company's share incentive plan expected to be adopted later in 2010 and (ii) deemed dividends on outstanding convertible preferred shares), compared to the initial 2010 net income guidance of $71 million to $75 million.

Jacky Lam, CME's Chief Financial Officer stated, "Our revised 2010 net income guidance reflects the continued growth of our business from existing revenue sources, and excludes the impact of any possible acquisitions, additional new buses, new revenue streams and any new investments in other media projects in 2010.

"We expect to continue to benefit from China's rapid increase in advertising spending - which is projected to remain one of the fastest growing advertising markets in the world - sustained economic growth, and increases in disposable income and domestic consumption. We plan to continue to grow our business organically and we are also actively looking for acquisition opportunities within our core business platform. Furthermore, we are working hard to finalize several new projects which we believe will further enhance CME's shareholder value. We have sufficient resources to fund our business expansion plans, including internal growth initiatives as well as potential acquisitions."

116.    On July 14, 2010, spreadsheets summarizing June income and balance sheets were sent to a Starr company by a CCME employee.  One such spreadsheet represented that Fujian Across Express' total profits in the year to date amounted to 352,950,398.8 Renminbi, or approximately $52 million.[2]  On information and belief, the CCME employee was acting under the direction of Cheng and Lam.

117.    On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their

---

[2] Using the July 14, 2010 exchange rate of approximately 0.1476 US Dollars to each Renminbi.

resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC; CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the July 14, 2010 spreadsheet including but not limited to overstating CCME's total profits.

118.    On August 13, 2010, CCME announced "Record Second Quarter Financial Results." Specifically, CCME issued a press release touting:

**Financial Highlights – Second Quarter 2010 vs. Second Quarter 2009**

* Revenue increased by 180% to $53.5 million as compared to $19.1 million;
* Gross margin for the current second quarter was 79% as compared to 62%
* Income from operations increased by 245% to $38.3 million as compared to $11.1 million; and
* Net income increased by 244% to $28.5 million or $0.80 per diluted share as compared to $8.3 million or $0.40 per diluted share.

**First Half 2010 vs. First Half 2009**

* Revenue increased by 159% to $98.0 million as compared to $37.9 million;
* Gross margin for the current first half period was 70% as compared to 62%;
* Income from operations increased by 189% to $62.5 million as compared to $21.6 million;
* Net income increased by 196% to $46.6 million or $1.07 per diluted share as compared to $15.7 million or $0.75 per diluted share; and
* As of June 30, 2010, the Company had more than $139 million in cash.

*          *          *

Mr. Cheng continued, "From January 2010 to now, we have grown our network by approximately 3,000 express buses to more than 23,200 express buses and we have long-term contracts in place, ranging from three to eight years with 61 bus operators."

Mr. Cheng noted, "Our clientele continues to grow and includes prestigious clients such as Hitachi, China Telecom, Toyota, Siemens, China Pacific Life Insurance (all of which have purchased advertising time from CME for more than

three years), Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance. In 2010, our clientele was expanded to include prestigious names such as Wrigley, Bank of Communication and Callreta D."

119.    CCME went on to announce:

The Company reaffirms its recently revised 2010 net income guidance which is expected to be in the range of $82 million to $85 million (on a non-GAAP basis, exclusive of non-cash charges for (i) share based compensation in connection with the granting of options under the Company's share incentive plan expected to be adopted later in 2010 and (ii) deemed dividends on outstanding convertible preferred shares). Again, these projections exclude the impact of any possible acquisitions, additional of new buses and new investments in other media projects in 2010.

120.    On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the August 13, 2010 press release, including but not limited to: (i) overstating CCME's net income and revenue, (ii) overstating the size of CCME's advertising network, and (iii) claiming that CCME had clients that it did not have.

121.    Also on August 13, 2010, CCME filed its Form 10-Q with the SEC reflecting its financial results for the quarter ended June 30, 2010. As with the prior filings, this Form 10-Q reflected continued positive performance by CCME. Among other things, the Form 10-Q reflected net income of $46.6 million for the six months ended June 30, 2010, compared with $15.7 million for the same period in 2009.

122.    The Second Quarter 10-Q also represented that CCME had attracted Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance as clients.

123.    CCME's Form 10-Q contains a certification signed by CCME's Chief Executive Officer (Cheng) and Chief Financial Officer (Lam) as required by Sarbanes-Oxley, attesting, among other things, that (1) the report fully complies, in all material respects, with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the Company.

124.    The filing also includes a separate certification from each of Cheng and Lam that states:  "Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report."  Those same certifications go on to state that:  "Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report."

125.    On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with

its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the Second Quarter 2010 10-Q including but not limited to: (i) overstating CCME's net income and (ii) claiming that CCME had clients that it did not have.

126.    CCME also held a conference call with investors on August 13, 2010.

127.    On September 16, 2010, CCME announced that a share repurchase program had been approved by its board of directors.  Among other things, the September 16 press release announced:

> Mr. Zheng Cheng, CCME's Chairman and Chief Executive Officer, noted, "CCME has a strong balance sheet. Our Board of Directors believes that the current share price of our common stock does not reflect the Company's fair value. The share repurchase program represents a good use of a portion of our cash position, is an attractive investment opportunity for CCME and its shareholders and is consistent with our commitment to enhance stockholder value."

128.    CCME's statements described above were materially false and/or misleading when made because, as stated in further detail below, CCME's financial results were materially overstated as were its statements regarding the size and success of its business operations, including, without limitation, statements regarding its profitability and the number of buses in its network.

### Starr Purchases Additional Securities from the Lin Defendants Based on Defendants' Continuing Misrepresentations and Omissions

129.    Based on the foregoing continuing false and misleading representations made by Defendants to Starr and the market, and Defendants' failure to correct their prior misrepresentations, Starr acquired additional shares of CCME stock from the Lin Defendants.

Absent such false and misleading statements, Starr would not have acquired additional CCME stock and/or would not have paid the price it did for the additional CCME stock.

130.     Specifically, on October 12, 2010, Starr entered into a Share Sale Agreement with Thousand Space, a company organized under the laws of the British Virgin Islands and wholly owned and controlled by Ou Wen Lin, to purchase 1,000,000 shares of CCME stock at $9 per share.

131.     Also on October 12, 2010, Starr entered into a Share Sale Agreement with Bright Elite, a company organized under the laws of the British Virgin Islands and wholly owned and controlled by Qingping Lin, to purchase 500,000 shares of CCME stock at $9 per share.  The transaction closed on October 18, 2010.

132.     On information and belief, Ou Wen Lin and Qingping Lin had access to and/or control over certain members of CCME's board of directors at all relevant times.  Specifically, Ou Wen Lin serves as the Chairman, CEO and founding shareholder and Qingping Lin serves as the General Manager, COO and founding shareholder of Wuyi International Pharmaceutical Company Limited ("WIPC").  At all relevant times, WIPC's Company Secretary and Financial Controller, Marco Kung, concurrently served on the Board of Directors of CCME.

133.     Further demonstrating the connectedness between WPIC and CCME, the two companies share a Hong Kong address, namely:  Suite 2805, 28/F., Central Plaza, 18 Harbour Road, Wanchai, Hong Kong.

134.     On information and belief, Ou Wen Lin and Qingping Lin enjoyed significant and longstanding personal and professional contact and familiarity with the other defendants and had access to and/or control over Cheng and Lam and other members of CCME's management team at all relevant times.  Ou Wen Lin and Qingping Lin, through Thousand Space and Bright Elite

respectively, along with Cheng, were the founding shareholders of Hong Kong Mandefu, the predecessor to CCME, which was formed on April 25, 2001. As of the time of the reverse merger with TM on October 15, 2009 discussed above, Cheng, Ou Wen Lin, and Qingping Lin were the sole shareholders of Hong Kong Mandefu, then doing business as China MediaExpress.

135. Additionally, and further demonstrating the connectedness among Ou Wen Lin, Qingping Lin, and Cheng, the Investor Rights Agreement between the defendants and Starr, dated January 28, 2010, indicates that all notices and communications with respect to the agreement, if to Ou Wen Lin, Qingping Lin, Thousand Space, or Bright Elite, should be addressed to the common attention of Zheng Cheng at: Room 2805, Central Plaza, WanChai, Hong Kong. This is the aforementioned address shared by WPIC and CCME.

136. On information and belief, based on the aforementioned long-standing relationships and contacts with certain members of CCME's board of directors and management team, Ou Wen Lin and Qingping Lin had access to and/or control over internal reports and other data and information about CCME's finances, operations and sales at all relevant times.

137. On information and belief, because they had access to information concerning the true nature and the extent of CCME's business relationships and operations, Ou Wen Lin and Qingping Lin had a motive to sell their shares to Starr at an artificially inflated price while Starr and the market still believed the foregoing false and misleading representations made by Defendants that CCME was a viable business that was performing well.

138. Ou Wen Lin and Qingping Lin had further motive to remain silent as to the true facts concerning CCME's operations and financial condition because they stood to receive TM/CCME earnout shares in the Third Quarter of 2010, pursuant to the terms of the reverse

merger, based on CCME's purported financial performance, which they received on August 12, 2010.

139. Because they sold CCME securities directly to Starr, Ou Wen Lin and Qingping Lin had a duty to Starr to disclose the true facts that they knew, should have known, or recklessly disregarded. Their silence and failure to do so constituted a material omission.

140. Based on the false financial and business information provided by CCME to Starr and to the market, Starr paid the Lin Defendants $13.5 million on or about October 13, 2010 in exchange for 1.5 million shares of CCME common stock. Thus, the Lin Defendants were able to sell to Starr a substantial portion of their holdings just a short time before the Defendants' misrepresentations were disclosed.

### Further Misrepresentations

141. Following Starr's acquisition of these shares, CCME acknowledged Starr's reliance on CCME's false representations concerning its business plan and growth prospects, stating in a press release issued on October 13, 2010:

> Fujian, China — October 13, 2010 — China MediaExpress Holdings, Inc. (NASDAQ GS: CCME) ("CCME" or "Company"), China's largest television advertising operator on inter-city and airport express buses, today announced that Starr International Company, Inc. ("Starr International"), through its wholly-owned subsidiary, Starr Investments Cayman II, Inc. ("Starr Cayman"), has agreed to purchase an aggregate of 1.5 million shares of the Company's common stock in two private transactions. Mr. Ou Wen Lin and Mr. Qing Ping Lin, two of CME's founding shareholders, through their holding companies, Thousand Space Holdings Limited and Bright Elite Management Limited have agreed to sell 1,000,000 and 500,000 shares of the Company's common stock, respectively, to Starr International at $9 per share. Although the agreement was signed after the Chinese Golden Week holiday, it has been under discussion between the parties since the middle of September, and the selling price was based on CME's average closing trading prices for that month. It is CME's understanding that Mr. Ou Wen Lin and Mr. Qing Ping Lin intend to use proceeds from the stock sale to finance their other personal business projects that are unrelated to CME.
>
> Starr International is one of the major investors in CCME, having invested, through Starr Cayman, $30 million in January 2010 in the form of 1,000,000

shares of CME Series A Convertible Preferred Stock at $30.00 per share, together with 1,545,455 of CCME common stock purchase warrants.

Mr. Zheng Cheng, CME's Chairman and Chief Executive Officer, noted, "We are pleased that Starr International increased its investment in CME, **which is indicative of their continued confidence in our business plan and growth prospects**. This transaction is also an indication that Starr International views its investment in CME as a very sound long-term investment for the firm and its investors. We are glad that the Ou Wen Lin and Qing Ping Lin were able to satisfy their personal liquidity requirements while meeting Starr International's investment objectives in a manner consistent with our understanding of their intention to avoid sales into the public market."

. . . Fujian Fenzhong generates revenue by selling advertisements on its network of television displays installed on over 24,400 express buses originating in eighteen of China's most prosperous regions, including the four municipalities of Beijing, Shanghai, Tianjin and Chongqing and fourteen economically prosperous regions. . . . (emphasis added)

142. On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the October 13, 2010 press release, including but not limited to claiming that CCME sold advertising space on 24,400 buses.

143. On November 1, 2010, an employee of CCME sent Starr an email attaching a spreadsheet noting CCME's earnings in the first three months of 2009 and 2010. The spreadsheet lists CCME's sales for the first nine months of 2009 as 477,764,200 Renminbi, or

approximately $71 million.[3]  Similarly, it lists the company's gross profits as 341,900,186.03

Renminbi, or approximately $51 million.  On information and belief, the CCME employee was

acting under the direction of Cheng and Lam.

144.    The same spreadsheet lists CCME's sales for the first nine months of 2010 as

1,141,518,000 Renminbi, or approximately $171 million, and its gross profits for the same time

period as 922,325,085.27 Renminbi, or approximately $138 million.

145.    On information and belief, premised on facts including but not limited to: (1)

subsequent media reports indicating falsified statements made by CCME, (2) the resignations of

several of CCME's independent directors and statements made in connection with their

resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4)

the resignation of CCME's independent auditor, DTT, and statements made in connection with

its resignation, including DTT's inability to confirm Company information or rely on prior

financial statements, and (5) the significant discrepancy between CCME's financials as reported

to the SEC and those reported to SAIC; CCME knowingly or recklessly made false and

misleading statements in the November 1, 2010 spreadsheet including but not limited to: (i)

overstating its sales and gross profits for the first three months of 2009, and (ii) overstating its

sales and gross profits for the first three months of 2010.

146.    On November 8, 2010, CCME issued a press release titled, "China MediaExpress

Holdings, Inc. Announces Third Quarter Financial Results."  Therein, the Company, in relevant

part, stated:

> China MediaExpress Holdings, Inc. (NASDAQ GS: CCME) ("CCME" or "Company"),
> China's largest television advertising operator on inter-city and airport express buses,
> today announces financial results for the three and nine months ended September 30,
> 2010.

---

[3] Assuming the November 1, 2010 exchange rate of 0.1494 US Dollars to 1 Renminbi.

**Third Quarter 2010 vs. Third Quarter 2009**

Revenue increased by 118% to $57.0 million as compared to $26.1 million; Gross margin was 76.8% as compared to 67.0%; Income from operations increased by 166% to $41.2 million as compared to $15.5 million; and, Net income increased by 167% to $31.1 million or $0.81 per diluted share as compared to $11.7 million or $0.56 per diluted share.

**Nine Months 2010 vs. Nine Months 2009**

*Revenue increased by 142% to $155.0 million as compared to $64.0 million;
*Gross margin was 72.6% as compared to 64.1%;
*Income from operations increased by 179% to $103.8 million as compared to $37.2 million;
*Net income increased by 184% to $77.8 million or $1.86 per diluted share as compared to $27.4 million or $1.31 per diluted share; and,
*As of September 30, 2010, the Company had approximately $170 million in cash.

Zheng Cheng, CME's Founder and CEO, commented, "As expected, revenue and net income maintained very strong growth in the third quarter. The growth was primarily attributed to the power from our largest inter-city buses network in China where our advertising time sold, average advertising rates, number of our advertising customers, and a greater proportion of direct sales to agency sales increased substantially compared to last year.

"In addition, embedded advertising continued to generate a significant portion of our revenue as we have packaged and sold it separately to our clients since Q3 2009. The embedded advertising, which is displayed during the broadcasting of the content, has relatively low production cost, generates high margins and accounts for approximately 23% of our revenue for the nine months ended September 30, 2010.

"Furthermore, our year-to-date results reflect the success of our airport express bus business. Since the first launch of this new business line at the beginning of 2010, the advertising packages sold for airport express buses have been at premium prices, because of the demographics of airport express bus travelers, exclusivity for all the buses from the airports and the unique captive environment. As a result, the expansion of this business has generated significant revenue and has produced higher gross margins overall. For the nine months ended September 30, 2010, the revenue generated from airport express buses was approximately $35.1 million, of which approximately $15.0 million was generated in the third quarter. Our network today covers six large and important airports in China: Beijing, Fuzhou, Guangzhou, Qingdao, Changsha and Chongqing."

Mr. Cheng continued, "We continue to grow our bus network through new contracts with bus operators in regions we already serve and by expanding into new regions in this highly fragmented niche market. Since the start of this year, we have grown our network by more than 4,000 express buses and have expanded into five new regions: Zhejiang,

Hunan, Jianxi, Henan and Inner Mongolia. We have long-term contracts in place, ranging from three to eight years with 63 bus operators."

Jacky Lam, CME's Chief Financial Officer stated, "As of September 30, 2010, we had approximately $170 million in cash up from $139 million as of June 30, 2010. Cash generated from operating activities for the first nine months of 2010 was $69.0 million (of which $30.8 million was generated in the third quarter), compared to $29.9 million generated in the same period of 2009. Net cash used in investing activities during the current nine month period was $3.6 million. Our cash resources continue to be sufficient to meet both our short-term and long-term liquidity needs, capital expenditure requirements to achieve our expansion plans, including internal growth initiatives as well as potential acquisitions."

**Increase 2010 Net Income Guidance**

Based on year-to-to-date results and expectations for the fourth quarter, the Company is increasing its 2010 net income guidance which is expected to be in the range of $100 million to $104 million compared to the previous net income guidance of $82 million to $85 million (on a non-GAAP basis, exclusive of non-cash charges for (i) share based compensation in connection with the granting of options under the Company's share incentive plan expected to be adopted later in 2010 and (ii) deemed dividends on outstanding convertible preferred shares).

Mr. Cheng concluded, "As we have mentioned in the past, we are working on several additional opportunities to increase our market share and reinforce our position as one of the leading players in the out-of-home advertising space. Furthermore, mergers and acquisition remain a corporate priority. We are very proud of our achievements and look forward to continued growth during the years ahead."

147.    On information and belief, premised on facts including but not limited to: (1) subsequent media reports indicating falsified statements made by CCME, (2) the resignations of several of CCME's independent directors and statements made in connection with their resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4) the resignation of CCME's independent auditor, DTT, and statements made in connection with its resignation, including DTT's inability to confirm Company information or rely on prior financial statements, and (5) the significant discrepancy between CCME's financials as reported to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made false and misleading statements in the November 8, 2010 press release including but not limited

to: (i) overstating CCME's gross margin, income from operations, assets and revenues, and (2) overstating the growth of CCME's advertising network by a purported 4,000 buses.

148.    Also on November 9, 2010, CCME filed its Form 10-Q with the SEC reflecting its financial results for the quarter ended September 30, 2010.  As with the prior filings, this Form 10-Q reflected continued positive performance by CCME.  Among other things, the Form 10-Q reflected net income of $77.8 million for the nine months ended September 30, 2010, compared with $27.4 million for the same period in 2009.

149.    The Third Quarter 10-Q additionally represented that CCME had attracted Coca Cola, Pepsi, Wahaha, Siemens, Hitachi, China Telecom, China Mobile, China Post, Toyota, Bank of China and China Pacific Life Insurance as clients.

150.    CCME's Form 10-Q contains a certification signed by CCME's Chief Executive Officer (Cheng) and Chief Financial Officer (Lam) as required by Sarbanes-Oxley, attesting, among other things, that (1) the report fully complies, in all material respects, with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the report fairly presents, in all material respects, the financial condition and results of operations of the Company.

151.    The filing also includes a separate certification from each of Cheng and Lam states that:  "Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report."  Those same certifications go on to state that:  "Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of

operations and cash flows of the registrant as of, and for, the periods presented in this quarterly
report."

152.    On information and belief, premised on facts including but not limited to: (1)
subsequent media reports indicating falsified statements made by CCME, (2) the resignations of
several of CCME's independent directors and statements made in connection with their
resignations, (3) the resignation of CCME's CFO and statements made after his resignation, (4)
the resignation of CCME's independent auditor, DTT, and statements made in connection with
its resignation, including DTT's inability to confirm Company information or rely on prior
financial statements, and (5) the significant discrepancy between CCME's financials as reported
to the SEC and those reported to SAIC, CCME, Cheng and Lam knowingly or recklessly made
false and misleading statements in the Third Quarter 2010 10-Q including but not limited to (i)
overstating CCME's net income, and financial information generally, and (ii) claiming that
CCME had clients that it did not have.

**Green and Bird Cash Out Before CCME's Fraud Becomes Known**

153.    Defendants Green and Bird had a motive to keep silent regarding the truth about
CCME.  While the market and Starr still believed the foregoing false and misleading
representations made by CCME that CCME was performing well, CCME filed its 2010 Form S-
3 to allow Green and Bird to sell their shares to the public at an artificially inflated price.  The
2010 Form S-3 incorporated by reference the financial statements included in the 2009 Form 10-
K and repeated Defendants' prior misrepresentations and omissions.  Thus Green and Bird were
able to cash out before the misrepresentations and omissions were disclosed.

**Starr Converts Warrants into Additional Securities in Reliance on Defendants' Continuing Misrepresentations and Omissions**

154.     Based on the foregoing continuing false and misleading representations and omissions that CCME was performing well, on December 8, 2010, Starr acquired 1,545,455 additional shares of CCME stock through the exercise of warrants, for which Starr paid approximately $10 million.  Absent such false and misleading statements and omissions by Defendants, Starr would not have acquired the additional CCME stock and/or would not have exercised the warrants.

**The Truth Is Revealed**

155.     By mid-2010, DTT began receiving anonymous complaints alleging that CCME and Cheng were committing fraud through the corporate entity.

156.     Financial analysts and investigative reporters eventually began conducting their own investigation into CCME to determine whether the corporation was, in whole or in part, a fraud.

157.     On January 30, 2011, analyst firm Citron Research published a report alleging that CCME had misrepresented, among other things, the scope of the Company's operations, its financial performance, and the extent of the Company's claimed strategic partnership with a government-affiliated entity. The Citron Research report concluded that the Company "does not exist at the scale that they are reporting to the investing public."  It identified the following sources of information indicating that CCME did not exist, or was far smaller than was first thought, including but not limited to:

- A "vacuum" of local media coverage on CCME's operating company.

- CCME's absence from a variety of market and industry reports listing the key players in its field.

- CCME's unexplained ability to generate significantly more revenue per LCD screen than its competitors.

158.    At its peak, CCME shares traded at $23.97 per share and the company had a market capitalization of approximately $884 million (assuming 36.9 million shares outstanding). On Friday, January 28, 2011 CCME shares closed at $20.86 per share.  On the news of the Citron report, shares of CCME declined $3.02 per share, more than 14%, to close on January 31, 2011, at $17.84 per share, reflecting a market capitalization of approximately $658 million.

159.    Three days later, on February 3, 2011, analyst firm Muddy Waters issued a detailed report echoing many of the allegations in the Citron Research report. Among other things, the Muddy Waters report alleged that CCME "is engaging in a massive 'pump and dump' scheme. . . . significantly inflating its revenue and earnings in order to pay management earn-outs and inflate the stock price so insiders can sell."  It detailed several misrepresentations it claimed to discover, including:

- The fact that CCME, although it tells its investors that is has over 27,200 buses in its network, tells its advertisers that it only has 12,565 buses in its network.

- That a report on which CCME relied by CTR Market Research included gross exaggerations of the number of buses that certain operators held.

- That many of the buses that are purported to be in CCME's network do not display CCME content, and were instead playing videos without CCME content.

- That it had contacted advertisers that CCME had represented were clients and discovered that three of its top ten advertisers were represented by media buyers that had never heard of CCME.

- That several of CCME's purported "competitors" had not heard of them. The same competitors also stated that the airport express bus contracts from which CCME purported to derive revenue were far less profitable than what CCME led the public to believe.

160. Following those disclosures, CCME shares declined $5.52 per share, or 33.23%, to close on February 3, 2011, at $11.09 per share on unusually heavy volume of more than 21.6 million shares traded.

161. On February 1, 2011, CCME issued a press release and on February 7, 2011, Cheng issued a letter to CCME shareholders, claiming to refute the allegations of Citron and Muddy Waters. The assertions in the press release and Cheng's letter were not specific; and they did not satisfy the market. CCME shares closed on February 7 at $13.14 per share but by February 11, 2011, were back down to $11.92 per share, and never again reached their prior high level.

162. CCME failed to provide a credible response to allegations of fraud. DTT sent a letter to the Board and Audit Committee of CCME dated March 3, 2011 (the "DTT Letter"), which stated:

> In the course of our audit of the consolidated financial statements of the Group for the year ended 31 December 2010, we have encountered a number of significant issues which we want to bring to your attention. You should be aware that our audit procedures were extended in some instances in light of the aforesaid allegations. . . .
>
> These are serious issues that raise questions about the validity of certain transactions and balances. We bring these issues to your attention in the context of our responsibilities under Statement on Auditing Standards No. 99 "Consideration of Fraud in Financial Statement Audit" issued by the American Institute of Certified Public Accountants.

163. The DTT Letter included a summary of the public allegations against CCME summarized in a chart as follows:

| Issue date | Allegations | Source | Date notified to Audit Committee |
|---|---|---|---|
| 31 January 2011 | Citron Research Reports on CCME – The China Reverse Merger stock that is "Too Good to be True" | Media | N/A |
| 1 February 2011 | Anonymous email alleging overstatement of revenue in 2009 and 2010. | Deloitte | February 1, 2011 |
| 3 February 2011 | Muddy Waters Research – CCME: Taking the Short Bus to Profits | Media | N/A |
| 8 February 2011 | Email from an individual alleging non-existence of cash balances | Deloitte | February 25, 2011 |
| 11 February 2011 | Open letter from deloittewatch setting out 9 warning signs | Deloitte | February 14, 2011 |
| 21 February 2011 | Email from a private fund manager alleging CCME committing accounting fraud. | Deloitte | February 23, 2011 |
| 23 February 2011 | Letters from Muddy Waters LLC alleging CCME committing securities fraud. | Deloitte | February 23, 2011 |
| 26 February 2011 | Email from reader10-Q's Instablog alleging CCME has made an apparent misrepresentation about a customer relationship | Deloitte | February 28, 2011 |
| 28 February 2011 | Email from LMG Capital alleging CCME committing corporate fraud | Deloitte | February 28, 2011 |
| 2 March 2011 | Email from Muddy Waters presenting its recent research – CCME: Irrefutable Evidence of Fraud | Deloitte | 3 March 2011 |
| 3 March 2011 | Email from the private fund manager (see 21 February 2011 above) presenting additional findings on CCME | Deloitte | 3 March 2011 |

164.    The DTT Letter confirms that the allegations of fraud made in analyst reports were not mere conjecture.  DTT found that there were "serious issues that raise questions about the validity of certain transactions and [CCME bank] balances."

165.     Against the background of the significant allegations of fraud, the DTT Letter set

forth the results of DTT's own preliminary investigation and raised twelve specific concerns:

(i)      DTT's review of bank slips attached in Fujian Fenzhong's accounting

books and the bank statements of Fujian Fenzhong and its subsidiary,

Fujian Suliangou "revealed abnormalities that cast doubts about the

authenticity of these documents."

(ii)     There were also significant abnormalities with Fujian Fenzhong's bank

confirmation and bank statements which "call into question the validity

and authenticity of the bank confirmation and bank statements" provided

to DTT.

(iii)    The Financial Controller of Fujian Fenzhong informed DTT that Fujian

Fenzhong only holds one bank account with the Agricultural Bank of

China but information extracted from the Chinese Administration of

Industry and Commerce ("AIC") showed that Fujian Fenzhong had other

bank accounts and held short-term loans that were not reported to DTT.

(iv)     There were "major inconsistencies" between the audited financial report

of Across Express and the financial report Across Express filed with AIC.

While the two reports were issued by the same accounting firm and

contains the same report reference number, there are large differences in

the revenue information reported on its audited financial statement (RMB

434,040,421.97) and the financial statement submitted to AIC (RMB 0).

(v)      The tax invoices provided to DTT appeared to be invalid.  Certain of the

tax invoices contained a 7-digit invoice number and do not contain any

invoice code.  Tax bureau representatives advised DTT that current tax
invoices should contain an 8-digit invoice number and an invoice code.

(vi)     DTT was unable to confirm tax payments of Fujian Fenzhong and Across
         Express.

(vii)    Searches of Fujian Fenzhong's purported top ten customers indicate that
         one customer has filed for deregistration and the business license of
         another company has been revoked.  In addition, there was no record of
         another customer filed with AIC.

(viii)   DTT received conflicting information in the confirmation process with
         Fujian Fenzhong customers and bus operators.  DTT was unable to locate
         some customers through site visits but confirmation letters were
         successfully delivered by courier to the customers at given locations and
         "confirmation (reply) was returned by customers from these addresses as
         well."  DTT noted irregularities in some of these confirmations including
         the fact that "replies from two customers were mailed at the same post
         office on the same day at the same time and processed by the same staff."

(ix)     DTT received contradictory information from one customer during an
         arranged interview.  The customer could not verify the contracts she had
         with Fujian Fenzhong and "indicated that she could not confirm the
         contracted amount."

(x)      Salary payments at Fujian Fenzhong were made in cash which is an
         "unusual practice."  Fujian Fenzhong did not retain any bank deposit slips
         for salary payments and DTT's review of payment records indicated that

four cash checks were issued on different days each month for cash

withdrawal.  DTT concluded that "[t]here was insufficient information to

ascertain and verify the amount of salary paid each month and to confirm

the exact number of employees working for Fujian Fenzhong."

(xi)    DTT was unable to verify the production process and advertising

programs that were produced by Fujian Fenzhong and, as a result, "were

unable to further verify whether Fujian Fenzhong had in fact displayed the

media content from its intended suppliers."

(xii)    DTT concluded that the bus information provided by Fujian Fenzhong was

inaccurate.  Fujian Fenzhong claimed that there were 22,205 buses playing

CCME programs but DTT concluded that this number was overstated by

approximately 1,330 busses.

**CCME Refuses to Allow DTT to Complete Its Investigation and DTT Resigns**

166.    In its March 3, 2011 letter, DTT requested certain company books and records

and an in-person meeting with CCME's Audit Committee and CCME's legal counsel.  DTT

further recommended that the Company conduct an independent investigation into the

allegations of fraud and requested that it have input into the scope of such an investigation.

167.    On information and belief, CCME did not provide DTT with the information and

documents it requested.  In light of management's inability or unwillingness to resolve DTT's

concerns, DTT resigned as the outside auditor of CCME on March 11, 2011.  In its resignation

letter, DTT cited, among other reasons, significant issues encountered in its audit and concerns

regarding the bank account balances held by CCME in China.  DTT's resignation letter stated:

> We have reached the conclusion that the Company is minded not to proceed in
> good faith on the basis of our requested course of action.  As a result, in our

opinion, the Board and the Audit Committee do not have a proper basis for concluding that the 2010 consolidated financial statements are free from material misstatement in respect to the above allegations and issues. In view of the foregoing, we have lost confidence in the representations of management (which underpin any audit) and also in the commitment of the Board and the Audit Committee to good governance and reliable financial reporting and hence our resignation.

168. On information and belief, based on court filings in this matter, Cheng refused to permit Deloitte to complete its work.

169. Simultaneously with this announcement, trading in CCME stock on NASDAQ was halted on March 11, 2011, and has never resumed, rendering Starr's CCME stock essentially worthless.

170. DTT's findings were discussed at a March 13, 2011 Board meeting. The results of management's inaction following the resignation of its auditor shortly before 10-K reports were to be filed prompted board member, Dong, to write in her resignation letter:

The conduct of CCME's management leading up to the resignation by Deloitte as CCME's auditor, and management's resistance to the protective measures which I and other independent directors proposed at, amongst other occasions, the board meeting on 13 March 2011, have raised serious questions in my mind as to whether my continued membership on the board of CCME will, or can, serve any purpose beneficial to the interests of CCME's shareholders.

171. On March 31, 2011, CCME filed a Form 8-K/A disclosing that DTT had "informed [CCME] in its resignation letter that it was no longer able to rely on the representations of management and that it had lost confidence in the commitment of the Board and the Audit Committee to good governance and reliable financial reporting." Among the issues DTT raised before resigning were "the authenticity of bank statements; a loss of confidence in bank confirmation procedures carried out under circumstances which DTT believed to be suspicious; issues concerning the validity of certain advertising agents/customers

and bus operators (including with respect to certain of the Company's top ten customers); concerns over possible undisclosed bank accounts and bank loans"; and other issues.

172.    According to the Form 8-K/A, "DTT had requested that the bank confirmation process be re-done at the banks' head office and that the issues described above be addressed by an independent forensic investigation."

173.    The Form 8-K/A also disclosed that "in the absence of the further investigatory procedures that DTT requested, DTT was unable to determine whether the prior periods' financial statements are reliable."

174.    Thus, on information and belief, during its normal audit procedures, including its review of the prior audits performed by Robbins, DTT did not previously attempt to get confirmation of CCME's alleged cash balances in Chinese bank accounts directly from the bank's headquarters, as it should have done.  It was only after public allegations of fraud at CCME surfaced in early 2011 that DTT considered performing this basic audit procedure.

175.    On April 1, 2011, CCME received a letter from NASDAQ stating that CCME would be suspended from trading on April 12, 2011 for failure to timely file a form 10-K subject to CCME's right to appeal.  CCME was delisted effective May 19, 2011, after a NASDAQ hearing panel denied CCME's request for continued listing.  As a result, CCME common stock cannot be traded on any public securities exchange and is essentially worthless.

176.    On April 6, 2011, CCME disclosed a March 25 letter in which DTT stated (referring to its March 11 resignation letter) "We have since reached the conclusion that we are no longer able to place reliance on management representations in relation to prior period financial reports.  Accordingly, we request that the Company take immediate steps to make the necessary 8-K/A filing to state that continuing reliance should no longer be placed on the audit

report on the 2009 financial statements and moreover that we decline to be associated with any

of [CCME]'s financial communications during 2010 and 2011."

**Another Board Member Resigns**

177.    On April 7, 2011, Marco Kung, director and chairperson of the Audit Committee,

resigned from his positions with the Company. His resignation letter questions the independence

of the Board and the Board's ability to engage an outside firm to properly investigate allegations

of wrongdoing.  Kung's resignation letter stated:

> I have resigned because I cannot execute my fiduciary duties and my roles of Chairman
> of [the Audit Committee] as well as an Independent Director for selecting and engaging
> capable and appropriate independent professionals and parties with sound reputation for
> performing the independent investigation to the Company. [sic]
>
> Even though a number of discussions and meetings were gone through in the past few
> weeks, I was not provided by the Chairman and CEO, and other senior managements of
> any prompt response and tangible actions for resolutions passed in our Board meetings
> dated 13 March 2011 and 17 March 2011.

178.    On April 29, 2011, the Company announced that as a result of Mr. Kung's

resignation, the Company no longer complied with NASDAQ Rule 5605(c)(2)(A), which

requires that the Company's audit committee consist of three independent directors, and that the

NASDAQ Staff exercised its discretionary authority under Listing Rule 5101 to deny the

Company a cure period to regain compliance with the audit committee composition requirement.

179.    On May 2, 2011 the Company issued a press release announcing that it had

retained law firm DLA Piper "to assist in [the Company's] investigation of concerns raised by

[DTT] when it resigned as the Company's registered independent accounting firm on March 11,

2011."  The Company has not revealed any other details about the purported investigation or

which board members were involved in hiring DLA Piper.

**CCME Refuses Requests from Shareholders for Information**

180.    On May 2, 2011 Starr made a request pursuant to 8 *Del. C.* § 220 to inspect books and records of CCME for the purposes of investigating potential breaches of fiduciary duties and to determine whether a demand on the board would be futile.  The Company did not respond to Starr's demand within the statutorily-required five-day period and Starr brought an action in the Delaware Court of Chancery seeking an order requiring CCME to provide Starr with the books and records it requested.

181.    On June 16, 2011 another purported CCME shareholder filed a similar action alleging that the Company did not respond to his demand made pursuant to Section 220 for books and records relating to the recent allegations of fraud.

### Conspiracy Allegations

182.    On information and belief, using as a basis the preceding paragraphs, defendants Cheng, Lam, Green, Bird, Ou Wen Lin and Qingping Lin and their holding companies, Thousand Space and Bright Elite, respectively, entered into a conspiracy in order to bring Hong Kong Mandefu to the United States securities market, and thereby defraud investors.

183.    On information and belief, based on the aforementioned contacts with CCME's board of directors and management team, Ou Wen Lin and Qingping Lin and their holding companies, Thousand Space and Bright Elite, respectively, had access to and/or control over internal reports and other data and information about CCME's finances, operations and sales, and agreed, whether tacitly or explicitly, with Cheng and Lam to engage in the aforementioned conduct.

184.    On information and belief, based on the aforementioned contacts with Hong Kong Mandefu's board of directors and management team, Green and Bird had access to and/or control over internal reports and other data and information about CCME's finances, operations

and sales, and agreed, whether tacitly or explicitly, with Cheng and Lam to engage in the aforementioned conduct.

185.    All eight parties did agree and did consummate this agreement through the October 2009 proxy, thereby forming a confederation to defraud Starr and U.S. investors.

## Reasonable Reliance

186.    Starr purchased or otherwise acquired CCME's securities at artificially inflated prices during the relevant time period while reasonably relying upon Defendants' misleading statements and omissions, and has been damaged thereby.

187.    Defendants materially misled Starr and the entire investing public by issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about CCME's business, operations, and prospects as alleged herein.

188.    At all relevant times, the material misrepresentations and omissions particularized in this Amended Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Starr.  As described herein, during the relevant time period, Defendants made or caused to be made a series of materially false and/or misleading statements about CCME's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating an unrealistically positive assessment of the Company and its financial well-being and prospects.  Defendants' materially false and/or misleading statements during the relevant period resulted in Starr's purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

189.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Starr.  Absent the SEC filings, public assurances, direct representations and other communications, and the participation of a reputable independent accounting firm such as DTT, Plaintiff would not have purchased and maintained the 1.5 million shares of CCME or converted its warrants to shares of common stock, which are now rendered essentially worthless.  Absent the misleading statements of Green, Bird, and Lam, and the participation of Robbins, Starr would not have made its initial investment in CCME.

190.     Even if CCME should prove not to be a fraud, Plaintiff purchased CCME's securities at artificially inflated prices and was damaged thereby.  When the misrepresentations and/or the information alleged herein to have been concealed and/or the effects thereof were revealed, the price of the Company's securities significantly declined; the Company's auditor, DTT, and several board members resigned; trading in CCME common stock was halted; and ultimately CCME's stock was permanently delisted, rendering the stock effectively worthless and causing Starr's losses.

## Loss Causation

191.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Starr.

192.     Starr purchased CCME's shares at artificially inflated prices and was damaged thereby.  The CCME shares owned by Starr became effectively worthless when the misrepresentations made to Starr and to the market and/or the information alleged herein to have been concealed from the market, and Starr specifically, and/or the effects thereof, were revealed, resulting in the delisting of CCME stock and causing Starr's loss.

### Defendants CCME, Cheng, Lam, Lin, Green and Bird's Scienter

193. As alleged herein, Defendants acted with scienter in that Defendants knew, should have known, or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to Starr and to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their exclusive access to and control over information reflecting the true facts regarding CCME, their control over, and/or receipt and/or modification of CCME's allegedly materially misleading misstatements and/or their associations with the Company which made them uniquely privy to confidential proprietary information concerning CCME, participated in the fraudulent scheme alleged herein.

194. Defendants made materially false and/or misleading representations, including with respect to the extent of CCME's revenue and earnings, for the purpose of, *inter alia*, enabling the payment of earn-outs and artificially inflating the value of CCME shares. Cheng and Lam's desire to receive earn-outs, and to allow insiders, including Green, Bird, and the Lin Defendants, to sell shares at an artificially inflated price to the investing public, and to Starr in particular, just a short time before the fraud was unraveled, combined with Defendants' unique position of exclusive access to CCME's financial information, provides that Defendants' motive and opportunity to carry out the fraudulent acts as alleged herein and gives rise to a strong inference of scienter.

195. Defendant CCME, through the actions of its controlling officers, including defendants Cheng and Lam, knew, should have known, or recklessly disregarded that the

information being submitted was false, and made material misrepresentations or omissions and failed to correct prior misrepresentations.

196.    Defendant Cheng was an officer and director of CCME and a signatory to filings submitted to the SEC.  In addition, Cheng was majority owner and at all relevant times in control of Fujian Fenzhong.  Cheng knew, should have known, or recklessly disregarded that the information being submitted was false and made material misrepresentations or omissions and failed to correct prior misrepresentations.  Cheng made materially false and/or misleading representations, including with respect to the extent of CCME's revenue and earnings, the size of its bus fleet, and the customers it serviced, for the purpose of, *inter alia*, enabling the payment of earn-outs and artificially inflating the value of CCME shares.  Cheng's desire to receive earn-outs and to allow insiders to sell shares at an artificially inflated price to the investing public, and to Starr in particular, just a short time before the fraud was unraveled, combined with his unique position of exclusive access to CCME's financial information at all levels of the company, provides motive and opportunity to carry out the fraudulent acts as alleged herein and gives rise to a strong inference of scienter.

197.    Defendant Lam was a director and officer of the CCME and a signatory to filings submitted to the SEC.  In addition, as CFO, Lam was at all relevant responsible for the consolidated financial statements of CCME, which included Fujian Fenzhong.  He knew, should have known, or recklessly disregarded, that the information being submitted was false and made material misrepresentations or omissions and failed to correct prior misrepresentations.  Lam made materially false and/or misleading representations, including with respect to the extent of CCME's revenue and earnings, the size of its fleet, and the customers it serviced, for the purpose of, *inter alia*, enabling the payment of earn-outs and artificially inflating the value of CCME

shares. Lam's desire to increase the value of the CCME shares he owned, as well as to allow insiders to sell shares at an artificially inflated price to the investing public, and to Starr in particular, just a short time before the fraud was unraveled, combined with his unique position of exclusive access to CCME's financial information, provides motive and opportunity to carry out the fraudulent acts as alleged herein and gives rise to a strong inference of scienter.

198. Furthermore, Defendants Cheng and Lam each certified in relevant SEC filings that they: (1) were the two individuals responsible for establishing and maintaining disclosure controls and procedures and internal controls over financial reporting; (2) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision; (3) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision; and (4) evaluated the effectiveness of the disclosure controls and procedures. Given that the Company had a relatively small number of paid staff, having only nine staff members involved in finance as of December 31, 2009, and a total of seven senior managers, it is not plausible to suggest that a different subset of management, employees of Fujian, or lower-level employees at CCME could have perpetrated and concealed the fraud from Defendants Cheng and Lam. Based on the above certifications made by Defendants Cheng and Lam, the small number of staff with oversight over the Company's finances, and senior management's strict control over the Company's operations, Defendants Cheng and Lam knew, should have known, or recklessly disregarded that the information being submitted was false and made material misrepresentations or omissions and failed to correct prior misrepresentations.

199. Defendants Thousand Space and Bright Elite, through the actions of their sole controlling shareholders and directors, Ou Wen Lin and Qingping Lin respectively, knew, should

have known, or recklessly disregarded that the information being submitted was false, and made material misrepresentations or omissions and failed to correct prior misrepresentations.

200. Defendants Ou Wen Lin and Qingping Lin, through their wholly owned and controlled holding companies, Thousand Space and Bright Elite respectively, were significant shareholders of Hong Kong Mandefu prior to the reverse merger, with superior access to board members, management and information. On information and belief, they knew, should have known, or recklessly disregarded that the information upon which Starr relied was false. The Lin Defendants sold 1.5 million shares of CCME stock to Starr at an artificially inflated price a few weeks before the truth about the nature and the extent of CCME's business relationships and operations was disclosed to Starr and the public, ultimately rendering CCME common stock essentially worthless.

201. The Lin Defendants did not regularly sell shares of CCME stock. According to public filings, the transaction with Starr was the first time that the Lin Defendants sold a substantial portion of their holdings. As further alleged above, the Lin Defendants dumped their shares on Starr after the Company was listed in the U.S. and just prior to the unraveling of the fraud.

202. In addition, as further alleged above, the Lin Defendants stood to receive TM/CCME earnout shares in the Third Quarter of 2010, pursuant to the terms of the reverse merger, based on CCME's purported financial performance. Their desire to receive their earnout shares as well as to sell a substantial portion of their shares only a short time before the fraud unraveled, combined with their unique position of exclusive access to CCME's financial information, provides motive and opportunity to carry out the fraudulent acts as alleged herein and gives rise to a strong inference of scienter.

203.    Defendants Green and Bird were officers of TM and directors of CCME.  They
were signatories to filings submitted by TM to the SEC and relied on by Starr in making its
decision to invest in CCME.  Green and Bird claimed to have conducted months of extensive due
diligence before the reverse merger that created CCME, and knew, should have known, or
recklessly disregarded, that the information being submitted in the October 2009 proxy was
false, and made material misrepresentations or omissions and failed to correct prior
misrepresentations.  Pursuant to CCME's 2010 Form S-3, the remaining shares of CCME stock
held by Green and Bird were registered for sale to the public, enabling them to sell those shares a
few weeks before the truth was disclosed, which would have rendered their CCME common
stock essentially worthless.  Their desire to cash out their pre-IPO shares and their unique
position of access to Hong Kong Mandefu's financial information provides motive and
opportunity to carry out the fraudulent acts as alleged herein and gives rise to a strong inference
of scienter.

### The Auditor Defendants' Scienter

204.    In April 2003, the PCAOB adopted certain preexisting standards as its interim
auditing standards.  Pursuant to PCAOB Rule 3200T, Interim Auditing Standards consist of
generally accepted auditing standards, as described in the AICPA's Auditing Standards Board's
Statement of Auditing Standards No. 95, as in existence on April 16, 2003, to the extent not
superseded or amended by the PCAOB.[4]

205.    The Auditor Defendants' scienter is evidenced by their repeated failure to adhere
to these basic auditing standards in the face of multiple red flags.  The Auditor Defendants knew,

---

[4] References to these standards in this Amended Complaint have the prefix AU.

should have known, or recklessly disregarded that CCME's financial statements contained material misstatements that were the result of fraud.

206.    The following facts constitute actual evidence of and give rise to a strong inference that the Auditor Defendants acted with scienter.

*Robbins Made False and Misleading Disclosures*

207.    Robbins knew, should have known, or recklessly disregarded that its audit report of Hong Kong Mandefu's annual financial statements for 2006, 2007, and 2008 would be disseminated in TM's October 2009 Proxy and CCME's 2009 10-K filed March 31, 2010 and the 2010 Form S-3.

208.    Robbins directly participated in the CCME fraud by ignoring material facts, violating the basic standards of the accounting profession, and knowingly or recklessly certifying the Company's false financial statements.  Among other things, Robbins represented in is audit opinion letter(s) dated February 7, 2009 that "we conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."  Robbins also certified that CCME's 2006, 2007, and 2008 financial statements were "in conformity with accounting principles generally accepted in the United States of America" and Robbins' audits provided a "reasonable basis" for its opinions.  These statements were materially false and misleading because Robbins knew, or but for its reckless disregard should have known, that it failed to conduct its audits in accordance with GAAS, that CCME had fundamentally misrepresented the condition of its business, and that CCME's financial statements for fiscal years 2006 through 2008 were materially misstated and not presented in conformity with GAAP.

209.    Robbins further reviewed CCME's financial statements for the first six months of 2009 to be included in the October 2009 Proxy.  Among other things, Robbins represented in its

audit opinion letter dated September 8, 2009, that "we conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States)." Robbins stated: "Based on our review, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America."

210.    GAAS requires that the auditor understand the client's industry and business and be knowledgeable about matters that relate to the nature of the entity's business, its organization, and operating characteristics. AU 311.07.  Auditors are also required to consider matters affecting the client's industry, including "matters such as accounting practices common to the industry, competitive conditions, and, if available, financial trends and ratios." *Id.*  Furthermore, the audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.  AU 150.

211.    On information and belief, based on the facts set forth above, Robbins was not familiar with and did not take sufficient steps to become familiar with Chinese norms and languages, and its personnel did not have sufficient knowledge of the bus advertising business in China, and were not adequately trained and proficient to perform CCME's 2008 audit.  Had Robbins understood CCME's business and industry and performed the analytical procedures required by GAAS, it would have identified a myriad of unrealistic claims, which would or should have elevated Robbins' risk assessment and resulted in additional procedures with heightened skepticism that would have, in turn, revealed that CCME's financial statements did not conform to GAAP.

212.    Two recent PCAOB inspection reports demonstrate that Robbins has a history of failing to obtain competent evidential matter to support its audit opinions.  These reports note

that in 57% (4 out of 7) of Robbins' audits inspected, the PCAOB identified significant

deficiencies.

213.    On December 22, 2008 the PCAOB issued a release detailing the PCAOB's

inspection team's findings in its inspection of Robbins' audit procedures.  The inspections were

designed to "identify and address weaknesses and deficiencies related to how a firm conducts

audits."  The PCAOB inspection team reviewed two of Robbins' audits and "identified what it

considered to be audit deficiencies . . . in both of the audits reviewed." The deficiencies were "of

such significance that it appeared to the inspection team that [Robbins] did not obtain sufficient

competent evidential matter to support its opinion on the issuer's financial statements."

214.    On March 31, 2010 the PCAOB issued a second report in which it disclosed,

without naming the audits involved, that "two of the [five] audits reviewed [by the PCAOB]

included deficiencies of such significance that it appeared to the inspection team that [Robbins]

did not obtain sufficient competent evidential matter to support its opinion on the issuer's

financial statements."

*DTT Made False and Misleading Disclosures*

215.    DTT was instrumental in getting Starr to invest in CCME.  DTT auditors first

introduced Starr to CCME in July 2009 for the purpose of a potential investment.  After an

affiliate of DTT conducted due diligence on CCME for Starr, DTT became CCME's auditor.

Starr relied on DTT's professional reputation and the integrity of its anticipated audit work in

deciding to make investments in CCME.  Starr would never have invested in CCME if CCME

had not retained DTT or another Big Four accounting firm as its auditor.

216.    After Starr made its initial investment, DTT provided periodic updates about

CCME's finances directly to Starr.  There were at least two in-person meetings between DTT

and Starr in which DTT made representations directly to Starr about CCME's finances and internal controls.

217.     On or about October 11, 2010 DTT met with Starr and represented, among other things, that it was conducting management interviews as part of its Sarbanes-Oxley program review.

218.     On or about December 12, 2010 DTT met with Starr and certain officers and directors of CCME to discuss DTT's review of CCME's finances and internal controls.  At that meeting, DTT made several representations, including that there were no major outstanding deficiencies in its Sarbanes-Oxley review and that DTT conducted a fraud interview with CCME management and reached a positive conclusion.

219.     DTT knew, should have known, or recklessly disregarded that its audit report of CCME's annual financial results for 2009 and other statements regarding CCME's finances would be disseminated in CCME's 2009 10-K filed March 31, 2010, and incorporated in CCME's 2010 Form S-3, and would be used in trade and commerce in the United States and relied upon by Starr.

220.     DTT directly participated in the CCME fraud by ignoring material facts, violating the basic standards of the accounting profession, and knowingly or recklessly certifying the Company's false financial statements.   Among other things, DTT represented in its audit opinion letter dated March 30, 2010 that "we conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)."  DTT also certified that CCME's 2009 financial statements were "in conformity with accounting principles generally accepted in the United States of America" and DTT's audits provided a "reasonable basis" for its opinions.  These statements were materially false and misleading when made

because DTT knew, or but for its reckless disregard should have known, that it failed to conduct its audits in accordance with PCAOB Standards (GAAS), that CCME had fundamentally misrepresented the condition of its business, and that CCME's financial statements for fiscal year 2009 were materially misstated and not presented in conformity with U.S. GAAP.

221.    CCME's financial statements for the fiscal year ending December 31, 2009 were materially false and misleading; contained untrue statements of material facts; omitted material facts necessary to make the statements made, under the circumstances in which they were made, not misleading; and failed to adequately disclose material facts.

*The Auditor Defendants Failed to Confirm CCME's Unusual Growth Pattern and Profitability*

222.    GAAS requires that analytical procedures performed when planning the audit should "identify such things as the existence of unusual transactions and events, and amounts, ratios and trends that might indicate matters that have financial statement and audit planning ramifications." AU 329.06.  Auditors are also required to understand the client's industry and business and to be knowledgeable about matters that relate to the nature of the entity's business, including "matters, such as accounting practices common to the industry, competitive conditions, and, if available, financial trends and ratios."  AU 311.07.

223.    GAAS also requires that auditors plan and perform their audits to obtain reasonable assurance that the financial statements subject to audit are free of material misstatement, whether caused by error or fraud.  AU 230.  "Although fraud usually is concealed and management's intent is difficult to determine, the presence of certain conditions may suggest to the auditor the possibility that fraud may exist.  For example, an important contract may be missing . . . or the results of an analytical procedure performed during the audit may not be consistent with expectations."  AU 316.11.

224.     During their audits, both of the Auditor Defendants failed to perform adequate analytical procedures required by GAAS.  Had the Auditor Defendants understood CCME's business and industry and performed the analytical procedures required by GAAS, they would have identified a myriad of unrealistic relationships, which should have elevated the Auditor Defendants' risk assessments and resulted in additional procedures with heightened skepticism that would have, in turn, resulted in discovery of the true facts.

225.     The Auditor Defendants failed to adequately confirm representations of CCME management in light of glaring red flags relating to CCME's unusual growth pattern and profitability including, but not limited to, the following:

(i)      enormous profits and growth rates, with a relatively tiny number of paid staff;

(ii)     reported operating income far higher than its competitors;

(iii)    despite having spent a mere fraction of what competitors have on infrastructure, CCME reportedly grew profits from $2 million to its recently raised guidance of $85 million expected in 2011 on revenues of $200 million; and

(iv)     management claims that the Company has grown faster and produced more cash flow than any other U.S.-listed Chinese media company over the last four years.

226.     The Auditor Defendants failed to consider that CCME's revenue per digital screen was significantly greater than its competitors.  Advertising revenue per screen was roughly double the competition, despite the fact that CCME does not own all the advertisement time on its screens.

227.    Also, CCME claims that it generated $15 million in the third quarter of 2010 from express buses operating in six airports, a number which Muddy Waters indicated was about 200% the Q3 2010 revenue that CCME's competitor AMCN derived from its 2,200 digital television screens in 38 airports, including 26 of the 30 busiest airports in China.

228.    As reported in CCME's 8K filed on March 29, 2011, DTT admitted that it was unable to verify "certain advertising agents/customers and bus operators (including with respect to certain of the Company's top ten customers)."

*The Auditor Defendants Failed to Confirm CCME's Unrealistically High Cash Flow*

229.    On information and belief, CCME's year-end and quarterly financial statements also vastly overstated the amount of cash on hand.

230.    Auditors are required look at evidentiary material to confirm management representations.  Specifically, auditors should consider "original documents," evidence "obtained from knowledgeable independent sources outside the entity," and "the reliability of the information to be used as audit evidence, for example, photocopies; facsimiles; or filmed, digitized, or other electronic documents, including consideration of controls over their preparation and maintenance where relevant."  AU 326.08-09.  GAAS requires that the auditor gather and objectively assess evidence to support his opinion with diligence, integrity, and good faith.  More specifically, due professional care requires the auditor to exercise professional skepticism, which "is an attitude that includes a questioning mind and a critical assessment of audit evidence."  AU 230.07.  "In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest."  AU 230.09.

231.    Following GAAS requirements, auditors should send confirmation letters to a client's banks and customers requesting that the third party provide evidence to support the client's cash and accounts receivable balances. GAAS recognize that information obtained directly from third parties, like that obtained through properly designed and executed confirmation procedures, provides auditors with high quality audit evidence. "When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity." AU 330.21. In addition, "[p]rofessional skepticism is important in designing the confirmation request, performing the confirmation procedures, and evaluating the results of the confirmation procedures." AU 330.15.

232.    The Auditor Defendants violated GAAS by failing to obtain adequate evidential matter supporting CCME's financial statements and related disclosures, and by failing to confirm management's representations and financial statement assertions given the numerous red flags. As a result, the Auditor Defendants failed to obtain sufficient competent evidence to support their audit opinions.

233.    During their audits, the Auditor Defendants failed to perform adequate analytical procedures required by GAAS and failed to notice the significant red flags related to CCME's purported reported cash flow and bank balances. For example, over the last eight quarters, CCME reported generating $95 million of cash flow after all capital expenditures and for-cash acquisitions, which is unusually high. The sheer magnitude of cash and accounts receivable, 73% and 84% of CCME's total reported assets for 2008 and 2009, respectively, was a red flag that should have prompted the Auditor Defendants to confirm CCME's cash and accounts receivable balances directly with bank headquarters and customers.

234. CCME also reported interest income amounts significantly lower than what would be expected in light of prevailing contemporaneous rates paid by Chinese banks. For the year ended December 31, 2008 CCME reported interest income of only $100,000 while its average cash balance during 2008 was purportedly $18,180,599, resulting in an assumed interest rate of 0.55%. However, according to the World Bank, the average interest rate paid to Chinese depositors during 2008 was 2.3%. For the year ended December 31, 2009 CCME reported interest income of $113,000 while the average cash balance during 2009 was $43,574,000, resulting in an assumed interest rate of 0.26%. However, according to the World Bank, the average interest rate paid to Chinese depositors during 2009 was 2.3%.

235. DTT also failed to confirm CCME's stated cash balances in Chinese bank accounts with each bank's headquarters prior to its investigation in early 2011. Instead, DTT relied on a combination of management representations and representations of local bank branches. DTT admitted *after* allegations of fraud at CCME came to light that the bank confirmations it received "call[ed] into question the validity and authenticity of the bank confirmation and bank statements provided to us."

236. On information and belief, if the Auditor Defendants had properly performed confirmation procedures regarding CCME's cash balances during the 2008 and 2009 audits, they would have discovered similar issues with the claimed bank balances in those years.

*The Auditor Defendants Failed to Investigate CCME's Conflicting Management Representations*

237. The Auditor Defendants did not exercise "due professional care" in the "performance of the audit and the preparation of [their] report" as required by GAAS. AU 150. Under this PCAOB Standard, auditors are required to exercise professional skepticism, which is an attitude that includes a questioning mind and a critical assessment of audit evidence.

238.    Representations from management "are part of the evidential matter the independent auditor obtains, but they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU 333.02.

239.    The auditor should exercise an appropriate level of professional skepticism throughout the confirmation process. AU 330.15.

240.    Auditors need to assess all representations provided by management and be alert for contradictory information as this reflects on the overall quality of management's representations. "If a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made. Based on the circumstances, the auditor should consider whether his or her reliance on management's representations related to other aspects of the financial statements is appropriate and justified." AU 333.04.

241.    If the auditor is precluded from performing necessary audit procedures, the auditor should qualify his or her opinion or disclaim an opinion even if management has given representations concerning the matter. AU 333.14.

242.    The Auditor Defendants knew, should have known, or recklessly disregarded that CCME's management was providing a number of contradictory representations. As a result, the Auditor Defendants were required under GAAS to appropriately investigate these contradictions and/or qualify their audit reports. They did neither.

243.    The Muddy Waters Research Report revealed significant contradictory representations including that in CCME's January 13, 2011 press release, the Company claimed to have over 27,200 buses under contract but the spreadsheet provided as part of its advertiser kit

shows that CCME has only 12,565 buses. Muddy Waters also noted that there are inconsistencies between numbers provided in financial and tax filings in China and financial disclosures made to the SEC.

244. In 2011, DTT admitted that it "observed conflicting information in the confirmation process with customers and bus operators. [DTT] conducted site visits but could not locate some of the customers and bus operators at their last known address provided by Fujian Fenzhong, including the company without registration with AIC. However, confirmation letters were successfully delivered by courier to these customers at the given locations and confirmation (reply) was returned by customers from these addresses as well."

245. In 2011 DTT also "compared Fujian Across Express Information Technology Co. Ltd. ('Across Express')'s audited financial report of 2009 with the audited financial report filed with the AIC (subsequent to [DTT's] 2009 audit) and found that although the two reports were issued by the same accounting firm and contains the same report reference number, there are huge differences in the information Across Express reported." The differences were set forth as follows:

| Item | Audit Report provided to DTT | Audit Report filed with AIC |
|---|---|---|
| Total Assets | RMB 521,409,081.70 | RMB 4,400,343.18 |
| Total Liabilities | RMB 44,809,524.16 | RMB 221,146.78 |
| Ending Cash Balance | RMB 747,964.78 | RMB 39,100.97 |
| Revenue | RMB 434,040,421.85 | RMB 0 |
| Tax Payable | RMB 43,688,711.97 | RMB 0 |
| Taxes Paid | RMB 80,802,451.85 | RMB -40.13 |

246. DTT also revealed in 2011 that it was unable to confirm the existence of all 22,205 buses CCME claims to have and believes that approximately 1,330 buses were over counted.

247. After conducting its additional procedures in 2011, DTT admitted that "Company searches of the top ten customers of Fujian Fenzhong indicate that one customer has filed for deregistration and the business license of another company has been revoked. Both companies are advertising agents instead of ultimate advertisers. In addition, there is no record of another customer . . . filed with the AIC. These companies therefore do not appear to have proper legal status."

248. The Auditor Defendants knew, should have known, or recklessly disregarded the above or similar inconsistencies in CCME's representations during the 2008 and 2009 audits. By failing to do so, the Auditor Defendants did not follow GAAS and should not have certified that CCME's 2008 and 2009 financial statements were in conformity with GAAP.

249. DTT has now admitted that it cannot rely on the information it had received from the Company and has been unable to confirm certain financial information provided to DTT, including tax invoices, salary payments, and financial information. DTT has stated that CCME's prior period financial statements cannot be relied upon. The fact that the Company may now have to restate all its financial statements based on basic questions that a professional firm and expert auditors should have asked from the start, leads to the conclusion that DTT and Robbins knowingly, negligently, and/or recklessly participated in the material misrepresentations.

*The Auditor Defendants Failed to Consider Fraud Risk Factors and Failed to Detect the Fraud at CCME*

250.     GAAS requires that the auditors plan and perform their audits to obtain reasonable assurance that financial statements subject to audit are free of material misstatement, whether caused by error or fraud.

251.     "Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks." AU 316.13.  "Although fraud is usually concealed and management's intent is difficult to determine, the presence of certain conditions may suggest to the auditor the possibility that fraud may exist.  For example, an important contract may be missing . . . or the results of an analytical procedure performed during the audit may not be consistent with expectations." AU 316.11.

252.     Auditors are also required to consider whether fraud risk factors are present and, if present, respond to such risks through appropriate audit procedures.  GAAS provides a number of explicit examples of fraud risk factors that were present at CCME.

253.     One risk factor is transactions that are outside the normal course of business for that entity, or that otherwise appear to be unusual.  In these situations, auditors need to understand "the business rationale for such transactions and whether that rationale (or lack thereof) suggests that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets." AU 316.66.

254.     In its March 3, 2011 letter, DTT noted that Fujian Fenzhong has an "unusual practice for salary payments."  DTT documented that salary payments were made in cash for each month of 2010 and that the only supporting document was a salary form containing signatures of employees working in different Fujian Fenzhong offices.

255.   DTT does not describe this as a new practice, leading to the conclusion that similar payments occurred during 2008 and 2009, which the Auditor Defendants knew or should have known.

256.   Another risk factor explicitly identified by GAAS relates to managements' or Board members' personal net worth being threatened by the entity's financial performance.  AU 316.85.

257.   Defendant Cheng held approximately 13 million shares of CCME, and therefore, on information and belief, his personal net worth was directly threatened by CCME's financial performance.

258.   In addition to specific examples of fraud risk factors, GAAS makes clear that auditors should consider whether other fraud risks are present that need to be addressed. "Although the risk factors [specifically listed in GAAS] cover a broad range of situations, they are only examples and, accordingly, the auditor may wish to consider additional or different risk factors."  AU 316.85.  The fact that CCME was a Chinese company that was listed on a U.S. stock exchange through a reverse merger presented an additional fraud risk factor which should have put the auditor on notice that the financial statements may be fraudulent.

259.   Both Citron and Muddy Waters identified a plethora of information pointing to CCME being a fraud, including but not limited to:  SAIC documents, credit rating agency documents, quotes from industry professionals, and a financial analysis.

260.   DTT only acknowledged the fraud after commencing additional procedures in 2011.  For example, in 2011 DTT reviewed the bank slips attached in Fujian Fenzhong's accounting books as well as the bank statements of Fujian Fenzhong and its subsidiary.  The review revealed anomalies and cast doubts about the authenticity of such documents.

261.     Despite having the express obligation under applicable PCAOB standards to obtain reasonable assurances that CCME's financial statements were free of material misstatement due to fraud, and despite having access to CCME's books and records throughout the audit period, the Auditor Defendants failed to detect CCME's fraud.

262.     The Auditor Defendants did not adequately assess and respond to the fraud risks and failed to employ the level of professional skepticism required by GAAS.

263.     The Auditor Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted in reckless disregard of the truth in failing to ascertain and to disclose the true facts, even though such facts were exclusively available to the Auditor Defendants.

## No Safe Harbor

264.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint.  Many or all of the specific statements pleaded herein were not identified as (and were not) "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements pleaded herein.  Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CCME who knew that those statements were false when made.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants)

265.    Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

266.    During the relevant period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the relevant period, did: (i) deceive the investing public, including Plaintiff, as alleged herein; and (ii) caused Plaintiff to purchase CCME's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

267.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff Starr in connection with its purchases of CCME stock.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

268.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CCME's financial well-being and prospects, as specified herein.

269.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of CCME's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about CCME and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Starr and other purchasers of the Company's securities during the relevant period.

270. Defendants Cheng and Lam's primary liability and controlling person liability arises from the following facts: (i) Cheng and Lam were high-level executives and directors at the Company during the relevant period and members of the Company's management team or had control thereof; (ii) by virtue of their responsibilities and activities as senior officers and/or directors of the Company, Cheng and Lam were uniquely privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Cheng and Lam signed certificates filed with the SEC; (iv) Cheng and Lam enjoyed significant personal contact and familiarity with the other defendants and were advised of, and had unique access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (v) Cheng and Lam were aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

271. As an additional basis for liability, Defendant Cheng: (i) held the position of majority owner of Fujian Fenzhong and had knowledge and control over the company; (ii)

because of his unique position as both CEO of CCME and majority owner of Fujian Fenzhong,

had knowledge of discrepancies between information communicated to the investing public and

the materially different financials, business relationships, and other information those

communications were based upon; (iii) enjoyed significant personal contact and familiarity with

the other defendants and was advised of, and had unique access to, Fujian Fenzhong's

management team, internal reports and other data and information about the Company's

finances, operations, and sales at all relevant times; and (iv) was aware of Fujian Fenzhong's and

other CCME subsidiaries' dissemination of false information to CCME, and knew or recklessly

disregarded that it was materially false or misleading.

272.     As an additional basis for liability, Defendant Lam: (i) held the position of CFO

of CCME and had access to the books and records of CCME and the financial reports of Fujian

Fenzhong, (ii) had personal contact with Defendant Cheng and members of Fujian Fenzhong's

management team, (iii) was part of the CCME management team and had unique access to

internal reports and other data and information about the Company's finances, operations, and

sales at all relevant times; (iv) knew or recklessly disregarded that CCME's public statements

about the Company's finances were materially false or misleading; and (v) communicated

directly with Starr.

273.     Defendants Bird and Green's primary liability and controlling person liability

arise from the following facts: (i) Green and Bird were high-level executives and directors at TM

during the period in which Hong Kong Mandefu was acquired and were members of TM's

management team or had control thereof; (ii) by virtue of their responsibilities and activities as

senior officers and/or directors of TM, Green and Bird were uniquely privy to and participated in

the investigation, due diligence, and reporting of CCME's internal budgets to their shareholders

in the October 2009 proxy; (iii) Green and Bird enjoyed significant personal contact and familiarity with the other defendants and were advised of, and had unique access to, other members of CCME's management team, internal reports and other data and information about CCME's finances, operations, and sales at all relevant times; (iv) Green and Bird were aware of CCME's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading; and (v) Green and Bird made false and or misleading statements, including statements made in the October 2009 proxy.

274. Defendants Ou Wen Lin and Qingping Lin's primary liability and controlling person liability arise from the following facts: (i) Ou Wen Lin and Qingping Lin, acting through their holding companies, along with Cheng, were the founders of the Company and at all relevant times were substantial shareholders in the Company; (ii) the Lins enjoyed significant and longstanding personal contact and familiarity with the other defendants and were advised of, and had unique access to and/or control over, certain members of the Company's board of directors, management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; (iii) by virtue of their responsibilities and activities as substantial shareholders of the Company, and their personal and professional contacts with the Company's board of directors and management team, the Lins were uniquely privy to and/or participated in the creation, development and reporting of the Company's internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) the Lins knew, should have known, or recklessly disregarded, by virtue of the above, that the information relied upon by Starr was false and misleading. Acting through their own holding companies, Ou Wen Lin and Qingping Lin sold shares directly to Starr, omitting material facts.

275.    Primary liability of Ou Wen Lin's holding company, Thousand Space, and Qingping Lin's holding company, Bright Elite, arises from the following facts  (i) along with Cheng, Bright Elite and Thousand Space were, at all relevant times, substantial shareholders in the Company; (ii) through their owners Bright Elite and Thousand Space enjoyed significant and longstanding personal contact and familiarity with the other defendants and were advised of, and had unique access to and/or control over, certain members of the Company's board of directors, management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; (iii) by virtue of their responsibilities and activities as shareholders of the Company, and their owners' professional contacts with the Company's board of directors and management team, Bright Elite and Thousand Space were uniquely privy to and/or participated in the creation, development and reporting of the Company's internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) the Lin Defendants knew, should have known, or recklessly disregarded, that the information including the financials relied upon by Starr was false and misleading.  Bright Elite and Thousand Space sold shares directly to Starr, omitting these material facts.

276.    Defendant Robbins was the Company auditor from 2006 through May 1, 2009 and had open access to all books and records during that period.  Robbins made material misstatements about Hong Kong Mandefu through its audit report which was part of TM's October 2009 Proxy, CCME's 2009 Form 10-K filed March 31, 2010, and CCME's 2010 Form S-3.  Robbins further misrepresented the adequacy of its own audit performance.  Robbins had both the right and obligation to independently verify the 2006, 2007, and 2008 fiscal reports, as well as to conduct whatever independent review was necessary to satisfy its own needs.

Knowing Hong Kong Mandefu was about to become a publicly-traded U.S. company, Robbins engaged in highly unreasonable conduct that was an extreme departure from the standard of ordinary care by failing to ask any of the relevant questions or to conduct the independent verifications that a reputable and reasonable accounting firm in its position would do.

277.    Defendant DTT was the Company auditor from May 2009 through March 2011 and had open access to all books and records.  DTT made material misstatements about CCME through its audit report, which was part of CCME's 2009 Form 10-K filed March 31, 2010, and CCME's 2010 Form S-3.  DTT further misrepresented the adequacy of its own audit performance.  DTT had both the right and obligation to independently verify all the financial data, business models, and operations being set forth and discussed in the 10-K and throughout the period it served as an independent auditor with the responsibility to review and verify the 2009 and 2010 fiscal reports, as well as to conduct whatever independent review was necessary to satisfy its own needs.  DTT engaged in highly unreasonable conduct that was an extreme departure from the standard of ordinary care by failing to ask any of the relevant questions or to conduct the independent verifications that a reputable accounting firm in its position would do despite being aware since mid 2010 of allegations of fraud and misconduct concerning CCME.

278.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were exclusively available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CCME's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business,

operations, financial well-being, and prospects throughout the relevant period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

279.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, Starr purchased CCME securities at artificially inflated prices.  In ignorance of the fact that the price of the Company's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed to Starr by Defendants during the relevant period, Plaintiff acquired CCME's securities during the relevant period at artificially high prices and was damaged thereby.

280.    Plaintiff has suffered damages in that, in reliance on these false and misleading statements, Starr paid artificially inflated prices for CCME stock in the January 2010 purchase (as to defendants Lam, Green, Bird, and Robbins), and in the October 2010 share purchases and December 2010 warrant exercise (as to all Defendants), prices that were shown to be grossly inflated when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were revealed, making the stock essentially worthless and thereby damaging Plaintiff. Plaintiff would not have purchased CCME stock at the prices it paid, or at all, if it had been aware that the purchase prices had been artificially and falsely inflated by Defendants' misleading statements.

281.    At the time of said misrepresentations and/or omissions, Plaintiff was ignorant of their falsity, and believed them to be true.  Had Starr known the truth regarding the actual

financial and business position of CCME, which was not disclosed by Defendants, Plaintiff would not have purchased or otherwise acquired its CCME securities, or would not have done so at the artificially inflated prices which it paid.

282.   Plaintiff acted in direct reliance on the representations made by Defendants, including but not limited to the statements made in the 10-K filed March 31, 2010, the audited financials contained within that 10-K, the first quarter 2010 10-Q, dated May 14, 2010, the second quarter 2010 10-Q dated August 13, 2010, and the third quarter 10-Q dated November 9, 2010, as well as the October 2009 proxy and other statements made directly to Starr as alleged herein.

283.   The Defendants' misrepresentations and omissions were the proximate cause of the significant fall in CCME's stock price that caused Plaintiff harm when the truth about CCME's actual financial and business position were finally disclosed to the market, trading in CCME was permanently halted, and Starr's investment in CCME became essentially worthless.

284.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of the Company's securities during the relevant period.

## SECOND CAUSE OF ACTION
**(Violation of Section 20(a) of the Exchange Act Against Defendants Cheng, Lam, Ou Wen Lin, Quingping Lin Green and Bird)**

285.   Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

286.   Defendant Cheng acted as a controlling person of CCME within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, and his ownership and contractual rights, unique participation in and/or awareness of the Company's

operations and/or uniquely intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, Cheng had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Plaintiff

contend are false and misleading. Cheng was provided with or had unlimited access to copies of

the Company's reports, press releases, public filings and other statements alleged by Plaintiff to

be misleading prior to and/or shortly after these statements were issued and had the ability to

prevent the issuance of the statements or cause the statements to be corrected.

287.    By virtue of his position as majority owner of Fujian Fenzhong, Cheng also had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of Fujian Fenzhong. Cheng was provided with or had unlimited access to copies

of Fujian Fenzhong's reports, press releases, public filings and other statements and had the

ability to prevent the issuance of the statements or cause the statements to be corrected.

288.    Defendant Lam acted as a controlling person of CCME within the meaning of

Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, and

his ownership and contractual rights, unique participation in and/or awareness of the Company's

operations and/or uniquely intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, Lam had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Plaintiff

contend are false and misleading. Lam was provided with or had unlimited access to copies of

the Company's reports, press releases, public filings and other statements alleged by Plaintiff to

be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

289. In particular, Defendants Cheng and Lam had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

290. Defendants Ou Wen Lin and Qingping Lin acted as controlling persons of CCME within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of the Lin Defendants founding of the Company, their ownership and contractual rights, significant and longstanding personal contact and familiarity with the other defendants and access to members of the Company's board of directors and management team, unique participation in and/or awareness of the Company's operations and/or uniquely intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Lin Defendants had the power to influence and control decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. The Lin Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

291. Defendant Green acted as a controlling person of TM within the meaning of Section 20(a) of the Exchange Act as alleged herein. TM later changed its name to CCME. By virtue of his high-level positions, and his ownership and contractual rights, unique participation

in and/or awareness of TM's operations and/or uniquely intimate knowledge of the false

financial statements and proxy statements filed by TM with the SEC and disseminated to the

investing public, Green had the power to influence and control and did influence and control,

directly or indirectly, the decision-making of TM, including the content and dissemination of the

various statements in the October 2009 Proxy which Plaintiff contends are false and misleading.

Green was provided with or had unlimited access to copies of Hong Kong Mandefu's reports,

press releases, public filings and other statements alleged by Plaintiff to be misleading prior to

and/or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected.  Green later became a director and controlling

person of CCME.  Thus, the statements made in the October 2009 Proxy, which Green signed,

for which liability is found against TM/CCME constitute a ground for 20(a) liability against

Green.

292.    Defendant Bird acted as a controlling person of TM within the meaning of

Section 20(a) of the Exchange Act as alleged herein.  TM later changed its name to CCME.  By

virtue of his high-level positions, and his ownership and contractual rights, unique participation

in and/or awareness of TM's operations and/or uniquely intimate knowledge of the false

financial statements and proxy statements filed by TM with the SEC and disseminated to the

investing public, Bird had the power to influence and control and did influence and control,

directly or indirectly, the decision-making of TM, including the content and dissemination of the

various statements in the October 2009 Proxy which Plaintiff contends are false and misleading.

Bird was provided with or had unlimited access to copies of Hong Kong Mandefu's reports,

press releases, public filings and other statements alleged by Plaintiff to be misleading prior to

and/or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected. Bird later became a director and controlling

person of CCME. Thus, the statements made in the October 2009 proxy statement for which

liability is found against TM/CCME constitute a ground for Section 20(a) liability against Bird.

293.    In particular, Defendants Green and Bird had direct and supervisory involvement

in the day-to-day operations of TM and were intimately involved in the transaction that led to

Hong Kong Mandefu's acquisition by TM. They are, therefore, presumed to have had the power

to control and influence the particular transactions giving rise to the securities violations as

allegations herein, and exercised the same.

294.    As set forth above, CCME, Cheng, Lam, the Lin Defendants, Green and Bird each

violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this

Complaint. By virtue of their positions as controlling persons, and their culpable participation in

making the false statements or omissions, Cheng, Lam, Ou Wen Lin, Qingping Lin, Green and

Bird are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result

of defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of

the Company's securities during the relevant period.

### THIRD CAUSE OF ACTION
#### (Common Law Fraud against CCME, Cheng, Lam, and the Auditor Defendants)

295.    Plaintiff realleges and incorporates by reference each and every allegation

contained above as if fully set forth herein.

296.    CCME, Cheng, Lam, and the Auditor Defendants (i) employed devices, schemes,

and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state

material facts necessary to make the statements not misleading; and (iii) engaged in acts,

practices, and a course of business which operated as a fraud and deceit upon Starr and other

purchasers of the Company's securities in an effort to induce Starr to purchase securities of

CCME and to maintain artificially high market prices for CCME's securities in violation of

Delaware State law.

297.    CCME, Cheng, Lam, and the Auditor Defendants had actual knowledge of the

misrepresentations and/or omissions of material facts set forth herein, or acted with reckless

disregard for the truth in that they failed to ascertain and to disclose such facts, even though such

facts were exclusively available to them. Such defendants' material misrepresentations and/or

omissions were done knowingly or recklessly and for the purpose and effect of concealing

CCME's financial well-being and prospects from Starr and the investing public and supporting

the artificially inflated price of its securities.  As demonstrated by CCME, Cheng, Lam, and the

Auditor Defendants' overstatements and/or misstatements of the Company's business,

operations, financial well-being, and prospects throughout the relevant period, these defendants,

if they did not have actual knowledge of the misrepresentations and/or omissions alleged,

behaved with reckless indifference to the truth in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements

were false or misleading.

298.    In all cases, CCME, Cheng, Lam, and the Auditor Defendants acted with the

intent that Plaintiff rely on their false representations, and with full knowledge that Plaintiff

would rely on their false representations.

299.    At the time of said misrepresentations and/or omissions, Plaintiff was ignorant of

their falsity, and believed them to be true.  Had Plaintiff known the truth regarding the actual

financial and business position of CCME, which was not disclosed by CCME, Cheng, Lam, and

the Auditor Defendants, Plaintiff would not have purchased or otherwise acquired its CCME securities, or would not have done so at the artificially inflated prices which it paid.

300.    Plaintiff acted in direct reliance on the representations made by CCME, Cheng, Lam, and the Auditor Defendants, including but not limited to the statements made in the 10-K filed March 31, 2010, the audited financials contained within that 10-K, the first quarter 2010 10-Q, dated May 14, 2010, the second quarter 2010 10-Q dated August 13, 2010, and the third quarter 10-Q dated November 9, 2010.

301.    As a direct and proximate result of CCME, Cheng, Lam, and the Auditor Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of the Company's securities during the relevant period.

302.    Plaintiff has suffered damages in that, in reliance on these false and misleading statements, Starr paid artificially inflated prices for CCME stock in the January 2010 purchase (as to defendants Lam and Robbins), and in the October 2010 share purchases and December 2010 warrant exercise (as to all Defendants), prices that were shown to be grossly inflated when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were revealed, making the stock essentially worthless and thereby damaging Plaintiff.  Plaintiff would not have purchased CCME stock at the prices it paid, or at all, if it had been aware that the purchase prices had been artificially and falsely inflated by Defendants' misleading statements.

## FOURTH CAUSE OF ACTION
### (Aiding and Abetting Fraud Against Green and Bird)

303.    Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein, and particularly those allegations contained in paragraphs 295-302 concerning common law fraud.

304.    Defendants Green and Bird, by virtue of their intimate involvement in the due diligence process and high level positions in TM, had knowledge of the fraud and/or negligence of Cheng and Lam prior to October 2009, but turned a blind eye to Cheng and Lam's fraudulent conduct, or recklessly disregarded it.

305.    Defendants Green and Bird carried out various lawful and unlawful acts, as specified above, in aiding the fraud, including but not limited to (i) making various false representations or omissions in connection with the filing of the October 2009 Proxy, and (ii) utilizing their powers and position as directors and officers to engage TM in a transaction with Hong Kong Mandefu that ultimately led to Hong Kong Mandefu being brought to the American securities markets.

306.    By facilitating the introduction of Hong Kong Mandefu to the United States securities markets, through issuance of the October 2009 Proxy, Green and Bird aided and abetted the fraud and/or the negligent misrepresentation of Cheng and Lam by providing substantial assistance and encouragement.

307.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase of the Company's securities during the relevant period.  Plaintiff would not have purchased CCME stock at the prices it paid, or at all, if it had been aware that the purchase prices had been artificially and falsely inflated by Defendants' misleading statements.

### FIFTH CAUSE OF ACTION
### (Negligent Misrepresentation against the Auditor Defendants)

308.    Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

309.     The Auditor Defendants owed Starr a pecuniary duty, in that they provided information used by Starr in its transactions, and the Auditor Defendants profited by issuing that information to the investing public.  The Auditor Defendants were engaged by CCME and its directors, for the purpose of providing information for the use of third parties in transactions, and the Auditor Defendants are engaged in the business of providing such information, in the form of audits, opinions, due diligence, and other forms of financial review.

310.     The Auditor Defendants breached those duties through the provision of false information regarding CCME's financials, business model, and business prospects, among other things.

311.     The Auditor Defendants also failed to take reasonable care in obtaining the relevant information and in communicating it to investors and to Starr in particular, and were therefore negligent.

312.     The Auditor Defendants knew or should have known that Starr would rely on information they provided for SEC filings, press releases, and other filings, releases, or communications, and intended that Starr rely on that information.  DTT introduced Starr to CCME for the express purpose of making a potential investment.  An affiliate of DTT conducted due diligence on behalf of Starr in advance of Starr's investment.  The fact of Starr's investment, and its intention to rely on DTT's audit work, was therefore well known to DTT.  Robbins also knew or should have known that Starr would rely on information it supplied for the October 2009 Proxy and intended Starr to so rely.  Furthermore, because of Starr's large purchases of CCME stock, both Auditor Defendants had particular reason to know that Starr would rely on their statements.

313.     Plaintiff acted in direct reliance on the representations made by the Auditor

Defendants, including but not limited to the statements made in CCME's 2009 10-K filed March

31, 2010, and the audited financials contained within that 10-K, the 2010 Form S-3, as well as

the October 2009 Proxy.

314.     As a direct and proximate result of the Auditor Defendants' wrongful conduct,

Plaintiff suffered damages in connection with its purchase of the Company's securities during

the relevant period.

315.     Plaintiff has suffered damages in that, in reliance on these false and misleading

statements, Starr paid artificially inflated prices for CCME stock in the January 2010 purchase

(as to defendant Robbins), and in the October 2010 share purchases and December 2010 warrant

exercise (as to Robbins and DTT), prices that were shown to be grossly inflated when

Defendants' misrepresentations and omissions were revealed, making the stock essentially

worthless and thereby damaging Plaintiff.  Plaintiff would not have purchased CCME stock at

the prices it paid, or at all, if it had been aware that the purchase prices had been artificially and

falsely inflated by Defendants' misleading statements.

### SIXTH CAUSE OF ACTION
**(Breach of Fiduciary Duty of Disclosure Against Defendants Cheng and Lam)**

316.     Plaintiff realleges and incorporates by reference each and every allegation

contained above as if fully set forth herein.

317.     Defendants Cheng and Lam, as directors and/or officers of CCME, owe fiduciary

duties of loyalty and care, including a duty of disclosure, to Starr as a shareholder of CCME .

318.     When directors of a Delaware corporation communicate publicly or directly with

stockholders about corporate matters, the *sine qua non* of directors' fiduciary duties is honesty,

and they are obligated not to deliberately misinform shareholders about the business of the corporation.

319.    Defendants Cheng and Lam breached their fiduciary duties to Starr by (i) employing devices, schemes, and artifices to defraud; (ii) deliberately making untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaging in acts, practices, and a course of business which operated as a fraud and deceit upon Starr.

320.    Plaintiff relied upon representations made in CCME's public disclosures, including CCME's 2009 10K dated March 31, 2010, the first quarter 2010 10-Q, dated May 14, 2010, the second quarter 2010 10-Q dated August 13, 2010 and the third quarter 2010 10-Q dated November 9, 2010.

321.    The actions of Defendants Cheng and Lam are directly and proximately responsible for Plaintiff's injuries, including inducing Starr's October 2010 purchase of CCME securities, its December 2010 exercise of warrants, and its continuing to hold CCME securities up to and including until the date when trading in CCME stock was halted.

## SEVENTH CAUSE OF ACTION
### (Conspiracy to Commit Fraud Against Defendants Cheng, Lam, Green, Bird, Ou Wen Lin, Thousand Space, Qingping Lin and Bright Elite)

322.    Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein, and particularly those allegations contained in paragraphs 295-302 concerning common law fraud.

323.    Cheng, Lam, Green, Bird, Ou Wen Lin (acting through Thousand Space) and Qingping Lin (acting through Bright Elite) engaged in various tortious and fraudulent acts with

the purpose of bringing Hong Kong Mandefu to the United States securities markets and defrauding American investors.

324.    As detailed above, and in furtherance of the conspiracy, Green and Bird, through the October 2009 proxy, made various affirmative misrepresentations and omissions that caused Hong Kong Mandefu to be acquired by TM, and thereby formed CCME, constituting unlawful acts.  The affirmative misrepresentations and omissions within the October 2009 proxy caused additional harm because they were relied upon, by Starr and other investors, in making investment decisions, and cloaked subsequent misrepresentations by CCME in legitimacy.

325.    In furtherance of the conspiracy, Cheng and Lam filed or caused to be filed false statements concerning CCME's business relationships and financials, as well as other false and misleading information, both with the SEC and with the media, constituting unlawful acts, including but not limited to the 10-K filed on March 31, 2010, the first quarter 2010 10-Q, dated May 14, 2010, the second quarter 2010 10-Q, dated August 13, 2010 and the third quarter 2010 10-Q dated November 9, 2010.

326.    In furtherance of the conspiracy, and in violation of their duties to Starr, Ou Wen Lin (acting through Thousand Space) and Qingping Lin (acting through Bright Elite) engaged in misrepresentations and omissions related to their sales of shares to Starr.

327.    Cheng, Lam, Green, Bird, Ou Wen Lin, Thousand Space, Qingping Lin and Bright Elite, through meetings in person, electronic and telephonic communications, written messages, and through their advisors, did agree on this course of conduct and formed a confederation to achieve their illicit purpose.

328.    Cheng, Lam, Green, Bird, Ou Wen Lin, Thousand Space, Qingping Lin and Bright Elite had knowledge of the affirmative misrepresentations and omissions.

329. Defendants, in engaging in the conspiracy, obtained benefits beyond their salaries. Cheng and the Lins obtained shares based on the earn-out provisions described in the October 2009 proxy. Moreover, the Lins, Thousand Space, Bright Elite, Green and Bird increased the value of shares they possessed and subsequently sold, and profited therefrom.

330. Furthermore, due to restrictions in their share transfer, Green and Bird could not have sold their TM shares obtained prior to the IPO in the absence of the Share Exchange Agreement, and would have lost the money they invested, had they not succeeded in consummating a deal with Hong Kong Mandefu to form CCME.

331. Plaintiff suffered actual damages as a result of this conspiracy, and in direct reliance on the unlawful acts carried out in furtherance of the conspiracy. Plaintiff would not have purchased CCME stock at the prices it paid, or at all, if it had been aware that the purchase prices had been artificially and falsely inflated by Defendants' misleading statements.

### EIGHTH CAUSE OF ACTION
### (Aiding and Abetting Fraud and Breach of Fiduciary Duty Against the Auditor Defendants)

332. Plaintiff realleges and incorporates by reference each and every allegation contained above as if fully set forth herein.

333. Defendants Cheng and Lam as directors and/or officers of CCME owe fiduciary duties of loyalty and care, including a duty of disclosure, to Starr as a shareholder of CCME.

334. Defendants Cheng and Lam breached their fiduciary duties to Starr, and committed fraud, by (i) employing devices, schemes, and artifices to defraud; (ii) making untrue statements, both deliberately and negligently, of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaging in acts, practices, and a

course of business which operated as a fraud and deceit upon Starr in an effort to cause Starr to pay artificially high prices for CCME's securities.

335.    The Auditor Defendants knowingly participated in the breaches of fiduciary duties and other tortious conduct of Defendants Cheng and Lam as set forth above, providing substantial assistance or encouragement in that course of conduct, including but not limited to knowingly or recklessly disregarding information, including various "red flags" during the course of the audit, and thereby proffering false financials for SEC filings.

336.    Plaintiff relied on the false statements provided by the Auditor Defendants, including but not limited to the audits contained within the October 2009 Proxy, the 2009 10-K filed March 31, 2010, and 2010 Form S-3.

337.    Defendants' actions are directly and proximately responsible for Plaintiff's injuries, including inducing the January 2010 purchase of CCME securities (as against Robbins) and the October 2010 purchase of CCME securities and December 2010 exercise of warrants (as against Robbins and DTT) and Plaintiff's maintenance of CCME securities up to and including the date when trading was halted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)    Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: July 5, 2011

BOUCHARD MARGULES &
FRIEDLANDER, P.A

    /s/ Andre G. Bouchard
Andre G. Bouchard (Bar No. 2504)
Sean M. Brennecke (Bar No. 4686)
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500

*Attorneys for Plaintiff Starr Investments
Cayman II, Inc.*

OF COUNSEL:

Nicholas A. Gravante, Jr.
Lee S. Wolosky
Marilyn C. Kunstler
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

**Table of Contents**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**SCHEDULE 14A**
**(Rule 14a-101)**

**INFORMATION REQUIRED IN PROXY STATEMENT**
**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the Securities**
**Exchange Act of 1934 (Amendment No. 5)**

Payment of Filing Fee (Check the appropriate box):

Filed by the Registrant ☑

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement
☐ Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☑ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to §240.14a-12

**TM ENTERTAINMENT AND MEDIA, INC.**

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)

☐ No fee required.
☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   (1)  Title of each class of securities to which transaction applies:

   (2)  Aggregate number of securities to which transaction applies:

   (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)  Proposed maximum aggregate value of transaction:

   (5)  Total fee paid:

☑ Fee paid previously with preliminary materials: $17,220

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   (1)  Amount Previously Paid:

   (2)  Form, Schedule or Registration Statement No.:

   (3)  Filing Party:

   (4)  Date Filed:

# TM ENTERTAINMENT AND MEDIA, INC.

### 307 EAST 87TH STREET
### NEW YORK, NEW YORK 10128

#### October 2, 2009

#### TO THE STOCKHOLDERS OF

#### TM ENTERTAINMENT AND MEDIA, INC.

You are cordially invited to attend the special meeting (the "Special Meeting") of stockholders of TM Entertainment and Media, Inc., a Delaware corporation ("TM"), to be held at 10:00 a.m., local time, on October 15, 2009. At the Special Meeting, you will be asked to consider, among other things, proposals relating to the purchase of all of the issued and outstanding capital stock of Hong Kong Mandefu Holding Limited ("CME") resulting in CME becoming a direct wholly-owned subsidiary of TM.

The Proxy Statement following this letter is dated October 2, 2009 and is first being mailed to TM stockholders on or about October 5, 2009.

CME operates the largest digital television advertising network on inter-city express buses in China. CME commenced operations in the advertising industry in November 2003 as one of the first participants in advertising on inter-city express buses in China. All of the issued and outstanding capital stock of CME is owned by Zheng Cheng, Thousand Space Holdings Limited and Bright Elite Management Limited (collectively, the "Sellers").

The Special Meeting will be held at 10:00 a.m. local time, on October 15, 2009, at the offices of Morrison Cohen LLP located at 909 Third Avenue, New York, New York 10022. At this important meeting, you will be asked to consider and vote upon the following proposals:

• to amend TM's Amended and Restated Certificate of Incorporation to remove the prohibition on the consummation of a Business Combination if holders of an aggregate of 30% or more in interest of the shares of our common stock issued in our initial public offering ("IPO Shares") exercise their conversion rights (the "Initial Charter Amendment Proposal No. 1");

• to amend TM's Amended and Restated Certificate of Incorporation to remove the requirement that only holders of the IPO Shares who vote against the Transaction (as defined below) may convert their IPO Shares into cash (the "Initial Charter Amendment Proposal No. 2"); (FOR THE AVOIDANCE OF DOUBT, CONSISTENT WITH TM'S IPO PROSPECTUS, THE 2,250,000 SHARES ISSUED TO THE FOUNDERS OF TM SHALL NOT BE PERMITTED TO CONVERT OR OTHERWISE PARTICIPATE IN THE LIQUIDATION OF THE TRUST ACCOUNT SHOULD TM LIQUIDATE.)

• to approve the purchase by TM of CME pursuant to a Share Exchange Agreement (the "Share Exchange Agreement") dated as of May 1, 2009 among TM, CME, the Sellers, Fujian Zong Heng Express Information Technology Co., Ltd., Fujian Fenzhong Media Co., Ltd., Ou Wen Lin and Qingping Lin (referred to as the "Transaction") and the transactions contemplated thereby (the "Transaction Proposal");

• to approve the issuance of shares (the "Share Issuance Proposal") of TM common stock, par value $0.001 ("TM Common Stock") pursuant to the Share Exchange Agreement to the Sellers (whereby the number of shares of TM Common Stock that will be issued to the Sellers is 20.915 million with the possibility for the Sellers to earn up to an additional 15.0 million shares subject to the achievement of certain net income targets);

• to amend TM's Amended and Restated Certificate of Incorporation to change TM's corporate name to "China MediaExpress Holdings, Inc.," delete certain provisions that relate to us as a blank check company and create perpetual existence (the "Charter Amendment Proposal");

• to amend TM's Amended and Restated Certificate of Incorporation to increase the number of shares authorized for issuance (the "Authorized Share Increase Proposal");

• to elect six persons to TM's board of directors to serve for the respective term of office of the class to which the nominee is elected and until their successors are duly elected and qualified (the "Election of Directors Proposal"); and

• to approve any adjournment or postponement of the Special Meeting to a later date or time or dates or times if necessary for the purpose of soliciting additional proxies (the "Adjournment Proposal").

Table of Contents

**Please be aware that if the Transaction is completed, each holder of IPO Shares who votes such shares either "FOR" or "AGAINST" the Transaction may, at the time of such vote, elect to convert those IPO Shares to cash following the procedures described in this document.**

Pursuant to TM's Amended and Restated Certificate of Incorporation, TM is required to obtain stockholder approval of the Transaction. Pursuant to certain rules of the NYSE Amex, TM is required to obtain stockholder approval of the issuance of TM Common Stock in connection with the Transaction. In addition, TM and CME have agreed that they will work together to, subject to stockholder approval, use their commercially reasonable efforts to cause the name of TM to be changed to "China MediaExpress Holdings, Inc." (or such other name as TM and the Sellers mutually agree upon) immediately after the consummation of the Transaction.

The Transaction Proposal is conditioned upon the approval of the Initial Charter Amendment Proposal No. 2 and, in the event the Initial Charter Amendment Proposal No. 2 does not receive the necessary vote to approve that proposal, then the Transaction Proposal will not be presented for approval. Each of the Share Issuance Proposal, the Charter Amendment Proposal and the Authorized Share Increase Proposal are conditioned upon the approval of the Transaction Proposal and, in the event the Transaction Proposal does not receive the necessary vote to approve that proposal, then none of those proposals will be presented for approval. If the Transaction Proposal is approved but the Share Issuance Proposal or the Charter Amendment Proposal are not approved, TM could be deemed to have failed to perform certain covenants under the Share Exchange Agreement, allowing the Sellers to terminate the Share Exchange Agreement or seek indemnification thereunder.

The Election of Directors Proposal and the Adjournment Proposal are not conditioned upon the approval of any of the other proposals, but if the Transaction Proposal is not approved, none of the proposals will be presented for approval.

In connection with the vote required for the Transaction, our pre-IPO stockholders (our "Initial Stockholders"), directors and officers have previously agreed to vote all of the 2,250,000 shares of TM Common Stock which are beneficially owned by them, representing approximately 18.0% of the shares of TM Common Stock outstanding as of the record date, in accordance with the vote of the majority of shares of TM Common Stock voted by the public shareholders other than our Initial Stockholders (our "public stockholders"). This voting arrangement does not apply to any other shares our Initial Stockholders may purchase in the future. Accordingly, they may vote these shares on a proposed business combination any way they chose. Currently, our Initial Stockholders do not own any shares of TM Common Stock which are not subject to this voting arrangement. In addition, TM's officers, directors, initial stockholders or their affiliates who may purchase IPO Shares, would be entitled to convert such shares in accordance with the procedures described in this Proxy Statement. In no event will our Initial Stockholders be entitled to convert the 2,250,000 shares they acquired before the IPO. Currently, no such persons own such IPO Shares and should they acquire such IPO Shares, they do not intend to exercise conversion rights with respect thereto. The ability of TM's officers, directors, initial stockholders and their affiliates to convert any IPO Shares they purchase to help secure approval of the Transaction may facilitate the purchase of more shares for this purpose.

In addition, if the Initial Charter Amendment Proposal No. 2 is approved and the Transaction is consummated, each public stockholder who votes either for or against the Transaction will have the right to contemporaneously elect to have his or her shares of TM Common Stock converted into cash regardless of whether he or she votes for or against the Transaction. If the Initial Charter Amendment Proposal No. 2 is not approved by the affirmative vote of the holders of a majority of the outstanding shares of our common stock on the record date, the Transaction Proposal will not be presented to the stockholders for a vote and the Transaction will not be consummated. The per share conversion price will be calculated as of two business days prior to the consummation of the Transaction, and will equal the amount in the trust account (the "Trust Account") into which were placed the proceeds of our initial public offering (the "IPO"), divided by the number of shares sold in our IPO (10,255,000). As of August 31, 2009, $81,075,868 (equating to approximately $7.91 per share), net of taxes payable, was in the Trust Account.

TM will proceed with the Transaction only if (1) the Initial Charter Amendment Proposal No. 2 is approved, and (2) a majority of the shares of common stock present at the meeting and voted by the public stockholders are voted in favor of the Transaction. The Initial Stockholders have previously agreed not to demand conversion of any shares of TM Common Stock owned by them.

If a stockholder vote on this Transaction is held and the Transaction is not approved, TM will not try to consummate a business combination with a different target. If TM does not consummate a business combination

Table of Contents

by October 17, 2009, its corporate existence will cease by operation of law and it will promptly distribute only to its public stockholders (including its existing stockholders to the extent they have purchased shares in its IPO or in the aftermarket) the amount in the Trust Account (including any accrued interest then remaining in the Trust Account) plus any remaining net assets. If a liquidation were to occur, based on the amount in the Trust Account as of August 31, 2009, $81,075,868, net of estimated taxes payable), the initial per share liquidation price would be approximately $7.91. Because the Trust Account will continue to earn interest and incur taxes on such interest until the date of liquidation, and because the Trust Account may be subject to the claims of creditors, the actual liquidation price may be more or less than approximately $7.91 per share.

TM shares of common stock, warrants and units are quoted on the NYSE Amex under the symbols "TMI", "TMI.WS" and "TMI.U," respectively. On September 25, 2009, the closing price of TM Common Stock, warrants and units was $7.90, $0.20 and $7.80, respectively.

After careful consideration, TM's board of directors unanimously recommends that you vote or give instruction to vote "FOR" the approval of each of the following proposals: (i) the Initial Charter Amendment No. 1, (ii) the Initial Charter Amendment No. 2, Proposal, (iii) the Transaction Proposal, (iv) the Share Issuance Proposal, (v) the Charter Amendment Proposal, (vi) the Authorized Share Increase Proposal, (vii) the Election of Directors Proposal, and (viii) the Adjournment Proposal.

The accompanying Proxy Statement provides detailed information concerning the foregoing proposals and certain additional information, including, without limitation, the information set forth under the section entitled "Risk Factors", all of which you are urged to read carefully. It is important that your TM Common Stock be represented at the Special Meeting, regardless of the number of shares you hold. Therefore, please sign, date and return your proxy card as soon as possible, whether or not you plan to attend the Special Meeting. This will not prevent you from voting your shares in person if you subsequently choose to attend the Special Meeting.

Certain financial and other information from TM's annual report on Form 10-K for the fiscal year ended December 31, 2008 and from TM's quarterly report on Form 10-Q for the six months ended June 30, 2009 is included in the accompanying Proxy Statement.

I look forward to seeing you at the Special Meeting.

Sincerely,

/s/  Theodore S. Green
_____

Theodore S. Green
Chairman of the Board, Co-Chief Executive Officer
and Interim Chief Financial Officer

YOUR VOTE IS IMPORTANT, WHETHER OR NOT YOU PLAN TO ATTEND THE SPECIAL MEETING, PLEASE PROMPTLY VOTE YOUR SHARES AND SUBMIT YOUR PROXY BY TELEPHONE OR BY INTERNET, OR BY COMPLETING, SIGNING, DATING AND RETURNING YOUR PROXY FORM IN THE ENCLOSED ENVELOPE. IF YOU RETURN A PROXY WITH YOUR SIGNATURE BUT WITHOUT AN INDICATION OF HOW YOU WISH TO VOTE, YOUR PROXY WILL BE VOTED "FOR" EACH OF THE PROPOSALS.

SEE "RISK FACTORS" FOR A DISCUSSION OF VARIOUS FACTORS THAT YOU SHOULD CONSIDER IN CONNECTION WITH THE PROPOSED ACQUISITION SINCE, UPON THE CONSUMMATION OF THE TRANSACTION, THE OPERATIONS AND ASSETS OF CME WILL ESSENTIALLY CONSTITUTE ALL OF THE OPERATIONS AND ASSETS OF TM.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTION, PASSED UPON THE MERITS OR FAIRNESS OF THE TRANSACTION OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.

**This Proxy Statement is dated October 2, 2009 and is first being mailed to TM stockholders on or about October 5, 2009.**

# TM ENTERTAINMENT AND MEDIA, INC.
### 307 EAST 87TH STREET
### NEW YORK, NEW YORK 10128

## NOTICE OF SPECIAL MEETING OF STOCKHOLDERS
## TO BE HELD OCTOBER 15, 2009

### TO THE STOCKHOLDERS OF

### TM ENTERTAINMENT AND MEDIA, INC.:

NOTICE IS HEREBY GIVEN that the special meeting (the "Special Meeting") of stockholders of TM Entertainment and Media, Inc., a Delaware corporation ("TM"), will be held at 10:00 a.m., local time, on October 15, 2009, at the offices of Morrison Cohen LLP located at 909 Third Avenue, New York, New York 10022 for the purpose of considering and voting upon the following proposals:

- to amend TM's Amended and Restated Certificate of Incorporation to remove the prohibition on the consummation of a Business Combination if holders of an aggregate of 30% or more in interest of the shares of our common stock issued in our initial public offering ("IPO Shares") exercise their conversion rights (the "Initial Charter Amendment Proposal No. 1");

- to amend TM's Amended and Restated Certificate of Incorporation to remove the requirement that only holders of the IPO Shares who vote against the Transaction (as defined below) may convert their IPO Shares into cash (the "Initial Charter Amendment Proposal No. 2"); (FOR THE AVOIDANCE OF DOUBT, CONSISTENT WITH TM'S IPO PROSPECTUS, THE 2,250,000 SHARES ISSUED TO THE FOUNDERS OF TM SHALL NOT BE PERMITTED TO CONVERT OR OTHERWISE PARTICIPATE IN THE LIQUIDATION OF THE TRUST ACCOUNT SHOULD TM LIQUIDATE.)

- to approve the purchase by TM of all of the issued and outstanding capital stock of Hong Kong Mandefu Holding Limited ("CME") pursuant to a Share Exchange Agreement (the "Share Exchange Agreement") dated as of May 1, 2009 among TM, CME, Zheng Cheng, Thousand Space Holdings Limited and Bright Elite Management Limited (collectively, the "Sellers"), Fujian Zong Heng Express Information Technology Co., Ltd., Fujian Fenzhong Media Co., Ltd., Ou Wen Lin and Qingping Lin, referred to as the "Transaction" and the transactions contemplated thereby (the "Transaction Proposal"), resulting in CME becoming a direct wholly-owned subsidiary of TM;

- to approve the issuance of shares (the "Share Issuance Proposal") of TM common stock, par value $0.001 per share ("TM Common Stock"), pursuant to the Share Exchange Agreement to the Sellers (whereby the number of shares of TM Common Stock that will be issued to the Sellers is 20.915 million with the possibility for the Sellers to earn up to an additional 15.0 million shares subject to the achievement of certain net income targets;

- to amend TM's Amended and Restated Certificate of Incorporation to change TM's corporate name to "China MediaExpress Holdings, Inc.," delete certain provisions that relate to us as a blank check company and create perpetual existence (the "Charter Amendment Proposal");

- to amend TM's Amended and Restated Certificate of Incorporation to increase the number of shares authorized for issuance (the "Authorized Share Increase Proposal");

- to elect six persons to CME's board of directors to serve for the respective term of office of the class to which the nominee is elected and until their successors are duly elected and qualified (the "Election of Directors Proposal"); and

- to approve any adjournment or postponement of the Special Meeting to a later date or time or dates or times if necessary for the purpose of soliciting additional proxies (the "Adjournment Proposal").

**Please be aware that if the Transaction is completed, each holder of IPO Shares who votes such shares either "FOR" or "AGAINST" the Transaction may, at the time of such vote, elect to convert those IPO Shares to cash following the procedures described in this document.**

Table of Contents

Our board of directors has fixed the close of business on September 21, 2009 as the record date (the "Record Date") for determining TM stockholders entitled to receive notice of and vote at the Special Meeting and any adjournment or postponement thereof. Only holders of record of TM Common Stock on that date are entitled to have their votes counted at the Special Meeting or any adjournment or postponement.

**Your vote is important.**  Please submit your proxy card as soon as possible to make sure that your shares are represented at the Special Meeting.

If you are a stockholder of record, you may also cast your vote in person at the Special Meeting. If your shares are held of record by a broker, bank or nominee, you may provide the record holder of your shares with instructions on how to vote your shares, or you may also cast your vote in person at the Special Meeting by obtaining a proxy from your broker, bank or nominee.

On the Record Date, there were 12,505,000 outstanding shares of TM Common Stock, of which 10,255,000 were issued to the public in TM's initial public offering (the "IPO"; such shares, the "IPO Shares") and 2,250,000 were issued prior to its IPO to its Initial Stockholders, each of which is entitled to one vote per share at the Special Meeting. The holders of the shares issued prior to TM's IPO are beneficially held by its directors and executive officers, each of whom has agreed to vote all of his shares with respect to the Transaction Proposal only in accordance with the majority of the votes cast by the holders of the IPO Shares. If holders of a majority of the IPO Shares voting in person or by proxy at the Special Meeting vote against, or abstain with respect to, the Transaction Proposal, such proposal shall not be approved.

Your vote is important, whether or not you plan to attend the special meeting, please promptly vote your shares and submit your proxy by completing, signing, dating and returning your proxy form in the enclosed envelope. You may also vote by telephone or the internet, as described on the proxy card. If you are a stockholder of record, you may also cast your vote in person at the special meeting. If your shares are held in an account at a brokerage firm or bank, you must instruct your broker or bank how to vote your shares, or you may cast your vote in person at the special meeting by obtaining a proxy from your brokerage firm or bank. If you return a proxy with your signature but without an indication of how you wish to vote, your proxy will be voted "for" each of the proposals.

Any proxy may be revoked at any time prior to its exercise by delivery of a later dated proxy, by notifying Theodore S. Green, our Co-Chief Executive Officer, in writing before the Special Meeting, or by voting in person at the Special Meeting. By authorizing your proxy promptly, you can help us avoid the expense of further proxy solicitations.

Your attention is directed to the Proxy Statement accompanying this notice (including the annexes thereto) for a more complete statement regarding the matters proposed to be acted on at the Special Meeting. We encourage you to read this Proxy Statement carefully. If you have any questions or need assistance voting your shares, please contact either TM and its representatives at (212) 289-6942 or our proxy solicitor MacKenzie Partners, Inc., by telephone at (800) 322-2885 or by email at proxy@mackenziepartners.com.

BY ORDER OF THE BOARD OF DIRECTORS,

/s/  Theodore S. Green
_____
Theodore S. Green
Chairman of the Board, Co-Chief Executive Officer
and Interim Chief Financial Officer

Dated: October 2, 2009

## TABLE OF CONTENTS

| Section | Page |
|---|---|
| CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING INFORMATION | 1 |
| SUMMARY OF THE PROXY STATEMENT | 2 |
|     The Parties | 2 |
|     The Transaction | 3 |
|     Issuance of TM Common Stock | 7 |
|     The Charter Amendment | 8 |
|     TM's Board of Directors and Management | 8 |
|     Adjournment | 9 |
|     The Special Meeting | 9 |
|     Certain U.S. Federal Income Tax Consequences | 12 |
| QUESTIONS AND ANSWERS ABOUT THE TRANSACTION AND THE SPECIAL MEETING | 13 |
| RISK FACTORS | 23 |
|     Risks Relating to the Proposed Transaction | 23 |
|     Risks Relating to Doing Business In China | 26 |
|     Risks Relating to CME | 29 |
|     Risks Relating to CME's Corporate Structure | 41 |
|     Risks Relating to TM | 49 |
| SELECTED HISTORICAL FINANCIAL INFORMATION | 55 |
|     Summary Historical Consolidated Financial Information of TM | 55 |
|     Summary Historical Consolidated Financial Information of CME | 56 |
|     Summary Unaudited Pro Forma Condensed Combined Financial Information | 57 |
|     Comparative Summary Historical and Unaudited Pro Forma Financial Data | 59 |
| PRICE RANGE OF SECURITIES AND DIVIDENDS | 60 |
|     Holders of Common Equity | 60 |
|     Dividends | 60 |
|     Securities Authorized for Issuance Under Equity Compensation Plans | 60 |
|     CME | 60 |
| THE SPECIAL MEETING | 61 |
|     Date, Time and Place | 61 |
|     Purpose of the Special Meeting | 61 |
|     Recommendation of TM's Board of Directors | 62 |
|     Record Date; Who is Entitled to Vote | 62 |
|     Quorum | 62 |
|     Required Vote | 62 |
|     Actions That May Be Taken to Secure Approval of this Stockholders | 63 |
|     Voting Your Shares | 65 |
|     Revoking Your Proxy | 65 |
|     Conversion Rights | 65 |
|     Questions About Voting | 66 |
|     No Additional Matters May Be Presented at the Special Meeting | 66 |
|     Abstentions and Broker Non-Votes | 67 |
|     Proxy Solicitation Costs | 67 |
|     Stock Ownership | 67 |
| THE TRANSACTION PROPOSAL | 67 |
|     General Description of the Transaction | 68 |
|     Background of the Transaction | 68 |

i

Table of Contents

| Section | Page |
| --- | --- |
| Recommendation of the Board of Directors and Reasons for the Transaction | 75 |
| Interests of TM's Management in the Transaction | 77 |
| Satisfaction of Requirement that the Transaction has a Fair Market Value Equal to at least 80.0% of TM's Net Assets | 78 |
| Certain U.S. Federal Income Tax Consequences of the Transaction | 78 |
| Anticipated Accounting Treatment | 80 |
| Post-Closing Ownership of TM Common Stock | 80 |
| Headquarters; Stock Symbols; Name; Fiscal Year End | 81 |
| THE SHARE EXCHANGE AGREEMENT | 81 |
| Basic Deal Terms | 81 |
| Representations and Warranties | 83 |
| Conduct of Business Pending Closing | 84 |
| Covenants | 86 |
| Exclusivity; No Other Negotiations | 87 |
| Additional Agreements and Covenants | 88 |
| Conditions to Closing | 88 |
| Indemnification | 90 |
| Liquidated Damages | |
| Termination | 91 |
| Effect of Termination | 92 |
| Amendment, Extension and Waiver | 92 |
| Regulatory and Other Approvals | 92 |
| CERTAIN AGREEMENTS RELATING TO THE TRANSACTION | 92 |
| Lock-Up Agreements | 92 |
| Voting Agreement | 93 |
| Registration Rights Agreement | 93 |
| Employment Agreement | 93 |
| Required Vote | 93 |
| Recommendation | 94 |
| THE INITIAL CHARTER AMENDMENT PROPOSALS | 94 |
| Background | 94 |
| Rescission Rights | 96 |
| Required Vote | 97 |
| Recommendation | 97 |
| THE SHARE ISSUANCE PROPOSAL | 97 |
| Background | 97 |
| Required Vote | 97 |
| Recommendation | 97 |
| THE CHARTER AMENDMENT PROPOSAL | 98 |
| Background | 98 |
| Required Vote | 99 |
| Recommendation | 100 |
| THE AUTHORIZED SHARE INCREASE PROPOSAL | 100 |
| Background | 100 |
| Required Vote | 100 |
| Recommendation | 100 |
| THE ELECTION OF DIRECTORS PROPOSAL | 101 |
| Background | 101 |

ii

Table of Contents

| Section | Page |
|---|---|
| Business Experience of Nominees | 101 |
| Required Vote | 101 |
| Additional Information | 101 |
| Recommendation | 102 |
| THE ADJOURNMENT PROPOSAL | 102 |
| Background | 102 |
| Required Vote | 102 |
| Recommendation | 102 |
| EXCHANGE RATE INFORMATION | 102 |
| ENFORCEABILITY OF CIVIL LIABILITIES | 103 |
| CME'S CORPORATE STRUCTURE | 104 |
| Corporate History and Structure | 104 |
| Contractual Arrangements | 105 |
| INFORMATION ABOUT HONG KONG MANDEFU HOLDING LIMITED ("CME") | 107 |
| Business Summary | 107 |
| Corporate Information | 109 |
| Industry | 109 |
| Competitive Strengths | 111 |
| CME Strategies | 114 |
| CME's Advertising Network | 116 |
| CME's Advertising Services | 117 |
| Audience Profile | 117 |
| Sales and Marketing | 118 |
| Advertising Contracts | 118 |
| Bus Operator Partners | 119 |
| Cooperation Agreement with the Transport Television and Audio-Video Center | 120 |
| Suppliers | 120 |
| CME's Equipment and Patented Automated Control Systems | 121 |
| Programming | 122 |
| Supporting Services | 123 |
| Intellectual Property | 123 |
| Competition | 124 |
| Employees | 125 |
| Facilities | 125 |
| Insurance | 125 |
| Legal and Administrative Proceedings | 125 |
| Regulation | 125 |
| SELECTED CONSOLIDATED FINANCIAL AND OPERATING DATA OF CME | 133 |
| CME'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF CME | 135 |
| Overview | 135 |
| Consolidation of CME's Significant Subsidiaries | 136 |
| Factors Affecting CME's Results of Operations | 137 |
| Critical Accounting Policies | 140 |
| Principal Components of Statement of Operations | 142 |
| Cost of Sales | 143 |
| Operating Expenses | 145 |
| Income Tax Expenses | 146 |

iii

**Table of Contents**

| **Section** | **Page** |
|---|---|
| Results of Operations | 147 |
| Liquidity and Capital Resources | 152 |
| Capital Expenditures | 154 |
| Contractual Obligations | 155 |
| Off-Balance Sheet Arrangements | 155 |
| Inflation | 155 |
| Quantitative and Qualitative Disclosures about Market Risk | 155 |
| Recently Issued Accounting Standards | 156 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 158 |
| INFORMATION ABOUT TM ENTERTAINMENT AND MEDIA, INC. | 163 |
| Business of TM | 163 |
| Effecting a business combination | 163 |
| Competition | 168 |
| Employees | 168 |
| Facilities | 168 |
| Periodic Reporting and Audited Financial Statements | 168 |
| Legal Proceedings | 168 |
| TM'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 169 |
| Overview | 169 |
| Liquidity and Capital Resources | 171 |
| Going Concern | 172 |
| Results of Operations | 173 |
| Off-Balance Sheet Arrangements | 173 |
| Contractual Obligations | 173 |
| Critical Accounting Estimates | 173 |
| Recently Adopted Accounting Pronouncements | 174 |
| MANAGEMENT | 177 |
| Directors, Management and Key Employees Following the Transaction | 177 |
| Number and Terms of Directors | 180 |
| Prior Involvement of Principals in Blank Check Companies | 180 |
| Section 16(a) Beneficial Ownership Reporting Compliance | 180 |
| Board Meetings and Committee Meetings | 180 |
| Code of Ethics | 180 |
| Committees of the Board of Directors | 181 |
| Fees of Independent Public Accountants | 182 |
| Communications with the Board of Directors | 183 |
| COMPENSATION DISCUSSION AND ANALYSIS | 183 |
| Historical Executive Compensation | 183 |
| Compensation Committee Report | 184 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 184 |
| Registration Rights | 184 |
| Administrative Services | 184 |
| Conflicts of Interest | 184 |
| Director Independence | 185 |
| BENEFICIAL OWNERSHIP OF TM SECURITIES | 186 |
| TM SHARES ELIGIBLE FOR FUTURE SALE | 188 |

iv

Table of Contents

| Section | Page |
|---|---|
| DESCRIPTION OF TM COMMON STOCK AND OTHER TM SECURITIES | 188 |
| General | 188 |
| Units | 188 |
| Common Stock | 189 |
| Preferred Stock | 189 |
| Warrants | 189 |
| Insider Warrants | 190 |
| Purchase Option | 191 |
| Change of Control Provisions | 191 |
| Limitation of Liability of Directors and Officers | 191 |
| Our Transfer Agent and Warrant Agent | 192 |
| APPRAISAL RIGHTS | 192 |
| STOCKHOLDER PROPOSALS | 192 |
| EXPERTS | 192 |
| DELIVERY OF DOCUMENTS TO STOCKHOLDERS | 193 |
| WHERE YOU CAN FIND MORE INFORMATION | 193 |
| INDEX TO FINANCIAL STATEMENTS | F-1 |
| ANNEX A-1 — Share Exchange Agreement | A-1 |
| ANNEX A-2 — First Amendment to Share Exchange Agreement | A-48 |
| ANNEX B — Forms of Lock-up Agreements | B-1 |
| ANNEX C — Form of Registration Rights Agreement | C-1 |
| ANNEX D — Form of Voting Agreement | D-1 |
| ANNEX E — Form of Certificate of Amendment | E-1 |
| ANNEX F — Form of Initial Certificate of Amendment | F-1 |
| ANNEX G — Opinion of Potter Anderson & Corroon LLP | G-1 |

v

Table of Contents

## CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING INFORMATION

*This Proxy Statement includes "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 (the "Securities Act"), as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Forward-looking statements include, but are not limited to statements regarding our expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this report may include, for example, statements about our:*

- *Ability to complete the Transaction;*
- *Success in retaining or recruiting, or changes required in, our management or directors following the Transaction;*
- *Potential inability to obtain additional financing to complete a business combination;*
- *Change in control if we acquire CME for stock;*
- *Public securities' limited liquidity and trading;*
- *The delisting of our securities from the NYSE Amex or an inability to have our securities listed on the NYSE Amex following the Transaction;*
- *Our goals and strategies;*
- *Our future prospects and market acceptance of our advertising network;*
- *Our future business development, financial condition and results of operations;*
- *Projected changes in revenues, costs, expense items, profits, earnings, and other estimated financial information;*
- *Our ability to manage the growth of our existing advertising network on inter-city express buses and expansion to prospective advertising network on high speed railways;*
- *Trends and competition in the out-of-home advertising media market in China;*
- *Changes in general economic and business conditions in China; and*
- *Chinese laws, regulations and policies, including those applicable to the advertising industry.*

*The forward-looking statements contained or incorporated by reference in this Proxy Statement are based on our current expectation and beliefs concerning future developments and their potential effects on us and speak only as of the date of such statement. There can be no assurance that future developments affecting us will be those that we have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described in this Proxy Statement, including in the section entitled "RISK FACTORS", and our other SEC Filings. Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.*

*References in this report as to "we," "us" or "our Company" refer to TM Entertainment and Media, Inc. References in this report to "CME" refer to Hong Kong Mandefu Holding Limited. References to "public stockholders" refer to holders of shares of common stock sold as part of the units in our IPO, including any of our stockholders existing prior to our IPO to the extent that they purchased or acquired such shares.*

1

[Table of Contents](#)

## SUMMARY OF THE PROXY STATEMENT

References in this report as to "we," "us" or "our Company" refer to TM Entertainment and Media, Inc., a Delaware corporation ("TM"). References to "Public Stockholders" refer to holders of shares of common stock sold as part of the units in our initial public offering (the "IPO"), including any of our stockholders existing prior to our IPO to the extent that they purchased or acquired such shares.

This Proxy Statement relates to a proposed purchase of all of the issued and outstanding capital stock of Hong Kong Mandefu Holding Limited ("CME") pursuant to a Share Exchange Agreement (the "Share Exchange Agreement") dated as of May 1, 2009 and amended as of September 30, 2009, among TM, CME, Zheng Cheng, Thousand Space Holdings Limited and Bright Elite Management Limited (collectively, the "Sellers"), Fujian Zong Heng Express Information Technology Co., Ltd. ("Fujian Express"), Fujian Fenzhong Media Co., Ltd. ("Fujian Fenzhong"), Ou Wen Lin and Qingping Lin (collectively, Fujian Express, Fujian Fenzhong, Ou Wen Lin, Qingping Lin and the Sellers are referred to herein as the "CME Parties") resulting in CME becoming a direct wholly-owned subsidiary of TM, referred to herein as (the "Transaction.")

This summary highlights selected information from this Proxy Statement and does not contain all of the information that is important to you. To better understand the proposals being considered at the Special Meeting, you should carefully read this entire Proxy Statement and the other documents to which it refers you, including the Share Exchange Agreement attached as Annex A to this Proxy Statement, and the other agreements, instruments and documents attached as annexes to this Proxy Statement.

### The Parties

#### TM

TM is a Delaware blank check company incorporated on May 1, 2007 in order to serve as a vehicle for the acquisition of an operating business in the entertainment, media, digital and communications industries. See section entitled "INFORMATION ABOUT TM ENTERTAINMENT AND MEDIA, INC." As discussed in this Proxy Statement, on May 4, 2009, we announced that we had entered into a definitive agreement to, among other things, purchase from the Sellers all of the issued and outstanding capital stock of CME.

The mailing address of TM's principal executive office is 307 East 87th Street, New York, New York 10128, and its telephone number is (212) 289-6942.

#### The Sellers

The Sellers own collectively all of the issued and outstanding capital stock of CME.

#### CME

CME, through contractual arrangements with Fujian Fenzhong, an entity majority owned by CME'S majority shareholder, operates the largest television advertising network on inter-city express buses in China. All references in this Proxy Statement to "CME's advertising network", "CME's customers", CME's operations in general and similar connotations, refer to Fujian Fenzhong, an entity which is controlled by CME through contractual agreements and which operates the advertising network. While CME has no direct equity ownership in Fujian Fenzhong, through the contractual agreements CME receives the economic benefits of Fujian Fenzhong's operations. See the sections entitled "RISK FACTORS — Risks Related to CME's Corporate Structure" and "CME'S CORPORATE STRUCTURE — Contractual Arrangements". CME generates revenues by selling advertising on its network of television displays installed on inter-city express buses in China. See section entitled "INFORMATION ABOUT HONG KONG MANDEFU HOLDING LIMITED ("CME") — Business Summary."

As of June 30, 2009, the number of inter-city express buses within CME's network exceeded 16,000 and covered inter-city express bus services originating in eleven regions, including the four municipalities of Beijing, Shanghai, Tianjin and Chongqing and seven economically prosperous provinces, namely Guangdong, Jiangsu, Fujian, Sichuan, Hubei, Anhui and Hebei.

2

Table of Contents

## QUESTIONS AND ANSWERS ABOUT THE TRANSACTION
## AND THE SPECIAL MEETING

These Questions and Answers are only summaries of the matters they discuss. Please read this entire Proxy Statement.

**I. Q:  Why am I receiving this Proxy Statement?**

A:  TM has agreed to purchase 100% of the issued and outstanding capital stock of CME under the terms of the Share Exchange Agreement dated as of May 1, 2009 as amended as of September 30, 2009, among TM, CME and the Sellers, which are described in this Proxy Statement. A copy of the Share Exchange Agreement is attached to this Proxy Statement as Annex A. We encourage you to read it in its entirety. In this Proxy Statement we refer to the purchase by TM of the issued and outstanding capital stock of CME and the related transactions contemplated by the Share Exchange Agreement as the "Transaction." Pursuant to TM's Amended and Restated Certificate of Incorporation, TM is required to obtain stockholder approval of the Transaction.

In addition to voting on the Transaction Proposal, the stockholders of TM will be asked to vote on: (i) the Initial Charter Amendment Proposal No. 1, (ii) the Initial Charter Amendment Proposal No. 2, (iii) the Share Issuance Proposal, (iv) the Charter Amendment Proposal, (v) the Authorized Share Increase Proposal, (vi) the Election of Directors Proposal, and (vii) the Adjournment Proposal.

Pursuant to certain rules of the NYSE Amex, TM is required to obtain stockholder approval of the issuance of TM Common Stock in connection with the Transaction. In addition, TM and CME have agreed that they will work together to, subject to stockholder approval, use their commercially reasonable efforts to cause the name of TM to be changed to "China MediaExpress Holdings, Inc." (or such other name as TM and the Sellers mutually agree upon) immediately after the consummation of the Transaction.

TM will hold a special meeting (the "Special Meeting") of its stockholders at 10:00 a.m., local time, on October 15, 2009 to obtain these approvals. This Proxy Statement contains important information about the Special Meeting, the proposed Transaction and the other proposals to be presented to the TM stockholders. You should read it carefully.

Your vote is important. We encourage you to vote as soon as possible after carefully reviewing this Proxy Statement.

**II. Q:  Why are we allowed to make the amendments contemplated by the Initial Charter Amendment Proposals?**

A:  As part of the Initial Charter Amendment Proposals (No. 1 and No. 2) we are removing (i) the prohibition on the consummation of a Business Combination if holders of an aggregate of 30% or more in interest of IPO Shares exercise their conversion rights and (ii) the requirement that only holders of IPO Shares who vote against the Transaction may convert their IPO Shares into cash. While our Amended and Restated Certificate of Incorporation states that each of these relevant provisions cannot be amended prior to the consummation of a business combination, we have obtained the opinion of Delaware counsel, included in this proxy statement as Annex G, that the Initial Charter Amendment Proposals, if duly adopted by our board of directors and duly approved by the holders of a majority of our outstanding capital stock, all in accordance with the applicable provisions of the Delaware General Corporations Law, or DGCL, would be valid and effective when filed in accordance with the DGCL. See the section entitled "THE INITIAL CHARTER AMENMENT PROPOSALS — Rescission Rights."

**III. Q:  Why is TM proposing the Transaction?**

A:  TM was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase and/or other similar transaction with one or more businesses in the entertainment, media, digital and communications industries and to seek out opportunities both

13

Table of Contents

domestically and internationally to take advantage of our management team's experience in these markets. CME operates the largest digital television advertising network on inter-city express buses in China.

TM believes that CME is well positioned for growth and that ownership of CME will provide TM stockholders with an opportunity to participate in a business with a history of earnings and with growth potential. However, CME has a limited operating history, derives a significant portion of its revenues from a limited number of advertising clients, depends on one equipment supplier and relies on contractual arrangements with a third party to conduct its advertising business in China. The Transaction is intended to be a "business combination" under TM's Amended and Restated Certificate of Incorporation, which TM must submit to its stockholders for approval prior to completion.

**IV. Q:  What is being voted on?**

A:  You are being asked to vote upon the following proposals:

- to approve the Initial Charter Amendment Proposal No. 1;

- to approve the Initial Charter Amendment Proposal No. 2;

- to approve the purchase by TM of CME pursuant to the Share Exchange Agreement and the transactions contemplated thereby (the "Transaction Proposal");

- to approve the Share Issuance Proposal;

- to approve the Charter Amendment Proposal;

- to approve the Authorized Share Increase Proposal;

- to approve the Election of Directors Proposal; and

- to approve the Adjournment Proposal.

**V. Q:  What is the relation between the Proposals?**

A:  The Transaction Proposal is conditioned upon the approval of the Initial Charter Amendment Proposal No. 2 and, in the event the Initial Charter Amendment Proposal No. 2 does not receive the necessary vote to approve that proposal, then the Transaction Proposal will not be presented for approval. Each of the Share Issuance Proposal, the Charter Amendment Proposal and the Authorized Share Increase Proposal are conditioned upon the approval of the Transaction Proposal and, in the event the Transaction Proposal does not receive the necessary vote to approve that proposal, then none of those proposals will be presented for approval. If the Transaction Proposal is approved but any of the Share Issuance Proposal, or the Charter Amendment Proposal are not approved, TM would not be able to perform its obligations under Share Exchange Agreement, allowing the Sellers to terminate the Share Exchange Agreement.

Adoption of the Election of Directors Proposal and the Adjournment Proposal are not conditioned upon the adoption of any of the other proposals, but if the Transaction Proposal is not approved the Election of Directors Proposal will not be presented for approval.

**VI. Q:  Who can vote at the Special Meeting?**

A:  Holders of TM Common Stock at the close of business on September 21, 2009, the record date for the Special Meeting, may vote in person or by proxy on the proposals, at the Special Meeting. On the record date, 12,505,000 shares of TM Common Stock were outstanding and entitled to vote at the Special Meeting. As of the record date, our Initial Stockholders, officers and directors beneficially owned approximately 18.0% of the outstanding shares of TM Common Stock (excluding any warrants held by such persons).

14

Table of Contents

# RISK FACTORS

You should carefully consider the following risk factors, together with all of the other information included in this Proxy Statement, before you decide whether to vote or direct your vote to be cast to approve the Transaction and related proposals. The following risk factors consist of risks relating to the proposed Transaction, risks relating to doing business in China, risks relating to CME, risks relating to CME's corporate structure and risks relating to TM. In addition, references in these "Risk Factors" to "CME's advertising network", "CME's customers", CME's operations in general and similar connotations, refer to Fujian Fenzhong, an entity which is controlled by CME through contractual agreements and which operates the advertising network. While CME has no direct equity ownership in Fujian Fenzhong, through the contractual agreements CME receives the economic benefits of Fujian Fenzhongs's operations. See the sections entitled "RISK FACTORS — Risks Related to CME's Corporate Structure" and "CME'S CORPORATE STRUCTURE — Contractual Arrangements".

## Risks Relating to the Proposed Transaction

***Various stockholder approvals are required to complete the Transaction, and we cannot assure you that it will be consummated; TM, CME, our initial stockholders and their respective affiliates may enter into transactions to secure the required stockholder approvals, which could reduce the amount of funds available to CME following the Transaction.***

We will proceed with the Transaction only if (1) the Initial Charter Amendment Proposal No. 2 is approved, and (2) a majority of the shares of TM Common Stock voted by the public stockholders are voted in favor of the Transaction. The Share Exchange Agreement contains a number of other conditions to closing, some or all of which may not be satisfied. Many of these conditions are beyond our control and include, among other things, the continued accuracy of the representations and warranties in the Share Exchange Agreement.

We cannot be certain that we will obtain the necessary stockholder approval or that we and the Sellers will satisfy other closing conditions.

In order to ensure that that the Transaction Proposal is approved TM, CME, TM's initial stockholders and their respective affiliates or other third parties may enter into transactions to purchase shares of common stock of TM from stockholders who have indicated their intention to vote against the acquisition and seek conversion of their shares. Such transactions could reduce the amount of funds available to CME following the Transaction. While TM will publicly disclose any such transactions, TM's stockholders may not have sufficient time to consider the impact of such purchases before submitting their proxy, or if they have submitted a proxy, to revoke such proxy prior to the Special Meeting.

***If we consummate the Transaction, we will be issuing additional shares of TM Common Stock. This would reduce the percentage of the equity interest held by our current stockholders in our company, and will cause a change in control of TM and could adversely affect the market price of the TM Common Stock and discourage certain business combinations in which our stockholders could be offered a premium for their shares.***

Pursuant to the Share Exchange Agreement, TM will purchase from the Sellers 100% of the outstanding equity of CME and TM will issue at closing 20.915 million newly issued shares of TM Common Stock, and pay $10.0 million in three year, no interest promissory notes. In addition, the Sellers may also earn up to an additional 15.0 million newly issued shares of TM Common Stock subject to the achievement of certain net income targets for 2009, 2010 and 2011.

As a consequence of such issuance, our current stockholders will experience immediate dilution of their percentage ownership interest in TM, with the Sellers owning approximately 64.6% of the outstanding shares of TM Common Stock immediately after the consummation of the Transaction assuming no conversions and 93.1% assuming a maximum of 100% conversions. The presence of the foregoing additional number of shares of TM Common Stock eligible for trading in the public market, or the perception that such additional shares may become eligible for trading, may have an adverse effect on the market price of the TM Common Stock.

23

Table of Contents

In January 2008, Pali introduced TM to a telecommunications service provider ("Target B") that was interested in raising capital and was considering a transaction with a blank check company. From January through March 2008, TM and its representatives conducted preliminary due diligence on Target B and the industry in which Target B operated. In March 2008, TM submitted a letter of intent to Target B that outlined the terms of a merger between TM and Target B. Subsequently, TM and Target B engaged in several discussions regarding the terms of the letter of intent. However, Target B ultimately decided to pursue another transaction.

In late May 2008, TM was contacted by the financial advisor of an entertainment distribution company ("Target C") regarding a potential transaction. From late May 2008 through November 2008, TM and its representatives conducted extensive financial and business due diligence on Target C, including meetings with Target C's management and representatives and a visit to Target C's facilities. In October 2008, TM submitted a non-binding letter of intent for a merger of TM and Target C. Through the remainder of October and November, TM and it representatives held numerous discussions with Target C and its representatives regarding the letter of intent and potential transaction structures. TM ended discussions with Target C in late November 2008 as a transaction structure could not be agreed upon between the parties.

In August 2008, TM was contacted regarding the auction of a pay-TV operator ("Target D"). From late August 2008 through November 2008, TM and its representatives conducted financial and business due diligence on Target D, including a meeting with and numerous conference calls with Target D's management and a review of documents provided to TM via a virtual data room. In early November 2008, TM submitted an offer for the acquisition of Target D. In late November 2008, TM was notified that it was not selected as the winning bidder in the auction of Target D.

On November 24, 2008, Pali was contacted by a finder regarding a potential transaction opportunity for TM with a Chinese media company. Upon signing a non-disclosure agreement on December 2, 2008, TM was provided with information on CME, including a draft of a Registration Statement on Form F-1 that had been prepared (but never filed) in connection with a contemplated IPO in the United States of CME. As a result of general market conditions in the United States in the fall of 2008 and since then, CME's management determined not to file the Form F-1 and to pursue the proposed transaction with TM in lieu of conducting an initial public offering. Immediately following, TM and its representatives began conducting preliminary due diligence on CME, other public Chinese advertising companies, and the Chinese adverting industry in general as well as on other blank check companies that had entered into a business combination with a target based in China. TM was informed that CME was planning to conduct a traditional IPO but due to the turmoil in the global equity and credit markets during the fall of 2008 that it had abandoned such plans for the time being. Since TM had already raised in excess of $80 million in its IPO in October 2007, we believed that CME might be receptive to entering into a transaction with us.

On December 8, 2008, Messrs. Green and Bird and representatives of Pali held a conference call with representatives of CME to discuss CME's historical and projected financial results, business plan and strategy.

On December 10, 2008, TM management received a preliminary financial model from Pali regarding the acquisition of CME. The financial model outlined a potential transaction based on the following information that could serve as the basis to structure the financial terms of a transaction: (i) unsubstantiated financial results of CME that had been provided to Pali by the finder (which subsequently proved to be substantially understated), and (ii) valuation metrics based on CME's most comparable publicly traded company, VisionChina Media, an operator of a television advertising network on intra-city buses and subways in China, and Focus Media and AirMedia. The valuation metrics presented were price to earnings multiples.

71

Table of Contents

The comparison of multiples presented were as follows:

| | Price/Earnings | | |
| --- | --- | --- | --- |
| | 2008E | 2009E | 2010E |
| VisionChina Media | 8.3x | 6.5x | 5.3x |
| AirMedia | 11.7x | 8.7x | 7.1x |
| Focus Media | 5.1x | 4.7x | 3.7x |
| TM/CME | 8.2x | 4.5x | 2.5x |

Based on the findings from the preliminary due diligence and the financial model, Messrs. Green and Bird decided to begin the preparation of a preliminary non-binding letter of intent to send to CME.

On December 11, 2008, TM provided CME with a preliminary non-binding letter of intent outlining the terms of a transaction between the two companies. As part of the letter of intent, TM's management contemplated a deal structure in which TM would issue shares of its common stock and pay cash to CME shareholders. The proposed structure included an earn-out component which assured TM's management that there would be a strong alignment of interests between CME's management and TM's stockholders following the closing of the transaction.

From December 18 through December 19, 2008, Messrs. Green and Bird and a representative of Pali visited CME at its headquarters in Fuzhou, China to discuss the terms of a transaction and to perform due diligence. TM and CME engaged in extensive negotiations over the aggregate value to be paid to CME's stockholders based on TM's valuation of CME. In addition, TM verbally engaged Pali as its financial advisor with respect to a transaction involving CME.

Between December 20, 2008 and January 12, 2009, representatives of TM and CME engaged in numerous discussions relating to the terms in the non-binding letter of intent for a transaction between CME and TM. In addition, another representative of Pali conducted on site due diligence of CME within that time frame.

On January 8, 2009, CME and TM signed a non-binding letter of intent setting forth the principal terms of the proposed acquisition of CME by TM, which included the following principle terms to be included in customary definitive agreements to be negotiated by the parties:

- *Consideration* — $316.9 million of total consideration comprised of $176.0 million of initial consideration at closing of the transaction (19.5 million shares of TM Common Stock valued at $8.00 per share, and $20.0 million in cash) and additional consideration of up to $140.9 million upon achieving certain benchmarks and the exercise of TM public warrants (15.0 million shares of TM Common Stock valued at $8.00 per share, and $20.9 million of the cash proceeds from the exercise of TM's publicly held warrants);

- *Pre-Shareholder Vote Financing* — TM is permitted to raise up to $50 million of financing prior to TM's shareholder vote to finance or partially finance the purchase of up to $50 million of TM Common Stock to the extent necessary to receive shareholder approval;

- *Lock-up* — CME's existing stockholders will agree to customary restrictions upon the sale, pledge or other transfer of shares of common stock that they receive;

- *Senior Management* — CME will agree to add a Chief Financial Officer conversant with US GAAP and public company accounting standards that is mutually acceptable to both TM and the CME;

- *Board of Directors* — The board of directors following the acquisition to initially consist of members designated by CME, with additional customary representation for TM as well as independent members as required by law and stock exchange rules;

- *Exclusivity* — The later of February 28, 2009 and 15 days following TM's receipt of CME's audited financial statements for the calendar years 2006, 2007 and 2008.

72

Table of Contents

The transaction was structured to be valued at a discount to what TM believed to be the most comparable publicly traded company (VisionChina Media) to CME. The actual negotiation process involved a series of discussions regarding a number of factors, including the number of shares CME's existing shareholders would receive upon the closing of the transaction, the number of shares they would receive through the achievement of various earn-out payments related to specified net income targets, the amount of cash they were to receive at closing and the amount of cash they could receive through the future exercise of TM's warrants. The earn-out net income targets were solely based on CME's financial projections that were provided to us.

From January 13 through mid-April 2009, TM continued its due diligence review of CME's business. The due diligence consisted of a detailed review of information provided to TM by CME on its business as well as a further due diligence review of the Chinese advertising industry in general and the competitive landscape with respect to CME in particular.

On January 23, 2009, Morrison Cohen LLP ("Morrison Cohen"), TM's counsel, provided a draft of a Share Exchange Agreement to CME.

From January 2009 through April 2009, TM's board of directors was continuously updated on the status of the transaction and was provided with information on CME and the Chinese advertising industry.

On February 4, 2009, TM engaged Global Law Office ("GLO") to act as its Chinese legal counsel. From January 2009 through April 2009, GLO along with Morrison Cohen conducted extensive legal due diligence on CME.

On February 11, 2009, GLO provided to TM a preliminary legal due diligence summary on CME.

On February 27, 2009, TM received a draft of CME's audited financial statements for the calendar years 2006, 2007 and 2008 prepared by AJ. Robbins, PC ("AJ Robbins").

On March 6, 2009, TM received comments to the Share Exchange Agreement from CME's legal counsel, Loeb & Loeb LLP ("Loeb").

On March 9, 2009, GLO provided to TM a list of legal issues surrounding the transaction with CME, including the lack of SARFT approval, the structure following consummation of the transaction and minor trademark issues.

On March 13, 2009, Morrison Cohen and Loeb held a conference call to highlight the material issues relating to the Share Exchange Agreement including the timing of the payment related to the $20.9 million of the cash proceeds from the exercise of TM's publicly held warrants, the definition of the Permitted Financing, conduct prior to closing, indemnification, and representations and warranties.

On March 16, 2009, TM, Pali and Morrison Cohen held a conference call with CME and Loeb to discuss the material issues relating to the Share Exchange Agreement that were highlighted on the March 13, 2009 conference call.

Between March 16, 2009 and April 23, 2009, representatives of TM and CME, and their respective legal counsel, continued to negotiate the terms of the Share Exchange Agreement and related documents. Such negotiations were primarily conducted telephonically. While numerous items were negotiated, particular attention was given to the definition and terms of TM's Permitted Financing (as defined in the Share Exchange Agreement) and the minimum amount of working capital that TM would be required to deliver in the transaction. During these negotiations, CME came to understand that a portion of TM's Trust could be used to purchase TM's publicly traded shares in order to secure approval of the Transaction and that additional financing might be required to complete the Transaction. As a result, CME sought to ensure that a minimum amount of cash (in addition to the consideration payable to the Sellers) for working capital purposes was delivered by TM at closing. After a series of negotiations, it was ultimately agreed that TM could secure up to $50.0 million in financing (secured or unsecured debt, which may be convertible into TM Common Stock, or preferred stock) with a term of at least 3 years. Additionally, TM agreed to deliver at least $10.0 million of working capital (after fees and expenses) at the closing of the transaction, but CME subsequently agreed to forego this requirement.

73

Table of Contents

On March 30, 2009, TM formalized its previously agreed upon engagement of Pali as its financial advisor through the execution of a written agreement.

On April 13, 2009, TM and Pali held a conference call with AJ Robbins to discuss the audited financials, CME's record keeping and internal controls, as well as the on site work performed for the audit. Additionally, AJ Robbins confirmed the draft received in March was substantially similar to the final version to be received upon payment of the audit fee by CME.

On April 23, 2009, at a meeting of TM's board of directors, TM management reviewed the principal terms of the proposed transaction with CME and the status of the negotiations regarding the Share Exchange Agreement and related documentation. The meeting included a verbal presentation from Pali, which included a summary of the proposed transaction consideration and structure, an overview of the business and financials of CME, and a discussion of the advertising market in China and the implied valuation of the transaction.

The historical financials and projections provided by the management of CME were as follows:

|  | 2006 | 2007 | 2008 | 2009E | 2010E | 2011E |
|---|---|---|---|---|---|---|
|  |  |  | (In millions) |  |  |  |
| Net Sales | $4.0 | $25.8 | $63.0 | $104.2 | $196.6 | $305.5 |
| Gross Profit | $2.5 | $12.7 | $37.9 | $ 71.5 | $140.9 | $219.5 |
| EBITDA | $2.0 | $12.6 | $38.0 | $ 65.5 | $128.5 | $197.8 |
| Pre-Tax Income | $1.6 | $11.0 | $35.2 | $ 60.2 | $119.4 | $186.1 |
| Net Income | $0.9 | $ 7.0 | $26.4 | $ 42.1 | $ 83.6 | $130.3 |

The projections provided by the management of CME were based on their current business plan and without regard to capital structure and the proposed Transaction.

The discussion on the implied valuation focused on a comparison of the price to earnings multiples, enterprise value to revenue multiples and enterprise value to EBITDA (earnings before interest, taxes, depreciation and amortization) multiples of the publicly-traded companies comparable to CME (VisionChina Media, AirMedia, Baidu, Sohu and Sina) compared to the multiples embedded in TM's transaction with CME. Heavy emphasis was placed on the price to earnings multiples of CME's most comparable publicly traded company, VisionChina Media, an operator of a television advertising network on intra-city buses and subways in China and a publicly listed company on NASDAQ, as compared to the price to earnings multiples in TM's transaction with CME. The comparison of multiples analyzed were as follows:

|  | Enterprise Value/Revenue | | | Enterprise Value/EBITDA | | | Price/Earnings | | | Debt/ 2008 EBITDA |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 2008 | 2009E | 2010E | 2008 | 2009E | 2010E | 2008 | 2009E | 2010E |  |
| VisionChina Media | 2.2x | 1.6x | 1.3x | 5.0x | 3.5x | 2.8x | 8.4x | 7.7x | 6.2x | 0.0x |
| AirMedia | 1.5x | 1.1x | 0.9x | 5.3x | 6.3x | 3.2x | 11.7x | 15.1x | 8.8x | 0.0x |
| Baidu | 14.2x | 11.4x | 8.4x | 31.2x | 25.4x | 18.8x | 42.8x | 36.5x | 27.5x | 0.0x |
| Sohu | 3.4x | 2.9x | 2.5x | 8.1x | 6.8x | 5.9x | 11.5x | 10.8x | 9.8x | 1.2x |
| Sina | 2.6x | 2.5x | 1.7x | 11.3x | 8.1x | 5.7x | 15.6x | 18.0x | 14.0x | 0.0x |
| TM/CME | 2.8x | 1.7x | 0.9x | 4.6x | 2.7x | 1.5x | 9.8x | 6.3x | 3.9x | 0.0x |

The analysis resulted in a conclusion by Pali that due to lower implied multiples in most cases, TM's transaction with CME compared favorably to its publicly-traded comparables. Following a full discussion, the TM board unanimously approved the Share Exchange Agreement and the transactions contemplated.

Pali had been one of the underwriters of TM's initial public offering. Pali regularly provides investment banking services and mergers and acquisitions advisory services and TM management believed that the Pali investment professionals would provide sound advice to TM and its board of directors relating to a proposed transaction with CME, especially in connection with structuring the transaction and helping to analyze the financial terms to be negotiated. In addition, Pali's investment professionals had advised numerous special purpose acquisition companies and were thus familiar with the various requirements pertaining to them. Pali was not engaged to issue an opinion to the Board of Directors regarding the fairness of the Transaction or

Table of Contents

whether the Transaction would satisfy the requirement that the Transaction have a fair market value equal to at least 80% of TM's net assets. Pali has agreed to waive its deferred underwriting fee in exchange for such number of shares of this Common Stock owned by our initial Stockholders to be agreed upon. Upon the closing of the Transaction, pursuant to the engagement agreement Pali is to be paid a fee of approximately $2.0 million, the exact amount to be determined based on the total expenses incurred in the Transaction by TM. TM has also agreed to reimburse Pali for its reasonable out-of-pocket expenses and to indemnify Pali and certain related persons against liabilities arising out of Pali's services under the engagement agreement.

Between April 23, 2009 and May 1, 2009, representatives of TM and CME continued to finalize the Share Exchange Agreement and related documentation.

On May 1, 2009, AJ Robbins delivered the final audit of CME to TM.

On the evening of May 1, 2009, the Share Exchange Agreement was executed by the parties thereto and on the morning of May 4, 2009, TM issued a press release announcing the transaction.

TM maintained regular contact with CME after execution of the original Share Exchange Agreement. From June 2009 through September 2009, and as permitted under the original Share Exchange Agreement, TM and CME sought to secure a Permitted Financing (as defined in the original Share Exchange Agreement) and conducted numerous meetings, in-person and telephonically, with approximately 30 potential debt and equity investors. The discussions with investors all varied in terms of level of interest. TM and CME ultimately received term sheets from several investors. None of the term sheets received were acceptable to both TM and CME. Therefore, in order to consummate the transaction and preserve value for all TM shareholders interested in the transaction, in late September, TM and CME agreed to discuss amending the original Share Exchange Agreement so as to reduce or defer the cash portion payable to the parties and to reduce the need to seek alternative sources of financing.

On September 23, 2009, the terms of such changes were verbally agreed upon by both TM and CME. The changes included issuing 1.415 million additional shares of TM Common Stock and $10.0 million in notes payable to CME shareholders, in lieu of the $20.0 million cash consideration. Additionally, it was agreed that the $10.0 working capital requirement would be removed and that TM would limit its transaction expense.

Between September 23, 2009 and September 30, 2009, representatives of TM and CME continued to negotiate an amendment to the Share Exchange Agreement.

On September 30, 2009, at a meeting of TM's board of directors, TM management and Morrison Cohen reviewed the changes to the transaction and the Share Exchange Agreement. The TM board unanimously approved the amended transaction and changes to the Share Exchange Agreement.

On September 30, 2009, the amendment to Share Exchange Agreement was executed by the parties thereto and on the morning of October 1, 2009, TM issued a press release announcing the amended transaction. A copy of such amendment is included in Annex A attached to this Proxy Statement.

In addition, during this time TM's management began considering ways to increase the likelihood that the Transaction would be approved, including by way of amendments to TM's Amended and Restated Certificate of Incorporation. It was determined that the amendments proposed by the Initial Charter Amendment Proposals would meet these goals by reducing the threshold vote required for approval of the Transaction and by reducing the incentive for holders of IPO Shares to vote against the Transaction. As a result, TM negotiated with CME to allow such amendments and to eliminate the contractual requirement in the Share Exchange Agreement that no more than 30% of the IPO Shares elect to convert in order to consummate the Transaction.

### Recommendation of the Board of Directors and Reasons for the Transaction

After careful consideration, TM's board of directors, by unanimous vote at a meeting on April 23, 2009 and on September 30, 2009, approved and declared advisable the Share Exchange Agreement and the Transaction. Accordingly, our board of directors recommends that TM's stockholders vote "FOR" the Transaction Proposal.

**Table of Contents**

TM's board of directors considered a wide variety of factors in connection with its evaluation of the Transaction. Pali's valuation analysis was one of the factors the board of directors considered, in addition to TM's own due diligence and review of CME's business operations and results. In light of the complexity of those factors, TM's board of directors did not consider it practicable to, nor did it attempt to, quantify or otherwise assign relative weights to the specific factors it considered in reaching its decision. In addition, individual members of TM's board of directors may have given different weight to different factors. In reaching its determination, TM's board of directors considered the following factors, among others:

- information with respect to the financial condition, results of operation and business of CME, on both a historical and prospective basis; 2006 — 2008 net revenue and net income CAGR of 269% and 404%, respectively, with a projected 2008 — 2011 net income CAGR of 158%;

- CME's lower price to earnings multiples relative to its public comparables, given its future prospects and those of the industry;

- CME's management team's quality and strength, and proven track record of success; CME's existing management team has grown the business to achieve 2008 net revenue and net income of $63.0 and $26.4 million, respectively, and 35,000 installed TV displays on over 16,000 buses in a short period of time;

- the earn-out and lock-up features of the transaction, which provide substantial incentives to the management and stockholders of CME to realize future value for all stockholders after the closing of the Transaction; CME's existing shareholders have agreed to receive a substantial portion of the consideration based on achieving certain net income targets that imply significant growth in earnings and indicate their commitment and confidence towards CME's future growth prospects; the lock-up agreements that CME's existing shareholders have agreed to enter into and the consideration based on the exercise of the publicly held warrants will align their interests with those of TM's stockholders;

- the terms and conditions of the Share Exchange Agreement and related transaction documents;

- the Chinese and global advertising market, both current and projected; advertising spending in China reached $15.4 billion in 2007 and is expected grow to $25.0 billion in 2011, a 12.8% CAGR; and

- the results of TM's business, financial, accounting, legal and other due diligence review of CME.

Our board of directors also considered potentially negative factors in its deliberations concerning the Transaction and the Share Exchange Agreement, including:

- the competitive nature of the Chinese advertising industry in general; although the Chinese advertising industry is generally competitive, it is also highly fragmented and growing quite rapidly; however, CME is the only company with an advertising network of its size and scope on inter-city express buses in China;

- the possibility that the benefits anticipated from the Transaction might not be achieved or might not occur as rapidly or to the extent currently anticipated; it is possible that the financial and strategic benefits of having CME publicly traded on a U.S. exchange, and that the ability of TM's management to leverage its business relationships to secure additional programming for CME could fall short of our expectations;

- the risk that CME is unable to increase the number of buses in its network as projected;

- the pro forma effect of the issuance of 15,000,000 shares of TM common stock pursuant to the Share Exchange Agreement on TM's earnings per share, which would reduce TM's earnings per share on a pro forma adjusted basis; and

- the limits on indemnification in the Share Exchange Agreement, which restrict the remedies available to TM in the event of a breach by CME and cap the damages recoverable by TM at $25.0 million.

In addition, TM's board of directors relied on a number of standards generally accepted by the financial community in making its decision to enter into the Share Exchange Agreement with CME. In particular, TM's

76

Table of Contents

board of directors placed heavy emphasis on the price to earnings multiples of publicly-traded companies that it deemed to be comparable to CME and compared those multiples to the earnings multiple embedded in TM's transaction with CME. In addition, TM's board of directors evaluated enterprise value to revenue multiples, enterprise value to EBITDA (earnings before interest, taxes, depreciation and amortization) multiples and the capital structures of the publicly-traded companies comparable to CME and compared the multiples and capital structures to those in TM's transaction with CME.

Despite not being disclosed in TM's IPO prospectus, TM's board of directors, also considered various transactions either TM or its affiliates might enter into in order to secure the required stockholder approval of the Transaction, including the purchase of TM's publicly traded shares with funds from the Trust, the entering into various debt or equity financing arrangements to fund such purchases and the impact of such transactions on the amounts available for the Transaction, the debt of the combined company and its relative equity ownership following such transactions.

This discussion of the information and factors that our board of directors considered is not intended to be exhaustive but, we believe, includes many of the material factors considered by our board of directors. Each member of our board of directors made his judgment based on the total mix of information available to our board of directors of the overall effect of the Transaction on our stockholders compared to other alternatives. The judgments of individual directors may have been influenced to a greater or lesser degree by their individual views with respect to different factors.

Based on the factors outlined above, our board of directors approved and declared it advisable that TM enter into the Transaction.

## Interests of TM's Management in the Transaction

When you consider the recommendation of TM's board of directors that you vote in favor of the Transaction, you should keep in mind that TM's officers and directors have interests in the Transaction that are different from, or in addition to, yours. These interests include the following:

- If the Transaction is not consummated and TM is required to liquidate, the shares of TM Common Stock owned and acquired by TM's directors and officers prior to our IPO will be worthless because they will not be entitled to receive any of the assets held in the Trust Account with respect to these shares. In addition, if the Transaction is not consummated, and TM is forced to liquidate, warrants held by TM's directors and officers will expire with no value. On April 23, 2009, the date TM's board of directors approved the Transaction and the Share Exchange Agreement, our directors and officers owned a total of 2,250,000 shares of TM Common Stock acquired prior to our IPO having a total market value of approximately $17.2 million based on the share price of $7.64 of the TM Common Stock on the last trading day prior to that date. In addition, on April 23, 2009, our directors and officers held warrants exercisable for an aggregate of 2,100,000 shares of TM Common Stock (for which they paid $2,100,000) having a total market value of approximately $0.2 million based on our warrant price of $0.11 per warrant on the last trading day prior to that date.

- Each of Messrs. Green and Bird has agreed, that, if we liquidate prior to the consummation of a business combination, they will be personally liable to ensure that the proceeds of the Trust Account are not reduced by the claims of vendors for services rendered or products sold to us as well as claims of prospective target businesses for fees and expenses of third parties that we have agreed in writing to pay in the event we do not complete a business combination. If the Transaction is consummated, TM's officers and directors will not have to perform such obligations. If the Transaction is not consummated, however, TM's officers and directors could potentially be liable for any claims against the Trust Account by such vendors or prospective target businesses who did not sign waivers. If the Transaction is not consummated, CME and the Sellers will be responsible for their own expenses incurred in connection with the proposed Transaction. Pursuant to the Share Exchange Agreement, CME and the Sellers have waived any claim they may have against the Trust Account.

77

Table of Contents

- All rights specified in TM's Amended and Restated Certificate of Incorporation relating to the right of directors and officers to be indemnified by TM, and of TM's directors and officers to be exculpated from monetary liability with respect to prior acts or omissions, will continue after the Transaction. If the Transaction is not consummated and TM liquidates, it will not be able to perform its obligations under those provisions. If the Transaction is ultimately completed, the combined company's ability to perform such obligations will probably be substantially enhanced.

## Satisfaction of Requirement that the Transaction has a Fair Market Value Equal to at least 80.0% of TM's Net Assets

It is a requirement that any business acquired by TM have a fair market value equal to at least 80.0% of TM's net assets at the time of acquisition. Based solely on its evaluation of the consideration to be paid in the Transaction, TM's board of directors determined that this requirement was met and exceeded. TM's board of directors did not consider the implied valuation of CME based on Pali's presentation on April 23, 2009 in making its determination that the 80% requirement was met. TM's board of directors did not seek or obtain an opinion of an outside valuation advisor as to whether the 80.0% test has been met, however, in light of the financial background and experience of members of TM's management and board of directors, TM's board of directors believes it is qualified to determine whether the Transaction meets this requirement. Mr. Green (in his roles at Anchor Bay Entertainment, Greenlight Consulting and Sony Wonder), Mr. Bird (in his roles at AOL, Hanana-Barbera and USA Broadcasting), Mr. Hyde (in his numerous roles as a senior executive, consultant and advisor) and Mr. Miller (in his roles as a senior executive, investor and advisor), all have had significant financial experience. If the Transaction is not consummated and TM is required to liquidate, the shares of TM Common Stock owned and acquired by TM's directors and officers prior to our IPO will be worthless because they will not be entitled to receive any of the assets held in the Trust Account with respect to these shares. In addition, if the Transaction is not consummated, and TM is forced to liquidate, warrants held by TM's directors and officers will expire with no value. These factors created a conflict of interest for TM's directors and officers in negotiating the Transaction on behalf of TM, which resulted in the value of the consideration being paid by TM exceeding 80% of TM's net assets.

In determining that the Transaction had a fair market value equal to at least 80.0% of TM's net assets, TM's board of directors first determined that as of March 31, 2009, TM had approximately $77.4 million in net assets (total assets minus total liabilities). The fair value of the Transaction was determined through arms-length negotiations between the Sellers and TM (Messrs. Green and Bird) and resulted in a minimum purchase price equal to approximately $176.0 million, assuming a value of $8.00 of the TM Common Stock being issued. This amount exceeds 80.0% of TM's net assets at the time our board of directors approved the Share Exchange Agreement and the Transaction. Therefore, the 80.0% test was satisfied.

## Certain U.S. Federal Income Tax Consequences of the Transaction

The following discussion is a summary of the material U.S. federal income tax consequences of the Transaction to TM and to current holders of TM Common Stock, as well as the material U.S. federal income tax consequences to the holders of TM Common Stock who choose to exercise their IPO conversion rights. This discussion addresses only those TM stockholders who are "U.S. Holders" (as defined below) that hold each of their shares of TM Common Stock as a "capital asset" as defined in the Internal Revenue Code of 1986, as amended (the "Code").. This summary is for the general information of TM stockholders only and does not purport to be a complete analysis of all potential tax effects of the Transaction or the exercise of the IPO conversion rights, nor does it constitute tax advice to any particular TM stockholder. For example, this summary does not consider the effect of any applicable state, local or non-U.S. tax laws, or of any non-income tax laws. This discussion does not address all of the U.S. federal income tax consequences that may be relevant to a particular TM stockholder in light of their individual circumstances or to TM stockholders that are subject to special treatment under U.S. federal income tax laws, including, without limitation:

- financial institutions, regulated investment companies, real estate investment trusts and insurance companies;

78

Table of Contents

*Equity Interest Pledge Agreements.*  Pursuant to the equity interest pledge agreements entered into on April 17, 2009, Zheng Cheng and Chunlan Bian have respectively pledged their equity interest in Fujian Fenzhong to Fujian Express to secure the obligations of Zheng Cheng, Chunlan Bian, and Fujian Fenzhong under the loan agreements and the exclusive business cooperation agreement (including all ancillary agreements, if any). In addition, shareholders of Fujian Fenzhong agree not to transfer, sell, pledge, dispose of or create any encumbrance on any equity interests in Fujian Fenzhong that would affect the pledgee's interests. The equity interest pledge agreements will expire upon the full payment of the consulting and service fees under the exclusive business cooperation agreement and upon termination of Fujian Fenzhong's obligations under the exclusive business cooperation agreement, or upon fulfillment of all the obligations due under the loan agreements by the shareholders of Fujian Fenzhong (the later of the fulfillment of the obligations). The equity interest pledge was registered with the Fuzhou SAIC effective June 15, 2009.

*Exclusive Business Cooperation Agreement.*  Fujian Express and Fujian Fenzhong entered into an exclusive business cooperation agreement on April 17, 2009, pursuant to which Fujian Express provides technology support, consulting services and other commercial services related to the business operations of Fujian Fenzhong. The term of this agreement is ten years from the date thereof, and it can be automatically renewed for an additional ten years upon expiration, provided that no objection is made by Fujian Express within 20 days prior to each tenth year anniversary. During the term of this agreement, unless Fujian Express commits willful misconduct or a fraudulent act against Fujian Fenzhong, Fujian Fenzhong may not terminate the agreement prior to its expiration date. Nevertheless, Fujian Express has the right to terminate the agreement upon giving 30 days' prior written notice to Fujian Fenzhong at any time.

In the opinion of CME's PRC legal counsel:

- the ownership structure of Fujian Fenzhong complies with and immediately after this Transaction, will comply with the current PRC laws, rules and regulations; and

- each of the contracts under CME's contractual arrangements among Fujian Express, Fujian Fenzhong and its shareholders are valid and binding on all parties to these arrangements, and do not violate current PRC laws, rules or regulations.

CME's PRC legal counsel has further advised TM that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws and regulations. Therefore, the PRC regulatory authorities may take a view that is contrary to the above opinion of CME's PRC legal counsel in the future. TM and CME has been further advised by CME's PRC counsel that if the PRC government determines that the agreements that establish the structure for operating CME PRC advertising network businesses do not comply with applicable restrictions on foreign investment in the advertising industry, CME could be subject to severe penalties, including an order from the government to cease CME's business operation. See the section entitled "RISK FACTORS — Risks Relating to CME's Corporate Structure".

## INFORMATION ABOUT HONG KONG MANDEFU HOLDING LIMITED ("CME")

### Business Summary

#### *Overview*

CME, through contractual arrangements with Fujian Fenzhong, an entity majority owned by CME's majority shareholder, operates the largest television advertising network on inter-city express buses in China. All references in this Proxy Statement to "CME's advertising network", "CME's customers", CME's operations in general and similar connotations, refer to Fujian Fenzhong, an entity which is controlled by CME through contractual agreements and which operates the advertising network. While CME has no direct equity ownership in Fujian Fenzhong, through the contractual agreements CME receives the economic benefits of Fujian Fenzhong's operations. See the sections entitled "RISK FACTORS — Risks Related to CME's Corporate Structure" and "CME'S CORPORATE STRUCTURE — Contractual Arrangements". CME generates revenues by selling advertising on its network of television displays installed on inter-city express buses in China. As of July 31, 2008, CME's advertising network accounted for 81% of all inter-city express buses

Table of Contents

installed with hard disk drive players, and 55% of all inter-city express buses installed with any type of television display, according to CTR Market Research. CME commenced its advertising services business in November 2003 as one of the first participants in advertising on inter-city express buses in China. CME believes its early entry into this business has enabled them to achieve an audience reach that is highly attractive to advertisers.

CME's extensive and growing network covers inter-city express bus services originating in China's most prosperous regions. As of June 30, 2009, CME's network covered inter-city express bus services originating in eleven regions, including the four municipalities of Beijing, Shanghai, Tianjin and Chongqing and seven economically prosperous provinces, namely Guangdong, Jiangsu, Fujian, Sichuan Hubei, Anhui and Hebei. These eleven regions in aggregate generated nearly half of China's gross domestic product, or GDP, in 2007, according to the National Bureau of Statistics of China. CME's network is capable of reaching a substantial and growing audience. In the first seven months of 2008, a monthly average of 53 million passengers traveled on inter-city express buses within CME's network, representing 57% of all passengers traveling on inter-city express buses installed with television displays in China, according to CTR Market Research. Many of the cities connected in CME's network are major transportation hubs, which serve as points of transfer for large numbers of leisure, business and other travelers in China to other modes of transportation. CME's network also includes airport buses connecting major cities to airports and tour buses traveling on routes that connect major cities with popular tourist destinations in China. As of June 30, 2009, CME's network covered six out of seven of the transportation hubs designated by the Ministry of Transport, and CME expects to further increase this percentage as it continues to expand the geographic coverage of its network. In addition to major transportation hubs, the network also covers small to medium-sized cities in China, some of which rely on highway transportation as the primary transportation option for connection outside these cities.

CME has entered into long-term framework agreements with 40 bus operator partners for terms ranging from five to eight years. Pursuant to these agreements, CME pays the bus operators concession fees for the right to install its displays and automated control systems inside their buses and display entertainment content and advertisements. CME's entertainment content is provided by third parties and advertisements provided by its clients. CME obtains a wide range of free entertainment content from Fujian SouthEastern Television Channel and Hunan Satellite Television each month and purchases a limited amount of copyrighted programs from the Audio and Video Publishing House of Fujian Province. As of June 30, 2009, the number of inter-city express buses within CME's network exceeded 16,000.

In October 2007, CME entered into a five-year cooperation agreement with TTAVC, an entity affiliated with the Ministry of Transport of the People's Republic of China, to be the sole strategic alliance partner in the establishment of a nationwide in-vehicle television system that displays copyrighted programs on buses traveling on highways in China. The cooperation agreement also gave CME exclusive rights to display advertisements on the system. In November 2007, TTAVC issued a notice regarding the facilitation of implementation of the system contemplated under the cooperation agreement to municipalities, provinces and transportation enterprises in China. CME believes its status as the sole strategic alliance partner designated by TTAVC and the exclusive rights to display advertisements on the system has facilitated its historical expansion and is expected to continue to provide them with a competitive advantage in the future.

CME believes its network is a highly effective advertising medium. The network is capable of reaching audiences on inter-city express buses while they remain in a comfortable and enclosed environment with minimal distraction. The majority of the inter-city express buses within the network are equipped with leather seats and air-conditioning, providing a comfortable environment which makes the audiences more receptive to the content displayed on CME's network. Inter- city travel in China typically takes a number of hours. Audiences are therefore exposed to the content displayed on its advertising platform for a significantly longer period of time than on shorter-distance travel. In addition, CME's patented automated control systems ensure that the programs and advertisements are displayed continuously throughout the journey.

CME has grown significantly since it commenced its advertising services business in November 2003. During the year ended December 31, 2008, more than 400 advertisers had purchased advertising time on CME's network either through advertising agents or directly from CME. Some of these clients have purchased

108

Table of Contents

specific attributes or criteria (financial or otherwise) for prospective target businesses. In evaluating a prospective target business, our management has considered a variety of factors, including one or more of the following:

- financial condition and results of operation;

- growth potential;

- experience and skill of management and availability of additional personnel;

- capital requirements;

- competitive position;

- barriers to entry;

- stage of development of the products, processes or services;

- degree of current or potential market acceptance of the products, processes or services;

- proprietary features and degree of intellectual property or other protection of the products, processes or services;

- regulatory environment of the industry; and

- costs associated with effecting the business combination.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular business combination were based, to the extent relevant, on the above factors as well as other considerations deemed relevant by our management in effecting a business combination consistent with our business objective. In evaluating a prospective target business, we have conducted an extensive due diligence review which has encompassed, among other things, meetings with incumbent management and inspection of facilities, as well as review of financial and other information which is made available to us. This due diligence review was conducted either by our management or by unaffiliated third parties we may engage. We have had all prospective target businesses execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the Trust Account. If any prospective target business refused to execute such agreement, we did not continue negotiations with such target business.

All costs incurred with respect to the identification and evaluation of a prospective target business with which a business combination was not ultimately completed resulted in a loss to us and reduced the amount of capital available to otherwise complete a business combination. While we are entitled to have released to us for the purpose of, among other things, covering such costs up to $1.5 million of interest earned on the funds, the Trust Account as discussed elsewhere herein, we have received the full amount allowed and accordingly we have borrowed funds from one of our initial stockholder to operate. Our Initial Stockholders were under no obligation to advance funds to us.

### Fair market value of target business

The target business or businesses that we acquire must collectively have a fair market value equal to at least 80.0% of our net assets at the time of such acquisition, although we may acquire a target business whose fair market value significantly exceeds 80.0% of our net assets. The fair market value of CME was determined by our board of directors based upon one or more standards generally accepted by the financial community (such as actual and potential sales, earnings and cash flow or book value).

### Lack of business diversification

By consummating a business combination with only CME, our lack of diversification may:

- subject us to numerous economic, competitive and regulatory developments, any or all of which may have a substantial adverse impact upon the particular industry in which we may operate subsequent to a business combination, and

164

Table of Contents

as a going concern) appearing in this Proxy Statement and are included in this Proxy Statement in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

Representatives of Eisner are not expected to be present at the Special Meeting but will be available by telephone with the opportunity to make statements and respond to appropriate questions.

## DELIVERY OF DOCUMENTS TO STOCKHOLDERS

Pursuant to the rules of the SEC, TM and the services that it employs to deliver communications to its stockholders are permitted to deliver to two or more stockholders sharing the same address a single copy of each of TM's annual report to stockholders and Proxy Statement. Upon written or oral request, TM will deliver a separate copy of the annual report to stockholders and/or Proxy Statement to any stockholder at a shared address who wishes to receive separate copies of such documents in the future. Stockholders receiving multiple copies of such documents may likewise request that TM deliver single copies of such documents in the future. Stockholders may notify TM of their requests by calling or writing TM's proxy solicitor, MacKenzie Partners, Inc., by telephone at (800) 322-2885 or by email at **proxy@mackenziepartners.com**.

## WHERE YOU CAN FIND MORE INFORMATION

TM files annual, quarterly and current reports, proxy statements and other documents with the SEC as required by the Exchange Act.

You may read and copy such annual, quarterly and current reports, proxy statements and other information filed by TM with the SEC at the SEC's public reference room located at 100 F Street, N.E., Washington, D.C. 20549-1004.

You may obtain information on the operation of the Public Reference Room by calling the SEC at (800) SEC-0330. You may also obtain copies of the materials described above at prescribed rates by writing to the SEC, Public Reference Section, 100 F Street, N.E., Washington, D.C. 20549-1004.

TM files its annual, quarterly and current reports, proxy statements and other information electronically with the SEC. You may access information on TM at the SEC web site containing reports, Proxy Statements and other information at http://www.sec.gov.

This Proxy Statement describes the material elements of relevant contracts, exhibits and other information described in this Proxy Statement. Information and statements contained in this Proxy Statement are qualified in all respects by reference to the copy of the relevant contract or other document included as an annex to this Proxy Statement.

All information contained or incorporated by reference in this Proxy Statement relating to TM has been supplied by TM, and all such information relating to CME has been supplied by the Sellers and CME. Information provided by either of us does not constitute any representation, estimate or projection of the other.

If you would like additional copies of this Proxy Statement, or if you have questions about the Transaction, you should contact:

Attention:   **MacKenzie Partners Inc.**
**105 Madison Avenue**
**New York, NY 10016**
**Phone: (800) 322-2885**
**Fax: (212) 929-0308**
**Email: proxy@mackenziepartners.com**

**We undertake to provide without charge to any person solicited upon written request of such person a copy of our annual report on Form 10-K for the fiscal year ended December 31, 2008, including the financial statements and the financial statement schedules contained therein. Such requests should be directed in writing to TM Entertainment and Media, Inc., 307 East 87th Street, New York, New York 10128, Attention: Theodore S. Green, Co-Chief Executive Officer.**

193

S-3 1 v193885_s3.htm

As filed with the Securities and Exchange Commission on August 16, 2010
Registration No. 333-

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

_____

**FORM S-3**
**REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933**

_____

**CHINA MEDIAEXPRESS HOLDINGS, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **20-8951489** | **7310** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (IRS Employer Identification No.) | (Primary Standard Industrial Classification Code Number) |

Room 2805, Central Plaza, Wanchai Hong Kong
+852 2827 6100
(Address, including zip code, and telephone number, including area code, of Registrant's Principal executive Offices)

Law Debenture Corporate Services Inc.
400 Madison Avenue, 4th Floor
New York, NY 10017
+1 212 750-6474
(Name, address, including zip code, and telephone number, including area code, of Agent for Service))

with a copy to:
**Mitchell S. Nussbaum, Esq.**
**Loeb & Loeb LLP**
**345 Park Avenue**
**New York, NY 10154**
**(212) 407-4000**

Approximate date of proposed sale to the public: **As soon as practicable after the effective date of this Registration Statement**.

If the only securities being registered on this form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 of the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☑

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, please check the following box. ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, please check the following box. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐     Accelerated filer ☒          Non-accelerated filer  ☐          Smaller reporting company
                                                   (Do not check if a smaller reporting                              ☐
                                                            company)

### CALCULATION OF REGISTRATION FEE

| Title of each Class of Security being Registered | Amount being Registered (1) | Proposed Maximum Offering Price Per Security (2) | Proposed Maximum Aggregate Offering Price (2) | Amount of Registration Fee |
|---|---|---|---|---|
| Common Stock, $0.001 par value per share | 660,540 | $ 10.39 | $ 6,863,011 | $ 490 |
| Common Stock, $0.001 par value per share(3) | 1,470,344 | $ 10.39 | $ 15,276,875 | $ 1,089 |
| Total | 2,130,884 | $ | $ 22,139,886 | $ 1,579 |

(1) Pursuant to Rule 416(a) under the Securities Act of 1933, as amended, this registration statement includes an indeterminate number of shares as may become necessary to adjust the number of shares issued by the Registrant to the Selling Stockholders upon exercise of the warrants to prevent dilution resulting from stock splits, stock dividends or similar transactions involving the Common Stock.

(2) Estimated solely for the purpose of calculating the registration fee in accordance with Rule 457(c) and 457(g) under the Securities Act of 1933, as amended, based on the average of the high and low sale prices on August 10, 2010, as reported by the NASDAQ.

(3) Represent shares issuable upon the exercise of outstanding warrants to purchase shares of common stock held by the Selling Stockholders name herein.

**THE REGISTRANT HEREBY AMENDS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a), MAY DETERMINE.**

- 2 -

**Subject to completion, dated August 16, 2010**

**The information in this prospectus is not complete and may be changed. These securities may not be sold until the post-effective amendment to registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities we are not soliciting offers to buy these securities in any state where the offer or sale is not permitted.**

PROSPECTUS

### CHINA MEDIAEXPRESS HOLDINGS, INC.

**660,540 Shares of Common Stock**
**1,470,344 Shares of Common Stock Underlying Purchase Warrants**

This prospectus relates to 1,470,344 shares of common stock issuable upon the exercise of warrants held by certain of our insider stockholders; and 486,067 shares of common stock held by certain of founders of our predecessor TM Entertainment and Media, Inc. (these securities are referred to as the "Founder Securities"); and 33,333 shares of common stock held by another selling stockholder named herein.

This prospectus also relates to the resale of the following securities issued upon exercise of the unit purchase option granted to certain representatives in our initial public offering: 141,140 shares of common stock, par value $0.001 per share (these securities are referred to as the "UPO Securities").

In order to obtain the shares of common stock, the holders of the warrants must pay an exercise price of $5.50 per share, or by cashless exercise in the case of the Founder Securities.  We will receive any cash proceeds from the exercise of warrants.

Our common stock is listed on the NASDAQ Global Select Market under the symbol "CCME".  On  August 11, 2010, the closing sale price of the common stock was $10.89 per share.

**Investing in our common stock involves a high degree of risk.  See "Risk Factors" included in the 2009 Annual Report incorporated by reference herein.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus.  Any representation to the contrary is a criminal offense.**

The date of this prospectus is _____, 2010

- 3 -

**Table of Contents**

PROSPECTUS SUMMARY                                                          6
FORWARD-LOOKING STATEMENTS                                                 7
RISK FACTORS                                                               7
USE OF PROCEEDS                                                            7
DETERMINATION OF OFFERING PRICE
PLAN OF DISTRIBUTION                                                      10
INCORPORATION OF CERTAIN INFORMATION BY REFERENCE                         12
WHERE YOU CAN FIND MORE INFORMATION                                        4
LEGAL MATTERS                                                            12
EXPERTS                                                                   12

- 4 -

## ABOUT THIS PROSPECTUS

You should rely only on the information contained or incorporated by reference in this prospectus and in an applicable prospectus supplement, if any, or in any amendment to this prospectus. We have not authorized any other person to provide you with different information, and if anyone provides, or has provided, you with different or inconsistent information, you should not rely on it. We will not make an offer to sell our common stock in any jurisdiction where the offer or sale is not permitted. You should assume that the information appearing in this prospectus as well as the information we filed previously with the SEC and incorporated herein by reference is accurate only as of the date of the document containing the information.

## WHERE YOU CAN FIND MORE INFORMATION

This prospectus is part of a registration statement we filed with the SEC.  You should rely only on the information contained in this prospectus or incorporated by reference.  We have not authorized anyone else to provide you with different information.  We are not making an offer of these securities in any state where the offer is not permitted.  You should not assume that the information in this prospectus is accurate as of any date other than the date on the front page of this prospectus, regardless of the time of delivery of this prospectus or any sale of common stock.

We file annual, quarterly and current reports, proxy statements and other information with the SEC.  You may read, without charge, and copy the documents we file with the SEC at the SEC's public reference room at 100 F Street, NE in Washington, D.C.  The public may obtain information about the operation of the public reference room by calling the SEC at 1-800-SEC-0330. In addition, the SEC maintains a web site at http://www.sec.gov which contains the Form S-3 and other reports, proxy and information statements and information regarding issuers that file electronically with the SEC.

- 5 -

## PROSPECTUS SUMMARY

### The Company

We were formed as a blank check company under the name "TM Entertainment and Media, Inc." to effect a merger, capital stock exchange, asset acquisition or other similar business combination with a domestic or foreign operating business in the entertainment, media, digital or communications industries.  On October 15, 2009, pursuant to the terms of a Share Exchange Agreement, dated as of May 1, 2009, as amended on September 30, 2009 ("Share Exchange Agreement"), TM Entertainment and Media, Inc. ("TM") acquired all of the issued and outstanding capital stock of Hong Kong Mandefu Holding Limited ("CME") and as a result, CME became a direct wholly-owned subsidiary of TM (the "Transaction").

CME, through contractual arrangements with Fujian Fenzhong, an entity majority owned by CME's former majority shareholder, operates the largest television advertising network on inter-city express buses in China.  While CME has no direct equity ownership in Fujian Fenzhong, through the contractual agreements CME receives the economic benefits of Fujian Fenzhong's operations.  Pursuant to the Share Exchange Agreement, TM purchased 100% of the outstanding equity of CME and changed TM's corporate name to "China MediaExpress Holdings, Inc." More information relating to acquisition and our advertising business in the People's Republic of China is contained in our Annual Report on Form 10-K for the year ended December 31, 2009 (the "2009 Annual Report"), which is incorporated herein by reference.

Our principal executive offices are located at Room 2805, Central Plaza, Wan Chai, Hong Kong .  The telephone number at our executive office is +852 2827 6100.  Our operating subsidiary maintains an English language website at www.ccme.tv/en/index.aspx. The information contained on our website is not a part of, and is not incorporated by reference into, this prospectus.

### The Offering

| | |
|---|---|
| Securities offered: | 2,130,884 shares of common stock, including (i) 486,067 shares of common stock held by certain of founders of our predecessor TM Entertainment and Media, Inc., (ii) 1,470,344 shares of common stock issuable upon exercise of warrants held by the founders of such predecessor; (iii) 70,570 shares of common stock issued pursuant to the underwriters' unit purchase option; and (iv) 70,570 shares issued upon the exercise of warrants issued pursuant to the underwriters' unit purchase option; and 33,333 shares of common stock held by another selling stockholder named herein. |
| Common Stock: | |
| Number outstanding before this offering | 33,290,552 |
| Number to be outstanding after this offering | 34,760,896 assuming the exercise for cash of all of the warrants. |
| Offering proceeds | Assuming the cash exercise of all the warrants, we will receive gross proceeds of $8,086,892.  We intend to use the proceeds from the exercise of the warrants for working capital, operating expenses and other general corporate purposes. |
| NASDAQ Symbol | CCME |

- 6 -

### CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

We believe that some of the information in this prospectus constitutes forward-looking statements within the definition of the Private Securities Litigation Reform Act of 1995. However, the safe-harbor provisions of that act do not apply to statements made in this prospectus. You can identify these statements by forward-looking words such as "may," "expect," "anticipate," "contemplate," "believe," "estimate," "intends," and "continue" or similar words. You should read statements that contain these words carefully because they discuss future expectations, contain projections of future results of operations or financial condition or state other "forward-looking" information.

We believe it is important to communicate our expectations to our security holders. However, there may be events in the future that we are not able to predict accurately or over which we have no control. The risk factors and cautionary language discussed in this prospectus provide examples of risks, uncertainties and events that may cause actual results to differ materially from the expectations described by us in such forward-looking statements, including among other things:

- outcomes of government reviews, inquiries, investigations and related litigation;
- continued compliance with government regulations;
- legislation or regulatory environments, requirements or changes adversely affecting the business in which we are engaged;
- fluctuations in client demand;
- management of rapid growth;
- general economic conditions;
- our business strategy and plans; and
- the results of future financing efforts.

You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this prospectus.

All forward-looking statements included herein attributable to us are expressly qualified in their entirety by the cautionary statements contained or referred to in this section. Except to the extent required by applicable laws and regulations, we do not undertake any obligation to update these forward-looking statements to reflect events or circumstances after the date of this prospectus or to reflect the occurrence of unanticipated events.

### RISK FACTORS

A discussion of the risk factors relating to an investment in us is included in the 2009 Annual Report, which is incorporated herein by reference. You should carefully consider the risk factors discussed in the 2009 Annual Report, together with all of the other information included in this prospectus, before you decide whether to exercise your warrants.

### USE OF PROCEEDS

Assuming the cash exercise of all the warrants, we will receive gross proceeds of $8,086,892.  We intend to use the proceeds from the exercise of the warrants for working capital, operating expenses, other general corporate purposes. If we have indebtedness at the time the warrants are exercised, we may also use proceeds to repay indebtedness. We may also use the proceeds to acquire other companies. There is no assurance that the holders of the unit purchase option or the warrants will elect to exercise any or all of the unit purchase option or the warrants.

- 7 -

# SELLING STOCKHOLDERS

We are registering for resale shares of our common stock that are issued and outstanding, and shares of common stock underlying our warrants held by the Selling Stockholders identified below. We are registering the shares to permit the Selling Stockholders and their pledgees, donees, transferees and other successors-in-interest that receive their shares from a Selling Stockholder as a gift, partnership distribution or other non-sale related transfer after the date of this prospectus to resell the shares when and as they deem appropriate in the manner described in the "Plan of Distribution".  As of August 11, 2010 there were 33,290,452 shares of common stock issued and outstanding.

The following table sets forth:

the name of the Selling Stockholders,

the number of shares of our common stock that the Selling Stockholders beneficially owned prior to the offering for resale of the shares under this prospectus,

the maximum number of shares of our common stock that may be offered for resale for the account of the Selling Stockholders under this prospectus, and

the number and percentage of shares of our common stock to be beneficially owned by the Selling Stockholders after the offering of the shares (assuming all of the offered shares are sold by the Selling Stockholders).

Except for Theodore S. Green, Malcolm Bird, Jonathan Miller and John W. Hyde, none of the Selling Stockholders has been an officer or director of the Company or any of its predecessors or affiliates within the last three years, nor has any Selling Stockholder had a material relationship with the Company.

 Each Selling Stockholder may offer for sale all or part of the shares from time to time. The table below assumes that the Selling Stockholders will sell all of the shares offered for sale. A Selling Stockholder is under no obligation, however, to sell any shares pursuant to this prospectus.

| Name of Selling Stockholder | Shares of Common Stock Beneficially Owned Prior to Offering (1) | Maximum Number of Shares of Common Stock to be Sold (2) | Number of Shares of Common Stock Owned After Offering | Percentage Ownership After Offering (3) |
|---|---|---|---|---|
| Theodore S. Green (3) | 1,670,344 | 1,670,344 | -0- | -0- |
| Blair Green 2007 GST Trust | 22,580 | 22,580 | -0- | -0- |
| Sara Green 2007 GST Trust | 22,580 | 22,580 | -0- | -0- |
| Malcolm Bird | 201,973 | 201,973 | -0- | -0- |
| John W. Hyde Living Trust | 15,035 | 15,035 | -0- | -0- |
| George Becker | 10,000 | 10,000 | -0- | -0- |
| Jonathan F. Miller | 13,899 | 13,899 | -0- | -0- |
| Maxim Partners LLC | 57,648 | 57,648 | -0- | -0- |
| HCFP/Brenner Securities LLC | 83,492 | 83,492 | -0- | -0- |
| Eric Gier | 33,333 | 33,333 | -0- | -0- |

- 8 -

(1)     Beneficial ownership is determined in accordance with the rules and regulations of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, securities that are currently convertible or exercisable into shares of our Common Stock, or convertible or exercisable into shares of our Common Stock within 60 days of the date hereof are deemed outstanding. Such shares, however, are not deemed outstanding for the purposes of computing the percentage ownership of any other person. Except as indicated in the footnotes to the following table, each stockholder named in the table has sole voting and investment power with respect to the shares set forth opposite such stockholder's name. The percentage of beneficial ownership is based on 33,290,552 shares of Common Stock outstanding as of August 11, 2010.

(2)     Includes the total number of shares of Common Stock that each Selling Stockholder intends to sell.

(3)     Consists of 1,470,344 shares of common stock underlying  Insider Warrants to purchase up to 1,470,344 shares of our common stock and 200,000 shares of common stock held by the Selling Stockholder.

- 9 -

## PLAN OF DISTRIBUTION

The Selling Stockholders and any of their pledgees, donees, transferees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on any stock exchange, market or trading facility on which the Shares are traded or quoted or in private transactions. These sales may be at fixed prices, at prevailing market prices at the time of sale, at prices related to the prevailing market price, at varying prices determined at the time of sale, or at negotiated prices. The Selling Stockholders may use any one or more of the following methods when selling Shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits Investors;

- block trades in which the broker-dealer will attempt to sell the Shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- to cover short sales made after the date that this registration statement is declared effective by the SEC;

- broker-dealers may agree with the Selling Stockholders to sell a specified number of such Shares at a stipulated price per share;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- a combination of any such methods of sale; and

- any other method permitted pursuant to applicable law.

The Selling Stockholders may also sell Shares under Rule 144 under the Securities Act, if available, rather than under this prospectus.

In connection with the sale of the common stock or interests therein, the Selling Stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the Common Stock in the course of hedging the positions they assume. The Selling Stockholders may also sell shares of the Common Stock short and deliver these securities to close out their short positions, or loan or pledge the Common Stock to broker-dealers that in turn may sell these securities. The Selling Stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more derivative securities which require the delivery to such broker-dealer or other financial institution of Shares offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

Broker-dealers engaged by the Selling Stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the Selling Stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated. The Selling Stockholders do not expect these commissions and discounts to exceed what is customary in the types of transactions involved.

- 10 -

The Selling Stockholders may from time to time pledge or grant a security interest in some or all of the Shares owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell shares of Common Stock from time to time under this prospectus, or under an amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act of 1933 amending the list of Selling Stockholders to include the pledgee, transferee or other successors in interest as Selling Stockholders under this prospectus.

Upon the Company being notified in writing by a Selling Stockholder that any material arrangement has been entered into with a broker-dealer for the sale of Common Stock through a block trade, special offering, exchange distribution or secondary distribution or a purchase by a broker or dealer, a supplement to this prospectus will be filed, if required, pursuant to Rule 424(b) under the Securities Act, disclosing (i) the name of each such Selling Stockholder and of the participating broker-dealer(s), (ii) the number of shares involved, (iii) the price at which such the shares of Common Stock were sold, (iv) the commissions paid or discounts or concessions allowed to such broker-dealer(s), where applicable, (v) that such broker-dealer(s) did not conduct any investigation to verify the information set out or incorporated by reference in this prospectus, and (vi) other facts material to the transaction. In addition, upon the Company being notified in writing by a Selling Stockholder that a donee or pledgee intends to sell more than 500 Shares of Common Stock, a supplement to this prospectus will be filed if then required in accordance with applicable securities law.

The Selling Stockholders also may transfer the shares of Common Stock in other circumstances, in which case the transferees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

The Selling Stockholders and any broker-dealers or agents that are involved in selling the Shares may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the Shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. Discounts, concessions, commissions and similar selling expenses, if any, that can be attributed to the sale of Securities will be paid by the Selling Stockholder and/or the purchasers. Each Selling Stockholder has represented and warranted to the Company that it acquired the securities subject to this registration statement in the ordinary course of such Selling Stockholder's business and, at the time of its purchase of such securities such Selling Stockholder had no agreements or understandings, directly or indirectly, with any person to distribute any such securities.

FINRA Rule 5110 requires FINRA members firms (unless an exemption applies) to satisfy the filing requirements of Rule 5110 in connection with the resale, on behalf of selling shareholders, of the securities on a principal or agency basis. NASD Notice to Members 88-101 states that in the event a selling shareholder intends to sell any of the shares registered for resale in this prospectus through a member of FINRA participating in a distribution of our securities, such member is responsible for insuring that a timely filing, if required, is first made with the Corporate Finance Department of FINRA and disclosing to FINRA the following:

- it intends to take possession of the registered securities or to facilitate the transfer of such certificates;

- the complete details of how the selling shareholders' shares are and will be held, including location of the particular accounts;

- whether the member firm or any direct or indirect affiliates thereof have entered into, will facilitate or otherwise participate in any type of payment transaction with the selling shareholders, including details regarding any such transactions; and

- in the event any of the securities offered by the selling shareholders are sold, transferred, assigned or hypothecated by any selling shareholder in a transaction that directly or indirectly involves a member firm of the NASD or any affiliates thereof, that prior to or at the time of said transaction the member firm will timely file all relevant documents with respect to such transaction(s) with the Corporate Finance Department of the NASD for review.

- 11 -

No FINRA member firm may receive compensation in excess of that allowable under FINRA rules, including Rule 2710, in connection with the resale of the securities by the selling shareholders, which total compensation may not exceed 8%.

The Company has advised each Selling Stockholder that it may not use Shares registered on this registration statement to cover short sales of Common Stock made prior to the date on which this registration statement shall have been declared effective by the Commission. If a Selling Stockholder uses this prospectus for any sale of the Common Stock, it will be subject to the prospectus delivery requirements of the Securities Act. The Selling Stockholders will be responsible to comply with the applicable provisions of the Securities Act and Exchange Act, and the rules and regulations thereunder promulgated, including, without limitation, Regulation M, as applicable to such Selling Stockholders in connection with resales of their respective Shares under this registration statement.

The Company is required to pay all fees and expenses incident to the registration of the Shares, but the Company will not receive any proceeds from the sale of the Common Stock. The Company has agreed to indemnify the Selling Stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

**LEGAL MATTERS**

The validity of the securities offered in this prospectus were passed upon for us by Morrison Cohen LLP, New York, New York other than the shares offered by Eric Gier, as to which Loeb & Loeb LLP has provided an opinion regarding the validity thereof.

**EXPERTS**

The consolidated financial statements and the related financial statement schedule of the Company, its subsidiaries and its variable interest as of December 31, 2009 and for the year then ended, and the retrospective adjustments to the consolidated financial statements for the years ended December 31, 2007 and 2008,  incorporated in this prospectus by reference from the Company's Annual Report on Form 10-K for the year ended December 31, 2009  have been audited by Deloitte Touche Tohmatsu, an independent registered public accounting firm, as stated in their report, which is incorporated by reference herein. Such consolidated financial statements and financial statement schedule have been so incorporated  in reliance upon the report of such firm given upon their authority as experts in accounting and auditing.

The consolidated financial statements of CME and its subsidiary and variable interest entity as of December 31, 2008 and for the two years then ended incorporated in this prospectus by reference from the Company's Annual Report on Form 10-K for the year ended December 31, 2009  have been audited by AJ Robbins, P.C., an independent registered public accounting firm, as stated in their report, which is incorporated by reference herein. Such consolidated financial statements have been so incorporated in reliance upon the report of such firm given upon their authority as experts in accounting and auditing.

**INCORPORATION OF CERTAIN INFORMATION BY REFERENCE**

We incorporate by reference the filed documents listed below, except as superseded, supplemented or modified by this prospectus, and any future filings we will make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"):

- our Annual Report on Form 10-K for the fiscal period ended December 31, 2009, as amended by Form 10-K/A filed on April 30, 2010;

- our Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2010 and June 30, 2010;

- our Current Reports on Form 8-K dated January 19, 2010, February 3, 2010, March 5, 2010 and March 8, 2010;

- all documents filed by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and prior to the termination of this offering of securities

- 12 -

Potential investors may obtain a copy of any of the agreements summarized herein (subject to certain restrictions because of the confidential nature of the subject matter) or any of our SEC filings without charge by written or oral request directed to Jacky Lam, Chief Financial Officer, China MediaExpress Holdings, Inc., Room 2805, Central Plaza, Wanchai, Hong Kong , Tel. +852 2827 6100

You should only rely on the information incorporated by reference or provided in this prospectus or any prospectus supplement. We have not authorized anyone else to provide you with different information. We are not making an offer of these securities in any state where the offer is not permitted. You should not assume that the information in this prospectus or any prospectus supplement is accurate as of any date other than the date on the front of those documents.

## INDEMNIFICATION

Our certificate of incorporation provides that the Company, to the full extent permitted by Section 145 of the Delaware General Corporation Law, as amended from time to time, shall indemnify all persons whom it may indemnify pursuant thereto. It further provides that expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative, or investigative action, suit or proceeding for which such officer or director may be entitled to indemnification hereunder shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Company as authorized thereby.

Our bylaws provide the Company with the power to indemnify its officers, directors, employees and agents or any person serving at the Company's request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise to the fullest extent permitted by Delaware law.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the registrant pursuant to the foregoing provisions, the registrant has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable.

- 13 -

## PART II INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 14.  Other Expenses of Issuance and Distribution.**

The following table sets forth an estimate of the fees and expenses relating to the issuance and distribution of the securities being registered hereby, all of which shall be borne by the registrant.  All of such fees and expenses, except for the SEC Registration Fee, are estimated:

| | | |
|---|---|---|
| SEC registration fee | $ | 1,579 |
| Legal fees and expenses | $ | 10,000 |
| Accounting fees and expenses | $ | 5,300 |
| Total | $ | 16,879 |

**Item 15. Indemnification of Directors and Officers.**

Our amended and restated certificate of incorporation provides that all directors, officers, employees and agents of the registrant shall be entitled to be indemnified by us to the fullest extent permitted by Section 145 of the Delaware General Corporation Law.

Section 145 of the Delaware General Corporation Law concerning indemnification of officers, directors, employees and agents is set forth below.

"Section 145. Indemnification of officers, directors, employees and agents; insurance.

(a)        A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.

(b)        A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

II-1

(c)      To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

(d)      Any indemnification under subsections (a) and (b) of this section (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the present or former director, officer, employee or agent is proper in the circumstances because the person has met the applicable standard of conduct set forth in subsections (a) and (b) of this section. Such determination shall be made, with respect to a person who is a director or officer at the time of such determination, (1) by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (2) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, or (3) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders.

(e)      Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section. Such expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.

(f)      The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office.

(g)      A corporation shall have power to purchase and maintain insurance on behalf of any person who is or was director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under this section.

(h)      For purposes of this section, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this section with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

(i)      For purposes of this section, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this section.

II-2

(j)      The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(k)      The Court of Chancery is hereby vested with exclusive jurisdiction to hear and determine all actions for advancement of expenses or indemnification brought under this section or under any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise. The Court of Chancery may summarily determine a corporation's obligation to advance expenses (including attorneys' fees)."

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers, and controlling persons pursuant to the foregoing provisions, or otherwise, we have been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment of expenses incurred or paid by a director, officer or controlling person in a successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, we will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to the court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

Paragraph B of Article Eighth of our amended and restated certificate of incorporation provides:

"The Corporation, to the full extent permitted by Section 145 of the GCL, as amended from time to time, shall indemnify all persons whom it may indemnify pursuant thereto. Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative, or investigative action, suit or proceeding for which such officer or director may be entitled to indemnification hereunder shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation as authorized hereby."

## Item 16.  Exhibits

| Exhibit Number | Description of Document |
|---|---|
| 4.2 | Specimen Common Stock Certificate (1) |
| 5.1 | Opinion of Morrissen Cohen LLP as to the legality of the UPO Securities.(1) |
| 5.2 | Opinion of Morrison Cohen LLP as to the legality of the Founder Securities.(2) |
| 5.3 | Opinion of Loeb & Loeb LLP as to the legality of the securities offered by Eric Gier. (3) |
| 23.1 | Consent of Morrison Cohen LLP (included in Exhibits 5.1 and 5.2). |
| 23.2 | Consent of Loeb & Loeb LLP (included in Exhibit 5.3). |
| 23.3 | Consent of Deloitte Touche Tohmatsu, independent registered public accounting firm. |
| 23.4 | Consent of AJ Robbins PC, independent registered public accounting firm. |
| 24 | Power of Attorney (4) |

(1)      Incorporated by reference to the Registration Statement on Form S-1 (File No. 333-143856) filed with the Securities and Exchange Commission on June 18, 2007, and subsequently amended on July 27, 2007, September 11, 2007, October 10, 2007 and October 12, 2007.

(2)      Incorporated by reference to Exhibit 5.2 to the Registration Statement on Form S-3 (File No 333-163748) filed with the Securities and Exchange Commission on December 16, 2009.

II-3

(3)        Incorporated by reference to Exhibit 5.3 to the Registration Statement on Form S-3 (File No 333-163748) filed with the Securities and Exchange Commission on December 16, 2009.

(4)        Appearing on the signature pages hereto.

**Item 17.  Undertakings.**

The undersigned Registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i)        To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933, as amended;

(ii)        To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement.  Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii)        To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

provided, however, that

(A)        subparagraphs (i) and (ii) above do not apply if the registration statement is on Form S-8, and the information required to be included in a post-effective amendment by these subparagraphs is contained in reports filed with or furnished to the Commission by the Registrant pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in this registration statement.

(B)        subparagraphs (i), (ii) and (iii) do not apply if the registration statement is on Form S-3 or Form F-3 and the information required to be included in a post-effective amendment by these subparagraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in this registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) that is part of the registration statement.

(2)        That, for the purpose of determining any liability under the Securities Act of 1933, as amended, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3)        To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, as amended, each filing of the Registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 that is incorporated by reference in this registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended, may be permitted to directors, officers, and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer, or controlling person of the Registrant in the successful defense of any action, suit, or proceeding) is asserted by such director, officer, or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question of whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

II-5

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Hong Kong, Special Administrative Region of the People's Republic of China, on the 16th day of August, 2010.

CHINA MEDIAEXPRESS HOLDINGS, INC.

By:   /s/ Zheng Cheng
          Zheng Cheng
          Chairman of the Board and Chief
          Executive Officer

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Zheng Cheng as his or her true and lawful attorney-in-fact, with full power of substitution and resubstitution for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments including post-effective amendments to this registration statement, and registration statements filed pursuant to Rule 462 and otherwise, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the SEC, granting unto said attorney-in-fact and agents the full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the foregoing, as to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorney-in-fact or his substitute, each acting alone, may lawfully do or cause to be done by virtue thereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Position | Date |
|---|---|---|
| /s/ Zheng Cheng <br> Zheng Cheng | Chairman of the Board and Chief Executive Officer (Principal Executive Officer and Principal Accounting and Financial Officer) | August 16, 2010 |
| /s/ Jacky Lam <br> Jacky Lam | Director and Chief Financial Officer (Principal Financial and Accounting Officer) | August 16, 2010 |
| /s/ George Zhou <br> George Zhou | Director | August 16, 2010 |
| /s/ Marco Kung <br> Marco Kung | Director | August 16, 2010 |
| /s/ Dorothy Dong <br> Dorothy Dong | Director | August 16, 2010 |
| /s/ Yinshaung Huang <br> Yinshaung Huang | Director | August 16, 2010 |

II-6

S-3/A 1 v197950_s3a.htm

As filed with the Securities and Exchange Commission on October 5, 2010
Registration No. 333-168872

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

_____

**Amendment No. 1**
**to**

**FORM S-3**
**REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933**

_____

**CHINA MEDIAEXPRESS HOLDINGS, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **20-8951489** | **7310** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (IRS Employer Identification No.) | (Primary Standard Industrial Classification Code Number) |

Room 2805, Central Plaza, Wanchai Hong Kong
+852 2827 6100
(Address, including zip code, and telephone number, including area code, of Registrant's Principal executive Offices)

Law Debenture Corporate Services Inc.
400 Madison Avenue, 4th Floor
New York, NY 10017
+1 212 750-6474
(Name, address, including zip code, and telephone number, including area code, of Agent for Service))

with a copy to:
**Mitchell S. Nussbaum, Esq.**
**Loeb & Loeb LLP**
**345 Park Avenue**
**New York, NY 10154**
**(212) 407-4000**

Approximate date of proposed sale to the public: **As soon as practicable after the effective date of this Registration Statement**.

If the only securities being registered on this form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 of the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☑

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, please check the following box. ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, please check the following box. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐     Accelerated filer ☒          Non-accelerated filer ☐          Smaller reporting company
                                                      (Do not check if a smaller reporting                                       ☐
                                                                company)

### CALCULATION OF REGISTRATION FEE

| Title of each Class of Security being Registered | Amount being Registered (1) | Proposed Maximum Offering Price Per Security (2) | Proposed Maximum Aggregate Offering Price (2) | Amount of Registration Fee |
|---|---|---|---|---|
| Common Stock, $0.001 par value per share | 660,540 $ | 10.39 $ | 6,863,011 $ | 490 |
| Common Stock, $0.001 par value per share(3) | 1,470,344 $ | 10.39 $ | 15,276,875 $ | 1,089 |
| Total | 2,130,884 | $ | 22,139,886 $ | 1,579(4) |

(1) Pursuant to Rule 416(a) under the Securities Act of 1933, as amended, this registration statement includes an indeterminate number of shares as may become necessary to adjust the number of shares issued by the Registrant to the Selling Stockholders upon exercise of the warrants to prevent dilution resulting from stock splits, stock dividends or similar transactions involving the Common Stock.

(2) Estimated solely for the purpose of calculating the registration fee in accordance with Rule 457(c) and 457(g) under the Securities Act of 1933, as amended, based on the average of the high and low sale prices on August 10, 2010, as reported by the NASDAQ.

(3) Represent shares issuable upon the exercise of outstanding warrants to purchase shares of common stock held by the Selling Stockholders name herein.

(4) Previously paid.

**THE REGISTRANT HEREBY AMENDS REGISTRATION STATEMENT ON SUCH DATE OR DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a), MAY DETERMINE.**

**Subject to completion, dated October 5, 2010**

The information in this prospectus is not complete and may be changed. These securities may not be sold until the post-effective amendment to registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities we are not soliciting offers to buy these securities in any state where the offer or sale is not permitted.

PROSPECTUS

CHINA MEDIAEXPRESS HOLDINGS, INC.

**660,540 Shares of Common Stock**
**1,470,344 Shares of Common Stock Underlying Purchase Warrants**

This prospectus relates to 1,470,344 shares of common stock issuable upon the exercise of warrants held by certain of our insider stockholders; and 486,067 shares of common stock held by certain of founders of our predecessor TM Entertainment and Media, Inc. (these securities are referred to as the "Founder Securities"); and 33,333 shares of common stock held by another selling stockholder named herein.

This prospectus also relates to the resale of the following securities issued upon exercise of the unit purchase option granted to certain representatives in our initial public offering: 141,140 shares of common stock, par value $0.001 per share (these securities are referred to as the "UPO Securities").

In order to obtain the shares of common stock, the holders of the warrants must pay an exercise price of $5.50 per share, or by cashless exercise in the case of the Founder Securities.  We will receive any cash proceeds from the exercise of warrants.

Our common stock is listed on the NASDAQ Global Select Market under the symbol "CCME".  On  October 4, 2010, the closing sale price of the common stock was $9.71 per share.

**Investing in our common stock involves a high degree of risk.  See "Risk Factors" included in the 2009 Annual Report incorporated by reference herein.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus.  Any representation to the contrary is a criminal offense.**

The date of this prospectus is _____, 2010

**Table of Contents**

ABOUT THIS PROSPECTUS                                                         i
WHERE YOU CAN FIND MORE INFORMATION                                          ii
PROSPECTUS SUMMARY                                                            1
CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS                          2
RISK FACTORS                                                                 2
USE OF PROCEEDS                                                              2
SELLING STOCKHOLDERS                                                         3
PLAN OF DISTRIBUTION                                                         5
LEGAL MATTERS                                                                7
EXPERTS                                                                      7
INCORPORATION OF CERTAIN INFORMATION BY REFERENCE                            7
INDEMNIFICATION                                                             8

i

### ABOUT THIS PROSPECTUS

You should rely only on the information contained or incorporated by reference in this prospectus and in an applicable prospectus supplement, if any, or in any amendment to this prospectus. We have not authorized any other person to provide you with different information, and if anyone provides, or has provided, you with different or inconsistent information, you should not rely on it. We will not make an offer to sell our common stock in any jurisdiction where the offer or sale is not permitted. You should assume that the information appearing in this prospectus as well as the information we filed previously with the SEC and incorporated herein by reference is accurate only as of the date of the document containing the information.

### WHERE YOU CAN FIND MORE INFORMATION

This prospectus is part of a registration statement we filed with the SEC.  You should rely only on the information contained in this prospectus or incorporated by reference.  We have not authorized anyone else to provide you with different information.  We are not making an offer of these securities in any state where the offer is not permitted.  You should not assume that the information in this prospectus is accurate as of any date other than the date on the front page of this prospectus, regardless of the time of delivery of this prospectus or any sale of common stock.

We file annual, quarterly and current reports, proxy statements and other information with the SEC.  You may read, without charge, and copy the documents we file with the SEC at the SEC's public reference room at 100 F Street, NE in Washington, D.C.  The public may obtain information about the operation of the public reference room by calling the SEC at 1-800-SEC-0330. In addition, the SEC maintains a web site at http://www.sec.gov which contains the Form S-3 and other reports, proxy and information statements and information regarding issuers that file electronically with the SEC.

ii

## PROSPECTUS SUMMARY

### The Company

We were formed as a blank check company under the name "TM Entertainment and Media, Inc." to effect a merger, capital stock exchange, asset acquisition or other similar business combination with a domestic or foreign operating business in the entertainment, media, digital or communications industries.  On October 15, 2009, pursuant to the terms of a Share Exchange Agreement, dated as of May 1, 2009, as amended on September 30, 2009 ("Share Exchange Agreement"), TM Entertainment and Media, Inc. ("TM") acquired all of the issued and outstanding capital stock of Hong Kong Mandefu Holding Limited ("CME") and as a result, CME became a direct wholly-owned subsidiary of TM (the "Transaction").

CME, through contractual arrangements with Fujian Fenzhong, an entity majority owned by CME's former majority shareholder, operates the largest television advertising network on inter-city express buses in China.  While CME has no direct equity ownership in Fujian Fenzhong, through the contractual agreements CME receives the economic benefits of Fujian Fenzhong's operations.  Pursuant to the Share Exchange Agreement, TM purchased 100% of the outstanding equity of CME and changed TM's corporate name to "China MediaExpress Holdings, Inc." More information relating to acquisition and our advertising business in the People's Republic of China is contained in our Annual Report on Form 10-K for the year ended December 31, 2009 (the "2009 Annual Report"), which is incorporated herein by reference.

Our principal executive offices are located at Room 2805, Central Plaza, Wan Chai, Hong Kong .  The telephone number at our executive office is +852 2827 6100.  Our operating subsidiary maintains an English language website at www.ccme.tv/en/index.aspx. The information contained on our website is not a part of, and is not incorporated by reference into, this prospectus.

### The Offering

| | |
|---|---|
| Securities offered: | 2,130,884 shares of common stock, including (i) 486,067 shares of common stock held by certain of founders of our predecessor TM Entertainment and Media, Inc., (ii) 1,470,344 shares of common stock issuable upon exercise of warrants held by the founders of such predecessor; (iii) 70,570 shares of common stock issued pursuant to the underwriters' unit purchase option; and (iv) 70,570 shares issued upon the exercise of warrants issued pursuant to the underwriters' unit purchase option; and 33,333 shares of common stock held by another selling stockholder named herein. |
| Common Stock: | |
|     Number outstanding before this offering | 34,290,552 |
|     Number to be outstanding after this offering | 35,760,896 assuming the exercise for cash of all of the warrants. |
| Offering proceeds | Assuming the cash exercise of all the warrants, we will receive gross proceeds of $8,086,892.  We intend to use the proceeds from the exercise of the warrants for working capital, operating expenses and other general corporate purposes. |
| NASDAQ Symbol | CCME |

- 1 -

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

We believe that some of the information in this prospectus constitutes forward-looking statements within the definition of the Private Securities Litigation Reform Act of 1995. However, the safe-harbor provisions of that act do not apply to statements made in this prospectus. You can identify these statements by forward-looking words such as "may," "expect," "anticipate," "contemplate," "believe," "estimate," "intends," and "continue" or similar words. You should read statements that contain these words carefully because they discuss future expectations, contain projections of future results of operations or financial condition or state other "forward-looking" information.

We believe it is important to communicate our expectations to our security holders. However, there may be events in the future that we are not able to predict accurately or over which we have no control. The risk factors and cautionary language discussed in this prospectus provide examples of risks, uncertainties and events that may cause actual results to differ materially from the expectations described by us in such forward-looking statements, including among other things:

- outcomes of government reviews, inquiries, investigations and related litigation;
- continued compliance with government regulations;
- legislation or regulatory environments, requirements or changes adversely affecting the business in which we are engaged;
- fluctuations in client demand;
- management of rapid growth;
- general economic conditions;
- our business strategy and plans; and
- the results of future financing efforts.

You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this prospectus.

All forward-looking statements included herein attributable to us are expressly qualified in their entirety by the cautionary statements contained or referred to in this section. Except to the extent required by applicable laws and regulations, we do not undertake any obligation to update these forward-looking statements to reflect events or circumstances after the date of this prospectus or to reflect the occurrence of unanticipated events.

## RISK FACTORS

A discussion of the risk factors relating to an investment in us is included in the 2009 Annual Report, which is incorporated herein by reference. You should carefully consider the risk factors discussed in the 2009 Annual Report, together with all of the other information included in this prospectus, before you decide whether to exercise your warrants.

## USE OF PROCEEDS

Assuming the cash exercise of all the warrants, we will receive gross proceeds of $8,086,892.  We intend to use the proceeds from the exercise of the warrants for working capital, operating expenses, other general corporate purposes. If we have indebtedness at the time the warrants are exercised, we may also use proceeds to repay indebtedness. We may also use the proceeds to acquire other companies. There is no assurance that the holders of the unit purchase option or the warrants will elect to exercise any or all of the unit purchase option or the warrants.

- 2 -

## SELLING STOCKHOLDERS

We are registering for resale shares of our common stock that are issued and outstanding, and shares of common stock underlying our warrants held by the Selling Stockholders identified below. We are registering the shares to permit the Selling Stockholders and their pledgees, donees, transferees and other successors-in-interest that receive their shares from a Selling Stockholder as a gift, partnership distribution or other non-sale related transfer after the date of this prospectus to resell the shares when and as they deem appropriate in the manner described in the "Plan of Distribution".  As of September 30, 2010 there were 34,290,552 shares of common stock issued and outstanding.

The following table sets forth:

the name of the Selling Stockholders,

the number of shares of our common stock that the Selling Stockholders beneficially owned prior to the offering for resale of the shares under this prospectus,

the maximum number of shares of our common stock that may be offered for resale for the account of the Selling Stockholders under this prospectus, and

the number and percentage of shares of our common stock to be beneficially owned by the Selling Stockholders after the offering of the shares (assuming all of the offered shares are sold by the Selling Stockholders).

Except for Theodore S. Green, Malcolm Bird, Jonathan Miller and John W. Hyde, none of the Selling Stockholders has been an officer or director of the Company or any of its predecessors or affiliates within the last three years, nor has any Selling Stockholder had a material relationship with the Company.

 Each Selling Stockholder may offer for sale all or part of the shares from time to time. The table below assumes that the Selling Stockholders will sell all of the shares offered for sale. A Selling Stockholder is under no obligation, however, to sell any shares pursuant to this prospectus.

| Name of Selling Stockholder | Shares of Common Stock Beneficially Owned Prior to Offering (1) | Maximum Number of Shares of Common Stock to be Sold (2) | Number of Shares of Common Stock Owned After Offering | Percentage Ownership After Offering |
|---|---|---|---|---|
| Theodore S. Green (3) | 1,670,344 | 1,670,344 | -0- | -0- |
| Blair Green 2007 GST Trust | 22,580 | 22,580 | -0- | -0- |
| Sara Green 2007 GST Trust | 22,580 | 22,580 | -0- | -0- |
| Malcolm Bird | 201,973 | 201,973 | -0- | -0- |
| John W. Hyde Living Trust | 15,035 | 15,035 | -0- | -0- |
| George Becker | 10,000 | 10,000 | -0- | -0- |
| Jonathan F. Miller | 13,899 | 13,899 | -0- | -0- |
| Maxim Partners LLC | 57,648 | 57,648 | -0- | -0- |
| HCFP/Brenner Securities LLC | 83,492 | 83,492 | -0- | -0- |
| Eric Gier | 33,333 | 33,333 | -0- | -0- |

- 3 -

(1)     Beneficial ownership is determined in accordance with the rules and regulations of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, securities that are currently convertible or exercisable into shares of our Common Stock, or convertible or exercisable into shares of our Common Stock within 60 days of the date hereof are deemed outstanding. Such shares, however, are not deemed outstanding for the purposes of computing the percentage ownership of any other person. Except as indicated in the footnotes to the following table, each stockholder named in the table has sole voting and investment power with respect to the shares set forth opposite such stockholder's name. The percentage of beneficial ownership is based on 34,290,552 shares of Common Stock outstanding as of September 30, 2010.

(2)     Includes the total number of shares of Common Stock that each Selling Stockholder intends to sell.

(3)     Consists of 1,470,344 shares of common stock underlying  Insider Warrants to purchase up to 1,470,344 shares of our common stock and 200,000 shares of common stock held by the Selling Stockholder.

- 4 -

## PLAN OF DISTRIBUTION

The Selling Stockholders and any of their pledgees, donees, transferees, assignees and successors-in-interest may, from time to time, sell any or all of their shares of Common Stock on any stock exchange, market or trading facility on which the Shares are traded or quoted or in private transactions. These sales may be at fixed prices, at prevailing market prices at the time of sale, at prices related to the prevailing market price, at varying prices determined at the time of sale, or at negotiated prices. The Selling Stockholders may use any one or more of the following methods when selling Shares:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits Investors;

- block trades in which the broker-dealer will attempt to sell the Shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

- to cover short sales made after the date that this registration statement is declared effective by the SEC;

- broker-dealers may agree with the Selling Stockholders to sell a specified number of such Shares at a stipulated price per share;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- a combination of any such methods of sale; and

- any other method permitted pursuant to applicable law.

The Selling Stockholders may also sell Shares under Rule 144 under the Securities Act, if available, rather than under this prospectus.

In connection with the sale of the common stock or interests therein, the Selling Stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the Common Stock in the course of hedging the positions they assume. The Selling Stockholders may also sell shares of the Common Stock short and deliver these securities to close out their short positions, or loan or pledge the Common Stock to broker-dealers that in turn may sell these securities. The Selling Stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more derivative securities which require the delivery to such broker-dealer or other financial institution of Shares offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

Broker-dealers engaged by the Selling Stockholders may arrange for other brokers-dealers to participate in sales. Broker-dealers may receive commissions or discounts from the Selling Stockholders (or, if any broker-dealer acts as agent for the purchaser of shares, from the purchaser) in amounts to be negotiated. The Selling Stockholders do not expect these commissions and discounts to exceed what is customary in the types of transactions involved.

- 5 -

The Selling Stockholders may from time to time pledge or grant a security interest in some or all of the Shares owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell shares of Common Stock from time to time under this prospectus, or under an amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act of 1933 amending the list of Selling Stockholders to include the pledgee, transferee or other successors in interest as Selling Stockholders under this prospectus.

Upon the Company being notified in writing by a Selling Stockholder that any material arrangement has been entered into with a broker-dealer for the sale of Common Stock through a block trade, special offering, exchange distribution or secondary distribution or a purchase by a broker or dealer, a supplement to this prospectus will be filed, if required, pursuant to Rule 424(b) under the Securities Act, disclosing (i) the name of each such Selling Stockholder and of the participating broker-dealer(s), (ii) the number of shares involved, (iii) the price at which such the shares of Common Stock were sold, (iv) the commissions paid or discounts or concessions allowed to such broker-dealer(s), where applicable, (v) that such broker-dealer(s) did not conduct any investigation to verify the information set out or incorporated by reference in this prospectus, and (vi) other facts material to the transaction. In addition, upon the Company being notified in writing by a Selling Stockholder that a donee or pledgee intends to sell more than 500 Shares of Common Stock, a supplement to this prospectus will be filed if then required in accordance with applicable securities law.

The Selling Stockholders also may transfer the shares of Common Stock in other circumstances, in which case the transferees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

The Selling Stockholders and any broker-dealers or agents that are involved in selling the Shares may be deemed to be "underwriters" within the meaning of the Securities Act in connection with such sales. In such event, any commissions received by such broker-dealers or agents and any profit on the resale of the Shares purchased by them may be deemed to be underwriting commissions or discounts under the Securities Act. Discounts, concessions, commissions and similar selling expenses, if any, that can be attributed to the sale of Securities will be paid by the Selling Stockholder and/or the purchasers. Each Selling Stockholder has represented and warranted to the Company that it acquired the securities subject to this registration statement in the ordinary course of such Selling Stockholder's business and, at the time of its purchase of such securities such Selling Stockholder had no agreements or understandings, directly or indirectly, with any person to distribute any such securities.

FINRA Rule 5110 requires FINRA members firms (unless an exemption applies) to satisfy the filing requirements of Rule 5110 in connection with the resale, on behalf of selling shareholders, of the securities on a principal or agency basis. NASD Notice to Members 88-101 states that in the event a selling shareholder intends to sell any of the shares registered for resale in this prospectus through a member of FINRA participating in a distribution of our securities, such member is responsible for insuring that a timely filing, if required, is first made with the Corporate Finance Department of FINRA and disclosing to FINRA the following:

- it intends to take possession of the registered securities or to facilitate the transfer of such certificates;

- the complete details of how the selling shareholders' shares are and will be held, including location of the particular accounts;

- whether the member firm or any direct or indirect affiliates thereof have entered into, will facilitate or otherwise participate in any type of payment transaction with the selling shareholders, including details regarding any such transactions; and

- in the event any of the securities offered by the selling shareholders are sold, transferred, assigned or hypothecated by any selling shareholder in a transaction that directly or indirectly involves a member firm of the NASD or any affiliates thereof, that prior to or at the time of said transaction the member firm will timely file all relevant documents with respect to such transaction(s) with the Corporate Finance Department of the NASD for review.

- 6 -

No FINRA member firm may receive compensation in excess of that allowable under FINRA rules, including Rule 5110, in connection with the resale of the securities by the selling shareholders, which total compensation may not exceed 8%.

The Company has advised each Selling Stockholder that it may not use Shares registered on this registration statement to cover short sales of Common Stock made prior to the date on which this registration statement shall have been declared effective by the Commission. If a Selling Stockholder uses this prospectus for any sale of the Common Stock, it will be subject to the prospectus delivery requirements of the Securities Act. The Selling Stockholders will be responsible to comply with the applicable provisions of the Securities Act and Exchange Act, and the rules and regulations thereunder promulgated, including, without limitation, Regulation M, as applicable to such Selling Stockholders in connection with resales of their respective Shares under this registration statement.

The Company is required to pay all fees and expenses incident to the registration of the Shares, but the Company will not receive any proceeds from the sale of the Common Stock. The Company has agreed to indemnify the Selling Stockholders against certain losses, claims, damages and liabilities, including liabilities under the Securities Act.

## LEGAL MATTERS

The validity of the securities offered in this prospectus were passed upon for us by Morrison Cohen LLP, New York, New York other than the shares offered by Maxim Partners LLC, HCFP/Brenner Securities LLc and Eric Gier, as to which Loeb & Loeb LLP has provided an opinion regarding the validity thereof.

## EXPERTS

The consolidated financial statements and the related financial statement schedule of the Company, its subsidiaries and its variable interest as of December 31, 2009 and for the year then ended, and the retrospective adjustments to the consolidated financial statements for the years ended December 31, 2007 and 2008,  incorporated in this prospectus by reference from the Company's Annual Report on Form 10-K for the year ended December 31, 2009  have been audited by Deloitte Touche Tohmatsu, an independent registered public accounting firm, as stated in their report, which is incorporated by reference herein. Such consolidated financial statements and financial statement schedule have been so incorporated  in reliance upon the report of such firm given upon their authority as experts in accounting and auditing.

The consolidated financial statements of CME and its subsidiary and variable interest entity as of December 31, 2008 and for the two years then ended incorporated in this prospectus by reference from the Company's Annual Report on Form 10-K for the year ended December 31, 2009  have been audited by AJ Robbins, P.C., an independent registered public accounting firm, as stated in their report, which is incorporated by reference herein. Such consolidated financial statements have been so incorporated in reliance upon the report of such firm given upon their authority as experts in accounting and auditing.

## INCORPORATION OF CERTAIN INFORMATION BY REFERENCE

We incorporate by reference the filed documents listed below, except as superseded, supplemented or modified by this prospectus, and any future filings we will make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"):

- our Annual Report on Form 10-K for the fiscal period ended December 31, 2009, as amended by Form 10-K/A filed on April 30, 2010;

- our Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2010 and June 30, 2010;

- our Current Reports on Form 8-K dated January 19, 2010, February 3, 2010, March 5, 2010 and March 8, 2010;

- all documents filed by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and prior to the termination of this offering of securities

- 7 -

Potential investors may obtain a copy of any of the agreements summarized herein (subject to certain restrictions because of the confidential nature of the subject matter) or any of our SEC filings without charge by written or oral request directed to Jacky Lam, Chief Financial Officer, China MediaExpress Holdings, Inc., Room 2805, Central Plaza, Wanchai, Hong Kong , Tel. +852 2827 6100

You should only rely on the information incorporated by reference or provided in this prospectus or any prospectus supplement. We have not authorized anyone else to provide you with different information. We are not making an offer of these securities in any state where the offer is not permitted. You should not assume that the information in this prospectus or any prospectus supplement is accurate as of any date other than the date on the front of those documents.

## INDEMNIFICATION

Our certificate of incorporation provides that the Company, to the full extent permitted by Section 145 of the Delaware General Corporation Law, as amended from time to time, shall indemnify all persons whom it may indemnify pursuant thereto. It further provides that expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative, or investigative action, suit or proceeding for which such officer or director may be entitled to indemnification hereunder shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Company as authorized thereby.

Our bylaws provide the Company with the power to indemnify its officers, directors, employees and agents or any person serving at the Company's request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise to the fullest extent permitted by Delaware law.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the registrant pursuant to the foregoing provisions, the registrant has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable.

- 8 -

**PART II INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 14.  Other Expenses of Issuance and Distribution.**

The following table sets forth an estimate of the fees and expenses relating to the issuance and distribution of the securities being registered hereby, all of which shall be borne by the registrant.  All of such fees and expenses, except for the SEC Registration Fee, are estimated:

| | | |
|---|---|---|
| SEC registration fee | $ | 1,579 |
| Legal fees and expenses | $ | 10,000 |
| Accounting fees and expenses | $ | 5,300 |
| Total | $ | 16,879 |

**Item 15. Indemnification of Directors and Officers.**

Our amended and restated certificate of incorporation provides that all directors, officers, employees and agents of the registrant shall be entitled to be indemnified by us to the fullest extent permitted by Section 145 of the Delaware General Corporation Law.

Section 145 of the Delaware General Corporation Law concerning indemnification of officers, directors, employees and agents is set forth below.

"Section 145. Indemnification of officers, directors, employees and agents; insurance.

(a)        A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.

(b)        A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)     To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

(d)     Any indemnification under subsections (a) and (b) of this section (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the present or former director, officer, employee or agent is proper in the circumstances because the person has met the applicable standard of conduct set forth in subsections (a) and (b) of this section. Such determination shall be made, with respect to a person who is a director or officer at the time of such determination, (1) by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (2) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, or (3) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders.

(e)     Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section. Such expenses (including attorneys' fees) incurred by former directors and officers or other employees and agents may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.

(f)     The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office.

(g)     A corporation shall have power to purchase and maintain insurance on behalf of any person who is or was director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under this section.

(h)     For purposes of this section, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this section with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

(i)     For purposes of this section, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this section.

II-2

(j)       The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(k)       The Court of Chancery is hereby vested with exclusive jurisdiction to hear and determine all actions for advancement of expenses or indemnification brought under this section or under any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise. The Court of Chancery may summarily determine a corporation's obligation to advance expenses (including attorneys' fees)."

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers, and controlling persons pursuant to the foregoing provisions, or otherwise, we have been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment of expenses incurred or paid by a director, officer or controlling person in a successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, we will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to the court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

Paragraph B of Article Eighth of our amended and restated certificate of incorporation provides:

"The Corporation, to the full extent permitted by Section 145 of the GCL, as amended from time to time, shall indemnify all persons whom it may indemnify pursuant thereto. Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative, or investigative action, suit or proceeding for which such officer or director may be entitled to indemnification hereunder shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation as authorized hereby."

## Item 16.  Exhibits

| Exhibit Number | Description of Document |
| --- | --- |
| 4.2 | Specimen Common Stock Certificate (1) |
| 5.1 | Opinion of Morrison Cohen LLP as to the legality of the Founder Securities. |
| 5.2 | Opinion of Loeb & Loeb LLP as to the legality of the securities offered by Maxim Partners, LLC, HCFP/Brenner Securities LLC and Eric Gier. |
| 23.1 | Consent of Morrison Cohen LLP (included in Exhibit 5.1). |
| 23.2 | Consent of Loeb & Loeb LLP (included in Exhibit 5.2). |
| 23.3 | Consent of Deloitte Touche Tohmatsu, independent registered public accounting firm. (2) |
| 23.4 | Consent of AJ Robbins PC, independent registered public accounting firm. (2) |
| 24 | Power of Attorney (2) |

(1)       Incorporated by reference to the Registration Statement on Form S-1 (File No. 333-143856) filed with the Securities and Exchange Commission on June 18, 2007, and subsequently amended on July 27, 2007, September 11, 2007, October 10, 2007 and October 12, 2007.

(2)       Previously filed.

**Item 17.  Undertakings.**

The undersigned Registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i)        To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933, as amended;

(ii)       To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement.  Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii)      To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

provided, however, that

(A)       subparagraphs (i) and (ii) above do not apply if the registration statement is on Form S-8, and the information required to be included in a post-effective amendment by these subparagraphs is contained in reports filed with or furnished to the Commission by the Registrant pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in this registration statement.

(B)       subparagraphs (i), (ii) and (iii) do not apply if the registration statement is on Form S-3 or Form F-3 and the information required to be included in a post-effective amendment by these subparagraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in this registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) that is part of the registration statement.

(2)       That, for the purpose of determining any liability under the Securities Act of 1933, as amended, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3)       To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

II-4

The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, as amended, each filing of the Registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 that is incorporated by reference in this registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended, may be permitted to directors, officers, and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer, or controlling person of the Registrant in the successful defense of any action, suit, or proceeding) is asserted by such director, officer, or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question of whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

II-5

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Hong Kong, Special Administrative Region of the People's Republic of China, on the 5th day of October, 2010.

CHINA MEDIAEXPRESS HOLDINGS, INC.

By:   /s/ Zheng Cheng
      Zheng Cheng
      Chairman of the Board and Chief
      Executive Officer

## POWER OF ATTORNEY

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Position | Date |
|------|----------|------|
| /s/ Zheng Cheng<br>Zheng Cheng | Chairman of the Board and Chief Executive Officer (Principal Executive Officer and Principal Accounting and Financial Officer) | October 5, 2010 |
| /s/ Jacky Lam<br>Jacky Lam | Director and Chief Financial Officer (Principal Financial and Accounting Officer) | October 5, 2010 |
| *<br>George Zhou | Director | October 5, 2010 |
| *<br>Marco Kung | Director | October 5, 2010 |
| *<br>Dorothy Dong | Director | October 5, 2010 |
| *<br>Yinshaung Huang | Director | October 5, 2010 |

* By:/s/ Zheng Cheng
   Attorney- in-Fact

II-6

SC 13D 1 sc13d.htm SCHEDULE 13 D

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

SCHEDULE 13D
Under the Securities Exchange Act of 1934

(Amendment No. __)*

CHINA MEDIAEXPRESS HOLDINGS, INC.
(Name of Issuer)

Common Stock, par value $0.001
(Title of Class of Securities)

169442100
(CUSIP Number)

Howard I. Smith
Vice Chairman-Finance
C. V. Starr & Co., Inc.
399 Park Avenue, 17th Floor
New York, New York 10022
(Name, address and telephone number of person authorized
to receive notices and communications)

January 28, 2010
(Date of event which requires filing of this statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Sections 240.13d-1(e), 240.13d-1(f) or 240.13d-(g), check the following box. ☐

Note. Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Section 240.13d-7 for other parties to whom copies are to be sent.

(Continued on following pages)

(Page 1 of 14 Pages)

_____

* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934 (the "Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act. (however, see the Notes.)

| CUSIP No. 169442100 | | | PAGE 2 of 14 PAGES |
|---|---|---|---|
| 1 | NAME OF REPORTING PERSON<br><br>Starr Investments Cayman II, Inc. | | |
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP<br>(See Instructions) | | (a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS (See instructions): | | WC |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) OR 2(e): | | ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION: | | Cayman Islands |
| 7 | NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH: | SOLE VOTING POWER: | 0 |
| 8 | | SHARED VOTING POWER: | 4,695,455 |
| 9 | | SOLE DISPOSITIVE POWER: | 0 |
| 10 | | SHARED DISPOSITIVE POWER: | 4,695,455 |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY REPORTING PERSON: | | 4,695,455[1] |
| 12 | CHECK IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS): | | ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11): | | 16.5%[2] |
| 14 | TYPE OF REPORTING PERSON: | | CO |

[1] Includes 3,000,000 shares of Common Stock issuable upon the conversion of the Purchased Shares (as defined below) and 1,545,455 shares of Common Stock issuable upon the exercise of the Purchased Warrants (as defined below).

[2] Assumes 23,917,413 shares of Common Stock of the Issuer issued and outstanding as of November, 13, 2009, which figure was disclosed on the Issuer's Form 10-Q for the quarterly period ended September 30, 2009, filed November 16, 2009.

| CUSIP No. 169442100 | PAGE 3 of 14 PAGES |
|---|---|

| 1 | NAME OF REPORTING PERSON<br><br>Starr International Cayman, Inc. | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (See Instructions) | | (a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS (See instructions): | | N/A |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) OR 2(e): | | ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION: | | Cayman Islands |
| 7 | NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH: | SOLE VOTING POWER: | 0 |
| 8 | | SHARED VOTING POWER: | 4,695,455 |
| 9 | | SOLE DISPOSITIVE POWER: | 0 |
| 10 | | SHARED DISPOSITIVE POWER: | 4,695,455 |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY REPORTING PERSON: | | 4,695,455[1] |
| 12 | CHECK IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS): | | ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11): | | 16.5%[2] |
| 14 | TYPE OF REPORTING PERSON: | | CO |

---

[1] Includes 3,000,000 shares of Common Stock issuable upon the conversion of the Purchased Shares (as defined below) and 1,545,455 shares of Common Stock issuable upon the exercise of the Purchased Warrants (as defined below).

[2] Assumes 23,917,413 shares of Common Stock of the Issuer issued and outstanding as of November, 13, 2009, which figure was disclosed on the Issuer's Form 10-Q for the quarterly period ended September 30, 2009, filed November 16, 2009.

| CUSIP No. 169442100 | | PAGE 4 of 14 PAGES |
|---|---|---|
| 1 | NAME OF REPORTING PERSON<br><br>Starr International Investments Ltd.<br><br>I.R.S. Identification Number: 98-0431724 | |
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (See Instructions) | (a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY | |
| 4 | SOURCE OF FUNDS (See instructions): | N/A |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) OR 2(e): | ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION: | Bermuda |
| 7 | NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH: | SOLE VOTING POWER: | 0 |
| 8 | | SHARED VOTING POWER: | 4,695,455 |
| 9 | | SOLE DISPOSITIVE POWER: | 0 |
| 10 | | SHARED DISPOSITIVE POWER: | 4,695,455 |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY REPORTING PERSON: | 4,695,455[1] |
| 12 | CHECK IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS): | ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11): | 16.5%[2] |
| 14 | TYPE OF REPORTING PERSON: | CO |

---

[1] Includes 3,000,000 shares of Common Stock issuable upon the conversion of the Purchased Shares (as defined below) and 1,545,455 shares of Common Stock issuable upon the exercise of the Purchased Warrants (as defined below).

[2] Assumes 23,917,413 shares of Common Stock of the Issuer issued and outstanding as of November, 13, 2009, which figure was disclosed on the Issuer's Form 10-Q for the quarterly period ended September 30, 2009, filed November 16, 2009.

| CUSIP No. 169442100 | | PAGE 5 of 14 PAGES |
|---|---|---|
| 1 | NAME OF REPORTING PERSON<br><br>Starr International Company, Inc.<br><br>I.R.S. Identification Number: 52-1198625 | |
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP<br>(See Instructions) | (a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY | |
| 4 | SOURCE OF FUNDS (See instructions): | N/A |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) OR 2(e): | ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION: | Panama |
| 7 | NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH: | SOLE VOTING POWER: | 0 |
| 8 | | SHARED VOTING POWER: | 4,695,455 |
| 9 | | SOLE DISPOSITIVE POWER: | 0 |
| 10 | | SHARED DISPOSITIVE POWER: | 4,695,455 |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY REPORTING PERSON: | 4,695,455[1] |
| 12 | CHECK IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS): | ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11): | 16.5%[2] |
| 14 | TYPE OF REPORTING PERSON: | CO |

---

[1] Includes 3,000,000 shares of Common Stock issuable upon the conversion of the Purchased Shares (as defined below) and 1,545,455 shares of Common Stock issuable upon the exercise of the Purchased Warrants (as defined below).

[2] Assumes 23,917,413 shares of Common Stock of the Issuer issued and outstanding as of November, 13, 2009, which figure was disclosed on the Issuer's Form 10-Q for the quarterly period ended September 30, 2009, filed November 16, 2009.

| CUSIP No. 169442100 | | PAGE 6 of 14 PAGES |
|---|---|---|
| 1 | NAME OF REPORTING PERSON<br><br>C. V. Starr & Co., Inc.<br><br>I.R.S. Identification Number: 13-5621350 | |
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (See Instructions) | (a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY | |
| 4 | SOURCE OF FUNDS (See instructions): | N/A |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) OR 2(e): | ☐ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION: | Delaware |
| 7 | NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH: | SOLE VOTING POWER: | 0 |
| 8 | | SHARED VOTING POWER: | 4,695,455 |
| 9 | | SOLE DISPOSITIVE POWER: | 0 |
| 10 | | SHARED DISPOSITIVE POWER: | 4,695,455 |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY REPORTING PERSON: | 4,695,455[1] |
| 12 | CHECK IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS): | ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11): | 16.5%[2] |
| 14 | TYPE OF REPORTING PERSON: | CO |

---

[1] Includes 3,000,000 shares of Common Stock issuable upon the conversion of the Purchased Shares (as defined below) and 1,545,455 shares of Common Stock issuable upon the exercise of the Purchased Warrants (as defined below).

[2] Assumes 23,917,413 shares of Common Stock of the Issuer issued and outstanding as of November, 13, 2009, which figure was disclosed on the Issuer's Form 10-Q for the quarterly period ended September 30, 2009, filed November 16, 2009.

| CUSIP No. 169442100 | | PAGE 7 of 14 PAGES |
|---|---|---|
| 1 | NAME OF REPORTING PERSON<br><br>Maurice R. Greenberg | |
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP<br>(See Instructions) | (a) ☐<br>(b) ☐ |
| 3 | SEC USE ONLY | |
| 4 | SOURCE OF FUNDS (See instructions): | N/A |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED<br>PURSUANT TO ITEM 2(d) OR 2(e): | ☒ |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION: | United States of America |
| 7 | NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH: | SOLE VOTING POWER: | 0 |
| 8 | | SHARED VOTING POWER: | 4,695,455 |
| 9 | | SOLE DISPOSITIVE POWER: | 0 |
| 10 | | SHARED DISPOSITIVE POWER: | 4,695,455 |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY REPORTING PERSON: | 4,695,455[1] |
| 12 | CHECK IF THE AGGREGATE AMOUNT IN ROW (11)<br>EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS): | ☐ |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN<br>ROW (11): | 16.5%[2] |
| 14 | TYPE OF REPORTING PERSON: | HC |

[1] Includes 3,000,000 shares of Common Stock issuable upon the conversion of the Purchased Shares (as defined below) and 1,545,455 shares of Common Stock issuable upon the exercise of the Purchased Warrants (as defined below).

[2] Assumes 23,917,413 shares of Common Stock of the Issuer issued and outstanding as of November, 13, 2009, which figure was disclosed on the Issuer's Form 10-Q for the quarterly period ended September 30, 2009, filed November 16, 2009.

## ITEM 1.     SECURITY AND ISSUER

This statement on Schedule 13D ("Schedule 13D") relates to the Common Stock, par value $0.001 per share (the "Common Stock"), of China MediaExpress Holdings, Inc., a Delaware corporation (the "Issuer").  The principal executive offices of the Issuer are located at Room 2805, Central Plaza, Wanchai, Hong Kong.

## ITEM 2.     IDENTITY AND BACKGROUND

**(a), (b), (c) and (f)**: This Schedule 13D is being filed on behalf of Starr Investments Cayman II, Inc. ("Starr"), Starr International Cayman, Inc. ("Starr International Cayman"), Starr International Investments Ltd. ("Starr International Investments"), Starr International Company, Inc. ("Starr International"), C. V. Starr & Co., Inc. ("C. V. Starr") and Maurice R. Greenberg ("Mr. Greenberg", together with Starr, Starr International Cayman, Starr International Investments, Starr International and C. V. Starr, the "Reporting Persons" and each a "Reporting Person").

Starr, a company organized under the laws of the Cayman Islands, is an investment holding company for various private equity funds and direct investments.  The address of Starr's principal office and principal business is Bermuda Commercial Bank Building, 19 Par-la-Ville Road, Hamilton HM 11, BM Bermuda.

Starr International Cayman, a company organized under the laws of the Cayman Islands, is an investment holding company for various private equity funds.  The address of Starr International Cayman's principal office and principal business is Bermuda Commercial Bank Building, 19 Par-la-Ville Road, Hamilton HM 11, BM Bermuda.

Starr International Investments, a corporation organized under the laws of Bermuda, is an investment holding company invested in various direct, private equity and hedge fund investments.  The address of Starr International Investments' principal office and principal business is Bermuda Commercial Bank Building, 19 Par-la-Ville Road, Hamilton HM 11, BM Bermuda.

Starr International, a corporation organized under the laws of Panama, is a holding company that operates in a number of lines, including commercial real estate, owning and operating a private golf club and holding an investment portfolio.  The address of Starr International's principal office and principal business is Baarerstrasse 101, CH-6300 Zug, Switzerland.

C. V. Starr, a corporation organized under the laws of the state of Delaware, is a holding company that operates in a number of lines of business, including owning a number of insurance agencies and holding an investment portfolio.  The address of C. V. Starr's principal office and principal business is 399 Park Avenue, 17th Floor, New York, NY 10022.

Maurice R. Greenberg's principal business address and office is 399 Park Avenue, 17th Floor, New York, NY 10022.  The principal occupation of Mr. Greenberg is serving as the Chief Executive Officer, Chairman, and Director of C. V. Starr.  Mr. Greenberg is a citizen of the United States.

The executive officers and directors of each of Starr, Starr International Cayman, Starr International Investments, Starr International, and C. V. Starr, their addresses, their present principal occupations and citizenship, if other than the United States, are disclosed as Annex A to this Schedule 13D.

8

**(d) and (e)**:  Except as disclosed below, during the last five years, none of the Reporting Persons or any of the individuals named on Annex A have been (i) convicted in any criminal proceedings or (ii) party to a civil proceedings of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

On August 6, 2009, the Securities and Exchange Commission ("SEC") filed a complaint naming Howard I. Smith and Mr. Greenberg as defendants, alleging purported violations of the securities laws.

Without admitting or denying the SEC's allegations, Mr. Greenberg consented to a judgment entered on August 7, 2009, enjoining him from violating the antifraud and other provisions of the securities laws and from controlling any person who violates the reporting, books and records and internal control provisions of the securities laws, and directing him to pay a penalty of $7,500,000 and disgorgement of $7,500,000.

Without admitting or denying the SEC's allegations, Mr. Smith consented to a judgment entered on August 7, 2009 enjoining him from violating the antifraud and other provisions of the securities laws, and from controlling any person who violates the reporting, books and records and internal control provisions of the securities laws, directing him to pay a penalty of $750,000 and disgorgement of $750,000, and prohibiting him from acting as an officer or director of any public company for three years.  Mr. Smith also consented to the entry of an SEC order that suspends him from appearing or practicing before the SEC as an accountant for five years.

\
**ITEM 3.        SOURCE AND AMOUNT OF FUNDS OR OTHER CONSIDERATION**

As described further in Item 4, on January 28, 2010, Starr acquired (i) 1,000,000 shares of Series A Convertible Preferred Stock, par value $0.001, (the "Series A Preferred Stock") of the Issuer (the "Purchased Shares") and (ii) warrants (the "Purchased Warrants") to purchase 1,545,455 shares of Common Stock (as defined above) of the Issuer for an aggregate purchase price of $30 million.  Concurrently, certain stockholders of the Issuer transferred 150,000 shares of Common Stock (the "Transferred Shares") to Starr for no additional cash consideration.

The funds used to effect the acquisition were from Starr's working capital.  Starr may receive certain Performance Adjustment Amounts from certain stockholders in the future, as described more fully under the heading "Performance-based Adjustments" in Item 4.

**ITEM 4.        PURPOSE OF TRANSACTION.**

Starr, the Issuer and certain subsidiaries and stockholders of the Issuer entered into a Securities Purchase Agreement on January 12, 2010 (the "Purchase Agreement"), pursuant to which Starr acquired (i) the Purchased Shares and (ii) the Purchased Warrants, for an aggregate purchase price of $30 million at a closing that occurred on January 28, 2010 (the "Closing").  Concurrently, certain stockholders of the Issuer transferred the Transferred Shares to Starr for no additional cash consideration.  The foregoing is referred to as the "Transactions."

**Purchase Agreement**

*Governance Arrangements*

9

Pursuant to the Purchase Agreement, the Certificate of Designations, as defined below, and the Investor Rights Agreement, as defined below, so long as Starr beneficially owns at least 3% of the Issuer's Common Stock on a fully-diluted and as-converted basis, the holders of at least a majority of the shares of Series A Preferred Stock outstanding will be entitled to designate one individual (the "Preferred Director") to the Issuer's board of directors (the "Board").  For so long as Starr is entitled to designate the Preferred Director, Starr will also have the right to appoint one director to each of the boards of directors of certain subsidiaries of the Issuer.  The authorized number of shares of the Series A Preferred Stock is 1 million, all of which are owned by Starr.

In addition, for so long as Starr owns at least 3% of the Issuer's Common Stock on a fully-diluted and as-converted basis, the affirmative vote or consent of the holders of at least a majority of the shares of Series A Preferred Stock then outstanding is necessary for effecting: (i) any amendment of the Certificate of Incorporation or Certificate of Designations or Bylaws of the Issuer or any subsidiary in a manner adverse to the rights, preferences or privileges of the holders of the Series A Preferred Stock; (ii) increase or decrease the total number of authorized shares of Series A Preferred Stock; or (iii) any material amendment of the agreements pursuant to which the Issuer controls its operating entities in the People's Republic of China ("PRC").

*Covenants*

After the Closing, the Issuer is obligated to, among other things, within 3 months (i) effect the transfer of certain of the assets held in the PRC to other companies controlled by it in the PRC and enter into licensing arrangements with respect thereto, (ii) amend the terms of the agreements pursuant to which it controls its operating entities in the PRC to the reasonable satisfaction of Starr, (iii) seek approval from the State Administration for Radio and Television for the broadcasting of certain video programming not later than December 31, 2010 and (iv) implement a program regarding compliance with the US Foreign Corrupt Practices Act not later than April 30, 2010.

**Certificate of Designations**

The Series A Preferred Stock were issued pursuant to the terms of the Certificate of Designations of the Series A Preferred Stock (the "Certificate of Designations"), which establishes the rights and privileges of the Series A Preferred Stock.

The Series A Preferred Stock have an initial liquidation preference of $30 per share and rank senior to the Issuer's Common Stock and any other stock that ranks junior to the Series A Preferred Stock with respect to distributions of assets upon the liquidation, dissolution or winding up of the Issuer.

If the Issuer voluntarily or involuntarily liquidates, dissolves or winds up its affairs, each holder of the Series A Preferred Stock will be entitled to receive out of the Issuer's assets available for distribution to stockholders, after satisfaction of liabilities to creditors, if any, and before any distribution of assets is made on the Issuer's Common Stock or any of the Issuer's other shares of stock ranking junior as to such a distribution to the Series A Preferred Stock, a liquidating distribution in the amount (the "Liquidation Preference") that is the greater of (a) $30 per share and (b) the amount such holder would receive as a holder of Common Stock assuming the prior conversion of each of its shares of Series A Preferred Stock.

In any such distribution, if the Issuer's assets are not sufficient to pay the liquidation preferences in full to all holders of the Series A Preferred Stock, the amounts paid to the holders of Series A Preferred Stock will be paid pro rata in accordance with the respective aggregate Liquidation Preferences of those holders.

10

No dividends will accrue on the Series A Preferred Stock.

Each Series A Preferred Stock is convertible into a number of shares of the Issuer's Common Stock in an amount equal to $30 divided by the then applicable conversion price. The initial conversion price is $10 per share and is subject to customary anti-dilution adjustments for issuances of shares of Common Stock as a dividend or distribution on shares of the Common Stock. In addition, each share of the Series A Preferred Stock shall be subject to mandatory conversion at the then applicable conversion price into shares of Common Stock upon the earliest to occur of the following: (i) the closing price of the Issuer's Common Stock is greater than or equal to $25 per share for a period of 20 consecutive trading days over any 30 trading day period, (ii) the Issuer's market capitalization equals or exceeds $1.2 billion, or (iii) January 28, 2014.

The holders of the Series A Preferred Stock are entitled to vote with the holders of shares of Common Stock on all matters submitted to a vote of the stockholders of the Issuer. The holders of the Series A Preferred Stock will be entitled to the same number of votes as the number of shares of Common Stock that the Series A Preferred Stock are then convertible into, subject to a cap mandated by the closing price of the Common Stock on NYSE Amex LLC on January 12, 2010.

**Purchased Warrants**

The Purchased Warrants entitle the holder thereof to purchase up to 1,545,455 shares of the Issuer's Common Stock at an exercise price of $6.47 per share at any time and from time to time prior to January 28, 2015. The Purchased Warrants contain customary anti-dilution adjustment provisions and may be exercised for cash or cancellation of indebtedness owed to the holder by the Issuer. The Purchased Warrants may be redeemed by the Issuer for $0.01 per Purchased Warrant if at any time the closing price of the Common Stock is greater than or equal to $14 for any 20 consecutive trading days within a 30 trading day period.

**Investor Rights Agreement**

*General*

In connection with the Transactions, Starr, the Issuer and certain stockholders of the Issuer also entered into an Investor Rights Agreement, dated as of January 28, 2010 (the "Investor Rights Agreement"). Pursuant to such Investor Rights Agreement, from the Closing until 6 months thereafter, Starr will not be permitted to transfer or otherwise dispose of its interest in the Purchased Shares, Purchased Warrants or Transferred Shares or in any shares of Common Stock issued upon conversion of the Purchased Shares or exercise of the Purchased Warrants (other than to certain permitted transferees or pursuant to certain other customary exceptions). In addition, without the prior written consent of the Issuer, Starr may not, at any time, transfer Purchased Shares other than to an affiliate of Starr. The Investor Rights Agreement also subjects certain controlling stockholders of the Issuer to transfer restrictions.

For so long as Starr owns at least 3% of the Issuer's Common Stock on a fully-diluted and as-converted basis, Starr will have the right to purchase a pro rata portion of any additional shares of capital stock proposed to be issued by the Issuer, and will have the right to join certain stockholders in their sale of capital stock of the Issuer on a pro rata basis, in each case in proportion to Starr's then current percentage of ownership of the issued and outstanding shares of Common Stock, on a fully diluted, as-converted basis.

11

*Put Option*

As long as Starr owns at least 3% of the issued and outstanding shares of Common Stock, on a fully diluted, as-converted basis, it will also have the right  to require certain stockholders to purchase its Purchased Shares and the Common Stock held by Starr or issued upon the conversion of Purchased Shares or exercise of the Purchased Warrants upon the occurrence of the Issuer's failure to achieve certain performance targets or upon breach of certain covenants contained in the Purchase Agreement or the Investor Rights Agreement and the failure to cure such breach within 60 days following written notice of such breach.

In the event that the stockholders subject to the obligation to purchase Starr's shares under the put right or to obligations under the performance-based adjustment provisions do not comply therewith, Starr will have the right to require such stockholders to sell up to all of the Issuers' capital stock directly or indirectly held by them to a third party pursuant to a managed sale process.

*Performance-based Adjustments*

Certain stockholders of the Issuer will be required to make certain payments (the "Performance Adjustment Amounts") to Starr in the event the Issuer's audited consolidated net profits ("ACNP") for 2009, 2010 or 2011 are less than $42 million, $55 million and $70 million, respectively (each, a "Profits Target").  The Performance Adjustment Amount payable in any of 2009, 2010 or 2011 will be a fraction of $343,462,957 which is proportionate to the amount by which the Issuer's ACNP in such year falls short of the then applicable Profits Target. The Performance Adjustment Amounts will be payable in cash or stock, but only to the extent such stock, together with the shares of Common Stock acquired or acquirable as a result of Starr's ownership of the Purchased Shares, the Purchased Warrants and the Transferred Shares, will not exceed 19.9% of the total number of shares of Common Stock of the Issuer issued and outstanding as of the date of the Purchase Agreement.

## Registration Rights Agreement

The Common Stock owned by Starr from time to time will be entitled to certain customary registration rights pursuant to a Registration Rights Agreement, dated January 28, 2010, entered into by and among Starr and the Issuer (the "Registration Rights Agreement").

## Stock Transfer Agreement

Concurrent with the execution of the Purchase Agreement, certain stockholders of the Issuer transferred 150,000 shares of Common Stock to Starr at no additional cash consideration, pursuant to the Stock Transfer Agreement, dated January 28, 2010 (the "Stock Transfer Agreement").

The description of the terms and conditions of the Purchase Agreement, the Certificate of Designations, the Purchased Warrants, the Investor Rights Agreement, the Registration Rights Agreement and the Stock Transfer Agreement (together, the "Transaction Documents") set forth herein does not purport to be complete and is qualified in its entirety by reference to the full text of the Purchase Agreement attached hereto as Exhibit B, the Certificate of Designations attached hereto as Exhibit C, the Warrant to Purchase Shares of Common Stock of Issuer attached hereto as Exhibit D, the Investor Rights Agreement attached hereto as Exhibit E, the Registration Rights Agreement attached hereto as Exhibit F and the Stock Transfer Agreement attached hereto as Exhibit G, each of which is hereby incorporated by reference into this Item 4.

12

The Reporting Persons intend to review Starr's investment in the Issuer on a continuing basis and may exercise Starr's rights described above or engage in discussions with the Issuer's management or board of directors, or other relevant parties, concerning the Issuer's business, operations, governance, management, strategy and future plans.  In addition to obtaining the rights described above by entering into the Transaction Documents, Starr entered into the Transactions for general investment purposes.   Whether in connection with the rights described above or for general investment purposes, the Reporting Persons, depending on various factors (including, without limitation, the Issuer's financial position, price levels of the Common Stock, other available investment opportunities, and conditions in the securities market, the Issuer's industry or the economy generally), may in the future take such actions with respect to Starr's investment in the Issuer as the Reporting Persons deem appropriate, including (in each case subject to the terms of the Transaction Documents, if applicable) selling some or all of the shares of Series A Preferred Stock and/or Common Stock owned by them, purchasing additional outstanding shares of the Issuer's equity securities (or rights thereto) or seeking to purchase additional shares of the Issuer's equity securities (or rights thereto) from the Issuer and/or otherwise changing their intentions with respect to any and all matters described in subparagraphs (a) through (j) of Item 4 of Schedule 13D.  Except as set forth herein, neither the Reporting Persons nor, to the best knowledge of the Reporting Persons, any individual named in Annex A have present plans or proposals which would relate to or result in any of the transactions described in subparagraphs (a) through (j) of Item 4 of Schedule 13D.

## ITEM 5.          INTEREST IN SECURITIES OF THE ISSUER.

(a) The following disclosure assumes that there are 23,917,413 shares of Common Stock of the Issuer issued and outstanding, which figure is disclosed on the Issuer's Form 10-Q for the quarterly period ended September 30, 2009, filed November 16, 2009.

As of the date hereof, Starr may be deemed to beneficially own in the aggregate 4,695,455 shares of Common Stock of the Issuer, which figure represents approximately 16.5% of the issued and outstanding shares of Common Stock and consists of 3,000,000 shares of Common Stock issuable upon the conversion of the Purchased Shares, 1,545,455 shares of Common Stock issuable upon the exercise of the Purchased Warrants and 150,000 shares of Common Stock.

Starr International Cayman, by virtue of being the sole stockholder of Starr, may be deemed to beneficially own the shares of Issuer beneficially owned by Starr.

Starr International Investments, by virtue of being the sole stockholder of Starr International Cayman, may be deemed to beneficially own the shares of Issuer beneficially owned by Starr International Cayman.

Starr International, by virtue of being the sole stockholder of Starr International Investments, may be deemed to beneficially own the shares of Issuer beneficially owned by Starr International Investments.

Pursuant to an Investment Management Agreement, effective January 1, 2008, C. V. Starr has shared power to vote on and direct the disposition of the shares of Issuer held by Starr International and may, by virtue of this relationship, be deemed to beneficially own shares of Issuer beneficially owned by Starr International.

Mr. Greenberg owns 26.37% of the common stock of C. V. Starr directly.  By virtue of Mr. Greenberg's voting power in C. V. Starr and his position as a Director, Chairman and Chief Executive Officer of C. V. Starr, Mr. Greenberg may be deemed to have or share voting or dispositive power over

the shares of Issuer that are beneficially owned by C. V. Starr.  Mr. Greenberg disclaims beneficial ownership of the shares of the Issuer beneficially owned by C. V. Starr.

To the best knowledge of the Reporting Persons, none of the individuals named in Annex A beneficially owns any shares of the Common Stock of Issuer.

(b)  Each of the Reporting Persons have shared power to vote or direct the vote and shared power to dispose of or direct the disposition of, in the aggregate, 4,695,455 shares of Common Stock of the Issuer.  To the best knowledge of the Reporting Persons, none of the individuals named in Annex A beneficially owns any shares of the Common Stock of Issuer.

(c)  Except as set forth in Items 3 and 4 of this Schedule 13D, both of which are hereby incorporated by reference into this Item 5(c) in their entirety, none of the Reporting Persons nor, to the best knowledge of the Reporting Persons, any of the individuals named in Annex A has engaged in any transaction during the past 60 days in any shares of the Common Stock.

(d) – (e) Inapplicable.

**ITEM 6.  CONTRACTS, ARRANGEMENTS, UNDERSTANDINGS OR RELATIONSHIPS WITH RESPECT TO THE SECURITIES OF THE ISSUER.**

There are no contracts, arrangements, understandings or relationships with respect to securities of the Issuer other than as set forth in Items 3 and 4 of this Schedule 13D both of which are hereby incorporated by reference into this Item 6 in their entirety.

**ITEM 7.      MATERIAL TO BE FILED AS EXHIBITS.**

Exhibit A     Joint Filing Agreement, dated as of February 4, 2010, by and among Starr Investments Cayman II, Inc., Starr International Cayman Inc., Starr International Investments Ltd., Starr International Company, Inc., C. V. Starr & Co., Inc. and Maurice R. Greenberg

Exhibit B     Securities Purchase Agreement, dated January 12, 2010, by and among Starr Investments Cayman II, Inc., ChinaMediaExpress Holdings, Inc. and certain subsidiaries and stockholders of China MediaExpress Holdings, Inc.

Exhibit C     Certificate of Designations of Series A Preferred Stock, par value $0.001 per share, of China MediaExpress Holdings, Inc.

Exhibit D     Warrant to Purchase Shares of Common Stock of China MediaExpress Holdings, Inc.

Exhibit E     Investor Rights Agreement, dated as of January 28, 2010, by and among Starr Investments Cayman II, Inc., China MediaExpress Holdings, Inc. and certain stockholders of China MediaExpress Holdings, Inc.

Exhibit F     Registration Rights Agreement, dated January 28, 2010, by and among Starr Investments Cayman II, Inc. and China MediaExpress Holdings, Inc.

Exhibit G     Stock Transfer Agreement, dated January 28, 2010, by and among Starr Investments Cayman II, Inc. and certain stockholders of China MediaExpress Holdings, Inc.

14

# SIGNATURE

After reasonable inquiry and to the best of the undersigned's knowledge and belief, the undersigned certifies that the information set forth in this statement is true, complete and correct.

Dated: February 8 , 2010                    STARR INVESTMENTS CAYMAN II, INC.

By:    /s/ Michael J. Horvath
       Michael J. Horvath
       Director

STARR INTERNATIONAL CAYMAN, INC.

By:    /s/ Michael J. Horvath
       Michael J. Horvath
       Director

STARR INTERNATIONAL INVESTMENTS LTD.

By:    /s/ Stuart Osborne
       Stuart Osborne
       Director, Controller and Vice President

STARR INTERNATIONAL COMPANY, INC.

By:    /s/ Stuart Osborne
       Stuart Osborne
       Vice President and Treasurer

C. V. STARR & CO., INC.

By:    /s/ Michael J. Horvath
       Michael J. Horvath
       Secretary

MAURICE R. GREENBERG

By:    /s/ Maurice R. Greenberg

## ANNEX A

### Starr Investments Cayman II, Inc. ("Starr")

| Name and Address | Office | Principal Occupation |
|---|---|---|
| Bertil P.H. Lundqvist<br>399 Park Avenue, 17th Floor, New York, NY 10022 | Director | Director, Executive Vice President, and General Counsel, C. V. Starr & Co., Inc. |
| Joseph C.H. Johnson (Bermuda)<br>Bermuda Commercial Bank Building, 19 Par la Ville Road, 5th Floor, Hamilton, Bermuda HM11 | Director | President and Director, Starr International Company Inc. |
| Michael J. Horvath<br>399 Park Avenue, 17th Floor, New York, NY 10022 | Director | Secretary and Associate Counsel, C. V. Starr & Co., Inc. |
| Stuart Osborne (United Kingdom)<br>Baarerstrasse 101, CH 6300, Zug, Switzerland | Director | Vice President and Treasurer, Starr International Company, Inc. |
| Howard I. Smith<br>399 Park Avenue, 17th Floor, New York, NY 10022 | Director | Vice Chairman- Finance and Director, C. V. Starr & Co., Inc. |

### Starr International Cayman, Inc. ("Starr International Cayman")

| Name and Address | Office | Principal Occupation |
|---|---|---|
| Bertil P.H. Lundqvist<br>399 Park Avenue, 17th Floor, New York, NY 10022 | Director | Director, Executive Vice President, and General Counsel, C. V. Starr & Co., Inc. |
| Joseph C.H. Johnson (Bermuda)<br>Bermuda Commercial Bank Building, 19 Par la Ville Road, 5th Floor, Hamilton, Bermuda HM11 | Director | President and Director, Starr International Company, Inc. |
| Michael J. Horvath<br>399 Park Avenue, 17th Floor, New York, NY 10022 | Director | Secretary and Associate Counsel, C. V. Starr & Co., Inc. |
| Stuart Osborne (United Kingdom)<br>Baarerstrasse 101, CH 6300, Zug, Switzerland | Director | Vice President and Treasurer, Starr International Company, Inc. |

| **Name and Address** | **Office** | **Principal Occupation** |
| --- | --- | --- |
| Howard I. Smith<br>399 Park Avenue, 17th Floor, New York, NY 10022 | Director | Vice Chairman- Finance and Director, C. V. Starr & Co., Inc. |

### Starr International Investments Ltd. ("Starr International Investments")

| **Name and Address** | **Office** | **Principal Occupation** |
| --- | --- | --- |
| Michael J. Horvath<br>399 Park Avenue, 17th Floor, New York, NY 10022 | Assistant Secretary | Secretary and Associate Counsel, C. V. Starr & Co., Inc. |
| Stuart Osborne (United Kingdom)<br>Baarerstrasse 101, CH 6300, Zug, Switzerland | Controller, Director and Vice President | Vice President and Treasurer, Starr International Company Inc. |
| Joseph C.H. Johnson (Bermuda)<br>Bermuda Commercial Bank Building<br>19 Par la Ville Road, 5th Floor, Hamilton Bermuda HM11 | President and Director | President and Director, Starr International Company, Inc. |

### Starr International Company, Inc. ("Starr International")

| **Name and Address** | **Office** | **Principal Occupation** |
| --- | --- | --- |
| Maurice R. Greenberg<br>399 Park Avenue, 17th Floor, New York, NY 10022 | Chairman, Managing Director and Director | Chairman, Chief Executive Officer, and Director, C. V. Starr & Co., Inc.; Chairman, Managing Director and Director, Starr International Company, Inc. |
| Edward E. Matthews<br>399 Park Avenue, 17th Floor, New York, NY 10022 | Vice Chairman and Director | President and Director, C. V. Starr & Co., Inc.; Vice Chairman and Director, Starr International Company Inc. |
| Joseph C.H. Johnson (Bermuda)<br>Bermuda Commercial Bank Building<br>19 Par la Ville Road, 5th Floor, Hamilton Bermuda HM11 | President and Director | President and Director, Starr International Company, Inc. |
| Stuart Osborne (United Kingdom)<br>Baarerstrasse 101, CH 6300, Zug, Switzerland | Vice President and Treasurer | Vice President and Treasurer, Starr International Company, Inc. |
| Margaret Barnes<br>(United Kingdom and Canada)<br>Baarerstrasse 101, CH 6300, Zug, Switzerland | Vice President, Controller, and Assistant Secretary | Vice President, Controller, and Assistant Secretary, Starr International Company, Inc. |
| Bertil P.H. Lundqvist<br>399 Park Avenue, 17th Floor, New York, NY 10022 | Director | Director, Executive Vice President, and General Counsel, C. V. Starr & Co., Inc. |
| Howard I. Smith<br>399 Park Avenue, 17th Floor, New York, NY 10022 | Director | Vice Chairman- Finance and Director, C. V. Starr & Co., Inc. |

| Name and Address | Office | Principal Occupation |
|---|---|---|
| Cesar Cabreza Zalamea (Republic of the Phillippines) Suite 1405-7 14/F, Two Exchange Square, 8 Connaught Place, Central, Hong Kong | Director | President and Chief Executive Officer, Starr International Company (Asia), Inc. |
| Houghton Freeman 499 Taber Hill Road Stowe, VT 05672 | Director | Retired. |
| John Joseph Roberts 210 East 65th St., Apt. 14J New York, NY 10065-6670 | Director | Retired |
| Lawrence Scott Greenberg 399 Park Avenue, 17th Floor, New York, NY 10022 | Director | Executive Vice President and Director, C. V. Starr & Co., Inc. |

## C. V. Starr & Co., Inc. ("C. V. Starr")

| Name and Address | Office | Principal Occupation |
|---|---|---|
| Maurice R. Greenberg 399 Park Avenue, 17th Floor, New York, NY 10022 | Chairman, Chief Executive Officer and Director | Chairman, Chief Executive Officer, and Director, C. V. Starr & Co., Inc.; Chairman, Managing Director and Director, Starr International Company, Inc. |
| Edward E. Matthews 399 Park Avenue, 17th Floor, New York, NY 10022 | President and Director | President and Director, C. V. Starr & Co., Inc.; Vice Chairman and Director, Starr International Company, Inc. |
| Lawrence Scott Greenberg 399 Park Avenue, 17th Floor, New York, NY 10022 | Executive Vice President and Director | Executive Vice President and Director, C. V. Starr & Co., Inc. |
| Bertil P.H. Lundqvist 399 Park Avenue, 17th Floor, New York, NY 10022 | Executive Vice President, General Counsel and Director | Executive Vice President, General Counsel and Director, C. V. Starr & Co., Inc. |
| Honora Keane 399 Park Avenue, 17th Floor, New York, NY 10022 | Senior Counsel and Vice President | Senior Counsel and Vice President, C. V. Starr & Co., Inc. |
| Michael J. Horvath 399 Park Avenue, 17th Floor, New York, NY 10022 | Secretary and Associate Counsel | Secretary and Associate Counsel, C. V. Starr & Co., Inc. |
| Howard I. Smith 399 Park Avenue, 17th Floor, New York, NY 10022 | Vice Chairman- Finance and Director | Vice Chairman- Finance and Director, C. V. Starr & Co., Inc. |

| Name and Address | Office | Principal Occupation |
|---|---|---|
| Houghton Freeman<br>499 Taber Hill Roa<br>Stowe, VT 05672 | Honorary Vice Chairman | Retired |
| John Joseph Roberts<br>210 East 65th St., Apt. 14J<br>New York, NY 10065-6670 | Honorary Vice Chairman | Retired |

EX-99 6 exhibit_e.htm EXHIBIT E - INVESTOR RIGHTS AGREEMENT

EXHIBIT E

# INVESTOR RIGHTS AGREEMENT

by and among

**China MediaExpress Holdings, Inc.,**

**Mr. Zheng Cheng,**

**Ou Wen Lin,**

**Qingping Lin,**

**Thousand Space Holdings Limited,**

**Bright Elite Management Limited,**

and

**Starr Investments Cayman II, Inc.**

January 28, 2010

## **TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | Definitions. | 1 |
| 2. | Governance Matters. | 5 |
| 3. | Restrictions on Transfer. | 7 |
| 4. | Right of First Offer. | 8 |
| 5. | Tag-along | 8 |
| 6. | Performance-based Adjustment | 9 |
| 7. | Put Option | 10 |
| 8. | Drag-along | 11 |
| 9. | Other Covenants | 12 |
| 10. | Earn-out. | 14 |
| 11. | Legend | 14 |
| 12. | Miscellaneous | 14 |

ii

INVESTOR RIGHTS AGREEMENT, dated as of January 28, 2010, by and among China MediaExpress Holdings, Inc., a Delaware corporation (the "Company"), Mr. Zheng CHENG, a citizen of the People's Republic of China (the "PRC" or "China"), identification number 350103197103110058 (the "Founder"), Ou Wen Lin, a citizen of the Republic of Philippines, passport number G15042722, and Qingping Lin, a citizen of the PRC, identification number 350127194911134311, Thousand Space Holdings Limited, a company organized under the laws of the British Virgin Islands ("Thousand"), Bright Elite Management Limited, a company organized under the laws of the British Virgin Islands ("Bright", together with the Founder, Ou Wen Lin, Qingping Lin and Thousand, the "Sponsor Shareholders"), and Starr Investments Cayman II, Inc., a company organized with limited liability under the laws of the Cayman Islands (the "Investor").

WHEREAS, the Company, the Sponsor Shareholders, the Investor together with other parties entered into a Securities Purchase Agreement (the "Purchase Agreement") dated as of January 12, 2010, pursuant to which the Company agreed to sell to the Investor, and the Investor agreed to purchase from the Company, (i) one million (1,000,000) shares of Preferred Stock (the "Purchased Shares") and (ii) warrants of the Company entitling the Investor to purchase 1,545,455 shares of Common Stock at US$6.47 per share (the "Purchased Warrants"), in each case on the terms and subject to the conditions set forth in the Purchase Agreement (the "Securities Purchase");

WHEREAS, on the terms and conditions set forth in the Purchase Agreement, the Sponsor Shareholders agreed to transfer to the Investor 150,000 shares of Common Stock (the "Transferred Shares"), and such transfer, the "Stock Transfer," together with the Securities Purchase, the "Transactions");

WHEREAS, it is a condition to the closing of the transactions contemplated by the Purchase Agreement that the Company, the Sponsor Shareholders and the Investor enter into this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the agreements contained in this Agreement, and intending to be legally bound by this Agreement, the Company, the Sponsor Shareholders and the Investor agree as follows:

1.     Definitions.  As used in this Agreement, the following terms shall have the respective meanings set forth in this Section 1:

"Affiliate" of any Person shall mean any other Person directly or indirectly controlling or controlled by or under common control with such Person. For purposes of this definition, "control" when used with respect to any Person has the meaning specified in Rule 12b-2 under the Exchange Act (including SEC and judicial interpretations thereof); and the terms "controlling" and "controlled" shall have meanings correlative to the foregoing.

"Audited Consolidated Net Profit" shall mean the "Net Income Attributable to the Parent" as calculated and disclosed pursuant to Statement of Financial Accounting Standards ("SFAS") No. 160, as set forth on the audited consolidated financial statements of the Company prepared in accordance with US GAAP and audited without qualification by a reputable international accounting firm appointed by the Company (but subject to the Investor's prior written consent, which consent shall not be unreasonably withheld, it being

understood that, for the fiscal year ended December 31, 2009 Deloitte & Touche Tohmatsu shall be acceptable to Investor) (the "Audited Consolidated Financial Statements"), which comprises a part of the Forms 10-K filed with the SEC for the fiscal years ending December 31, 2009, 2010 or 2011, and shall be adjusted to:

       (i)      add back to the "Net Income Attributable to the Parent" any charges for (a) "acquisition-related costs" as defined in and charged to expense pursuant to SFAS No. 141 (R) and any other fees, expenses or payments to any third party related to the Share Exchange (as defined in the Exchange Agreement), (b) the amortization or intangibles, (c) impairment of goodwill, (d) compensation expense arising from the Earn-out Shares (as defined in the Exchange Agreement) and, any other share-based compensation, each (a)-(d) as it relates to any acquisitions completed in, or pending at the end of, the applicable period (including the Share Exchange), by the Company, the HKCo, the WFOE and the PRCCo;

       (ii)     add back to the "Net Income Attributable to the Parent" any out of pocket expenses incurred to design, implement and annually assess disclosure controls and procedures and internal controls over financial reporting by the Company or its Subsidiaries as a consequence of the Company's compliance with the Sarbanes-Oxley Act;

       (iii)     add back to the "Net Income Attributable to the Parent" any charges for Taxes payable by any of the Company, the HKCo, the WFOE and the PRCCo that are directly attributable to the Share Exchange and that apply to the applicable period; and

       (iv)     deduct from the "Net Income Attributable to the Parent" the financial statement tax benefit of the amount in (i), (ii) and (iii) above, computed by multiplying the amount of the adjustment in (i), (ii) or (iii) above by the statutory tax rate applicable to the Company or its Subsidiaries that incurred the expense;

provided, however, that if the Company is no longer required or eligible to file a Form 10-K, then the "Net Income Attributable to Parent" as calculated and disclosed pursuant to SFAS No. 160 for any particular fiscal year shall be as set forth on the Audited Consolidated Financial Statements for such fiscal year. For the avoidance of doubt, any non-recurring profit or gain shall not be counted toward the Audited Consolidated Net Profit.

      "Board" shall mean the board of directors of the Company.

      "Business Day" means a day that is a Monday, Tuesday, Wednesday, Thursday or Friday and is not a day on which banking institutions in New York, New York or in Beijing, the PRC generally are authorized or obligated by law, regulation or executive order to close.

      "Capital Stock" shall mean any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (in each case however designated) stock issued by the Company.

      "Closing" shall have the meaning given to it in the Purchase Agreement.

      "Closing Date" shall have the meaning given to it in the Purchase Agreement.

      "Closing Price" shall mean, with respect to a share of Capital Stock of a Person, the price per share of the final trade of the Capital Stock on the applicable Trading

2

Day on the principal national securities exchange on which the Capital Stock is listed or admitted to trading; *provided*, *however*, that, if the Capital Stock is not so listed or traded, the Closing Price shall be equal to the fair market value of such share, as determined in good faith by the Board.

"Code" shall mean the Internal Revenue Code of 1986, together with all regulations, rulings and interpretations thereof or thereunder by the Internal Revenue Service.

"Common Stock" shall mean the common stock of the Company, par value US$ 0.001 per share.

"Exchange Act" shall mean the U.S. Securities Exchange Act of 1934, as amended and the rules and regulations promulgated by the SEC thereunder.

"FCPA" shall mean the U.S. Foreign Corrupt Practices Act of 1977, as amended.

"Founding Shareholder Ownership Percentage" as of a particular date of determination shall mean the percentage determined by a fraction, the numerator of which is the total number of shares of Common Stock held, directly or indirectly, by such Founding Shareholder and the denominator of which is the aggregate number of shares Common Stock collectively held, directly or indirectly, by all of the Founding Shareholders, in each case on a fully diluted and as-converted basis as of the date of determination. As of the date hereof, and for all purposes herein, such percentages shall be as follows unless revised by written notice to the Investor signed by each of the Founding Shareholders: Mr. Zheng Cheng, 61.17%; Ou Wen Lin, held indirectly through Thousand, 28.22%; and Qingping Lin, held indirectly through Bright, 10.61%.

"Founding Shareholders" shall mean the Founder, Ou Wen Lin and Qingping Lin, and a "Founding Shareholder" shall mean any of them.

"Governmental Authority" shall mean any foreign governmental authority, the United States of America, any state of the United States and any political subdivision of any of the foregoing, and any agency, instrumentality, department, commission, board, bureau, central bank, authority, court or other tribunal, in each case whether executive, legislative, judicial, regulatory or administrative.

"IRR" shall mean, with respect to the Investor's investment in the Put Shares (as of any given determination date of the Put Price with respect to the exercise of the Put Option) (calculated in U.S. dollars), the annual discount rate at which the net present value of all capital in-flows relating to such investment in the Put Shares at the time of the Closing is equal to the net present value of all cash out-flows from such investment in the Put Shares at the time of the Closing.

"Investor Ownership Percentage" as of a particular date of determination shall mean the percentage determined by a fraction, the numerator of which is the sum of the number of (i) shares of Common Stock held by the Investor *plus* (ii) shares of Common Stock issuable upon the conversion of the Purchased Shares or the exercise of the Purchased Warrants, and the denominator of which is the total number of shares of Common Stock issued and outstanding, on a fully-diluted and as-converted basis as of the date of determination.

3

"Lock-up Agreement" shall have the meaning given to it in the Share Exchange Agreement.

"Person" shall mean any individual, association, partnership, limited liability company, joint venture, corporation, trust, unincorporated organization, Governmental Authority or any other form of entity.

"Per Share Issuance Price" shall, in the case of shares of Preferred Stock, equal US$ 30.00, and, in the case of shares of Common Stock, equal US$ 10.00.

"PRCCo" shall mean Fujian Fenzhong Media Co., Ltd., a limited liability company operating in media business established in the PRC.

"Preferred Stock" shall mean the Series A Preferred Stock of the Company, par value of US$ 0.001 per share.

"Put Price" shall mean, as of any given determination date, the product of the total number of the Put Shares multiplied by the sum of (a) the Per Share Issuance Price *plus* (b) such amount as would result in an IRR of twenty-three percent (23%) on the Per Share Issuance Price from the date of Closing up to the date of the full payment of all the Put Price, *provided* that the aggregate Put Price shall be reduced on a dollar for dollar basis to the extent that the Investor has recovered any amounts under Section 11 of the Purchase Agreement, *provided* further that, in any event, any given reduction shall reduce the Put Price with respect to only one exercise of the Put Right and any further exercise of the Put Right shall only be reduced by any additional amounts recovered by the Investor under Section 12 following the previous exercise of the Put Right. To the extent the Put Right is exercised with respect to a combination of Preferred Stock and Common Stock, the Put Price shall be equal to the sum of the Put Price for each class of Capital Stock calculated separately.

"Put Shares" means such number of shares of Preferred Stock and such number of shares of Common Stock (i) held by the Investor or issuable upon the conversion of Preferred Shares or the exercise of the Purchased Warrants with respect to which the Investor exercises the Put Right under Section 7.1, it being understood that, the Investor may exercise such right in connection with all or any portion of such shares that it holds at such time.

"SEC" shall mean the U.S. Securities and Exchange Commission or any other U.S. federal agency then administering the Securities Act or Exchange Act.

"Securities Act" shall mean the U.S. Securities Act of 1933, as amended and the rules and regulations of the SEC thereunder.

"Share Exchange Agreement" shall mean the share exchange agreement dated May 1, 2009 relating to the acquisition by the Company of all the outstanding capital stock of Hong Kong Mandefu Holdings Ltd..

"Short Sales" shall include, without limitation, all "short sales" as defined in Rule 200 promulgated under Regulation SHO under the Exchange Act and all types of direct and indirect stock pledges, forward sale contracts, options, puts, calls, swaps and similar arrangements (including on a total return basis), and sales and other transactions through non-US broker dealers or foreign regulated brokers.

4

"Subsidiary" of any Person shall mean any corporation, partnership, joint venture, limited liability company, trust, variable interest entity or other entity controlled by such Person directly or indirectly through one or more intermediaries.

"Tag-along Pro Rata Share" shall mean the proportion that the number of the shares of Common Stock held by the Investor (on an as-converted basis) as of the date of the Transfer Notice bears to the aggregate number of shares of the Common Stock held by the Investor (on an as-converted basis) and the Transferring Shareholder as of the date of the Transfer Notice.

"Tax" or "Taxes" shall mean all forms of taxation, whenever created or imposed, and whether of the United States or elsewhere, and whether imposed by a local, municipal, governmental, state, foreign, federal or other Governmental Authority, or in connection with any agreement with respect to Taxes, including all interest, penalties and additions imposed with respect to such amounts.

"Trading Day" shall mean any Business Day on which the Common Stock is traded, or able to be traded, on the principal national securities exchange on which the Common Stock is listed or admitted to trading.

"Transaction Agreements" shall mean this Agreement, the Purchase Agreement, the Certificate of Designations and the Registration Rights Agreement.

"U.S. GAAP" shall mean United States generally accepted accounting principles, as in effect from time to time, applied on a consistent basis.

"Warrants" shall mean (i) 9.055 million redeemable warrants entitling the registered holders thereof to purchase shares of Common Stock at a price of US$5.50 per share; and (ii) 2.1 million redeemable warrants entitling the registered holders thereof to purchase shares of Common Stock at US$1.00 per share. For the avoidance of doubt, Warrants, as used herein, shall exclude the Purchased Warrants.

"WFOE" shall mean Fujian Zongheng Express Information Technology Ltd., a limited liability company established in the PRC and a wholly-owned Subsidiary of the Company.

2.    Governance Matters.

2.1    Preferred Director.

(i)    Effective as of the Closing, the Company shall increase the size of the Board by one director.  The Investor shall have the right to one (1) director to the Board (the "Preferred Director"), pursuant to the terms hereof or of the Certificate of Designations of Preferred Stock (the "Certificate of Designations"), for so long as the Investor Ownership Percentage is greater than or equal to 3% (the "Preferred Threshold").

(ii)    In the event any Preferred Director shall resign prior to the expiration of the term for which he is elected to serve on the Board, then the Investor shall have the right to nominate for election by the Board a replacement, *provided* that the Investor is entitled to elect such Preferred Director pursuant to the terms hereof or of the Certificate of Designations.  Each of the Sponsor Shareholders shall cause such person designated by the Investor to be appointed to the Board.

5

(iii)    The Investor agrees to use reasonable efforts to cause the individual serving as the Preferred Director to provide the Company, on a timely basis, with any information relating to such individual that the Company may be required to disclose pursuant to applicable law, rules and regulations.

(iv)    Upon appointment and election to the Board, (i) the Preferred Director shall serve as a full member of the Board and shall receive the benefit of the same indemnification and other protective agreements (and any related advancement of expenses), indemnification provisions provided in the Company's Certificate of Incorporation, compensation (whether in the form of cash, equity award or otherwise), expense reimbursement, perquisites and insurance coverage as the other non-employee directors of the Company, and (ii) the Company shall not, without the consent of the Investor, directly or indirectly, amend, alter or repeal any of the provisions of the Certificate of Designations so as to adversely change any of the rights, preferences or privileges of Preferred Stock or Section 4(b) and (c) of the Certificate of Designations relating to the Preferred Director.

(v)    Effective as of the Closing and for so long as the Investor is entitled to designate the Preferred Director to the Company, the Investor shall have the right to appoint one (1) director to each of the board of directors of the HKCo, WFOE and PRCCo, and each of the Company and the Sponsor Shareholders shall cause such person designated by the Investor to be appointed to the board of directors of the HKCo effectively as of the Closing and cause such persons designated by the Investor to be appointed to the board of directors of the WFOE and PRCCo respectively within one (1) month after the Closing Date.

(vi)    The Investor shall have the right to, and shall have no duty not to (i) invest in or engage in the same or similar business activities or lines of business as the Company, and (ii) do business with any client or customer of the Company and the Company shall not be deemed to have an interest or expectancy in any such activities merely because the Company engages in the same or similar activities. Neither the Investor nor any officer or director thereof nor any of the Preferred Director shall be liable to the Company or its shareholders for breach of any fiduciary duty by reason of any such activities of the Investor or of such person's participation therein. In the event that the Investor acquires knowledge of a potential transaction or matter, from an independent, third-party source, which may be a corporate opportunity for both the Investor and the Company, the Investor shall have no duty to communicate or present such corporate opportunity to the Company. The Company, to the fullest extent permitted by law, renounces any interest or expectancy in such corporate opportunity and waives any claim that such corporate opportunity should have been presented to the Company. The Investor shall not be liable to the Company or its shareholders for breach of any fiduciary duty as a shareholder of the Company by reason of the fact that the Investor pursues or acquires such corporate opportunity for itself, directs such corporate opportunity to another person or entity or does not present such corporate opportunity to the Company.

2.2    <u>Committee Membership</u>. For so long as the Investor is entitled to designate the Preferred Director pursuant to the terms hereof or of the Certificate of Designations, the Preferred Director or other person designated by the Investor shall be appointed by the Board to sit on each regular committee of the Board, subject to such person satisfying applicable qualifications under applicable law, regulation or stock exchange rules and regulations.

6

3.      <u>Restrictions on Transfer</u>.

3.1      <u>Investor's Lock-Up</u>. From the date of the Closing until the date that is six (6) months thereafter, the Investor agrees that, without the prior written consent of the Company (which consent may be given or withheld, or made subject to such conditions as are determined by the Company, in its sole discretion), it will not directly or indirectly sell, transfer, pledge, encumber, assign or otherwise dispose of any Purchased Shares, Purchased Warrants or Transferred Shares or shares of Common Stock issuable upon conversion of any Purchased Shares or exercise of any Purchased Warrants (collectively the "<u>Transaction Shares</u>") to any Person, or enter into a transaction that would have the same effect, or enter into any swap, hedge or other arrangement that transfers or intends to transfer, in whole or in part, any of the economic or beneficial consequences of ownership of any Transaction Shares, whether any of these transactions are to be settled by delivery of any Transaction Shares, in cash or otherwise, publicly disclose the intention to make any offer, sale, pledge or disposition, or to enter into any transaction, swap, hedge or other arrangement, or engage in any Short Sales with respect to any Transaction Shares other than (i) to its Affiliates (including commonly controlled or managed investment funds) who execute a written joinder agreement in a form approved by the Company pursuant to which such transferee(s) agree(s) to be bound by the terms hereof; (ii) pursuant to a tender or exchange offer recommended by the Board, (iv) pursuant to a merger or consolidation recommended by the Board in which the Company will not be the surviving entity.  Without the prior written consent of the Company, Investor may not, at any time, transfer Preferred Shares to any Person other than an Affiliate of Investor; *provided* that if at any such time such transferee is no longer an Affiliate of Investor, Investor must ensure that it reacquires the transferred Preferred Shares.

Any purported transfer which is not in accordance with the terms and conditions of the above shall be, to the fullest extent permitted by law, null and void ab initio and, in addition to other rights and remedies at law and in equity, the Company shall be entitled to injunctive relief enjoining the prohibited action.

3.2      <u>Sponsor Shareholders' Lock-up</u>.

3.2.1      From the date of the Closing until the date that is twelve (12) months thereafter, the Founder agrees that, without the prior written consent of the Investor (which consent may be given or withheld, or made subject to such conditions as are determined by the Investor, in its sole discretion), he will not at any time directly or indirectly sell, transfer, pledge, encumber, assign or otherwise dispose of any share of Common Stock to any Person, or enter into a transaction that would have the same effect, or enter into any swap, hedge or other arrangement that transfers or intends to transfer, in whole or in part, any of the economic or beneficial consequences of ownership of such shares of Common Stock, whether any of these transactions are to be settled by delivery of any such shares of Common Stock, in cash or otherwise, publicly disclose the intention to make any offer, sale, pledge or disposition, or to enter into any transaction, swap, hedge or other arrangement, or engage in any Short Sales with respect to any security of the Company.

3.2.2      Until the date that is six (6) months from the Date of Delivery (as defined in the Lock-up Agreement), each of Thousand and Bright agrees that it will not violate any of its lock-up obligations under the Lock-up Agreement.

3.2.3     Each of Mr. Ou Wen Lin and Mr. Qingping Lin agrees that he will not at any time directly or indirectly sell, transfer, pledge, encumber, assign or otherwise dispose of any of his equity interest in Thousand and Bright respectively to any Person during the six (6)-month period described in Section 3.2.2 above.

Any purported transfer which is not in accordance with the terms and conditions of above Sections 3.2.1, 3.2.2 and 3.2.3 shall be, to the fullest extent permitted by law, null and void ab initio and, in addition to other rights and remedies at law and in equity, the Investor shall be entitled to injunctive relief enjoining the prohibited action.

4.     Right of First Offer.

4.1     The Investor shall have the right to purchase from the Company an amount of any additional shares of Capital Stock that the Company may propose to issue and sell equal to the Investor Ownership Percentage calculated as of the date of delivery of the Notice of Issuance (as defined below) (the "ROFO Percentage") to the extent such additional shares of Capital Stock are actually issued.

4.2     In the event the Company proposes to undertake an issuance of any shares of Capital Stock, it shall give the Investor a written notice of its intention, describing the type of the shares to be issued and the price and terms upon which the Company proposes to issue such shares (a "Notice of Issuance").  The Investor shall have twenty-one (21) days from the date of delivery of a Notice of Issuance to the Investor to agree to purchase a portion of such shares equal to the ROFO Percentage (calculated as of the date of delivery of such Notice of Issuance), for the price and upon the terms specified in the Notice of Issuance.  On or prior to the expiration of such twenty-one (21) day period, the Investor shall deliver a written notice to the Company stating the quantity of the shares to be purchased by the Investor (the "Investor Response"), which written notice shall be binding on the Company and such Investor subject only to the completion of the issuance of the shares described in the applicable Notice of Issuance.

4.3     The Company shall have one hundred and twenty (120) days following the earlier of (i) the expiration of the twenty-one (21) day period described in Section 4.2 and (ii) the delivery of the Investor Response to sell or enter into an agreement to sell the shares with respect to which the Investor' right to purchase was not exercised, at a price and upon terms no more favorable than those specified in the Notice of Issuance. If the Company does not sell such shares or enter into an agreement to sell such shares within such one hundred and twenty (120) day period, then the Company shall not thereafter issue or sell any shares without first offering such shares to the Investor in the manner provided in Section 4.2.

4.4     The right of first offer set forth in this Section 4 shall expire at any time the Investor ceases to maintain the Preferred Threshold.

5.     Tag-along.

5.1     If any Founding Shareholder (the "Transferring Shareholder") proposes to transfer any share of Capital Stock of the Company to any bona fide third party

8

(the "<u>Transferee</u>"), the Investor shall have the right (the "<u>Tag-Along Right</u>") but not the obligation to require the Transferring Shareholder to require the Transferee to purchase from the Investor, for the same consideration per share of Common Stock and upon the same terms and conditions as to be paid and given to the Transferring Shareholder up to a maximum of the Tag-along Pro Rata Share of the Offered Shares ("<u>Investor Tag Shares</u>").

5.2     If the Transferring Shareholder proposes to transfer all or a portion of the shares held by it, it shall send a written notice to the Investor (the "<u>Transfer Notice</u>"), which shall state: (i) the name of the Transferring Shareholder, (ii) the number of the shares (the "<u>Offered Shares</u>") proposed to be transferred, (iii) the price per share at which the Offered Shares will be offered for sale, which price in each case must be in US$ cash only and may not be in kind (the "<u>Offer Price</u>").

5.3     Within 30 days following the receipt of the Transfer Notice, if the Investor elects to exercise its Tag-along Right, it shall deliver a written notice of such election to the Transferring Shareholder, specifying the number of the shares of Common Stock with respect to which it has elected to exercise its Tag-along Right.  Such notice shall be irrevocable and shall constitute a binding agreement by the Investor to transfer such shares on the terms and conditions set forth in the Transfer Notice.

5.4     For the avoidance of doubt, without the prior written consent of the Company, the Investor shall not be permitted to transfer Preferred Stock pursuant to the Tag-Along Right without converting into Common Stock.

5.5     Where the Investor has properly elected to exercise its Tag-along Right and the proposed Transferee fails to purchase the shares from the Investor, the Transferring Shareholder shall not make the proposed transfer, and if purported to be made, such transfer shall be void.

5.6     For avoidance of doubt, the Investor shall have a Tag-Along Right with respect to any sale of any equity interests of Thousand or Bright by Ou Wen Lin or Qingping Lin, calculating the Investor Tag Shares as if Ou Wen Lin or Qingping Lin, as applicable, were transferring Capital Stock owned by Thousand or Bright, directly on a basis proportional with the disposition of their equity interests of Thousand or Bright.

5.7     The Tag-Along right shall expire at any time the Investor ceases to maintain the Preferred Threshold.

6.     <u>Performance-based Adjustment</u>.

6.1     The parties acknowledge that the Investor's Percentage Ownership immediately following the Closing is calculated based upon a post-money valuation of US$ 343,462,957 (the "<u>Valuation</u>") and estimated Audited Consolidated Net Profit for the fiscal years of 2009, 2010 and 2011 as set forth below (each a "<u>Profits Target</u>"):

| Fiscal Year | Audited Consolidated Net Profit |
|---|---|
| 2009 | US$ 42 million |
| 2010 | US$ 55 million |

9

2011        US$ 70 million

6.2      The Company shall and the Sponsor Shareholders shall procure that the Company deliver to the Investor the Audited Consolidated Financial Statements within ninety (90) days after the end of each fiscal year of 2009, 2010 and 2011.  If the Audited Consolidated Net Profit for any given year is less than the corresponding Profits Target as set forth in Section 6.1 above, then the Founding Shareholders shall, within thirty (30) after the date of the Audited Consolidated Financial Statements, on a pro rata basis based on their respective Founding Shareholder Ownership Percentage, pay to the Investor an amount in cash in U. S. dollars equal to the amount derived from the formula set forth below (such amount the "<u>Performance Adjustment Amount</u>"):



$$\text{Performance Adjustment Amount} = \text{Investor Ownership Percentage} \quad X \quad \frac{(\text{Profits Target} - \text{Audited Consolidated Net Profits})}{\text{Profits Target}} \quad X \quad \text{Valuation}$$

6.3      The Investor and the Sponsor Shareholders hereby agree that the payment of any Performance Adjustment Amount shall be treated as an adjustment to the Purchase Price (as defined in the Purchase Agreement) for U.S. federal income tax purposes.

6.4      At the sole option of the Founding Shareholders, the Founding Shareholders may satisfy their obligation to pay the Investor the Performance Adjustment Amount by a transfer of additional shares of Common Stock to the Investor (the "<u>Performance-based Share Transfer</u>") based on the average of the closing price of Common Stock for the thirty (30)-day period ending three (3) Business Days prior to the date that the Performance based Share Transfer is made, *provided, however*, that the Performance Adjustment Amount may be satisfied through the Performance-based Share Transfer only to the extent that the aggregate number of shares of Common Stock acquired or acquirable by the Investor from the Transactions together with the number of shares transferred pursuant to the Performance-based Share Transfer does not exceed 19.9% of the total number of shares of Common Stock issued and outstanding as of the date of the Purchase Agreement and any remaining Performance Adjustment Amount shall be paid in cash.

6.5      The Founding Shareholders shall be responsible for any and all documentary, stamp, or similar issue or transfer tax due on any Performance-based Share Transfer pursuant to the Section 6.4 on or prior to the closing of such transfer.

7.      <u>Put Option</u>.

7.1      The Investor shall have the right (the "<u>Put Right</u>") but not the obligation to sell the Put Shares to the Founding Shareholders at a price equal to the Put Price and the Founding Shareholders shall have the obligation to purchase such Put Shares on a pro rata basis based on Founding Shareholder Ownership Percentage, at the Put Price if:

7.1.1      the Audited Consolidated Net Profit for the fiscal year of 2012 is less than the Audited Consolidated Net Profit for the fiscal year of 2011;

10

7.1.2     the Company fails to meet 50% of any Profits Target as set forth in Section 6.1 for any of fiscal year 2009, 2010 or 2011; or

7.1.3     the Company or any of the Sponsor Shareholders materially breaches any covenants or agreements set forth in Sections 9 or 10 of the Purchase Agreement or Sections 2, 3, 4, 5, 6 or 9.2 of this Agreement, and fails to rectify such breach to the satisfaction of the Investor within sixty (60) days after the date of the written notice by the Investor.

7.2     The Company shall, and the Sponsor Shareholders shall procure the Company to, immediately upon the occurrence of any of the events as set forth in Sections 7.1.1, 7.1.2 and 7.1.3 deliver a written notice to the Investor. From the date of such delivery or the date the Investor is aware of the occurrence of any such event, the Investor shall have thirty (30) days to deliver a written notice (the "Put Notice") to the Founding Shareholders of the exercise of its Put Right.

7.3     The Founding Shareholders shall complete the purchase of the Put Shares from and pay the entire Put Price to the Investor within three (3) months after the delivery of the Put Notice by the Investor. The payment of the Put Price shall be in cash in U.S. dollars, *provided* that in the event of an exercise of Put Right pursuant to Section 7.1.2, the Founding Shareholders may pay the Put Price in kind (other than the shares of the Company with an equivalent value, *provided* that the type of consideration and the valuation thereof shall be subject to the Investor's review and consent), acting reasonably.

7.4     Regarding any event or circumstance giving rise to a Put Right, to the extent that the Investor chooses to exercise the Put Right with respect to less than all the Put Shares within the applicable 30-day put exercise period, the Investor shall be deemed to have waived the Put Right as to the remaining Put Shares in connection with the such event or circumstance, but, for the avoidance of doubt, not with respect to any subsequent event or circumstance giving rise to a similar Put Right.

7.5     The Put right shall expire at any time the Investor ceases to maintain the Preferred Threshold.

8.     Drag-along.

8.1     In the event that (i) the Investor has exercised the Put Right and the Founding Shareholders fail to complete the purchase of the Put Shares from, and to pay the entire Put Price to, the Investor in accordance with Section 7.3, or (ii) any Founding Shareholder fails to perform in accordance with Section 6, the Investor shall have the right (the "Drag-along Right") but not the obligation to require the Founding Shareholders to sell up to all shares of Capital Stock directly or indirectly held by the Founding Shareholders pursuant to a managed sale process conducted by an investment bank of internationally recognized standing with demonstrable experience in the Chinese and international markets and designated by the Investor ("Designated Investment Bank") to a bona fide third party buyer or buyers designated by the Investor to which the Investor will also sell all shares of Capital Stock held by it at a price per share (in US$ cash only and may not be in kind) reflecting an enterprise value which shall not be less than the product of the Company's last twelve months' net income (as adjusted using the same methodology as Audited Consolidated Net Profit) times seven (7) (the "Drag-along Sale").

11

8.2      If the Investor wishes to exercise its Drag-Along Right, the Investor shall provide a written notice to the Founding Shareholders (the "Drag Notice"), which shall state (i) the name of the buyer or buyers, (ii) the material terms and timing of the proposed transaction, (iii) the price in US$ cash, and (iv) a reasonably detailed calculation showing that the valuation is no less than the price required in Section 8.1. The Investor shall have 120 days following the Founding Shareholders' receipt of the Drag Notice to consummate the proposed transaction and to exercise its Drag-along Right. The Founding Shareholders shall execute such documents or take such other actions as may be reasonably necessary or appropriate to effect the Drag-along Sale to the designated buyer or buyers.

9.     Other Covenants.

9.1     Repurchase of Warrants. The Company shall use its reasonable best efforts to, and the Sponsor Shareholders shall use their reasonable best efforts to cause the Company to, develop and implement a plan to repurchase and retire four million (4,000,000) outstanding Warrants.

9.2     Compliance with Certificate of Designations. The Company shall, and each of the Sponsor Shareholders shall cause the Company to, comply with the Certificate of Designations, the Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation") and the Bylaws of the Company.

9.3     Economic Sanctions. The Sponsor Shareholders and the Company shall procure that neither the Company, nor any of its Subsidiaries, nor any agent or other person acting for or on behalf of the neither the Company or any of its Subsidiaries, shall engage in any transactions or enter into any contract or association with or involving, directly or indirectly, countries, territories, governments, entities, individuals and other persons (including transactions or contracts which the Company or such Subsidiary knows or has reasons to believe involve goods, services or technology of origin from such countries or territories) that, at the date of the transaction, contract, or association, are targets of any law, regulation, order or license relating to any economic sanctions program administered by the U.S. Department of the Treasury's Office of Foreign Assets Control, including without limitation any program the regulations of which are codified in Chapter V of Subtitle B of Title 31 of the U.S. Code of Federal Regulations.

9.4     Anti-corruption.

9.4.1     The Sponsor Shareholders and the Company shall ensure that neither the Company nor any of its Subsidiaries, nor any agent or other person acting for or on behalf of the Company or any of its Subsidiaries, shall, in connection with the operations of the Company or such Subsidiary, in violation of any applicable law or regulation, offer, promise or give, or authorize or approve the payment, gift or promise of anything of value, directly or through a third party, to any officer or employee of a non-U.S. government or any department, agency, or instrumentality thereof, or any entity owned in whole or in part or controlled by any such non-U.S. government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency or instrumentality, or for or on behalf of any such public international organization, including any non-U.S. political party, party official or candidate for non-U.S. political office for the purpose

12

of securing any improper business advantage for the Company or any of its Subsidiaries, including to obtain or retain business.

      9.4.2      Each of the Company and the Sponsor Shareholders covenants to maintain the FCPA Compliance Program (as such term is defined in the Purchase Agreement) adopted prior to the Closing and insure that such FCPA Compliance Program will be binding on the Company, each of its Subsidiaries and their respective Affiliates, including the directors, officers, employees and agents of each such person and the shareholders acting on behalf of each such person.  In implementing the FCPA Compliance Program, the Sponsor Shareholders and the Company covenant that they will use their respective reasonable best efforts to ensure that the Company and each of its Subsidiaries and their respective Affiliates, including the directors, officers, employees, agents and other business partners of each such entity and the shareholders acting on behalf of each such entity, follow the policies and procedures set forth in the FCPA Compliance Program.  The Sponsor Shareholders and the Company further covenant to arrange for personnel training to acquaint employees of the Company and each of its Subsidiaries with the FCPA Compliance Program.

      9.4.3      The Sponsor Shareholders and the Company covenant with the Investor that (i) it will ensure that the representation set out in section 4.23 of the Purchase Agreement remains true, accurate and not misleading at all times after the Closing and (ii) it will certify to the foregoing on an annual basis by letter directed to the Investor for so long as the Investor Ownership Percentage is greater than or equal to 1%.

      9.4.4      The Company agrees to, and the Sponsor Shareholders shall ensure the Company to, maintain, throughout the course of this Agreement, books and records that accurately reflect its assets and transactions in reasonable detail, and to maintain a system of internal accounting controls to ensure that all transactions are properly authorized by management.  Further, the Investor shall be allowed reasonable access to the Company's books and records during regular business hours and with reasonable prior written notice, and shall have the right to audit the Company on a periodic basis.

      9.4.5      The Company further covenants that, should it learn of or have reason to suspect any breach of the covenants in this Section 9.4, it will promptly notify the Investor.  Following dispatch of such notification the Company shall (i) investigate the suspected breach and (ii) take any measure that may be required, or that the Investor may reasonably request, to remediate any suspected breach of the FCPA Compliance Program (including by dismissing employees that have breached the FCPA Compliance Program) and to insure continued compliance of the Company with FCPA, local anti-corruption laws and the provisions of this clause 9.4.

      9.4.6      Subject to the PRC laws, during the term of this Agreement, the Company agrees in good faith to obtain certification, to the reasonable satisfaction of the Investor, on an annual basis from all Reporting Employees as to whether they are Government Officials or immediate family members of a Government Official, and the Company agrees to make immediate disclosure to the Investor of such fact and all relevant details with respect thereto. In carrying out its

13

obligations under this clause 9.4, the Company shall in good faith exercise its reasonable best efforts to (A) insure the truth, accuracy and completeness of the certification provided by the Reporting Employees and (B) take legally permissible disciplinary or punitive action, as may be reasonably requested by the Investor, against any Reporting Employees for their failure to fully cooperate with the Company. For the purposes of this provision, "Reporting Employees" shall refer to any directors, indirect owners, any employee working with the sales department, finance department or legal department of the Company and any other employee whose work by nature shall create rights or obligations on behalf of the Company. "Government Official" shall refer to any officer, employee or any other person acting in an official capacity for any government or any department, agency or instrumentality thereof, including any entity or enterprise majority-owned or otherwise controlled by a government, or a public international organization (each a "Government Entity"), in each case, only to the extent that the Company, in the course of its business, interacts or engages with such Government Entity; "immediate family members" shall refer to the spouses, siblings, parents, or children (including by virtue of adoption) of a Government Official.

10. Earn-out. The Investor agrees that the Company may issue and deliver up to an aggregate of 15,000,000 shares of Common Stock of the Company to HMDF Shareholders (as defined in the Share Exchange Agreement) in accordance with the terms of the Share Exchange Agreement.

11. Legend.

11.1     The Purchased Shares and all shares of Common Stock issued upon conversion thereof shall be stamped or imprinted with a legend in substantially the following form (in addition to any legend required by state securities laws):

THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS.  SUCH SECURITIES AND ANY SECURITIES ISSUED HEREUNDER OR THEREUNDER MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SAID ACT AND APPLICABLE LAWS.  COPIES OF THE AGREEMENT COVERING THE PURCHASE OF THESE SECURITIES AND RESTRICTING THEIR TRANSFER OR SALE MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD HEREOF TO THE SECRETARY OF THE COMPANY AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY.

12. Miscellaneous.

12.1     Governing Law.
This Agreement shall be governed in all respects by the laws of the State of State of Delaware without regard to any choice of laws or conflict of laws provisions that would require the application of the laws of any other jurisdiction.

14

12.2     Jurisdiction; Enforcement. Any dispute, controversy or claim arising out of or relating to this Agreement or its subject matter (including a dispute regarding the existence, validity, formation, effect, interpretation, performance or termination of this Agreement) (each a "Dispute") shall be finally settled by arbitration.

(a)     The place of arbitration shall be Hong Kong, and the arbitration shall be administered by the Hong Kong International Arbitration Centre (the "HKIAC") in accordance with the HKIAC Administered Arbitration Rules then in force (the "HKIAC Rules").

(b)     The arbitration shall be decided by a tribunal of three (3) arbitrators, whose appointment shall be in accordance with the HKIAC Rules; provided, however, that the third presiding arbitrator must be licensed to practice Delaware state law and in good standing with the Delaware State Bar, as of the date the Notice of Arbitration is received by the HKIAC Secretariat.

(c)     Arbitration proceedings (including but not limited to any arbitral award rendered) shall be in English.

(d)     Subject to the agreement of the tribunal, any Dispute(s) which arise subsequent to the commencement of arbitration of any existing Dispute(s), shall be resolved by the tribunal already appointed to hear the existing Dispute(s).

(e)     The award of the arbitration tribunal shall be final and conclusive and binding upon the parties as from the date rendered.

(f)     Judgment upon any award may be entered and enforced in any court having jurisdiction over a party or any of its assets.  For the purpose of the enforcement of an award, the parties irrevocably and unconditionally submit to the jurisdiction of any competent court and waive any defenses to such enforcement based on lack of personal jurisdiction or inconvenient forum.

12.3     Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties (including transferees of any Capital Stock).  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.  For avoidance of doubt, the rights set forth in Sections 2, 4.2, 5, 6, 7 and 8 are not transferable to any third party without the prior written consent of the Company.

12.4     Entire Agreement. This Agreement, the Purchase Agreement and the other documents delivered pursuant to the Purchase Agreement, including the Registration Rights Agreement and Warrant, constitute the full and entire understanding and agreement among the parties with regard to the subjects of this Agreement and such other agreements and documents.

12.5     Notices. Except as otherwise provided in this Agreement, all notices, requests, claims, demands, waivers and other communications required or permitted under

15

this Agreement shall be in writing and shall be mailed by reliable overnight delivery service or delivered by hand, facsimile or messenger as follows:

if to the Company:    China MediaExpress Holdings, Inc
Room 2805
Central Plaza
Wanchai, Hong Kong
Attention: Zheng Cheng and Jacky Lam
Facsimile: +852.2827.6099

with a copy to:    Loeb & Loeb LLP
345 Park Avenue
New York, NY 10145
Attention: Mitchell S. Nussbaum / Frank J. Marinaro
Facsimile: +1.212.656.1349

if to the Investor:    Starr Investments Cayman II, Inc.
Bermuda Commercial Bank Building, 5th Floor
19 Par la Ville Road
Hamilton HM 11
Bermuda
Attention: Stuart Osbourne / Jenny Barclay

with a copy to:    Starr Investments Cayman II, Inc.
c/o Beijing C.V. Starr Investment Advisors Limited Shanghai Branch
Suite 4609-4611A, Tower II, Plaza 66,
1266 Nanjing West Road,
Shanghai 200040 People's Republic of China
Attention: John Lin / Dorothy Dong
Facsimile: +8621.6288.9773

with a copy to:    Skadden, Arps, Slate, Meagher & Flom LLP
30th Floor, Tower 2, China World Trade Centre
No. 1 Jianguomenwai Avenue
Beijing 100004 People's Republic of China
Attention:  Jon L Christianson
Facsimile:  +8610.6535.5577

if to the Founder:    c/o China MediaExpress Holdings, Inc.
Room 2805, Central Plaza
Wanchai, Hong Kong
Attention: Zheng Cheng
Facsimile: +852.2827.6099

if to Ou Wen Lin:    c/o China MediaExpress Holdings, Inc.
Room 2805, Central Plaza
Wanchai, Hong Kong
Attention: Zheng Cheng
Facsimile: +852.2827.6099

if to Qingping Lin:    c/o China MediaExpress Holdings, Inc.
Room 2805, Central Plaza
Wanchai, Hong Kong
Attention: Zheng Cheng
Facsimile: +852.2827.6099

if to Thousand:    c/o China MediaExpress Holdings, Inc.
Room 2805, Central Plaza
Wanchai, Hong Kong
Attention: Zheng Cheng
Facsimile: +852.2827.6099

if to Bright:    c/o China MediaExpress Holdings, Inc.
Room 2805, Central Plaza
Wanchai, Hong Kong
Attention: Zheng Cheng
Facsimile: +852.2827.6099

or in any such case to such other address, facsimile number or telephone as either party may, from time to time, designate in a written notice given in a like manner. Notices shall be deemed given when actually delivered by overnight delivery service, hand or messenger, or when received by facsimile if promptly confirmed.

12.6    <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement shall impair any such right, power, or remedy of such party, nor shall it be construed to be a waiver of or acquiescence to any breach or default, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default. All remedies, either under this Agreement or by law or otherwise afforded to any holder, shall be cumulative and not alternative.

12.7    <u>Amendments and Waivers</u>. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only if such amendment or waiver is in writing and signed, in the case of an amendment, by all the parties hereto or, in the case of a waiver, by the party against whom the waiver is to be effective, *provided* that with respect to a waiver of the provisions set forth in Section 3.1.1 hereof, a waiver signed by the Company shall constitute an effective waiver. Any amendment or waiver effected in accordance with this paragraph shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which such securities are convertible), each future holder of all such securities, and the Company.

12.8    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and signatures may be delivered by facsimile or in electronic format, each of which may be executed by less than all the parties, each of which shall be enforceable against

17

the parties actually executing such counterparts and all of which together shall constitute one instrument.

       12.9      <u>Severability</u>. If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable, or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement and the balance of this Agreement shall be enforceable in accordance with its terms.

       12.10      <u>Titles and Subtitles; Interpretation</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. When a reference is made in this Agreement to a Section, Schedule or Annex, such reference shall be to a Section, Schedule or Annex of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to in this Agreement means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes. Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if it is drafted by each of the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

       12.11      <u>Withholding Rights</u>. Notwithstanding anything to the contrary contained in any of the Transaction Agreements, the Company shall be entitled to deduct and withhold in respect of any dividends or deemed dividends with respect to the Series A Preferred Stock or any other amounts paid or deemed to be paid by the Company under any of the Transaction Agreements, such amounts as the Company reasonably determines are required to be deducted and withheld under the Code or any provision of state, local, provincial or foreign tax law; *provided* that the Person with respect to whom such deduction or withholding would occur shall be entitled to provide the Company with such forms or other documents as may be required in order to claim a reduction of any such deduction or withholding under the applicable tax law.  To the extent that any such amounts are so withheld, all appropriate and available evidence of such deduction and withholding, including any receipts or forms required in order for the Person with respect to whom such deduction and withholding occurred to establish the deduction and withholding and payment to the appropriate taxing authority as being for its account with the appropriate taxing authority, shall be delivered to the Person with respect to whom such deduction and withholding has occurred, and such withheld amounts shall be treated for all purposes as having been delivered and paid to the Person otherwise entitled to the amounts in respect of which such deduction and withholding was made.  Notwithstanding the foregoing, the Company, at its option, may require any such amounts required to be deducted and withheld to be reimbursed in cash to the Company by such Person prior to the time when the amounts subject to any such deduction or withholding are paid or are considered to be paid by the Company under the applicable tax law, in which case any such reimbursements received by the Company (net

of any Taxes payable by the Company on such reimbursements) shall not be deducted and withheld from any such payments or deemed payments.

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

CHINA MEDIAEXPRESS HOLDINGS, INC.

By: /s/ Zheng Cheng
    Name:  Zheng Cheng
    Title:


ZHENG CHENG

/s/ Zheng Cheng


OU WEN LIN

/s/ Ou Wen Lin


QINGPING LIN

/s/ Qingping Lin


THOUSAND SPACE HOLDINGS LIMITED

By: /s/ Ou Wen Lin
    Name:  Ou Wen Lin
    Title:


[*Signature Page to Investor Rights Agreement*]

BRIGHT ELITE MANAGEMENT LIMITED

By: /s/ Qingping Lin
    Name:  Qingping Lin
    Title:

STARR INVESTMENTS CAYMAN II, INC.

By: /s/ Stuart Osborne
    Name:  Stuart Osborne
    Title:  Director

[*Signature Page to Investor Rights Agreement*]

EXHIBIT E

# INVESTOR RIGHTS AGREEMENT

by and among

## China MediaExpress Holdings, Inc.,

## Mr. Zheng Cheng,

## Ou Wen Lin,

## Qingping Lin,

## Thousand Space Holdings Limited,

## Bright Elite Management Limited,

and

## Starr Investments Cayman II, Inc.

January 28, 2010

## **TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | Definitions. | 1 |
| 2. | Governance Matters. | 5 |
| 3. | Restrictions on Transfer. | 7 |
| 4. | Right of First Offer. | 8 |
| 5. | Tag-along | 8 |
| 6. | Performance-based Adjustment | 9 |
| 7. | Put Option | 10 |
| 8. | Drag-along | 11 |
| 9. | Other Covenants | 12 |
| 10. | Earn-out. | 14 |
| 11. | Legend | 14 |
| 12. | Miscellaneous | 14 |

ii

INVESTOR RIGHTS AGREEMENT, dated as of January 28, 2010, by and among China MediaExpress Holdings, Inc., a Delaware corporation (the "Company"), Mr. Zheng CHENG, a citizen of the People's Republic of China (the "PRC" or "China"), identification number 350103197103110058 (the "Founder"), Ou Wen Lin, a citizen of the Republic of Philippines, passport number G15042722, and Qingping Lin, a citizen of the PRC, identification number 350127194911134311, Thousand Space Holdings Limited, a company organized under the laws of the British Virgin Islands ("Thousand"), Bright Elite Management Limited, a company organized under the laws of the British Virgin Islands ("Bright", together with the Founder, Ou Wen Lin, Qingping Lin and Thousand, the "Sponsor Shareholders"), and Starr Investments Cayman II, Inc., a company organized with limited liability under the laws of the Cayman Islands (the "Investor").

WHEREAS, the Company, the Sponsor Shareholders, the Investor together with other parties entered into a Securities Purchase Agreement (the "Purchase Agreement") dated as of January 12, 2010, pursuant to which the Company agreed to sell to the Investor, and the Investor agreed to purchase from the Company, (i) one million (1,000,000) shares of Preferred Stock (the "Purchased Shares") and (ii) warrants of the Company entitling the Investor to purchase 1,545,455 shares of Common Stock at US$6.47 per share (the "Purchased Warrants"), in each case on the terms and subject to the conditions set forth in the Purchase Agreement (the "Securities Purchase");

WHEREAS, on the terms and conditions set forth in the Purchase Agreement, the Sponsor Shareholders agreed to transfer to the Investor 150,000 shares of Common Stock (the "Transferred Shares"), and such transfer, the "Stock Transfer," together with the Securities Purchase, the "Transactions");

WHEREAS, it is a condition to the closing of the transactions contemplated by the Purchase Agreement that the Company, the Sponsor Shareholders and the Investor enter into this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the agreements contained in this Agreement, and intending to be legally bound by this Agreement, the Company, the Sponsor Shareholders and the Investor agree as follows:

1.    Definitions.  As used in this Agreement, the following terms shall have the respective meanings set forth in this Section 1:

"Affiliate" of any Person shall mean any other Person directly or indirectly controlling or controlled by or under common control with such Person. For purposes of this definition, "control" when used with respect to any Person has the meaning specified in Rule 12b-2 under the Exchange Act (including SEC and judicial interpretations thereof); and the terms "controlling" and "controlled" shall have meanings correlative to the foregoing.

"Audited Consolidated Net Profit" shall mean the "Net Income Attributable to the Parent" as calculated and disclosed pursuant to Statement of Financial Accounting Standards ("SFAS") No. 160, as set forth on the audited consolidated financial statements of the Company prepared in accordance with US GAAP and audited without qualification by a reputable international accounting firm appointed by the Company (but subject to the Investor's prior written consent, which consent shall not be unreasonably withheld, it being

understood that, for the fiscal year ended December 31, 2009 Deloitte & Touche Tohmatsu shall be acceptable to Investor) (the "Audited Consolidated Financial Statements"), which comprises a part of the Forms 10-K filed with the SEC for the fiscal years ending December 31, 2009, 2010 or 2011, and shall be adjusted to:

(i)      add back to the "Net Income Attributable to the Parent" any charges for (a) "acquisition-related costs" as defined in and charged to expense pursuant to SFAS No. 141 (R) and any other fees, expenses or payments to any third party related to the Share Exchange (as defined in the Exchange Agreement), (b) the amortization or intangibles, (c) impairment of goodwill, (d) compensation expense arising from the Earn-out Shares (as defined in the Exchange Agreement) and, any other share-based compensation, each (a)-(d) as it relates to any acquisitions completed in, or pending at the end of, the applicable period (including the Share Exchange), by the Company, the HKCo, the WFOE and the PRCCo;

(ii)      add back to the "Net Income Attributable to the Parent" any out of pocket expenses incurred to design, implement and annually assess disclosure controls and procedures and internal controls over financial reporting by the Company or its Subsidiaries as a consequence of the Company's compliance with the Sarbanes-Oxley Act;

(iii)      add back to the "Net Income Attributable to the Parent" any charges for Taxes payable by any of the Company, the HKCo, the WFOE and the PRCCo that are directly attributable to the Share Exchange and that apply to the applicable period; and

(iv)      deduct from the "Net Income Attributable to the Parent" the financial statement tax benefit of the amount in (i), (ii) and (iii) above, computed by multiplying the amount of the adjustment in (i), (ii) or (iii) above by the statutory tax rate applicable to the Company or its Subsidiaries that incurred the expense;

*provided, however,* that if the Company is no longer required or eligible to file a Form 10-K, then the "Net Income Attributable to Parent" as calculated and disclosed pursuant to SFAS No. 160 for any particular fiscal year shall be as set forth on the Audited Consolidated Financial Statements for such fiscal year.  For the avoidance of doubt, any non-recurring profit or gain shall not be counted toward the Audited Consolidated Net Profit.

"Board" shall mean the board of directors of the Company.

"Business Day" means a day that is a Monday, Tuesday, Wednesday, Thursday or Friday and is not a day on which banking institutions in New York, New York or in Beijing, the PRC generally are authorized or obligated by law, regulation or executive order to close.

"Capital Stock" shall mean any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (in each case however designated) stock issued by the Company.

"Closing" shall have the meaning given to it in the Purchase Agreement.

"Closing Date" shall have the meaning given to it in the Purchase Agreement.

"Closing Price" shall mean, with respect to a share of Capital Stock of a Person, the price per share of the final trade of the Capital Stock on the applicable Trading

2

Day on the principal national securities exchange on which the Capital Stock is listed or admitted to trading; *provided*, *however*, that, if the Capital Stock is not so listed or traded, the Closing Price shall be equal to the fair market value of such share, as determined in good faith by the Board.

"Code" shall mean the Internal Revenue Code of 1986, together with all regulations, rulings and interpretations thereof or thereunder by the Internal Revenue Service.

"Common Stock" shall mean the common stock of the Company, par value US$ 0.001 per share.

"Exchange Act" shall mean the U.S. Securities Exchange Act of 1934, as amended and the rules and regulations promulgated by the SEC thereunder.

"FCPA" shall mean the U.S. Foreign Corrupt Practices Act of 1977, as amended.

"Founding Shareholder Ownership Percentage" as of a particular date of determination shall mean the percentage determined by a fraction, the numerator of which is the total number of shares of Common Stock held, directly or indirectly, by such Founding Shareholder and the denominator of which is the aggregate number of shares Common Stock collectively held, directly or indirectly, by all of the Founding Shareholders, in each case on a fully diluted and as-converted basis as of the date of determination. As of the date hereof, and for all purposes herein, such percentages shall be as follows unless revised by written notice to the Investor signed by each of the Founding Shareholders: Mr. Zheng Cheng, 61.17%; Ou Wen Lin, held indirectly through Thousand, 28.22%; and Qingping Lin, held indirectly through Bright, 10.61%.

"Founding Shareholders" shall mean the Founder, Ou Wen Lin and Qingping Lin, and a "Founding Shareholder" shall mean any of them.

"Governmental Authority" shall mean any foreign governmental authority, the United States of America, any state of the United States and any political subdivision of any of the foregoing, and any agency, instrumentality, department, commission, board, bureau, central bank, authority, court or other tribunal, in each case whether executive, legislative, judicial, regulatory or administrative.

"IRR" shall mean, with respect to the Investor's investment in the Put Shares (as of any given determination date of the Put Price with respect to the exercise of the Put Option) (calculated in U.S. dollars), the annual discount rate at which the net present value of all capital in-flows relating to such investment in the Put Shares at the time of the Closing is equal to the net present value of all cash out-flows from such investment in the Put Shares at the time of the Closing.

"Investor Ownership Percentage" as of a particular date of determination shall mean the percentage determined by a fraction, the numerator of which is the sum of the number of (i) shares of Common Stock held by the Investor *plus* (ii) shares of Common Stock issuable upon the conversion of the Purchased Shares or the exercise of the Purchased Warrants, and the denominator of which is the total number of shares of Common Stock issued and outstanding, on a fully-diluted and as-converted basis as of the date of determination.

3

"Lock-up Agreement" shall have the meaning given to it in the Share Exchange Agreement.

"Person" shall mean any individual, association, partnership, limited liability company, joint venture, corporation, trust, unincorporated organization, Governmental Authority or any other form of entity.

"Per Share Issuance Price" shall, in the case of shares of Preferred Stock, equal US$ 30.00, and, in the case of shares of Common Stock, equal US$ 10.00.

"PRCCo" shall mean Fujian Fenzhong Media Co., Ltd., a limited liability company operating in media business established in the PRC.

"Preferred Stock" shall mean the Series A Preferred Stock of the Company, par value of US$ 0.001 per share.

"Put Price" shall mean, as of any given determination date, the product of the total number of the Put Shares multiplied by the sum of (a) the Per Share Issuance Price *plus* (b) such amount as would result in an IRR of twenty-three percent (23%) on the Per Share Issuance Price from the date of Closing up to the date of the full payment of all the Put Price, *provided* that the aggregate Put Price shall be reduced on a dollar for dollar basis to the extent that the Investor has recovered any amounts under Section 11 of the Purchase Agreement, *provided* further that, in any event, any given reduction shall reduce the Put Price with respect to only one exercise of the Put Right and any further exercise of the Put Right shall only be reduced by any additional amounts recovered by the Investor under Section 12 following the previous exercise of the Put Right. To the extent the Put Right is exercised with respect to a combination of Preferred Stock and Common Stock, the Put Price shall be equal to the sum of the Put Price for each class of Capital Stock calculated separately.

"Put Shares" means such number of shares of Preferred Stock and such number of shares of Common Stock (i) held by the Investor or issuable upon the conversion of Preferred Shares or the exercise of the Purchased Warrants with respect to which the Investor exercises the Put Right under Section 7.1, it being understood that, the Investor may exercise such right in connection with all or any portion of such shares that it holds at such time.

"SEC" shall mean the U.S. Securities and Exchange Commission or any other U.S. federal agency then administering the Securities Act or Exchange Act.

"Securities Act" shall mean the U.S. Securities Act of 1933, as amended and the rules and regulations of the SEC thereunder.

"Share Exchange Agreement" shall mean the share exchange agreement dated May 1, 2009 relating to the acquisition by the Company of all the outstanding capital stock of Hong Kong Mandefu Holdings Ltd..

"Short Sales" shall include, without limitation, all "short sales" as defined in Rule 200 promulgated under Regulation SHO under the Exchange Act and all types of direct and indirect stock pledges, forward sale contracts, options, puts, calls, swaps and similar arrangements (including on a total return basis), and sales and other transactions through non-US broker dealers or foreign regulated brokers.

"Subsidiary" of any Person shall mean any corporation, partnership, joint venture, limited liability company, trust, variable interest entity or other entity controlled by such Person directly or indirectly through one or more intermediaries.

"Tag-along Pro Rata Share" shall mean the proportion that the number of the shares of Common Stock held by the Investor (on an as-converted basis) as of the date of the Transfer Notice bears to the aggregate number of shares of the Common Stock held by the Investor (on an as-converted basis) and the Transferring Shareholder as of the date of the Transfer Notice.

"Tax" or "Taxes" shall mean all forms of taxation, whenever created or imposed, and whether of the United States or elsewhere, and whether imposed by a local, municipal, governmental, state, foreign, federal or other Governmental Authority, or in connection with any agreement with respect to Taxes, including all interest, penalties and additions imposed with respect to such amounts.

"Trading Day" shall mean any Business Day on which the Common Stock is traded, or able to be traded, on the principal national securities exchange on which the Common Stock is listed or admitted to trading.

"Transaction Agreements" shall mean this Agreement, the Purchase Agreement, the Certificate of Designations and the Registration Rights Agreement.

"U.S. GAAP" shall mean United States generally accepted accounting principles, as in effect from time to time, applied on a consistent basis.

"Warrants" shall mean (i) 9.055 million redeemable warrants entitling the registered holders thereof to purchase shares of Common Stock at a price of US$5.50 per share; and (ii) 2.1 million redeemable warrants entitling the registered holders thereof to purchase shares of Common Stock at US$1.00 per share. For the avoidance of doubt, Warrants, as used herein, shall exclude the Purchased Warrants.

"WFOE" shall mean Fujian Zongheng Express Information Technology Ltd., a limited liability company established in the PRC and a wholly-owned Subsidiary of the Company.

2.    Governance Matters.

2.1    Preferred Director.

(i)    Effective as of the Closing, the Company shall increase the size of the Board by one director.  The Investor shall have the right to one (1) director to the Board (the "Preferred Director"), pursuant to the terms hereof or of the Certificate of Designations of Preferred Stock (the "Certificate of Designations"), for so long as the Investor Ownership Percentage is greater than or equal to 3% (the "Preferred Threshold").

(ii)    In the event any Preferred Director shall resign prior to the expiration of the term for which he is elected to serve on the Board, then the Investor shall have the right to nominate for election by the Board a replacement, *provided* that the Investor is entitled to elect such Preferred Director pursuant to the terms hereof or of the Certificate of Designations.  Each of the Sponsor Shareholders shall cause such person designated by the Investor to be appointed to the Board.

5

(iii)     The Investor agrees to use reasonable efforts to cause the individual serving as the Preferred Director to provide the Company, on a timely basis, with any information relating to such individual that the Company may be required to disclose pursuant to applicable law, rules and regulations.

(iv)     Upon appointment and election to the Board, (i) the Preferred Director shall serve as a full member of the Board and shall receive the benefit of the same indemnification and other protective agreements (and any related advancement of expenses), indemnification provisions provided in the Company's Certificate of Incorporation, compensation (whether in the form of cash, equity award or otherwise), expense reimbursement, perquisites and insurance coverage as the other non-employee directors of the Company, and (ii) the Company shall not, without the consent of the Investor, directly or indirectly, amend, alter or repeal any of the provisions of the Certificate of Designations so as to adversely change any of the rights, preferences or privileges of Preferred Stock or Section 4(b) and (c) of the Certificate of Designations relating to the Preferred Director.

(v)     Effective as of the Closing and for so long as the Investor is entitled to designate the Preferred Director to the Company, the Investor shall have the right to appoint one (1) director to each of the board of directors of the HKCo, WFOE and PRCCo, and each of the Company and the Sponsor Shareholders shall cause such person designated by the Investor to be appointed to the board of directors of the HKCo effectively as of the Closing and cause such persons designated by the Investor to be appointed to the board of directors of the WFOE and PRCCo respectively within one (1) month after the Closing Date.

(vi)     The Investor shall have the right to, and shall have no duty not to (i) invest in or engage in the same or similar business activities or lines of business as the Company, and (ii) do business with any client or customer of the Company and the Company shall not be deemed to have an interest or expectancy in any such activities merely because the Company engages in the same or similar activities. Neither the Investor nor any officer or director thereof nor any of the Preferred Director shall be liable to the Company or its shareholders for breach of any fiduciary duty by reason of any such activities of the Investor or of such person's participation therein. In the event that the Investor acquires knowledge of a potential transaction or matter, from an independent, third-party source, which may be a corporate opportunity for both the Investor and the Company, the Investor shall have no duty to communicate or present such corporate opportunity to the Company. The Company, to the fullest extent permitted by law, renounces any interest or expectancy in such corporate opportunity and waives any claim that such corporate opportunity should have been presented to the Company. The Investor shall not be liable to the Company or its shareholders for breach of any fiduciary duty as a shareholder of the Company by reason of the fact that the Investor pursues or acquires such corporate opportunity for itself, directs such corporate opportunity to another person or entity or does not present such corporate opportunity to the Company.

2.2     <u>Committee Membership</u>. For so long as the Investor is entitled to designate the Preferred Director pursuant to the terms hereof or of the Certificate of Designations, the Preferred Director or other person designated by the Investor shall be appointed by the Board to sit on each regular committee of the Board, subject to such person satisfying applicable qualifications under applicable law, regulation or stock exchange rules and regulations.

6

3.      Restrictions on Transfer.

3.1      Investor's Lock-Up. From the date of the Closing until the date that is six (6) months thereafter, the Investor agrees that, without the prior written consent of the Company (which consent may be given or withheld, or made subject to such conditions as are determined by the Company, in its sole discretion), it will not directly or indirectly sell, transfer, pledge, encumber, assign or otherwise dispose of any Purchased Shares, Purchased Warrants or Transferred Shares or shares of Common Stock issuable upon conversion of any Purchased Shares or exercise of any Purchased Warrants (collectively the "Transaction Shares") to any Person, or enter into a transaction that would have the same effect, or enter into any swap, hedge or other arrangement that transfers or intends to transfer, in whole or in part, any of the economic or beneficial consequences of ownership of any Transaction Shares, whether any of these transactions are to be settled by delivery of any Transaction Shares, in cash or otherwise, publicly disclose the intention to make any offer, sale, pledge or disposition, or to enter into any transaction, swap, hedge or other arrangement, or engage in any Short Sales with respect to any Transaction Shares other than (i) to its Affiliates (including commonly controlled and managed investment funds) who execute a written joinder agreement in a form approved by the Company pursuant to which such transferee(s) agree(s) to be bound by the terms hereof; (ii) pursuant to a tender or exchange offer recommended by the Board, (iv) pursuant to a merger or consolidation recommended by the Board in which the Company will not be the surviving entity.  Without the prior written consent of the Company, Investor may not, at any time, transfer Preferred Shares to any Person other than an Affiliate of Investor; *provided* that if at any such time such transferee is no longer an Affiliate of Investor, Investor must ensure that it reacquires the transferred Preferred Shares.

Any purported transfer which is not in accordance with the terms and conditions of the above shall be, to the fullest extent permitted by law, null and void ab initio and, in addition to other rights and remedies at law and in equity, the Company shall be entitled to injunctive relief enjoining the prohibited action.

3.2      Sponsor Shareholders' Lock-up.

3.2.1      From the date of the Closing until the date that is twelve (12) months thereafter, the Founder agrees that, without the prior written consent of the Investor (which consent may be given or withheld, or made subject to such conditions as are determined by the Investor, in its sole discretion), he will not at any time directly or indirectly sell, transfer, pledge, encumber, assign or otherwise dispose of any share of Common Stock to any Person, or enter into a transaction that would have the same effect, or enter into any swap, hedge or other arrangement that transfers or intends to transfer, in whole or in part, any of the economic or beneficial consequences of ownership of such shares of Common Stock, whether any of these transactions are to be settled by delivery of any such shares of Common Stock, in cash or otherwise, publicly disclose the intention to make any offer, sale, pledge or disposition, or to enter into any transaction, swap, hedge or other arrangement, or engage in any Short Sales with respect to any security of the Company.

3.2.2      Until the date that is six (6) months from the Date of Delivery (as defined in the Lock-up Agreement), each of Thousand and Bright agrees that it will not violate any of its lock-up obligations under the Lock-up Agreement.

7

3.2.3      Each of Mr. Ou Wen Lin and Mr. Qingping Lin agrees that he will not at any time directly or indirectly sell, transfer, pledge, encumber, assign or otherwise dispose of any of his equity interest in Thousand and Bright respectively to any Person during the six (6)-month period described in Section 3.2.2 above.

Any purported transfer which is not in accordance with the terms and conditions of above Sections 3.2.1, 3.2.2 and 3.2.3 shall be, to the fullest extent permitted by law, null and void ab initio and, in addition to other rights and remedies at law and in equity, the Investor shall be entitled to injunctive relief enjoining the prohibited action.

4.      Right of First Offer.

4.1      The Investor shall have the right to purchase from the Company an amount of any additional shares of Capital Stock that the Company may propose to issue and sell equal to the Investor Ownership Percentage calculated as of the date of delivery of the Notice of Issuance (as defined below) (the "ROFO Percentage") to the extent such additional shares of Capital Stock are actually issued.

4.2      In the event the Company proposes to undertake an issuance of any shares of Capital Stock, it shall give the Investor a written notice of its intention, describing the type of the shares to be issued and the price and terms upon which the Company proposes to issue such shares (a "Notice of Issuance").  The Investor shall have twenty-one (21) days from the date of delivery of a Notice of Issuance to the Investor to agree to purchase a portion of such shares equal to the ROFO Percentage (calculated as of the date of delivery of such Notice of Issuance), for the price and upon the terms specified in the Notice of Issuance.  On or prior to the expiration of such twenty-one (21) day period, the Investor shall deliver a written notice to the Company stating the quantity of the shares to be purchased by the Investor (the "Investor Response"), which written notice shall be binding on the Company and such Investor subject only to the completion of the issuance of the shares described in the applicable Notice of Issuance.

4.3      The Company shall have one hundred and twenty (120) days following the earlier of (i) the expiration of the twenty-one (21) day period described in Section 4.2 and (ii) the delivery of the Investor Response to sell or enter into an agreement to sell the shares with respect to which the Investor' right to purchase was not exercised, at a price and upon terms no more favorable than those specified in the Notice of Issuance. If the Company does not sell such shares or enter into an agreement to sell such shares within such one hundred and twenty (120) day period, then the Company shall not thereafter issue or sell any shares without first offering such shares to the Investor in the manner provided in Section 4.2.

4.4      The right of first offer set forth in this Section 4 shall expire at any time the Investor ceases to maintain the Preferred Threshold.

5.      Tag-along.

5.1      If any Founding Shareholder (the "Transferring Shareholder") proposes to transfer any share of Capital Stock of the Company to any bona fide third party

8

(the "<u>Transferee</u>"), the Investor shall have the right (the "<u>Tag-Along Right</u>") but not the obligation to require the Transferring Shareholder to require the Transferee to purchase from the Investor, for the same consideration per share of Common Stock and upon the same terms and conditions as to be paid and given to the Transferring Shareholder up to a maximum of the Tag-along Pro Rata Share of the Offered Shares ("<u>Investor Tag Shares</u>").

5.2     If the Transferring Shareholder proposes to transfer all or a portion of the shares held by it, it shall send a written notice to the Investor (the "<u>Transfer Notice</u>"), which shall state: (i) the name of the Transferring Shareholder, (ii) the number of the shares (the "<u>Offered Shares</u>") proposed to be transferred, (iii) the price per share at which the Offered Shares will be offered for sale, which price in each case must be in US$ cash only and may not be in kind (the "<u>Offer Price</u>").

5.3     Within 30 days following the receipt of the Transfer Notice, if the Investor elects to exercise its Tag-along Right, it shall deliver a written notice of such election to the Transferring Shareholder, specifying the number of the shares of Common Stock with respect to which it has elected to exercise its Tag-along Right.  Such notice shall be irrevocable and shall constitute a binding agreement by the Investor to transfer such shares on the terms and conditions set forth in the Transfer Notice.

5.4     For the avoidance of doubt, without the prior written consent of the Company, the Investor shall not be permitted to transfer Preferred Stock pursuant to the Tag-Along Right without converting into Common Stock.

5.5     Where the Investor has properly elected to exercise its Tag-along Right and the proposed Transferee fails to purchase the shares from the Investor, the Transferring Shareholder shall not make the proposed transfer, and if purported to be made, such transfer shall be void.

5.6     For avoidance of doubt, the Investor shall have a Tag-Along Right with respect to any sale of any equity interests of Thousand or Bright by Ou Wen Lin or Qingping Lin, calculating the Investor Tag Shares as if Ou Wen Lin or Qingping Lin, as applicable, were transferring Capital Stock owned by Thousand or Bright, directly on a basis proportional with the disposition of their equity interests of Thousand or Bright.

5.7     The Tag-Along right shall expire at any time the Investor ceases to maintain the Preferred Threshold.

6.     <u>Performance-based Adjustment</u>.

6.1     The parties acknowledge that the Investor's Percentage Ownership immediately following the Closing is calculated based upon a post-money valuation of US$ 343,462,957 (the "<u>Valuation</u>") and estimated Audited Consolidated Net Profit for the fiscal years of 2009, 2010 and 2011 as set forth below (each a "<u>Profits Target</u>"):

| Fiscal Year | Audited Consolidated Net Profit |
|---|---|
| 2009 | US$ 42 million |
| 2010 | US$ 55 million |

9

2011       US$ 70 million

6.2     The Company shall and the Sponsor Shareholders shall procure that the Company deliver to the Investor the Audited Consolidated Financial Statements within ninety (90) days after the end of each fiscal year of 2009, 2010 and 2011.  If the Audited Consolidated Net Profit for any given year is less than the corresponding Profits Target as set forth in Section 6.1 above, then the Founding Shareholders shall, within thirty (30) after the date of the Audited Consolidated Financial Statements, on a pro rata basis based on their respective Founding Shareholder Ownership Percentage, pay to the Investor an amount in cash in U. S. dollars equal to the amount derived from the formula set forth below (such amount the "<u>Performance Adjustment Amount</u>"):



6.3     The Investor and the Sponsor Shareholders hereby agree that the payment of any Performance Adjustment Amount shall be treated as an adjustment to the Purchase Price (as defined in the Purchase Agreement) for U.S. federal income tax purposes.

6.4     At the sole option of the Founding Shareholders, the Founding Shareholders may satisfy their obligation to pay the Investor the Performance Adjustment Amount by a transfer of additional shares of Common Stock to the Investor (the "<u>Performance-based Share Transfer</u>") based on the average of the closing price of Common Stock for the thirty (30)-day period ending three (3) Business Days prior to the date that the Performance based Share Transfer is made, *provided, however*, that the Performance Adjustment Amount may be satisfied through the Performance-based Share Transfer only to the extent that the aggregate number of shares of Common Stock acquired or acquirable by the Investor from the Transactions together with the number of shares transferred pursuant to the Performance-based Share Transfer does not exceed 19.9% of the total number of shares of Common Stock issued and outstanding as of the date of the Purchase Agreement and any remaining Performance Adjustment Amount shall be paid in cash.

6.5     The Founding Shareholders shall be responsible for any and all documentary, stamp, or similar issue or transfer tax due on any Performance-based Share Transfer pursuant to the Section 6.4 on or prior to the closing of such transfer.

7.    <u>Put Option</u>.

7.1     The Investor shall have the right (the "<u>Put Right</u>") but not the obligation to sell the Put Shares to the Founding Shareholders at a price equal to the Put Price and the Founding Shareholders shall have the obligation to purchase such Put Shares on a pro rata basis based on Founding Shareholder Ownership Percentage, at the Put Price if:

7.1.1     the Audited Consolidated Net Profit for the fiscal year of 2012 is less than the Audited Consolidated Net Profit for the fiscal year of 2011;

10

7.1.2    the Company fails to meet 50% of any Profits Target as set forth in Section 6.1 for any of fiscal year 2009, 2010 or 2011; or

7.1.3    the Company or any of the Sponsor Shareholders materially breaches any covenants or agreements set forth in Sections 9 or 10 of the Purchase Agreement or Sections 2, 3, 4, 5, 6 or 9.2 of this Agreement, and fails to rectify such breach to the satisfaction of the Investor within sixty (60) days after the date of the written notice by the Investor.

7.2    The Company shall, and the Sponsor Shareholders shall procure the Company to, immediately upon the occurrence of any of the events as set forth in Sections 7.1.1, 7.1.2 and 7.1.3 deliver a written notice to the Investor.  From the date of such delivery or the date the Investor is aware of the occurrence of any such event, the Investor shall have thirty (30) days to deliver a written notice (the "Put Notice") to the Founding Shareholders of the exercise of its Put Right.

7.3    The Founding Shareholders shall complete the purchase of the Put Shares from and pay the entire Put Price to the Investor within three (3) months after the delivery of the Put Notice by the Investor.  The payment of the Put Price shall be in cash in U.S. dollars, *provided* that in the event of an exercise of Put Right pursuant to Section 7.1.2, the Founding Shareholders may pay the Put Price in kind (other than the shares of the Company with an equivalent value, *provided* that the type of consideration and the valuation thereof shall be subject to the Investor's review and consent), acting reasonably.

7.4    Regarding any event or circumstance giving rise to a Put Right, to the extent that the Investor chooses to exercise the Put Right with respect to less than all the Put Shares within the applicable 30-day put exercise period, the Investor shall be deemed to have waived the Put Right as to the remaining Put Shares in connection with the such event or circumstance, but, for the avoidance of doubt, not with respect to any subsequent event or circumstance giving rise to a similar Put Right.

7.5    The Put right shall expire at any time the Investor ceases to maintain the Preferred Threshold.

8.    Drag-along.

8.1    In the event that (i) the Investor has exercised the Put Right and the Founding Shareholders fail to complete the purchase of the Put Shares from, and to pay the entire Put Price to, the Investor in accordance with Section 7.3, or (ii) any Founding Shareholder fails to perform in accordance with Section 6, the Investor shall have the right (the "Drag-along Right") but not the obligation to require the Founding Shareholders to sell up to all shares of Capital Stock directly or indirectly held by the Founding Shareholders pursuant to a managed sale process conducted by an investment bank of internationally recognized standing with demonstrable experience in the Chinese and international markets and designated by the Investor ("Designated Investment Bank") to a bona fide third party buyer or buyers designated by the Investor to which the Investor will also sell all shares of Capital Stock held by it at a price per share (in US$ cash only and may not be in kind) reflecting an enterprise value which shall not be less than the product of the Company's last twelve months' net income (as adjusted using the same methodology as Audited Consolidated Net Profit) times seven (7) (the "Drag-along Sale").

11

8.2     If the Investor wishes to exercise its Drag-Along Right, the Investor shall provide a written notice to the Founding Shareholders (the "Drag Notice"), which shall state (i) the name of the buyer or buyers, (ii) the material terms and timing of the proposed transaction, (iii) the price in US$ cash, and (iv) a reasonably detailed calculation showing that the valuation is no less than the price required in Section 8.1.  The Investor shall have 120 days following the Founding Shareholders' receipt of the Drag Notice to consummate the proposed transaction and to exercise its Drag-along Right. The Founding Shareholders shall execute such documents or take such other actions as may be reasonably necessary or appropriate to effect the Drag-along Sale to the designated buyer or buyers.

9.     Other Covenants.

9.1     Repurchase of Warrants. The Company shall use its reasonable best efforts to, and the Sponsor Shareholders shall use their reasonable best efforts to cause the Company to, develop and implement a plan to repurchase and retire four million (4,000,000) outstanding Warrants.

9.2     Compliance with Certificate of Designations. The Company shall, and each of the Sponsor Shareholders shall cause the Company to, comply with the Certificate of Designations, the Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation") and the Bylaws of the Company.

9.3     Economic Sanctions. The Sponsor Shareholders and the Company shall procure that neither the Company, nor any of its Subsidiaries, nor any agent or other person acting for or on behalf of the neither the Company or any of its Subsidiaries, shall engage in any transactions or enter into any contract or association with or involving, directly or indirectly, countries, territories, governments, entities, individuals and other persons (including transactions or contracts which the Company or such Subsidiary knows or has reasons to believe involve goods, services or technology of origin from such countries or territories) that, at the date of the transaction, contract, or association, are targets of any law, regulation, order or license relating to any economic sanctions program administered by the U.S. Department of the Treasury's Office of Foreign Assets Control, including without limitation any program the regulations of which are codified in Chapter V of Subtitle B of Title 31 of the U.S. Code of Federal Regulations.

9.4     Anti-corruption.

9.4.1     The Sponsor Shareholders and the Company shall ensure that neither the Company nor any of its Subsidiaries, nor any agent or other person acting for or on behalf of the Company or any of its Subsidiaries, shall, in connection with the operations of the Company or such Subsidiary, in violation of any applicable law or regulation, offer, promise or give, or authorize or approve the payment, gift or promise of anything of value, directly or through a third party, to any officer or employee of a non-U.S. government or any department, agency, or instrumentality thereof, or any entity owned in whole or in part or controlled by any such non-U.S. government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency or instrumentality, or for or on behalf of any such public international organization, including any non-U.S. political party, party official or candidate for non-U.S. political office for the purpose

12

of securing any improper business advantage for the Company or any of its Subsidiaries, including to obtain or retain business.

9.4.2     Each of the Company and the Sponsor Shareholders covenants to maintain the FCPA Compliance Program (as such term is defined in the Purchase Agreement) adopted prior to the Closing and insure that such FCPA Compliance Program will be binding on the Company, each of its Subsidiaries and their respective Affiliates, including the directors, officers, employees and agents of each such person and the shareholders acting on behalf of each such person.  In implementing the FCPA Compliance Program, the Sponsor Shareholders and the Company covenant that they will use their respective reasonable best efforts to ensure that the Company and each of its Subsidiaries and their respective Affiliates, including the directors, officers, employees, agents and other business partners of each such entity and the shareholders acting on behalf of each such entity, follow the policies and procedures set forth in the FCPA Compliance Program.  The Sponsor Shareholders and the Company further covenant to arrange for personnel training to acquaint employees of the Company and each of its Subsidiaries with the FCPA Compliance Program.

9.4.3     The Sponsor Shareholders and the Company covenant with the Investor that (i) it will ensure that the representation set out in section 4.23 of the Purchase Agreement remains true, accurate and not misleading at all times after the Closing and (ii) it will certify to the foregoing on an annual basis by letter directed to the Investor for so long as the Investor Ownership Percentage is greater than or equal to 1%.

9.4.4     The Company agrees to, and the Sponsor Shareholders shall ensure the Company to, maintain, throughout the course of this Agreement, books and records that accurately reflect its assets and transactions in reasonable detail, and to maintain a system of internal accounting controls to ensure that all transactions are properly authorized by management.  Further, the Investor shall be allowed reasonable access to the Company's books and records during regular business hours and with reasonable prior written notice, and shall have the right to audit the Company on a periodic basis.

9.4.5     The Company further covenants that, should it learn of or have reason to suspect any breach of the covenants in this Section 9.4, it will promptly notify the Investor.  Following dispatch of such notification the Company shall (i) investigate the suspected breach and (ii) take any measure that may be required, or that the Investor may reasonably request, to remediate any suspected breach of the FCPA Compliance Program (including by dismissing employees that have breached the FCPA Compliance Program) and to insure continued compliance of the Company with FCPA, local anti-corruption laws and the provisions of this clause 9.4.

9.4.6     Subject to the PRC laws, during the term of this Agreement, the Company agrees in good faith to obtain certification, to the reasonable satisfaction of the Investor, on an annual basis from all Reporting Employees as to whether they are Government Officials or immediate family members of a Government Official, and the Company agrees to make immediate disclosure to the Investor of such fact and all relevant details with respect thereto. In carrying out its

13

obligations under this clause 9.4, the Company shall in good faith exercise its reasonable best efforts to (A) insure the truth, accuracy and completeness of the certification provided by the Reporting Employees and (B) take legally permissible disciplinary or punitive action, as may be reasonably requested by the Investor, against any Reporting Employees for their failure to fully cooperate with the Company. For the purposes of this provision, "Reporting Employees" shall refer to any directors, indirect owners, any employee working with the sales department, finance department or legal department of the Company and any other employee whose work by nature shall create rights or obligations on behalf of the Company. "Government Official" shall refer to any officer, employee or any other person acting in an official capacity for any government or any department, agency or instrumentality thereof, including any entity or enterprise majority-owned or otherwise controlled by a government, or a public international organization (each a "Government Entity"), in each case, only to the extent that the Company, in the course of its business, interacts or engages with such Government Entity; "immediate family members" shall refer to the spouses, siblings, parents, or children (including by virtue of adoption) of a Government Official.

10.    Earn-out. The Investor agrees that the Company may issue and deliver up to an aggregate of 15,000,000 shares of Common Stock of the Company to HMDF Shareholders (as defined in the Share Exchange Agreement) in accordance with the terms of the Share Exchange Agreement.

11.    Legend.

11.1    The Purchased Shares and all shares of Common Stock issued upon conversion thereof shall be stamped or imprinted with a legend in substantially the following form (in addition to any legend required by state securities laws):

THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS.  SUCH SECURITIES AND ANY SECURITIES ISSUED HEREUNDER OR THEREUNDER MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SAID ACT AND APPLICABLE LAWS.  COPIES OF THE AGREEMENT COVERING THE PURCHASE OF THESE SECURITIES AND RESTRICTING THEIR TRANSFER OR SALE MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF RECORD HEREOF TO THE SECRETARY OF THE COMPANY AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY.

12.    Miscellaneous.

12.1    Governing Law.
 This Agreement shall be governed in all respects by the laws of the State of State of Delaware without regard to any choice of laws or conflict of laws provisions that would require the application of the laws of any other jurisdiction.

14

12.2     Jurisdiction; Enforcement. Any dispute, controversy or claim arising out of or relating to this Agreement or its subject matter (including a dispute regarding the existence, validity, formation, effect, interpretation, performance or termination of this Agreement) (each a "Dispute") shall be finally settled by arbitration.

(a)     The place of arbitration shall be Hong Kong, and the arbitration shall be administered by the Hong Kong International Arbitration Centre (the "HKIAC") in accordance with the HKIAC Administered Arbitration Rules then in force (the "HKIAC Rules").

(b)     The arbitration shall be decided by a tribunal of three (3) arbitrators, whose appointment shall be in accordance with the HKIAC Rules; provided, however, that the third presiding arbitrator must be licensed to practice Delaware state law and in good standing with the Delaware State Bar, as of the date the Notice of Arbitration is received by the HKIAC Secretariat.

(c)     Arbitration proceedings (including but not limited to any arbitral award rendered) shall be in English.

(d)     Subject to the agreement of the tribunal, any Dispute(s) which arise subsequent to the commencement of arbitration of any existing Dispute(s), shall be resolved by the tribunal already appointed to hear the existing Dispute(s).

(e)     The award of the arbitration tribunal shall be final and conclusive and binding upon the parties as from the date rendered.

(f)     Judgment upon any award may be entered and enforced in any court having jurisdiction over a party or any of its assets.  For the purpose of the enforcement of an award, the parties irrevocably and unconditionally submit to the jurisdiction of any competent court and waive any defenses to such enforcement based on lack of personal jurisdiction or inconvenient forum.

12.3     Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties (including transferees of any Capital Stock).  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.  For avoidance of doubt, the rights set forth in Sections 2, 4.2, 5, 6, 7 and 8 are not transferable to any third party without the prior written consent of the Company.

12.4     Entire Agreement. This Agreement, the Purchase Agreement and the other documents delivered pursuant to the Purchase Agreement, including the Registration Rights Agreement and Warrant, constitute the full and entire understanding and agreement among the parties with regard to the subjects of this Agreement and such other agreements and documents.

12.5     Notices. Except as otherwise provided in this Agreement, all notices, requests, claims, demands, waivers and other communications required or permitted under

15

this Agreement shall be in writing and shall be mailed by reliable overnight delivery service or delivered by hand, facsimile or messenger as follows:

if to the Company: China MediaExpress Holdings, Inc
 Room 2805
 Central Plaza
 Wanchai, Hong Kong
 Attention: Zheng Cheng and Jacky Lam
 Facsimile: +852.2827.6099

with a copy to: Loeb & Loeb LLP
 345 Park Avenue
 New York, NY 10145
 Attention: Mitchell S. Nussbaum / Frank J. Marinaro
 Facsimile: +1.212.656.1349

if to the Investor: Starr Investments Cayman II, Inc.
 Bermuda Commercial Bank Building, 5th Floor
 19 Par la Ville Road
 Hamilton HM 11
 Bermuda
 Attention: Stuart Osbourne / Jenny Barclay

with a copy to: Starr Investments Cayman II, Inc.
 c/o Beijing C.V. Starr Investment Advisors Limited Shanghai Branch
 Suite 4609-4611A, Tower II, Plaza 66,
 1266 Nanjing West Road,
 Shanghai 200040 People's Republic of China
 Attention: John Lin / Dorothy Dong
 Facsimile: +8621.6288.9773

with a copy to: Skadden, Arps, Slate, Meagher & Flom LLP
 30th Floor, Tower 2, China World Trade Centre
 No. 1 Jianguomenwai Avenue
 Beijing 100004 People's Republic of China
 Attention:  Jon L Christianson
 Facsimile:  +8610.6535.5577

if to the Founder: c/o China MediaExpress Holdings, Inc.
 Room 2805, Central Plaza
 Wanchai, Hong Kong
 Attention: Zheng Cheng
 Facsimile: +852.2827.6099

16

| if to Ou Wen Lin: | c/o China MediaExpress Holdings, Inc. |
|---|---|
| | Room 2805, Central Plaza |
| | Wanchai, Hong Kong |
| | Attention: Zheng Cheng |
| | Facsimile: +852.2827.6099 |

| if to Qingping Lin: | c/o China MediaExpress Holdings, Inc. |
|---|---|
| | Room 2805, Central Plaza |
| | Wanchai, Hong Kong |
| | Attention: Zheng Cheng |
| | Facsimile: +852.2827.6099 |

| if to Thousand: | c/o China MediaExpress Holdings, Inc. |
|---|---|
| | Room 2805, Central Plaza |
| | Wanchai, Hong Kong |
| | Attention: Zheng Cheng |
| | Facsimile: +852.2827.6099 |

| if to Bright: | c/o China MediaExpress Holdings, Inc. |
|---|---|
| | Room 2805, Central Plaza |
| | Wanchai, Hong Kong |
| | Attention: Zheng Cheng |
| | Facsimile: +852.2827.6099 |

or in any such case to such other address, facsimile number or telephone as either party may, from time to time, designate in a written notice given in a like manner. Notices shall be deemed given when actually delivered by overnight delivery service, hand or messenger, or when received by facsimile if promptly confirmed.

12.6     Delays or Omissions. No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement shall impair any such right, power, or remedy of such party, nor shall it be construed to be a waiver of or acquiescence to any breach or default, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default. All remedies, either under this Agreement or by law or otherwise afforded to any holder, shall be cumulative and not alternative.

12.7     Amendments and Waivers. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only if such amendment or waiver is in writing and signed, in the case of an amendment, by all the parties hereto or, in the case of a waiver, by the party against whom the waiver is to be effective, *provided* that with respect to a waiver of the provisions set forth in Section 3.1.1 hereof, a waiver signed by the Company shall constitute an effective waiver. Any amendment or waiver effected in accordance with this paragraph shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which such securities are convertible), each future holder of all such securities, and the Company.

12.8     Counterparts. This Agreement may be executed in any number of counterparts and signatures may be delivered by facsimile or in electronic format, each of which may be executed by less than all the parties, each of which shall be enforceable against

17

the parties actually executing such counterparts and all of which together shall constitute one instrument.

12.9     Severability. If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable, or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement and the balance of this Agreement shall be enforceable in accordance with its terms.

12.10     Titles and Subtitles; Interpretation. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. When a reference is made in this Agreement to a Section, Schedule or Annex, such reference shall be to a Section, Schedule or Annex of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to in this Agreement means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes. Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if it is drafted by each of the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

12.11     Withholding Rights. Notwithstanding anything to the contrary contained in any of the Transaction Agreements, the Company shall be entitled to deduct and withhold in respect of any dividends or deemed dividends with respect to the Series A Preferred Stock or any other amounts paid or deemed to be paid by the Company under any of the Transaction Agreements, such amounts as the Company reasonably determines are required to be deducted and withheld under the Code or any provision of state, local, provincial or foreign tax law; *provided* that the Person with respect to whom such deduction or withholding would occur shall be entitled to provide the Company with such forms or other documents as may be required in order to claim a reduction of any such deduction or withholding under the applicable tax law.  To the extent that any such amounts are so withheld, all appropriate and available evidence of such deduction and withholding, including any receipts or forms required in order for the Person with respect to whom such deduction and withholding occurred to establish the deduction and withholding and payment to the appropriate taxing authority as being for its account with the appropriate taxing authority, shall be delivered to the Person with respect to whom such deduction and withholding has occurred, and such withheld amounts shall be treated for all purposes as having been delivered and paid to the Person otherwise entitled to the amounts in respect of which such deduction and withholding was made.  Notwithstanding the foregoing, the Company, at its option, may require any such amounts required to be deducted and withheld to be reimbursed in cash to the Company by such Person prior to the time when the amounts subject to any such deduction or withholding are paid or are considered to be paid by the Company under the applicable tax law, in which case any such reimbursements received by the Company (net

18

of any Taxes payable by the Company on such reimbursements) shall not be deducted and withheld from any such payments or deemed payments.

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

CHINA MEDIAEXPRESS HOLDINGS, INC.

By: /s/ Zheng Cheng
    Name: Zheng Cheng
    Title:


ZHENG CHENG

/s/ Zheng Cheng


OU WEN LIN

/s/ Ou Wen Lin


QINGPING LIN

/s/ Qingping Lin


THOUSAND SPACE HOLDINGS LIMITED

By: /s/ Ou Wen Lin
    Name: Ou Wen Lin
    Title:

*[Signature Page to Investor Rights Agreement]*

BRIGHT ELITE MANAGEMENT LIMITED

By: /s/ Qingping Lin
     Name:  Qingping Lin
     Title:

STARR INVESTMENTS CAYMAN II, INC.

By: /s/ Stuart Osborne
     Name:  Stuart Osborne
     Title:  Director

[*Signature Page to Investor Rights Agreement*]

EX-99 8 exhibit_g.htm EXHIBIT G - STOCK TRANSFER AGREEMENT

EXHIBIT G

## TM HOLDERS SHARE SALE AGREEMENT

This STOCK TRANSFER AGREEMENT (the "**Agreement**"), dated as of January 28, 2010 by and among John W. Hyde Living Trust, Theodore S. Green, Malcolm Bird, Jonathan F. Miller, Sara Green 2007 GST Trust and Blair Green 2007 GST Trust (each a "**Transferor**" and collectively, the "**Transferors**"), and Starr Investments Cayman II, Inc., a company organized with limited liability under the laws of the Cayman Islands ("**Transferee**").

WHEREAS, the Transferors have agreed to transfer an aggregate of up to 150,000 of their shares of common stock of China MediaExpress Holdings, Inc. (the "**Company**") to the Transferee, for good and valuable consideration already received.

NOW, THEREFORE, the parties hereto agree as follows:

ARTICLE 1
PURCHASE AND SALE

Section 1. *Transfer of the Founder Shares*.  (a)  Each Transferor hereby transfers (the "**Transfer**") to Transferee such number of their shares of the Company's common stock (the "**Founder Shares**") set forth on Annex A hereto opposite their respective names thereon for good and valuable consideration already received.

(b)       Transferors shall cause Company's transfer agent, CST to (i) irrevocably transfer to Transferee the Founder Shares, from the accounts of the applicable Transferors, with such Founder Shares and (ii) provide written evidence satisfactory to Transferee and its counsel of the occurrence of (i), above.

ARTICLE 2
REPRESENTATIONS AND WARRANTIES OF TRANSFERORS

Each Transferor severally and not jointly represents and warrants to Transferee as of the date hereof that:

Section 2.01.  *Authority*.  This Agreement has been validly authorized, executed and delivered by Transferor and, assuming the due authorization, execution and delivery thereof by Transferee, is a valid and binding agreement of Transferor, enforceable in accordance with its terms, subject to the general principles of equity and to bankruptcy or other laws affecting the enforcement of creditors' rights generally.  The execution, delivery and performance of this Agreement by Transferors does not and will not conflict with, violate or cause a

breach of, constitute a default under, or result in a violation of (i) any agreement, contract or instrument to which Transferor is a party which would prevent Transferor from performing or materially delay or materially impair the ability of Transferor to perform its obligations hereunder or (ii) any law, statute, rule or regulation to which Transferor is subject.

Section 2.02.  *Ownership of Founder Shares*.  Transferor is the legal and beneficial owner of the applicable Founder Shares, free and clear of any liens, claims, security interests, options, charges or any other encumbrance, limitation or restriction whatsoever.  The Founder Shares are duly authorized, validly issued, fully paid and nonassessable.  None of the Founder Shares is subject to any voting trust or other agreement or arrangement with respect to the voting of such Founder Shares.

Section 2.03. *Governmental Consents*.  No consent, approval, license or authorization of or designation, declaration, or filing with, any federal, state, or local governmental authority on the part of any Transferor is required in connection with the consummation of the transitions contemplated by this Agreement.

Section 2.04.  *Sophisticated Investor; Information*.  Transferor is an informed and sophisticated investor, and has engaged expert advisors, experienced in transactions of the type contemplated by this Agreement.  Transferor further represents that it has been furnished by the Company with, and has evaluated, all information it deems necessary, desirable and appropriate to evaluate the merits and risks of the transactions contemplated herein and has received such legal and financial other advice as deemed to be necessary, desirable and appropriate to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  In evaluating the suitability of the transactions contemplated herein, Transferor has not relied upon any representations or information whether oral or written made by or on behalf of Transferee other than the representations and warranties of the Transferee expressly set forth in this Agreement.

Transferor understands and acknowledges that, in effecting the transactions contemplated by this Agreement, the Transferee will rely on the representations and warrants contained in this Section 2.

Section 2.05.  *Finder's Fees*.  No investment banker, broker, finder or other intermediary is entitled to a fee or commission from Transferor or the Company in respect of this Agreement based upon any arrangement or agreement made by or on behalf of Transferee or any of its Affiliates.

Section 2.06.  *No Legal Advice from Transferee*.  Transferor acknowledges that it has had the opportunity to review this Agreement and the transactions contemplated by this Agreement with Transferor's own legal counsel and investment and tax advisors.  Transferor is not relying on any statements or representations of Transferee or any of their representatives or agents for legal, tax

or investment advice with respect to this Agreement or the transactions contemplated by the Agreement.

Section 2.07. *Transfer Taxes*. Transferor understands that Transferor (and not Transferee) shall be responsible for any and all tax liabilities of Transferor that may arise as a result of the transactions contemplated by this Agreement.

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF TRANSFEREE

Transferee represents and warrants to Transferors as of the date hereof that:

Section 3.01. *Authorization*. This Agreement has been validly authorized, executed and delivered by Transferee and assuming the due authorization, execution and delivery thereof by Transferors, is a valid and binding agreement of Transferee, enforceable in accordance with its terms, subject to the general principles of equity and to bankruptcy or other laws affecting the enforcement of creditors' rights generally. The execution, delivery and performance of this Agreement by Transferee does not and will not conflict with, violate or cause a breach of, constitute a default under, or result in a violation of (i) any agreement, contract or instrument to which Transferee is a party which would prevent Transferee from performing or materially delay or materially impair the ability of Transferee from performing its obligations hereunder or (ii) any law, statute, rule or regulation to which Transferee is subject.

Section 3.02. *Sophisticated Buyer; Information*. Transferee is sophisticated in financial matters and is able to evaluate the risks and benefits attendant to the Transfer and is an "accredited investor" within the meaning of Rule 501(a) promulgated pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"). Transferee further represents that it has been furnished by the Company with, and has evaluated, all information it deems necessary, desirable and appropriate to evaluate the merits and risks of the transactions contemplated herein and has received such legal and financial other advice as deemed to be necessary, desirable and appropriate to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. In evaluating the suitability of the transactions contemplated herein, Transferee has not relied upon any representations or information whether oral or written made by or on behalf of Transferors other than the representations and warranties of the Transferors expressly set forth in this Agreement.

Section 3.03. *No Legal Advice from Transferors*. Transferee acknowledges that it has had the opportunity to review this Agreement and the transactions contemplated by this Agreement with Transferee's own legal counsel and investment and tax advisors. Transferee is not relying on any statements or representations of the Transferors or any of their representatives or agents for legal,

3

tax or investment advice with respect to this Agreement or the transactions contemplated by the Agreement.

Section 3.04.  *Transfer Taxes*.  Transferee understands that Transferee (and not Transferors) shall be responsible for any and all tax liabilities of Transferee that may arise as a result of the transactions contemplated by this Agreement.

Section 3.05.  *Restrictions on Transfer*.  Transferee acknowledges and understands the Founder Shares have not been registered under the Securities Act, and, if in the future the Transferee decides to offer, resell, pledge or otherwise transfer the Founder Shares, such Founder Shares may be offered, resold, pledged or otherwise transferred only (A) pursuant to an effective registration statement filed under the Securities Act, (B) pursuant to an exemption from registration under Rule 144 promulgated under the Securities Act, if available, or (C) pursuant to any available other exemption from the registration requirements of the Securities Act, and in each case in accordance with any applicable securities laws of any state or any other jurisdiction.  Absent registration or an available exemption from registration, Transferee agrees that it will not resell the Founder Shares.

ARTICLE 5
MISCELLANEOUS

Section 5.01.  *Further Assurances*.  Transferors and Transferee will execute and deliver, or cause to be executed and delivered, all further documents and instruments and use it reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable law, to consummate and make effective the transactions contemplated by this Agreement.

Section 5.02.  *Amendments*.  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or in the case of a waiver, by the party against whom the waiver is to be effective.

Section 5.03   *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the other parties hereto.

Section 5.04.  *Governing Law*.  This Agreement shall for all purposes be deemed to be made under and shall be construed in accordance with the laws of the State of Delaware.  Each of the parties hereby agrees that any action, proceeding or claim against it arising out of or relating in any way to this Agreement shall, to the fullest extent applicable, be brought and enforced first in the Delaware Chancery Court, then to such other court in the State of Delaware as

4

appropriate and irrevocably submits to such jurisdiction, which jurisdiction shall be exclusive.  Each of the parties hereby waives any objection to such exclusive jurisdiction and that such courts represent an inconvenient forum.

Section 5.05.  *Counterparts; Effectiveness*.  This Agreement may be signed in any number of counterparts and delivered by facsimile, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received counterparts hereof signed by all of the other parties hereto.  Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).

5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

TRANSFERORS

**JOHN W. HYDE LIVING TRUST**

By:/s/ John W. Hyde
   Name:John W. Hyde
   Title:  Trustee

**SARA GREEN 2007 GST TRUST**

By:/s/ Jeffrey Bolson
   Name:Jeffrey Bolson
   Title:  Trustee

**BLAIR GREEN 2007 GST TRUST**

By:/s/ Jeffrey Bolson
   Name:Jeffrey Bolson
   Title:  Trustee

/s/ Theodore S. Green
Theodore S. Green


/s/ Malcolm Bird
Malcolm Bird


/s/ Jonathan F. Miller
Jonathan F. Miller


[*Signature Page to Share Transfer Agreement*]

---

TRANSFEREE

**STARR INVESTMENTS
CAYMAN II, INC.**

By: /s/ Stuart Osborne
     Name:  Stuart Osborne
     Title:  Director

---

**ANNEX A**

| Name of Stockholder | Number of Shares |
| --- | --- |
| John W. Hyde Living Trust | 7,500 |
| Theodore S. Green | 57,500 |
| Malcolm Bird | 52,500 |
| Jonathan F. Miller | 7,500 |

| | |
|---|---|
| Sara Green 2007 GST Trust | 12,500 |
| Blair Green 2007 GST Trust | 12,500 |
| **Total:** | **150,000** |

8-K 1 v171261_8k.htm

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C. 20549

---

### FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): January 12, 2010

### CHINA MEDIAEXPRESS HOLDINGS, INC.
(Exact Name of Registrant as Specified in Charter)

| Delaware | 001-33746 | 20-8951489 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| Room 2805, Central Plaza, Wanchai Hong Kong | N/A |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code:  +852 2827 6100

---

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

**Item 1.01          Entry into a Material Definitive Agreement.**

On January 12, 2010, China MediaExpress Holdings, Inc., a Delaware corporation (the "Company"), entered into a securities purchase agreement (the "Purchase Agreement"), with Starr Investments Cayman II, Inc. ("Starr"). Under this agreement, Starr will, subject to various terms and conditions, purchase from the Company 1,000,000 shares of Series A Convertible Preferred Stock, par value US$0.001 (the "Purchased Shares"), and warrants (the "Purchased Warrants") to purchase 1,545,455 shares of the Common Stock, par value US$0.001, of the Company ("Common Stock"), for an aggregate purchase price of US$30,000,000. Concurrently, certain shareholders of the Company will transfer (the "Share Transfer") 150,000 shares of Common Stock to Starr for no additional cash consideration (the "Transferred Shares")

Further details regarding these agreements and transactions are set forth below.

**Purchase Agreement**

*The Purchased Shares Purchase*

On January 12, 2010, the Company entered into the Purchase Agreement with Starr and certain of the Company's controlling stockholders, pursuant to which Starr will, subject to the terms and conditions contained therein, purchase the Purchased Shares and the Purchased Warrants for an aggregate purchase price of $30.0 million. The terms of the Purchased Shares will be set forth in the Certificate of Designations described below. The purchase of the Purchased Shares will close no later than the fifth business day following satisfaction or waiver of all of the closing conditions set forth in the Purchase Agreement.

*Governance Arrangements*

Pursuant to the Purchase Agreement and the Certificate of Designations, Starr will be entitled to designate one individual to the Company's board of directors. Starr will continue to be able to designate a director under the terms of the Purchase Agreement and the Certificate of Designations so long as Starr beneficially owns at least 3% of the Company's Common Stock on a fully-diluted and as converted basis.

In addition, until the earlier of the date on which Starr no longer beneficially owns at least 3% of the Company's Common Stock on a fully-diluted and as converted basis, the Company will not adopt or make, without the affirmative vote or consent of the holders of at least a majority of the outstanding Purchased Shares voting as a separate class, given in person or by proxy, either in writing or at a meeting:

•  any amendment of its Certificate of Incorporation or Bylaws of the Company or any subsidiary in a manner adverse to the rights, preferences or privileges of the Purchased Shares;

•  increase or decrease the total number of authorized Purchased Shares; or

•  any amendment of the agreements pursuant to which it controls its operating entities in the People's Republic of China ("PRC").

*Lock-Up and Transfer Restrictions*

For the six-month period from the closing of the issuance of the Purchased Shares, Starr will not be permitted to transfer or otherwise dispose of its interest in the Purchased Shares, Purchased Warrants or Transferred Shares or in any shares of Common Stock issued upon conversion of the Purchased Shares or exercise of the Purchased Warrants (other than to its permitted transferees or pursuant to certain other customary exceptions).

*Preemptive Rights*

For so long as Starr continues to beneficially own 3% or more of the Company's Common Stock on a fully-diluted and as converted basis, it will have customary preemptive rights in the event the Company offers securities to any person to purchase an amount of securities in the offering in proportion to the percentage of the Company's Common Stock on a fully-diluted and as converted basis held by Starr at the time of the offering.

*Closing Conditions*

Appointment of Director

The closing of the issuance of the Purchased Shares is conditioned upon the Starr board member nominee being appointed and Starr receiving satisfactory evidence of such appointment.

Receipt of Transferred Shares

The closing of the issuance of the Purchased Shares is conditioned upon Starr receiving the Transferred Shares.

Other Closing Conditions

The closing of the issuance of the Purchased Shares is also subject to satisfaction or waiver of other customary conditions, including compliance with covenants and the accuracy of representations and warranties provided in the Purchase Agreement, including that no material adverse effect shall have occurred with respect to the Company prior to the closing of the issuance of the Purchased Shares and that the Company shall have adopted a program with respect to compliance with the US Foreign Corrupt Practices Act and the NYSE Amex LLC having approved the Company's application to list additional shares in connection with the transaction.

*Post-Closing Covenants*

After the closing, the Company is obligated to, among other things, within 3 months (a) effect the transfer of certain of the assets held in the PRC to other companies controlled by it in the PRC and enter into licensing arrangements with respect thereto, and (b) amend the terms of the agreements pursuant to which it controls its operating entities in the PRC to the reasonable satisfaction of Starr, seek approval from the State Administration for Radio and Television for the broadcasting of certain video programming not later than December 31, 2010 and implement a program regarding compliance with the US Foreign Corrupt Practices Act not later than April 30, 2010.

*Termination*

The Purchase Agreement may be terminated at any time prior to closing in certain circumstances, including:

- by mutual written consent of Starr and the Company;

- by either party if any governmental entity shall have taken action prohibiting any of the contemplated transactions; or

- by either party if the other party is in breach of, or has failed to comply with, any of its representations, warranties or covenants, and such breach or failure to comply is not curable, or has not been cured within 10 days of receipt of notice thereof.

*Fees and Expenses*

Upon the closing of the issuance of the Purchased Shares, the Company will pay up to $200,000 of the reasonable fees and expenses of Starr associated with the transaction incurred through the earlier of the closing or the termination of the Purchase Agreement.

*Survival*

The Purchase Agreement contains customary representations and warranties. Certain of these representations and warranties will survive for 36 months following the closing.

**Purchased Warrants**

*General*

The Purchased Warrants entitle the holder thereof to purchase up to 1,545,455 shares of the Company's Common Stock at an exercise price of $6.47 per share at any time prior to the fifth anniversary of the date of issuance.  The Purchased Warrants contain customary anti-dilution adjustment provisions and may be exercised for cash or cancellation of indebtedness owed to the holder by the Company.  The Purchased Warrants may be redeemed by the Company for $.01 per Purchased Warrant if at any time the closing price of the Company's Common Stock is greater than or equal to $14 for a period of 20 trading days over any 30 consecutive trading days.

3

**Certificate of Designations**

*General*

The Company does not currently have any shares of preferred stock issued and outstanding, and, therefore, the Purchased Shares will be the Company's most senior equity security. The Purchased Shares will be convertible into shares of the Company's common stock at the rates described below. The Purchased Shares have no stated maturity; however, the shares of Purchased Shares automatically convert to Common Stock on the fourth anniversary of their issuance.

*Ranking*

The Purchased Shares will have an initial liquidation preference of $30 per share and will rank senior to the Company's Common Stock and any other stock that ranks junior to the Purchased Shares with respect to distributions of assets upon the liquidation, dissolution or winding up of the Company.

The shares of Purchased Shares will be equity interests in the Company and will not constitute indebtedness. In the event of bankruptcy, liquidation, dissolution, reorganization or similar proceeding with respect to the Company, its indebtedness will effectively rank senior to the Purchased Shares, and the holders of the indebtedness will be entitled to the satisfaction of any amounts owed to them prior to the payment of the then applicable liquidation preference of any capital stock, including the Purchased Shares.

*Liquidation Rights*

If the Company voluntarily or involuntarily liquidates, dissolves or winds up its affairs, each holder of the Purchased Shares will be entitled to receive out of the Company's assets available for distribution to stockholders, after satisfaction of liabilities to creditors, if any, and before any distribution of assets is made on the Company's Common Stock or any of our other shares of stock ranking junior as to such a distribution to the Purchased Shares, a liquidating distribution in the amount that is the greater of (a) the aggregate liquidation preference of all such holder's shares of Purchased Shares plus any accrued but unpaid dividends thereon and (b) the amount such holder would receive as a holder of Common Stock assuming the prior conversion of each of its Purchased Shares.

In any such distribution, if the Company's assets are not sufficient to pay the liquidation preferences in full to all holders of the Purchased Shares, the amounts paid to the holders of Purchased Shares will be paid *pro rata* in accordance with the respective aggregate liquidation preferences of those holders. In any such distribution, the "liquidation preference" of any holder of Purchased Shares means the initial liquidation preference of $30 *plus* any dividends paid by increasing the liquidation preference of the shares of Purchased Shares *plus* any accrued but unpaid dividends. If the liquidation preference has been paid in full to all holders of the Purchased Shares then the holders of the Company's other stock shall be entitled to receive all of the Company's remaining assets according to their respective rights and preferences.

*Dividends*

No dividends will accrue on the Purchased Shares.

*Conversion; Anti-Dilution Adjustments*

Each Purchased Share will be convertible into the Company's Common Stock in an amount equal to the then applicable liquidation preference of the Purchased Shares (plus accrued and unpaid dividends) divided by the then applicable conversion price. The initial conversion price is $10 per share and is subject to customary anti-dilution adjustments for issuances of shares of Common Stock as a dividend or distribution on shares of the Common Stock.

*Automatic Conversion*

In addition, (i) if at any time the closing price of the Company's Common Stock is greater than or equal to $25 for a period of 20 consecutive trading days over any 30 consecutive trading days, (ii) if at any time the Company's market capitalization exceeds $1.2 billion, or (iii) on the fourth anniversary of the issuance of the Purchased Shares, then the Company may cause the conversion of all or part of the Purchased Shares into common stock at the then applicable conversion price.

4

*Voting Rights*

The holders of the Purchased Shares will be entitled to vote upon all matters upon which holders of Common Stock have the right to vote, such votes to be counted together with all other shares of capital stock having general voting powers and not separately as a class. The holders of the Purchased Shares will be entitled to the number of votes as the number of shares of Common Stock as the Purchased Shares is convertible into, subject to a cap mandated by the NYSE Amex LLC as a result of the Purchased Shares being issued at a discount to the closing bid price of the Company's Common Stock immediately prior to the execution of the Purchase Agreement.

In addition, until the earlier of the date on which Starr no longer beneficially owns at least 3% of the Company's Common Stock on a fully-diluted and as converted basis, the Company will not adopt or make, without the affirmative vote or consent of the holders of at least a majority of the outstanding Purchased Shares voting as a separate class, given in person or by proxy, either in writing or at a meeting:

- any amendment of its Certificate of Incorporation or Bylaws of the Company or any subsidiary in a manner adverse to the rights, preferences or privileges of the Purchased Shares;

- increase or decrease the total number of authorized Purchased Shares; or

- any amendment of the agreements pursuant to which it controls its operating entities in the PRC.

**Investor Rights Agreement**

Pursuant to the terms of an Investor Rights Agreement, Starr will have the right to purchase a pro-rata portion of any additional shares of capital stock proposed to be issued by the Company, and will have the right to join any of Mr. Cheng, Ou Wen Lin or Qinping Lin (the "Founding Stockholders") in their sale of capital stock of the Company on a pro rata basis, in each case in proportion to Starr's then current percentage of ownership of the issued and outstanding shares of Common Stock, on a fully diluted, as-if-converted basis.

The Founding Stockholders will be required to pay certain Performance Adjustment Amounts to Starr in the event the Company's audited consolidated net profits ("ACNP") for 2009, 2010 or 2011 are less than US$42,000,000, US$55,000,000 and US$70,000,000, respectively (each, a "Profits Target"). The Performance Adjustment Amount payable in any of 2009, 2010 or 2011 will be a fraction of US$343,462,957 proportionate to the amount by which the Company's ACNP in such year falls short of the then applicable Profits Target. The Performance Adjustment Amounts will be payable in cash or stock, but only to the extent such stock, together with the shares of Common Stock acquired or acquirable as a result of Starr's ownership of the Purchased Shares, the Purchased Warrants and the Transferred Shares, will not exceed 19.9% of the total number of shares of Common Stock issued and outstanding as of the date of the Purchase Agreement.

As long as Starr owns at least 3% of the issued and outstanding shares of Common Stock, on a fully diluted, as-if-converted basis, it will also have the right (the "Put Right") to require the Founding Stockholders to purchase its Purchased Shares and Common Stock held by Starr or issued upon the conversion of Purchased Shares or exercise of the Purchased Warrants if any of the following occurs: (1) the Company's ACNP for 2012 is less than its ACNP for 2011; (2) the Company fails to achieve 50% of any Profits Target for any of 2009, 2010 or 2011; or (3) the Company, Thousand, Bright or any Founding Stockholder materially breaches any of the agreements in Sections 9 (Covenants) or 10 (Indemnification) of the Securities Purchase Agreement or Sections 2 (Governance Matters), 3 (Restrictions on Transfer), 4 (Rights of First Offer), 5 (Tag-along), 6 (Performance-based Adjustment) or 9.2 (Compliance with Certificate of Designations) of the Investor Rights Agreement, and fails to cure such breach within 60 days following written notice of such breach by Starr.

In the event the Founding Stockholders do not comply with their obligation to purchase Starr's shares under the put right or their obligations under Section 6 (Performance-based Adjustment) of the Investor Rights Agreement, Starr will have the right to require the Founding Stockholders to sell up to all of the Company's capital stock directly or indirectly held by them to a third party pursuant to a managed sale process.

**Registration Rights Agreement**

The Common Stock owned by Starr from time to time will be entitled to registration rights pursuant to a Registration Rights Agreement (the "Registration Rights Agreement") to be entered into between the Company and Starr. The Company is required to file one or more demand registration statements for an offering intended to result in net proceeds of at least $10 million to the selling stockholder or, in the alternative, an initial shelf registration statement covering the sale of such Common Stock from time to time for the benefit of Starr. If the Company breaches certain of its obligations under the Registration Rights Agreement (including any of those related to the requirement to timely file registration statements and including the Common Stock issuable upon conversion of the Purchased Shares in any applicable registration statement), the Company will be obligated to pay liquidated damages, up to a maximum of 10% of Starr's total investment.

**Item 3.02  Unregistered Sales of Equity Securities.**

As described in Item 1.01 above, pursuant to the Purchase Agreement, the Company has agreed to sell to Starr the Purchased Shares and Purchased Warrants. The offer and sale of the shares of Purchased Shares and Warrants through the Securities Purchase Agreement are being made in reliance an exemption from registration under the Securities Act of 1933, as amended, pursuant to Section 4(2) thereof. The terms of conversion of the Purchased Shares are set forth in Item 1.01 above. The information in Item 1.01 above is incorporated into this Item 3.02 by reference.

A copy of the Purchase Agreement, Certificate of Designations, Investor Rights Agreement, Registration Rights Agreement and Purchased Warrant are incorporated herein by reference and are filed as Exhibits 10.18, 3.3, 4.6, 4.7 and 4.8, respectively, to this Form 8-K. The description of the transactions contemplated by the Purchase Agreement, and our obligations under the Certificate of Designations, Investor Rights Agreement, Registration Rights Agreement and Purchased Warrant set forth herein do not purport to be complete and is qualified in its entirety by reference to the full text of the exhibits filed herewith.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 3.3 | Certificate of Designation |
| 4.6 | Investor Rights Agreement |
| 4.7 | Registration Rights Agreement |
| 4.8 | Purchased Warrant |
| 10.18 | Purchase Agreement |
| 99.1 | Press release dated January 13, 2010 |

6

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**CHINA MEDIAEXPRESS HOLDINGS, INC.**

Date: January 13, 2010

By:   /s/ Zheng Cheng
      Name:   Zheng Cheng
      Title:   Chief Executive Officer

7

**EXECUTION VERSION**

**SECURITIES PURCHASE AGREEMENT**

by and among

**China MediaExpress Holdings, Inc.,**

**Fujian Zongheng Express Information Technology, Ltd.,**

**Fujian Fenzhong Media Co., Ltd.**

**Mr. Zheng Cheng,**

**Mr. Ou Wen Lin,**

**Mr. Qingping Lin,**

**Thousand Space Holdings Limited,**

**Bright Elite Management Limited,**

and

**Starr Investments Cayman II, Inc.**

**January 12, 2010**

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 1. | Definitions | 2 |
| 2. | Purchase and Sale | 8 |
| 3. | Closing | 8 |
| 4. | Representations and Warranties of the Company | 8 |
| | 4.1   Organization, Good Standing and Qualification | 8 |
| | 4.2   Authorization; Enforceable Agreement | 9 |
| | 4.3   No Conflict | 10 |
| | 4.4   Governmental Consents | 10 |
| | 4.5   Permits and Licenses | 10 |
| | 4.6   Capital Structure | 10 |
| | 4.7   Valid Issuance of Common Stock and Preferred Stock | 11 |
| | 4.8   Financial Statements | 12 |
| | 4.9   Absence of Certain Changes or Events | 12 |
| | 4.10  Compliance with Laws | 13 |
| | 4.11  Title | 13 |
| | 4.12  Litigation | 14 |
| | 4.13  Intellectual Property | 15 |
| | 4.14  Material Contracts | 15 |
| | 4.15  Insurance | 17 |
| | 4.16  Taxes | 17 |
| | 4.17  Subsidiaries | 18 |
| | 4.18  Employment Matters | 19 |
| | 4.19  Environmental Matters | 20 |
| | 4.20  Customers and Suppliers | 20 |
| | 4.21  Transactions With Affiliates and Employees | 20 |
| | 4.22  Money Laundering Laws | 21 |
| | 4.23  Foreign Corrupt Practices Act | 21 |
| | 4.24  Economics Sanctions Laws | 21 |
| | 4.25  Additional PRC Representations and Warranties | 22 |
| | 4.26  No Material Adverse Effect | 23 |
| | 4.27  Registration Rights | 23 |
| | 4.28  Reports | 24 |
| | 4.29  Investment Company Act | 24 |
| | 4.30  Brokers' Fees and Expenses | 24 |
| | 4.31  AMEX | 24 |
| | 4.32  Application of Takeover Protections | 25 |
| | 4.33  No Integrated Offering | 25 |
| | 4.34  Internal Accounting and Disclosure Controls | 25 |
| | 4.35  Off Balance Sheet Arrangements | 25 |
| | 4.36  Sarbanes-Oxley Act of 2002 | 26 |
| | 4.37  Transfer Taxes | 26 |

|        | 4.38 | Manipulation of Price                               | 26 |
|        | 4.39 | Anti-dilution Provisions                            | 26 |
|        | 4.40 | General Solicitation                                | 27 |
|        | 4.41 | Waiver of Section 203                               | 27 |
|        | 4.42 | Disclosure                                          | 27 |
| 5.     |      | Representations and Warranties of the Sponsor Shareholders | 27 |
|        | 5.1  | Organization                                        | 27 |
|        | 5.2  | Authorization; Enforceability                       | 27 |
|        | 5.3  | No Default or Violation                             | 28 |
|        | 5.4  | Governmental Consents                               | 28 |
|        | 5.5  | Good Title                                          | 28 |
|        | 5.6  | Foreign Corrupt Practices Act                       | 28 |
| 6.     |      | Representations and Warranties of the Investor      | 29 |
|        | 6.1  | Organization                                        | 29 |
|        | 6.2  | Authorization; Enforceability                       | 29 |
|        | 6.3  | No Default or Violation                             | 29 |
|        | 6.4  | Governmental Consents                               | 29 |
|        | 6.5  | Private Placement                                   | 30 |
| 7.     |      | Conditions to the Investor's Obligations at Closing | 30 |
|        | 7.1  | Representations and Warranties                      | 30 |
|        | 7.2  | Covenants                                           | 30 |
|        | 7.3  | Share Transfer                                      | 31 |
|        | 7.4  | No Material Adverse Effect                          | 31 |
|        | 7.5  | FCPA Compliance                                     | 31 |
|        | 7.6  | Accounting Firm Engagement                          | 31 |
|        | 7.7  | Legal Counsel Engagement                            | 31 |
|        | 7.8  | Series A Certificate of Designations and Bylaws     | 31 |
|        | 7.9  | AMEX Registration                                   | 31 |
|        | 7.10 | Ancillary Agreements                                | 31 |
|        | 7.11 | Legal Opinions                                      | 31 |
|        | 7.12 | Expenses                                            | 32 |
|        | 7.13 | Board of Directors                                  | 32 |
|        | 7.14 | Purchased Shares; Warrants                          | 32 |
| 8.     |      | Conditions to the Company's Obligations at Closing  | 32 |
|        | 8.1  | Representations and Warranties                      | 32 |
|        | 8.2  | Purchase Price                                      | 32 |
|        | 8.3  | Ancillary Agreements                                | 32 |
|        | 8.4  | AMEX Registration.                                  | 33 |
| 9.     |      | Covenants                                           | 33 |
|        | 9.1  | Asset and IP Transfer                               | 33 |
|        | 9.2  | VIE Restructuring                                   | 33 |
|        | 9.3  | SARFT Approval                                      | 33 |
|        | 9.4  | FCPA Compliance                                     | 33 |
|        | 9.5  | Listing                                             | 33 |
|        | 9.6  | Director Appointment                                | 34 |
|        | 9.7  | Business Development                                | 34 |

| | | |
|---|---|---:|
| 9.8 | Compliance | 34 |
| 9.9 | Use of Proceeds | 34 |
| 9.10 | Transfer Taxes | 34 |
| 9.11 | Share Transfer | 34 |
| 9.12 | Confidentiality; Public Disclosure | 34 |
| 9.13 | Further Assurances | 35 |
| 10. | Indemnification | 35 |
| 10.1 | Survival | 35 |
| 10.2 | Company Indemnification Obligation | 35 |
| 10.3 | Sponsor Shareholders Indemnification Obligation | 36 |
| 10.4 | Limitation on Indemnification | 36 |
| 10.5 | Conduct of Claims | 37 |
| 11. | Miscellaneous | 38 |
| 11.1 | Governing Law | 38 |
| 11.2 | Jurisdiction; Enforcement | 38 |
| 11.3 | Termination | 39 |
| 11.4 | Successors and Assigns | 39 |
| 11.5 | No Third-Party Beneficiaries | 39 |
| 11.6 | No Personal Liability of Directors, Officers, Owners, Etc | 39 |
| 11.7 | Entire Agreement | 40 |
| 11.8 | Notices | 40 |
| 11.9 | Delays or Omissions | 41 |
| 11.10 | Expenses | 41 |
| 11.11 | Amendments and Waivers | 41 |
| 11.12 | Counterparts | 41 |
| 11.13 | Severability | 41 |
| 11.14 | Titles and Subtitles; Interpretation | 42 |

**EXHIBITS**

Exhibit A – Form of Series A Certificate of Designations
Exhibit B – Form of Registration Rights Agreement
Exhibit C – Form of Investor Rights Agreement
Exhibit D – Form of Warrant
Exhibit E – Form of Legal Opinion of Hankun Law Office
Exhibit F – Form of Legal Opinion of Loeb & Loeb LLP
Exhibit G – Form of Legal Opinion of Morris, Nichols, Arsht & Tunnell
Exhibit H – Form of Legal Opinion of Gallant Y.T. Ho & Co.
Exhibit I – Disclosure Letter

SECURITIES PURCHASE AGREEMENT (this "Agreement"), dated January 12, 2010, by and among China MediaExpress Holdings, Inc., a Delaware corporation (the "Company"), Fujian Zongheng Express Information Technology, Ltd. a limited liability company established in the PRC and a wholly-owned Subsidiary of the Company (the "WFOE"), Zheng Cheng, a citizen of the People's Republic of China (the "PRC", or "China"), identification number 350103197103110058, Ou Wen Lin, a citizen of the Republic of Philippines, passport number G15042722, and Qinping Lin, a citizen of the PRC, identification number 350127194911134311, Fujian Fenzhong Media Co., Ltd., a limited liability company operating in the media business established in the PRC (the "PRCCo"), controlled by the WFOE through contractual agreements and arrangements, Thousand Space Holding Limited, a company organized under the laws of the British Virgin Islands ("Thousand"), and Bright Elite Management Limited, a company organized under the laws of the British Virgin Islands ("Bright") and Starr Investments Cayman II, Inc., a company organized with limited liability under the laws of the Cayman Islands (the "Investor"). Each of the Company and its Subsidiaries (as defined below), Zheng Cheng, Ou Wen Lin, Qinping Lin, Thousand and Bright is sometimes individually referred to herein as a "Company Party," and collectively as the "Company Parties" and each of Zheng Cheng, Ou Wen Lin, Qinping Lin, Thousand and Bright, is sometimes individually referred to herein as a "Sponsor Shareholder" and collectively as the "Sponsor Shareholders." Each of the Parties to this Agreement is individually referred to herein as a "Party" and collectively as the "Parties." Capitalized terms used herein that are not otherwise defined herein shall have the meanings ascribed to them in Section 1 hereof.

WHEREAS, on the terms and conditions set forth in this Agreement, the Company desires to sell, and the Investor desires to purchase, (i) one million (1,000,000) shares of the Company's Series A Convertible Preferred Stock, par value US$0.001 per share (the "Series A Preferred Stock") and (ii) 1,545,455 warrants each entitling the Investor to purchase one share of Common Stock at US$6.47 (the "Purchased Warrants," and such sale and purchase, collectively, the "Securities Purchase");

WHEREAS, in connection with the Transactions, the Company, the Sponsor Shareholders and the Investor desire to make certain representations and warranties and enter into certain agreements; and

WHEREAS, in connection with the Transactions, the Parties hereto will execute and deliver, as applicable, among other things (i) a registration rights agreement in the form attached as Exhibit B (the "Registration Rights Agreement"); (ii) an investor rights agreement in the form attached as Exhibit C (the "Investor Rights Agreement") and (iii) a warrant in the form attached as Exhibit D (the "Warrant") and the Company will adopt a certificate of designations setting forth the rights and preferences of the Series A Preferred Stock in the form attached as Exhibit A (the "Series A Certificate of Designations").

NOW THEREFORE, in consideration of the foregoing and the representations, warranties and agreements set forth in this Agreement, and intending to be legally bound by this Agreement, the Parties agree as follows:

1.        <u>Definitions</u>. As used in this Agreement, the following terms shall have the respective meanings set forth in this Section 1:

"<u>Action</u>" shall have the meaning set forth in Section 4.12.

"<u>Affiliate</u>" of any Person shall mean any other Person directly or indirectly controlling or controlled by or under common control with such Person. For purposes of this definition, "control" when used with respect to any Person has the meaning specified in Rule 12b-2 under the Exchange Act (including SEC and judicial interpretations thereof); and the terms "controlling" and "controlled" shall have meanings correlative to the foregoing.

"<u>Agreement</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>AMEX</u>" shall mean the NYSE Amex LLC.

"<u>Board</u>" means the Board of Directors of the Company.

"<u>Bright</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Business Day</u>" means a day that is a Monday, Tuesday, Wednesday, Thursday or Friday and is not a day on which banking institutions in New York, New York or in Beijing, the PRC generally are authorized or obligated by law, regulation or executive order to close.

"<u>Bylaws</u>" shall have the meaning set forth in Section 4.1.

"<u>Certificate of Incorporation</u>" shall have the meaning set forth in Section 4.1.

"<u>Closing</u>" shall have the meaning set forth in Section 3.

"<u>Closing Date</u>" shall have the meaning set forth in Section 3.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, together with all regulations, rulings and interpretations thereof or thereunder by the Internal Revenue Service.

2

"Common Stock" shall mean the common stock, par value $0.001 per share, of the Company.

"Company" shall have the meaning set forth in the preamble of this Agreement.

"Company Party" or "Company Parties" shall have the meaning set forth in the preamble to this Agreement.

"Contract" shall mean a contract, lease, license, indenture, note, bond, agreement, permit, concession, franchise or other instrument.

"Exchange Act" shall mean the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the SEC thereunder.

"FINRA" shall have the meaning set forth in Section 4.3.

"Governmental Authority" shall mean any foreign governmental authority, the United States of America, any state of the United States and any political subdivision of any of the foregoing, and any agency, instrumentality, department, commission, board, bureau, central bank, authority, court or other tribunal, in each case whether executive, legislative, judicial, regulatory or administrative.

"In-Bound Licenses" shall have the meaning set forth in Section 4.13.

"Indebtedness" shall mean, as to any Person, without duplication: (i) all indebtedness (including principal, interest, fees and charges) of such Person for borrowed money or for the deferred purchase price of Property or services; (ii) any other indebtedness that is evidenced by a promissory note, bond, debenture or similar instrument; (iii) any obligation under or in respect of outstanding letters of credit, acceptances and similar obligations created for the account of such Person; (iv) all capital lease obligations of such Person; (v) all indebtedness, liabilities, and obligations secured by any Lien on any Property owned by such Person even though such Person has not assumed or has not otherwise become liable for the payment of any such indebtedness, liabilities or obligations secured by such Lien; (vi) any obligation under or in respect of hedging agreements and (vii) any guarantees of the foregoing liabilities and synthetic liabilities of such Person.

"Investor" shall have the meaning set forth in the preamble to this Agreement.

3

"<u>Investor Rights Agreement</u>" shall have the meaning set forth in the recitals of this Agreement.

"<u>Intellectual Property</u>" shall mean all tangible and intangible intellectual property, including: (i) discoveries and inventions, patents, patent applications (either filed or in preparation for filing) and statutory invention registrations (including reissues, divisions, continuations, continuations in part, extensions and reexaminations thereof) and all rights therein and all improvements thereto; (ii) trademarks, service marks, trade names, slogans, logos, trade dress, corporate names and other source identifiers (whether or not registered), including all common law rights, and registrations and applications for registration thereof and all rights therein and all renewals of any of the foregoing; (iii) copyrightable works, copyrights (whether or not registered) and copyright registrations and applications for registration therefor, derivative work and all rights therein and all extensions and renewals of any of the foregoing; (iv) electronic addresses and passwords, domain names and registrations and applications or reservations for registration thereof, and any similar rights and all content embodied in all websites and web pages found at such uniform resource locators; (v) Software; (vi) confidential and proprietary information, trade secrets, know-how, models, algorithms, processes, formulas, and techniques, research and development information, ideas, technical data, designs, drawings and specifications; (vii) advertising and promotional materials; (viii) rights under all Contracts under which intellectual property rights were granted to any Person by a third party, or to a third party by any Person; (ix) modifications or improvements to any item described in the immediately preceding clauses (i) through (viii); (x) copies and tangible embodiments of any item described in the immediately preceding clauses (i) through (ix); and (xi) other proprietary rights relating to any item described in the immediately preceding clauses (i) through (x), including associated goodwill, remedies against past and future infringements thereof and rights of protection of an interest therein under the laws of all jurisdictions.

"<u>Knowledge</u>" of the Company shall mean the actual knowledge of any of Zheng Cheng, Chunlan Bian, Qingping Lin, Ou Wen Lin, or any executive officers of the Company or any of its Subsidiaries or members of the board of directors of the Company or any of its Subsidiaries.

"<u>Laws</u>" shall have the meaning set forth in Section 4.10.

"<u>Lien</u>" shall mean any mortgage, pledge, charge, encumbrance, security interest, collateral assignment or other lien or restriction of any kind, whether based on common law, constitutional provision, statute or contract, and shall include reservations, exceptions, encroachments, easements, rights of way, covenants, conditions, restrictions, leases and other title exceptions.

4

"<u>Material Adverse Effect</u>" shall mean any circumstance, change, development, occurrence or effect, on the Company or any of its Subsidiaries, that, individually or in the aggregate with any other circumstance, change, development, occurrence or effect on the Company or any of its Subsidiaries, is or could reasonably be expected to be materially adverse to the business, operations, assets or liabilities (including contingent liabilities), employee relationships, customer or supplier relationships, continuing results of operations or financial condition of the Company and its Subsidiaries, taken as a whole.

"<u>Material Permits</u>" shall mean all Permits other than such franchises, licenses, permits, authorizations and approvals the lack of which, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

"<u>Out-Bound Licenses</u>" shall have the meaning set forth in Section 4.13.

"<u>PRCCo</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Party</u>" or "<u>Parties</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Performance Adjustment Amount</u>" shall have the meaning set forth in the Investor Rights Agreement.

"<u>Person</u>" shall mean any individual, association, partnership, limited liability company, joint venture, corporation, trust, unincorporated organization, Governmental Authority or any other form of entity.

"<u>Permits</u>" shall mean all governmental franchises, licenses, permits, authorizations and approvals necessary to enable a Person to own, lease or otherwise hold its properties and assets and to conduct its businesses as presently conducted.

"<u>Permitted Lien</u>" shall mean (a) any restriction on transfer arising under applicable securities law; (b) any Liens for Taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with U.S. GAAP; (c) any statutory Liens arising in the ordinary course of business by operation of Law with respect to a liability that is not yet due and delinquent and which are not, individually or in the aggregate, significant; (d) zoning, entitlement, building and other land use regulations imposed by governmental agencies having jurisdiction over the Real Property which are not violated by the current use and operation of the Real Property; (e) covenants, conditions, restrictions, easements and other similar matters of record affecting title to the Real Property which do not materially impair the occupancy or use of the Real Property for the purposes for which it is currently used or proposed to be used in connection with the such relevant Person's business; (f) Liens identified on title policies, title opinions or preliminary title reports or other documents or writings included in the public records; (g) Liens arising under worker's compensation, unemployment insurance, social security, retirement and similar legislation; (h) Liens of lessors and licensors arising under lease agreements or license arrangements; and (i) those Liens set forth in the Disclosure Letter.

5

"<u>Purchased Shares</u>" shall have the meaning set forth in Section 2.

"<u>Put Price</u>" shall have the meaning set forth in the Investor Rights Agreement.

"<u>Property</u>" shall mean any interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible.

"<u>Purchase Price</u>" shall have the meaning set forth in Section 2.

"<u>Real Property</u>" shall have the meaning set forth in Section 4.11.

"<u>Real Estate Leases</u>" shall have the meaning set forth in Section 4.11.

"<u>Registration Rights Agreement</u>" shall have the meaning set forth in the recitals of this Agreement.

"<u>SEC</u>" shall mean the U.S. Securities and Exchange Commission or any other U.S. federal agency then administering the Securities Act or Exchange Act.

"<u>SEC Documents</u>" shall mean the Company's reports and forms filed with or furnished to the SEC under Sections 12, 13, 14 or 15(d) of the Exchange Act after June 18, 2007 and before the date of this Agreement.

"<u>Securities Act</u>" shall mean the U.S. Securities Act of 1933, as amended, and the rules and regulations of the SEC thereunder.

"<u>Series A Certificate of Designations</u>" shall have the meaning set forth in the recitals to this Agreement.

"<u>Series A Preferred Stock</u>" shall have the meaning set forth in the recitals to this Agreement.

6

"Sponsor Shareholder" or "Sponsor Shareholders" shall have the meaning set forth in the preamble to this Agreement.

"Stock Purchase" shall have the meaning set forth in the recitals to this Agreement.

"Structure Agreements" shall mean, collectively, the Contracts which were executed and delivered to enable the Company to effect control over and consolidate with its financial statements, each of its Subsidiaries (including the PRCCo).

"Subsidiary" of any Person shall mean any corporation, partnership, joint venture, limited liability company, trust, variable interest entity or other entity controlled by such Person directly or indirectly through one or more intermediaries. For the avoidance of doubt, the Subsidiaries of the Company shall include, without limitation, the HKCo, the WFOE and the PRCCo.

"Tangible Personal Property" shall have the meaning set forth in Section 4.11.

"Tax" shall mean all forms of taxation, whenever created or imposed, and whether of the United States or elsewhere, and whether imposed by a local, municipal, governmental, state, foreign, federal or other Governmental Authority, or in connection with any agreement with respect to Taxes, including all interest, penalties and additions imposed with respect to such amounts.

"Tax Return" shall mean all federal, state, local, provincial and foreign Tax returns, declarations, statements, reports, schedules, forms and information returns and any amended Tax return relating to Taxes

"Thousand" shall have the meaning set forth in the preamble to this Agreement.

"Transactions" shall mean the transactions contemplated by this Agreement, including, without limitation, the Securities Purchase, the Share Transfer and the transactions contemplated by the Investor Rights Agreement and the Registration Rights Agreement.

"Transaction Documents" shall mean this Agreement, the Investor Rights Agreement, the Series A Certificate of Designations and the Registration Rights Agreement.

"United States" shall mean the United States of America.

7

"U.S. GAAP" shall mean United States generally accepted accounting principles, as in effect from time to time, applied on a consistent basis.

"US$" shall mean U.S. Dollars, the lawful currency of the United States of America.

"Voting Company Debt" shall have the meaning set forth in Section 4.6.

"WFOE" shall have the meaning set forth in the preamble to this Agreement.

2.      Purchase and Sale. Subject to the terms and conditions set forth in this Agreement, on the Closing Date (as defined below), the Company will issue, sell and deliver to the Investor, and the Investor will purchase from the Company, (i) one million (1,000,000) shares of Series A Preferred Stock (the "Purchased Shares") and (ii) the Purchased Warrants, at an aggregate purchase price of US$30,000,000 in cash (the "Purchase Price") to be paid in full to the Company on the Closing Date.

3.      Closing. The consummation of the Transactions (the "Closing") shall take place on the fifth (5th) Business Day following the satisfaction or waiver of the conditions of the obligations of the parties set forth in Sections 7 and 8 (other than such conditions as can only be satisfied contemporaneous with the Closing) or at such time (the "Closing Date") and place as the Company and the Investor shall mutually agree. At the Closing, the Investor shall pay the Purchase Price by wire transfer of immediately available funds to an account designated by the Company in advance of the Closing Date. The Company shall, within seven (7) Business Days after the Closing, deliver to the Investor certificates representing the Purchased Shares and the Purchased Warrants.

4.      Representations and Warranties of the Company. Each of the Company and the Sponsor Shareholders jointly and severally represents and warrants to the Investors as of the date of this Agreement, or if a representation or warranty is made as of a special date, as of such date, that:

4.1      Organization, Good Standing and Qualification. Each of the Company and its Subsidiaries is duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation and is duly qualified to do business in each of the jurisdictions in which the property owned, leased or operated by it or the nature of the business which it conducts requires qualification, except where the failure to so would not result in a Material Adverse Effect. Except as disclosed in Section 4.1 of the disclosure letter attached hereto as Exhibit I (the "Disclosure Letter"), each of the Company and its Subsidiaries (i) has all requisite power and authority to own, lease and operate its tangible assets and properties and to carry on its business as now being conducted and (ii) has no encumbrance in obtaining any Permits to conduct its business as required by PRC Law. The Company has delivered to the Investor true and complete copies of its Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation") and Bylaws (the "Bylaws"), each as in effect as of the date of this Agreement.

8

4.2            Authorization; Enforceable Agreement.

(a)        The Company has all necessary corporate right, power and authority and has taken all necessary corporate action on the part of the Company, its officers, directors, and shareholders necessary for the authorization, execution, and delivery of this Agreement, the Registration Rights Agreement and the Investor Rights Agreement, the performance of all obligations of the Company under this Agreement, the Registration Rights Agreement and the Investor Rights Agreement, the filing of the Series A Certificate of Designations with the Secretary of State of the State of Delaware, and the authorization, issuance, sale, delivery and registration of transfer of (i) the Purchased Shares and Purchased Warrants being sold hereunder; (ii) any shares of Common Stock to be issued to the Investor upon the conversion of the Purchased Shares and (iii) any shares of Common Stock to be issued pursuant to the Investor's exercise of any Purchased Warrants. The issuance of the Purchased Shares and the Purchased Warrant does not require any further corporate action and is not subject to any preemptive right or rights of first refusal under the Company's Certificate of Incorporation, Bylaws or any other agreement or contract to which the Company is a party. This Agreement has been and each of the Registration Rights Agreement and the Investor Rights Agreement will at Closing be duly executed and delivered, and assuming due authorization, execution and delivery by the Investor and the other parties thereto, constitutes and will constitute valid and legally binding obligations of the Company, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable laws relating to bankruptcy, insolvency, reorganization, moratorium or other similar legal requirement relating to or affecting creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

(b)        On or prior to the date of this Agreement, the Board has duly adopted resolutions (i) evidencing its determination that as of the date of this Agreement this Agreement and the transactions contemplated hereby are in the best interests of the Company, (ii) approving this Agreement, the Registration Rights Agreement, the Investor Rights Agreement and the transactions contemplated hereby and thereby, (iii) declaring this Agreement and the issuance and sale of the Purchased Shares and the Purchased Warrants (including the shares of Common Stock issuable on the exercise thereof) advisable, and (iv) adopting the Series A Certificate of Designations.

9

4.3            No Conflict. Except as disclosed in Section 4.3 of the Disclosure Letter, none of the Company, nor any of its Subsidiaries is in violation or default of any provision of its certificate of incorporation, bylaws or other constitutional documents. The authorization, execution, delivery and performance by the Company of this Agreement, the Registration Rights Agreement and the Investor Rights Agreement, and the consummation by the Company of the transactions contemplated hereby and thereby, including without limitation the filing of the Series A Certificate of Designations and the issuance of the Purchased Shares do not and will not: (a) violate, conflict with or result in the breach of any provision of the certificate of incorporation and bylaws of the Company or any of its Subsidiaries; or (b) with such exceptions that would not have a Material Adverse Effect, whether after the giving of notice or the lapse of time or both: (i) violate any provision of, constitute a breach of, or default under, or result in or permit the cancellation, termination or acceleration of any decree, judgment, order, law, treaty, rule, regulation or determination of any court, governmental agency or body, or arbitrator having jurisdiction over the Company or its properties or assets; (ii) violate any provision of, constitute a breach of, or default under, any applicable state, federal or local law, rule or regulation; (iii) result in the creation of any Lien upon any assets of the Company or any of its Subsidiaries or the suspension, revocation, material impairment, forfeiture or non-renewal of any franchise, permit, license or other right granted by a governmental authority to the Company or any of its Subsidiaries, (iv) violate the terms of any bond, debenture, indenture, credit agreement, note or any other evidence of indebtedness, or any agreement, stock option or other similar plan, lease, mortgage, deed of trust or other instrument to which the Company or any of its Subsidiaries is a party, by which the Company or any of its Subsidiaries is bound, or to which any of the properties or assets of the Company or any of its Subsidiaries is subject, (v) violate the terms of any "lock-up" or similar provision of any underwriting or similar agreement to which the Company or any of its Subsidiaries is a party or (vi) violate any rule or regulation of the Financial Industry Regulatory Authority, Inc. ("FINRA") or AMEX (*provided*, with respect to the representation and warranty made regarding the rules or regulations of AMEX as of the date hereof only, that AMEX approves the listing of the shares of Common Stock issuable upon conversion of the Purchased Shares or exercise of the Purchased Warrants and the Transferred Shares).

4.4            Governmental Consents. No consent, approval, license or authorization of, or designation, declaration, or filing with, any federal, state, or local governmental authority on the part of the Investor is required in connection with the consummation of the Transactions, except for the following: (i) the filing of the Series A Certificate of Designations with the Secretary of State of the State of Delaware; (ii) those which have already been made or granted; (iii) the filing of a current report on form 8-K with the SEC; (iv) filings with applicable state securities commissions; (v) the listing of the shares of Common Stock issuable upon conversion of the Purchased Shares or exercise of the Purchased Warrants and the Transferred Shares with the NYSE Amex; and (vi) post-Closing filings as may be required to be made with the SEC and with any state or foreign blue sky or securities regulatory authority.

4.5            Permits and Licenses. Except as set forth in Section 4.5 of the Disclosure Letter, the Company and each of its Subsidiaries possess all Material Permits and all Material Permits are in full force and effect.  True, complete and correct copies of the Material Permits issued to the Company and its Subsidiaries have been delivered to the Investor.

4.6            Capital Structure.

(a)        Section 4.6(a) of the Disclosure Letter sets forth, as of the date hereof, the share capitalization of the Company and all the outstanding options, warrants or rights to acquire any share capital of the Company. There are no disputes, arbitrations or litigation proceedings involving the Company with respect to the share capital of the Company.

10

(b)      (i) Except as set forth in Section 4.6 (b) of the Disclosure Letter, no shares of capital stock or other voting securities of the Company were issued, reserved for issuance or outstanding and there have not been any issuances of capital securities or options, warrants or rights to acquire the capital securities of the Company; (ii) all outstanding shares of the capital stock of the Company are, and all such shares that may be issued prior to the date hereof will be when issued, duly authorized, validly issued, fully paid and non-assessable and not subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of the Delaware General Corporation Law, the Company's Certificate of Incorporation, Bylaws or any Contract to which the Company is a party or otherwise bound; and (iii) there are no outstanding contractual obligations of the Company to repurchase, redeem or otherwise acquire any shares of capital stock of the Company.

(c)      (i) there are no bonds, debentures, notes or other indebtedness of the Company having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which holders of Common Stock may vote ("Voting Company Debt"); and (ii) other than as set forth in Section 4.6 (c) of the Disclosure Letter, there are no options, warrants, rights, convertible or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind to which the Company is a Party or by which it is bound (A) obligating the Company to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock or other equity interests in, or any security convertible or exercisable for or exchangeable into any capital stock of or other equity interest in, the Company or any Voting Company Debt, or (B) obligating the Company to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking.

(d)      The stockholder list set forth in Section 4.6 (d) of the Disclosure Letter is a current shareholder list generated by the Company's stock transfer agent, and, to the Knowledge of the Company, such list accurately reflects all of the issued and outstanding shares of the Company's capital stock as of the date hereof.

4.7      Valid Issuance of Common Stock and Preferred Stock. The Purchased Shares and Warrants being purchased by the Investor hereunder, and the shares of Common Stock to be issued upon the conversion of the Purchased Shares or any exercise of the Purchased Warrants, when issued, sold, and delivered in accordance with the terms of this Agreement for the consideration expressed in this Agreement, will be duly and validly issued, fully paid, and non-assessable, and will be free of any Liens or restrictions on transfer other than restrictions under this Agreement, the Investor Rights Agreement and the Series A Certificate of Designations and under applicable state and federal securities laws. The sale of the Purchased Shares is not, and the issuance of the shares of Common Stock upon the conversion of the Purchased Shares or exercise of the Purchased Warrants shall not be subject to any preemptive rights, rights of first offer or any anti-dilution provisions contained in the Company's Certificate of Incorporation, Bylaws or any other agreement.

11

4.8        Financial Statements.

(a)        The financial statements of the Company and Hong Kong Mandefu Holding Limited (the "HKCo") included in (i) the proxy statement on Schedule 14A filed with the SEC on October 5, 2009, (ii) the Form 10-Q filed with the SEC on November 16, 2009 and (iii) Form 8-K filed with the SEC on November 16, 2009 (such financial statements, collectively, the "Financial Statements") fairly present in all material respects, in accordance with U.S. GAAP, and in case of the unaudited financial statements, subject only to normal year-end adjustments, as of the dates thereof and the periods covered thereby, the financial condition and the results of operations of the Company and its Subsidiaries, including, without limitation, the HKCo, the WFOE and the PRCCo.

(b)        The Company and its Subsidiaries do not have any material liabilities or obligations (accrued, absolute, contingent or otherwise) that would be required under U.S. GAAP, as in effect on the date of this Agreement, to be reflected on a consolidated balance sheet of the Company, other than liabilities or obligations reflected on, reserved against, or disclosed in the notes to, the Financial Statements.

4.9        Absence of Certain Changes or Events. From the date of the Financial Statements to the date of this Agreement, there has not been, with respect to the Company or any of its Subsidiaries:

(a)        any event, situation or effect (whether or not covered by insurance) that has had, or to the Knowledge of the Company, would have, a Material Adverse Effect;

(b)        any damage, destruction or loss to, or any material interruption in the use of, any assets (whether or not covered by insurance) that has had or would have a Material Adverse Effect

(c)        any material change to a material Contract;

(d)        any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

(e)        any resignation or termination of employment of the Chief Executive Officer, Chief Financial Officer, President or the Secretary of the Company;

12

(f)        any mortgage, pledge, transfer of a security interest in, or Lien, created by the Company or any of its Subsidiaries, with respect to any of its material properties or assets, except for Permitted Liens;

(g)        any loans or guarantees to or for the benefit of its officers or directors, or any members of their immediate families, or any material loans or guarantees made to or for the benefit of any of its employees or any members of their immediate families, in each case, other than travel advances and other advances made in the ordinary course of its business;

(h)        any declaration, setting aside or payment or other distribution in respect of any capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock;

(i)        any material alteration of the method of accounting or any change in the identity of its auditors;

(j)        any issuance of equity securities to any officer, director or affiliate, except pursuant to existing shares option plans; or

(k)        any negotiations, arrangements or commitments to take any of the actions described in this Section 4.9.

4.10              <u>Compliance with Laws</u>. Except as disclosed in Section 4.10 of the Disclosure Letter, neither the Company nor any of its Subsidiaries is in material violation of any applicable federal, state, local, foreign or other law, statute, regulation, rule, ordinance, code, convention, directive, order, judgment or other legal requirement (collectively, "<u>Laws</u>") of any Governmental Authority, except where such violation would not have a Material Adverse Effect. To the Knowledge of the Company, neither the Company nor any of its Subsidiaries is being investigated with respect to, or has been overtly threatened to be charged with or given notice of any violation of, any applicable Law, except for such of the foregoing as would not have a Material Adverse Effect.

4.11              <u>Title</u>.

(a)        Section 4.11 of the Company Disclosure Letter contains an accurate and complete list and description of (i) all real properties owned or leased by the Company and its Subsidiaries (collectively, the "<u>Real Property</u>"); *provided* such list need not include leased real estate for which the annual rental payment is less than US$100,000 and (ii) any lease under which any such Real Property is possessed (the "<u>Real Estate Leases</u>"); *provided* such list need not include Real Estate Leases which involve an annual rental payment of less than US$100,000. Each of the Company and its Subsidiaries, as applicable, has good and marketable title to its Real Property, free and clear of all Liens. None of the Company or any of its Subsidiaries in default under any of the Real Estate Leases, and, as of the date of this Agreement, to the Knowledge of the Company, there has been no default by any of the lessors thereunder, except any such default that have not had and would not have a Material Adverse Effect.

13

(b)      Except as disclosed in Section 4.11(b) of the Disclosure Letter and which would not have a Material Adverse Effect, the Company and its Subsidiaries are in possession of and have good and marketable title to, or have valid leasehold interests in or valid contractual rights to use all tangible personal property as reflected in the Financial Statements, and tangible personal property acquired (and not otherwise disposed of in the ordinary course of business with a value not exceeding US$100,000) since December 31, 2008 (collectively, the "Tangible Personal Property"). All Tangible Personal Property is free and clear of all Liens other than Permitted Liens, and is in good order and condition, ordinary wear and tear excepted, and its use complies in all material respects with all applicable Laws.

(c)      The accounts receivable of the Company and its Subsidiaries reflected in each balance sheet included in the Financial Statements has been or will be (as applicable) presented in accordance with U.S. GAAP applied in a manner consistent with the accounting principles applied in the preparation of the Financial Statements.  Neither the Company nor any of its Subsidiaries has any inventory.

4.12      Litigation. Except as disclosed in Section 4.12 of the Disclosure Letter, as of the date of this Agreement, there is no private or governmental action, suit, inquiry, notice of violation, claim, arbitration, audit, proceeding (including any partial proceeding such as a deposition) or investigation ("Action") pending or threatened in writing against any of the Company or any of its Subsidiaries, any of their respective executive officers or directors (in their capacities as such) or any of their respective properties before or by any Governmental Authority which (a) adversely affects or challenges the legality, validity or enforceability of this Agreement or (b) if there were an unfavorable decision, would result in a Material Adverse Effect. As of the date of this Agreement, there is no Judgment imposed upon any of the Company or any of its Subsidiaries or any of their respective properties, that would prevent, enjoin, alter or materially delay any of the Transactions, or that would have a Material Adverse Effect. Neither the Company nor any of its Subsidiaries, nor any director or executive officer thereof (in his or her capacity as such), is or has been the subject of any Action involving a material claim or material violation of or material liability under the company laws and securities laws of any Governmental Authority or a material claim of breach of fiduciary duty.

14

4.13        Intellectual Property.

(a)        Section 4.13 of the Disclosure Letter sets forth an accurate and complete listing of all Intellectual Property and applications for Intellectual Property owned, used or held for use by each of the Company and its Subsidiaries and material to the conduct of its business, including, as applicable, the Intellectual Property that has been registered (or regarding which an application for registration has been submitted) with any Governmental Authority of any kind. Except as set forth in Section 4.13 (a) of the Disclosure Letter, (i) there are no Actions before any Governmental Authority challenging the validity or ownership of any of such Intellectual Property; (ii) all such Intellectual Property owned by the Company or any of its Subsidiaries is owned by it free and clear of any Liens; (iii) the Company and its Subsidiaries' operation of their business, as such business is currently conducted, does not infringe or misappropriate the Intellectual Property of any other Person; (iv) none of the Company or any of its Subsidiaries has granted to any Person any rights in any such Intellectual Property owned or controlled by the Company or any of its Subsidiaries; (v) no claims are pending or, to the Knowledge of the Company, threatened that any of the Company or any of its Subsidiaries is infringing or otherwise adversely affecting the rights of any Person with regard to any Intellectual Property set forth on Section 4.13 of the Disclosure Letter; and (vi) to the Knowledge of the Company, no Person is infringing the rights of any of the Company or any of its Subsidiaries with respect to any such Intellectual Property.

(b)        Section 4.13 of the Disclosure Letter lists (i) all licenses, sublicenses and other agreements ("In-Bound Licenses") pursuant to which a third party authorizes any of the Company or any of its Subsidiaries to use, practice any rights under, or grant sublicenses with respect to, any Intellectual Property owned by such third party and material to the conduct of the business of the Company or any of its Subsidiaries, other than In-Bound Licenses that consist solely of "shrink-wrap" and similar commercially available end-user licenses, and (ii) all licenses, sublicenses and other agreements ("Out-Bound Licenses") pursuant to which any of the Company or any of its Subsidiaries authorizes a third party to use, practice any rights under, or grant sublicenses with respect to, any Intellectual Property owned by any of the Company or any of its Subsidiaries and which Out-Bound Licenses are material to the business of the Company or any of its Subsidiaries or pursuant to which any of the Company or any of its Subsidiaries grants rights to use or practice any rights under any Intellectual Property owned by a third party.

4.14        Material Contracts.

(a)        The Company has made available to the Investor, prior to the date of this Agreement, true, correct and complete copies of all of the material Contracts, as amended and supplemented to which any of the Company or any of its Subsidiaries is a party, including, without limitation, (i) Contracts that would be considered a material contract pursuant to Item 601(b) (10) of Regulation S-K; (ii) Contracts (including all advertising and advertising-related agreements) pursuant to which any of the Company or any of its Subsidiaries has received or has paid amounts in excess of an aggregate of US$100,000 during the fiscal year ended December 31, 2008; (iii) Contracts that are in full force and effect with any bus company or transportation company or authority; (iv) Contracts that are in full force and effect with any program or content provider (including any television stations or video press); (v) Contracts that relate to the acquisition, disposition or transfer of any equipment; (vi) loan agreements, indentures or similar Contracts relating to any indebtedness in excess of US$250,000; (vii) partnership, joint venture or similar Contracts; (viii) Contracts with a Governmental Authority or any Person affiliated with a Governmental Authority; (ix) Contracts that relate to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise); (x) the Structure Agreements; and (xi) Contracts that restrict or purport to restrict the right of any Person to engage in any line of business, acquire any property, develop or distribute any product or provide any service (including geographic restrictions) or to compete with any Person or grant any exclusive distribution rights, in any market, field or territory (each, a "Material Contract"). A list of each such Material Contract is set forth on Section 4.14 of the Disclosure Letter. None of the Company or any of its Subsidiaries is party to any oral or unwritten Contracts that would be considered a material contract pursuant to Item 601(b)(10) of Regulation S-K. None of the Company or any of its Subsidiaries is in violation of or in default under (nor does there exist any condition which upon the passage of time or the giving of notice would cause such a violation of or default under) any Contract to which it is a party or by which it or any of its properties or assets is bound, except for violations or defaults that would not result in a Material Adverse Effect; and, to the Knowledge of the Company as of the date of this Agreement, no other Person has violated or breached, or committed any default under, any Material Contract, except for violations, breaches and defaults that, individually or in the aggregate, have not had and would not have a Material Adverse Effect.

15

(b)     Except as disclosed in Section 4.14(b) of the Disclosure Letter, each Material Contract is a legal, valid and binding agreement and is in full force and effect. Except as would not have a Material Adverse Effect, (i) none of the Company or any of its Subsidiaries is in breach or default of any Material Contract to which it is a party; (ii) no event has occurred or circumstance has existed that (with or without notice or lapse of time), will or would reasonably be expected to, (A) contravene, conflict with or result in a violation or breach of, or become a default or event of default under, any provision of any Material Contract; (B) permit any of the Company or any of its Subsidiaries or any other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify any Material Contract; and (iii) none of the Company or any of its Subsidiaries has received notice of the pending or threatened cancellation, revocation or termination of any Material Contract to which it is a party. Since December 31, 2008, none of the Company or any of its Subsidiaries has received any notice or other communication regarding any actual or possible violation or breach of, or default under, any Material Contract.

(c)     Section 4.14(c) of the Disclosure Letter sets forth all of the Structure Agreements, which constitute all of the Contracts enabling the Company to effect control over and consolidate with its financial statements each of its Subsidiaries (including the PRCCo). The execution, delivery and performance of each Structure Agreement by the parties thereto did not and is not reasonably expected to (i) result in any material violation of the business license, articles of association, other constitutional documents (if any) or permits of any of the Company or any of its Subsidiaries; (ii) result in any violation of or penalty under any PRC Law as in effect as of the date hereof; or (iii) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any other Contract, license, indenture, mortgage, deed of trust, loan agreement, note, lease or other agreement or instrument in effect as of the date hereof to which any of them is a party or by which any of them is bound or to which any of their property or assets is subject; except, in the case of clause (ii) and (iii), as would not have a Material Adverse Effect. No breach or default under any of the Structure Agreements by any of the Company or any of its Subsidiaries will occur as a result of the execution, delivery and performance of this Agreement, the Registration Rights Agreement or the Investor Rights Agreement. Consummation of the Transactions will not (and will not give any Person a right to) terminate or modify any rights of, or accelerate or augment any obligation of, any of the Company or any of its Subsidiaries under any Structure Agreement.

16

4.15        <u>Insurance</u>. Section 4.15 of the Disclosure Letter (i) sets forth an accurate and complete list of each insurance policy or contract which covers any of the Company or any of its Subsidiaries or to which any of the Company or any of its Subsidiaries is party, and (ii) lists all pending claims and the claims history for each of the Company and any of its Subsidiaries during the current year and the three (3) preceding years. All such insurance policies are in full force and effect, all premiums due thereon have been paid or provided for and the Company and its Subsidiaries have complied with the material provisions of such policies. The Company and its Subsidiaries have been advised of any defense to coverage in connection with any claim to coverage asserted or noticed by the Company or any of its Subsidiaries under or in connection with any of their insurance policies. The Company or any of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which the Company or any of its Subsidiaries are engaged and in the geographic areas where any of them engages in such businesses.

4.16        <u>Taxes</u>.

(a)        The Company and each of its Subsidiaries have timely filed, or have caused to be timely filed on their behalf, all Tax Returns that are or were required to be filed by or with respect to any of them, either separately or as a member of group of corporations, pursuant to applicable Law. All Tax Returns filed by (or that include on a consolidated basis) the Company or any of its Subsidiaries were (and, as to a Tax Return not filed as of the date hereof, will be) in all respects true, complete and accurate, except to the extent any failure to file or any inaccuracies in any filed Tax returns have not had and would not have a Material Adverse Effect. There are no unpaid Taxes of any of the Company or any of its Subsidiaries claimed to be due by any Governmental Authority in charge of taxation of any jurisdiction, nor any claim for additional Taxes of any of the Company or any of its Subsidiaries for any period for which Tax Returns have been filed, except to the extent any failure to file or any inaccuracies in any filed Tax Returns, individually or in the aggregate, have not had and would not have a Material Adverse Effect.

(b)        Section 4.16(b) of the Disclosure Letter lists all the relevant Governmental Authorities in charge of taxation in which Tax Returns are filed with respect to the Company or any of its Subsidiaries, and indicates those Tax Returns that have been audited or that are currently the subject of an audit since January 1, 2002. Except as disclosed in Section 4.16(b) of the Disclosure Letter, none of the Company or any of its Subsidiaries has received any notice that any Governmental Authority will audit or examine (except for any general audits or examinations routinely performed by such Governmental Authorities), seek information with respect to, or make material claims or assessments with respect to, any Taxes of the Company or any of its Subsidiaries for any period. The Company or any of its Subsidiaries have delivered or made available to the Investor correct and complete copies of all Tax Returns, examination reports, and statements of deficiencies filed by, assessed against or agreed to by the Company or any of its Subsidiaries, for and during fiscal years 2002 through 2007.

17

(c)     The Financial Statements reflect an adequate reserve for all Taxes payable by the Company or any of its Subsidiaries (in addition to any reserve for deferred Taxes to reflect timing differences between book and Tax items) for all taxable periods and portions thereof through the date of such financial statements. None of the Company or any of its Subsidiaries is a party to or bound by any Tax indemnity, Tax sharing or similar agreement, and the Company or any of its Subsidiaries currently have no material liability and will not have any material liabilities for any Taxes of any other Person under any agreement or by the operation of any Law. No deficiency with respect to any Taxes has been proposed, asserted or assessed against any of the Company or any of its Subsidiaries, and no requests for waivers of the time to assess any such Taxes are pending, except to the extent any such deficiency or request for waiver, individually or in the aggregate, has not had and would not have a Material Adverse Effect.

(d)     None of the Company or any of its Subsidiaries has requested any extension of time within which to file any Tax Return, which Tax Return has not since been filed. None of the Company or any of its Subsidiaries has executed any outstanding waivers or comparable consents regarding the application of the statute of limitations with respect to any Taxes or Tax Returns. No power of attorney currently in force has been granted by any of the Company or any of its Subsidiaries concerning any Taxes or Tax Return.

(e)     None of the Company's Subsidiaries (i) is currently engaged in the conduct of a trade or business within the United States; (ii) is a corporation or other entity organized or incorporated in the United States; or (iii) has or has ever owned any United States real property interests as described in Section 897 of the Code.

4.17          Subsidiaries. Section 4.17 of the Disclosure Letter lists, as of the date hereof, all Subsidiaries of the Company and indicates as to each the type of entity, its jurisdiction of organization and its stockholders or other equity holders. The Company does not directly or indirectly own any other equity or similar interest in or any interest convertible or exchangeable or exercisable for, any equity or similar interest in, any corporation, partnership, joint venture or other business association or entity. Except with respect to the PRCCo, the Company is the direct or indirect owner of all outstanding shares of capital stock of its Subsidiaries, and all such shares are duly authorized, validly issued, fully paid and non-assessable and are owned by the Company free and clear of all Liens. There are no outstanding subscriptions, options, warrants, puts, calls, rights, exchangeable or convertible securities or other commitments or agreements of any character relating to the issued or unissued capital stock or other securities of any Subsidiaries of the Company or otherwise obligating any Subsidiaries of the Company to issue, transfer, sell, purchase, redeem or otherwise acquire any such securities.

18

4.18        Employment Matters.

(a)        None of the Company or any of its Subsidiaries has or maintains any material bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, phantom stock, retirement, vacation, severance, disability, death benefit, hospitalization, medical or other plan, arrangement or understanding (whether or not legally binding) providing material benefits to any current or former employee, officer or director of any of the Company or any of its Subsidiaries (collectively, "Benefit Plans"). Except as set forth in Section 4.18 (a) of the Disclosure Letter, neither the execution and delivery of this Agreement nor the consummation of the Transactions will result in, cause the accelerated vesting or delivery of, or increase the amount or value of, any payment or benefit to any employee of any of the Company or any of its Subsidiaries. As of the date of this Agreement, there are no severance or termination agreements or arrangements currently in effect between any of the Company or any of its Subsidiaries and any of its current or former employees, officers or directors, nor do any of the Company or any of its Subsidiaries have any general severance plan or policy currently in effect for any of its employees, officers or directors. Since December 31, 2008 through the date hereof, there has not been any adoption or amendment in any material respect by any of the Company or any of its Subsidiaries of any Benefit Plan.

(b)        (i) There are no collective bargaining or other labor union agreements to which any of the Company or any of its Subsidiaries is a party or by which it is bound; (ii) no material labor dispute exists or, to the Knowledge of the Company, is imminent with respect to any of the employees of any of the Company or any of its Subsidiaries; (iii) to the Knowledge of the Company, none of the Company or any of its Subsidiaries is, and no event, condition or other circumstance exists as of the date hereof which could reasonably be expected to cause any of the Company or any of its Subsidiaries to become, the subject of any Actions asserting that any of the Company or any of its Subsidiaries has committed an unfair labor practice or seeking to compel it to bargain with any labor organization as to wages or conditions of employment; (iv) there is no strike, work stoppage or other labor dispute involving any of the Company or any of its Subsidiaries pending or, to the Knowledge of the Company, threatened; (v) no complaint, charge or Actions by or before any Governmental Authority brought by or on behalf of any employee, prospective employee, former employee, retiree, labor organization or other representative of its employees is pending or, to the Knowledge of the Company, threatened against any of the Company or any of its Subsidiaries; (vi) no material grievance is pending or, to the Knowledge of the Company, threatened against any of the Company or any of its Subsidiaries; and (vii) none of the Company or any of its Subsidiaries is a party to, or otherwise bound by, any consent decree with, or to the Knowledge of the Company, citation by, any Governmental Authorities relating to employees or employment practices.

(c)        None of the execution of, or the completion of the Transactions (whether alone or in connection with any other event(s)), will result in (i) severance pay or an increase in severance pay upon termination after Closing, (ii) any payment, compensation or benefit becoming due, or increase in the amount of any payment, compensation or benefit due, to any current or former employee of the Company or its Affiliates, (iii) acceleration of the time of payment or vesting or result in funding of compensation or benefits, (iv) any new material obligation under any Benefit Plan, (v) any limitation or restriction on the right of Company to merge, amend, or terminate any Benefit Plan, or (vi) any payments which would not be deductible under Section 280G of the Code.

19

4.19        Environmental Matters.With such exceptions that do not have a Material Adverse Effect, each of the Company or any of its Subsidiaries is in substantial compliance with, and has not been and is not in material violation of or subject to any material liability under, any Environmental Law and no proceeding involving any of the Company or any of its Subsidiaries with respect to any Environmental Law is pending or, to the Knowledge of the Company, is threatened.

4.20        Customers and Suppliers.

(a)        Set forth on Section 4.20(a) of the Disclosure Letter is a true and correct list of (i) the ten (10) largest customers (measured by revenues paid to the Company or any of its Subsidiaries, in the aggregate, during the twelve-month period ended December 31, 2008), together with the dollar amount of sales made to such customers during such period, (ii) the ten (10) largest suppliers in terms of purchases and leases by the Company or any of its Subsidiaries during the twelve-month period ended December 31, 2008, and (iii) any sole source suppliers of goods or services for which there is no ready alternative to the Company or any of its Subsidiaries on comparable or better terms, together with the dollar amount paid to such suppliers during such period.

(b)        The relationships of the Company or any of its Subsidiaries with each supplier and customer listed in Section 4.20 of the Disclosure Letter (including each supplier and customer listed in Section 4.20 of the Disclosure Letter party to a Contract) are good commercial working relationships. Except as set forth in Section 4.20 (b) of the Disclosure Letter, no such supplier or customer has canceled or otherwise terminated, or to the Knowledge of the Company, threatened to cancel or otherwise terminate, its relationship with the Company or any of its Subsidiaries. Since December 31, 2008, except as provided in Section 4.20 (b) of the Disclosure letter, none of the of the Company or any of its Subsidiaries has received any written or oral notice that any such supplier or customer may cancel, terminate or otherwise materially and adversely modify its relationship with the Company or any of its Subsidiaries (including by modifying its pricing) or limit its services, supplies or materials to the Company or any of its Subsidiaries, either as a result of the consummation of the Transactions or otherwise.

4.21        Transactions With Affiliates and Employees. Except as disclosed in Section 4.21 of the Disclosure Letter, none of the executive officers or directors of the Company or any of its Subsidiaries and none of the Company's shareholders is presently a party, directly or indirectly, to any transaction with any of the Company or any of its Subsidiaries that is required to be disclosed under Rule 404(a) of Regulation S-K (other than for services as employees, officers and directors), including any Contract providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any executive officer, director or, to the Knowledge of the Company, any entity in which any executive officer or director has a substantial interest or is an officer, director, trustee or partner.

20

4.22        Money Laundering Laws. None of the Company nor any of its Subsidiaries has violated any money laundering statute or any rules and regulations relating to money laundering statutes (collectively, the "Money Laundering Laws") and no proceeding involving any of the Company or any of its Subsidiaries with respect to the Money Laundering Laws is pending or, to the Knowledge of the Company or any of its Subsidiaries, is threatened.

4.23        Foreign Corrupt Practices Act. Neither the Company nor any of its Subsidiaries, or any director, officer, agent, employee, or any other person acting for or on behalf of the Company or any of its Subsidiaries (individually and collectively, a "Company Affiliate"), has violated the U.S. Foreign Corrupt Practices Act of 1977 (the "FCPA") or any other applicable anti-bribery or anti-corruption laws of any jurisdiction, nor has any Company Affiliate, in violation of any applicable law or regulation, offered, paid, promised to pay, or authorized the payment of any money, or offered, given, promised to give, or authorized the giving of anything of value, to any officer, employee or any other person acting in an official capacity for any Government Entity, as defined below, to any political party or official thereof or to any candidate for political office (individually and collectively, a "Government Official") or to any person under circumstances where such Company Affiliate knew or was aware of a high probability that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to any Government Official, for the purpose of:

(a)        (i) influencing any act or decision of such Government Official in his official capacity, (ii) inducing such Government Official to do or omit to do any act in violation of his lawful duty, (iii) securing any improper advantage, or (iv) inducing such Government Official to influence or affect any act or decision of any Government Entity, or

(b)        in order to assist the Company or any of its Subsidiaries in obtaining or retaining business for or with, or directing business to the Company or any of its Subsidiaries.

"Government Entity" as used in this Agreement means any government or any department, agency or instrumentality thereof, including any entity or enterprise owned or controlled by a government, or a public international organization.

4.24        Economics Sanctions Laws.

(a)        None of (i) the Company nor any of its Subsidiaries or (ii) any of their respective officers, employees, directors, or agents acting for or on behalf of the Company or any of its Subsidiaries, at the direction or Knowledge of the Company, or who are under obligations to report to the Company or any of its Subsidiaries ((i) and (ii) collectively, "Relevant Persons") is in violation of any applicable Law relating to economic sanctions administered by U.S. Department of the Treasury's Office of Foreign Assets Control or its successor organization(s) from time to time ("OFAC").

21

(b)        No Relevant Person:

(i)        conducts any business with, or engaged directly or indirectly in transactions connected with any of North Korea, Iraq, Libya, Cuba, Iran, Myanmar or Sudan, or is otherwise engaged directly or indirectly in transactions connected with any government, country or other entity or persons that is the target of U.S. economic sanctions administered by OFAC, including "Specially Designated Nationals and Blocked Persons" and no Relevant Person is any such person or entity;

(ii)        deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to the economic sanctions laws administered by OFAC; or

(iii)        engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any economic sanctions law administered by OFAC.

4.25        <u>Additional PRC Representations and Warranties</u>.

(a)        Except as disclosed in Section 4.25(a) of the Disclosure Letter, all material consents, approvals, authorizations or licenses required under PRC Law for the due and proper establishment and operation of the WFOE and the PRCCo have been duly obtained from the relevant PRC Governmental Authority and are in full force and effect.

(b)        Except as disclosed in Section 4.25(b) of the Disclosure Letter, all filings and registrations with the PRC Governmental Authorities required in respect of the WFOE and the PRCCo and their respective operations including, without limitation, the registration with and approval by the Ministry of Commerce, the State Administration for Industry and Commerce (the "<u>SAIC</u>"), the State Administration of Foreign Exchange (the "<u>SAFE</u>"), the State Administration of Taxation, the State Administration of Radio, Film and Television, the General Administration of Customs of the PRC and their relevant local counterparts, the tax bureau and other PRC Governmental Authorities that administer foreign investment enterprises have been duly completed in accordance with the relevant Laws, except where the failure to complete such filings and registrations does not, and would not, individually or in the aggregate, have a Material Adverse Effect.

(c)        Except as disclosed in Section 4.25(c) of the Disclosure Letter, each of Zheng Cheng, Ou Wen Lin and Qingping Lin has completed all fillings and registrations with the SAFE in accordance with all applicable PRC Laws including without limitation the Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents to Engage in Financing and Inbound Investment Via Offshore Special Purpose Vehicles issued by the SAFE on October 21, 2005 and effective as of November 1, 2005.

22

(d)  Except as disclosed in Section 4.25 (d) of the Disclosure Letter, each of the WFOE and the PRCCo has complied with all relevant Laws and regulations regarding the contribution and payment of its registered share capital, the payment schedule of which has been approved by the relevant PRC Governmental Authority. There are no outstanding rights to acquire, or commitments made by either the WFOE or the PRCCo to sell, any of its equity interests.

(e)  Neither the WFOE nor the PRCCo is in receipt of any letter or notice from any relevant PRC Governmental Authority notifying it of the revocation, or otherwise questioning the validity, of any licenses or qualifications issued to it or any subsidy granted to it by any PRC Governmental Authority for non-compliance with the terms thereof or with applicable PRC laws, or the need for compliance or remedial actions in respect of the activities carried out by the WFOE or the PRCCo.

(f)  Each of the WFOE and the PRCCo have conducted its respective business activities within its permitted scope of business or has otherwise operated its business in compliance, in all material respects, with all relevant legal requirements and with all requisite licenses and approvals granted by competent PRC Governmental Authorities. As to licenses, approvals and government grants and concessions required or material for the conduct of any part of the WFOE or the PRCCo's business which is subject to periodic renewal, to the Knowledge of the Company, as of the date of this Agreement, there does not exist any grounds on which renewals of any such licenses, approvals, grants or concessions will not be granted by the relevant PRC Governmental Authorities.

(g)  With regard to employment and staff or labor, each of the WFOE and the PRCCo has complied, in all material respects, with all applicable Laws and regulations, including without limitation, laws and regulations pertaining to welfare funds, social benefits, medical benefits, insurance, retirement benefits, pensions or the like.

4.26  No Material Adverse Effect. Since October 19, 2009, no event or circumstance has occurred that has had (and continues to have) or would have a Material Adverse Effect.

4.27  Registration Rights. Except as set forth in Section 4.27 of the Disclosure Letter and in the Registration Rights Agreement, the Company has not granted or agreed to grant, and is not under any obligation to provide, any rights to register under the Securities Act any of its presently outstanding securities or any of its securities that may be issued subsequently.

23

4.28        <u>Reports</u>.

(a)        Since June 18, 2007, the Company has timely filed all documents required to be filed with the SEC pursuant to Sections 13(a) or 15(d) of the Exchange Act.

(b)        The SEC Documents, when they became effective or were filed with the SEC, as the case may be, complied as to form in all material respects with the requirements of the Securities Act or the Exchange Act, as applicable, and the rules and regulations of the SEC thereunder, in each case as in effect at such time, and none of such documents contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make such statements, in the light of the circumstances in which they were made, not misleading.

(c)        The Company (i) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) that are reasonably designed to ensure that material information relating to the Company, including its consolidated Subsidiaries, is made known to the individuals responsible for the preparation of the Company's filings with the SEC and (ii) has disclosed, based on its most recent evaluation prior to the date of this Agreement, to the Company's outside auditors and the Board's Audit Committee (A) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting. As of the date of this Agreement, to the Knowledge of the Company, there is no reason that its outside auditors, its chief executive officer and chief financial officer will not be able to give the certifications and attestations required pursuant to the rules and regulations adopted pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, without qualification, when next due.

4.29        <u>Investment Company Act</u>. Neither the Company nor any of its Subsidiaries is an investment company within the meaning of the Investment Company Act of 1940, or, directly or indirectly, controlled by or acting on behalf of any Person which is an investment company, within the meaning of said Act.

4.30        <u>Brokers' Fees and Expenses</u>. No broker, investment banker, or financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Transactions.

4.31        <u>AMEX</u>. As of the date hereof, the Company's Common Stock is listed on AMEX, and no event has occurred, and the Company is not aware of any event that is reasonably likely to occur, that would result in the Common Stock being de-listed from AMEX.  The sale and issuance of the Purchased Shares and execution of and performance under the Investor Rights Agreement complies with the rules and regulations of AMEX (*provided*, with respect to the representation and warranty made regarding the rules or regulations of AMEX as of the date hereof only, that AMEX approves the listing of the Purchased Shares, the Transferred Shares and the shares of Common Stock underlying the Purchased Warrants).

24

4.32     Application of Takeover Protections. As of the Closing Date, there is no control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's charter documents or the laws of its state of incorporation in effect as of the date hereof that is or would become applicable to the Investor as a result of the Investor and the Company fulfilling their obligations or exercising their rights under this Agreement, including, without limitation, as a result of any transfer by the Sponsor Shareholders of common stock pursuant to the terms of the Investor Rights Agreement.

4.33     No Integrated Offering. Neither the Company, nor any Person acting on its behalf, has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause any offering contemplated by this Agreement to be integrated with prior offerings by the Company for purposes of the Securities Act or the rules and regulations of FINRA or AMEX.

4.34     Internal Accounting and Disclosure Controls. The Company maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset and liability accountability, (iii) access to assets or incurrence of liabilities is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets and liabilities is compared with the existing assets and liabilities at reasonable intervals and appropriate action is taken with respect to any difference.  The Company maintains disclosure controls and procedures (as such term is defined in Rule 13a-15 under the Exchange Act) that are effective in ensuring that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the SEC, including, without limitation, controls and procedures designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including its principal executive officer or officers and its principal financial officer or officers, as appropriate, to allow timely decisions regarding required disclosure.

4.35     Off Balance Sheet Arrangements. There is no transaction, arrangement, or other relationship between the Company and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in the Company's SEC Documents and is not so disclosed and that otherwise would have a Material Adverse Effect.

25

4.36        <u>Sarbanes-Oxley Act of 2002</u>. The Company is in material compliance with all provisions of the Sarbanes-Oxley Act of 2002 (the "<u>Sarbanes-Oxley Act</u>") applicable to it as of the date hereof and as of the Closing. There has been no change in the Company's accounting policies since inception except as described in the notes to the Financial Statements. Each required form, report and document containing financial statements that has been filed with or submitted to the SEC since inception, was accompanied by the certifications required to be filed or submitted by the Company's chief executive officer and chief financial officer pursuant to the Sarbanes-Oxley Act, and at the time of filing or submission of each such certification, such certification was true and accurate and materially complied with the Sarbanes-Oxley Act and the rules and regulations promulgated thereunder. Neither the Company, nor to the Knowledge of the Company, any Representative of the Company, has received or otherwise had or obtained knowledge of any complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of the Company or their respective internal accounting controls, including any complaint, allegation, assertion or claim that the Company has engaged in questionable accounting or auditing practices, except for (a) any complaint, allegation, assertion or claim as has been resolved without any resulting change to the Company's accounting or auditing practices, procedures methodologies or methods of the Company or its internal accounting controls, and (b) questions regarding such matters raised and resolved in the ordinary course in connection with the preparation and review of the Company's financial statements and periodic reports. To the Knowledge of the Company, no attorney representing the Company, whether or not employed by the Company, has reported evidence of a material violation of securities laws, breach of fiduciary duty or similar violation by the Company or any of its officers, directors, employees or agents to the Board or any committee thereof or to any director or officer of the Company. To the Knowledge of the Company, no employee of the Company has provided or is providing information to any law enforcement agency regarding the commission or possible commission of any crime or the violation or possible violation of any applicable law.

4.37        <u>Transfer Taxes</u>. On the Closing Date, all stock transfer or other taxes (other than income or similar Taxes) which are required to be paid in connection with the transactions contemplated hereby will be, or will have been, fully paid or provided for by the Company or the Sponsor Shareholders, and all laws imposing such taxes will be or will have been complied with.

4.38        <u>Manipulation of Price</u>. The Company has not, and, to the Knowledge of the Company, no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the transactions contemplated hereby or (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases for the transactions contemplated hereby.

4.39        <u>Anti-dilution Provisions</u>. There is no anti-dilution provision under any agreement to which the Company is party or to which any assets of the Company are subject that is or would become effective as a result of the Investors and the Company fulfilling their obligations or exercising their rights under this Agreement.

26

4.40        General Solicitation. Neither the Company nor, to the Knowledge of the Company, any person acting on behalf of the Company, has offered or sold any of the Securities by any form of "general solicitation" within the meaning of Rule 502 under the Securities Act.  To the knowledge of the Company, no person acting on its behalf has offered the Securities for sale other than to the Investor and certain other "accredited investors" within the meaning of Rule 501 under the Securities Act.

4.41        Waiver of Section 203. As of the Closing Date, the Company represents and warrants to the Investor that the Board has heretofore taken all necessary action to approve the transactions contemplated by this Agreement and the Investor Rights Agreement, and has approved, for purposes of Section 203 of the Delaware General Corporation Law (including any successor statute thereto ("Section 203")), the Investor's becoming an "interested stockholder" within the meaning of Section 203 (the "Waiver") and such action is effective as of the date hereof.  No other state takeover, "moratorium," "fair price," "affiliate transaction" or similar statute or regulation under any applicable Law is applicable to the Transactions.

4.42        Disclosure. The Company understands and confirms that the Investor will rely on the foregoing representations in effecting transactions in securities of the Company.  To the Knowledge of the Company, no material event or circumstance has occurred or information exists with respect to the Company or its business, properties, operations or financial conditions, which, under applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed.

5.        Representations and Warranties of the Sponsor Shareholders. Each of the Sponsor Shareholders jointly and severally represents and warrants to the Investor as of the date of this Agreement that:

5.1        Organization. Each of the Sponsor Shareholders that is not an individual has been duly organized and is validly existing in the jurisdiction of its incorporation.

5.2        Authorization; Enforceability. Each of the Sponsor Shareholders that is not an individual has all necessary power and authority to enter into this Agreement and the Investor Rights Agreement and to consummate the transactions contemplated by this Agreement and the Investor Rights Agreement, including, without limitation, the payment of any Performance Adjustment Amount and Put Price, as applicable. The execution, delivery and performance of this Agreement and the Investor Rights Agreement, including, without limitation, the payment of any Performance Adjustment Amount and Put Price, as applicable, have been duly authorized by all necessary action on the part of the Sponsor Shareholders, and assuming due authorization, execution and delivery thereof by the other parties thereto, this Agreement and the Investor Rights Agreement will constitute valid and binding obligation of the Sponsor Shareholders, enforceable against them in accordance with its terms, except as such enforceability may be limited by applicable laws relating to bankruptcy, reorganization, moratorium or other similar legal requirements relating to or affecting creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

27

5.3        No Default or Violation. The execution, delivery, and performance of this Agreement and the Investor Rights Agreement and the consummation by the Sponsor Shareholders of the transactions contemplated hereby and thereby, including, without limitation, the payment of any Performance Adjustment Amount and Put Price, as applicable, will not (i) result in any default or violation of the certificate of incorporation, bylaws, limited partnership agreement, limited liability company operating agreement or other applicable organizational documents of the Sponsor Shareholders, (ii) result in any violation of or constitute a breach of, with or without the passage of time or giving of notice, any law applicable to the Sponsor Shareholders, except as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay or materially impair the ability of the Sponsor Shareholders to consummate the transactions contemplated by this Agreement and the Investor Rights Agreement, including, without limitation, the payment of any Performance Adjustment Amount and Put Price, as applicable.

5.4        Governmental Consents. No consent, approval, license or authorization of, or designation, declaration, or filing with, any federal, state, or local governmental authority on the part of the Sponsor Shareholders is required in connection with the consummation of the transactions contemplated by this Agreement and the Investor Rights Agreement, including, without limitation, the payment of any Performance Adjustment Amount and Put Price, as applicable except for the following: (i) those which have already been made or granted; (ii) the filing with the SEC of such reports under the Exchange Act as may be required in connection with this Agreement and the Investor Rights Agreement and the transactions contemplated hereby and thereby and (iii) those where the failure to obtain such consent, approval or license would not have a material adverse effect on the ability of the Sponsor Shareholders to perform their obligations under this Agreement and the Investor Rights Agreement, including, without limitation, the payment of any Performance Adjustment Amount and Put Price, as applicable.

5.5        Good Title. Upon delivery of any certificate or certificates duly assigned, representing the same as herein contemplated and upon registering of the Investor as the new owner of such Transferred Shares in the share register of the Company, the Investor will receive good title to such Transferred Shares, free and clear of all Liens.

5.6        Foreign Corrupt Practices Act. None of the Sponsor Shareholders, or, in case of each of Thousand and Bright, any director, officer, agent, employee, or any other person acting for or on behalf of it (individually and collectively, a "Sponsor Shareholder Affiliate"), has violated the FCPA or any other applicable anti-bribery or anti-corruption laws of any applicable jurisdiction, nor has any Sponsor Shareholder Affiliate, in violation of any applicable law or regulation, offered, paid, promised to pay, or authorized the payment of any money, or offered, given, promised to give, or authorized the giving of anything of value, to any Government Official or to any person under circumstances where such Sponsor Shareholder Affiliate knew or was aware of a high probability that all or a portion of such money or thing of value would be offered, given or promised, directly or indirectly, to any Government Official, for the purpose of:

(a)        (i) influencing any act or decision of such Government Official in his official capacity, (ii) inducing such Government Official to do or omit to do any act in violation of his lawful duty, (iii) securing any improper advantage, or (iv) inducing such Government Official to influence or affect any act or decision of any Government Entity, or

28

(b)     in order to assist the Company or any of its Subsidiaries in obtaining or retaining business for or with, or directing business to the Company or any of its Subsidiaries.

6.     <u>Representations and Warranties of the Investor</u>. The Investor represents and warrants to the Company and the Sponsor Shareholders as of the date of this Agreement that:

6.1     <u>Organization</u>. The Investor has been duly organized and is validly existing in the jurisdiction of its incorporation.

6.2     <u>Authorization; Enforceability</u>. The Investor has all necessary power and authority to enter into this Agreement, the Registration Rights Agreement and the Investor Rights Agreement and to consummate the transactions contemplated by this Agreement, the Registration Rights Agreement and the Investor Rights Agreement. The execution, delivery and performance of this Agreement, the Registration Rights Agreement and the Investor Rights Agreement have been duly authorized by all necessary action on the part of the Investor, and assuming due authorization, execution and delivery thereof by the other Persons contemplated to be a party thereto, this Agreement, the Registration Rights Agreement and the Investor Rights Agreement by the Investor, will constitute valid and binding obligation of the Investor, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable laws relating to bankruptcy, reorganization, moratorium or other similar legal requirements relating to or affecting creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

6.3     <u>No Default or Violation</u>. The execution, delivery, and performance of this Agreement, the Registration Rights Agreement and the Investor Rights Agreement and the consummation by the Investor of the transactions contemplated hereby will not (i) result in any default or violation of the limited partnership agreement, limited liability company operating agreement or other applicable organizational documents of the Investor and (ii) assuming the truth and accuracy of the representations and warranties of the Company made in Section 4 hereof and receipt of any consent approval or license required in connection with any subsequent issuance or transfer of Common Stock pursuant to the Investor Rights Agreement, result in any violation of or constitute a breach of, with or without the passage of time or giving of notice, any law applicable to the Investor, except as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay or materially impair the ability of the Investor to consummate the transactions contemplated by this Agreement and the Investor Rights Agreement.

6.4     <u>Governmental Consents</u>.No consent, approval, license or authorization of, or designation, declaration, or filing with, any federal, state, or local governmental authority on the part of the Investor is required in connection with the consummation of the transactions contemplated by this Agreement or the Investor Rights Agreement, except for the following: (i) those which have already been made or granted; (ii) the filing with the SEC of such reports under the Exchange Act as may be required in connection with this Agreement and the Investor Rights Agreement and the transactions contemplated hereby and thereby and (iii) those where the failure to obtain such consent, approval or license would not have a material adverse effect on the ability of the Investor to perform its obligations under this Agreement and the Investor Rights Agreement.

29

6.5        Private Placement.

(a)        The Investor is (i) an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act;

(b)        The Investor has been advised by the Company that the Purchased Shares and the Purchased Warrants have not been registered under the Securities Act, that the Purchased Shares and the Purchased Warrants will be issued on the basis of the statutory exemption provided by Section 4(2) under the Securities Act or Regulation D promulgated thereunder, or both, relating to transactions by an issuer not involving any public offering and under similar exemptions under certain state securities laws, that this transaction has not been reviewed by, passed on or submitted to any federal or state agency or self-regulatory organization where an exemption is being relied upon, and that the Company's reliance thereon is based in part upon the representations made by such Investor in this Agreement.  The Investor acknowledges that it has been informed by the Company of, or is otherwise familiar with, the nature of the limitations imposed by the Securities Act and the rules and regulations thereunder on the transfer of securities; and

(c)        The Investor is acquiring the Purchased Shares, Purchased Warrants and the Transferred Shares for its own account, and solely for the purpose of investment and not with a view to, or for offer or sale in connection with any distribution thereof.

7.        Conditions to the Investor's Obligations at Closing. The obligation of the Investors to purchase the Purchased Shares and the Purchased Warrants at the Closing is subject to the fulfillment or waiver on or before the Closing of each of the following conditions:

7.1        Representations and Warranties. Each of the representations and warranties of the Company and the Sponsor Shareholders contained in Sections 4 and 5 of this Agreement shall be true and correct in all material respects (other than representations and warranties qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except for representations and warranties that are made as of a specific date or time other than the date hereof or the Closing Date (which need only be true and correct as of such date or time).

7.2        Covenants. The Company shall have performed and complied with in all material respects all covenants and agreements required by this Agreement to be performed or complied with by it at or prior to the Closing.

30

7.3         <u>Share Transfer</u>. The Sponsor Shareholders shall have caused to be executed a share transfer agreement, in form and substance reasonably acceptable to the Investor in its sole discretion, providing for the transfer of one-hundred-fifty thousand (150,000) shares of Common Stock of the Company (the "<u>Transferred Shares</u>") to the Investor (the "<u>Share Transfer</u>") and the Share Transfer shall have been consummated and the Transferred Shares shall have been delivered to the Investor.

7.4         <u>No Material Adverse Effect</u>. There has, since the date of this Agreement, occurred no event or circumstance that has had (and continues to have) a Material Adverse Effect.

7.5         <u>FCPA Compliance</u>. The Company shall have (i) approved and adopted an FCPA compliance program in the form set forth in section 9.4(a) of the Disclosure Letter (the "<u>FCPA Compliance Program</u>") and made available copies of such FCPA Compliance Program to all employees of the Company and its Subsidiaries, (ii) appointed an FCPA compliance officer to oversee and insure compliance with the FCPA Compliance Program and (iii) conducted FCPA training sessions for each of the Founder and Jacky Lam with respect to the FCPA Compliance Program.

7.6         <u>Accounting Firm Engagement</u>. The Company shall have engaged Deloitte Touche Tohmatsu or any of the following accounting firms approved by the Investor as the accounting firm of the Company and its Subsidiaries: Ernst & Young, KPMG or PricewaterhouseCoopers.

7.7         <u>Legal Counsel Engagement</u>. The Company shall have engaged Loeb & Loeb LLP or such other internationally recognized U.S. law firm as the legal counsel of the Company and its Subsidiaries.

7.8         <u>Series A Certificate of Designations and Bylaws</u>. The Company shall have adopted and filed with the Secretary of State of the State of Delaware the Series A Certificate of Designations and any amendments to the Bylaws as may be reasonably requested by the Investor to reflect the terms hereof, the Series A Certificate of Designations or the Investor Rights Agreement.

7.9         <u>AMEX Registration</u>. The AMEX shall have approved the listing of the shares of Common Stock issuable upon conversion of the Purchased Shares or exercise of the Purchased Warrants and the Transferred Shares on the AMEX.

7.10       <u>Ancillary Agreements</u>. The Company shall have executed and delivered the Registration Rights Agreement, the Investor Rights Agreement and the Warrant.

7.11       <u>Legal Opinions</u>. The Investor shall have received (a) from Hankun Law Offices, the PRC counsel for the Company, an opinion, dated as of the Closing Date, in the form attached as Exhibit E; (b) from Loeb & Loeb LLP, U.S. counsel to the Company, an opinion dated the Closing Date in the form attached as Exhibit F; (c) from Morris, Nichols, Arsht & Tunnell, the Delaware counsel for the Company, an opinion, dated as of the Closing Date, in the form attached as Exhibit G; and (d) from Gallant Y.T. Ho & Co., the Hong Kong counsel for the Company, an opinion, dated as of the Closing Date, in the form attached as Exhibit H.

31

7.12        Expenses. Simultaneous with the Closing, the Company shall have reimbursed the Investors for up to $200,000 of their reasonable documented out-of-pocket fees and expenses incurred on or before the Closing Date in connection with the execution of this Agreement, the Investor Rights Agreement, the Warrant and the Registration Rights Agreement and the purchase by the Investor of the Purchased Shares and Warrants pursuant to this Agreement, which may be effected through an offset to the Purchase Price.

7.13        Board of Directors.

(a)        The Sponsor Shareholders and the Board shall have taken all actions necessary and appropriate to appoint one person designated by the Investor to the Board effective immediately following the Closing.

(b)        The Company and the Sponsor Shareholders shall have taken all actions necessary and appropriate to appoint one person designated by the Investor to the board of directors of the HKCo effective immediately following the Closing.

(c)        The Investor shall have received evidence satisfactory to it of such actions.

7.14        Purchased Shares; Warrants. The Company shall have delivered the Purchased Shares and the Purchased Warrants to the Investor.

8.        Conditions to the Company's Obligations at Closing. The obligations of the Company to issue, sell and deliver to the Investor the Purchased Shares and the Purchased Warrants are subject to the fulfillment or waiver on or before the Closing of each of the following conditions:

8.1        Representations and Warranties. Each of the representations and warranties of the Investor contained in Section 6 of this Agreement shall be true and correct in all material respects (other than representations and warranties qualified by materiality or material adverse effect, which shall be true and correct in all respects) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except for representations and warranties that are made as of a specific date or time other than the date hereof or the Closing Date (which need only be true and correct as of such date or time).

8.2        Purchase Price. The Investor shall have paid to the Company the Purchase Price.

8.3        Ancillary Agreements. The Investor shall have executed and delivered the Registration Rights Agreement, the Investor Rights Agreement and the Warrant.

32

8.4        AMEX Registration. The AMEX shall have approved the listing of the shares of Common Stock issuable upon conversion of the Purchased Shares or exercise of the Purchased Warrants and the Transferred Shares on the AMEX; *provided* that the condition set forth in this Section 8.4 shall be deemed waived by the Company to the extent the failure or delay of the AMEX to approve such listing shall have been caused by the Company.

9.        Covenants. The Company and its Subsidiaries, the Sponsor Shareholders and the Investor hereby covenant and agree, for the benefit of the other parties to this Agreement and their respective assigns, as follows:

9.1        Asset and IP Transfer. Within three (3) months after the Closing Date, (i) the Company shall use reasonable best commercial efforts to procure the PRCCo, to the extent commercially reasonable and not materially adverse from a tax, accounting or similar perspective, to, transfer all of the assets currently owned by the PRCCo (other than the Intellectual Property and those which may not, in accordance with applicable Law of the PRC, be transfer to the WFOE) to the WFOE (the "Assets Transfer") and all of the Intellectual Property currently owned by the PRCCo to the HKCo (the "IP Transfer"), in each case in accordance with all applicable Laws; (ii) the Company shall use reasonable best efforts to procure the HKCo and the WFOE, to the extent commercially practicable and not materially adverse from a tax, accounting or similar perspective, to enter into commercially reasonable intellectual property licensing agreement(s) or commercially reasonable asset leasing agreement(s) with the PRCCo (collectively, the "Licensing and Leasing Agreements") contemporaneously with the Assets Transfer and the IP Transfer (as the case may be); (iii) the Company shall procure the PRCCo to complete all registrations and filings with respect to the Licensing and Leasing Agreements in accordance with all applicable Laws, except where the failure to make such registration or filing would not have a Material Adverse Effect.

9.2        VIE Restructuring. Within three (3) months after the Closing Date, the Company and the Sponsor Shareholders shall cause the agreements, contracts and instruments enabling the WFOE to effect control over and consolidate with its financial statements the PRCCo (collectively, the "VIE Agreements") to be amended to the reasonable satisfaction of the Investor.

9.3        SARFT Approval. The Company shall use its reasonable best efforts to obtain as soon as practicable and in any event no later than December 31, 2010, from SARFT any and all approvals necessary for the broadcast of video programming by the Company and the operation of the business as currently contemplated (the "SARFT Approval") to the extent obtaining such approvals is practicable within the Company's industry.

9.4        FCPA Compliance. As soon as practicable, but in no event later than April 30, 2010, the Company shall have completed or put in place each of the measures set forth in section 9.4(b) of the Disclosure Letter.

9.5 <u>Listing</u>. In connection with the application for the subsequent listing on AMEX of the shares of Common Stock issuable upon conversion of the Purchased Shares and upon exercise of the Purchased Warrants, and the ongoing listing of such securities thereon, the parties hereto agree to cooperate and, following good faith discussions with AMEX involving both parties hereto, to take all necessary steps, if any, required by AMEX in connection with the approval of such application and the continued listing of such securities, including, without limitation, the amendment or modification of any of the Transaction Documents and any related document.

9.6 <u>Director Appointment</u>. Within one (1) month after the Closing Date, the Company and the Sponsor Shareholders shall cause one person designated by the Investor to be appointed to the board of directors of each of the WFOE and the PRCCo.

9.7 <u>Business Development</u>. The Company shall use its reasonable best efforts to, within three (3) years after the Closing Date or such longer period of time as mutually agreed by the Company and the Investor, establish wireless uploading stations in each province of the PRC where the WFOE or the PRCCo currently conducts business operations, *provided* that the costs of establishing wireless uploading stations in any province shall be commercially reasonable and practicable.

9.8 <u>Compliance</u>. For so long as any share of the Series A Preferred Stock remains outstanding, the Company will comply with the terms and conditions of the Series A Certificate of Designations.

9.9 <u>Use of Proceeds</u>. The Company shall apply substantially all of the net proceeds from the issuance and sale of the Purchased Shares for working capital and capital expenditures in connection with expansion of the business.

9.10 <u>Transfer Taxes</u>. The Company shall pay any and all documentary, stamp or similar issue or transfer tax due on the issue of the Purchased Shares at Closing. The Sponsor Shareholders shall pay any and all documentary, stamp or similar issue or transfer tax due on the transfer of the Transferred Shares.

9.11 <u>Share Transfer</u>. The Sponsor Shareholders shall cause to be executed a share transfer agreement, in form and substance reasonably acceptable to the Investor, providing for the Share Transfer.

9.12 <u>Confidentiality; Public Disclosure</u>. Each Party shall hold in confidence the terms and existence of this Agreement, the Investor Rights Agreement, the Warrant and the Registration Rights Agreement and the transactions contemplated hereby and thereby and shall not disclose or make any release, announcement or filing except as such disclosure, release, announcement or filing as may be required by Law or the rules or regulations of any securities exchange, in which case the Party required to make the release or announcement shall, to the extent reasonably practicable, allow the other Party reasonable time to comment on such release or announcement in advance of such issuance.

34

9.13       Further Assurances. Each of the Investor and the Company will cooperate and consult with each other and use commercially reasonable efforts to prepare and file all necessary documentation, to effect all necessary applications, notices, petitions, filings and other documents, and to obtain all necessary permits, consents, orders, approvals and authorizations of, or any exemption by, all third Persons required to consummate the Transactions.

10.       Indemnification.

10.1       Survival. The representations and warranties of the Parties contained in this Agreement shall survive the Closing until the date three (3) years after the Closing, *provided, however*, that (i) the representations and warranties made pursuant to Sections 4.01, 4.02, 4.06, 4.07 and 4.23 shall survive indefinitely and (ii) the representations and warranties dealing with Tax matters shall survive until one hundred and twenty (120) days after the expiration of the relevant statute of limitations for the Tax liabilities in question.  All of the covenants and obligations of the Parties contained in this Agreement shall survive the Closing indefinitely.  Neither the period of survival nor the liability of a Party with respect to such Party's representations, warranties and covenants shall be reduced by any investigation made at any time by or on behalf of the other Parties.  If written notice of a claim setting forth reasonable details as to the basis of the claim has been given prior to the expiration of the applicable representations, warranties and covenants, then the relevant representations, warranties and covenants shall survive as to such claim, until such claim has been finally resolved.

10.2       Company Indemnification Obligation. The Company hereby agrees to indemnify the Investor and each of their respective officers, directors and employees, and each Person that controls (within the meaning of Section 20 of the Exchange Act) any of the foregoing Persons (each a "Investor Indemnified Party") against any claim, demand, action, liability, damages, loss, cost or expense (including, without limitation, consequential damages, diminution in value and reasonable legal fees and expenses incurred by such Investor Indemnified Party in investigating or defending any such proceeding) regardless of whether any of the foregoing results from a third-party claim or otherwise (all of the foregoing, including associated costs and expenses being referred to herein as a "Loss"), that it actually incurs in connection with any of the transactions contemplated hereby arising out of or based upon:

(a)       any of the representations or warranties made by the Company in Section 4 of this Agreement being untrue or incorrect (i) at the time such representation or warranty was made or (ii) on the Closing Date as if given as of the Closing Date (except, in each case, to the extent such representations or warranties are as of a date other than the date hereof or the Closing Date, in which case, the failure of any such representation or warranty to be true and correct as of that date);

(b)       any breach by the Company of any of its covenants, agreements or obligations under this Agreement, the Registration Rights Agreement, the Warrant, the Series A Certificate of Designations, or the Investor Rights Agreement;

35

(c)      any failure of the WFOE to comply with any Law with respect to any dividend distributions made by the WFOE, including without limitations, any foreign exchange regulations and rules;

(d)      any failure to by the Company obtain outdoor advertising registration with the SAIC or its local branches to the extent required by the SAIC; and

(e)      any failure by the Company or any of its Subsidiaries (i) to timely file any Tax Return; (ii) to timely pay any Tax as it became due, or (iii) to comply with any applicable Law relating to Tax.

10.3      <u>Sponsor Shareholders Indemnification Obligation</u>. The Sponsor Shareholders hereby agree, jointly and severally, to indemnify each Investor Indemnified Party against any Losses that it actually incurs in connection with any of the transactions contemplated hereby arising out of or based upon:

(a)      any of the representations or warranties made by the Sponsor Shareholders in Section 5 of this Agreement being untrue or incorrect (i) at the time such representation or warranty was made or (ii) on the Closing Date as if given as of the Closing Date (except, in each case, to the extent such representations or warranties are as of another date, in which case, the failure of any such representation or warranty to be true and correct as of that date);

(b)      any breach by the Sponsor Shareholders of any of its covenants, agreements or obligations under this Agreement, the Registration Rights Agreement or the Investor Rights Agreement; and

(c)      any failure of any of the Founder, Ou Wen Lin or Qingping Lin complete all filings and registrations with the SAFE in accordance with all applicable PRC Laws including without limitation the Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents to Engage in Financing and Inbound Investment Via Offshore Special Purpose Vehicles issued by the SAFE on October 21, 2005 and effective as of November 1, 2005.

10.4      <u>Limitation on Indemnification</u>.

(a)      The foregoing indemnification as set out in Sections 10.1 and 10.2 hereof shall not apply to any Loss to the extent that it arises out of, or is based upon, the gross negligence or willful misconduct of the Investor in connection therewith. Except with respect to the Put Option, Section 10.1 and Section 10.2 (and the other applicable provisions of Section 10) will be the sole and the exclusive remedy of the Investor Indemnified Parties with respect to the matters set forth in subsections (a) – (d) of Section 10.2 hereof, and, to the maximum extent possible under applicable Law, the Investor hereby waives any other rights and remedies that the Investor and the Investor Indemnified Parties may have under applicable Law.

36

(b)      Notwithstanding anything to the contrary contained in this Agreement: (a) neither the Company nor the Sponsor Shareholders shall be liable for any claim for indemnification pursuant to Section 10.1 or Section 10.2, unless and until the aggregate amount of indemnifiable Losses which may be recovered from the Company or the Sponsor Shareholders equals or exceeds US$100,000, whereupon the Investor Indemnified Party shall be entitled to indemnification for the full amount of such Losses, and (b) the maximum amount of indemnifiable Losses which may be recovered from the Company or the Sponsor Shareholders arising out of or resulting from the causes set forth in Section 10.1 or Section 10.2, as the case may be, shall be an amount equal to US$30,000,000, *provided*, *however*, that such amount shall be (i) increased by US$10,000,000 upon the exercise of all of the Purchased Warrants and, to the extent the Purchased Warrants are not fully exercised, increased by a pro rata proportion of US$10,000,000 equal to the proportion the amount of Purchased Warrants exercised bears to the total amount of Purchased Warrants and (ii) reduced on a dollar for dollar basis to the extent the Investor received any amounts from its exercise of the put right pursuant to Section 7 of the Investor Rights Agreement.

10.5          Conduct of Claims.

(a)      Whenever a claim for indemnification shall arise under this Section 10 as a result of a third-party claim, the party seeking indemnification (the "Indemnified Party"), shall notify the party from whom such indemnification is sought (the "Indemnifying Party") in writing of the claim and the facts constituting the basis for such claim in reasonable detail.

(b)      Such Indemnifying Party shall have the right to retain the counsel of its choice in connection with such claim and to participate at its own expense in the defense of any such claim; *provided*, *however*, that counsel to the Indemnifying Party shall not (except with the consent of the relevant Indemnified Party) also be counsel to such Indemnified Party. In no event shall the Indemnifying Party be liable for fees and expenses of more than one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances.

(c)      No Indemnifying Party shall, without the prior written consent of the Indemnified Parties (which consent shall not be unreasonably withheld), settle or compromise or consent to the entry of any judgment with respect to any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever in respect of which indemnification could be sought under this Section 10 unless such settlement, compromise or consent (A) includes an unconditional release of each Indemnified Party from all liability arising out of such litigation, investigation, proceeding or claim and (B) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party.

37

11. <u>Miscellaneous</u>.

11.1 <u>Governing Law</u>. This Agreement shall be governed in all respects by the laws of the State of State of Delaware without regard to any choice of laws or conflict of laws provisions that would require the application of the laws of any other jurisdiction.

11.2 <u>Jurisdiction; Enforcement</u>. Any dispute, controversy or claim arising out of or relating to this Agreement or its subject matter (including a dispute regarding the existence, validity, formation, effect, interpretation, performance or termination of this Agreement) (each a "<u>Dispute</u>") shall be finally settled by arbitration.

(a) The place of arbitration shall be Hong Kong, and the arbitration shall be administered by the Hong Kong International Arbitration Centre (the "<u>HKIAC</u>") in accordance with the HKIAC Administered Arbitration Rules then in force (the "<u>HKIAC Rules</u>").

(b) The arbitration shall be decided by a tribunal of three (3) arbitrators, whose appointment shall be in accordance with the HKIAC Rules; *provided*, *however*, that the third presiding arbitrator must be licensed to practice Delaware state law and in good standing with the Delaware State Bar, as of the date the Notice of Arbitration is received by the HKIAC Secretariat.

(c) Arbitration proceedings (including but not limited to any arbitral award rendered) shall be in English.

(d) Subject to the agreement of the tribunal, any Dispute(s) which arise subsequent to the commencement of arbitration of any existing Dispute(s), shall be resolved by the tribunal already appointed to hear the existing Dispute(s).

(e) The award of the arbitration tribunal shall be final and conclusive and binding upon the parties as from the date rendered.

(f) Judgment upon any award may be entered and enforced in any court having jurisdiction over a party or any of its assets.  For the purpose of the enforcement of an award, the parties irrevocably and unconditionally submit to the jurisdiction of any competent court and waive any defenses to such enforcement based on lack of personal jurisdiction or inconvenient forum.

38

11.3      <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing:

(a)      by either the Company or the Investor in the event that any Governmental Authority restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement shall have become final and non-appealable;

(b)      by the Investor if the Company or any Sponsor Shareholder shall have breached any of its representations, warranties, covenants or agreements contained in this Agreement which would give rise to the failure of a condition set forth in Section 7, which breach cannot be or has not been cured within thirty (30) days after the giving of written notice by the Investor specifying such breach; or

(c)      by the mutual written consent of the Company and the Investor.

In the event of termination of this Agreement as provided above, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except (a) as set forth in Section 12 and (b) that nothing herein shall relieve any party from liability for any breach of this Agreement occurring prior to such termination.

11.4      <u>Successors and Assigns</u>. Except as otherwise provided in this Agreement, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors, and administrators of the parties; *provided*, *however*, the rights of the Investor under this Agreement shall not be assignable to any Person without the consent of the Company.

11.5      <u>No Third-Party Beneficiaries</u>. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties any rights, remedies, obligations or liabilities under or by reason of this Agreement, and no Person that is not a party to this Agreement (including any partner, member, shareholder, director, officer, employee or other beneficial owner of any party, in its own capacity as such or in bringing a derivative action on behalf of a party) shall have any standing as third-party beneficiary with respect to this Agreement or the transactions contemplated by this Agreement.

11.6      <u>No Personal Liability of Directors, Officers, Owners, Etc</u>. No director, officer, employee, incorporator, shareholder, managing member, member, general partner, limited partner, principal or other agent of any of the Investor or the Company shall have any liability for any obligations of the Investor or the Company, as applicable, under this Agreement or for any claim based on, in respect of, or by reason of, the respective obligations of the Investors or the Company, as applicable, under this Agreement. Each party hereby waives and releases all such liability. This waiver and release is a material inducement to each party's entry into this Agreement.

39

11.7         Entire Agreement. This Agreement (including the exhibits hereto), the Registration Rights Agreement and the Investor Rights Agreement, constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and thereof.

11.8         Notices. Except as otherwise provided in this Agreement, all notices, requests, claims, demands, waivers and other communications required or permitted under this Agreement shall be in writing and shall be mailed by reliable overnight delivery service or delivered by hand, facsimile or messenger as follows:

if to the Company:

China MediaExpress Holdings, Inc.
Room 2805
Central Plaza
Wanchai, Hong Kong
Attention: Zheng Cheng and Jacky Lam
Facsimile: +852.2827.6099

with a copy to:

Loeb & Loeb LLP
345 Park Avenue
New York, NY 10145, U.S.A.
Attention: Mitchell S. Nussbaum / Frank J. Marinaro
Facsimile: +1.212.656.1349

if to the Investor

Starr Investments Cayman II, Inc.
Bermuda Commercial Bank Building, 5th Floor
19 Par la Ville Road
Hamilton HM 11
Bermuda
Attention: Stuart Osbourne / Jenny Barclay

with a copy to:

Starr Investments Cayman II, Inc.
c/o Beijing C.V. Starr Investment Advisors Limited Shanghai Branch
Suite 4609-4611A, Tower II, Plaza 66,
1266 Nanjing West Road,
Shanghai 200040 People's Republic of China
Attention: John Lin / Dorothy Dong
Facsimile: +8621.6288.9773

40

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
30th Floor, Tower 2, China World Trade Centre
No. 1 Jianguomenwai Avenue
Beijing 100004 People's Republic of China
Attention:  Jon L Christianson
Facsimile:  +8610.6535.5577

or in any such case to such other address, facsimile number or telephone as either party may, from time to time, designate in a written notice given in a like manner. Notices shall be deemed given when actually delivered by overnight delivery service, hand or messenger, or when received by facsimile if promptly confirmed.

11.9        <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement shall impair any such right, power, or remedy of such party, nor shall it be construed to be a waiver of or acquiescence to any breach or default, or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default. All remedies, either under this Agreement or by law or otherwise afforded to any holder, shall be cumulative and not alternative.

11.10       <u>Expenses</u>. Each Party shall bear its own expenses incurred on their behalf with respect to this Agreement and the transactions contemplated hereby, except as otherwise provided in Section 7.12.

11.11       <u>Amendments and Waivers</u>. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only if such amendment or waiver is in writing and signed, in the case of an amendment, by the Company and the Investor or, in the case of a waiver, by the Party against whom the waiver is to be effective. Any amendment or waiver effected in accordance with this paragraph shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding, each future holder of all such securities, and the Company.

11.12       <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and signatures may be delivered by facsimile or in electronic format, each of which may be executed by less than all the parties, each of which shall be enforceable against the parties actually executing such counterparts and all of which together shall constitute one instrument.

11.13       <u>Severability</u>. If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable, or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement and the balance of this Agreement shall be enforceable in accordance with its terms.

41

11.14        <u>Titles and Subtitles; Interpretation</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. When a reference is made in this Agreement to an Article, Section, Schedule or Exhibit, such reference shall be to an Article, Section, Schedule or Exhibit of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to in this Agreement means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes. Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if it is drafted by each of the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

42

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

CHINA MEDIAEXPRESS HOLDINGS, INC.

By: */s/ Zheng Cheng*
     Name: Zheng Cheng
     Title:

FUJIAN ZONGHENG EXPRESS
INFORMATION TECHNOLOGY, LTD.

By: */s/ Zheng Cheng*
     Name: Zheng Cheng
     Title:

FUJIAN FENZHONG MEDIA CO., LTD.

By: */s/ Zheng Cheng*
     Name: Zheng Cheng
     Title:

ZHENG CHENG

*/s/ Zheng Cheng*

OU WEN LIN

*/s/ Ou Wen Lin*

QINGPING LIN

*/s/ Qingping Lin*

[*Signature Page to Securities Purchase Agreement*]

THOUSAND SPACE HOLDINGS LIMITED

By:   */s/ Ou Wen Lin*
      Name: Ou Wen Lin
      Title:

BRIGHT ELITE MANAGEMENT LIMITED

By:   */s/ Qingping Lin*
      Name: Qingping Lin
      Title:

STARR INVESTMENTS CAYMAN II, INC.

By:   */s/ Stuart Osborne*
      Name: Stuart Osborne
      Title: Director

[*Signature Page to Securities Purchase Agreement*]

**EXHIBIT A**

**Form of Series A Preferred Certificate of Designations**

**EXHIBIT B**

<u>**Form of Registration Rights Agreement**</u>

**EXHIBIT C**

<u>**Form of Investor Rights Agreement**</u>

**EXHIBIT D**

**Form of Warrant**

**EXHIBIT E**

**Form of Legal Opinion of Hankun Law Office**

**EXHIBIT F**

**Form of Legal Opinion of Morris, Nichols, Arsht & Tunnell**

**EXHIBIT G**

<u>**Form of Legal Opinion of Loeb & Loeb LLP**</u>

**EXHIBIT H**

**Form of Legal Opinion of Gallant Y.T. Ho & Co.**

**EXHIBIT I**

**Disclosure Letter**

8-K 1 v173051_8k.htm

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C. 20549
_____

### FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported)  January 28, 2010

### CHINA MEDIAEXPRESS HOLDINGS, INC.
(Exact Name of Registrant as Specified in Charter)

| Delaware | 001-33746 | 20-8951489 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| Room 2805, Central Plaza, Wanchai Hong Kong | N/A |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code:  +852 2827 6100

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02      Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

Effective upon the closing of the previously announced investment by Starr International Company, Inc. ("Starr") on January 28, 2010, Ms. Dorothy Dong was appointed as a director to serve on the Board of Directors of China MediaExpress Holdings, Inc. (the "Company").

Ms. Dong has been a Managing Director at C.V. Starr Investment Advisors (Asia) Ltd. since December 2007 and for seven months prior to that acted as Vice President at AIG Private Equity, a division of American International Group, Inc., an international insurance and investment company.  From December of 2002 to March of 2007, Ms. Dong was a Director of Anglo Chinese Corporate Finance Limited, an investment banking advisory firm, and the General Manager of its Shanghai operation.  Ms. Dong currently serves on the board of directors of Changeng Axle (China) Co. Ltd. and Guangzhou Techpool Pharmaceutical Co. Ltd.  Ms. Dong holds an LLB in Business Law from Shanghai University, an MBA from McGill Univesity and is a Chartered Financial Analyst.

Ms. Dong has no family relationships with any of the executive officers or directors of the Company. Ms. Dong's appointment was effected pursuant to the terms of the Securities Purchase Agreement previously entered into between the Company and Starr. There have been no transactions in the past two years to which the Company or any of its subsidiaries was or is to be a party, in which Ms. Dong had, or will have, a direct or indirect material interest.

2

**SIGNATURES**

       Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**CHINA MEDIAEXPRESS HOLDINGS, INC.**

Date:  February 3, 2010

By: */s/ Jacky Wai Kei Lam*
       Name:  Jacky Wai Kei Lam
       Title:    Chief Financial Officer

3

       http://www.sec.gov/Archives...